## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAKE THE ROAD NEW YORK, 301 Grove St. Brooklyn, New York 11237;<br><br>LA UNION DEL PUEBLO ENTERO, 1601 East US-83 BUS, San Juan, Texas 78589; and<br><br>WECOUNT!, 201 N. Krome Ave., 2nd Floor, Homestead, FL 33030<br><br>*Plaintiffs*,<br><br>v.<br><br>KEVIN MCALEENAN, Acting Secretary of the Department of Homeland Security, in his official capacity, 1300 Pennsylvania Avenue NW, Washington, DC 20528;<br><br>MATTHEW T. ALBENCE, Acting Director of United States Immigration and Customs Enforcement, in his official capacity, 500 12th St., SW, Washington, D.C. 20536;<br><br>KENNETH T. CUCCINELLI, Acting Director of United States Citizenship and Immigration Services, in his official capacity, 111 Massachusetts Ave., NW, Washington, DC 20001;<br><br>MARK MORGAN, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity, 1300 Pennsylvania Avenue, NW, Washington, DC 20229; and<br><br>WILLIAM BARR, Attorney General of the United States, in his official capacity, 950 Pennsylvania Avenue, NW, Washington, DC 20530, *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 19-cv-2369<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Violation of Immigration and Nationality Act, Administrative Procedure Act, Due Process, and Suspension Clause)

**INTRODUCTION**

1.      This case concerns the Trump Administration's recent decision to dramatically

expand "expedited removal," under which low-level Department of Homeland Security ("DHS")

immigration officers summarily deport individuals from the United States without any court

hearing or opportunity for meaningful review.  DHS deports individuals subject to expedited

removal soon after apprehension, without any opportunity to speak with an attorney; to gather

evidence or call witnesses; or to present a claim for relief from removal, other than a truncated

process for expressing fear of persecution.

2.      The expedited removal process is a major departure from a consistent century-

long norm of providing all noncitizens within the United States with notice, access to counsel, an

opportunity to prepare, and a contested hearing when they face removal.  Since it was created

two decades ago, federal immigration authorities have only authorized the use of expedited

removal in limited circumstances: to noncitizens who are seeking admission at a port of entry,

who have been apprehended near the border shortly after they entered the country, or who arrive

in the United States by sea.

3.      On July 23, 2019, without providing notice or an opportunity for public comment,

the Administration abruptly issued a new rule that dramatically expanded the reach of expedited

removal to individuals located anywhere in the country who cannot prove they have been

continuously present in the United States for more than two years.  *See* Notice Designating

Aliens for Expedited Removal, 84 Fed. Reg. 35409 (July 23, 2019) ("July 23 Rule" or "Rule").

4.      No prior Administration has authorized such broad use of expedited removal

against noncitizens who have resided in the country for significant periods or who have been

apprehended in the interior of the country, far from the border.  And at least one prior

administration decided against expanding expedited removal in this way given concerns that it would be illegal.[1]

5. On January 25, 2017, President Trump signed an Executive Order that directed then-Secretary of Homeland Security, John Kelly, to take action to apply expedited removal to the group of people covered in the July 23 Rule. Exec. Order No. 13767, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8793 (Jan. 30, 2017) ("Executive Order").

6. Less than a month later, Secretary Kelly announced that he would issue a rule expanding expedited removal. However, DHS took no action for more than two years.

7. On July 23, 2019, Acting Secretary Kevin K. McAleenan issued the new rule. Effective immediately, it permits the use of expedited removal against noncitizens residing anywhere in the country who are unable to prove to an immigration officer that they have been continuously present in the United States for two years or more and who an immigration officer believes is inadmissible based on lack of valid entry documents, or fraud or misrepresentation in connection with their entry.

8. The Administration's unprecedented decision to expand expedited removal to a vast group of noncitizens apprehended anywhere in the United States, and to noncitizens who have been living in the country for long periods, disregards twenty years of experience showing that the expedited removal process, even at the border, is rife with errors and results in widespread violations of individuals' legal rights. That experience shows that the government has erroneously deported numerous individuals through expedited removal, including U.S.

---

[1] Alan Gomez, *Trump's Quick Deportation Plan May Be Illegal, Past Immigration Chiefs Say*, USA Today (Feb. 26, 2017 1:00 P.M. ET), https://www.usatoday.com/story/news/nation/2017/02/24/president-trumps-expedited-removal-plan-may-be-illegal/98276078/.

citizens and individuals with bona fide fears of persecution in their countries of origin.

Numerous reports, including a comprehensive study commissioned by Congress, have

extensively documented the widespread abuse and serious flaws in the expedited removal

process.

9.      The unprecedented expansion means that low-level DHS officers can now

immediately subject hundreds of thousands of additional individuals to expedited removal,

without any consideration of their family ties—including ties to U.S. citizen or lawful permanent

resident family members—or their strong ties to their communities.  Countless more noncitizens

will likely have expedited removal erroneously applied to them, because current procedures

place the burden of proof on the individual to show that he or she is not subject to expedited

removal, yet fail to provide time or a meaningful opportunity for the individual to do so.

10.     The Administration has taken this far-reaching step by publishing a directive in

the Federal Register, styled as a Notice, which took immediate effect upon publication.  In so

doing, the Administration bypassed the notice-and-comment and grace periods required by the

Administrative Procedure Act ("APA") for regulatory changes of this nature, depriving the

public an opportunity to comment prior to expansion even though it easily could have done so

during the two-plus years between the Executive Order and the issuance of the new rule.

11.     In addition to violating the APA, expanding expedited removal to individuals

apprehended in the interior of the United States who have been living in the country for extended

periods of time violates the Due Process Clause of the Fifth Amendment, because it deprives

them a meaningful opportunity and process to contest removal before they are deported.

Likewise, the expanded use of expedited removal violates federal statutes requiring that

noncitizens appearing before an immigration officer or immigration judge be permitted to be represented by counsel.

12.     Expanding expedited removal is also arbitrary and capricious.  The Administration has provided inadequate reasons to justify the decision to change the long-standing policies, and has not considered, let alone addressed, the serious due process concerns and grave risk of error created by the expansion of expedited removal.

13.     Finally, if there is no judicial review, by habeas corpus or otherwise, of individual expedited removal orders, then the statute, as expanded, violates the Suspension Clause.

14.     The July 23 Rule is illegal.  Without relief from this Court, hundreds of thousands of individuals living anywhere in this country are at risk of being separated from their families and expelled from the country without any meaningful process.

## JURISDICTION AND VENUE

15.      This case arises under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.* and its implementing regulations; and the Convention Against Torture ("CAT"), the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

16.     The Court has jurisdiction under 8 U.S.C. § 1252(e)(3).  Section 1252(e)(3) is a provision of the INA that provides jurisdiction in the United States District Court for the District of Columbia over "[c]hallenges [to the] validity of the system," including regulations and "written" policies regarding expedited removal.  The Court also has jurisdiction under 28 U.S.C. § 1331.

