## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAKE THE ROAD NEW YORK, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| KEVIN MCALEENAN, Acting Secretary of the Department of Homeland Security, et al., | ) Civil Action No. 2019-cv-02369-<br>) KBJ |
| | ) |
| *Defendants*. | ) |
| | ) |
| | ) |
| | ) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Trina Realmuto*****
Kristin Macleod-Ball*****
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
(857) 305-3600

Karolina J. Walters (D.C. Bar No. 1049113)
American Immigration Council
1331 G Street, NW, Suite 200
Washington, D.C. 20005
(202) 507-7520

Jonathan K. Youngwood*
Susannah S. Geltman*
Joshua Polster*
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

Celso Perez  (D.C. Bar No. 1034959)
Anand Balakrishnan*****
Omar C. Jadwat*
Lee Gelernt*****
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Jennifer Chang Newell***
Stephen B. Kang*****
Julie Veroff***
American Civil Liberties Union
Foundation, Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Adrienne V. Baxley (D.C. Bar No. 1044750)****
Simpson Thacher & Bartlett LLP
900 G Street, N.W.
Washington, D.C. 20001
(202) 636-5822

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union
Foundation of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

*Attorneys for Plaintiffs*

*Pro hac vice application forthcoming*
**Pro hac vice application pending*
***Filing pursuant to LCvR 83.2(c)*
****Application for admission forthcoming*
*****Admitted pro hac vice*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTS ............................................................................................................................. 3

  A. The Expedited Removal Process............................................................................ 3

  B. Prior Administrations Expanded the Scope of Expedited Removal to Apply to Limited
     Groups of Noncitizens Who Enter Without Inspection. ........................................ 6

  C. Two Decades of Experience Revealed Widespread Flaws in the Expedited Removal
     Process. .................................................................................................................. 7

  D. The Trump Administration Dramatically Expanded Expedited Removal Without
     Addressing the Flaws of the Existing System or Inviting Pre-Promulgation Public
     Comment................................................................................................................ 12

LEGAL STANDARD...................................................................................................... 13

ARGUMENT .................................................................................................................. 14

  I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS........................................ 14

    A. DHS Violated the APA by Failing to Engage in Notice and Comment
       Rulemaking. ...................................................................................................... 15

      1. Congress has not exempted DHS from notice-and-comment requirements.  .......... 16

      2. DHS has not shown good cause to bypass notice and comment............................. 19

    B. The July 23 Rule Violates the Immigration and Nationality Act, 8 U.S.C. §
       1225(b)(1), Which Must Be Read to Require Fundamentally Fair Expedited Removal
       Proceedings that Mitigate the Risk of Erroneous Deportation .................................. 21

      1. If Not Interpreted to Require Fair Procedures, the Expedited Removal Statute
         Would Raise Grave Constitutional Concerns....................................................... 22

        a. The private interests at stake are of the utmost importance. .............................. 23

b. The risk of error is high. ................................................................................. 24

c. The probable value of additional safeguards is also high. .................................. 30

d. The government's interests do not outweigh the need for minimal procedural safeguards. ........................................................................................................ 32

2. The Expedited Removal Statute Must Be Read to Require Fair Determinations That the Person is Properly Subject to Expedited Removal, is Removable, and of Their Fear-Based Claims. ............................................................................................. 34

C. The Rule is Arbitrary and Capricious Because it Fails to Acknowledge or Address the Due Process Problems in the Existing Expedited Removal System, and Fails to Ensure Its Fair Application to Those Newly Subject to the Rule. ........................................... 36

D. The July 23 Rule Violates the APA and the Immigration and Nationality Act, Which Confer the Right to Counsel in Expedited Removal Proceedings. ............................... 38

1. The APA Affords Noncitizens in Expedited Removal Proceedings the Right to Counsel of Their Own Choosing ........................................................................ .38

2. The INA Entitles Noncitizens to Counsel of Their Own Choosing in Immigration Judge Reviews of Credible Fear Denials. .............................................................. 40

II. THE REMAINING FACTORS TIP DECIDEDLY IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION ............................................................................. 41

CONCLUSION ..................................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. Civil Aeronautics Bd.,* 713 F.2d 795 (D.C. Cir. 1983) .............. 19

*Al Otro Lado v. McAleenan*, 2019 WL 3413406 (S.D. Cal. July 29, 2019) ................................. 33

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) .............................. 38

*Am. Fed'n of Gov't Emps., AFL-CIO v. Block,* 655 F.2d 1153 (D.C. Cir. 1981) ........................ 15

*Ardestani v. INS*, 502 U.S. 129 (1991) ...................................................................................... 40

*Asiana Airlines v. FAA,* 134 F.3d 393 (D.C. Cir. 1998) .................................................. 16, 17, 18

*Bondarenko v. Holder*, 733 F.3d 899 (9th Cir. 2013) ................................................................ 35

*Bridges v. Wixon,* 326 U.S. 135 (1945) ...................................................................................... 23

*Castaneda-Delgado v. INS*, 525 F.2d 1295 (7th Cir. 1975) ....................................................... 41

*Catawba County v. EPA*, 571 F.3d 20 (D.C. Cir. 2009) ....................................................... 16, 17

*Chandler v. United States Parole Comm'n,* 60 F. Supp. 3d 205 (D.D.C. 2014) ......................... 31

*Cheung v. INS,* 418 F.2d 460 (D.C. Cir. 1969) ...................................................................... 31, 32

*Clark v. Martinez,* 543 U.S. 371 (2005) ..................................................................................... 22

*Coalition for Parity v. Sebelius ,* 709 F. Supp. 2d 10 (D.D.C. 2010) ......................................... 18

*Council of S. Mountains, Inc. v. Donovan,* 653 F.2d 573 (D.C. Cir. 1981) ........................... 19, 20

*Genuine Parts Co. v. EPA*, 890 F.3d 304 (D.C. Cir. 2018) ........................................................ 37

*Gray Panthers v. Schweiker,* 652 F.2d 146 (D.C. Cir. 1980) ............................................... 23, 30

*Great Lakes Screw Corp. v. NLRB*, 409 F.2d 375 (7th Cir. 1969) .............................................. 38

*INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987) .......................................................................... 23

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
   407 F.3d 1250 (D.C. Cir. 2005) ............................................................................................. 15

*Jifry v. FAA,* 370 F.3d 1174 (D.C. Cir. 2004) ...................................................................... 19, 20

*Judulang v. Holder*, 565 U.S. 42 (2011) ............................................................ 36

*Kaweesa v. Gonzales,* 450 F.3d 62 (1st Cir. 2006) ............................................ 23

*Khan v. Holder,* 608 F.3d 325 (7th Cir. 2010) ............................................ 21, 25

*Lane v. U.S. Dep't of Agric.*, 120 F.3d 106 (8th Cir. 1997) ............................ 39

*Lake Carriers' Ass'n v. EPA,* 652 F.3d 1 (D.C. Cir. 2011) ............................ 18

*Landon v. Plasencia,* 459 U.S. 21 (1982) ........................................................ 23

*Leslie v. Attorney Gen.*, 611 F.3d 171 (3d Cir. 2010) .................................... 41

*Lyttle v. United States*, 867 F. Supp. 2d 1256 (M.D. Ga. 2012) ...................... 8

*Mack Trucks, Inc. v. EPA,* 682 F.3d 87 (D.C. Cir. 2012) .......................... 19, 21

*Marcello v. Bonds*, 349 U.S. 302 (1955) ........................................................ 40

*Maria de la Paz v. Jeh Johnson,*  No. 1:14-CV-016 (S.D. Tex. 2014) .......... 8

*Marincas v. Lewis,* 92 F.3d 195 (3d Cir. 1996) ............................................ 35

*Mathews v. Eldridge,* 424 U.S. 319 (1976) .................................................... 22

*Matter of Lujan-Quintana*, 25 I. & N. Dec. 53 (BIA 2009) .......................... 8

*Matter of Tomas*, 19 I. & N. Dec. 464 (BIA 1987) ........................................ 35

*Methodist Hosp. of Sacramento v. Shalala,* 38 F.3d 1225 (D.C. Cir. 1994) .............. 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

     463 U.S. 29 (1983) ............................................................ 36, 37, 38

*N. Mariana Islands v. U.S.*, 686 F. Supp. 2d 7 (D.D.C. 2009) .................... 43

*New Jersey v. EPA*, 626 F.2d 1038 (D.C. Cir.1980) .................................... 43

*Ng Fung Ho v. White,* 259 U.S. 276 (1922) .................................................... 23

*Ngou v. Schweiker*, 535 F. Supp. 1214 (D.D.C. 1982) ................................ 21

*Nken v. Holder,* 556 U.S. 418 (2009) ........................................................ 32, 44

*Osorio-Martinez v. Attorney Gen.,* 893 F.3d 153 (3d Cir. 2018) .................................................. 26

*Professional Reactor Operator Soc. v. U.S. Nuclear Regulatory Comm'n,*

    939 F.2d 1047 (D.C. Cir. 1991) ................................................................................ 39

*Propert v. D.C.,* 948 F.2d 1327 (D.C. Cir. 1991) ...................................................... 31

*Prows v. Dep't of Justice,* 938 F.2d 274 (D.C. Cir. 1991) ............................................ 21

*Rapanos v. United States,* 547 U.S. 715 (2006) ........................................................ 17

*R.I.L-R v. Johnson,* 80 F. Supp. 3d 164 (D.D.C. 2015) ................................................ 33

*Roelofs v. Sec'y of Air Force,* 628 F.2d 594 (D.C. Cir. 1980) ...................................... 39

*Santosky v. Kramer,* 455 U.S. 745 (1982) ............................................................... 31

*SEC v. Higashi,* 359 F.2d 550 (9th Cir. 1966) ........................................................... 38

*Sierra Club v. U.S. Army Corps of Engineers,* 900 F. Supp. 2d 9 (D.D.C. 2013) ........................ 13

*Simms v. D.C.,* 872 F. Supp. 2d 90 (D.D.C. 2012) ...................................................... 30

*Sorenson Commc'ns Inc v. FCC,* 755 F.3d 702 (D.C. Cir. 2014) .......................................... 19, 20

*Sugar Cane Growers Cooperative of Fla. v. Veneman,* 289 F.3d 89 (D.C. Cir. 2002) ...................... 42

*Tun v. Gonzales,* 485 F.3d 1014 (8th Cir. 2007) ........................................................ 35

*United States v. Huazo-Garcia,* No. 2:18-CR-00056-SMJ,

    2018 WL 2306890 (E.D. Wash. May 21, 2018) .................................................. 30

*United States v. Mejia-Avila,* No. 2:14-CR-0177-WFN-1 (E.D. Wash. Apr. 4, 2016) ............... 29

*United States v. Ochoa-Oregel,* 904 F.3d 682 (9th Cir. 2018) ...................................... 27

*United States v. Ramirez-Diaz,* 359 F. Supp. 3d 994 (D. Or. 2019) ................................ 30

*United States v. Raya-Vaca,* 771 F.3d 1195 (9th Cir. 2014) ........................................ 29

*United States v. Sanchez-Figuero,* No. 3:19-cr-00025-MMD-WGC (D. Nev. July 25, 2019) .... 28

*Util. Solid Waste Activities Grp. v. EPA,* 236 F.3d 749 (D.C. Cir. 2001) ................................... 19

*Wong Yang Sung v. McGrath*, 339 U.S. 33 (1950) ...................................................... 35

*Yamataya v. Fisher,* 189 U.S. 86 (1903) .................................................. 22, 34, 35, 36

