# EXHIBIT G

 

May 1, 2019

<u>VIA U.S. MAIL AND EMAIL</u>

Acting Secretary Kevin K. McAleenan
Department of Homeland Security
Washington, DC 20229
DHSSecretary@hq.dhs.gov,
  Kevin.McAleenan@cbp.dhs.gov,
  Kevin.McAleenan@hq.dhs.gov

Director L. Francis Cissna
U.S. Citizenship & Immigration Services
20 Massachusetts Ave NW
Washington, DC 20529

Acting Deputy Director Matthew T. Albence
U.S. Immigration & Customs Enforcement
500 12th St., SW
Washington, D.C. 20536
Matthew.Albence@ice.dhs.gov

Acting Commissioner John Sanders
U.S. Customs and Border Protection
1300 Pennsylvania Ave. NW
Washington, DC 20229

**RE: Expansion of Expedited Removal**

Dear Acting Secretary McAleenan, Director Cissna, Acting Deputy Director Albence, and Acting Commissioner Sanders:

According to recent media reports, the Department of Homeland Security (DHS) is considering an unprecedented expansion of expedited removal to individuals who cannot demonstrate two years of continuous presence, are apprehended anywhere in the United States, and have not been admitted or paroled.  Since its initial implementation over 20 years ago, expedited removal has been rife with error, misconduct, and rights violations.  Rather than expand this flawed process to more noncitizens, the agency should address and ameliorate the well-documented problems in its existing implementation of expedited removal.  We write to bring your attention to numerous reports and other materials (attached, and summarized below) providing extensive, detailed information concerning the widespread problems in the existing expedited removal system. DHS and its component agencies must consider this evidence before making any determination to expand the flawed expedited removal system. We ask that you reply confirming that you have received and reviewed the enclosed information.

1. **DHS officers regularly fail to refer individuals who express fear of return to their countries of origin for credible fear interviews and interfere with asylum seekers' claims**

DHS officers, usually those employed by U.S. Customs and Border Protection (CBP), must inform individuals potentially subject to expedited removal of their rights and refer those with a fear of return to their countries of origin to asylum officers within U.S. Citizenship and Immigration Services (USCIS) for credible fear interviews (CFIs). These responsibilities are to

be carried out without misinformation, harassment, or intimidation.[1] In light of immigration officers' well-documented failure to fulfill these basic obligations to asylum seekers facing expedited removal, the flawed expedited removal system should not be expanded. DHS should consider evidence of these abuses, including the following evidence attached to this letter:

- A. Reports documenting CBP agents' failure to comply with their legal obligations to asylum seekers:
    - o Ex. A, Human Rights First, *Fact Sheet: Allowing CBP to Conduct Credible Fear Interviews Undermines Safeguards to Protect Refugees* (Apr. 2019) ("CBP officers already often fail to even properly question and refer asylum seekers for fear screenings.")
    - o Ex. B, DHS Office of the Inspector General, *Special Review—Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (Sept. 27, 2018) (describing CBP practices amounting to failure to properly refer asylum seekers for CFIs in order to "regulat[e] the flow of asylum-seekers at ports of entry")
    - o Ex. C, Amnesty International, *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers* (2017) (describing CBP agents' coercion of and threats to asylum seekers, including making them recant their claims of fear on video, claiming that they cannot seek asylum without a ticket from officials in Mexico, and claiming that there is no more asylum for individuals from certain countries)
    - o Ex. D, Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border*, 12-14 (2017) (reporting "commonplace" failure to refer individuals who express fear for CFIs and summary deportations of such individuals after hostile interrogations and "verbal, physical, and mental harassment")
    - o Ex. E, American Immigration Council, *Deportations in the Dark: Lack of Process and Information in the Removal of Mexican Migrants*, 1, 2, 5, 7-8 (Sept. 2017) (reporting that 55.7% of a survey of 600 deported Mexican migrants were not asked if they feared return to Mexico and describing numerous incidents of CBP interference with asylum claims)
    - o Ex. F, American Immigration Council, *Still No Action Taken: Complaints Against Border Patrol Agents Continue to Go Unanswered*, 9 (Aug. 2017) (reporting CBP's failure to act in response to complaints of misconduct, including complaints that agents ignored claims of fear or persecution)
    - o Ex. G, Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers* (May 2017) (documenting CBP abuses towards asylum seekers, including ignoring asylum claims, providing false information—e.g., that the United States no longer provides asylum—mocking and intimidating asylum

