IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MAKE THE ROAD NEW YORK; LA UNION DEL PUEBLO ENTERO; and WECOUNT!;**<br><br>Plaintiffs,<br><br>**v.**<br><br>**KEVIN MCALEENAN, Acting Secretary of the Department of Homeland Security, in his official capacity; MATTHEW T. ALBENCE, Acting Director of United States Immigration and Customs Enforcement, in his official capacity; KENNETH T. CUCCINELLI, Acting Director of United States Citizenship and Immigration Services, in his official capacity; MARK MORGAN, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; and WILLIAM BARR, Attorney General of the United States, in his official capacity;**<br><br>Defendants. | No. 19-cv-2369 (KBJ) |

**AMICUS CURIAE BRIEF OF THE STATES OF CALIFORNIA, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, VERMONT, VIRGINIA, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF PLAINTIFFS**

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
Supervising Deputy Attorney General
ANTONETTE BENITA CORDERO
LAURA FAER (CAL. STATE BAR NO. 233846)
VILMA PALMA-SOLANA
ANTHONY SEFERIAN
Deputy Attorneys General
  1515 Clay Street, Suite 2000
  Oakland, CA 94612
  Telephone: (510) 879-3304
  Fax: (510) 622-2270
  Email:  Laura.Faer@doj.ca.gov
*Attorneys for the State of California*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND STATEMENT OF INTEREST..............................................1

ARGUMENT ....................................................................................................3

    I.     A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST ..........................3

    II.    EXPANSIVE USE OF EXPEDITED REMOVAL UNDERMINES AMICI
         STATES' EFFORTS TO ENSURE FAIR TREATMENT OF ALL THEIR
         RESIDENTS .............................................................................................4

         A.     Expedited Removal Process ..........................................................4

         B.     Amici State Residents Will Face Substantial Risk of
               Wrongful Deportation Under the New Rule ................................6

         C.     The Expedited Removal Process is Perilous for Asylum
               Seekers ........................................................................................9

    III.   THE NEW RULE HARMS THE STATES' INTEREST IN PROTECTING
         RIGHTS OF RESIDENTS ...........................................................................12

    IV.   THE NEW RULE WILL INFLICT SERIOUS HARM ON INDIVIDUALS,
         FAMILIES, COMMUNITIES, AND THE PUBLIC SERVED BY AMICI
         STATES .................................................................................................16

         A.     Families will be torn apart .........................................................18

          B.     Public safety, worker safety, and access to health care will
               suffer .........................................................................................20

    V.    THE STATES ARE HARMED BY THE FAILURE TO PROVIDE A NOTICE-
         AND-COMMENT PROCESS ......................................................................22

CONCLUSION ................................................................................................23

i

## TABLE OF AUTHORITIES

Page

CASES

*Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*
  458 U.S. 592 (1982) ..................................................................................... 20

*Batterton v. Marshall*
  648 F.2d 694 (D.C. Cir. 1980) .................................................................... 23

*Flores v. Barr*
  No. 17-56297, slip. op. (9th Cir. Aug. 15, 2019) .................................... 5, 10

*Hernandez v. Sessions*
  872 F. 3d 976 (9th Cir. 2017) .................................................................... 3, 4

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*
  407 F.3d 1250 (D.C. Cir. 2005) ................................................................. 23

*League of Women Voters of United States v. Newby*
  838 F.3d 1 (D.C. Cir. 2016) ...................................................................... 3, 4

*Leiva-Perez v. Holder*
  640 F.3d 962 (9th Cir. 2011) ..................................................................... 11

*Metropolitan Life Ins. Co v. Massachusetts*
  471 U.S. 724 (1985) ..................................................................................... 21

*Mova Pharm. Corp v. Shalala*
  140 F.3d 1060 (D.C. Cir. 1998) ................................................................... 3

*R.I.L-R v. Johnson*
  80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................. 16

*Shaughnessy v. United States ex rel. Mezei*
  345 U.S. 206 (1953) ..................................................................................... 12

*Texas Children's Hosp. v. Burwell*
  76 F. Supp. 3d 224 (D.D.C. 2014) ............................................................... 4

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008) .......................................................................................... 3

*Zadvydas v. Davis*
  533 U.S. 678 (2001) ..................................................................................... 12

**TABLE OF AUTHORITIES**
(continued)

Page

**FEDERAL STATUTES AND REGULATIONS**

8 C.F.R.
§ 208.30(f) .................................................................................................. 10
§ 212.5(b) ............................................................................................... 5, 10
§ 235.3 ......................................................................................................... 7
§ 235.3(b) ..................................................................................................... 5
§ 235.3(b)(1)(ii) ........................................................................................... 8
§ 1208.30(g) ............................................................................................... 10

8 United States Code
§ 1101(a)(15)(U) .......................................................................................... 9
§ 1182(a)(9)(A)(i) ........................................................................................ 5
§ 1225(b)(i) .................................................................................................. 9
§ 1225(b)(1)(A)(i) ........................................................................................ 5
§ 1225(b)(1)(B)(iii) .................................................................................... 10
§ 1225(b)(1)(B)(v) ..................................................................................... 10
§ 1225(b)(1)(C) ............................................................................................ 5
§ 1225(b)(2)(A) ............................................................................................ 5
§ 1225(b)(2)(A) .......................................................................................... 10

**FEDERAL RULES**

67 Fed. Reg. 68,924 ........................................................................................ 5

69 Fed. Reg. 48,877 ................................................................................... 5, 10

84 Fed. Reg. 35,409 ............................................................................... *passim*

**STATE STATUTES**

N.Y. Soc. Serv. Law § 483-bb ...................................................................... 15

2018 Wash. Sess. Laws 2152 ........................................................................ 13

2018 Wash. Sess. Laws 2220 ........................................................................ 15

**OTHER AUTHORITIES**

*About Equity Corps*, Equity Corps Or. ........................................................ 13

**TABLE OF AUTHORITIES**
**(continued)**

Page

ACLU Found., *American Exile: Rapid Deportations that Bypass the Courtroom* (Dec. 2014).................................................................... 6, 8, 12

Aid to Localities Budget, 2019 N.Y. Sess. Laws ch. 53 (McKinney). ............................ 15

Am. Immigration Council, *A Primer on Expedited Removal* (July 2019) .................... 7, 8

Am. Immigration Council, *Immigrants in California* (Oct. 4, 2017).............................. 17

Am. Immigration Council, *Immigrants in Connecticut* (Oct. 13, 2017) .......................... 17

Am. Immigration Council, *Immigrants in Massachusetts* (Oct. 5, 2017) ........................ 17

Am. Immigration Council, *Immigrants in Minnesota* (Oct. 13, 2017) ............................ 17

Am. Immigration Council, *Immigrants in New Jersey* (Oct. 13, 2017) ............................ 18

Am. Immigration Lawyers Ass'n, *Due Process Denied: Central Americans Seeking Asylum and Legal Protection in the United States* (June 15, 2016)............................................................................................. 6

Anna North, *Immigrants Are Skipping Reproductive Health Care Because They're Afraid of Being Deported*, Vox (July 22, 2019)............................................ 22

Beth Fertig, *Two Immigrant Children In Connecticut Get Temporary Legal Status After Separation From Parents*, WSHU Conn. (August 31, 2018) ........................................................................................................... 13

Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border* (Feb. 2017) ...................... 7

Bruce J. Einhorn, *Op-Ed: L.A. needs to provide attorneys to immigrants facing deportation*, L.A. Times (Mar. 27, 2017).......................................................... 1

Cal. Dep't of Soc. Servs., *Immigration Branch: Immigration Services Funding: Tentative Award Announcement* (Jan. 3, 2019) ........................................... 2

Cal. Dep't of Soc. Servs., *Immigration Services Contractors.* ........................................... 2

**TABLE OF AUTHORITIES**
**(continued)**

Page

Cal. Dep't of Soc. Servs., *Immigration Services Program Update* (Mar. 2019). ................................................................................................ 2, 13

Cal. Dep't of Soc. Servs., *Services for Refugees, Asylees, and Trafficking Victims* ................................................................................................ 15