17.     Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all § 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendants are officers of the United States being sued in their official capacity and reside in the District.

## PLAINTIFFS

18.     Plaintiff Make the Road New York ("MRNY") is a nonprofit, membership-based community organization with five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

19.     MRNY's mission is to build the power of immigrant and working class communities to achieve dignity and justice.

20.     MRNY's members are subject to the July 23 Rule's expansion of expedited removal.

21.     Plaintiff *La Unión del Pueblo Entero* ("LUPE") is a nonprofit, membership-based community union with offices in several South Texas locations including San Juan, Alton, and Mercedes.

22.     Part of LUPE's mission is to advocate for fair, humane, and sensible policies that impact immigrant communities.

23.     LUPE's members are subject to the July 23 Rule's expansion of expedited removal.

24.     Plaintiff WeCount! is a nonprofit, membership-based organization with offices in South Florida.

25.     WeCount!'s mission is to build the power of the immigrant community through education, support, and collective action.

26.     WeCount!'s members are subject to the July 23 Rule's expansion of expedited removal.

27.     Defendant Kevin McAleenan is sued in his official capacity as the Acting Secretary of DHS.  In this capacity, he directs each of the component agencies within DHS, including United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP").  In his official capacity, Defendant McAleenan is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to designate categories of noncitizens subject to expedited removal and to grant asylum or other relief.

28.     Defendant Matthew T. Albence is sued in his official capacity as Acting Director of ICE, which is the agency responsible for the enforcement of the immigration laws, including the apprehension and detention of noncitizens, in the interior of the United States.

29.     Defendant Mark Morgan is sued in his official capacity as the Acting Commissioner of CBP, the agency responsible for the initial processing and detention of noncitizens who are apprehended at or near the border and placed in expedited removal proceedings.

30.     Defendant Kenneth T. Cuccinelli is sued in his official capacity as the Acting Director of USCIS, which is the agency that, through its asylum officers, conducts interviews of certain individuals placed in the expedited removal process to determine whether they have a

credible fear of persecution and therefore are entitled to have a hearing before an immigration judge in which they can apply for relief and protection from removal.

31.     Defendant William Barr is sued in his official capacity as the Attorney General of the United States.  In this capacity, he is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office for Immigration Review ("EOIR") (the administrative immigration court system), and is empowered to grant asylum or other relief.

## FACTS

### A.  The Trump Administration's Decision to Expand Expedited Removal.

32.     On January 25, 2017, President Trump signed an Executive Order titled "Border Security and Immigration Enforcement Improvements."  In relevant part, the Executive Order emphasizes that "[i]t is the policy of the executive branch to . . . expedite determinations of apprehended individuals' claims of eligibility to remain in the United States."  *See* Executive Order, §§ 1, 2(c).

33.     Consistent with the President's goal of deporting millions of immigrants from the United States,[2] section 11(c) of the Executive Order directs the DHS Secretary to take action to apply expedited removal to certain noncitizens arrested anywhere within the United States who have been continuously present for less than two years: "[p]ursuant to section 235(b)(1)(A)(iii)(I) of the INA, the Secretary [of Homeland Security] shall take appropriate action to apply, in his sole and unreviewable discretion, the provisions of section

---

[2] Amy B. Wang, *Donald Trump Plans To Immediately Deport 2 million to 3 million Undocumented Immigrants*, Wash. Post (Nov. 14, 2016), https://www.washingtonpost.com/news/the-fix/wp/2016/11/13/donald-trump-plans-to-immediately-deport-2-to-3-million-undocumented-immigrants/.

235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II) [8 U.S.C. § 1225(b)(1) (A)(iii)(I)]."

34.     On February 20, 2017, then-DHS Secretary John Kelly issued a memorandum addressing the expansion of expedited removal.  John Kelly, Dep't of Homeland Sec., Memorandum Implementing the President's Border Security and Immigration Enforcement Improvements Policies 5-7 (2017).  The Secretary stated: "To ensure the prompt removal of aliens apprehended soon after crossing the border illegally, the Department will publish in the *Federal Register* a new Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(l)(a)(iii) of the Immigration and Nationality Act, which may, to the extent I determine is appropriate, depart from the limitations set forth in the designation currently in force." *Id.* at 7.

35.     More than two years later, on July 23, 2019, DHS published a Federal Register Notice that authorized the application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for longer than two years.  *See* July 23 Rule, 84 Fed. Reg. at 35409.

36.     As a result, hundreds of thousands of noncitizens who have resided in the country for less than two years continuously are at imminent risk of deportation without any hearing or meaningful review, regardless of their ties to the United States, or the availability of claims for relief from and defenses to removal.  Even individuals who are not properly subject to expedited removal (for example, U.S. citizens or individuals who have been continuously present for more than two years)—or to removal at all—can be summarily removed if they are unable to prove that fact to the satisfaction of an immigration officer.

37.     DHS declared that the July 23 Rule would go into effect immediately, without providing any advance notice or public comment period, even though the government waited to act for over 30 months from the January 25, 2017 Executive Order that originally announced its intention to expand expedited removal.

38.     There are no special circumstances that would justify the government's failure to provide advance notice of its decision, and to allow for and respond to public comment prior to the effective date of the expansion.  The Rule cites only a generalized "concern[] that delayed implementation could lead to a surge in migration across the southern border during a notice-and-comment period."  84 Fed. Reg. at 35413.  But the Rule does not cite a single piece of evidence to support such a concern.  And the government already has sufficient tools to cope with any such imagined "surge," without expanding expedited removal, including the pre-existing expedited removal scheme, which has applied to recent entrants to the United States for the past fifteen years.

**B.  History of Expedited Removal.**

39.     The Administration's decision to apply expedited removal to noncitizens who have resided in this country for extended periods of time marks a significant departure from past immigration policy and practice.

40.     Prior to 1996, noncitizens generally were entitled to a full hearing in immigration court before they could be removed, whether they were seeking entry at the border or had already entered the country.  They also were entitled to administrative appellate review before the Board of Immigration Appeals ("BIA" or "Board") and judicial review in federal court.

41.     In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA").  The Act generally retained the procedures for removal hearings

for all noncitizens—i.e., full immigration court hearings, appellate review before the BIA, and federal court review.  8 U.S.C. § 1229a; 8 U.S.C. § 1252(a) *et seq.*  In these removal proceedings (commonly referred to as "Section 240" proceedings), the noncitizen has a number of procedural rights, including the right to an adversarial hearing before an Immigration Judge ("IJ"), and the right to retain and be represented by counsel.  The noncitizen can contest the factual and legal allegations against him or her and apply for relief from removal, including asylum.  The noncitizen also can move to terminate the proceedings or suppress evidence based on an unlawful arrest.  Moreover, noncitizens in Section 240 proceedings are entitled to an administrative appeal to the BIA along with an automatic stay of deportation while the appeal is pending, and to seek judicial review of an adverse administrative decision by filing a petition for review in the court of appeals.