**Statutes**

5 U.S.C. § 533(b) ........................................................................................ 15

5 U.S.C. § 533(c) ........................................................................................ 15

5 U.S.C. § 553 ............................................................................................. 17

5 U.S.C. § 553(b)(B) .................................................................................... 19

5 U.S.C. § 553(d) ........................................................................................ 21

5 U.S.C. § 555(a) ........................................................................................ 39

5 U.S.C. § 555(b) .................................................................................... 38, 39

5 U.S.C. § 559 ........................................................................................ 16, 39

5 U.S.C. § 706(2)(A) .................................................................................... 36

6 U.S.C. § 557 .............................................................................................. 6

8 U.S.C. § 1105(a) ........................................................................................ 3

8 U.S.C. § 1182(a)(6)(C) ...................................................................... 3, 11, 29

8 U.S.C. § 1182(a)(7) .................................................................................... 3

8 U.S.C. § 1225(a)(4) .......................................................................... 4, 11, 29

8 U.S.C. § 1225(b)(1) .......................................................................... 3, 17, 39

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................... 3, 4, 24, 35

8 U.S.C. § 1225(b)(1)(A)(ii) ................................................................. 3, 4, 35, 36

8 U.S.C. § 1225(b)(1)(A)(iii) ................................................................... 24, 36

8 U.S.C. § 1225(b)(1)(A)(iii)(I) ................................................................. 6, 17

8 U.S.C. § 1225(b)(1)(A)(iii)(II) ................................................................... 6

8 U.S.C. § 1225(b)(1)(B) .................................................................................. 4, 36

8 U.S.C. § 1225(b)(1)(B)(iii)(II) ............................................................................ 5

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ...................................................................... 5, 40

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) .......................................................................... 32

8 U.S.C. § 1225(b)(1)(B)(v) ................................................................................... 5

8 U.S.C. § 1225(b)(1)(C) ................................................................................. 3, 27

8 U.S.C. § 1228(b)(3) ............................................................................................ 30

8 U.S.C. § 1229a ............................................................................................ 32, 40

8 U.S.C. § 1229a(a)(3) ........................................................................................... 40

8 U.S.C. § 1229a(b)(4)(B) ...................................................................................... 35

8 U.S.C. § 1229a(b) ............................................................................................... 40

8 U.S.C. § 1229a(c) ............................................................................................... 40

8 U.S.C. § 1232(a)(2)(B) .......................................................................................... 8

8 U.S.C. § 1232(5)(D) .............................................................................................. 8

8 U.S.C. § 1252 ........................................................................................................ 3

8 U.S.C. § 1252(a)(2) ............................................................................................... 4

8 U.S.C. § 1252(e) .................................................................................................... 4

8 U.S.C. § 1362 ...................................................................................................... 40

22 U.S.C. § 6474 ...................................................................................................... 7

**Regulations**

8 C.F.R. § 208.30 ..................................................................................................... 4

8 C.F.R. § 208.30(d)(4) ............................................................................................ 5

8 C.F.R. § 208.30(g)(1) ............................................................................................. 5

8 C.F.R. § 208.30(g)(2) ............................................................................................... 41

8 C.F.R. § 235.3(b)(1)(i) ............................................................................................. 24

8 C.F.R. § 235.3(b)(1)(ii) ............................................................................................ 24

8 C.F.R. § 235.3(b)(2)(i) ........................................................................................ 24, 28

8 C.F.R. § 235.3(b)(2)(ii) ......................................................................................... 4, 24

8 C.F.R. § 235.3(b)(4) ............................................................................................... 4, 6

8 C.F.R. § 235.3(b)(5) ............................................................................................... 3, 24

8 C.F.R. § 235.3(b)(6) ............................................................................................ 25, 31

8 C.F.R. § 235.3(b)(7) .................................................................................................. 4

8 C.F.R. § 235.3(4)(ii) .................................................................................................. 5

8 C.F.R. § 241.22 ....................................................................................................... 30

8 C.F.R. § 241.33(b) .................................................................................................. 30

8 C.F.R. § 242.16(a) ..................................................................................................... 3

8 C.F.R. § 253.3(b)(1)(ii) ........................................................................................ 6, 19

8 C.F.R. § 1208.30(g)(2) ............................................................................................ 41

8 C.F.R. § 1235.3(b)(2)(i) ............................................................................................ 4

8 C.F.R. § 1235.3(b)(4) ................................................................................................ 4

**Other Authorities**

Deportation of Aliens in the United States; Expulsion, 51 Fed. Reg. 23,041 (June 25, 1986) .... 30

H.R. Rep. No. 105-480, pt. 3 (1998) ............................................................................ 7

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) ............... 6

Notice Designating Aliens Subject to Expedited Removal,
   67 Fed. Reg. 68924 (Nov. 13, 2002) ...................................................................... 6

Notice Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004)............ 7

# **INTRODUCTION**

This case challenges the Department of Homeland Security's ("DHS") unprecedented decision to strip hundreds of thousands of noncitizens of their basic right to a fair hearing before they can be deported from their lives and families in the United States.  On July 23, DHS promulgated a new rule expanding the summary removal process known as "expedited removal" to noncitizens arrested anywhere in the United States who cannot prove they have been continuously present in the country for at least two years.  *See* Declaration of Taslim Tavarez ("Tavarez Decl."), Ex. A, Notice Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409 (July 23, 2019) ("Rule").

The Rule reverses a fundamental, longstanding principle: that individuals with substantial ties to the United States generally cannot be removed without an opportunity for a full hearing before an Immigration Judge ("IJ").  Instead of receiving an adversarial hearing with the right to retain counsel and an opportunity to prepare and present evidence, an immigrant residing in the United States can now be ordered removed by a line-level immigration officer, and denied even the ability to make a single phone call to a family member, let alone to consult counsel or gather favorable evidence.

The new Rule will exacerbate the deep flaws that already exist in the expedited removal process.  In its prior form, expedited removal was limited to those who had been in the country for up to fourteen days and were apprehended near the border, or those who had arrived by sea. Even in that far more limited application, expedited removal has been rife with errors, resulting in the wrongful deportation of U.S. citizens, legal permanent residents, and bona fide asylum seekers, often to countries where they face the risk of persecution, torture, or death.

The government's decision to expand expedited removal does not account for or even acknowledge any of these well-documented problems.  Worse still, the new Rule does not acknowledge the severe logistical and due process concerns that will arise from fast-tracking the removal of individuals who have been living in the U.S. for years.  As a result, the new Rule already has sown fear and confusion among immigrants concerned they may be erroneously deported in the course of a chance encounter with an immigration officer.

Without immediate judicial relief, Plaintiffs—three organizations whose members are subject to the new Rule—will continue to suffer irreparable harm.  They have been denied their ability to participate in the rulemaking process, despite the immediate and grave impact the Rule will have on their constituents.  And their members can—at any time—be removed abruptly through a flawed process that lacks safeguards against erroneous removals.  *See* Declaration of Paige Austin  ¶¶ 11-18 (Plaintiff Make the Road New York); Declaration of Juanita Valdez-Cox ¶¶ 6-16 (Plaintiff LUPE); Declaration of Jonathan Fried ¶¶ 6-13 (Plaintiff WeCount!).

The July 23 Rule is illegal.  Its issuance violated the basic procedural requirement, under the Administrative Procedure Act ("APA"), that new agency rules be subject to notice and comment.  It also denies noncitizens a meaningful opportunity to challenge their removal, in violation of the Immigration and Nationality Act ("INA"), and it deprives them of their statutory rights to counsel.  Finally, it is arbitrary and capricious in violation of the APA because it was implemented without safeguards to guarantee noncitizens a fair chance to contest their expedited removal.

# FACTS

**A.  The Expedited Removal Process.**

Before 1996, all noncitizens were entitled to a full hearing in immigration court before the immigration authorities could deport or exclude them, whether they sought admission at the border or had already entered the country.  They were provided with an opportunity to investigate and prepare their case, to retain and rely on the assistance of counsel, and to present and confront evidence before an IJ.  They also were entitled to two layers of review: an administrative appeal and subsequent federal court review.  *See* 8 U.S.C. § 1105a (1995); 8 U.S.C. § 1252 (1995); 8 C.F.R. § 242.16(a) (1995).

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which retained full removal hearings as the standard procedure, while also creating a highly truncated process called "expedited removal."  8 U.S.C. § 1225(b)(1).  In IIRIRA, Congress authorized the use of expedited removal for noncitizens seeking admission at ports of entry, and provided for possible future expansion of the procedure to the interior by administrative action, within certain limits.

Expedited removal is a one- or two-stage process: the first is inspection by an immigration officer; the second, where applicable, is a credible fear interview by an asylum officer.  For an individual who applies for admission at a port of entry, the immigration officer must first determine if the individual is a noncitizen who is inadmissible either because they have engaged in fraud or lack valid entry documents.  *See* 8 U.S.C. § 1225(b)(1)(A)(i), (ii) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).  If an individual claims to be a U.S. citizen, lawful permanent resident, or refugee, or to have been granted asylum, then the individual is entitled to limited additional review.  *See* 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5).  Otherwise, if the

officer concludes that the individual is inadmissible under either ground, the officer "shall" order the individual removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). At any time during the process, the officer may allow the person to withdraw his or her application for admission and leave the country. 8 U.S.C. § 1225(a)(4).

During the inspection stage, the individual is detained and denied the ability to contact or rely on the assistance of counsel. "Because the person is detained, he or she generally has no way to gather evidence." Declaration of Kara Hartzler ("Harzer Decl.") ¶13. The inspection stage can, and generally does, begin and conclude in a matter of hours. *See* Declaration of Timothy Warden-Hertz ("Warden-Hertz Decl.") ¶ 8 ("People who do not have legal representation can be shuffled through the process very quickly and may be deported without ever talking to an attorney."); Hartzler Decl. ¶ 13. The immigration officer's decision is subject only to a paper review by a supervisor. 8 C.F.R. § 235.3(b)(2)(i). There is no administrative appeal, *see* 8 C.F.R. § 235.3(b)(2)(ii), (7), and the government's position is that the statute severely limits federal court review, *see* 8 U.S.C. § 1252(a)(2), (e).

For many individuals, the inspection stage is the beginning and the end of the expedited removal process. Those seeking asylum and related forms of protection may have access to a second stage—which is also flawed and does not remotely approach that which is available in regular immigration proceedings. To access this "credible fear" stage, an individual must indicate an intention to apply for asylum or express fear of return to the individual's country of origin. The immigration officer must then refer the individual for a credible fear interview with an asylum officer. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. § 235.3(b)(4); 8 C.F.R. § 208.30. At that interview, the applicant must show "a significant possibility, taking into

account the credibility of the statements made by the alien in support of the alien's claim and

such other facts as are known to the officer, that the alien could establish eligibility for asylum."

8 U.S.C. § 1225(b)(1)(B)(v).

　　If the asylum officer determines that the individual meets the credible fear standard, the

individual will be placed into removal proceedings.  Those who do not pass the credible fear

interview may request a paper review of the decision by an IJ, but do not receive a full hearing or

any subsequent administrative appellate review.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(II)-(III); *see*

*also* 8 C.F.R. § 208.30(g)(1).

　　As with the inspection stage, Defendants detain non-citizens during the credible fear

stage.  8 C.F.R. § 235.3(4)(ii).  Regulations provide that noncitizens may consult with "a person

or persons of [their] choosing" to prepare for their credible fear interview and the person(s)

may—at the discretion of the asylum officer—be permitted to attend the interview and present a

statement.  8 C.F.R. § 208.30(d)(4).  However, applicants are not guaranteed the right to have

counsel participate in either the credible fear hearing or any IJ review thereof.  *See* Hartzler Decl.