---

[1] CBP Directive No. 51735-013A, Standards of Conduct (Mar. 13, 2012) ("All employees must maintain high standards of honesty, integrity, impartiality, character, and professionalism . . . .").

seekers, imposing procedures to deter asylum seekers from pursuing their claims, and coercing asylum seekers into giving up their claims)
- Ex. H, Human Rights First, *Violations at the Border: The El Paso Sector* (Feb. 2017) (describing CBP's treatment of asylum seekers in the El Paso Sector, including examples of using physical force to turn asylum seekers away from ports of entry and refusing to process asylum seekers' claims)
- Ex. I., U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*, 20-32 (2016) ("2016 USCIRF Study") (documenting examples of failure to properly screen for fear of return in CBP primary inspection interviews and noting "certain CBP officers' outright skepticism, if not hostility, toward asylum claims")
- Ex. J, American Civil Liberties Union, *American Exile: Rapid Deportations That Bypass the Courtroom*, 4 (Dec. 2014) (reporting that 55% of 89 interviewed individuals who received summary removal orders, including expedited removal orders, were not asked about fear of persecution in language they could understand and 40% of those asked about fear were deported without CFI despite expressing fear of return)
- Ex. K, Human Rights Watch, *"You Don't Have Rights Here": US Border Screening and Returns of Central Americans to Risk of Serious Harm* (Oct. 16, 2014) (finding, in investigation of individuals deported to Honduras, that CBP did not refer individuals seeking asylum for CFIs and that individuals were not informed of right to seek asylum or referred for CFIs after expressing fear and faced harassment, threats, and coercion to dissuade them from seeking asylum)
- Ex. L, American Immigration Council, *Mexican and Central American Asylum and Credible Fear Claims: Background and Context* (May 2014) (providing description of credible fear process, including report of frequent complaints that CBP agents dissuade people from seeking asylum through harassment, threats, provision of misinformation, use inadequate interview processes, and use of boilerplate language in paperwork indicating that the agents failed to record asylum seekers' claims)
- Ex. M, U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 4, 10, 64 (2005) (documenting numerous "serious problems" in the expedited removal process "which put some asylum seekers at risk of improper return" and describing expedited removal as "a [s]ystem with [s]erious [f]laws"), *id.* at 53-54 (finding that in 15% of observed cases, when a noncitizen expressed a fear of return to an immigration officer during the inspections process, the officer failed to refer the individual to an asylum officer for a credible fear interview)

B. Administrative complaints to DHS and/or its component agencies documenting ongoing problems with CBPs' treatment of individuals who should be referred for CFIs:
- Ex. Q, Complaint to DHS by individual detained at South Texas Family Residential Center (Apr. 28, 2017) (documenting that complainant, who, with her

3

7-year-old son, attempted to apply for asylum at port of entry three times, was repeatedly told by CBP that there was "no more asylum" and that they could face family separation if they pursued their claims)
- Ex. R, Complaint from American Immigration Council, et al. to DHS Officer for Civil Rights and Civil Liberties and DHS Inspector General, Re: CBP's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border (Jan. 13, 2017) (documenting CBP agents' failure to refer asylum seekers for CFIs by, inter alia, lying or misinforming them about asylum law, using intimidation, and engaging in physical and verbal abuse)
- Ex. S, Complaint from ACLU of San Diego & Imperial Counties to CBP San Ysidro Port of Entry and CBP San Diego Field Office, 2 (Mar. 23, 2016) (reporting that CBP agent failed to provide for physical needs of disabled asylum seeker and made disparaging comments regarding her claims)
- Ex. T, Complaint from National Immigrant Justice Center, et al. to DHS Officer for Civil Rights and Civil Liberties and DHS Inspector General, Re: Systemic Abuse of Unaccompanied Immigrant Children by CBP, 17 (June 11, 2014) (describing CBP agent insulting and calling a 16-year-old girl expressing fear of return a liar)
- Ex. U, Complaint from National Immigrant Justice Center, et al. to DHS Officer for Civil Rights and Civil Liberties and DHS Inspector General, Re: Inadequate CBP screening practices block individuals fleeing persecution from access to the asylum process (Nov. 13, 2014) (explaining that "[w]hen applicants express fears, CBP officials fail to capture those statements in the required documentation or include mistaken information," and providing numerous stories of asylum seekers affected by CBP's failures during the inspections stage of expedited removal).