The Children's P'ship, *Healthy Mind, Healthy Future: Promoting the Mental Health and Wellbeing of Children in Immigrant Families in California* (Sept. 22, 2018) ...................................................................... 22

Ctr. for Health Progress, *Immigration Policy Is Health Policy: Executive Order 13768 & The Impact of Anti-Immigrant Policy on Health* (Mar. 20, 2018) .......................................................................................... 22

Ebba Gebisa, *Constitutional Concerns with the Enforcement and Expansion of Expedited Removal*, 2007 U. Chi. Legal F. 565 (2007). ........................ 7

Elizabeth Cassidy & Tiffany Lynch, U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection, The Treatment of Asylum Seekers in Expedited Removal* (2016) ................................................................ 7, 11, 12, 14

H.B. 5050, 80th Legis. Assemb., 2019 Reg. Sess. (Or. 2019) ........................ 13

Heather Koball, et al., Urb. Inst., *Health and Social Services Needs of US-Citizen Children with Detained or Deported Immigrant Parents* (Sept. 2015) .................................................................................................. 19

Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* (2011) .............................................. 18

I.R.S. Form 990 (2018), Conn. Bar Found., Inc. (Aug. 14, 2019) .................... 13

Immigrant Legal Res. Ctr., *Immigration Enforcement & the Child Welfare System* (Dec. 11, 2017) .................................................................... 20

Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1 (2015) .................................... 8

Inst. on Taxation & Econ. Policy, *State and Local Tax Contributions of Undocumented Californians* 1 (Apr. 2017) ...................................... 17

v

**TABLE OF AUTHORITIES**
**(continued)**

Page

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017)........................21

Jens Hainmueller, et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357 Science 1041 (2017)........................18

John Washington, The Intercept, *Bad Information: Border Patrol Arrest Reports Are Full of Lies That Can Sabotage Asylum Claims* (Aug. 11, 2019)........................11

Kathryn Shepherd & Royce Bernstein Murray, Am. Immigration Council, *The Perils of Expedited Removal: How Fast-Track Deportations Jeopardize Asylum Seekers* (May 2017)........................7

Kelly Heyboer, *ICE Arrests Surging in N.J. Under Trump. Here's Why.*, N.J. On-Line (Feb. 2018)........................20

Kristen Lee Gray, Cal. Polytechnic St. Univ., San Luis Obispo, *Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood* (June 2011)........................19

Letter from Nat'l Immigrant Justice Ctr. et al. to U.S. Dep't of Homeland Sec. Office of Civil Rights & Civil Liberties & Office of the Inspector Gen. (Nov. 13, 2014)........................11

*List of Community Service Agencies Serving Immigrants*, Ill. Dep't Hum. Servs........................13

Make the Road N.J., *ICE in the New Jersey Courts: The Impact of Immigration Enforcement on Access to Justice in the Garden State* (Dec. 2017)........................21

Mary Papenfuss, *Weeping Girl Left Abandoned by ICE Pleads with 'Government' to 'Let my Parent be Free'*, Huffington Post (Aug. 8, 2019)........................19, 20

Medecins Sans Frontieres, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis* (May 2017)........................10

vi

**TABLE OF AUTHORITIES**
**(continued)**

Page

Michele R. Pistone & John J. Hoeffner, *Rules Are Made to Be Broken:*
*How the Process of Expedited Removal Fails Asylum Seekers*, 20 Geo.
Immigr. L.J. 167 (2006) ........................................................................ 11

N.J. Office of Mgmt. & Budget, *The Governor's FY2020 Budget –*
*Detailed Budget* (Mar. 2019) ................................................................ 13

Nadwa Mossad & Ryan Baugh, Office of Immigration Statistics, U.S.
Dep't of Homeland Sec., *Refugees and Asylees: 2016* (Jan. 2018) .......... 14

New. Am. Economy, *Contributions of New Americans in New York* (Aug.
2016) ...................................................................................................... 18

New Am. Economy, *Contributions of New Americans in Vermont* (Aug.
2016) ...................................................................................................... 17

New Am. Economy, *Immigrants and the Economy in Connecticut* .............. 17

Nicholas Zill, Nat'l Council for Adoption, *Better Prospects, Lower Cost:*
*The Case for Increasing Foster Care Adoption* (May 2011) ..................... 19

Office of Immigration Statistic, Dep't of Homeland Sec., *Population*
*Estimates: Illegal Alien Population Residing in the United States:*
*January 2015* (Dec. 2018) ...................................................................... 1

Office of Immigration Statistics, U.S. Dep't of Homeland Sec.,
*Immigration Enforcement Actions: 2004* (Nov. 2005) ............................ 6

Office of Immigration Statistics, U.S. Dep't of Homeland Sec.,
*Immigration Enforcement Actions: 2010* (June 2011) ............................ 9

Office of Immigration Statistics, U.S. Dep't of Homeland Sec.,
*Immigration Enforcement Actions: 2011* (Sept. 2012) ............................ 9

Office of Immigration Statistics, U.S. Dep't of Homeland Sec.,
*Immigration Enforcement Actions: 2012* (Dec. 2013) ............................ 9

Office of Immigration Statistics, U.S. Dep't of Homeland Sec.,
*Immigration Enforcement Actions: 2013* (Sept. 2014) ............................ 9

**TABLE OF AUTHORITIES**
**(continued)**

Page

Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Annual Report: Immigration Enforcement Actions: 2013* (Sept. 2014)...................................6

Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Immigration Enforcement Actions: 2017* (Mar. 2019) ................................................6

Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *2016 Yearbook of Immigration Statistics* (Nov. 2017) ......................................................14

Office of Inspector Gen., U.S. Dep't of Homeland Sec., *Management Alert – DHS Needs to Address Dangerous Overcrowding Among Single Adults at El Paso Del Norte Processing Center* (May 30, 2019) .............................12

*Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States*, White House (Nov. 9, 2018) .........................16

Press Release, Office of the Governor, Governor Cuomo and Legislative Leaders Announces 2020 Enacted Budget Includes $10 Million to Support Expansion of the Liberty Defense Project (Apr. 5, 2019) ...........................14

Press Release, Office of the Mayor, *Mayor Bowser Announces $2.5 Million Available for FY 2020 Immigrant Justice Legal Services Grant Program* (July 12, 2019)...........................................................................................15

Randy Capps, et al., Urb Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature* (Sept. 2015 ................................................................ 18, 19

Ready Cal., *One California: Immigration Services Funding* (July 28, 2017)...........................................................................................................................2

Ready Cal., *Ready California Overview* (Aug. 2018).........................................................2

Rebecca Smith, Ana Avendaño & Julie Martínez Ortega, AFL-CIO, *Iced Out: How Immigration Enforcement Has Interfered with Workers' Rights* (2009)...........................................................................................................22

*Refugee & Asylee Benefits*, SF-CAIRS ..........................................................................15

*Refugee Health Program,* Vt. Dept. of Health.................................................................16

**TABLE OF AUTHORITIES**
**(continued)**

Page

Sarah Stillman, *When Deportation is a Death Sentence,* New Yorker (Jan. 8, 2018) ............................................................................................................... 12

Seth Freed Wessler, Applied Research Ctr., *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System* (Nov. 2011) .................................................................................. 19

Stephen Manning & Kari Hong, *Getting It Righted: Access to Counsel in Rapid Removals*, 101 Marq. L. Rev. 673 (2018)................................................. 4, 5, 6

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017) ...................................................... 21

U.N. High Comm'r for Refugees, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico* (Oct. 2015) ................................................................................................ 10

U.S. Citizenship & Immigration Servs., *Credible Fear Workload Report Summary FY 2018* ................................................................................................. 10

U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* (Feb. 8, 2005) .................................................................................................................... 7, 11

U.S. Gov't Accountability Office, *U.S. Asylum System: Significant Variation Existed in Asylum Outcomes across Immigration Courts and Judges* (Sept. 2008) ................................................................................................ 8

Wendy Cervantes, et al., Ctr. for Law & Soc. Policy, *Our Children's Fear: Immigration Policy's Effects on Young Children* (Mar. 2018) ........................ 18

## INTRODUCTION AND STATEMENT OF INTEREST

The federal government has significantly expanded the summary deportation process known as expedited removal, with no advance notice or opportunity for comment. The process allows low-level immigration officers to summarily deport anyone apprehended anywhere in the country who cannot satisfy the officer that he or she is lawfully in the country, has been continuously present here for at least two years, or has a credible fear of persecution if deported. Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409 (July 23, 2019). The States of California, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Vermont, Virginia and Washington, and the District of Columbia (the Amici States) respectfully submit this brief as amici curiae to support plaintiffs' motion for a preliminary injunction suspending this expansion.