42.     IIRIRA also created the highly truncated removal process called "expedited removal" for certain individuals coming to the United States who are inadmissible because they engaged in fraud or misrepresentation to procure admission or other immigration benefits, 8 U.S.C. § 1182(a)(6)(C), or they lack the requisite documents for admission at all, § 1182(a)(7). *See* 8 U.S.C. § 1225(b)(1).

43.     Noncitizens subjected to expedited removal are ordered removed by an immigration officer "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i). Individuals who express a fear of persecution or an intention to apply for asylum are entitled to an additional screening process, *see* 8 U.S.C. § 1225(b)(1), but nothing remotely approaching a full immigration court hearing unless they pass the screening.  If they pass the screening, the expedited removal order is cancelled and they are permitted to apply for asylum and any other

form of relief or protection for which they are eligible in full Section 240 proceedings.  *See* 8

U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30(f); Imm. Court Practice Manual Chapter 7.4(d)(ii)(B).

44.     Congress initially authorized the use of expedited removal for individuals who

were applying for admission at a port of entry.  *See* 8 U.S.C. § 1225(b)(1).

45.     IIRIRA also included a provision allowing the Attorney General to apply

expedited removal to individuals who had entered the country but had never been officially

admitted—i.e., individuals who had crossed the border without presenting themselves for

inspection.  *See* 8 U.S.C. § 1225(b)(1).  Under that provision, the Attorney General could apply

expedited removal to noncitizens residing anywhere in the United States who cannot prove to an

immigration officer's "satisfaction" that they have been continuously physically present for two

years and were lawfully admitted or paroled into the country.  *See*

8 U.S.C. § 1225(b)(1)(A)(iii)(II), 8 C.F.R. § 235.3(b)(6).  As with noncitizens who presented at

the border, Congress specified that noncitizens in the interior could be subject to expedited

removal only if they were inadmissible for having committed certain forms of immigration fraud

or lacking the required documents.

46.     However, IIRIRA provided that, before the Attorney General could apply

expedited removal to noncitizens apprehended inside the country, the Attorney General would

have to affirmatively designate which noncitizens would be included.  *See* 8 U.S.C. § 1225(b)(1)

(A)(iii)(I).[3]

---

[3] Under the Homeland Security Act of 2002, the Immigration and Naturalization Service
("INS"), under the direction of the Attorney General, ceased to exist and its functions were
transferred to DHS, effective March 1, 2003.  *See* Homeland Security Act of 2002, Pub. L. No.
107-296, 116 Stat. 2135 (Nov. 25, 2002).  As a result, statutory references to the INS or its
officers are deemed to have been replaced by reference to DHS or the applicable DHS official.
*See* 6 U.S.C. § 557.

47.     No prior Administration has ever sought to apply expedited removal as broadly as this Administration.

48.     From the time the expedited removal provisions took effect in 1997 until 2002, the government did not apply expedited removal to individuals who had entered the country at all.  Instead, it applied expedited removal only to inadmissible noncitizens arriving at ports of entry.  *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures; Final Rule, 62 Fed. Reg. 10311 (Mar. 6, 1997).

49.     In 2002, the government first invoked its authority to apply expedited removal to persons already inside the country, but limited application to a narrow group of individuals who arrived by *sea* without being admitted or paroled and were apprehended within two years of entry.  *See* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002).

50.     Beginning in 2004, the government authorized the application of expedited removal to individuals who entered by means other than sea, but only if they were apprehended within 100 miles of a land border and were unable to demonstrate that they had been continuously physically present in the United States for 14 days.  *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877, 48879 (Aug. 11, 2004).

51.     Thus, between 1997 and 2017, with the limited exception of noncitizens who arrived by sea, immigration authorities never sought to apply expedited removal to noncitizens apprehended far from the border, or individuals anywhere in the United States (including near the border) who had been residing in the country for more than fourteen days.

**C.  The Expedited Removal Process.**

52.     The expedited removal statute provides that the process begins—and often effectively concludes—with an inspection by an immigration officer.  That officer must, first, determine if the individual is a noncitizen who is inadmissible because he or she has engaged in certain kinds of fraud or lacks valid entry documents. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

53.     If an individual claims to be a U.S. citizen, to have been admitted as a lawful permanent resident or refugee, or to have been granted asylum (in which case the individual cannot be subject to expedited removal), then the individual is entitled to limited additional review.  *See* 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5).

54.     Otherwise, if the officer concludes that the individual is inadmissible under an applicable ground, the officer "shall," with the concurrence of a supervisor, 8 C.F.R. § 235.3(b)(7), order the individual removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution."  8 U.S.C. § 1225(b)(1)(A)(i).

55.     Thus, a low-level DHS officer can order the removal of an individual who has been living in the United States with virtually no administrative process—just completion of cursory paperwork—based only on the officer's own conclusions that the individual has not been admitted or paroled, that the individual has not adequately shown the requisite continuous physical presence, and that the individual is inadmissible on one of the two specified grounds.

56.     At any time during the expedited removal process, the officer may permit the individual to withdraw his or her application for admission and allow the person to depart the

13

country without issuing an expedited removal order. 8 U.S.C § 1225(a)(4).  However, noncitizens are seldom advised of this option.

57.     For those who fear return to their countries of origin, the expedited removal statute provides a limited additional screening.  But the additional screening does not remotely approach the type of process that asylum seekers receive in regular Section 240 immigration proceedings.

58.     During the inspection process, if an individual indicates an intention to apply for asylum or expresses fear of return to his or her country of origin, the immigration officer must refer the individual for a rudimentary screening interview with an asylum officer, referred to as a "credible fear" interview, to determine whether the individual should be able to apply for asylum and related humanitarian relief.  8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. § 235.3(b)(4); 8 C.F.R. § 208.30(d)-(e).

59.     To prevail at the credible fear interview, the applicant must show "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum."  8 U.S.C. § 1225(b)(1)(B)(v).

60.     Applicants who satisfy the credible fear standard have their expedited removal orders cancelled by operation of law and are placed into Section 240 removal proceedings, where they have the opportunity to apply for asylum and other relief from removal, present and cross-examine evidence before an Immigration Judge, preserve objections, and appeal any adverse decision to the BIA and court of appeals.  8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

61.     Applicants who do not pass the credible fear interview may request review of the decision by an IJ, but do not receive a full hearing or any subsequent administrative appellate review.  8 U.S.C. § 1225(b)(1)(B)(iii)(II)-(III); *see also* 8 C.F.R. § 208.30(g)(1).  During the inspection and credible fear stages of expedited removal, DHS generally detains the noncitizen. 8 C.F.R. §§ 235.3(b)(2)(iii), (b)(4)(ii).