¶ 16 ("[T]he government takes the position that people in expedited removal have no right to

counsel, even at their own expense."); Declaration of Eduardo Beckett ("Beckett Decl.") ¶ 8

("IJs begin the [negative credible fear review] hearing by telling me that they do not have to

allow me to speak on behalf of my client and that they can tell me to leave their courtroom.");

Declaration of Kelly White ("White Decl.") ¶ 23 (addressing lack of safeguards for noncitizens

with mental disabilities).  The government's position is that there is no judicial review of a

credible fear denial.

**B. Prior Administrations Expanded the Scope of Expedited Removal to Apply to Limited Groups of Noncitizens Who Enter Without Inspection.**

Congress authorized the Attorney General to expand the application of expedited removal beyond its initial scope. At maximum, the congressional authorization encompasses certain noncitizens who were not lawfully admitted or paroled into the country and not continuously physically present two years or more. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II).[1] But Congress specified that the Attorney General must affirmatively designate the scope of any expansion of expedited removal before he can subject new groups of noncitizens to these truncated procedures. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(I).

For twenty years, the government chose not to expand expedited removal to its statutory limits, and at least one prior administration rejected such an extreme expansion because of concerns it would be illegal. *See* Tavarez Decl., Ex. P, Alan Gomez, *Trump's Quick Deportation Plan May Be Illegal, Past Immigration Chiefs Say*, USA Today (Feb. 24, 2017). Instead, the government made only two much more modest expansions. In 2002, the government invoked its authority to apply expedited removal to persons inside the country, but limited that expansion to a narrow group of individuals who arrived by *sea* and were not continuously present for two years. *See* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924, 68925-26 (Nov. 13, 2002).[2]

In 2004, the government expanded the use of expedited removal to people who were apprehended within *100 air miles of a land border* and unable to demonstrate that they had been

---

[1] The Attorney General delegated the designation power to the Commissioner of the Immigration and Naturalization Service ("INS"). *See* 8 C.F.R. § 253.3(b)(1)(ii). Under the Homeland Security Act of 2002, the INS ceased to exist and its functions were transferred to DHS. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002). As a result, DHS now holds the designation power. *See* 6 U.S.C. § 557.

[2] On a typical day, only about 5% of individuals whom Customs and Border Protection processes have arrived by sea. *See* Tavarez Decl., Ex. H, U.S. Customs & Border Protection, Snapshot: A Summary of CBP Facts and Figures (May 2019).

physically present in the United States for *14 days*.  *See* Notice Designating Aliens for Expedited

Removal, 69 Fed. Reg. 48877, 48880-81 (Aug. 11, 2004).

**C.  Two Decades of Experience Revealed Widespread Flaws in the Expedited Removal Process.**

The experience of the past two decades of expedited removal have shown the process to

be profoundly flawed.  A 2005 study commissioned by Congress documented numerous "serious

problems" in the expedited removal process "which put some asylum seekers at risk of improper

return."  Tavarez Decl., Ex. J, U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum*

*Seekers in Expedited Removal: Volume I: Findings & Recommendations* 4-5, 10 (2005) ("2005

USCIRF Study").[3]  A 2016 follow-up study "revealed continuing and new concerns about

[Customs and Border Protection ("CBP")] officers' interviewing practices and the reliability of

the records they create, including . . . certain CBP officers' outright skepticism, if not hostility,

toward asylum claims; and inadequate quality assurance procedures."  *See* Tavarez Decl., Ex. K,

U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum*

*Seekers in Expedited Removal* 2 (2016) ("2016 USCIRF Study").

Each stage of expedited removal is rife with errors.  At the inspection stage, inspecting

officers  routinely make factual errors resulting in erroneous expedited removal orders.  Even

with the prior 14-day continuous presence requirement, inspecting officers have wrongly

determined that the continuous-presence threshold was not met.  *See, e.g.*, Tavarez Decl., Ex. M,

American Civil Liberties Union*, American Exile: Rapid Deportations that Bypass the Courtroom*

63 (2014) ("American Exile") (describing erroneous expedited removal of Mexican citizen who

had lived in the United States for 14 years); Declaration of Hannah Cartwright ("Cartwright

---

[3] *See* 22 U.S.C. § 6474 (authorizing study); *see also* H.R. Rep. No. 105-480, pt. 3, at 17 (1998) (recognizing that immigration officers "may not always be following INS procedures designed to ensure that potential asylum claimants are properly referred" for interviews).

Decl.") ¶¶ 3-8 (describing entry of expedited removal order against individual who had not left the United States for ten years); Declaration of Joanna Delfunt ("Delfunt Decl.") ¶ 8 (describing entry of expedited removal order against individual who previously had not left the United States for three years).  Errors are made even in identifying unaccompanied minors, who by statute cannot be placed in expedited removal.  8 U.S.C. §§ 1232(a)(2)(B), (5)(D); Declaration of Leah A. Jones ("Jones Decl.")  ¶¶ 11-14 (describing expedited removal of 16-year-old survivor of abuse with fear of return to Mexico); Hartzler Decl. ¶ 12 ("[O]fficers are often unable or unwilling to identify people who are juveniles or suffer from serious mental health issues.").

Errors are also made in determining alienage.  *See Lyttle v. United States*, 867 F. Supp. 2d 1256, 1272-73 (M.D. Ga. 2012) (U.S. citizen erroneously issued expedited removal order); Tavarez Decl., Ex. U, *Maria de la Paz v. Jeh Johnson*, No. 1:14-CV-016 (S.D. Tex. habeas petition filed Jan. 24, 2014) (U.S. citizen erroneously subjected to expedited removal); *Matter of Lujan-Quintana*, 25 I&N Dec. 53, 55 (BIA 2009) (holding BIA lacks jurisdiction to review immigration judge's decision to vacate expedited removal order issued against U.S. citizen); Declaration of Shalyn Fluharty ("Fluharty Decl.")  ¶ 10 (attesting that attorneys and paralegals at the South Texas Family Residential Center have identified at least 20 U.S. citizen children erroneously placed in expedited removal); Tavarez Decl., Ex. Q, Ian James, *Wrongly Deported, American Citizen Sues INS for $8 Million*, L.A. Times (Sept. 3, 2000) (recounting expedited removal of U.S. citizen Sharon McKnight).

Immigration officers also fail to record material statements made by noncitizens who express a fear of persecution or torture, thereby depriving them of the opportunity to seek protection.  *See* Hartzler Decl. ¶ 14 ("It is not uncommon for a sworn statement or a video to show that a person stated that they were afraid to return to their country, yet that person never

8

receives a credible fear interview….”); Beckett Decl. ¶ 5 (“My clients regularly report that, although they expressed that they were afraid to go back to their country of origin, [CBP] did not refer them for a credible fear interview.”); Declaration of Gracie Willis (“Willis Decl.”) ¶ 9 (same); Declaration of Edna Yang (“Yang Decl.”) ¶¶ 4-6 (same); Declaration of Laura Lunn (“Lunn Decl.”) ¶¶ 5-6 (same); Fluharty Decl. ¶ 7 (describing encountering families in detention “[e]very day” who expressed fear but were not referred, resulting in attorneys at the South Texas Family Residential Center sending between 10 and 50 requests for credible fear interviews each week); Jones Decl. ¶¶ 11, 13 (describing failure to record client’s expressed fear of return); *see also* 2005 USCIRF Study at 53-55 (finding that in 15% of observed cases, when a noncitizen expressed a fear of return to an immigration officer during the inspections process, the officer failed to refer the individual to an asylum officer for a credible fear interview).[4]

In other cases, CBP officers actively interfere with noncitizens’ efforts to express fear of return. *See* Fluharty Decl. ¶ 5 (describing families who reported that CBP officers lied about the availability of asylum and how to apply for it, “verbally intimidated them by calling them liars and dogs, and physically intimidated them by kicking them, pulling their hair and pinching them”); Lunn Decl. ¶ 13 (describing clients told by CBP that “they were worthless, [that] they should give up, or [that] they have no chance of staying in the United States”); Yang Decl. ¶ 6 (describing client told that “asylum does not exist [] anymore in the US” and others told that they

---

[4] *See also* Tavarez Decl., Ex. N, Human Rights Watch, *You Don’t Have Rights Here* 6 (2014) (finding that fewer than half of individuals interviewed who claimed a fear of return were referred for credible fear hearings); *id.*, Ex. L, Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border* 12 (2017) (“Borderland Report”) (“In 12% of the cases documented for this report, individuals expressing fear of violence upon return to their country of origin were not processed for credible fear screenings and instead, were placed into removal proceedings.”); *id.*, Ex. F, Letter from Nat’l Immigrant Justice Ctr. et al. to U.S. Dep’t of Homeland Sec. Office of Civil Rights & Civil Liberties & Office of the Inspector Gen., at 12-22 (Nov. 13, 2014) (explaining that “[w]hen applicants express fears, CBP officials fail to capture those statements in the required documentation or include mistaken information,” and providing numerous stories of asylum seekers affected by CBP’s failures during the inspections stage of expedited removal).

could not apply for asylum); Declaration of Jessica Shulruff Schneider ("Schneider Decl.") ¶ 7

(describing CBP officers' frequent modification of questions to discourage individuals from

expressing fear).

Even when immigration officers do take statements from noncitizens, the statements are

replete with errors, and "often inaccurate and nearly always unverifiable."  2005 USCIRF Study

at 53, 55, 74; *see also* 2016 USCIRF Study at 21; Borderland Report at 13 (describing evidence

"that CBP affidavits are often inconsistent with asylum-seekers' own accounts"); Willis Decl.

¶¶ 5-6 ("It was common for CBP officers to record what appeared to be boilerplate language

stating that individuals did not have a fear of return to their country of origin or that they were

coming to the United States to work."); Beckett Decl. ¶¶ 5-6 (same); Warden-Hertz Decl. ¶ 6

(same and noting that when asked about the paperwork, clients report having come to the United

States due to fear of persecution); Yang Decl. ¶ 7 (same); Lunn Decl. ¶¶ 8-9 ("I have been told

by at least 50 clients with . . . boilerplate language in their paperwork that they never made those

statements to CBP . . . .  On numerous occasions, the paperwork for a pre-verbal child said that

the child had stated that he or she came to the United States to work."); Schneider Decl. ¶ 8

("The information on the [expedited removal paperwork] is inaccurate at best and often seems

fraudulently filled out."); White Dec1. ¶¶ 11-12 (attesting to inaccuracies in expedited removal

paperwork); Hartzler Decl. ¶ 11 ("[O]fficers often include boilerplate information in the sworn

statement that does not apply to a particular individual."); Jones Decl. ¶ 13 ("[T]he agent wrote a

statement for [client] claiming that she was not afraid to return to Mexico, which was not true.");

Cartwright Decl. ¶ 7 (describing agent who "recorded . . . that [client] had entered the U.S. five

days earlier" even though the individual had not left the United States for ten years).