C. Litigation documenting CBP agents' failure to comply with their obligations to individuals with fear of return:
- Ex. X, *Al Otro Lado v. Nielsen*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal., filed Jul. 12, 2017) (argument on second partial motion to dismiss scheduled May 10, 2019) (describing, in lawsuit challenging CBP's practice of denying asylum seekers' access to the asylum process, CBP agents' mistreatment of asylum seekers, including failing to refer them for CFIs, using lies, threats, intimidation and coercion, verbal and physical abuse, physically obstructing access to ports of entry, imposing unreasonable delays, denying outright access to the asylum process, and denying access to the asylum process in a racially discriminatory manner). Multiple declarations filed with the court in this case document CBP's interference with the credible fear process, including:
    - Declaration of Diego Iniguez Lopez (summarizing the declarations of over fifty asylum seekers, all mothers detained at the South Texas Family Residential Center with their children, about CBP agents' failure to refer them for CFIs)

4

- Declaration of Faraz Mohammadi (attaching declarations of 22 asylum seekers whom CBP refused to refer for CFIs)
- Declarations of Shaw Drake, Leah Chavla, Joanna Williams, and Jennifer Harbury (describing, respectively, the experiences of Human Rights First, Women's Refugee Commission, Kino Border Initiative, and individual attorneys with CBP agents' failure to refer asylum seekers for CFIs)
- Declaration of Clara Long (describing records produced in response to a Freedom of Information Act Request by Human Rights Watch and the American Immigration Council for USCIS records describing complaints of CBP abuse, which included use of intimidation, coercion, or verbal abuse to deter individuals from expressing fear of return; CBP agents' failure to ask individuals about fear of return or to ask only improperly narrow questions about fear; and CBP agents' refusal to record information about fear of return and/or inclusion of incorrect information about fear of return in expedited removal paperwork)

D. Requests that the agency reconsider expedited removal determinations due to, inter alia, failure to properly refer individuals for credible fear interviews, which were ultimately granted:
   - Ex. CC, Redacted Motion to Reopen and Rescind Expedited Removal Order (May 11, 2016) (errors include failure to refer for CFI, failure to read Record of Sworn Statement in Proceedings, and failure to identify an individual as a minor not subject to expedited removal) (order rescinded Oct. 20, 2016)
   - Ex DD, Redacted Motion to Reconsider and Rescind Expedited Removal Order (Sept 24, 2015) (challenging expedited removal order as unlawfully issued against an unaccompanied minor) (order rescinded Jan. 26, 2016)

2. **DHS officers routinely record inaccurate or false information on expedited removal forms and coerce noncitizens to sign forms they do not understand**

Reports also document immigration officers' misconduct throughout expedited removal proceedings, by providing false information in expedited removal paperwork and using coercion to force noncitizens to sign forms they do not understand.  DHS should consider evidence of these abuses, including the following evidence attached to this letter:

- Ex. D, Borderland Immigration Council, *Discretion to Deny*, *supra*, 13 ("individuals are forced to sign legal documents in English without translation.")
- Ex. I, U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection*, *supra*, 2, 20-22 (discussing "continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create")
- Ex. J, American Civil Liberties Union, *American Exile*, *supra*, 34-36 (describing noncitizens who were required to sign forms in languages they do not understand)
- Ex. M, U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal*, *supra*, 53, 55, 74 (indicating that the sworn statements as