The Amici States are home to hundreds of thousands of people who have come to this country because they fear persecution, torture, or violence in their countries of origin or to seek a better life for their families.[1] These individuals are welcome members of our communities. They face severe consequences if placed in expedited removal. For some, the stakes are "life or death, since [they] face torture or worse upon returning to their home countries."[2] Even for those who do not face persecution, a removal order may result in permanent separation from their spouses and children and the lives they have built in the United States.

The Amici States have a strong interest in ensuring that all people residing within their borders—citizens and non-citizens alike—are treated fairly, especially when facing such severe

---

[1] For example, New Jersey is home to around 440,000 individuals without documentation, the majority of whom are long-term residents. Office of Immigration Statistic, Dep't of Homeland Sec. (DHS), *Population Estimates: Illegal Alien Population Residing in the United States: January 2015* at 2, 5 (Dec. 2018), https://tinyurl.com/OffImmStatsUndoc (estimating size of undocumented population as of January 2015).
[2] Bruce J. Einhorn, *Op-Ed: L.A. needs to provide attorneys to immigrants facing deportation*, L.A. Times (Mar. 27, 2017), https://tinyurl.com/Einhorn-LATimes.

1

consequences.  Defendants' significant expansion of the expedited removal process substantially increases the risk that people will be erroneously deported, while according those caught up in the proceedings virtually none of the process provided in formal immigration hearings.  Not surprisingly, this has led to numerous documented cases of erroneous deportation, with dire consequences for the people removed.  People have been erroneously expelled who have lived in the United States for years, have children who are U.S. citizens, are fleeing violence, persecution and torture, or have lawful status, including U.S. citizenship.

Many of the Amici States invest significant resources to help fund, either directly or through immigrant services organizations, legal and other services to immigrants residing within their borders, including those who have been granted or are seeking asylum.  These funds are generally aimed at increasing access to legal services and information about constitutional rights to better enable immigrants to protect themselves and their families.[3]  California, for example, provided more than $43 million in funding for this purpose in the past fiscal year.[4]  The expanded use of expedited removal undermines these efforts.  It will greatly increase the demand for state resources to provide immigrant assistance, and may require Amici States to divert funds from other purposes to meet the needs of residents subjected to the expedited removal process.[5]

The new rule also fails to account for the disruption caused by summarily detaining and expelling productive members of our communities.  These residents provide care and support to children or other family members, pay taxes, provide goods and services in their communities,

---

[3] Ready Cal., *One California: Immigration Services Funding* (July 28, 2017), https://tinyurl.com/OneCal-funding; Ready Cal., *Ready California Overview* (Aug. 2018), https://tinyurl.com/ReadyCal.

[4] Cal. Dep't of Soc. Servs., *Immigration Branch: Immigration Services Funding: Tentative Award Announcement* (Jan. 3, 2019), https://tinyurl.com/CDSS-ImmServs2019; *Immigration Services Contractors*, Cal. Dep't of Soc. Servs., https://tinyurl.com/Cal-DSS-ISC (last visited Aug. 8, 2019); Cal. Dep't. of Soc. Servs., *Immigration Services Program Update* 17 (March 2019).

[5] *E.g.*, 84 Fed. Reg. 35,409, 35,411 (recognizing that even prior to the new rule's enactment, the rate of expedited removal may be increasing).

and otherwise contribute to society.  They cannot simply be plucked from the lives they have

established without causing great hardship to children, relatives, employers, and Amici States.

Had Amici States been given the opportunity to comment on this new rule *before* it was

implemented, they would have detailed the dangers with extending so broadly a process that is

fraught with potential for error and abuse.  Thus, the harms to Amici States support the issuance

of a preliminary injunction to preserve the status quo and prevent widespread harm.

## ARGUMENT

Amici States have an interest in the well-being of all of their residents, and in ensuring

that citizens and non-citizens alike are accorded the process they are due when threatened with

being deported, separated from their families, and deprived of their livelihoods.  Expansive use

of summary deportations under the expedited removal process undermines these interests.  It

subjects anyone in any part of the country who is suspected of being here illegally to a

deportation process lacking any meaningful way of defending against removal and devoid of

effective oversight.  Expansive use of expedited removal will likely lead to an increase in

wrongful deportations that will cause significant disruptions to communities where they occur.

## I.     A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

One factor a court considers when determining whether to issue a preliminary injunction

is whether the "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008).  The public interest is particularly relevant in cases where the impact of an

injunction reaches beyond the parties and carries a potential for public consequences. *Hernandez

v. Sessions*, 872 F. 3d 976, 996 (9th Cir. 2017).  Further, in cases like this, which affect many

non-parties (including the Amici States), courts consider the hardship to third parties as part of

the public interest analysis. *League of Women Voters of United States v. Newby,* 838 F.3d 1, 12-

14 (D.C. Cir. 2016); *Mova Pharm. Corp v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  For

example, an injunction is in the public interest where it ensures that immigrants are not improperly held in immigration detention, *Hernandez*, 872 F.3d at 996, or requires "governmental agencies [to] abide by the federal laws that govern their existence and operations," *League of Women Voters*, 838 F.3d at 12; s*ee also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 246 (D.D.C. 2014) ("[T]he Secretary's compliance with applicable law constitutes a . . . compelling public interest.") (quotation omitted).

Here, the public interest strongly favors suspending implementation of the new expedited removal rule, at least until its legality and constitutionality can be resolved.  Without an injunction, hundreds of thousands of residents of Amici States—including citizens, lawful residents, asylees, or residents otherwise exempt from expedited removal—will be in danger of summary deportation without a meaningful opportunity to establish their status, as explained below.

## II. EXPANSIVE USE OF EXPEDITED REMOVAL UNDERMINES AMICI STATES' EFFORTS TO ENSURE FAIR TREATMENT OF ALL THEIR RESIDENTS

### A. Expedited Removal Process

Expedited removal is designed to "maximize[] . . . executive power, minimize[] process, and eliminate[] judicial intervention—with a singular goal to deport at high velocity."[6]  During the expedited removal process, subject to certain exceptions for individuals claiming a credible fear of persecution, individuals can be hastily removed without a regular immigration court hearing before a judge, access to counsel, or the opportunity to apply for most forms of relief

---

[6] Stephen Manning & Kari Hong, *Getting It Righted: Access to Counsel in Rapid Removals*, 101 Marq. L. Rev. 673, 675-76 (2018).

from removal.  8 U.S.C. § 1225(b)(1)(A)(i).[7]  Instead, both the fact-finding and adjudication

functions are given to a DHS line-level immigration enforcement officer whose decision to

deport someone via expedited removal is generally final, subject only to approval by a

supervisor.  8 U.S.C. § 1225(b)(1)(A)(i).[8]  Despite the significant penalties that result from a

removal order, including a ban on readmission ranging from five years to life, and potential

criminal penalties for reentry, such orders generally are not subject to either judicial review or

appeal.  8 U.S.C. § 1225(b)(1)(C) (orders generally not subject to review or appeal); 8 U.S.C.

§ 1182(a)(9)(A)(i) (ban on readmission); *id.* § 1326 (criminal penalties for reentry).