62.     An expedited removal order comes with significant consequences beyond removal itself.  Noncitizens who are issued expedited removal orders are subject to a five-year bar on admission to the United States unless they qualify for a discretionary waiver.  8 U.S.C. § 1182(a)(9)(A)(i); 8 C.F.R. § 212.2.  Similarly, noncitizens issued expedited removal orders after having been found inadmissible based on misrepresentation are subject to a lifetime bar on admission to the United States unless they are granted a discretionary exception or waiver.  8 U.S.C. § 1182(a)(6)(C).

**D. Widespread Flaws in the Government's Expedited Removal Policies.**

63.     The government's expedited removal policies already suffer from numerous serious deficiencies.  This expansion will only result in more erroneous removals and rights violations.  Any individual may be apprehended by immigration authorities in any location and summarily removed without a meaningful process to test whether that individual is properly subject to arrest, to expedited removal, or even to removal at all.

*Flaws in the Procedures for Inspection by Immigration Officers*

64.     Under expedited removal, an individual who seeks to contest many of the critical factual or legal requisites for expedited removal—the lack of alienage, admission or parole, inadmissibility, or the requisite continuous physical presence in the country—receives no meaningful opportunity to do so.  The individual bears the burden of proving certain critical

facts.  *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (noncitizen must show continuous presence to

"satisfaction of" immigration officer); 8 C.F.R §§ 253.3(b)(1)(ii) (burden on noncitizen to show

continuous presence), (b)(6) (same as to parole or admission). The individual is not provided

with any time to prepare; any means by which to gather evidence, present witnesses, or review or

cross-examine DHS' evidence; nor any right to counsel recognized by the government or time to

obtain counsel—all in sharp contrast to regular removal proceedings where individuals are

entitled to such safeguards.

65.    For individuals who have been residing in the country for an extended period or

who are apprehended far from the border, the risk of error in the expedited removal process is

particularly high.

66.    For example, DHS puts the burden on the individual to show "to the satisfaction

of an immigration officer" that the length of the individual's continuous presence makes the

individual ineligible for expedited removal.  *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8 C.F.R

253.3(b)(1)(ii). Thus, the government imposes a default presumption that, in the absence of any

affirmative evidence, any individual arrested anywhere in the country is a noncitizen who has not

been continuously present for two years or more.

67.    That presumption makes no sense when applied to individuals apprehended in the

interior of the United States.  Indeed, of the approximately 11 million undocumented immigrants

residing in this country less than 4% arrived less than two years ago without having been

admitted or paroled.  That means that nearly 96% of the undocumented immigrants that DHS

might apprehend cannot properly be removed pursuant to expedited removal.  Yet, the Rule

presumes all are subject to expedited removal, and requires them to show not only that they have

been here for two years, but also that they have been here *continuously* in that period, in order to avoid its application.

68.     Moreover, under the government's policies, individuals faced with proving that they have been continuously physically present in the United States for longer than two years are not guaranteed any time or opportunity to gather evidence that would establish that fact.  That is so even though individuals who are going about their daily lives—attending religious services, taking their children to school, attending community events, or even simply grocery shopping— are extremely unlikely to be carrying the necessary documentary evidence on their persons.

69.     The government's policies and interpretations of the statute and regulations fail to afford these individuals, who are detained during the inspection process, with time or any opportunity to gather the necessary evidence, nor even the ability to make a telephone call to someone who could help.  The inspecting officer is not required to make any independent effort to corroborate or verify any information, unless the individual makes a claim to U.S. citizenship; to lawful permanent resident, refugee, or asylee status; or to having been admitted or paroled.

70.     In addition, the government's expedited removal policies fail to require that the immigration officer assess individuals to ensure that they are mentally competent or otherwise have the capacity to participate in the inspections process, and they fail to require additional safeguards should an individual be found to have competency or capacity issues.

71.     Likewise, in the expedited removal process, a noncitizen's removability is determined by a low-level immigration enforcement officer who acts as both prosecutor and judge, rather than by a neutral adjudicator, as required in regular removal proceedings.  *See* 8 U.S.C. § 1225(b)(1)(A)(i).

72.     In addition, the expedited removal policies fail to provide an opportunity for a noncitizen to raise claims that his or her arrest violated a statutory or constitutional requirement.

73.     Over the last two decades, extensive studies have demonstrated that the expedited removal process deprives individuals of a meaningful opportunity to show that they are not subject to expedited removal, or to removal at all.  The government is well aware of the widespread inadequacies and flaws in the expedited removal process, and yet has failed to adequately address the problem.  Expanding this process to alleged noncitizens apprehended in the interior of the United States and who are alleged to have resided in the country for up to two years is certain to result in even more widespread erroneous removals.

74.     For example, a 2005 study commissioned by Congress documented numerous "serious problems" in the expedited removal process "which put some asylum seekers at risk of improper return."  U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 4, 10 (2005), a*vailable at* https://bit.ly/1GkjQfK ("2005 USCIRF Study").

75.      A 2016 follow-up study "revealed continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create, including: flawed Border Patrol internal guidance that conflates CBP's role with that of USCIS; certain CBP officers' outright skepticism, if not hostility, toward asylum claims; and inadequate quality assurance procedures."  *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* 2 (2016), *available at* https://bit.ly/2uydMQ8 ("2016 USCIRF Study").

76.     Specifically, multiple reports have documented that immigration enforcement officers routinely make factual errors in completing the forms required for expedited removal.

Although the officers are required to take sworn statements from the individual, the sworn statements that are recorded in the forms are "often inaccurate and nearly always unverifiable." 2005 USCIRF Study, at 53, 55, 74; *see also* 2016 USCIRF Study, at 21.  The officer taking the sworn statement is often the person translating as well.  Asylum officers, who review expedited removal forms in the course of conducting credible fear interviews, have reported that the forms filled out by immigration enforcement officers commonly contain egregious inaccuracies.  *See, e.g.*, Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border* 13 (2017) ("Borderland Report"), https://bit.ly/2ZxInuV (describing evidence "that CBP affidavits are often inconsistent with asylum-seekers' own accounts").

77.     Asylum officers also have reported seeing many forms with identical answers, and others with clearly erroneous ones—such as forms indicating that a male noncitizen was asked and answered whether he was pregnant.  *See, e.g.*, 2016 USCIRF Study, at 20-22.