Furthermore, providers report systemic interpretation failures.  *See* Willis Decl. ¶¶ 7-8 (describing representing "numerous Mayan language speakers with fear-based claims who had little to no understanding of what was happening in their case" due to CBP interviewing them in Spanish); Warden-Hertz Decl. ¶ 5 (describing a group of about 150 Haitian men who, after being detained for a month, had yet to have any immigration official communicate with them in Creole); Declaration of Jose Jesus Rodriguez ("Rodriguez Decl.") ¶¶ 7-8 (describing case of an indigenous language seeker inspected by a CBP officer speaking broken Spanish who was never referred for a credible fear interview); Fluharty Decl. ¶ 9 (explaining that "an overwhelmingly large percentage" of the separated families that ended up at the South Texas Family Residential Center "had been in immigration custody for between one and three months without having a credible fear interview because neither CBP nor ICE officers questioned them in a language they understood"); Yang Decl. ¶ 9 (reporting that many people "received inadequate interpretation services during expedited removal interviews"); Schneider Decl. ¶ 10 (same); Lunn Decl. ¶ 7 (same); Hartzler Decl. ¶¶ 7-8 (same); White Decl. ¶ 14 (same); 2016 USCIRF Study at 28 (same); *see also* Tavarez Decl., Ex. I, U.S. Dep't of Homeland Sec. Advisory Comm. on Family Residential Ctrs., *Report of the DHS Advisory Committee on Family Residential Centers* 96-100 (2016) (discussing inadequate or nonexistent interpretation services during credible fear interviews and immigration judge reviews of negative credible fear determinations).

Finally, immigration officers fail to advise noncitizens that they may request to withdraw their applications for admission, which allows noncitizens to leave the United States voluntarily and avoid penalties that include permanent inadmissibility to the country.  *See* 8 U.S.C. § 1182(a)(6)(C); 8 U.S.C. § 1225(a)(4); *see also, e.g.*, Hartzler Decl. ¶¶ 18-19 (explaining that "officers advise almost no one" of their right to request to withdraw their application for

admission and identifying lack of guidance regarding decisions to grant withdrawal); White

Decl. ¶ 6 (same); Jones Decl. ¶ 12 (stating that agent failed to provide client with opportunity to

withdraw application for admission).

The systemic inadequacies extend beyond the inspection stage to the credible fear

process.  Without a guarantee that counsel can meaningfully participate in the hearing, non-

citizens are often subject to truncated and unfair interviews.  *See* Tavarez Decl., Ex. E, *Interior*

*Immigration Enforcement Legislation: Hearing Before the H. Judiciary Subcomm. on*

*Immigration & Border Sec.* 5 (Feb. 11, 2015) (statement of Eleanor Acer, Dir., Refugee

Protection, Human Rights First) ("In some cases, interviews are sometimes rushed, essential

information is not identified due to lack of follow up questions, and/or other mistakes are made

that block genuine asylum seekers from even applying for asylum and having a real chance to

submit evidence and have their case fully considered"); Tavarez Decl., Ex. D, Letter from Am.

Immigration Lawyers Ass'n et al. to Leon Rodríguez, Dir., U.S. Citizenship & Immigration

Servs., and Sarah Saldaña, Dir., U.S. Immigration & Customs Enforcement 2 (Dec. 24, 2015)

("USCIS' negative fear determinations are often flawed, with numerous substantive problems

evident in the transcripts of initial fear interviews."); *see also, e.g.*, Warden-Hertz Decl. ¶ 9

(describing improper denial of credible fear and IJ review corrected only due to attorney

intervention).

### D. The Trump Administration Dramatically Expanded Expedited Removal Without Addressing the Flaws of the Existing System or Inviting Pre-Promulgation Public Comment.

On January 25, 2017, President Trump signed an Executive Order directing DHS to take

action to expand expedited removal to the maximum scope authorized by statute.  *See* Tavarez

Decl., Ex. B, Exec. Order No. 13767, Border Security and Immigration Enforcement

Improvements, 82 Fed. Reg. 8793, 8796 (Jan. 30, 2017).  Less than a month later, on February

20, 2017, then-DHS Secretary John Kelly announced that he would issue a rule expanding

expedited removal.  Tavarez Decl., Ex. V, Memorandum from John Kelly, *Implementing the

President's Border Security and Immigration Enforcement Improvements Policies* (Feb. 20,

2017).  However, DHS took no action for more than two years.

On July 23, 2019, DHS published a rule in the Federal Register implementing President

Trump's directive.  The Rule allows immigration officers to apply expedited removal to

noncitizens arrested *anywhere* in the country who cannot show that they have been lawfully and

continuously present in the United States for at least two years.  *See* 84 Fed. Reg. at 35409.

DHS made the Rule immediately effective.  DHS did not provide any advance notice or

public comment period, despite the fact that the Administration had waited to act for more than

two and half years after the January 25, 2017 Executive Order announced an intention to expand

expedited removal.  Nowhere in the Rule has DHS noted or addressed the well-documented

concerns with expedited removal.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Sierra Club

v. U.S. Army Corps of Engineers*, 900 F. Supp. 2d 9, 24 (D.D.C. 2013) (internal citation and

quotations omitted).

<u>**ARGUMENT**</u>

**I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

The Rule is illegal for at least four reasons.  First, the Rule was promulgated without advance notice and comment, in violation of the APA.  The APA requires that agencies must provide an advance opportunity for public comment before any new regulation is promulgated.  Any exemptions from that presumption must be clear and express.  The expedited removal statute contains no such exemption, or any procedures that are incompatible with notice and comment.  Nor was there any "good cause" to avoid notice and comment here, where the Rule was issued more than two and a half years after it was announced.

Second, the Rule violates the expedited removal statute itself by potentially subjecting hundreds of thousands of noncitizens to summary removal without implementing procedures to ensure fair proceedings.  Applying the canon of constitutional avoidance, courts have long construed immigration statutes to require fair deportation procedures based on the reasonable assumption that when Congress provides a process, it intends a fair one.  The current expedited removal system is rife with flaws and error.  Expanding the reach of expedited removal to noncitizens with substantial ties to this country, without providing concomitant safeguards to mitigate error, calls the statute into grave constitutional doubt.  Accordingly, the Rule is invalid when measured against the statute, which, when properly interpreted, guarantees basic procedural fairness.

Third, for similar reasons, the Rule is arbitrary and capricious under the APA.  Expedited removal's long and well-documented history of grave error will only be exacerbated by its application to countless noncitizens in the interior who have been living here for years.  In

deciding to dramatically expand a flawed system, without addressing or even acknowledging those flaws, DHS has failed to consider important relevant factors it was required to address.

Fourth, the Rule violates two separate statutory provisions—the first, provided by the APA, and the second, the INA—that confer the right to counsel of one's own choosing. Under current agency interpretation and practice, noncitizens in expedited removal have no right to counsel at all. Even if the noncitizen has a lawyer standing by, ready to enter the room where the immigration officer is conducting the proceeding, the agency will bar that lawyer from entering. Asylum seekers placed in expedited removal may be denied counsel when they seek review of a negative credible fear finding before an Immigration Judge. The Rule thus deprives countless noncitizens of their statutory counsel rights.

### A. DHS Violated the APA by Failing to Engage in Notice and Comment Rulemaking.

The notice and comment requirement of the Administrative Procedure Act ("APA"), 5 U.S.C § 533(b), (c), is a bedrock principle designed "to ensure that agency regulations are tested via exposure to diverse public comment [and] to ensure fairness to affected parties." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Section 553 of the APA requires an agency to issue notice of a proposed rulemaking to the public, allow the public to comment, and respond to those comments. Critically, the APA requires that this process occur *before* a rule is promulgated, and not after, to ensure "the right of interested persons to make their views known to the agency in time to influence the rulemaking process in a meaningful way." *Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981). All three Plaintiff organizations would have submitted comments to the Rule prior to implementation, in light of its sweeping and potentially devastating effects on their member communities. *See* Austin Decl. ¶¶ 19-22; Valdez-Cox Decl. ¶¶ 17-20; Fried Decl.

¶¶ 14-17.  And they would have helped their members submit comments as well.  *See* Austin Decl. ¶ 21; Valdez-Cox Decl. ¶ 21; Fried Decl. ¶ 18.

Expanding expedited removal has serious ramifications for hundreds of thousands of noncitizens, their families, and their communities.  And yet, despite the gravity of the new Rule's effect, the serious concerns about expedited removal's past implementation, and the two-plus years DHS took to issue the Rule, DHS chose to bypass a basic procedural safeguard.

DHS erroneously claims that the notice-and-comment requirements do not apply, and offer two flawed reasons: first, because Congress implicitly exempted the designation process from the APA's procedural requirements, and, second, because there was "good cause" to bypass notice and comment.  The agency is wrong on both counts.

### 1. Congress has not exempted DHS from notice-and-comment requirements.

DHS claims that Congress has authorized the expansion of expedited removal to occur without notice-and-comment requirements.  But a "[s]ubsequent statute may not be held to supersede or modify" APA requirements "except to the extent that it does so expressly."  5 U.S.C. § 559.  Accordingly, the D.C. Circuit has "looked askance at agencies' attempts to avoid the standard notice and comment procedures" and directed that exceptions "must be narrowly construed and only reluctantly countenanced in order to assure that an agency's decisions will be informed and responsive."  *Asiana Airlines v. FAA*, 134 F.3d 393, 396 (D.C. Cir. 1998).  Thus, Congress must either specify that the APA's notice-and-comment procedures are not required*, see, e.g.*, *Catawba County v. EPA*, 571 F.3d 20, 32 (D.C. Cir. 2009), or "establish[] procedures so clearly different from those required by the APA that it must have intended to displace the norm," *Asiana Airlines*, 134 F.3d at 397, to exempt a particular type of rulemaking from the APA's procedural requirements.

Congress did neither here.  The text of the expedited removal statute, 8 U.S.C.

§ 1225(b)(1)(A)(iii)(I), states:

> The Attorney General may apply clauses (i) and (ii) of this subparagraph
> to any or all aliens described in subclause (II) as designated by the
> Attorney General. Such designation shall be in the sole and unreviewable
> discretion of the Attorney General and may be modified at any time.

That language fails to meet the high bar for exemptions to the APA's notice-and-comment

requirements.  Although § 1225(b)(1)(A)(iii)(I) authorizes the Attorney General to make or

modify designations and leaves the substance of the "designation" to the Attorney General's

"unreviewable discretion," the statute says nothing about the *procedures* the agency must follow

when making such designations.  Even on its own terms, allowing the Attorney General the

discretion to make or modify a designation "at any time," even in his "unreviewable discretion,"

does not imply anything about what procedures making a designation should involve.[5]

Congress knows how to draft express notice-and-comment exemptions, and chose not to

do so in § 1225(b)(1).  For example, *Catawba County v. EPA* involved a statute in which

Congress had provided that "[p]romulgation or announcement of a designation . . . shall not be

subject to the provisions of sections 553 . . . (relating to notice and comment)."  571 F.3d at 32

(quotation marks removed).  No such language is present here.

Nor does the statute establish its own, "clearly different" procedural requirements.  *Cf.*

*Asiana Airlines*, 134 F.3d at 397.  In fact, it establishes none at all, leaving the default APA

requirements firmly in place.  In *Asiana Airlines*, the D.C. Circuit found that 5 U.S.C. § 553's

procedural requirements were displaced by a statute that required the agency to publish "an

---

[5] DHS also seeks to rely on its previous practice of avoiding notice-and-comment requirements when designating classes subject to expedited removal.  84 Fed. Reg. at 35413.  But there is no rule that "insulates disregard of statutory text from judicial review" simply because an agency has exceeded its authority in the past, and courts have accordingly rejected such "curious appeal[s] to entrenched executive error."  *Rapanos v. United States*, 547 U.S. 715, 752 (2006).

initial fee schedule and associated collections process as an interim final rule, pursuant to which public comment will be sought and a final rule issued."  134 F.3d at 398.  Similarly, in *Methodist Hosp. of Sacramento v. Shalala*, the court held that the statute at issue "required" the issuance of interim final rules, which would then be followed by opportunity for public comment.  38 F.3d 1225, 1237 (D.C. Cir. 1994).  In both cases, the D.C. Circuit held that the statutory requirement of an interim final rule superseded § 553's requirement for advance notice and comment, because an interim final rule is a rule that takes immediate effect.  *See Asiana*, 134 F.3d at 398 (holding that no "reasonable construction" of the statute would "harmonize with simultaneous application of § 553"); *Methodist Hosp. of Sacramento*, 38 F.3d at 1237 (holding that Congress had "expressed its clear intent that APA notice and comment procedures need not be followed" because providing for public comment *after* an interim final rule "contrast[ed with] . . . the procedure set by the APA"). No similar language exists in the expedited removal statute at issue here.