5

- recorded by immigration officers are "often inaccurate and nearly always unverifiable")
- Ex. U, Complaint from National Immigrant Justice Center, et al. Re: Inadequate CBP screening practices, *supra* (explaining that "[w]hen applicants express fears, CBP officials fail to capture those statements in the required documentation or include mistaken information," and providing numerous stories of asylum seekers affected by CBP's failures during the inspections stage of expedited removal)
- Ex. Y, *United States v. Raya-Vaca*, 771 F.3d 1195, 1205-06, 1210-11 (9th Cir. 2014) (holding that immigration officer's failure during expedited removal process to advise the defendant of the charge of removability and to permit him to review the sworn statement prepared by the officer violated his due process rights to notice and an opportunity to respond)

### 3. There are well-documented failures in the credible fear process

Even individuals who are referred to USCIS for credible fear interviews may not receive adequate consideration of their asylum claims, instead facing erroneous denials of credible fear, denials of access to counsel, and inadequacies in interpretation. Before expanding expedited removal, DHS should consider evidence of these problems with the credible fear process, including the following evidence attached to this letter:

- Ex. N, *Report of the DHS Advisory Committee on Family Residential Centers* 96-99 (Sept. 2016) (discussing inadequate or nonexistent interpretation services during CFIs and immigration judge reviews of negative credible fear determinations);
- Ex. D, Borderland Immigration Council, *Discretion to Deny*, *supra*, 13 (interpretation failure);
- Ex. I, U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection*, *supra*, 28 (describing case of a detained Ethiopian asylum seeker who was denied an interpreter);
- Ex. J, American Civil Liberties Union, *American Exile*, *supra*, 34 ("Most of the individuals interviewed . . . stated that they were given forms to sign in English, which most did not speak or read, and often were not interviewed by an immigration officer who fluently spoke their language or through an interpreter.")
- Ex. V, Letter from American Immigration Lawyers Association, et al., to USCIS and ICE Re: Due Process Violations at Detention Centers 2-4 (Dec. 24, 2015) ("USCIS' negative fear determinations are often flawed, with numerous substantive problems evident in the transcripts of initial fear interviews."); *id.* at 3 (explaining that immigration judge review of credible fear determinations "seldom involves attorney participation" because attorneys receive notice of hearings either not at all, or with too little time to prepare and attend such hearings)
- Ex. W, Statement for the Record of Eleanor Acer, Dir., Refugee Protection, Human Rights First, *Hearing before the House Judiciary Subcommittee on Immigration and Border Security* 5 (Feb. 11, 2015) (advocates "regularly learn of reports of legitimate asylum seekers who are denied 'credible fear' – and the chance to even file an application for asylum - even though they should meet the standard and may be

6

eligible for asylum.  In some cases, interviews are sometimes rushed, essential information is not identified due to lack of follow up questions, and/or other mistakes are made that block genuine asylum seekers from even applying for asylum and having a real chance to submit evidence and have their case fully considered"); *id.* (describing unrepresented Guatemalan mother who was persecuted based on her indigenous ethnicity was removed after an asylum officer interviewed her in Spanish – a language in which she was unable to communicate – and issued a negative credible fear determination)

**4. DHS officers have wrongfully removed numerous individuals through expedited removal**

As a result of the widespread flaws in the expedited removal process, numerous individuals have been wrongfully removed from the United States.  For example:

- Ex. J, American Civil Liberties Union, *American Exile*, *supra*, 63 (describing case of Mexican citizen who had been living in the United States continuously for 14 years but was nonetheless removed under an expedited removal order after a traffic stop in Weslaco, Texas); *id.* at 38 (recounting case of a Guatemalan citizen and mother of four U.S. citizen children who was removed under an expedited removal order even though she told the CBP officers that she was afraid to be deported to Guatemala, where her father had been murdered and her mother had been the target of extortion by gangs); *id.* at 39 (describing 22-year-old woman who fled domestic violence removed to El Salvador without being provided a credible fear interview)
- Ex. O, Ian James, *Wrongly Deported, American Citizen Sues INS for $8 Million*, L.A. Times, Sept. 3, 2000 (recounting expedited removal of U.S. citizen Sharon McKnight)
- Ex. Z, *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1272-73 (M.D. Ga. 2012) (U.S. citizen erroneously issued expedited removal order)
- Ex. AA, John Burnett, *Born in The U.S. But Turned Back at The Border, Time After Time*, NPR (Dec. 12, 2014) (describing the case of a U.S. citizen erroneously subjected to expedited removal); *see also de la Paz v. Johnson*, No. 1:14-CV-016 (S.D. Tex., filed Jan. 24, 2014)