Initially, the expedited removal powers were used almost exclusively at the border with

the purpose of ensuring speedy, "high velocity" deportations for those found entering the United

States without documentation.[9]  Gradually, expedited removal was expanded, first to immigrants

arriving by sea who had not been lawfully admitted or paroled into the country and could not

demonstrate they had been present here for at least two years.  Notice Designating Aliens Subject

to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act,

67 Fed. Reg. 68,924 (Nov. 13, 2002).  In 2004, the federal government further extended

expedited removal to undocumented individuals who were apprehended within 14 days of arrival

in the United States by land and within 100 air miles of any land border.  Designating Aliens for

Expedited Removal, 69 Fed. Reg. 48,878, 48,879 (Aug. 11, 2004).  Despite the increased risk of

erroneous deportations under this summary process, the use of expedited removals jumped from

---

[7] In the process, individuals may be detained until removed.  8 U.S.C. § 1225(b)(2)(A); *see also* 8 C.F.R. §§ 212.5(b), 235.3(b) (discussing parole of noncitizens in expedited removal); *Flores v. Barr,* No. 17-56297, slip. op. at 15-18 (9th Cir. Aug. 15, 2019) (same).

[8] In limited circumstances, additional review is provided.  For example, any person who claims under oath to have been lawfully admitted for permanent residence, to have been admitted as a refugee, or to have been granted asylum is entitled to prompt review of an expedited removal order.  8 U.S.C. § 1225(b)(1)(C).

[9] Manning & Hong, *supra* note 6, at 676, 697-98.

approximately 42,000 immigrants in 2004 to 193,000 in 2013—about 44 percent of the total

number of people deported that year.[10]  In 2017, 35 percent of all removals from the United

States were conducted through expedited removal.[11]

　　　　DHS reports that in fiscal year 2018, the time from initial detention to deportation

averaged 11.4 days for individuals in expedited removal, compared to 51.5 days for persons

"placed into full removal proceedings."[12]  Generally, the entire process consists of an interview

with an immigration officer who fills out a standardized form, and may even be in a remote

location.[13]  Fewer than 20 percent of the people ordered removed through expedited removal

(and reinstatement of removal)[14] ever see an immigration judge.[15]

　　　　The process is rife with potential for errors or abuse and has been misused to deport

legitimate asylum seekers, longtime residents with family who are U.S. citizens, children,

individuals with valid work and tourist visas, "and others with significant ties or legal claims to

be in the United States."[16]

### B.　Amici State Residents Will Face Substantial Risk of Wrongful Deportation Under the New Rule

　　　　Since the inception of expedited removal, reports have documented substantial errors in

---

[10] Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Immigration Enforcement Actions: 2004* at 6 (Nov. 2005), https://tinyurl.com/ImmEnf2004; Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Annual Report: Immigration Enforcement Actions: 2013* at 5 (Sept. 2014), https://tinyurl.com/ImmEnf2013.

[11] Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Immigration Enforcement Actions: 2017* at 9 (Mar. 2019), https://tinyurl.com/ImmEnf2017.

[12] 84 Fed. Reg. 35,409, 35,411.

[13] Manning & Hong, *supra* note 6, at 682-83, 690.

[14] Reinstatement of a final removal order occurs where the person departed the United States "under an order of removal and . . . unlawfully reentered the United States."  Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Immigration Enforcement Actions: 2017* at 4 (Mar. 2019), https://tinyurl.com/ImmEnf2017. Similar to expedited removal, the person may be ordered removed without a hearing before an immigration judge. *Id.*

[15] Am. Immigration Lawyers Ass'n, *Due Process Denied: Central Americans Seeking Asylum and Legal Protection in the United States* 17 (June 15, 2016), https://tinyurl.com/AILA-DueProcess.

[16] ACLU Found., *American Exile: Rapid Deportations that Bypass the Courtroom* 4 (Dec. 2014), https://tinyurl.com/ACLU-AmExile.

the system, including significant numbers of people: (1) forced by officers to sign documents they cannot read or understand; (2) misinformed about or denied their right to apply for asylum; and (3) denied the ability to collect documentary or other information to support a valid defense against expedited removal.[17]  Given the inexorable speed at which the process takes place, there is rarely an opportunity to consult with an attorney, obtain witnesses, or collect documentary evidence, such as a birth certificate, lease, or employment form, that might prevent immediate deportation.  For people traumatized by the harm they fled or the shock of being uprooted from family and friends, the short timeline may increase the likelihood they will be unable to clearly articulate the basis for immigration relief.[18]  Hasty decisions made by low-level immigration officers with broad discretion and little to no judicial review also compound the likelihood of error.[19]  These errors occurred even before the federal government's recent efforts to greatly expand expedited removal; thus, it is likely that expanding the scope of the system will only magnify the mistakes.

Moreover, expedited removal regulations do not provide the applicant with any notice as to how continuous presence in the United States may be established or what burden of proof or legal standard is to be applied by the immigration officer making the determination.  8 C.F.R.

---

[17] *See e.g.*, U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 51 (Feb. 8, 2005), https://tinyurl.com/USCIRF-ExpeditedRemoval; Elizabeth Cassidy & Tiffany Lynch, U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection, The Treatment of Asylum Seekers in Expedited Removal* 21-22 (2016), https://tinyurl.com/USCIRF-Barriers; Am. Immigration Council, *A Primer on Expedited Removal* 1 (July 2019), https://tinyurl.com/AmIC-Perils; *see also* Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border* 12-13 (Feb. 2017), https://bit.ly/2ZxInuV.

[18] Kathryn Shepherd & Royce Bernstein Murray, Am. Immigration Council, *The Perils of Expedited Removal: How Fast-Track Deportations Jeopardize Asylum Seekers* 9-16 (May 2017), https://tinyurl.com/AIC-Perils (finding that many in expedited removal who are seeking asylum are suffering from significant trauma, including the emotional impact of family separation, which may have an effect on their ability to tell their story).

[19] Ebba Gebisa, *Constitutional Concerns with the Enforcement and Expansion of Expedited Removal*, 2007 U. Chi. Legal F. 565, 580-83 (2007).

§ 235.3.  Instead, expedited removal is allowed if the person does not "establish[] to the satisfaction of the immigration officer" that he or she has been physically present in the United States continuously for two years.  8 C.F.R. § 235.3(b)(1)(ii).  Lack of a clear legal standard can result in immigration officers applying an unfairly high burden of proof and/or inconsistent burdens, and is especially problematic in this context, where people are compelled to try to prove a negative—that they have not left the country for a period of up to two years.[20]

Such a truncated procedure, with little to no process or judicial review and a lack of articulable legal standards, means the likelihood of wrongful deportation from the United States is far greater than in a full deportation proceeding.  The failure to provide a right to counsel only increases the probability of mistakes.  A national study of 1.2 million immigration cases found that detained immigrants with counsel were ten times more likely to seek relief than those without counsel and more than twice as likely to obtain relief from removal.[21]

Multiple reports have documented the grave consequences of wrongful deportation.  For example, a 2014 report described a U.S. citizen who was issued an expedited removal order by an officer who did not believe a U.S. citizen would speak only Spanish.  After spending many years in Mexico trying to return to the United States, she found an attorney who, after months of litigation, was able to prove her case.[22]  The new rule increases the likelihood of errors like these by expanding expedited removal immediately without first providing adequate training to immigration officers.  DHS's Notice states that, in light of the greater use of expedited removal,

---

[20] Am. Immigration Council, *supra* note 17; Cassidy & Lynch, *supra* note 17, at 35.

[21] Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 51 fig.15 (2015); *see also* U.S. Gov't Accountability Office, *U.S. Asylum System: Significant Variation Existed in Asylum Outcomes across Immigration Courts and Judges* 30 (Sept. 2008), https://tinyurl.com/GAO-Asylum (after controlling for other factors, finding that having an attorney more than doubled an asylum seeker's chance of being granted asylum).

[22] ACLU Found., *supra* note 16, at 4-5.

Immigration and Customs Enforcement (ICE) will develop and deploy updated expedited removal training for its officers, including proper referral for credible fear screening. 84 Fed. Reg. 35,409. In the meantime, numerous individuals will be subjected to a process without meaningful review, lacking clear standards, and conducted by untrained immigration officers.