78.     Such factual errors are the natural consequence of a system bereft of necessary procedural protections.  Furthermore, the government's expedited removal policies fail to provide any adequate check against immigration enforcement officers' failure to comply with required procedures, such as giving the individual an opportunity to review and respond to the statements in the requisite expedited removal forms.  For example, asylum seekers commonly report that immigration enforcement officers failed to read their statements back to them but nonetheless pressured them to sign documents.  *See, e.g.*, 2016 USCIRF Study, at 20-22.  As a result, individuals routinely are deprived of any opportunity to correct errors in their statements before signing.

79.     Multiple reports have documented that immigration enforcement officers have routinely employed coercive tactics to force non-English speaking individuals to sign expedited removal forms in English, without any translation or interpretation.  For example, when one individual refused to sign the expedited removal forms and asked to speak to a judge, the immigration officer told him: "Here, I'm the judge, the attorney, and the one who is going to deport you."  American Civil Liberties Union, *American Exile: Rapid Deportations that Bypass the Courtroom* 35-36 (2014) ("American Exile"), https://bit.ly/2GPKeE9; *see also, e.g.*, Borderland Report at 13 ("[I]ndividuals are forced to sign legal documents in English without translation."); American Exile, at 34-36 (describing noncitizens who were required to sign forms in languages they do not understand).

80.     Multiple other reports have documented immigration enforcement officers engaging in flagrant intimidation to pressure asylum seekers not to express a fear of return.  For example, officers often accuse asylum seekers of lying, falsely tell asylum seekers that they have no right to seek asylum, inform asylum seekers that they will be jailed if they continue to assert a fear of return and refuse to sign the expedited removal order, or prematurely assert that the asylum seekers' claim will not succeed.

81.     The lack of any meaningful administrative review also contributes to errors.  For example, although current regulations technically require a supervisor to review the issuance of an expedited removal order, that requirement is limited to review of the paperwork—which, as described above, is often rife with errors and inaccuracies—and does not provide any independent review of the facts or corroboration of the immigration officer's representations. *See* 8 C.F.R. § 235.3(b)(7).  The government also takes the position that expedited removal orders are not subject to federal court review.

82.     Among the most troubling problems is the widespread failure of immigration enforcement officers to refer noncitizens who express a fear of persecution for interviews with asylum officers, a problem for which the expedited review system offers no recourse.  As a result, numerous asylum seekers have been erroneously removed without any opportunity to speak with an asylum officer or apply for asylum.

83.     A study commissioned by Congress found that in 15% of observed cases, when a noncitizen expressed a fear of return to an immigration officer during the inspections process, the officer failed to refer the individual to an asylum officer for a credible fear interview.  2005 USCIRF Study, at 53-54.  Another study found that of the numerous individuals interviewed who reportedly told a CBP officer of their fear of return, fewer than half were referred for a credible fear interview before being summarily removed.  *See* Human Rights Watch, *You Don't Have Rights Here* (2014), https://bit.ly/1GocBhZ ("[S]ome said that US border officials ignored their expressions of fear and removed them with no opportunity to have their claims examined; others said border officials acknowledged hearing their expressions of fear but pressured them to abandon their claims.").

84.     Numerous other reports have reached the same conclusion.  *See, e.g.*, Borderland Report, at 12 ("CBP and Border Patrol officers in the El Paso Sector routinely and intentionally discourage people from seeking asylum.  In 12% of the cases documented for this report, individuals expressing fear of violence upon return to their country of origin were not processed for credible fear screenings and instead, were placed into removal proceedings."); American Exile, at 4, 32-33 (recounting that individuals subjected to expedited removal and interviewed for the report indicated that "they told the agent they were afraid of returning to their country but were nevertheless not referred to an asylum officer before being summarily deported"); Letter

from Nat'l Immigrant Justice Ctr. et al. to U.S. Dep't of Homeland Sec. Office of Civil Rights &

Civil Liberties & Office of the Inspector Gen. at 12-22  (Nov. 13, 2014), https://bit.ly/1xfFsog

(explaining that "[w]hen applicants express fears, CBP officials fail to capture those statements

in the required documentation or include mistaken information," and providing numerous stories

of asylum seekers affected by CBP's failures during the inspections stage of expedited removal).

### *Flaws in the Credible Fear Asylum Process*

85.     Even where asylum applicants are referred for a credible fear interview, there are

serious flaws in the government's credible fear procedures.

86.     Although the credible fear procedures provide greater safeguards for asylum

seekers than for other noncitizens placed into expedited removal, the procedures are inadequate

given the complexity of asylum law and the fact that an overwhelming number of applicants are

traumatized, do not speak English, and are afraid to be candid at their interviews, especially

women and children.

87.     For example, the asylum officer need not create a transcript or audio recording of

what occurred at the credible fear interview, a particularly glaring procedural deficiency given

the translation problems and misunderstandings that routinely occur in asylum cases.  Instead,

the asylum officer must create only a written summary of the "material facts," 8 C.F.R. §

208.30(d)(6), *see also* 8 USC § 1225(b)(1)(B)(iii)(II), and a written record of "the officer's

analysis of why, in light of [the] facts, the alien has not established a credible fear of

persecution."  8 U.S.C. § 1225(b)(1)(B)(iii)(II).

88.     And, although the asylum officer is required to "determine that the alien has an

understanding of the credible fear determination process," 8 C.F.R. § 208.30(d)(2), the

government's policies fail to require that the asylum officer or immigration judge assess

individuals to ensure that they are mentally competent and have the capacity to meaningfully participate in the credible fear process; they also fail to require additional safeguards should an individual be found to have competency or capacity issues.

89.     Further, although the government recognizes that there is a right before and during the asylum officer interview to consult with a third party, 8 C.F.R. § 208.30(d)(4), the government's policies do not recognize a right to representation by counsel.  Nor do the government's policies recognize a right to counsel prior to or during the IJ review hearing of a determination that credible fear has not been shown.  As a result, the government's policies do not guarantee an individual the right to be represented by her own counsel, who could help the individual identify and articulate the key facts relevant to a claim of persecution or torture, which is particularly important given the specialized nature of asylum and protection claims.

90.     Significantly, although the credible fear standard allows the decision maker to consider "such other facts as are known to the officer," 8 U.S.C. § 1225(b)(1)(B)(v), the government's policies do not impose any requirement that the asylum officer or IJ fully disclose to the individual all of the other facts that were considered, nor is there any requirement that the individual be given an opportunity to respond to those other facts.

91.     Further, although during the IJ review stage the judge "may receive into evidence any oral or written statement which is material and relevant to any issue in the review," 8 C.F.R. § 1003.42(c), at no point in the process do the government's credible fear policies provide an adequate opportunity to *gather* evidence, including expert testimony which could address country conditions and other key factual questions, such as whether the noncitizen is a member of a particular social group that is being targeted for persecution.