Notably, courts have held that even statutes with *more* procedural content than the expedited removal statute do not supersede the APA.  In *Coalition for Parity v. Sebelius*, the court held that the APA's procedures still applied even where the statute provided that "[t]he Secretary may promulgate any interim final rules as the Secretary determines are appropriate to carry out this [part,]" explaining that the language of the statute remained "permissive . . . , wide-ranging . . . , and [did] not contain any specific deadlines for agency action."  709 F. Supp. 2d 10, 19 (D.D.C. 2010).  *See also Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011) (statute directing that states engage in notice and comment for certification applications did not "constitute[] the requisite 'plain express[ion]' of congressional intent to supersede the APA's requirements" and obviate need for *federal* agency to provide for notice and comment). Here, the

18

Court need not even consider whether any statutory procedures are inconsistent with the APA, because the statute does not set forth any alternative procedure.[6]

## 2.   DHS has not shown good cause to bypass notice and comment.

DHS also claims an exemption to notice-and-comment requirements under 5 U.S.C. § 553(b)(B), which provides an exception to the notice-and comment-requirements "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  Courts review an agency's finding of good cause *de novo*, *see Sorenson v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014), and must "examine closely" the agency's explanation as outlined in the rule.  *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981).  Because notice and comment is the default, "the onus is on the [agency]" to show it can bypass notice and comment.  *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 801 n.6 (D.C. Cir. 1983).

The D.C. Circuit has repeatedly explained that "the good cause exception 'is to be narrowly construed and only reluctantly countenanced.'"  *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001)).  An inquiry into good cause is "meticulous and demanding," *Sorenson Commc'ns*, 755 F.3d at 706 (internal quotations removed), and the agency's good cause determination must be supported by "factual findings" grounded in the record, not "unsupported assertion" or evidence "too scant to establish a[n]. . . emergency," *id.* at 707.  The APA "excuses notice and comment in emergency situations, or where delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (citations omitted).

---

[6] The Notice also cites a regulation, 8 C.F.R. § 253.3(b)(1)(ii), in support of its claim that statutorily mandated notice-and-comment procedures do not apply.  84 Fed. Reg. at 35413, n.6.  But the regulation is irrelevant.  Section 559 and the case law are clear:  Congress' intent, not the agency's interpretation, controls.

Here, the agency asserts that notice and comment is "impracticable." 84 Fed. Reg. at

35413. But a conclusory allegation is not enough: the agency must show that "delay would

imminently threaten life or physical property." *Sorenson Commc'ns*, 755 F.3d at 706; *Jifry*, 370

F.3d at 1179 (good cause shown when rule was "necessary to prevent a possible imminent

hazard to aircraft, persons, and property within the United States"); *Council of the S. Mountains*,

653 F.2d at 581 (good cause shown where rule was one of "life-saving importance" involving

miners in a mine explosion).

No emergency justifies this attempt to evade notice-and-comment requirements here.

Defendants' own actions make that clear. In twenty years, no prior Administration has seen fit to

expand expedited removal to the maximum extent the statute allows. Even more significantly,

an Executive Order directed DHS to expand expedited removal in January 2017, but DHS did

not issue the Rule until July of 2019. In light of this lengthy delay, there is no clearly no

"emergency," and no evidence of "good cause" to make the rule immediately effective and

bypass the legally required deliberative process. Ensuring that the public has an opportunity to

comment on a change of such magnitude will protect, not endanger, both those potentially

subject to expedited removal and the public interest.

The Rule's assertions of good cause fail even on their own terms. The Rule cites only a

generalized "concern[] that delayed implementation could lead to a surge in migration across the

southern border during a notice-and-comment period." 84 Fed. Reg. at 35413. But the Rule

does not cite a single piece of "record support" for such a hypothesized surge. *Sorensen*

*Commc'ns*, 755 F.3d at 707. DHS has long applied expedited removal to individuals who are

apprehended at the border, or who have recently entered the country. There is no logical reason

that a delay in application of expedited removal *in the interior* and to individuals who have *not*

20

recently entered would affect Defendants' ability to cope with any purported increase in migration at the southern border through existing expedited removal procedures.

The Rule also claims that the "public interest" is served through immediate implementation without notice and comment. But the public interest exception "is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Mack Trucks*, 682 F.3d at 95. That is not so here. The purpose of these procedures is precisely to inform the agency of the public's views, especially impacted parties, and to test its rationales.[7]

### B. The Rule Violates the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1), Which Must Be Read to Require Fundamentally Fair Expedited Removal Proceedings that Mitigate the Risk of Erroneous Deportation.

"The troubling reality of the expedited removal procedure is that," under current government practice, a CBP officer can order an individual removed "without any check on whether the person understood the proceedings, had an interpreter, or enjoyed any other safeguards. . . . [T]his procedure is fraught with risk of arbitrary, mistaken, or discriminatory behavior . . . ." *Khan v. Holder*, 608 F.3d 325, 329 (7th Cir. 2010). The Rule includes no procedures to ensure that noncitizens apprehended in the interior of the country, far from the border, and who have resided here for significant periods of time, will receive fair removal determinations. Moreover, there is ample evidence concerning the flaws in the expedited

---

[7] In addition to the notice-and-comment violation, the Rule separately violates 5 U.S.C. § 553(d)'s requirement that a rule be published "no less than 30 days before its effective date, except . . . (3) as otherwise provided by the agency for good cause found and published with the rule." This requirement "protects those who are affected by agency action taken during the 30-day waiting period without disturbing later action that is not the product of the violation." *Prows v. Dep't of Justice*, 938 F.2d 274, 276 (D.C. Cir. 1991). As with notice and comment, Congress did not express a clear intent to depart from § 553(d), and the agency has not shown good cause why the 30-day waiting period should not apply. *See Ngou v. Schweiker*, 535 F. Supp. 1214, 1216 (D.D.C. 1982) (rejecting agency's statement of good cause).

removal system as it existed even before the Rule, which the Rule's broad scope will only aggravate.  Consequently, the Rule raises serious constitutional problems.  *See* Part I.B.1, *infra*.

However, the Court need not resolve the constitutional questions at this stage and may instead invalidate the Rule as an illegal implementation of the expedited removal statute itself. For over a century, courts have applied the canon of constitutional avoidance to interpret immigration statutes to provide safeguards to noncitizens facing deportation.  *See Yamataya v. Fisher*, 189 U.S. 86, 101 (1903).  Consistent with that approach, the expedited removal statute must be read to give noncitizens a procedurally fair opportunity to contest the allegations against them and present countervailing evidence—namely, additional safeguards to protect against wrongful application of the expedited removal statute, including both factual application and legal inadmissibility determinations, and against the failure to refer fear-based claims to asylum officers.  *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (explaining that if one interpretation of statute "would raise a multitude of constitutional problems, the other [interpretation] should prevail").  When measured against the statute's core requirement that the agency's expedited removal determinations must be fair, the Rule's utter failure to provide such procedures renders it invalid.  *See* Part I.B.2, *infra*.

At this stage, Plaintiffs do not ask the Court to declare what procedures would make the Rule fair.  They ask only that the Court find that the expedited removal statute, read to avoid grave constitutional problems, requires far more procedures than the Rule currently provides, and enjoin the Rule for failure to comply with the statute.

### 1. If Not Interpreted to Require Fair Procedures, the Expedited Removal Statute Would Raise Grave Constitutional Concerns.

Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), a court weighs three factors when determining what process is due in a given proceeding: the private interests at stake; the risk of

erroneous deprivation and the probable value of additional procedural safeguards; and the government's countervailing interests.  *Id.* at 335.  The Rule targets noncitizens anywhere within the United States who have substantial ties with the country.  Applying the existing expedited removal process, which is deeply flawed, to these newly designated individuals raises grave constitutional concerns.

### a.  The private interests at stake are of the utmost importance.

The private interests of noncitizens newly subject to expedited removal under the Rule are of paramount importance.  The Supreme Court has repeatedly observed that deportation imposes grave penalties and implicates a Fifth Amendment-protected liberty interest.  *See*, *e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 164 (1945) ("[D]eportation . . . may result in poverty, persecution, and even death.").  Those harms are even greater for those who have built connections and families in this country.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (describing "weighty" possibility of losing "the right to rejoin [one's] immediate family, a right that ranks high among the interests of the individual"); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (deportation "may result … in loss of both property and life; or of all that makes life worth living").  The stakes are likewise heightened for noncitizens fleeing persecution.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is . . . all the more replete with danger when the [noncitizen] makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country."); *Kaweesa v. Gonzales*, 450 F.3d 62, 69 (1st Cir. 2006) (recognizing that a noncitizen "seeking asylum or protection under the Convention Against Torture . . . clearly has a weighty interest in avoiding deportation").

Finally, the private interests at stake are particularly powerful here because the Rule targets a vulnerable population.  *Cf. Gray Panthers v. Schweiker*, 652 F.2d 146, 167 (D.C. Cir.

1980) (requiring the district court to "give some explicit consideration to the unique disability problems and low economic status of large numbers of aged persons when evaluating their need for protections against unjustified denials of modest medical claims").

> **b. The risk of error is high.**

At two key stages of the process—determining whether the noncitizen is properly subject to expedited removal, and determining whether the noncitizen has defenses to removal—the application of expedited removal in its current form already carries a high risk of erroneous deprivation. That risk, when applied to the expanded group of individuals subject to the new Rule, will create a constitutionally intolerable removal system.

First, there is a significant risk that, pursuant to the Rule, noncitizens will be erroneously threatened with swift deportation even though they are not properly subject to expedited removal at all. Issuance of an expedited removal order under the new Rule requires a single low-level officer to make four threshold findings, based only on a cursory interview and records check: (1) that the individual has not been admitted or paroled; (2) that the individual "has not affirmatively shown, to the satisfaction of an immigration officer," continuous physical presence of at least two years; (3) that the individual is inadmissible under certain specified statutory grounds, and (4) that the individual is not a U.S. citizen, lawful permanent resident, or refugee/asylee. 8 U.S.C. § 1225(b)(1)(A)(i), (iii); 8 C.F.R. § 235.3(b)(1)(i)-(ii), (b)(5); 84 Fed. Reg. at 35414. Upon a supervisor's paper review, the officer "shall" order the individual removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see also* 8 C.F.R. § 235.3(b)(2)(i)-(ii).

Because the Rule provides that "[e]ach alien placed in expedited removal under this designation bears the affirmative burden to show to the satisfaction of an immigration officer that

the alien has been present in the United States continuously for" two years or more, 84 Fed. Reg.

at 35414, DHS officers can presume, without evidence, that *any* individual they arrest is properly

subject to expedited removal.  However, the vast majority of undocumented immigrants in this

country have been living here for longer than two years.  Tavarez Decl., Ex. O, Center for

Migration Studies, *U.S. Undocumented Population Continued to Fall from 2016 to 2017, and*

*Visa Overstays Significantly Exceed Illegal Crossings for the Seventh Consecutive Year* (Jan. 16,

2019) (suggesting that as of 2016 less than 4% of the undocumented population present for less

than two years had entered without inspection).  In addition, although the noncitizen theoretically

may present evidence consisting of "documentation in the possession of the [noncitizen], the

Service, or a third party," 8 C.F.R. § 235.3(b)(6), the government's practices effectively preclude

a meaningful opportunity to gather such evidence, to prepare for the inspection by the

immigration officer, or any right or time to obtain counsel.  The Rule fails to require that

noncitizens even be provided an opportunity to make a phone call to a friend or family member

who can help them, or reasonable time to gather evidence.  *Cf. Khan*, 608 F.3d at 326 (neither

petitioner's counsel nor family "had been permitted to speak to him" while he was in expedited

removal proceedings).  And there is no requirement that the government provide notice of, or an

opportunity to rebut, adverse evidence.