**5. There are available alternatives to deal with any backlog in the immigration system**

The expansion of expedited removal is not necessary to deal with the backlog of cases before Immigration Judges.  There are alternative methods to decrease the backlog, documented in reports, including:

- Ex. P, American Bar Association, *2019 Update Report: Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency, and Professionalism in the Adjudication of Removal Cases* (March 2019) (explaining that 69 Immigration Judge positions had not yet been filled as of December 2018 and that additional support staff, including law clerks and staff attorneys, can decrease burden on immigration judges).

- Ex. BB, Declaration of Aaron Reichlin-Melnick (Feb. 17, 2019), filed in *Innovation Law Lab v. Nielsen*, No. 3:19-cv-00807 (N.D. Cal., filed Feb. 14, 2019), No. 19-15716 (9th Cir., argument on temporary restraining order held Apr. 24, 2019) (explaining that DHS does not account for the existence of the backlog in its calculation of asylum grant and in absentia removal order rates)

Before determining whether to expand expedited removal, DHS must consider and address evidence of the well-documented failures in the system, including the attached evidence. Given the existing problems with implementing the current expedited removal scheme, we urge the agency to reject any expansion of expedited removal.


Sincerely,

Kristin Macleod-Ball
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
kmacleod-ball@immcouncil.org


Jennifer Chang Newell
American Civil Liberties Union Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
jnewell@aclu.org


CC:  John M. Mitnick, DHS General Counsel, ogc@hq.dhs.gov, John.Mitnick@dhs.gov
James McCament, Deputy Under Secretary, DHS Office of Strategy, Policy, and Plans, James.McCament@dhs.gov, James.McCament@hq.dhs.gov
Kathy Nuebel Kovarik, Chief, USCIS Office of Policy and Strategy, Kathy.NuebelKovarik@uscis.dhs.gov
Craig Symons, Chief, USCIS Office of Chief Counsel, Craig.M.Symons@uscis.dhs.gov
Tim Quinn, Acting Executive Director, CBP Intergovernmental Public Liaison, Timothy.Quinn@cbp.dhs.gov
Cameron Quinn, DHS Officer for Civil Rights and Civil Liberties, Cameron.Quinn@hq.dhs.gov
Jennifer Higgins, Associate Director, USCIS Refugee, Asylum and International Operations, Jennifer.B.Higgins@uscis.dhs.gov
Shannon Joyce, OMB DHS Desk Officer, dhsdeskofficer@omb.eop.gov

Enclosures (electronic copies of cited exhibits, with paper copies of cited exhibits to Acting Secretary McAleenan, Director Cissna, Acting Deputy Director Albence, and Acting Commissioner Sanders)

Index of Exhibits

Reports

A      Human Rights First, *Fact Sheet: Allowing CBP to Conduct Credible Fear Interviews Undermines Safeguards to Protect Refugees* (Apr. 2019)
https://www.humanrightsfirst.org/sites/default/files/CBP_Credible_Fear.pdf

B      DHS Office of the Inspector General, *Special Review—Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (Sept. 27, 2018)
https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf

C      Amnesty International, *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers* (2017)
https://www.amnestyusa.org/wp-content/uploads/2017/06/USA-Mexico-Facing-Walls-REPORT-ENG.pdf

D      Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border* (2017)
https://docs.wixstatic.com/ugd/e07ba9_72743e60ea6d4c3aa796becc71c3b0fe.pdf

E      American Immigration Council, *Deportations in the Dark: Lack of Process and Information in the Removal of Mexican Migrants* (Sept. 2017)
https://americanimmigrationcouncil.org/sites/default/files/research/deportations_in_the_dark.pdf

F      American Immigration Council, *Still No Action Taken: Complaints Against Border Patrol Agents Continue to Go Unanswered* (Aug. 2017)
https://americanimmigrationcouncil.org/sites/default/files/research/still_no_action_taken_complaints_against_border_patrol_agents_continue_to_go_unanswered.pdf