Lastly, the summary process may also unjustly deprive individuals who otherwise would be eligible to make a legal claim to stay in the United States any opportunity to pursue such relief. For example, a witness or victim of a crime who might be otherwise eligible to remain in the country is prohibited from making such a claim in expedited removal proceedings.[23] Similarly, individuals who are profiled on the basis of national origin or race or arrested in violation of their Fourth Amendment rights will be effectively prevented from raising those violations in the expedited removal process by the lack of a neutral adjudicator or any procedure for deciding such issues. This is especially troubling where, as here, concerns about racial profiling are particularly acute. To date, expedited removal has almost exclusively been applied to persons who are from Mexico and three Central American countries, namely Guatemala, Honduras, and El Salvador. Nationals from these four countries accounted for 98 percent of all expedited removals in fiscal year 2013, 97 percent in fiscal year 2012, 96 percent in fiscal year 2011, and 94 percent in fiscal year 2010.[24]

### C.    The Expedited Removal Process is Perilous for Asylum Seekers

In expedited removal cases, if a non-citizen expresses an intent to seek asylum, the statute

---

[23] *Compare* 8 U.S.C. § 1225(b)(i) (identifying limited grounds for challenging inadmissibility in expedited removal), *with* 8 U.S.C. § 1101(a)(15)(U) (identifying that witnesses and victims to a crime not in expedited removal proceedings can, under certain circumstances, petition for relief from removal).

[24] Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Immigration Enforcement Actions: 2013* at 6 (Sept. 2014), https://tinyurl.com/ImmEnf2013; Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Immigration Enforcement Actions: 2012* at 5 (Dec. 2013), https://tinyurl.com/ImmEnf2012; Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Immigration Enforcement Actions: 2011* at 5 (Sept. 2012), https://tinyurl.com/ImmEnf2011; Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Immigration Enforcement Actions: 2010* at 4 (June 2011), https://tinyurl.com/ImmEnf2010.

requires the immigration officer to make a referral to an asylum officer for an interview to determine whether the applicant "has a credible fear of persecution."  8 U.S.C. § 1225(b)(1)(B)(v).  If the asylum officer concludes that no credible fear exists, applicants are "removed from the United States without further hearing or review," except for an expedited review by an immigration judge, which must be concluded within seven days.  During this time period, individuals may be detained by the federal government.  8 U.S.C. § 1225(b)(1)(B)(iii); *see also* 8 C.F.R. § 1208.30(g); *but see* 8 C.F.R. §§ 212.5(b), 235.3(b) (discussing parole of noncitizens in expedited removal); *Flores,* slip. op. at 15-18 (same).  If the asylum officer concludes that a credible fear exists, individuals are placed in removal proceedings.  8 U.S.C. § 1225(b)(2)(A); 8 C.F.R. § 208.30(f).  While the asylum case is pending, they may remain in detention.  *E.g.*, 69 Fed. Reg. 48,877-48,881 (Aug. 11, 2014) (discussing circumstances under which parole into the U.S. may be granted).

Many recent arrivals requesting asylum are from the Northern Triangle of Central America (El Salvador, Honduras, and Guatemala),[25] one of the most violent regions in the world, "akin to the conditions found in the deadliest armed conflicts in the world today."[26]  The law excludes asylum seekers who pass the "credible fear" interview from being subject to expedited removal.  However, immigration officers retain virtually unchecked authority to determine whether to refer the individual for a credible fear interview in the first instance, subject only to review by a supervisor.  The United States Commission on International Religious Freedom

---

[25] U.S. Citizenship & Immigration Servs., *Credible Fear Workload Report Summary FY 2018* at 3, https://tinyurl.com/USCIS-CredFear.

[26] Medecins Sans Frontieres, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis* 4 (May 2017), https://tinyurl.com/MSF-ForcedFlee; *see also* U.N. High Comm'r for Refugees, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico* 4 (Oct. 2015), https://tinyurl.com/UNHCR-WomenRun ("[T]he increasing violence from criminal armed groups occurred alongside repeated physical and sexual violence at home.").

found that the federal government lacked sufficient quality assurance mechanisms to ensure that asylum seekers were not improperly returned to their home countries.[27]  Multiple reports have found that not all persons in the expedited removal process who express a fear of persecution if deported are provided a credible fear screening interview.[28]  The Commission reported that, in some cases, immigration officers pressured individuals expressing fear into withdrawing their application for admission, and thus their request for asylum, despite DHS policies forbidding the practice.[29]  In other cases, officers failed to ask if the arriving individual feared return.[30]  Even where the individuals expressed such fear, officers failed to document it, resulting in denial of a credible fear screening.[31]  In still other cases, individuals were denied a credible fear interview because officers interviewed them in a language they could not understand.[32]

The increased use of the summary expedited removal process heightens the risk that an individual will not know to assert, or immigration officers will not recognize, a valid claim for refuge from abuse, violence, or persecution in the person's country of origin.  As a result, the new rule jeopardizes the interests of the States and the public in ensuring that persons eligible for refuge in this country are not "deliver[ed] . . . into the hands of their persecutors."  *Leiva-Perez v.*

---

[27] U.S. Comm'n on Int'l Religious Freedom, *supra* note 17, at 8-9.

[28] Michele R. Pistone & John J. Hoeffner, *Rules Are Made to Be Broken: How the Process of Expedited Removal Fails Asylum Seekers*, 20 Geo. Immigr. L.J. 167, 175-93 (2006) (describing failure of federal government to adhere to statutes and regulations governing expedited removal); *see also* Cassidy & Lynch, *supra* note 17, at 21-22.

[29] *E.g.*, U.S. Comm'n on Int'l Religious Freedom, *supra* note 17, at 5-6; *see also* Cassidy & Lynch, *supra* note 17, at 23.

[30] *Id.*

[31] U.S. Comm'n on Int'l Religious Freedom *supra* note 17, at 53, 54-55, 57; Cassidy & Lynch, *supra* note 17, at 21; *see also* Letter from Nat'l Immigrant Justice Ctr. et al. to U.S. Dep't of Homeland Sec. Office of Civil Rights & Civil Liberties & Office of the Inspector Gen., at 12-22 (Nov. 13, 2014), https://tinyurl.com/NIJCtoCRCL (explaining that "[w]hen applicants express fears, CBP officials fail to capture those statements in the required documentation or include mistaken information"); John Washington, The Intercept, *Bad Information: Border Patrol Arrest Reports Are Full of Lies That Can Sabotage Asylum Claims* (Aug. 11, 2019), https://tinyurl.com/Washington-BadInfo.

[32] Cassidy & Lynch, *supra* note 17, at 27-28.

*Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (per curiam).  The consequences for those who are returned to their home countries can be deadly.  For example, a 2014 Report described the story of Braulia A. and Hermalinda L. who were gang-raped and shot after being deported to Guatemala; Braulia's son, who joined her in Guatemala after her deportation, was murdered by the same gang.[33]  Laura S. told border officials that she was afraid of her abusive ex-partner; her pleas ignored, she was deported and murdered by him within days of her return to Mexico.[34]

Furthermore, when federal authorities place asylum seekers in expedited removal, they are often housed in units designed like criminal, not civil, detention facilities, with little or no privacy or freedom of movement.  These facilities are often already overwhelmed and filled to capacity, and fail to provide even the most basic services and care.[35]  "[P]enal detention conditions risk re-traumatizing asylum seekers who experienced or fear persecution or torture," and prolonged detention can cause severe chronic emotional distress, including chronic anxiety, physically damaging stress levels, depression, and suicide, and post-traumatic stress disorder.[36]

### III.  THE NEW RULE HARMS THE STATES' INTEREST IN PROTECTING RIGHTS OF RESIDENTS

Recognizing the importance of proper legal guidance during immigration proceedings where constitutionally protected due process rights are at stake,[37] many of the Amici States fund

---

[33] ACLU Found., *supra* note 16, at 4.

[34] Sarah Stillman, *When Deportation is a Death Sentence,* New Yorker (Jan. 8, 2018), https://tinyurl.com/Stillman-Deportation.

[35] Cassidy & Lynch, *supra* note 17, at 40-42; Office of Inspector Gen., U.S. Dep't of Homeland Sec., *Management Alert – DHS Needs to Address Dangerous Overcrowding Among Single Adults at El Paso Del Norte Processing Center* (May 30, 2019), https://tinyurl.com/DHSOIG-MA.