92.     The procedures are further flawed because, for the many individuals who are forced to proceed pro se, there is no obligation for the asylum officer or immigration judge to fully develop the record or advise the individual about what he or she must prove to prevail.

93.     That the government's credible fear policies are inadequate is reinforced by the widespread evidence of failures in the credible fear process.  For example, advocates "regularly learn of reports of legitimate asylum seekers who are denied 'credible fear' – and the chance to even file an application for asylum – even though they should meet the standard and may be eligible for asylum.  In some cases, interviews are sometimes rushed, essential information is not identified due to lack of follow up questions, and/or other mistakes are made that block genuine asylum seekers from even applying for asylum and having a real chance to submit evidence and have their case fully considered." *Hearing before the H. Judiciary Subcomm. on Immigration & Border Sec.* at 5 (Feb. 11, 2015) (statement of Eleanor Acer, Dir., Refugee Protection, Human Rights First), https://bit.ly/2OGFszm; *see also, e.g.*, Letter from Am. Immigration Lawyers Ass'n, et al. to Leon Rodríguez, Dir., U.S. Citizenship & Immigration Servs., and Sarah Saldaña, Dir., U.S. Immigration & Customs Enforcement 2-4 (Dec. 24, 2015) ("AILA Letter"), https://bit.ly/2Yr3DWF ("USCIS' negative fear determinations are often flawed, with numerous substantive problems evident in the transcripts of initial fear interviews.").  In some cases, mothers are called upon to reveal sensitive details of the persecution they faced—including physical or sexual violence or abuse at the hands of other family members—with their children present at their interviews; as a result, critical information is often not elicited during these interviews.

94.     These flaws are compounded by the lack of access to counsel.  Few individuals in the credible fear process have the assistance of counsel or any other representative.  Those that

do often cannot be effectively represented due to restrictions on attorney participation and lack of notice of key proceedings.  *See, e.g.*, AILA Letter at 3 (explaining that immigration judge review of credible fear determinations "seldom involves attorney participation" because attorneys receive notice of hearings either not at all, or with too little time to prepare and attend such hearings).

95.     There are well-documented systematic inadequacies in interpretation services during the expedited removal process.  For example, an unrepresented Guatemalan mother who was persecuted based on her indigenous ethnicity was removed after an asylum officer interviewed her in Spanish—a language in which she was unable to communicate—and issued a negative credible fear determination.  Acer Statement at 6 ("This woman was deported from the United States under expedited removal before she could secure legal counsel."); *see also, e.g.*, *Report of the DHS Advisory Committee on Family Residential Centers* 96-99 (2016), https://bit.ly/2yFluu0 (discussing inadequate or nonexistent interpretation services during credible fear interviews and immigration judge reviews of negative credible fear determinations); American Exile, at 34 ("Most of the individuals interviewed . . . stated that they were given forms to sign in English, which most did not speak or read, and often were not interviewed by an immigration officer who fluently spoke their language or through an interpreter."); Borderland Report at 13; 2016 USCIRF Study, at 28 (describing the case of a detained Ethiopian asylum seeker who was denied an interpreter).

### *Erroneous Expedited Removals*

96.     The result of the widespread flaws in the expedited removal process is that many individuals have been erroneously removed from the United States.

97.     For example, in 2014, a Mexican citizen who had been living in the United States continuously for 14 years was nonetheless removed under an expedited removal order after a traffic stop in Weslaco, Texas.  DHS removed the individual even though, at the time of the incident, expedited removal could not be applied to individuals who had been in the country more than 14 days.  American Exile, at 63.

98.     DHS has removed multiple U.S. citizens pursuant to expedited removal orders. *See Lyttle v. United States*, 867 F. Supp. 2d 1256, 1272-73 (M.D. Ga. 2012) (U.S. citizen erroneously issued expedited removal order); *de la Paz v. Johnson*, No. 1:14-CV-016 (S.D. Tex.) (habeas petition filed Jan. 24, 2014) (U.S. citizen erroneously subjected to expedited removal); Ian James, *Wrongly Deported, American Citizen Sues INS for $8 Million*, L.A. Times (Sept. 3, 2000), https://tinyurl.com/y4uulrds (recounting expedited removal of U.S. citizen Sharon McKnight).

99.     DHS also has erroneously removed numerous asylum seekers pursuant to expedited removal orders.  For example, CBP removed a Guatemalan citizen and mother of four U.S. citizen children under an expedited removal order even though she told the officers that she was afraid to be deported to Guatemala, where her father had been murdered and her mother had been the target of extortion by gangs.  Although the woman told the immigration officers that she was illiterate, they forced her to initial that she had read their account of her interview, which incorrectly stated that she did not fear return.  She refused to sign the expedited removal order, but was nonetheless deported to Guatemala, where she was later raped and shot by a gang. American Exile at 38.  In another example, a 22-year-old woman fled domestic violence in El Salvador and border officials arrested her in Texas.  Although a CBP officer asked her about fear of return, the officer never referred her to an asylum officer.  She was asked to sign forms in

English, with no opportunity to ask questions.  After she was removed to El Salvador, her ex-boyfriend continued to abuse her.  *Id.* at 39.

100.    Defendants are aware of the flaws in the expedited removal and credible fear processes, including the lack of procedural protections.  Nevertheless, Defendants have acted to expand a systematically deficient process to an even larger category of individuals, without taking steps to address these well-documented problems.  Under expanded expedited removal, any individual apprehended anywhere in the country could be erroneously subjected to these truncated and flawed procedures and mistakenly deported without a meaningful hearing.  Indeed, the application of expedited removal to the interior of the country—far from the border— increases the likelihood that citizens, noncitizens with lawful status, and noncitizens who have lived in the country for years or decades and are therefore eligible for relief from removal, will be swept up in raids or other enforcement actions and mistakenly or arbitrarily subjected to expedited removal.  Applying expedited removal to noncitizens who have significant ties to the United States and have resided in communities across the country for extended periods will exacerbate the existing widespread, systemic violations of constitutional, statutory, and regulatory rights in the expedited removal process.

**E. Harm to Plaintiff Organizations and Their Members.**

101.    Plaintiffs are nonprofit membership-based organizations whose missions include providing immigration counseling and legal services to members and community members.

102.    Make the Road New York ("MRNY") is a nonprofit, membership-based community organization that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers

improve their lives and neighborhoods. MRNY has five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

103.    MRNY has over 23,000 members residing in New York City, Westchester County, and Long Island.

104.    Members include noncitizens who have not been admitted to the United States and who have been continuously present for between two weeks and two years, and are subject to the July 23 Rule expanding expedited removal.

105.    For example, MRNY-John Doe 1 is a member of MRNY and a noncitizen. He entered the United States without inspection in November 2018, and has been in the country since then. He is not in removal proceedings, nor does he have a final order of removal.