These procedural deficiencies, combined with the Rule's scope, make the risk of error

unacceptably high. Proving at least two years of continuous physical presence, while detained

and alone, would be challenging for a U.S. citizen or lawful permanent resident, let alone for an

undocumented person who may lack credit cards in their name or an identification document

with a sufficiently early issue date.  *See* USCIS, *Considerations of Deferred Action for*

*Childhood Arrivals*, (Feb. 14, 2018), https://www.uscis.gov/archive/consideration-deferred-

action-childhood-arrivals-daca (listing school records, employment records, bills, and military records as examples of documents to show continuous presence).  For example, young people who came to this country as children may not have proof of physical presence easily accessible to them, or that evidence may be held by family members.  In addition, one Plaintiff has transgender members who recently changed their legal names, meaning that much of their proof of presence may be in a different name.  *See* Austin Decl. ¶¶ 16-17; *see also* Valdez-Cox Decl. ¶ 13 (member of Plaintiff organization fears not having proper documentation on his person at time of ICE arrest).  Even those who can locate such documents may not physically have them at the time of apprehension.  Without an opportunity to call family or counsel for help, the Rule will erroneously sweep in ineligible individuals.

These procedures were error-prone even prior to the Rule.  For example, in 2014, a Mexican citizen who had been living in the United States continuously for *14 years* was wrongly subjected to expedited removal after a traffic stop.  *See American Exile* at 63; *see also* Cartwright Decl. ¶¶ 6-8; Delfunt Decl. ¶¶ 7-8 (describing entry of expedited removal order against individual who had not left the United States for three years).  The Rule will magnify these problems.  Unlike those apprehended soon after their entry, noncitizens who have lived in the United States for substantial periods of time may have already applied for or obtained immigration relief, which could grant them various forms of admission or parole.  *See, e.g.*, *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 170-71 (3d Cir. 2018) (discussing parole based on application for Special Immigrant Juvenile Status).  But without time to assemble records, or the chance to speak with counsel, noncitizens will be hard-pressed to explain their situation or provide necessary documents to an immigration officer.

Moreover, individuals may have other defenses to being subject to expedited removal, such as showing that they have lawful permanent resident, asylee, or refugee status or U.S. citizenship.  *See* Facts Part C, *supra* (discussing cases of wrongful removals of citizens).  Individuals claiming those types of lawful status have a chance for IJ review of such a claim.  *See* 8 U.S.C. § 1225(b)(1)(C).  But unrepresented and detained noncitizens likely will have difficulty triggering that review, as claims of lawful status can be complex and difficult to articulate.  *See United States v. Ochoa-Oregel*, 904 F.3d 682, 685-86 (9th Cir. 2018) (addressing noncitizen subjected to expedited removal, despite claim that prior deportation did not extinguish his lawful permanent resident status).

Second, the government's system currently fails to adequately guard against errors at key stages in the expedited removal process and to ensure compliance with the limited procedures the government currently affords.  Practitioners report that routinely, noncitizens are not advised of their rights in expedited removal proceedings or are pressured or coerced into signing documents.  *See* Schneider Decl. ¶¶ 5-7, 9 ("People regularly tell us they felt coerced into signing paperwork during the expedited removal process, including paperwork in English that they could not understand."); Warden-Hertz Decl. ¶¶ 5, 7 (describing meeting with 150 men detained for at least a month, none of whom had been told they could report fear of return, and meeting with women subject to family separation who signed papers to try to be reunited with their children); Fluharty Decl. ¶¶ 6, 8; Yang Decl. ¶ 8; Hartzler Decl. ¶¶ 5-6, 10; Jones Decl. ¶ 13; Beckett Decl. ¶ 7.

There are no checks to ensure that noncitizens who require an interpreter are provided with one, or that the information recorded by immigration officers accurately reflects the individual's statements.  Numerous practitioners report serious interpretation problems arising

from this inadequate procedure. *See* Rodriguez Decl. ¶ 7; Hartzler Decl. ¶¶ 7-9; White Decl.

¶ 14; Willis Decl. ¶ 7-8; Warden-Hertz Decl. ¶ 5; Yang Decl. ¶ 9; Fluharty Decl. ¶ 9; Schneider

Decl. ¶ 10; Lunn Decl. ¶ 7.

Moreover, the existing system does not provide for any review of the decision to refer—

or not refer—an individual to an asylum officer for a credible fear interview.  Multiple reports—

including reports by a congressionally-authorized commission—have documented systemic

flaws in this phase of the process, with numerous asylum seekers denied credible fear interviews.

*See* 2005 USCIRF Study at 6, 53-55; 2016 USCIRF Study at 2, 18-23.

The risk of error also is substantial for those without persecution-based claims.

Immigration officers consistently fail to give noncitizens an opportunity to review and respond to

the statements in the required paperwork.  2016 USCIRF Study at 21-22 (documenting that

asylum seekers' statements were not read back to them, and that some were pressured to sign

documents); *cf.* 8 C.F.R. § 235.3(b)(2)(i) (regulation providing that noncitizens should have

opportunity to review and respond to statements and charges); *see also* Hartzler Decl. ¶¶ 5-10;

Jones Decl. ¶¶ 13-14; Tavarez Decl., Ex. T, *United States v. Sanchez-Figuero*, No. 3:19-cr-

00025-MMD-WGC, slip op. at 2, 9  (D. Nev. July 25, 2019) (dismissing unlawful reentry

indictment where defendant, who had not slept for 36 hours at the time of apprehension, "was

not informed of the charge against him and never received a meaningful opportunity to review

the sworn statement").  CBP officers have forced non-English speaking individuals to sign

expedited removal forms without providing translations, despite the regulations' requirement that

"[i]nterpretative assistance shall be used if necessary . . . ."  8 C.F.R. § 235.3(b)(2)(i).  *See*

Hartzler Decl. ¶¶ 7-8; White Decl. ¶ 14; Schneider Decl. ¶ 9; Yang Decl. ¶ 8; *American Exile* at

35-36; Borderland Report at 13 ("Individuals are forced to sign legal documents in English without translation.").

Expedited removal forms regularly reflect factual errors that in turn result in erroneous removal orders.  *See, e.g.*, Jones Decl. ¶¶ 11-14 (expedited removal of 16-year-old survivor of abuse with fear of return to Mexico); Cartwright Decl. ¶¶ 3-8 (entry of expedited removal order against individual who had not left the United States for 10 years); *United States v. Mejia-Avila*, No. 2:14-CR-0177-WFN-1, 2016 WL 1423845, at *1 (E.D. Wash. Apr. 5, 2016) (dismissing indictment where defendant was not subject to expedited removal because the record was "clear" that he had lived in the United States for more than two years); 2016 USCIRF Study at 2 (describing "continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create" during the expedited removal process); 2005 USCIRF Study at 74 (explaining that statements recorded by CBP officers "are often inaccurate and are almost always unverifiable"); *id.* at 55 ("Study observations indicate that paper files created by the inspector are not always reliable indicators" of whether a credible fear interview was merited.); *id.* at 53 (noting that expedited removal forms were routinely inaccurate).

Finally, the government's system creates a significant risk that noncitizens subject to the Rule will be erroneously denied the opportunity, provided by statute, to withdraw their applications for admission.  *See* 8 U.S.C. § 1225(a)(4) (providing that noncitizen seeking admission "may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission").  Withdrawal permits the noncitizen to leave the United States voluntarily, without receiving a removal order and other associated penalties.[8]  *See United States v. Raya-Vaca*, 771 F.3d 1195, 1206 (9th Cir. 2014).

---

[8] For example, a person removed from the United States via expedited removal is permanently inadmissible to the country, absent a discretionary waiver from the government.  *See* 8 U.S.C. § 1182(a)(6)(C).

Yet the government does not require that noncitizens be notified of the availability of withdrawal, meaning that most noncitizens subject to the Rule would not know that they can request that relief, much less understand why they might want to do so.  *See* Hartzler Decl. ¶¶ 18-19; Jones Decl. ¶ 12; *see also, e.g.*, *United States v. Ramirez-Diaz*, 359 F. Supp. 3d 994, 999-1000 (D. Or. 2019) (ruling that noncitizen who had lived and worked in United States since young age could plausibly have been granted withdrawal); *United States v. Huazo-Garcia*, No. 2:18-cr-00056-SMJ, 2018 WL 2306890, at *2, *4 (E.D. Wash. May 21, 2018) (finding that noncitizen had shown he was potentially eligible for withdrawal).

### c.   The probable value of additional safeguards is also high.

Straightforward safeguards would mitigate the risk of error.  For example, the noncitizen should be given greater notice of, and an opportunity to rebut, the government's adverse evidence.  *See Gray Panthers*, 652 F.2d at 168 (disapproving use of form letters that reduce claimant "to guessing what evidence can or should be submitted in response"); *Simms v. D.C.*, 872 F. Supp. 2d 90, 102 (D.D.C. 2012) ("No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.") (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55 (1993)).  And noncitizens must be given a reasonable amount of time to do so before any expedited removal order can be executed.[9]

Immigration officers must also advise noncitizens of their rights, including the right to seek withdrawal of an application for admission, as well as of the rights that apply when the

---

[9] Indeed, the government recognizes that other kinds of removal orders should not be immediately executed, in order to give the noncitizen a chance to challenge them.  *Accord* Deportation of Aliens in the United States; Expulsion, 51 Fed. Reg. 23,041 (June 25, 1986) (recognizing that noncitizens subject to deportation "will be held a minimum of 72 hours prior to removal by the Service, to ensure that due process is accorded the detainee"); 8 C.F.R. § 241.33(b) (preventing execution of removal order sooner than 72 hours after service of decision absent noncitizen's waiver); 8 C.F.R. § 241.22 (same); 8 U.S.C. § 1228(b)(3) (automatically staying execution of administrative removal order against noncitizens with aggravated felony convictions for 14 days unless waived by the noncitizen).

noncitizen may have lawful status.  *See Chandler v. United States Parole Comm'n*, 60 F. Supp. 3d 205, 223–24 (D.D.C. 2014) (due process may require "effective and timely notice" of one's procedural rights at the hearing).  The right to request more time to gather evidence is also critical.  *See id.* (providing that defendants must have notice of impending sex offender classification and have sufficient time to prepare a defense at the hearing).  More thorough review of an individual immigration officer's decision would provide a critical check on a line officer's determination.  *See Propert v. District of Columbia*, 948 F.2d 1327, 1333-34 (D.C. Cir. 1991) (officer who made initial determination that car was "junk" could not be relied upon to hear rebuttals or countervailing evidence).