G      Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers* (May 2017)
https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf

H      Human Rights First, *Violations at the Border: The El Paso Sector* (Feb. 2017)
http://www.humanrightsfirst.org/sites/default/files/hrf-violations-at-el-paso-border-rep.pdf

I      U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016)
https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf

J      American Civil Liberties Union, *American Exile: Rapid Deportations That Bypass the Courtroom* (Dec. 2014)
https://www.aclu.org/report/american-exile-rapid-deportations-bypass-courtroom

K      Human Rights Watch, *"You Don't Have Rights Here": US Border Screening and Returns of Central Americans to Risk of Serious Harm* (Oct. 16, 2014)
https://www.hrw.org/sites/default/files/reports/us1014_web_0.pdf

L      American Immigration Council, *Mexican and Central American Asylum and Credible Fear Claims: Background and Context* (May 2014)
https://www.americanimmigrationcouncil.org/sites/default/files/research/asylum_and_credible_fear_claims_final_0.pdf

M      U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* (2005)
https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf

N      *Report of the DHS Advisory Committee on Family Residential Centers* 96-99 (2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf

O      Ian James, *Wrongly Deported, American Citizen Sues INS for $8 Million*, L.A. Times, Sept. 3, 2000
https://www.latimes.com/archives/la-xpm-2000-sep-03-mn-14714-story.html

P      American Bar Association, *2019 Update Report: Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency, and Professionalism in the Adjudication of Removal Cases* (March 2019)
https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/2019_reforming_the_immigration_system_volume_1.pdf.

Complaints and Testimony

Q      Complaint to DHS by individual detained at South Texas Family Residential Center (Apr. 28, 2017)

R      Complaint from American Immigration Council, et al., to DHS Officer for Civil Rights and Civil Liberties and DHS Inspector General, Re: CBP's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border (Jan. 13, 2017)
http://ftp.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf

S Complaint from ACLU of San Diego & Imperial Counties to CBP San Ysidro Port of Entry and CBP San Diego Field Office, Re: Denial of Food to Asylum Seekers Awaiting Processing at San Ysidro Port of Entry (Mar. 23, 2016) https://www.aclusandiego.org/wp-content/uploads/2016/03/2016-03-23-Ltr-re-Denial-of-Food-at-SYS-POE-FINAL.pdf

T Complaint from National Immigrant Justice Center, et al., to DHS Officer for Civil Rights and Civil Liberties and DHS Inspector General, Re: Systemic Abuse of Unaccompanied Immigrant Children by CBP (June 11, 2014) https://www.acluaz.org/sites/default/files/documents/DHS%20Complaint%20re%20CBP%20Abuse%20of%20UICs.pdf

U Complaint from National Immigrant Justice Center, et al., to DHS Officer of Civil Rights and Civil Liberties and DHS Inspector General, Re: Inadequate CBP screening practices block individuals fleeing persecution from access to the asylum process (Nov. 13, 2014) http://immigrantjustice.org/sites/immigrantjustice.org/files/images/Right%20to%20Asylum%20-%20CRCL%20Complaint%20Cover%20Letter%20-%2011.13.14%20FINAL%20PUBLIC.pdf

V Letter from American Immigration Lawyers Association, et al., to USCIS and ICE Re: Due Process Violations at Detention Centers (Dec. 24, 2015) http://www.aila.org/advo-media/aila-correspondence/2015/letter-uscis-ice-due-process

W Statement for the Record of Eleanor Acer, Dir., Refugee Protection, Human Rights First, *Hearing before the House Judiciary Subcommittee on Immigration and Border Security* 5 (Feb. 11, 2015) http://docs.house.gov/meetings/JU/JU01/20150211/102941/HHRG-114-JU01-20150211-SD003.pdf

Lawsuits and Court filings

X *Al Otro Lado v. Nielsen*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal., filed Jul. 12, 2017) (argument on second partial motion to dismiss scheduled May 10, 2019) https://ccrjustice.org/sites/default/files/attach/2018/10/AmendedComplaint.pdf https://www.americanimmigrationcouncil.org/sites/default/files/litigation_documents/litigation_aol_declarations_of_immigration_and_human_rights_advocates.pdf