[36] Cassidy & Lynch, *supra* note 17, at 9, 43-44.

[37] *E.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (due process clause of the constitution applies "to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").

nonprofit organizations to provide legal assistance in immigration-related matters.  For example, Illinois funds more than five dozen community organizations providing citizenship and others services to immigrants.[38]  New Jersey provides $2.1 million in state funds to provide legal services to individuals facing detention or deportation due to their immigration status.[39]  Similarly, since fiscal year 2015-16, California has allocated $147 million to nonprofit legal service organizations for immigration-related programs.[40]  The State of Washington allocated $1 million for fiscal year 2019 to contract with organizations and attorneys providing legal representation to asylum seekers and other immigrant populations in the state.[41]  In calendar year 2018, the state of Connecticut's Judicial Branch provided $13,886,873, through the Connecticut Bar Foundation to nonprofit civil legal services providers in the state.[42]  All of those nonprofits provide legal services to immigrants, including asylees, asylum seekers, and refugees.[43]  Under a 2019 Oregon law, the nonprofit Innovation Law Lab will receive $2 million in state funding to represent Oregonians in removal proceedings.[44]  New York's Fiscal Year 2020 Enacted Budget includes $10 million to support the expansion of the Liberty Defense Project, the first-in-the-nation, state-led public-private project administered by New York's Office for New Americans to assist immigrants, regardless of status, in obtaining access to legal

---

[38] *List of Community Service Agencies Serving Immigrants*, Ill. Dep't Hum. Servs., https://tinyurl.com/Ill-Imm-Servs (last visited Aug. 16, 2019).

[39] N.J. Office of Mgmt. & Budget, *The Governor's FY2020 Budget – Detailed Budget* 495 (Mar. 2019), https://tinyurl.com/NJ-Budget-2020.

[40] Cal. Dep't of Soc. Servs., *Immigration Services Program Update* 1 (Mar. 2019).

[41] 2018 Wash. Sess. Laws 2152, https://tinyurl.com/WA-SessLaw.

[42] I.R.S. Form 990 (2018), Conn. Bar Found., Inc. (Aug. 14, 2019), https://tinyurl.com/CBF-990.

[43] *See, e.g.*, Beth Fertig, *Two Immigrant Children In Connecticut Get Temporary Legal Status After Separation From Parents*, WSHU Conn. (August 31, 2018), https://tinyurl.com/WSHU-Fertig (describing immigration advocacy efforts of state-funded Connecticut Legal Services lawyers).

[44] H.B. 5050, 80th Legis. Assemb., 2019 Reg. Sess. (Or. 2019), https://tinyurl.com/Or-HB5050; *About Equity Corps*, Equity Corps Or., https://tinyurl.com/EquityCorpsOr (last visited Aug. 7, 2019).

services and process.[45] Community Legal Aid Society, Inc. of Delaware (Delaware Legal Aid) receives federal and state funding for the legal services it provides to immigrants.  State funding for 2018-2021 amounted to approximately $1.5 million, which included funding to provide victim-based services to non-citizens.

The Amici States also have a significant interest in protecting the rights of asylees.[46]  For instance, Amici States welcomed more than 72 percent of the asylum applicants granted asylum in 2016.[47]  Since 1990, an average of more than 22,000 individuals have been granted asylum annually.[48]  California welcomes by far the most individuals who are granted asylum, with almost 44 percent of the total in fiscal year 2016.[49]

Substantial expansion of the expedited removal process magnifies the harms visited upon both those who are seeking asylum and those who have been granted asylum.  Because of the expansion, it is likely that more people who express a credible fear of persecution will be detained by the federal government under conditions that will result in re-traumatization.[50]  When non-citizens ultimately granted asylum return to their communities, Amici States, their local jurisdictions, and non-governmental organizations funded by Amici States will be called upon to provide additional mental health and other services.  The Amici States' public health

---

[45] Press Release, Office of the Governor, Governor Cuomo and Legislative Leaders Announces 2020 Enacted Budget Includes $10 Million to Support Expansion of the Liberty Defense Project (Apr. 5, 2019), https://tinyurl.com/NYGOV-PR.

[46] For purposes of this brief, the term asylee includes those who are seeking asylum and those who have been granted asylum.

[47] Nadwa Mossad & Ryan Baugh, Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Refugees and Asylees: 2016* at 10 fig.7 (Jan. 2018), https://tinyurl.com/Mossad-Baugh-DHS.

[48] Office of Immigration Statistics, U.S. Dep't of Homeland Sec. (DHS), *2016 Yearbook of Immigration Statistics* 43 tbl.16 (Nov. 2017), https://tinyurl.com/2016YBImmStats.

[49] Mossad & Baugh, *supra* note 47, at 8.

[50] Cassidy & Lynch, *supra* note 17, at 14 (noting that "[a]s Expedited Removals have increased, so too have claims of fear by non-citizens in that process").

care systems will also face the increased health needs of those who were denied preventative care and necessary mental health and medical treatment in detention.

Many of the Amici States have invested in specialized services to meet asylees' needs.  In California, for example, the Immigration Branch of the California Department of Social Services has various forms of assistance for certain eligible asylees and refugees including programs that provide cash assistance and employment services.[51]  These program benefits and services are typically administered by county social services departments or through county contracts with local providers to deliver direct services.[52]  The State of Washington allocated approximately $2.4 million for fiscal year 2018 to provide employment services for organizations serving asylum seekers and other immigrant populations in the state.[53]  For fiscal year 2020, the District of Columbia allocated $2.5 million to programs that provide services and resources to its immigrant population.[54]  The New York State Office of Temporary and Disability Assistance provides various forms of financial and social services assistance to eligible asylees and refugees through its Refugee Resettlement Program, appropriating $26,000,000 in state fiscal year 2019-2020.[55]  For state fiscal year 2019-2020, New York has also appropriated $2,397,000 for the Response to Human Trafficking Program, a state-funded program to assist human trafficking victims not otherwise eligible for services due to their immigration status.[56]  In Vermont, the state Department of Health works with asylees from the moment they arrive through a

---

[51] *See Services for Refugees, Asylees, and Trafficking Victims*, Cal. Dep't of Soc. Servs., https://tinyurl.com/Services-CDSS (last visited Aug. 12, 2019).

[52] *Id.*; *see also Refugee & Asylee Benefits*, SF-CAIRS, https://tinyurl.com/SF-CAIRs (last visited Aug. 12, 2019).

[53] 2018 Wash. Sess. Laws 2220, https://tinyurl.com/WA-SessLaw.

[54] Press Release, Office of the Mayor, *Mayor Bowser Announces $2.5 Million Available for FY 2020 Immigrant Justice Legal Services Grant Program* (July 12, 2019), https://tinyurl.com/DC-Grant.

[55] Aid to Localities Budget, 2019 N.Y. Sess. Laws ch. 53 (McKinney).

[56] N.Y. Soc. Serv. Law § 483-bb; Aid to Localities Budget, 2019 N.Y. Sess. Laws ch. 53 (McKinney).

community-based system of care.  It collaborates with local health care partners to provide health screenings and integrate asylees into the health care system.  It also provides translated information on public health and wellness for these new Vermonters.[57]

The potential influx of additional asylees will likely put pressure on local governments and providers to seek additional funding from the Amici States.  Amici States, who have a strong interest in ensuring that asylees can become healthy and productive state residents, may have to divert funds from other purposes to meet the growing need caused by Defendants' new rule.

Finally, the evidence suggests that one of the principal purposes of harsh federal policies such as the new rule is to deter legitimate asylum seekers from obtaining relief.[58]  The Amici States have a strong interest in ensuring that asylum seekers are not denied protection accorded to them under federal law.  Courts have held that similar policies treating asylum seekers harshly in order to deter others from attempting to enter the United States are unconstitutional.  *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188–90 (D.D.C. 2015) (granting preliminary injunction against policy of detaining asylum seekers to send "a message of deterrence to other Central American individuals who may be considering immigration").