106.    MRNY-John Doe 2 is a member of MRNY and a noncitizen. He entered the United States without inspection in June 2019 and has been in the country since then. He does not have a removal order.  He and his son were apprehended by ICE and released without a Credible Fear Interview or a formal grant of parole.  ICE provided him with a Notice to Appear for regular removal proceedings, but that document has not been filed with an Immigration Court, and, thus, he is not in regular removal proceedings.  He is required to report periodically to ICE.

107.    MRNY-Jane Doe 1 is a member of MRNY and a noncitizen. She entered the United States without inspection in June 2019 and has been in the country since then. She does not have a removal order. She and her children were apprehended by ICE and released without a credible fear interview or a formal grant of parole. She was provided with a Notice to Appear for regular removal proceedings, but that document has not been filed with an Immigration Court, and, thus, she is not in regular removal proceedings.

108.    MRNY also has numerous members who have lived in the country for longer than two years, but would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so, as is regularly the case when expedited removal orders are issued.

109.    The expansion of expedited removal requires MRNY to divert the time and resources of attorneys that would otherwise be dedicated to assisting noncitizens in applying for forms of relief and in supporting MRNY's core mission of building the power of immigrant communities.  For example, MRNY has created and disseminated informational materials about expanded expedited removal in English and Spanish and begun community education efforts around expedited removal.  This has required numerous staff members' time due to the lack of any clear standards around the expansion of expedited removal or the availability of judicial federal court review, which has left lawyers and organizers unsure of how to appropriately advise members and clients.  MRNY now frequently works with members and clients to identify whether they may be at risk of being subject to expedited removal; how to prepare for encounters with ICE officers; what documents may provide continuous residence; and whether and where to gather and maintain those documents.

110.    MRNY is also harmed in its mission to empower immigrant communities to understand and assert their fundamental rights including the right to remain silent. MRNY's public-facing materials and trainings on immigrant rights often counsel that immigrants may invoke the right to remain silent.  The expansion of expedited removal necessitates a wholesale revisiting of these training materials—and the legal trainings that members, organizers and others receive through MRNY—because individuals who exercise their right to remain silent now face the possibility of wrongful placement into expedited removal, whether due to failure to

assert a fear; failure to explain their manner of entry; or failure to affirmatively establish two years of presence.

111.    MRNY members live in areas where encounters with ICE officers are common. Since 2017, MRNY has assisted hundreds of families in the New York City area who have had a loved one detained by ICE.   Several dozen of these detentions have been at municipal courthouses, where ICE arrests have become extremely common, particularly in New York City and Westchester County.  In addition, under the present administration, ICE regularly detains so-called "collateral" individuals when conducting home raids.  These detentions demonstrate the high risk of ICE detention faced by MRNY members and all undocumented New Yorkers.

112.    *La Unión del Pueblo Entero* ("LUPE") is a membership-based community union based in the Rio Grande Valley, in South Texas, near the United States-Mexico border.  The name translates to Union of the People.

113.    LUPE has over 8,000 dues-paying members located in South Texas.

114.    LUPE members include noncitizens subject to the government's expanded expedited removal policy.  These members have been in the country for more than fourteen days, but less than two years, and have not been admitted to the United States by an immigration officer.

115.    For example, LUPE-Jane Doe 1 is a member of LUPE, and a noncitizen. She entered the United States without inspection on or about May 13, 2019, and has been in the country since then.  She has had no previous contact with immigration authorities. She intends to seek asylum in the United States, because she fears if she returned to Mexico she would be targeted on account of her previous affiliations with the Mexican government.

116.     Jane Doe 2 is a member of LUPE and a noncitizen, who entered the United States without inspection in July of 2018, when her husband, who was living in the United States, became seriously ill.  She is not currently in removal proceedings.

117.     LUPE has members who have been in the United States for more than two years and have not been admitted to the United States, but who are at risk of wrongful placement into expanded expedited removal if they exercise their right to remain silent if they come into contact with immigration authorities or if the officer is not "satisfied" with their proof of continuous presence.

118.     For example, LUPE-John Doe 1 is a member of LUPE and a noncitizen.  He entered the United States without inspection in July 2017, and has been in the country since. Even though he has been in the country for just over two years, he fears being placed in expedited removal because he would not have sufficient evidence to demonstrate presence or would not have this evidence with him if placed in expedited removal.

119.     LUPE members live in areas in South Texas with a large number of encounters with immigration officers.  For example, LUPE has received reports about immigration officers stationed in low-income Latino neighborhoods and near bus stops frequented by Latinos; immigration officers have also conduct workplace raids in in areas known to have Latino restaurants.

120.     Expanded expedited removal has already required LUPE to divert staff members from their regular assignments.  LUPE will have to hire and train new staff members, to organize and conduct Know Your Rights presentations to inform the community as to the effects of the July 23 Rule.

121.     WeCount! is a membership-based organization in South Florida.

122.   WeCount! has approximately 200 dues paying members located in and around Homestead, Florida.

123.   WeCount! members include noncitizens who are subject to the government's expanded expedited removal policy.  These members have been in the country for more than fourteen days, but less than two years, and have not been admitted to the United States by an immigration officer.

124.   For example, WeCount!-John Doe 1 is a member of WeCount! and a noncitizen. He entered the United States without inspection in December 2017 and has been in the country since then.  He has had no previous contact with immigration authorities.

125.   WeCount! has members who have been here for more than two years and have not been admitted to the United States, but who are at risk of wrongful placement into expanded expedited removal if they exercise their right to remain silent if they come into contact with immigration authorities or if the officer is not "satisfied" with their proof of continuous presence.

126.   WeCount! members are the target of frequent enforcement actions in the communities in which they live.  WeCount! members have been the target of home raids and workplace raids.

127.   WeCount! members have also been subject to other forms of immigration enforcement, including stake-outs and traffic stops.

128.   Expanded expedited removal has already required WeCount! to divert staff members from regular assignments to address the effects of the expansion, including to organize and conduct information meetings to inform the community about the consequences of expanded expedited removal, advise members how to collect documents to show sufficient presence, and help members to assemble those documents.

## FIRST CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 553)

129.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

130.    The Administrative Procedure Act, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation.  *See* 5 U.S.C. §§ 553(b), (c).  The APA also requires that any substantive rule must be published at least 30 days prior to its effective date.  *See* 5 U.S.C. § 553(d).

131.    Although styled as a "Notice," the July 23 Rule is a legislative rule within the meaning of the APA.

132.    DHS did not comply with the APA's procedural requirements when it made the July 23 Rule immediately effective upon publication.

133.    Defendants' failure to provide for notice and comment violates 5 U.S.C. § 553(b) and (c).

134.    Defendants' failure to publish the July 23 Rule 30 days before its effective date violates 5 U.S.C. § 553(d).

## SECOND CLAIM FOR RELIEF

### (Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution)

135.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

136.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law. . . ."