Immigration officers should also bear the burden of showing that the noncitizen is not admitted or paroled, and of establishing removability.  The government's regulations require the noncitizen to shoulder that burden.  *See* 8 C.F.R. § 235.3(b)(6).  But in light of the government's superior access to evidence, the potential swiftness of the process, and the fundamental rights at stake, it is unfair to put this onus on the noncitizen.  *Cf. Santosky v. Kramer*, 455 U.S. 745, 763 (1982) (holding that state should bear heightened proof burden in parental neglect proceedings because, inter alia, "[t]he State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense").  The simple opportunity to engage in consultation—with family, friends, or counsel—will ensure that noncitizens have a meaningful opportunity to gather evidence to demonstrate that they are not properly subject to expedited removal, and to respond to the government's evidence.  *Cf. Cheung v. INS*, 418 F.2d 460, 463 (D.C. Cir. 1969) (discussing the importance of giving noncitizens in deportation proceedings the "opportunity to consult with friends").  And the ability to retain and consult counsel would help noncitizens enforce legal rights provided by statute and regulation, such as, for example, helping noncitizens

request withdrawal of applications for admission, or the statutory right to a credible fear interview for someone who claims a fear of persecution.[10]  *See id.* at 464 (explaining that a "lawyer could be helpful to [a noncitizen] even if deportability seemed clear" by, *inter alia*, "seek[ing] more time for a voluntary departure").

>    **d.  The government's interests do not outweigh the need for minimal procedural safeguards.**

The effort required to provide relatively minimal procedural safeguards—such as more time, the opportunity to make a phone call, and the chance to speak with a lawyer—is not burdensome.  Nor will every noncitizen seek to avail themselves of these protections; those noncitizens with no colorable defenses or who are plainly eligible for summary removal likely will not want their proceedings prolonged when it will result in lengthening their detention.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).

Moreover, the government shares Plaintiffs' interest in the effective and fair administration of the immigration laws.  *Cf. Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").  Indeed, the government *already* provides safeguards similar to, and even beyond, those described above to all noncitizens in regular removal proceedings.  *See generally* 8 U.S.C. § 1229a.

To the extent the government claims an immigration "crisis" weighs in its favor, the Rule's assertion of a border "crisis" is conclusory, unsupported, and in any case would not be solved by the new Rule.  Overall apprehensions along the U.S.-Mexico border are down since the early 2000s, and in Fiscal Year 2017, hit their lowest point since 1971.  *See* Declaration of Cecilia Menjivar ("Menjivar Decl."), Ex. B (U.S. Border Patrol Apprehensions by Fiscal Year).

---

[10] Plaintiffs do not assert a right to appointed counsel provided by the government. Rather, they assert that the APA, the Due Process Clause, and the INA confer on them a right to representation *at their own expense.*

Overall southern border apprehensions for Fiscal Year 2019 currently are expected to be about 33% lower than they were during Fiscal Years 2004-05.  *Compare* Menjivar Decl. ¶ 10 (showing current apprehensions for Fiscal Year 2019 totaling under 700,000) *with* Menjivar Decl., Ex. B (showing over one million apprehensions during Fiscal Years 2004-2005).

Furthermore, any increase in current migration to the southern border is largely driven by asylum seekers.  Menjivar Decl. ¶ 17 ("The overwhelming majority of women and children crossing the United States' southern border in recent years have been fleeing violence both inside and outside the home in northern Central America.").  Aggressive enforcement efforts will not deter current migration patterns of individuals fleeing extreme violence in their home countries. *See id.* ¶ 14 ("Studies of the effect of detention policy have shown that the imposition of harsher conditions on asylum seekers has no deterrent effect on migration."); *see also id.* ¶¶ 15-20; *cf. R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 189 (D.D.C. 2015) (citing lack of empirical evidence that the government's detention policy would further purpose of deterring asylum seekers from coming to United States).  And even if it did, courts have recognized that deterring migration of asylum seekers is not a legitimate governmental purpose.  *Al Otro Lado v. McAleenan*, No. 17-cv-02366-BAS-KSC, 2019 WL 3413406, at *29 (S.D. Cal. July 29, 2019) ("[T]here is no room for deterrence under the [asylum] scheme Congress has enacted.").

Even if any border "crisis" existed, focusing on *interior* enforcement will not address that situation.  As stated above, even before the new Rule, DHS officers operating along land borders *already* had the authority to place individuals who recently entered the United States into expedited removal.  Virtually all migrants who are part of the purported border surge were already subject to expedited removal long before the new Rule.

A desire to swiftly deport immigrants from this country is not well served by expanding a flawed system to groups of people who may not be subject to expedited removal at all.[11]

> ## 2. The Expedited Removal Statute Must be Read to Require Fair Determinations That the Person is Properly Subject to Expedited Removal, is Removable, and of Their Fear-Based Claims.

Although the Rule, as applied to the hundreds of thousands of noncitizens within its sweep, would be unconstitutional, this Court need not rule for Plaintiffs on constitutional grounds. Instead, the Court can and should find that the expedited removal statute must be read to require procedurally fair determinations, and invalidate the Rule for failure to comply with the statute.

Courts have long construed removal statutes to require due process protections, even where the statute does not expressly provide such safeguards. The very concept of a deportation hearing arose when the Supreme Court read an early immigration statute to require a hearing to avoid serious due process concerns. *See Yamataya*, 189 U.S. at 100-01. The statute in *Yamataya* provided that immigration officers should "inspect" certain noncitizens arriving by sea to determine their excludability, that those determinations "shall be final" absent administrative appeal, and that the government could, "within one year after an alien of the excluded class entered the country, . . . cause him to be taken into custody and returned to the country whence he came." *Id.* at 95-96, 99. The Court rejected a "rigid construction" of those statutes and held

---

[11] The Rule itself relies on incomplete data that obscures the severe logistical and procedural difficulties of expanding expedited removal. 84 Fed. Reg. at 35411. DHS presents a set of numbers for "interior encounters" for Fiscal Years 2018 and 2019 to date, claiming that 37 to 39 percent of ICE's total "interior encounters, *with entry dates*" were of noncitizens present in the country for less than two years. *Id.* (emphasis added). The Rule states that in FY18, 20,507 of "ICE's *54,983* total interior encounters, *with entry dates*, would have been eligible for expedited removal. *Id.* (emphases added).

    But according to ICE's own data, the agency had more than 474,500 *encounters* during FY18—a nearly nine-fold increase from the Rule's cited figure. *See* Tavarez Decl., Ex. R, Guillermo Cantor, et al., Am. Imm. Council, *Changing Patterns of Interior Enforcement in the United States, 2016 – 2018* 31 (2019) (providing data on ICE encounters by month through September 23, 2018). The rule makes no mention of how the eligibility for expedited removal for the remainder of this total number—whose entry dates may not be known to the agency—is to be determined, or how the errors that permeate expedited removal will not be carried over to that determination.

that they "do not necessarily exclude opportunity to the immigrant to be heard, when such opportunity is of right." *Id.* at 100. "The words here used do not require an interpretation that would invest executive or administrative officers with the absolute, arbitrary power" to deport noncitizens without process. *Id.* at 101; *see also Wong Yang Sung v. McGrath*, 339 U.S. 33, 49 (1950) ("It was under compulsion of the Constitution that this Court long ago held that an antecedent deportation statute must provide a hearing . . . .").

As with *Yamataya*, courts and immigration agencies have construed other immigration statutes to provide certain unenumerated safeguards when necessary to protect due process. For example, the "fair hearing" provision that applies to regular removal proceedings, 8 U.S.C. § 1229a(b)(4)(B), and its precursors have long been read to require protections such as interpretation at the hearing, *see Matter of Tomas*, 19 I. & N. Dec. 464, 465-66 (BIA 1987), "the . . . timely production of" adverse evidence, *Bondarenko v. Holder*, 733 F.3d 899, 907 (9th Cir. 2013), and a neutral fact finder, *see Tun v. Gonzales*, 485 F.3d 1014, 1025 (8th Cir. 2007). And in *Marincas v. Lewis*, 92 F.3d 195, 199-200, 203-04 (3d Cir. 1996), the Third Circuit read into the Refugee Act a requirement that stowaways seeking asylum were entitled to basic procedural safeguards like the right to an interpreter or translator.

This Court should similarly interpret the expedited removal statute to provide a meaningful opportunity to be heard to noncitizens who have lived in the United States for a substantial period of time. Although it allows for removal of noncitizens without a full hearing, the statute requires immigration officers to "inspect" noncitizens and make determinations of inadmissibility. 8 U.S.C. § 1225(b)(1)(A)(i). If the noncitizen claims a fear of persecution, she must be referred for a fear interview by an asylum officer. *Id.*; *id.* § 1225(b)(1)(A)(ii). The statute also limits the potential applicability of expedited removal to noncitizens who "ha[ve] not

35

been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the [noncitizen] has been physically present in the United States" for two continuous years.  *Id.* § 1225(b)(1)(A)(iii).  If the noncitizen claims a fear, the immigration officer must refer her "for an interview by an asylum officer," *id.* § 1225(b)(1)(A)(ii), consistent with the procedures credible fear determinations, *id.* § 1225(b)(1)(B).

As courts have long done in the immigration context, this Court should interpret the expedited removal statute to require fair determinations of whether, *inter alia*, the factual criteria for expedited removal are met, that the noncitizen is inadmissible for the specified grounds, and that there is a viable opportunity to express a fear of return.  *See* Argument Part 1.B.1.c *supra* (discussing probable value of additional safeguards).  Reading the expedited removal statute to guard against "absolute, arbitrary power," *Yamataya*, 189 U.S. at 101, would avoid an interpretation that would create serious constitutional problems.

As explained above, the Court need not now determine what specific procedures the government must put in place to cure these constitutional problems.  The Rule's utter absence of safeguards renders it fatally defective under the statute, as read to avoid constitutional doubt, and the Court can strike it down on that basis.

### C. The Rule is Arbitrary and Capricious Because it Fails to Acknowledge or Address the Due Process Problems in the Existing Expedited Removal System, and Fails to Ensure Its Fair Application to Those Newly Subject to the Rule.

For related reasons, the Rule is arbitrary and capricious in violation of the APA.  *See* 5 U.S.C. § 706(2)(A).  The APA requires agencies to "provide a reasoned explanation for [their] action[s]."  *Judulang v. Holder*, 565 U.S. 42, 45 (2011).  An agency may not "entirely fail[] to address an important aspect of the problem . . . ."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Genuine Parts Co. v. EPA*, 890 F.3d

304, 307 (D.C. Cir. 2018) (invalidating action where agency "entirely failed to consider an

important aspect of the problem by failing to address evidence that runs counter to the agency's

decision").

If the agency chooses to make the sweeping and impactful decision to expand expedited

removal to its outermost parameters, it must implement it in a way that ensures its fair

application.  Despite voluminous evidence of systemic due process violations in the existing

expedited removal process and DHS' widespread failure to comply with even the minimal

procedural protections in place, the Rule does not mention these issues, let alone attempt to

address how the expansion of expedited removal will do anything but intensify the problems.

DHS was undoubtedly aware of the problems with the existing expedited review system before it

promulgated the Rule, given the numerous investigations and public reports on expedited

removal.  *See generally* Facts Part C *supra*; *see also* Tavarez Decl., Ex. G, Letter from American

Immigration Council and American Civil Liberties Union to Kevin K. McAleenan, DHS Acting

Secretary 1 (May 1, 2019) (letter sent to agency by Plaintiffs' counsel specifically requesting that

they "address and ameliorate the well-documented problems in its existing implementation of

expedited removal" rather than moving forward with an expansion of expedited removal).  These

publicly-available reports are confirmed by the court decisions discussed above, as well as the

testimony of numerous legal services providers who have represented noncitizens subject to

expedited removal.  Yet, the Rule does not promulgate any of the protections necessary to

safeguard against these known problems.