Y *United States v. Raya-Vaca*, 771 F.3d 1195 (9th Cir. 2014) http://cdn.ca9.uscourts.gov/datastore/opinions/2014/11/10/13-50129.pdf

Z *Lyttle v. United States*, 867 F. Supp. 2d 1256 (M.D. Ga. 2012) https://www.aclu.org/legal-document/lyttle-v-usa-order

AA  John Burnett, *Born in The U.S. But Turned Back at The Border, Time After Time*, NPR (Dec. 12, 2014); *see also de la Paz v. Johnson*, No. 1:14-CV-016 (S.D. Tex., filed Jan. 24, 2014)
https://www.npr.org/2014/12/12/370264909/born-in-the-u-s-but-turned-back-at-the-border-time-after-time

BB  Declaration of Aaron Reichlin-Melnick (Feb. 17, 2019), filed in *Innovation Law Lab v. Nielsen*, No. 3:19-cv-00807 (N.D. Cal., filed Feb. 14, 2019), No. 19-15716 (9th Cir., argument on TRO held Apr. 24, 2019)
https://www.aclu.org/sites/default/files/field_document/2019.02.20.0020-12_decl._of_aaron_reichlin-melnick.pdf

Motions to Reopen DHS-Issued Orders

CC  Redacted Motion to Reopen and Rescind Expedited Removal Order (May 11, 2016)

DD  Redacted Motion to Reconsider and Rescind Expedited Removal Order (Sept 24, 2015)



Secretary
U.S. Department of Homeland Security
Washington, DC 20528

July 9, 2019

Kristin Macleod-Ball
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, Massachusetts 02446

Dear Ms. Macleod-Ball:

    Thank you for your May 1, 2019 letter regarding a potential plan to protect the integrity of our asylum system, ensure a path for processing legitimate asylum-seekers, and enhance national security and public safety.

    The Department of Homeland Security (DHS) has the critical task of safeguarding the United States, while adhering to statutory and international obligations for the protection of vulnerable and persecuted persons. The laws of the United States, as well as international treaties to which the United States is a party, allow people to seek asylum and other protection on the grounds that they fear being persecuted outside of the United States because of their race, religion, nationality, membership in a particular social group, or political opinion; or fear being tortured. Accordingly, DHS designs policies and procedures based on these legal standards in order to protect vulnerable and persecuted persons. DHS understands the importance of complying with these laws, and takes its legal obligations seriously. The Department has investigated allegations of abuse and addressed all substantiated that have been raised in the past. DHS also ensures agents follow proper protocol in processing aliens in expedited removal, including asking the required questions related to fear of persecution or torture, using interpreters when asking those questions, and referring to USCIS for a Credible Fear interview those who express fear of return to their country of origin.

    The Immigration and Nationality Act (INA) grants DHS the "sole and unreviewable discretion" to modify at any time its discretionary limits on the scope of expedited removal consistent with its statutory authority. *See* INA § 235(b)(1)(A)(iii)(I), 8 U.S.C. § 1225(b)(1)(A)(iii)(I). DHS exercises this discretionary authority prudently, mindful of its mission of protecting the national security and public safety of the United States while upholding U.S. immigration law, including enforcing immigration law against those who present a danger to our national security, are a threat to public safety, or who otherwise undermine the integrity of our immigration system.

    The dedicated professionals at DHS work tirelessly every day to strengthen the safety and security of our nation, while meeting the humanitarian needs of people who have crossed our borders. During this time of crisis, when DHS personnel are stretched beyond capacity, it is even more incumbent upon DHS to develop policies and procedures that will make our nation

www.dhs.gov

Ms. Kristin Macleod-Ball
Page 2

safer and more secure by facilitating prompt immigration determinations, while staying true to our commitment to protect vulnerable populations. As we develop policies to restore integrity to the U.S. immigration process, DHS will continue to ensure that its mission is carried out in a manner consistent with the law and policy.

Thank you, again, for your letter and your interest in this important issue. The cosigner of your letter will receive a separate, identical response. Should you wish to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Kevin K. McAleenan
Acting Secretary