## IV. THE NEW RULE WILL INFLICT SERIOUS HARM ON INDIVIDUALS, FAMILIES, COMMUNITIES, AND THE PUBLIC SERVED BY AMICI STATES

DHS's decision to expand expedited removal will inflict broad and systemic harm on the individuals, families, communities, and the broader public served by Amici States.  People who

---

[57] *See Refugee Health Program,* Vt. Dept. of Health (VTDOH), https://tinyurl.com/VTDOH-RHP (last visited Aug. 15, 2019).

[58] *See Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States*, White House (Nov. 9, 2018), https://tinyurl.com/Pres-Proc ("Virtually all members of family units . . . that are found to have a credible fear of persecution, are . . . released into the United States.  Against this backdrop of near-assurance of release, the number of such aliens traveling as family units who enter through the southern border and claim a credible fear of persecution has greatly increased . . . .  Failing to take immediate action to stem the mass migration the United States is currently experiencing and anticipating would only encourage additional mass unlawful migration . . . .").

have lived in this country for one or two years (or more) have begun to build lives here.  They contribute to our economy and civic life in countless ways.  For instance, immigrants make up more than a third of California's workforce and undocumented immigrants in California each year contribute an estimated $3 billion in state and local taxes.[59]  In 2015, immigrant workers comprised 10 percent of the labor force in Minnesota.[60]  Immigrant-led households in Minnesota paid $1.1 billion in state and local taxes in 2014.[61]  Eight percent of all self-employed Minnesota residents in 2015 were immigrant business owners, who generated $489.1 million in business income.[62]  In 2015 in Connecticut, one of every six workers was an immigrant, comprising 17.6 percent of the labor force.[63]  As of 2017, Connecticut had 525,813 immigrant residents, about 14.7 percent of the state population, who generated $14.5 billion in spending power and paid almost $6 billion in taxes annually.[64]  The 37,285 immigrant entrepreneurs in Connecticut produced total sales of $15.6 billion and employed 95,177 people.[65]  Immigrant households in Vermont contributed nearly $135 million in federal taxes and nearly $58 million in state and local taxes in 2014.[66]  In Massachusetts, one in five workers is an immigrant and undocumented immigrants pay an estimated $185 million in taxes each year.[67] Undocumented immigrants in

---

[59] Am. Immigration Council, *Immigrants in California* 2 (Oct. 4, 2017), https://tinyurl.com/AmIC-CA; Inst. on Taxation & Econ. Policy, *State and Local Tax Contributions of Undocumented Californians* 1 (Apr. 2017), https://tinyurl.com/ITEP-Taxes.

[60] *See* Am. Immigration Council, *Immigrants in Minnesota* 2 (Oct. 13, 2017), https://tinyurl.com/AmIC-MN.

[61] *See id.* at 4.

[62] *Id.*

[63] Am. Immigration Council, *Immigrants in Connecticut* 2 (Oct. 13, 2017), https://tinyurl.com/AmImC-CT.

[64] New Am. Economy, *Immigrants and the Economy in Connecticut*, https://tinyurl.com/NewAE-CT (last visited Aug. 19, 2019).

[65] *Id*.

[66] New Am. Economy, *Contributions of New Americans in Vermont* 5 (Aug. 2016), https://tinyurl.com/NAE-VT-Report.

[67] Am. Immigration Council, *Immigrants in Massachusetts* 3, 5 (Oct. 5, 2017), https://tinyurl.com/AmIC-MA.

New Jersey paid an estimated $587.4 million in state and local taxes in 2014.[68]  Approximately 4.5 million immigrants live in New York State.[69] Some 2.8 million immigrant workers comprise roughly 27.8 percent of the state's labor force.[70] In 2014, New York State immigrant-led households paid $26.5 billion in federal taxes and $15.9 billion in state and local taxes, and had $103.3 billion in after-tax income spending power.[71]

### A.    Families will be torn apart

Millions of children born to undocumented immigrants in the United States are U.S. citizens by virtue of having been born in the United States.  As a result, millions of people live in "mixed-status" households, where one or both parents may be undocumented, while some or all of the children (and, sometimes, a spouse) are U.S. citizens.[72]  Expanding expedited removal means that these "mixed-status" families face separation with little or no time to prepare.

Studies show that children faced with the likelihood of a family members' deportation can experience serious mental health problems, including depression, anxiety, self-harm, and regression.[73]  Studies also show that children's concerns about their parents' immigration status can impair their socio-emotional and cognitive development.[74]  And children whose immigrant mothers are subject to deportation have higher incidence of adjustment and anxiety disorders.[75]

---

[68] Am. Immigration Council, *Immigrants in New Jersey* 4 (Oct. 13, 2017), https://tinyurl.com/AmIC-NJ.

[69] New. Am. Economy, *Contributions of New Americans in New York* 4 (Aug. 2016), https://tinyurl.com/NewAm-NY.

[70] *Id*. at 10.

[71] *Id*. at 7.

[72] Randy Capps, et al., Urb  Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature* 8-12 (Sept. 2015), https://tinyurl.com/CappsMPI (discussing 2015 study estimating that 5.3 million children, 85% of whom were U.S. born, were living with undocumented immigrant parents).

[73] Wendy Cervantes, et al., Ctr. for Law & Soc. Policy, *Our Children's Fear: Immigration Policy's Effects on Young Children* 2-3, 10-12 (Mar. 2018), https://tinyurl.com/ChildFears.

[74] Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120-136 (2011); Capps, *supra* note 72, at 8-9.

[75] Jens Hainmueller, et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357 Science 1041, 1041 (2017).

Of course, these harms only get worse when fears of forcible separation come true.  In one study, children with deported parents refused to eat, pulled out their hair, had persistent stomachaches and headaches, engaged in substance abuse, lost interest in daily activities, and had trouble maintaining positive relationships with non-deported parents.[76]  These traumatic childhood experiences also can inflict lasting harm, including severe impairments of a child's sense of self-worth and ability to form close relationships later in life, increased anxiety, and depression.[77]

In addition to threatening children's health, deporting a family's financial breadwinner can lead to economic hardship and loss of housing for remaining family members, and can put children, seniors, and disabled family members at serious risk.[78]  As a result of increased deportations under the new rule, many families will be forced to seek increased social services,[79] stretching the resources of the Amici States.  For example, as of 2011, more than 5,000 children nationally were estimated to be living in foster care due to their parents' detention or deportation.[80]  With long-term foster care estimated to cost about $25,000 per child per year,[81] these immigration enforcement actions also cost states and local governments $125 million

---

[76] Heather Koball, et al., Urb. Inst., *Health and Social Services Needs of US-Citizen Children with Detained or Deported Immigrant Parents* 5 (Sept. 2015), https://tinyurl.com/MIRFinal; *see also* Mary Papenfuss, *Weeping Girl Left Abandoned by ICE Pleads with 'Government' to 'Let my Parent be Free'*, Huffington Post (Aug. 8, 2019), https://tinyurl.com/Papenfuss-HuffPost (reporting scores of children left abandoned after largest ICE raid in a decade and 200 children failing to show up for schools in the area the following day).

[77] Kristen Lee Gray, Cal. Polytechnic St. Univ., San Luis Obispo, *Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood* 14-15, 19 (June 2011), https://tinyurl.com/j3lgrno.

[78] Capps, *supra* note 72, at 9-14, 17-23.

[79] *Id.*

[80] Seth Freed Wessler, Applied Research Ctr., *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System* 6 (Nov. 2011), https://tinyurl.com/ARCFam.

[81] Nicholas Zill, Nat'l Council for Adoption, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption* at 3 (May 2011), https://tinyurl.com/Zill-Adoption.

dollars annually.  Such costs could substantially increase with the expansion of expedited removal and the separation of families.[82]

Further, harms are suffered not only by children, but also extend to other residents of the Amici States who suffer the daily uncertainty of not knowing whether their relatives will be placed (erroneously or not) in expedited removal on the way to the grocery store, to work, or even to their children's schools.[83]  Many individuals who seek asylum have relatives across the country and those relatives in Amici States are harmed by the federal government's actions.