137.    Plaintiffs' members who are at risk of being subjected to expedited removal are entitled under the Due Process Clause to meaningful process before they can be removed from the country.

138.    The July 23 Rule violates the Due Process Clause.

### THIRD CLAIM FOR RELIEF

**(Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(a), (b)(1); Administrative Procedure Act, 5 U.S.C. § 706(2))**

139.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

140.    The expansion of expedited removal denies people a meaningful process before they are removed from the United States.  A meaningful process includes, *inter alia*, an opportunity to gather evidence necessary to establish they are not inadmissible and have been continuously present in the United States for more than two years, and an opportunity to consult or rely on the aid of others, including counsel, to otherwise challenge the application of expedited removal.

141.    If the expedited removal statute is not interpreted to provide a meaningful process, it would raise serious constitutional questions.

142.    The July 23 Rule violates the Immigration and Nationality Act, 8 U.S.C. § 1225(a), (b)(1) because it deprives persons faced with expedited removal of minimal procedures necessary to ensure that the statute is administered fairly and consistent with constitutional due process.

143.    Therefore, the July 23 Rule violates the APA because it is, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right," and "without observance of procedure required by law . . . ." 5 U.S.C. §

706(2)(A), (C), (D).

## FOURTH CLAIM FOR RELIEF

### (Violation of the Immigration and Nationality Act, 8 U.S.C. § 1362; Administrative Procedure Act, 5 U.S.C. §§ 555(b), 706(1), (2))

144.    All of the foregoing allegations are repeated and realleged as if fully set forth

herein.

145.    The Immigration and Nationality Act, 8 U.S.C. § 1362, provides that "[i]n any

removal proceedings before an immigration judge," the individual "shall have the privilege of

being represented . . . ."  Section 1362 does not exempt expedited removal proceedings.  Where

an asylum seeker requests review of a credible fear denial before an immigration judge, the

statute confers on them the right to representation by counsel of their own choosing.

146.    The APA, 5 U.S.C. § 555(b), provides that "[a] person compelled to appear in

person before an agency or representative thereof is entitled to be accompanied, represented, and

advised by counsel or, if permitted by the agency, by other qualified representative. A party is

entitled to appear in person or by or with counsel or other duly qualified representative in an

agency proceeding."  Individuals subjected to expedited removal procedures are compelled to

appear in person before agency representatives.  Congress has not exempted expedited removal

proceedings from this requirement.

147.    Defendants' application of policies restricting the participation of counsel for

individuals in expedited removal during both the immigration enforcement officer's inspection

and the credible fear process (including during proceedings in which an IJ reviews a negative

credible fear determination) to individuals described in the July 23 Rule violates 8 U.S.C. § 1362

and the APA, 5 U.S.C. § 555(b).

148.    In addition, the July 23 Rule violates the APA because it is, *inter alia*, agency action "unlawfully withheld," "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of procedure required by law . . . ." 5 U.S.C. § 706(1), (2)(A), (2)(C), (2)(D).

## FIFTH CLAIM FOR RELIEF

## (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

149.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

150.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

151.    Among other reasons, the July 23 Rule is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency.

## SIXTH CLAIM FOR RELIEF

## (Violation of the Suspension Clause, Art. 1, § 9, cl. 2, of the U.S. Constitution)

152.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

153.    Article 1, § 9, cl. 2., of the United States Constitution provides that the "Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

154.    Under the government's interpretation of the Immigration and Nationality Act,

the July 23 Rule subjects individuals to expedited removal without federal court review of an

expedited removal order, other than with respect to the three determinations listed in 8 U.S.C. §

1252(e)(2) pertaining to alienage, the existence of an order, and whether the individual was

lawfully admitted for permanent residence, admitted as a refugee, or granted asylum.

155.    Depriving individuals of the right to seek judicial review of an expedited removal

order violates the Suspension Clause.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray this Court to:

a.  Declare the Federal Register Notice dated July 23, 2019 contrary to law;

b.  Enter an order vacating the Federal Register Notice;

c.  Declare contrary to law the expedited removal of noncitizens who have been present in

this country for longer than 14 days or who have been apprehended farther than 100 miles from

the border;

d.  Enter an order enjoining and staying Defendants from continuing to apply expedited

removal to noncitizens who have been present in this country for longer than 14 days, or who

have been apprehended farther than 100 miles from the border;

e.  Issue an order directing that, should Defendants seek to remove any noncitizen who has

resided in the United States for longer than 14 days, or who has been apprehended more than 100

miles from the border, Defendants shall place the individual in regular immigration court

removal proceedings under 8 U.S.C. § 1229a.

f.  Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice

Act, and any other applicable statute or regulation; and

g.   Grant such further relief as the Court deems just, equitable, and appropriate.


Dated: August 6, 2019                                  Respectfully submitted,


Trina Realmuto*                                        /s/ Celso Perez
Kristin Macleod-Ball*                                  Celso Perez  (D.C. Bar No. 1034959)
American Immigration Council                           Anand Balakrishnan*
1318 Beacon Street, Suite 18                           Omar C. Jadwat*
Brookline, MA 02446                                    Lee Gelernt*
(857) 305-3600                                         American Civil Liberties Union
                                                       Foundation, Immigrants' Rights Project
Karolina J. Walters (D.C. Bar No. 1049113)             125 Broad Street, 18th Floor
American Immigration Council                           New York, NY 10004
1331 G Street, NW, Suite 200                           (212) 549-2600
Washington, D.C. 20005
(202) 507-7520                                         Jennifer Chang Newell**
                                                       Stephen B. Kang*
Jonathan K. Youngwood*                                 Julie Veroff**
Susannah S. Geltman*                                   American Civil Liberties Union
Joshua Polster*                                        Foundation, Immigrants' Rights Project
Simpson Thacher & Bartlett LLP                         39 Drumm Street
425 Lexington Avenue                                   San Francisco, CA 94111
New York, NY 10017                                     (415) 343-0774
(212) 455-2000
                                                       Arthur B. Spitzer (D.C. Bar No. 235960)
Adrienne V. Baxley (D.C. Bar No.                       Scott Michelman (D.C. Bar No. 1006945)
1044750)***                                            American Civil Liberties Union
Simpson Thacher & Bartlett LLP                         Foundation of the District of Columbia
900 G Street, N.W.                                     915 15th Street, NW, 2nd floor
Washington, D.C. 20001                                 Washington, D.C. 20005
(202) 636-5822                                         (202) 457-0800

                                                       *Attorneys for Plaintiffs*

                                                       *Pro hac vice application forthcoming*
                                                       ***Filing pursuant to LCvR 83.2(c)*
                                                       ****Application for admission forthcoming*