As discussed above, the expansion of expedited removal will be accompanied by *new*

logistical and due process concerns, stemming from its application to noncitizens who have been

living in the United States for long periods, including those with established family ties and/or pending applications for various forms of immigration relief.  Yet the Rule fails to provide noncitizens with the ability to even make a phone call or gather evidence necessary to demonstrate the two-year continuous-presence requirement, which will undoubtedly prejudice many noncitizens with valid defenses.  *See* Facts Part A *supra*.

The agency's decision to apply expedited removal to noncitizens with strong ties to this country without accounting for the serious procedural flaws means it failed to consider "important aspect[s] of the problem" in issuing the Rule, rendering it arbitrary and capricious. *State Farm*, 463 U.S. at 43; *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (agencies must "adequately analyze … the consequences" of their actions).

### D.  The July 23 Rule Violates the APA and the Immigration and Nationality Act, Which Confer the Right to Counsel in Expedited Removal Proceedings.

The APA and the Immigration and Nationality Act ("INA") independently provide noncitizens the right to representation, at their own expense, in expedited removal proceedings.

#### 1.  The APA Affords Noncitizens in Expedited Removal Proceedings the Right to Counsel of Their Own Choosing.

An individual considered for expedited removal under the Rule is compelled to appear before an immigration officer, who will decide if that person is properly subject to the summary process. The APA's counsel provision, 5 U.S.C. § 555(b), provides that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel . . . ."  This provision grants any person who is compelled to appear before an agency the right to "counsel of [his] choice."  *Sec. and Exch. Comm'n v. Higashi*, 359 F.2d 550, 553 (9th Cir. 1966); *see also Great Lakes Screw Corp. v. Nat'l Labor Relations Bd.*, 409 F.2d 375, 3881 (7th Cir. 1969) (stating that "the statutorily provided right to

be represented by counsel of one's own choice is fundamental").  Section 555(b) applies broadly to both formal hearings under the APA and other adjudicative proceedings.  *See Prof'l Reactor Operator Soc. v. U.S. Nuclear Regulatory Comm'n*, 939 F.2d 1047, 1051 (D.C. Cir. 1991); *see also Roelofs v. Sec'y of Air Force*, 628 F.2d 594, 600 (D.C. Cir. 1980) ("[Section] 555 is not limited to cases where a specific statutory prescription exists, but applies 'according to the provisions thereof.'") (quoting 5 U.S.C. § 555(a)).

As set forth above, the APA provides that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so *expressly*."  5 U.S.C. § 559 (emphasis added); *see also Prof'l Reactor Operator Soc.*, 939 F.2d at 1052 ("If the right to counsel at investigatory interviews is to expand or contract depending on the mission of the agency, Congress must say so 'expressly.'") (quoting 5 U.S.C. § 559).  Any exemptions from the APA's terms must be clear.  *See Lane v. U.S. Dep't of Agric.*, 120 F.3d 106, 110 (8th Cir. 1997) (rejecting argument that APA did not apply to administrative proceedings before Department of Agriculture because "[t]here is no provision in the . . . statutes that it is the sole and exclusive procedure for conducting hearings").

None of the provisions in 8 U.S.C. § 1225(b)(1) are incompatible with the APA's counsel guarantee, and certainly none can be read to displace any procedural safeguard the APA provides.  Nor does Section 1225 contain an express exemption—either general or specific— from the APA.  *See* Argument Part I.A *supra*.  By the statute's plain terms, and in light of the APA's requirements that any exemptions from its provisions must be express, *see* 5 U.S.C. §§ 559, 555(b), guarantees noncitizens in expedited removal the right to counsel of their choice.

Comparing Section 1225(b)(1) with the statute governing regular removal proceedings under 8 U.S.C. § 1229a is instructive.  In contrast to expedited removal, Congress specified that

39

the procedures set forth in Section 1229a "shall be the sole and exclusive procedure for determining" removability, "[u]nless otherwise specified in this chapter," 8 U.S.C. § 1229a(a)(3), and included discrete procedural requirements.  8 U.S.C. § 1229a(b)-(c) (containing various provisions on counsel rights, notice, burdens and methods of proof, and credibility determinations).  The Supreme Court relied on this "sole and exclusive" language and the enumerated procedures in Section 1229a to conclude they superseded the APA's requirements.  *See Marcello v. Bonds*, 349 U.S. 302, 309 (1955); *Ardestani v. INS*, 502 U.S. 129, 134 (1991) (reading *Marcello* as "rest[ing] in large part on the statute's prescription that the INA 'shall be the sole and exclusive procedure for determining the deportability of an alien under this section.'").  Section 1225(b)(1) contains no such "sole and exclusive language" or specific procedural protections.  Congress knew how to displace the APA's protections in the immigration context, and chose to not to do so as to expedited removal.

### 2. The INA Entitles Noncitizens to Counsel of Their Own Choosing in Immigration Judge Reviews of Credible Fear Denials.

The Rule also violates the INA's guarantee of a right to counsel in one specific part of the credible fear process—the IJ review of a negative credible fear finding.  The immigration statute provides that "[i]n any removal proceedings before an immigration judge . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."  8 U.S.C. § 1362.  Immigration judge review of a negative credible fear finding is part of expedited removal proceedings.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III) (provision of the expedited removal statute allowing for review by an immigration judge of negative credible fear determinations); 8 C.F.R. § 208.30(g)(2); *see generally* 8 C.F.R. § 1208.30(g)(2).  Therefore, the review of a negative credible fear finding is clearly a "removal proceeding before an immigration judge."

40

Consequently, barring counsel from participating in that hearing unlawfully interferes with the noncitizen's statutory right to counsel of their own choosing. *See Leslie v. Att'y Gen.*, 611 F.3d 171, 180 (3d Cir. 2010) (recognizing noncitizen's "right to counsel at removal hearings" as "manifestly a statutory right"); *Castaneda-Delgado v. INS*, 525 F.2d 1295, 1298 (7th Cir. 1975) (recognizing that noncitizens "in deportation proceedings[] ha[ve] the right granted by statute and regulation to be represented by an attorney . . . at no expense to the Government"). This right also draws support from the APA. *See* Argument Part I.C.1 *supra*.

In violation of this statutory right, IJs can ban attorneys from the courtroom during reviews of negative credible-fear determinations. *See* Tavarez Decl., Ex. C, EOIR, Interim Operating Policy and Procedure Memorandum 97-3: Procedures for Credible Fear and Claimed Status Reviews 10 (1997) ("There is no right to representation prior to or during the review, either in the statute or the regulation.") (emphasis omitted); *id*. at 10 n.10 ("[N]othing in the statute, regulations or this OPPM entitles an attorney to make an opening statement, call and question witnesses, cross examine, object to written evidence, or make a closing argument."); *see also* Beckett Decl. ¶ 8 (IJs begin negative credible fear reviews by telling attorney "they can tell [him] to leave their courtroom"). By subjecting the individuals newly eligible to expedited removal to this practice, the Rule violates the INA's own counsel provisions.

## II.   THE REMAINING FACTORS TIP DECIDEDLY IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION

The new Rule makes far-reaching changes that will harm Plaintiff Organizations. Plaintiffs' members face the prospect of summary removal pursuant to the flawed and illegal expedited removal procedures. For example, Plaintiff Make the Road New York ("MRNY") is a membership-based organization has thousands of noncitizen members, many of whom have been subject to enforcement activities by DHS. Austin Decl. ¶¶ 6-10. MRNY has identified at least

three members who could be placed in expedited removal proceedings pursuant to the Rule, because they entered without inspection, and have been continuously present in the United States for less than two years.  *Id.* ¶¶ 11-16.  MRNY also has other members who have been living in the United States for longer than two years and who could be erroneously subject to expedited removal.  *Id.* ¶¶ 16-18.

Similarly, Plaintiff *La Unión del Pueblo Entero* ("LUPE")—a membership-based organization located in South Texas—has identified at least two members who have been continuously present less than two years, and could be placed into expedited removal.  Valdez-Cox Decl. ¶¶ 11-12.  The organization also has at least one member who has been present for more than two years, but fears being erroneously placed in expedited removal because he would not be able to prove the duration of his residence, or would not have this proof with him in the event he were detained.  *Id.* ¶ 13.  Plaintiff WeCount!, a Florida-based organization, has at least one member who could be summarily removed under the new Rule.  Fried Decl. ¶¶ 6-17.

The noncitizen members of the three Plaintiff Organizations are routinely subject to various forms of ICE enforcement activities, including workplace raids and checkpoints in communities where immigrant members reside.  *See* Austin Decl. ¶¶ 5-10; Valdez-Cox Decl. ¶¶ 6-9; Fried Decl. ¶¶ 12-13.  Thus, even those members who have been continuously present for more than two years are scared of being subject to summary removal because they do not have or know what documents they could use to show their legal status or their continuous presence, and do not know when and how they would be able to access this crucial information if they encounter an immigration officer at work, on the street, or a courthouse.  *See* Austin Decl. ¶¶ 9, 16-17; Valdez-Cox Decl. ¶¶ 8, 9, 14; Fried Decl. ¶ 12.

Plaintiffs are also currently experiencing irreparable harm because they are being "depriv[ed] of a procedural protection to which [they are] entitled" under the APA. *Sugar Cane Growers Cooperative of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002). Given the stakes of the Rule, Plaintiffs and their members would have responded to a request for pre-promulgation comments regarding the drastic impact of expanding expedited removal. *See* Austin Decl. ¶¶ 19-22; Valdez-Cox Decl. ¶¶ 17-20; Fried Decl. ¶¶ 14-17. Section 553 "is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980) (citation and internal quotation marks omitted). *Accord N. Mariana Islands v. U.S.*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009) (agencies are "far less likely to be receptive to comments" submitted after a rule is effective). Had it complied with APA requirements, DHS would have been obligated to consider comments here before making a determination on whether and how to expand expedited removal.

In contrast, the government cannot point to any harm that could outweigh that experienced by Plaintiffs. As explained above, the current Rule is not made in response to an emergency, and a delay will not harm the public interest. *See supra*, Argument Part I.A.2 (explaining that any imagined "surge" in response to a delay in implementing the Rule is entirely speculative and contrary to all evidence). But while the Rule is in effect, countless people living in the United States with their families could be deported pursuant to a procedure that flouts core due process guarantees.

Finally, the public interest strongly favors a preliminary injunction, as the public interest is served when administrative agencies comply with their legal obligations. *See New Jersey v.*

*EPA*, 626 F.2d at 1045 ("It is now a commonplace that notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive."). Moreover, "[o]f course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be granted.

Dated: August 9, 2019

Trina Realmuto*****
Kristin Macleod-Ball*****
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
(857) 305-3600

Karolina J. Walters (D.C. Bar No. 1049113)
American Immigration Council
1331 G Street, NW, Suite 200
Washington, D.C. 20005
(202) 507-7520

Jonathan K. Youngwood*
Susannah S. Geltman*
Joshua Polster*
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

Adrienne V. Baxley
(D.C. Bar No. 1044750)****
Simpson Thacher & Bartlett LLP
900 G Street, N.W.
Washington, D.C. 20001
(202) 636-5822

Respectfully submitted,

*/s/ Celso Perez*

Celso Perez  (D.C. Bar No. 1034959)
Anand Balakrishnan*****
Omar C. Jadwat*
Lee Gelernt*****
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Jennifer Chang Newell***
Stephen B. Kang******
Julie Veroff***
American Civil Liberties Union
Foundation, Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union
Foundation of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

44

*Pro hac vice application forthcoming                    *Attorneys for Plaintiffs*
**Pro hac vice application pending
***Filing pursuant to LCvR 83.2(c)
****Application for admission forthcoming
*****Admitted pro hac vice