Finally, the new rule is inhumane, as it fails to include exceptions to delay expedited removal for long-term residents to take care of even the most basic human needs, such as the need for urgent, life-saving medical care.  84 Fed. Reg. 35,409, 35,412.

### B.   Public safety, worker safety, and access to health care will suffer

The risks undocumented immigrants face under the immigration system make them some of the most vulnerable people residing in Amici States.  The federal government's dramatic expansion of expedited removal only exposes these residents to even more abuse.  It is foreseeable that they will be even less likely to report crime or exploitation or to seek needed medical care, which obstructs the efforts of Amici States to protect the public.

Amici States are dedicated to ensuring that police and prosecutors are able to do their jobs to protect public safety.  *See, e.g., Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 601 (1982) (discussing states' sovereign interests in enforcing criminal code).  But by

---

[82] Papenfuss, *supra* note 76 (discussing scores of crying children left abandoned after largest ICE raid in a decade); Immigrant Legal Res. Ctr., *Immigration Enforcement & the Child Welfare System* 2 (Dec. 11, 2017), https://tinyurl.com/ImmChildWelfare.

[83] Kelly Heyboer, *ICE Arrests Surging in N.J. Under Trump. Here's Why.*, N.J. On-Line (Feb. 2018), https://tinyurl.com/Heyboer-ICEArrests (ICE has increased arrests and detentions of immigrants in New Jersey by 42%; many have been arrested at courthouses, children's schools, and at their work places).

subjecting hundreds of thousands additional immigrants to unexpected and hasty deportation, expedited removal makes them less likely to report crimes to law enforcement, even if they are victims.[84]  When law enforcement is unable to obtain evidence of crimes, public safety suffers. For example, Delaware Legal Aid reports that among immigrants there is now rampant fear of contacting law enforcement for help or to report a crime.  The organization says its clients and their communities do not distinguish between federal immigration enforcement or prosecutors and state social services agencies or Family Court, but view them all as "the government."  As a result, Delaware Legal Services reports that more of its clients and their children are staying in unsafe or abusive situations.  This not only endangers those families, but also damages Delaware's ability to investigate and prosecute crimes, which renders all Delawareans less safe.

Similarly, the Amici States have an interest in ensuring enforcement of wage and hour and employment safety laws that protect not only the specific workers but also ensure economic fairness and a safe workplace for all of the Amici States' residents.  *See, e.g., Metropolitan Life Ins. Co v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'") (quotation omitted).  When fear of immigration enforcement is high, immigrants are more vulnerable to unlawful wage theft and health and safety workplace

---

[84] *E.g.*, James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://tinyurl.com/Queally (Los Angeles law enforcement officials reporting precipitous drop in domestic violence reports in Latino community, which they attributed to victims' fear of deportation);  Make the Road N.J., *ICE in the New Jersey Courts: The Impact of Immigration Enforcement on Access to Justice in the Garden State* 2-3 (Dec. 2017), https://tinyurl.com/MTRNJ-ICE (seventy-two percent of legal services providers surveyed in New Jersey reported clients who feared attending court proceedings because abusive partners threatened that ICE would be there; 60% reported clients who had withdrawn or failed to pursue orders of protection due to fear of ICE.); Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017), https://tinyurl.com/Wong-CAP-Crime (concluding that when immigrant populations have an increased fear of deportation from law enforcement, it chills reporting of crimes and results in communities that are less safe).

violations.  Unscrupulous employers can take advantage of their fear of deportation to keep them from reporting violations, making it more difficult for Amici States to enforce their labor laws.[85]

Further, Amici States have a substantial interest in ensuring that its residents access medical treatment and preventative care.  Amici States who fund and provide health care services to immigrants can reduce future medical costs when they prevent health problems from becoming more extreme and expensive.  Unfortunately, immigration enforcement fears, which will only increase with the expansion of expedited removal, cause immigrant families to forego preventative medical care.  In recent studies, health care providers are finding that immigrant families are increasingly skipping health care appointments and abstaining from scheduling routine prevention or primary care appointments for their children.[86]  Clinics across the country have noticed a significant decline in clinic visits due to this Administration's harsh immigration enforcement policies.[87]  The expansion of expedited removal will further dissuade immigrants from seeking cost-effective preventive care that saves lives and reduces costs in Amici States.

## V.   THE STATES ARE HARMED BY THE FAILURE TO PROVIDE A NOTICE-AND-COMMENT PROCESS

Amici States could have, and would have, identified all of the foregoing problems with the new rule before it was implemented had the federal government provided an opportunity for comment.[88]  But this rule was implemented with no advance notice and no opportunity for comment from affected individuals, organizations, States, or the public in general.

---

[85] Rebecca Smith, Ana Avendaño & Julie Martínez Ortega, AFL-CIO, *Iced Out: How Immigration Enforcement Has Interfered with Workers' Rights* 5-6 (2009), https://tinyurl.com/Smith-IcedOut.

[86] The Children's P'ship, *Healthy Mind, Healthy Future: Promoting the Mental Health and Wellbeing of Children in Immigrant Families in California* 25 (Sept. 22, 2018), https://tinyurl.com/ChildrensPship-Healthy.

[87] Ctr. for Health Progress, *Immigration Policy Is Health Policy: Executive Order 13768 & The Impact of Anti-Immigrant Policy on Health* 3 (Mar. 20, 2018), https://tinyurl.com/CHP-Health; *see also* Anna North, *Immigrants Are Skipping Reproductive Health Care Because They're Afraid of Being Deported*, Vox (July 22, 2019), https://tinyurl.com/North-Vox.

[88] Several Amici States intend to submit objections during the *post hoc* comment period.

Public notice and comment promotes good government by ensuring the decision-maker has access to complete information about potential pitfalls and ramifications of, and alternatives to, the proposed action. Public participation ensures that agency actions are tested through exposure to diverse public comment, that the process is fair to affected parties, particularly where "governmental authority has been delegated to unrepresentative agencies," and that affected parties have "an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005); *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980).

Defendants' failure to engage in pre-rule notice and comment not only deprived the States of the opportunity to participate in the rulemaking process but also deprived the DHS Secretary and the public of the benefit of their unique perspectives. 84 Fed. Reg. 35,409, 35,410. The opportunity to comment on proposed federal actions is vital to the States' ability to protect their residents. As sovereigns responsible for the health, safety, and welfare of millions of people within their respective borders, the Amici States have unique interests and perspectives to contribute, particularly where, as here, federal actions will cause residents of our States unnecessary, substantial, and enduring harm. Further, the record developed through the notice and comment process might have resulted in changes to the rule and would have aided the court in its review of the action. *See United Mine Workers*, 407 F.3d at 1259.

## CONCLUSION

The Amici States support plaintiffs' motion for a preliminary injunction.

Dated:  August 21, 2019

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MICHAEL NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
Supervising Deputy Attorney General
ANTONETTE BENITA CORDERO
LAURA FAER
VILMA PALMA-SOLANA
ANTHONY SEFERIAN
Deputy Attorneys General


*/s/Laura Faer*
LAURA FAER (CAL. STATE BAR NO.
233846)*
Deputy Attorney General
*Attorneys for the State of California*
*Filing pursuant to LCvR 83*

WILLIAM TONG
*Attorney General*
*State of Connecticut*
55 Elm Street
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
*Attorney General*
*District of Columbia*
441 4th Street N.W., Suite 630 South
Washington, DC 20001

CLARE E. CONNORS
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
100 West Randolph Street
Chicago, Illinois 60601

BRIAN E. FROSH
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

MAURA HEALY
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

GURBIR S. GREWAL
*Attorney General*
*State of New Jersey*
25 Market Street, Box 080
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, New York 10005

THOMAS J. DONOVAN, JR.
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
PO Box 40100
Olympia, Washington 98504-0100

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

HECTOR BALDERAS
*Attorney General*
*State of New Mexico*
PO Drawer 1508
Santa Fe, New Mexico 87504-1508

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
162 Court Street NE
Salem, OR 97301-4096

MARK R. HERRING
*Attorney General*
*State of Virginia*
202 North 9th Street
Richmond, Virginia 23219