JOSEPH H. HUNT
*Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
KATHRYNE GRAY
ARCHITH RAMKUMAR
*Trial Attorneys*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Make the Road New York, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:19-cv-02369-KBJ |
| ) | |
| Kevin McAleenan, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND ....................................................6

ARGUMENT ......................................................................................................17

I.      Plaintiffs' Claims are Not Justiciable ..........................................................17

      A.     The Court Lacks Subject Matter Jurisdiction Over all Plaintiffs' Claims and Plaintiffs are Not Within the Statutory Zone of Interests ....................................17

      B.     Plaintiffs Lack Article III Standing ....................................20

      C.     Plaintiffs Lack Any Cause of Action under the APA ..........................25

II.     The Government is Likely to Succeed on the Merits ....................................30

      A.     The Notice Is Not Subject to the APA's Procedural Requirements ....................30

      B.     The Notice Is Consistent with the Statute and the Due Process Clause ..............36

            i.     *Plaintiffs' Claims are Foreclosed by AILA v. Reno, 18 F. Supp. 2d 38 (D.D.C. 1998), aff'd, 199 F.3d 1352 (D.C. Cir. 2000)* ............38

            ii.    *Plaintiffs' Due Process Claims Fails on their Merits* ..................41

      C.     The Notice Is Not Arbitrary or Capricious ..........................................51

      D.     The Notice is Consistent with the INA's Access to Counsel Provision. ..............53

III.    The Other Preliminary Injunction Factors Foreclose Issuing an Injunction ............56

IV.    Any Interim Relief Must Be Sharply Limited .............................................59

CONCLUSION ...................................................................................................60

CERTIFICATE OF SERVICE ............................................................................61

# TABLE OF AUTHORITIES

## CASE LAW

*Adams v. Vance,*
   570 F.2d 950 (D.C. Cir. 1978)................................................................................59

*Alaka v. Att'y Gen. of U.S.,*
   456 F.3d 88 (3d Cir. 2006)....................................................................................28

*Al-Aulaqi v. Obama,*
   727 F. Supp. 2d 1 (D.D.C. 2010)..........................................................................26

*Am. Ass'n for Homecare v. Leavitt,*
   2008 WL 2580217 (D.D.C. June 30, 2008) ..........................................................59

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
   271 F.3d 262 (D.C. Cir. 2001)..............................................................................53

*\*Am. Immigration Lawyers Ass'n v. Reno,*
   18 F. Supp. 2d 38 (D.D.C. 1998)......................................................................*passim*

*\*Am. Immigration Lawyers Ass'n v. Reno,*
   199 F.3d 1352 (D.C. Cir. 2000)........................................................................*passim*

*American Chem. Council v. DOT.,*
   468 F.3d 810 (D.C. Cir. 2006)..............................................................................22

*American Fed'n of Labor v. Donovan,*
   757 F.2d 330 (D.C.Cir.1985).................................................................................40

*American Soc. of Cataract & Refractive Surgery v. Thompson,*
   279 F.3d 447 (7th Cir. 2002)...........................................................................29, 30

*\*Amgen, Inc. v. Smith,*
   357 F.3d 103 (D.C. Cir. 2004).........................................................................28, 30

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531 (1987)..............................................................................................59

*\*Ardestani v. I.N.S.,*
   502 U.S. 129 (1991)..........................................................................................6, 55

*Ark Initiative v. Tidwell,*
   749 F.3d 1071 (D.C. Cir. 2014)............................................................................22

*Ashcroft v. Mattis*,
    431 U.S. 171 (1977)..................................................................23

*\*Asiana Airlines v. F.A.A.*,
    134 F.3d 393 (D.C. Cir. 1998).................................... 31, 32, 33

*Assoc. of Flight Attendants-CWA, AFL-CIO v. Huerta*,
    785 F.3d 710 (D.C. Cir. 2015)..............................................34

*\*Bakran v. Sec'y, United States Dep't of Homeland Sec.*,
    894 F.3d 557 (3d Cir. 2018)...................................................28

*Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*,
    814 F.3d 481 (1st Cir. 2016)..................................................28

*Bill Barret Corp. v. U.S. Dep't of Interior*,
    601 F. Supp. 2d 331 (D.D.C. 2009)......................................58

*\*Bremer v. Johnson*,
    834 F.3d 925 (8th Cir. 2016)...........................................28, 29

*Camp v.Pitts*
    411 U.S. 138 (1973)...............................................................53

*\*Carlson v. Landon*,
    342 U.S. 524 (1952)...............................................................47

*\*Castro v. United States Dep't of Homeland Sec.*,
    163 F. Supp. 3d 157 (E.D. Pa.) .......................................51, 52

*\*Castro v. United States Dep't of Homeland Sec.*,
    835 F.3d 422 (3d Cir. 2016) ............................................51, 52

*Chamber of Comm. v. EPA*,
    642 F.3d 192 (D.C. Cir. 2011)...............................................23

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006)..........................................57, 58

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)...............................................................33

*Cisneros v. Alpine Ridge Group*,
    508 U.S. 10 (1993).................................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ...................................................................................53

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) .....................................................................57

*\*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...........................................................................*passim*

*Clarian Health West, LLC v. Hargan,*
    878 F.3d 346 (D.C. Cir. 2017) ............................................................33, 34

*Clarke v. Secs. Indus. Ass'n,*
    479 U.S. 388 (1987) ...................................................................................20

*Claybrook v. Slater,*
    111 F.3d 904 (D.C. Cir. 1997) ...................................................................25

*Coalition for Parity, Inc. v. Sebelius,*
    709 F. Supp. 2d 10 (D.D.C. 2010) .............................................................35

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,*
    452 F.3d 798 (D.C. Cir. 2006) ............................................................30, 31

*Detroit Int'l Bridge Co. v. Gov't of Canada,*
    883 F.3d 895 (D.C. Cir. 2018) ...................................................................27

*\*Dia v. Ashcroft,*
    353 F.3d 228 (3d Cir. 2003) ...............................................37, 42, 43, 47

*DRG Funding Corp. v. Sec. of Housing & Urban Development,*
    76 F.3d 1212 (D.C. Cir. 1996) ...................................................................30

*Dugdale v. U.S. C.B.P.,*
    88 F. Supp. 3d 1 (D.D.C. 2015) .................................................................20

*Dugdale v. U.S. C.B.P.,*
    2015 WL 2124937 (D.D.C. May 6, 2015), , aff'd sub nom. Dugdale v. Lynch, 672 F. App'x 35
    (D.C. Cir. 2016) .........................................................................................20

*East Bay Sanctuary Covenant v. Trump,*
    --- F. 3d. ---, 2018 WL 8807133 (9th Cir. Dec. 7, 2018) ...................25, 59

*East Bay Sanctuary Covenant v. Trump,*
    354 F. Supp. 3d (N.D. Cal. 2018) ..............................................................35

*Elk Assoc. Funding Corp. v. U.S. Small Bus. Admin.*,
  858 F. Supp. 2d 1 (D.D.C. 2012) ................................................................. 59

*Envtl. Integrity Project v. United States Envtl. Prot. Agency*,
  177 F. Supp. 3d 36 (D.D.C. 2016) ............................................................... 32

*Food & Water Watch, Inc. v. Vilsack*,
  79 F. Supp. 3d 174 (D.D.C.), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015) .......... 25

*Foti v. Immigration & Naturalization Serv.*,
  375 U.S. 217 (1963) ..................................................................................... 39

*Found. v. Leavitt*,
  477 F. Supp. 2d 202 (D.D.C. 2007) ............................................................. 22

*Friends of Animals v. United States Bureau of Land Mgmt.*,
  232 F. Supp. 3d 53 (D.D.C. 2017) ............................................................... 58

*Fund Democracy LLC v. SEC*,
  278 F.3d 21 (D.C. Cir. 2002) ....................................................................... 21

*Gebhardt v. Nielsen*,
  879 F.3d 980 (9th Cir. 2018) .......................................................... 28, 29, 30

*Gill v. Whitford*,
  138 S. Ct. 1934 (2018) ................................................................................. 60

*Haitian Refugee Ctr., Inc. v. Baker*,
  953 F.2d 1498 (11th Cir. 1992) ................................................................... 27

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ..................................................................................... 27

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ......................................................................................... 36

*HP Inc. v. MPHJ Tech. Invs. LLC*,
  817 F.3d 1339 (Fed. Cir. 2016) ................................................................... 29

*Hunt v. Washington State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) ..................................................................................... 21

*Ibrahim v. DHS.*,
  669 F.3d 983 (9th Cir. 2012) ....................................................................... 44

*Initiative & Referendum Inst. v. Walker*,
450 F.3d 1082 (10th Cir. 2006) ....................................................... 25

*\*Innovation Law Lab v. McAleenan*,
924 F.3d 510 (9th Cir. 2019) .................................................... 57, 59

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) ....................................................................... 50

*J. Roderick MacArthur Found. v. FBI*,
102 F.3d 600 (D.C. Cir. 1996) ....................................................... 24

*Jean-Louis v. U.S. Att'y Gen.*,
582 F.3d 462 (3d Cir. 2009) ........................................................... 50

*\*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) ................................................................ 45, 46

*\*Jifry v. F.A.A.*,
370 F.3d 1174 (D.C. Cir. 2004) .................................................. 34, 35

*\*Jilin Pharm. USA, Inc. v. Chertoff*,
447 F.3d 196 (3d Cir. 2006) ....................................................... 28, 30

*Khan v. Holder*,
608 F.3d 325 (7th Cir. 2010) .......................................................... 20

*\*Knauff v. Shaughnessy*,
338 U.S. 537 (1950) .......................................................... 4, 7, 43, 47

*Kucana v. Holder*,
558 U.S. 233 (2010) ......................................................................... 8

*\*Landon v. Plasencia*,
459 U.S. 21 (1982) .................................................................. *passim*

*\*Legal Assistance for Vietnamese Asylum Seekers v. DOS*,
104 F.3d 1349 (D.C. Cir. 1997) .................................................. 42, 43

*\*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................... 3, 33, 38

*Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................................................................... 23, 24

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ........................................................................................22, 25

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ................................................................................................60

*Maldonado-Perez v. I.N.S.,*
  865 F.2d 328 (D.C. Cir. 1989) ...............................................................................50

*Marcello v. Bonds,*
  349 U.S. 302 (1955) ................................................................................................55

*Martinez v. U.S. Att'y Gen.,*
  693 F.3d 408 (3d Cir. 2010) .....................................................................................7

*Martinez–Aguero v. Gonzalez,*
  459 F.3d 618 (5th Cir. 2006) ..................................................................................44

*Mathews v. Diaz,*
  426 U.S. 67 (1976) ..................................................................................................43

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) ..........................................................................................38, 44

*McLouth Steel Products Corp. v. Thomas,*
  838 F.2d 1317 (D.C. Cir. 1988) .............................................................................33

*Mobil Oil Corp. v. Dep't of Energy,*
  728 F.2d 1477 (TECA 1983) ..................................................................................35

*Morrissey v. Brewer,*
  408 U.S. 471 (1972) ................................................................................................46

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29  (1983) .................................................................................................53

*Murray's Lessee v. Hoboken Land & Imp. Co.,*
  59 U.S. (18 How.) 272 (1855) ................................................................................47

*N. Mariana Islands v. United States,*
  686 F. Supp. 2d, 7 (D.D.C. 2009) ..........................................................................59

*NAACP v. Alabama ex rel. Patterson,*
  357 U.S. 449 (1958) ................................................................................................23

*Nat'l Ass'n of Home Builders v. Norton,*
   415 F.3d 8 (D.C. Cir. 2005)..................................................................31

*Nat'l Federation of Fed. Employees v. Divine,*
   671 F.2d 607 (D.C. Cir. 1982)..............................................................35

*Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.,*
   416 F. Supp. 2d 92 (D.D.C. 2006).........................................................32

*Olim v. Wakinekona,*
   461 U.S. 238 (1983)..............................................................................46

*\*Osorio-Martinez v. Attorney Gen. United States of Am.,*
   893 F.3d 153 (3d Cir. 2018)..................................................................44

*Pacific Gas & Elec. Co. v. FPC,*
   506 F.2d 33 (D.C. Cir. 1974).................................................................33

*Power Mobility Coalition v. Leavitt,*
   404 F. Supp. 2d 190 (D.D.C. 2005).......................................................58

*Privacy Info. Ctr. v. United States Dep't of Commerce,*
   928 F.3d 95 (D.C. Cir. 2019).........................................................21, 22

*Privett v. Sec'y, Dep't of Homeland Sec.,*
   865 F.3d 375 (6th Cir. 2017).................................................................30

*Pub. Citizen v. F.T.C.,*
   869 F.2d 1541 (D.C. Cir. 1989).............................................................52

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
   489 F.3d 1279 (D.C. Cir. 2007).............................................................24

*Renal Physicians Ass'n v. U.S. HHS.,*
   489 F.3d 1267 (D.C. Cir. 2007).............................................................24

*Reno v. Flores,*
   507 U.S. 292 (1993)................................................................................5

*\*Scenic Am., Inc. v. U.S. DOT,*
   836 F.3d 42 (D.C. Cir. 2016).................................................................21

*Sierra Club v. EPA,*
   873 F.3d 946 (D.C. Cir. 2017)...............................................................34

*Sierra Club v. Jackson*,
  648 F.3d 848 (D.C. Cir. 2011) ....................................................................27

*Struniak v. Lynch*,
  159 F.Supp.3d 643 (E.D. Va. 2016) ............................................................29

*\*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................23, 25

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ....................................................................................25

*Syncor Int'l Corp. v. Shalala*,
  127 F.3d 90 (D.C. Cir. 1997) ......................................................................33

*Texas v. United States*,
  523 U.S. 296 (1998) ....................................................................................25

*Ukrainian-American Bar Ass'n v. Baker*,
  893 F.2d 1374 (D.C. Cir. 1990) ..................................................................50

*\*United States v. Barajas-Alvarado*,
  655 F.3d 1077 (9th Cir. 2011) ...............................................37, 43, 54, 56

*United States v. Cortez*,
  449 U.S. 411 (1981) ....................................................................................57

*United States v. Grande*,
  623 F. App'x 858 ........................................................................................54

*United States v. Meza-Rodriguez*,
  798 F.3d 664 (7th Cir. 2015) ......................................................................44

*\*United States v. Peralta-Sanchez*,
  847 F.3d 1124 (9th Cir.), *opinion withdrawn on grant of reh'g*, 868 F.3d 852
  (9th Cir. 2017) ......................................................................................47, 49

*\*United States v. Quinteros Guzman*,
  No. 3:18-CR-00031-001, 2019 WL 3220576 (W.D. Va. July 17, 2019)..............49, 54, 55

*\*United States v. Salerno*,
  481 U.S. 745 (1987) .........................................................43, 44, 46, 50

*\*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ....................................................................................43

*United States v. Villarreal Silva,*
931 F.3d 330 ...................................................................................47

*Util. Solid Waste Activities Grp. v. E.P.A.,*
236 F.3d 749 (D.C. Cir. 2001) .........................................................34

*Valero Energy Corp. v. EPA,*
927 F.3d 532 (D.C. Cir. 2019) .........................................................31

*Vartelas v. Holder,*
132 S. Ct. 1479 (2012) .......................................................................7

*Walters v. Nat'l Ass'n of Radiation Survivors,*
473 U.S. 305 (1985) .........................................................................48

*Washington v. Confederated Bands and Tribes of Yakima Indian* Nation,
439 U.S. 463 (1979) .........................................................................38

*Washington v. Fed. Election Comm'n,*
892 F.3d 434 (D.C. Cir. 2018) .........................................................26

*West v. Lynch,*
845 F.3d 1228 (D.C. Cir. 2017) .......................................................21

*Winter v. NRDC,*
555 U.S. 7 (2008) .............................................................................60

*Wis. Gas Co. v. Fed. Energy Reg. Comm'n,*
758 F.2d 669 (D.C. Cir. 1985) .........................................................58

*Yamataya v. Fisher,*
189 U.S. 86 (1903) .....................................................................46, 47

*Zakonaite v. Wolf,*
226 U.S. 272 (1912) ...................................................................37, 47

*Zhu v. Gonzales,*
411 F.3d 292 (D.C. Cir. 2005) .........................................................28

## ADMINISTRATIVE DECISIONS

*Matter of E-R-M- & L-R-M,*
25 I. & N. Dec. 520 (BIA 2011) ........................................................7

## STATUTES

5 U.S.C. § 552(a)(1)(D) ................................................................................................33

5 U.S.C. § 553(b)(3)(A) ..................................................................................................3

5 U.S.C. § 553(b)(3)(B) ..................................................................................................4

5 U.S.C. § 553(b)(B) .....................................................................................................33

5 U.S.C. §  555(b) .........................................................................................................54

5 U.S.C. § 559 ...............................................................................................................31

5 U.S.C. § 701(a) ..........................................................................................................28

5 U.S.C. § 701(a)(1) ........................................................................................................3

5 U.S.C. § 701(a)(2) ..................................................................................................3, 52

5 U.S.C. § 704 ...........................................................................................................3, 30

5 U.S.C. § 706 ...............................................................................................................26

8 U.S.C. § 1101(a)(13) ....................................................................................................7

8 U.S.C. § 1101(a)(13)(A) ...............................................................................................7

8 U.S.C. § 1158 ........................................................................................................10, 11

8 U.S.C. § 1182(a)(6)(C) ...............................................................................................14

8 U.S.C. § 1182(a)(7) .....................................................................................................14

8 U.S.C. § 1221-32 ........................................................................................................61

8 U.S.C. § 1225(a)(4) .....................................................................................................49

8 U.S.C. § 1225(b)(1) ...............................................................................................48, 56

8 U.S.C. § 1225(b)(1)(A)(I) ...........................................................................................14

8 U.S.C. § 1225(b)(1)(A)(i) .............................................................................9, 15, 45, 50

8 U.S.C. § 1225(b)(1)(A)(ii) ..........................................................................................10

8 U.S.C. § 1225(b)(1)(A)(iii)..........................................................................................*passim*

8 U.S.C. § 1225(b)(1)(A)(iii)(I).......................................................................................*passim*

8 U.S.C. § 1225(b)(1)(B)...........................................................................................................5

8 U.S.C. § 1225(b)(1)(B)(III)(ii)..............................................................................................47

8 U.S.C. § 1225(b)(1)(B)(ii)......................................................................................................11

8 U.S.C. § 1225(b)(1)(B)(iii)(I)...........................................................................................12, 19

8 U.S.C. § 1225(b)(1)(B)(iii)(II)...............................................................................................12

8 U.S.C. § 1225(b)(1)(B)(iv)...........................................................................................6, 40, 53

8 U.S.C. § 1225(b)(1)(B)(v)...........................................................................................10, 11, 16

8 U.S.C. § 1225(b)(1)(C)................................................................................................... 12, 15

8 U.S.C. § 1225(b)(1)(A)(iii)......................................................................................................1

8 U.S.C. § 1225(b)(1)(A)(iii)(I)...............................................................................................3, 4

8 U.S.C. § 1225(b)(2)(A) ......................................................................................................8, 51

8 U.S.C. § 1228...........................................................................................................................56

8 U.S.C. § 1228(b)(4)(A)...........................................................................................................54

8 U.S.C. § 1228(b)(4)(B)...........................................................................................................56

8 U.S.C. § 1229(a)(1)(E)............................................................................................................56

8 U.S.C. § 1229a ...................................................................................................... 8, 11, 24, 56

8 U.S.C. § 1229a(a)(3)................................................................................................................55

8 U.S.C. § 1229a(b)(4)(A)..........................................................................................................54

8 U.S.C. § 1252(a)(2)(A)........................................................................................................2, 18

8 U.S.C. § 1252(a)(2)(B)(ii) ............................................................................................3, 19, 28

8 U.S.C. § 1252(e) .......................................................................................................................2

8 U.S.C. § 1252(e)(1) ........................................................................................................... 20

8 U.S.C. § 1252(e)(2) ...................................................................................................... 48, 50

8 U.S.C. § 1252(e)(3) ........................................................................................................ 2, 17

8 U.S.C. § 1252(e)(3)(B) ........................................................................................ 5, 18, 19, 39

8 U.S.C. § 1252(e)(4) ........................................................................................................... 50

8 U.S.C. § 1252(f) ............................................................................................................... 20

8 U.S.C. § 1252(f)(1) ........................................................................................................... 61

8 U.S.C. § 1252(g) .............................................................................................................. 20

8 U.S.C. § 1362 .............................................................................................................. 54, 56

28 U.S.C. § 1331 ................................................................................................................. 18

## FEDERAL REGULATIONS

8 C.F.R. § 208.30 ........................................................................................................... *passim*

8 C.F.R. § 208.30(d) ................................................................................................... 10, 11, 54

8 C.F.R. § 208.30(e)(1) ......................................................................................................... 11

8 C.F.R. § 208.30(d)(4) ................................................................................................... 11, 54

8 C.F.R. § 208.30(f) .............................................................................................................. 11

8 C.F.R. § 235.3 ............................................................................................................... 37, 39

8 C.F.R. § 235.3(b)(1)(ii) ....................................................................................... 10, 13, 15, 33

8 C.F.R. § 235.3(b)(2)(i) .......................................................................................................... 9

8 C.F.R. § 235.3(b)(4) ..................................................................................................... 15, 16

8 C.F.R. § 235.3(b)(5) ............................................................................................................ 16

8 C.F.R. § 235.3(b)(5)(i) ......................................................................................................... 15

8 C.F.R. § 235.3(b)(5)(ii) ......................................................................................................... 9

8 C.F.R. § 235.3(b)(5)(iii) ................................................................................9

8 C.F.R. § 235.3(b)(5)(iv) ................................................................................10

8 C.F.R. § 235.3(b)(6) ................................................................................10, 15

8 C.F.R. § 235.3(b)(ii) ................................................................................34

8 C.F.R. § 287.3(c) ................................................................................54

8 C.F.R. § 292.5(b) ................................................................................54

8 C.F.R. § 1003.42 ................................................................................6, 37, 39

8 C.F.R. § 1003.42(c) ................................................................................12

8 C.F.R. § 1003.42(d) ................................................................................12

8 C.F.R. § 1003.42(f) ................................................................................12

8 C.F.R. § 1208.30 ................................................................................5, 37, 39, 50

8 C.F.R. § 1208.30(g)(2) ................................................................................12

8 C.F.R. § 1235.3(b)(4) ................................................................................50

## FEDERAL REGISTER NOTICES

62 Fed. Reg. 10,312 ................................................................................13

62 Fed. Reg. 10313-314 ................................................................................32

67 Fed. Reg. 68923 ................................................................................13

67 Fed. Reg. 68925 ................................................................................36

69 Fed. Reg. 48877 ................................................................................14

69 Fed. Reg. 48879 ................................................................................14

82 Fed. Reg. 4902 ................................................................................14

82 Fed. Reg. 4904 ................................................................................36

84 Fed. Reg. 3541 ................................................................................................................56

84 Fed. Reg. 35409 ................................................................................................ 1, 14, 30

84 Fed. Reg. 35410 ................................................................................................................34

84 Fed. Reg. 35411 ................................................................................................................2, 6

84 Fed. Reg. 35412 ................................................................................................ 33, 36

84 Fed. Reg. 35413 ................................................................................................ 4, 34, 35

## LEGISLATIVE HISTORY

H.R. Rep. No. 104-469..........................................................................................1, 51

H.R. Rep. No. 104-828................................................................................... 1, 12, 51

## MISCELLANEOUS

*Designate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/designate (last
    visited August 28, 2019)..........................................................................................27

ICE Policy 11058.1, "Implementation of July 2019 Designation of Aliens Subject to Expedited
    Removal" ............................................................................................ 15, 48

## INTRODUCTION

This case arises from three advocacy groups' efforts to halt nationwide the Acting Secretary of Homeland Security's discretionary decision to apply expedited removal to the full extent authorized by Congress—to certain aliens illegally present in the United States for less than two years not covered by previous designations issued by the Secretary. *See* 8 U.S.C. § 1225(b)(1)(A)(iii); Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409 (July 23, 2019) (the Notice). The Court should reject Plaintiffs' request and should uphold the Acting Secretary's lawful July 23, 2019 designation of certain aliens for expedited removal.

Congress delegated this authority to the Executive Branch in 1996, providing that the Attorney General (now Secretary) "may ... designate[]" any class of inadmissible, unlawfully present aliens who have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility," as subject to the expedited removal statute, and that such designation "shall be in the sole and unreviewable discretion of the [Secretary] and may be modified at any time." 8 U.S.C. § 1225(b)(1)(A)(iii). Members of Congress viewed expedited removal as necessary to curtail incentives for aliens to cross the border illegally based on an "expect[ation] that" they may "remain indefinitely in the United States," H.R. Rep. No. 104-469 at 225-26, to combat the "crisis" of "hundreds of thousands of illegal aliens" entering each year, *id*. at 107, and "to expedite the removal ... of aliens who indisputably have no authorization to be admitted," H.R. Rep. 104-828 at 209. The expedited removal statute and its implementing regulations were upheld as facially constitutional nearly 20 years ago, *see Am. Immigration Lawyers Ass'n v. Reno ("AILA")*, 199 F.3d 1352 (D.C. Cir. 2000).

On July 23, 2019, noting "the large number of aliens who entered illegally and were apprehended and detained within the interior of the United States, and DHS's insufficient detention

capacity both along the border and in the interior of the United States," the Secretary issued the Notice. 84 Fed. Reg. at 35,411. The Secretary explained that the Notice would allow DHS "to use more effectively and efficiently its limited resources to fulfill its mission to enforce the immigration laws and ensure the security of the Nation's borders," and "to alleviate some of the burden and capacity issues currently faced by DHS and DOJ by allowing DHS to remove certain aliens encountered in the interior more quickly, as opposed to placing those aliens in more time-consuming removal proceedings," thereby exacerbating the "historic backlog of removal cases," 909,034 pending immigration cases as of June, 2019. *Id.*

Despite the Notice's sound policy aims, the broad discretion Congress has delegated to the Executive, and the fact that the expedited removal statute and its implementing regulations were upheld as facially constitutional nearly 20 years ago, Plaintiffs now ask this court to re-litigate the long-settled constitutionality of the expedited removal scheme and immediately enjoin it on a nationwide basis. This Court should deny the Plaintiffs' extraordinary request.

To begin, because Plaintiffs are organizations, the court lacks subject matter jurisdiction over their claims. Title 8 U.S.C. § 1252(e)(3) provides the sole basis for jurisdiction to challenge the expedited removal statute and its implementation. *See* 8 U.S.C. §§ 1252(a)(2)(A), (e). Under that provision, the court has jurisdiction over "challenges on [the] validity of the system," but only if Plaintiffs are subject to "orders under section 1225(b)(1)." 8 U.S.C. §§ 1252(e) (title), (e)(3)(A). Accordingly, section 1252(e)(3) grants jurisdiction only if there is a reviewable "determination[] under section 1225(b) of this title." *Id.* § 1252(e)(3)(A). As the D.C. Circuit has already held, organizational plaintiffs may not invoke this Court's jurisdiction under section 1252(e)(3). *AILA*, 199 F.3d at 1360. Rather, "Congress meant to allow litigation challenging the new system by, and only by, aliens against whom the new procedures had been applied." *Id.* This case involves no

alien against whom the new procedures have been applied, and so the Court lacks jurisdiction.

Plaintiffs also lack standing. Plaintiffs exclusively allege standing premised on associational standing, but Plaintiffs fail to identify a single member of their organizations who faces the "certainly impending" likelihood of being subject to expedited removal procedures. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). And even if they could, again, section 1252(e)(3) only permits aliens actually subject to an order of removal under section 1225(b)(1) to challenge implementation of section 1225(b)(1), so a challenge by Plaintiffs is statutorily precluded and Plaintiffs themselves are outside the statute's zone of interests.

Moreover, none of Plaintiffs' Administrative Procedure Act (APA) claims may proceed. The decision to designate aliens as subject to expedited removal is exempt from the APA, because "such designation shall be in the *sole and unreviewable discretion* of the [Secretary] and may be *modified at any time*," 8 U.S.C. § 1225(b)(1)(A)(iii)(I) (emphasis added), and so is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Also, the INA provision barring judicial review of determinations specified to be at the "discretion" of the Secretary applies, 8 U.S.C. § 1252(a)(2)(B)(ii), and so 5 U.S.C. § 701(a)(1) forecloses *any* APA cause of action. Nor is the designation reviewable "final agency action." *Id.* at § 704.

Plaintiffs' claims also fail on the merits. *First*, they contend that the July 23 Notice is a legislative rule that should have been issued through notice-and-comment procedures. Mot. 16-21. But notice-and-comment procedures do not apply to "general statements of policy," 5 U.S.C. § 553(b)(3)(A), which merely "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993). Even were the Notice a legislative rule, it would still be exempt from notice and comment because such procedures would be "impracticable," 5 U.S.C. § 553(b)(3)(B), given Congress's directive that

expedited removal's scope "may be modified at any time," 8 U.S.C. § 1225(b)(1)(A)(iii)(I), and contrary to the "public interest,"  5 U.S.C. § 553(b)(3)(B), given that "delayed implementation could lead to a surge in migration across the southern border across a notice-and-comment period," threatening "national security and public safety." 84 Fed. Reg. at 35413.

*Second*, Plaintiffs assert that the July 23 Notice "violates the expedited removal statute by potentially subjecting hundreds of thousands of noncitizens to summary removal without implementing procedures to ensure fair proceedings." Mot. 14. This claim is nothing more than an attempt to challenge the "constitutional[ity]" of section 1225(b)(1) and its implementing regulations under the guise of "constitutional avoidance."  Mot. 21-22. But this Court and the D.C. Circuit have already upheld the constitutionality of the expedited removal statute and its implementing regulations as applied to aliens lacking "substantial connections with the United States," *AILA v. Reno*, 18 F. Supp. 2d 38, 58-60 (D.D.C. 1998), *aff'd*, 199 F.3d at 1357. The reasoning of those decisions—that Congress determines what process governs admission into the country—applies here just as it did in *AILA*. Then, as now, what rights aliens have with respect to their attempts to gain admission to this country are controlled by Congress, because "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application," *Landon v. Plasencia*, 459 U.S. 21, 32 (1982), and so "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950). Congress has determined that inadmissible aliens unlawfully here less than two years as a *class*—*i.e.* aliens who lack substantial connections to this country—are entitled only to the procedures provided by the expedited removal statute before they may be removed from this country. Plaintiffs thus for the most part are trying to re-litigate the issues resolved in *AILA*, issues that are now time-barred. 8 U.S.C. § 1252(e)(3)(B).

4

Even were that not so, the statute and its implementing regulations adequately safeguard any due process rights inadmissible aliens neither lawfully admitted nor paroled to this country and present for less than two years may have as a class given that Congress sets the terms for entry into the United States and the only process due to an alien seeking admission is the process provided by Congress. Contrary to Plaintiffs' assertions that expedited removal "includes no procedures to ensure that noncitizens apprehended in the interior of the country, far from the border, and who have resided here for significant periods of time, will receive fair removal determinations," Mot. 21, the statute and regulations are replete with such provisions. 8 U.S.C. § 1225(b)(1)(A), (B); 8 C.F.R. §§ 235.3, 208.30, 1003.42. 1208.30. As Plaintiffs' claims are belied by the statutory and regulatory text as to every alien conceivably subject to expedited removal, Plaintiffs cannot "establish that no set of circumstances exists under which the [statute and its implementing regulations] would be valid" on either "constitutional" or "statutory" grounds. *See Reno v. Flores*, 507 U.S. 292, 301 (1993).

*Third*, Plaintiffs contend that the Notice is arbitrary and capricious because the Secretary did not consider whether the statute Congress legislated might raise "logistical and due process concerns" and does not allow for aliens with "ties to this country" to "gather evidence necessary to demonstrate ... two-year continuous-presence." Mot. 37-38. This was true of the expedited removal system upheld by the D.C. Circuit in 2000. And there is no requirement that an *agency* contemplate the legality of actions *taken by Congress* in order for its decision to be considered reasoned. And for all the same reasons Plaintiffs' due process claim fails, so does their APA claim.

*Fourth*, Plaintiffs assert that the APA and the INA "provide noncitizens the right to representation, at their own expense, in expedited removal proceedings." Mot. 38. But the INA provides only a limited right to "consultation" prior to a credible fear interview. 8 U.S.C. §

1225(b)(1)(B)(iv). And Plaintiffs' suggestion that the APA's right-to-counsel provision displaces the INA's consultation provision is meritless. *See Ardestani v. INS*, 502 U.S. 129, 134 (1991).

*Finally*, Plaintiffs cannot demonstrate that the balance of harms warrants drastic and immediate injunctive relief based on their speculation that expedited removal *could* be applied to *some* of their members at an *unspecified future* date, or because they could not comment on the Notice at a time of their choosing. Mot. 41-45. The Notice implements authority granted the Executive Branch by Congress to designate certain aliens for removal under expedited removal procedures and does so at a time when our nation's limited immigration resources are vastly overwhelmed in unprecedented ways. The Notice addresses that crisis by implementing one of the few statutory mechanisms Congress gave the Executive Branch to combat "the large number of aliens who entered illegally and were apprehended and detained within the interior of the United States, [] DHS's insufficient detention capacity both along the border and in the interior of the United States," and the "historic backlog of removal cases" caused by that crush of illegal migrants. 84 Fed. Reg at 35,411. The Executive has a paramount sovereign interest in maintaining the integrity of our borders, in enforcing the immigration laws, and in ensuring that immigration cases can be adjudicated swiftly. Indeed, Plaintiffs have not even brought before this Court a single alien plaintiff to claim harm. The United States and the public, by contrast, would plainly be harmed by any halting of the operation of expedited removal procedures as applied to aliens subject to the Notice. The Court should therefore deny the drastic remedy of a preliminary injunction.

## LEGAL AND PROCEDURAL BACKGROUND

<u>Legal Background.</u> The Executive Branch has broad constitutional and statutory power to exclude aliens and secure the border, *Knauff*, 338 U.S. at 543, and has for years exercised that authority through its prosecutorial discretion to prioritize which aliens to remove and what

proceedings to initiate against them, including by expedited removal, *see Matter of E-R-M- & L-R-M*, 25 I&N Dec. 520, 523 (BIA 2011).

In 1996, Congress substantially amended the immigration laws through the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Until then, "two types of proceedings" governed removal of aliens: "deportation hearings and exclusion hearings." *Vartelas v. Holder*, 132 S. Ct. 1479, 1484 (2012). Exclusion hearings—which accorded aliens fewer procedural rights than deportation hearings—were for "aliens seeking entry to the United States," while deportation hearings were for "aliens who had already entered this country." *Id*. Thus, before 1996, aliens "who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while noncitizens who actually presented themselves to authorities for inspection were restrained by more summary exclusion proceedings." *Martinez v. U.S. Att'y Gen*., 693 F.3d 408, 413 n.5 (3d Cir. 2010).

"To remedy this unintended and undesirable consequence," *id*., Congress eliminated exclusion and deportation proceedings, creating instead a uniform "removal" procedure. *Vartelas*, 132 S. Ct. at 1484. Removability now turns on whether an alien is admissible or has been lawfully "admitted" "after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Aliens arriving in the United States or present in the United States without having been admitted are now "applicants for admission," *id*., § 1225(a)(1), and aliens "seeking admission" who fail to "clearly and beyond a doubt" demonstrate an entitlement "to be admitted," are detained for a removal proceeding pursuant to 8 U.S.C. § 1229a. *See* 8 U.S.C. § 1225(b)(2)(A).

However, Congress preserved elements of the former distinction between exclusion and deportation by establishing "expedited removal," in order to ensure that the Executive could "expedite removal of aliens lacking a legal basis to remain in the United States," *Kucana v. Holder*,

558 U.S. 233, 249 (2010). Congress's findings on the need for expedited removal are stark: Expedited removal was viewed as a critical tool to deal with the "crisis at the land border" whereby "hundreds of thousands of illegal aliens" illegally cross the border "each year, [] contributing more than half of the 300,000 to 400,000 annual growth in the illegal alien population." *Id*. at 107. Congress was also concerned with the "[t]housands of smuggled aliens [who] arrive in the United States each year with no valid entry documents and declare asylum immediately upon arrival" that "[b]ecause of the lack of detention space and overcrowded immigration court dockets" "have been released into the general population" without "return[ing] for their hearings." *Id*. at 117. "Due to the huge backlog in asylum cases, and the inability of the INS to detain failed asylum applicants who are deportable from the United States, these aliens could reasonably expect that the filing of an asylum application would allow them to remain indefinitely in the United States," further incentivizing illegal entry. *Id*. at 117-18. Congress also sought to deter aliens from making the dangerous journey to the United States. *Id*.

To effectuate these ends, Congress sought to confer considerable authority to Executive Branch officers while restricting judicial review. Under these procedures, an alien "who is arriving in the United States" who lacks valid entry documentation or makes material misrepresentations shall be "order[ed] ... removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i); *see id*. § 1182(a)(6)(C), (a)(7). Although the statute does not require it, the implementing regulations establish extensive process aliens are due prior to execution of an order of expedited removal. "In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien." 8 C.F.R. § 235.3(b)(2)(i). This is "accomplished by means of a sworn statement," which "[t]he

examining immigration officer shall read (or have read) to the alien." *Id.* "Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response[,] ... have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction." *Id.* The examining officer shall also "advise the alien of the charges against him or her," and provide "an opportunity to respond to those charges in the sworn statement." *Id.* "Interpretative assistance shall be used if necessary to communicate with the alien." *Id.*

The regulations also establish procedures that must be followed "[i]f an applicant for admission who is subject to expedited removal ... claims to have been lawfully admitted for permanent residence, admitted as a refugee ..., granted asylum ..., or claims to be a U.S. citizen." *Id.* § 235.3(b)(5)(i). In those circumstances, the officer must "attempt to verify the alien's claim" by checking all available "data systems" and taking a sworn "written statement" "from the alien in the alien's own language and handwriting" to that effect. *Id.* If the officer verifies those claims, the alien may not be subject to expedited removal. *Id.* §§ 235.3(b)(5)(ii), (iii). If the officer cannot verify the alien's claims, the alien is referred to an "immigration judge for review" of those claims. *Id.* §§ 235.3(b)(5)(iv). If the immigration judge then determines that the alien's claims are valid, "the immigration judge will terminate proceedings and vacate the expedited removal order." *Id.*

The regulations also provide a process for an "alien to establish that he or she was admitted or paroled into the United States," or was "physically present … continuously for the 2-year period immediately prior to the date of determination of inadmissibility." *Id.* § 235.3(b)(1)(ii), (b)(6). "The alien will be allowed to present evidence or provide sufficient information to support the claim. Such evidence may consist of documentation in the possession of the alien, the Service, or a third party. The examining immigration officer will consider all such evidence and information,

9

make further inquiry if necessary, and will attempt to verify the alien's status through a check of all available Service data systems." *Id.* § 235.3(b)(6); *see also id.* § 235.3(b)(1)(ii).

In all events, "any removal order" entered under section 1225(b)(1) "must be reviewed and approved by the appropriate supervisor before the order is considered final." *Id.* 235.3(b)(7). Such review must include the "sworn statement and any answers and statements made by the alien," "any claim of lawful admission or parole[,] and any evidence or information presented to support such a claim." *Id.* In addition, "the supervisor may request additional information from any source and may require further interview of the alien." *Id.*

Expedited removal includes special procedures applicable to aliens seeking asylum. If an alien subject to expedited removal "indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution," the immigration officer inspecting the alien must "refer the alien for" an interview conducted by an asylum officer. *Id.* § 1225(b)(1)(A)(ii). In such an interview, an asylum officer considers relevant facts and assesses whether the alien has a "credible fear of persecution," *id.* § 1225(b)(1)(A)(ii) and (B)(1)(B)(v); *see* 8 C.F.R. § 208.30(d), meaning "that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." *Id.* § 1225(b)(1)(B)(v). A credible-fear interview thus assesses whether the alien has a plausible basis to pursue asylum, which would allow the alien to temporarily remain in the country for that purpose despite his inadmissibility. *See id.*; *id.* § 1158.

The asylum officer "will conduct the interview in a non-adversarial manner, separate and apart from the general public." 8 C.F.R. § 208.30(d). The officer must "create a written record of his or her determination" regarding credible fear, including a "summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination

of whether, in light of such facts, the alien has established a credible fear of persecution or torture." *Id.* § 208.30(e)(1); *see* 8 U.S.C. § 1225(b)(1)(B)(iii)(II). "The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence, if available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process." *Id.* § 208.30(d)(4); *see* 8 U.S.C. § 1225(b)(1)(B)(iv). "If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview." *Id.* § 208.30(d)(5).

If the officer determines that the alien "has a credible fear of persecution," the officer refers the alien to full removal proceedings under 8 U.S.C. § 1229a, *id.* § 208.30(f), which provide more extensive procedures than expedited removal. *Compare id.*, *with id.* § 1225(b)(1). In section 1229a proceedings an alien may apply for asylum or other relief or protection from removal. *Id.* § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f). An alien can also appeal an adverse decision to the Board of Immigration Appeals (Board), 8 C.F.R. § 1003.1(b),  and can obtain judicial review of an adverse Board decision by filing a petition for review in a court of appeals. 8 U.S.C. § 1252(a)(1).

If, however, the interviewing officer determines that the alien lacks a credible fear, and a supervisory officer concurs on the negative determination, the alien is not entitled to be placed into full removal proceedings. But he may seek review of the credible-fear determination before an immigration judge (IJ). *Id.* § 1225(b)(1)(B)(iii)(I), (III); 8 C.F.R. § 1208.30(g)(2). If an alien requests IJ review, that review is *de novo*. 8 C.F.R. 1003.42(d). "Such review shall include an opportunity for the alien to be heard and questioned by the immigration judge," 8 U.S.C. § 1225(b)(1)(B)(iii)(III), and the IJ "may receive into evidence any oral or written statement which is material and relevant to any issue in the review." 8 C.F.R. § 1003.42(c). If, after review, the IJ

concludes that the alien has established a credible fear, the IJ will vacate the asylum officer's decision and DHS will place the alien in full removal proceedings for adjudication of the alien's asylum claim (and other removal-related claims). *Id.* § 1003.42(f). If the IJ agrees with the asylum officer's decision that the alien lacks a credible fear, however, the alien must be "removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(iii)(I); 8 C.F.R. § 1208.30(g)(2)(iv)(A). The INA precludes further review by the Board or any court of the credible-fear determination. 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii), (e)(2); 8 C.F.R. § 1003.42(f).

Prior Designations. Cognizant of the need to provide the Executive Branch authority "to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted," H.R. Rep. 104-828 at 209, and to eliminate incentives to enter "without inspection" to "gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry," H.R. Rep. No. 104-469 at 225-26, Congress also delegated to the Executive Branch the authority to designate for application of expedited removal procedures aliens who are inadmissible under sections 1182(a)(6)(A) and (a)(7), are unlawfully present inside the United States without having been admitted or paroled, and have been continuously physically present for less than two years. 8 U.S.C. § 1225(b)(1)(A)(iii); *see* 142 Congr. Rec. S11491-02, 1996 WL 565553 (Sept. 27, 1996) (statement of Sen. Hatch).

The Secretary (and previously the Attorney General) has designated aliens for expedited removal under section 1225(b)(1)(A)(iii) on four prior occasions. In 1997, the Attorney General promulgated a regulation applying expedited removal to aliens arriving in the United States at a port-of-entry and aliens interdicted in international or United States waters. *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312 (Mar. 6, 1997). The Attorney General also established a

mechanism for later designations of aliens subject to expedited removal, *see* 8 C.F.R. § 235.3(b)(1)(ii), emphasizing that "a proposed expansion of the expedited removal procedures may occur at any time and may be driven either by specific situations such as a sudden influx of illegal aliens motivated by political or economic unrest or other events or by a general need to increase the effectiveness of enforcement operations at one or more locations." 62 Fed. Reg. at 10,312.

In 2002, the INS Commissioner designated as eligible for expedited removal aliens who arrived in the United States by sea, were not paroled or admitted into the United States, and "who have not been physically present in the United States continuously for the two-year period prior to the determination of inadmissibility under" the Notice. *Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act*, 67 Fed. Reg. 68,923 (Nov. 13, 2002). Under the 2002 Notice, immigration officers could apply expedited removal to aliens encountered anywhere in the United States for up to two years after their arrival, as long as the alien arrived by sea and the other conditions were satisfied.

In 2004, the Secretary designated additional aliens for expedited removal through a Federal Register notice, pursuant to which DHS officials could apply expedited removal to aliens encountered within 100 air miles of the border and within 14 days of their date of entry regardless of the alien's method of arrival, as long as the other conditions for expedited removal were satisfied. *Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48877 (Aug. 11, 2004); *see also Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*, 82 Fed. Reg. 4902 (Jan. 17, 2017). The 2004 Notice explained that in the interest of focusing limited resources "upon unlawful entries that have a close spatial and temporal nexus to the border," the 2004 Notice did not implement "the full nationwide expedited removal authority available to DHS." 69 Fed. Reg. at 48,879. It did, however, expressly

13

reserve to DHS the option of "implementing the full nationwide enforcement authority of the statute through publication of a subsequent Federal Register notice." *Id.*

July 23 Notice. On July 23, the Acting Secretary invoked his authority under 8 U.S.C. § 1225(b)(1)(A)(iii)(I) and designated as subject to expedited removal "aliens determined to be inadmissible under [8 U.S.C. §§ 1182(a)(6)(C) or (a)(7)] who have not been admitted or paroled into the United States, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility," who were not covered by previous designations. 84 Fed. Reg. at 35,409. The Secretary noted "the large number of aliens who entered illegally and were apprehended and detained within the interior of the United States, and DHS's insufficient detention capacity both along the border and in the interior of the United States," *id.* at 35,411, and explained that the Notice would allow DHS "to use more effectively and efficiently its limited resources to fulfill its mission to enforce the immigration laws and ensure the security of the Nation's borders." *Id.* That would "alleviate some of the burden and capacity issues currently faced by DHS and DOJ by allowing DHS to remove certain aliens encountered in the interior more quickly, as opposed to placing those aliens in more time-consuming removal proceedings," thereby exacerbating the "historic backlog of removal cases," 909,034 pending immigration cases as of June, 2019. *Id.* The Notice—mirroring the text of section 1225(b)(1) and its implementing regulations, and consistent will all prior designations under section 1225(b)(1)(A)(I)—also provides that aliens "have the burden of proving that they are not inadmissible and satisfy the continuous physical presence requirement." *Id.* (citing 8 C.F.R. § 235.3(b)(1)(ii)). An "alien otherwise subject to expedited removal" will receive "a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was

admitted or paroled into the United States." *Id.* (citing 8 C.F.R. § 235.3(b)(6)). Moreover, as provided by statute, "[a]liens otherwise subject to expedited removal who indicate either an intention to apply for asylum or a fear of persecution or torture will be given further review by an asylum officer including an opportunity to establish a 'credible fear,' and thus potential eligibility for asylum." *Id.* (citing 8 U.S.C. § 1225(b)(1)(A)(i), (b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4)). Moreover, aliens "subject to expedited removal" "will receive prompt review of that determination if they claim under oath, after being warned of the penalties for perjury, that they have been admitted for permanent residence, admitted as a refugee, granted asylum, or are a U.S. citizen." *Id.* (citing 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5)(i)).

ICE Policy 11058.1. On July 24, ICE issued guidance titled "Implementation of July 2019 Designation of Aliens Subject to Expedited Removal." *See* Ex. A. That guidance articulates discretionary factors ICE officers should apply in determining whether to apply expedited removal to aliens subject to the July 23 Notice, and indicates that the authority "will be primarily used by ICE in the Criminal Alien Program and worksite enforcement contexts, when officers encounter aliens who have been arrested by another law enforcement agency for criminal activity or when agents encounter unlawful workers at worksites targeted for enforcement action based on investigative leads." *Id.* at 2. The guidance provides, consistent with the statute and regulations, that the alien bears of burden of demonstrating that they have been physically present for the "two-year period immediately preceding the date of the determination of inadmissibility by providing evidence establishing the place, date, and manner of entry into the United States and continuity of presence since that time." *Id.* Such evidence "includes, but is not limited to: "bankbooks, leases, deeds, licenses, bills, receipts, letters, birth records, church records, school records, employment records, evidence of prior law enforcement encounters or tax payments, and/or the alien's oral

statements." *Id.* And, "[i]f an alien is unable to personally provide such evidence at the time of encounter but claims to have access to such evidence, the alien shall be permitted a brief but reasonable opportunity to obtain it or communicate with a third party to obtain such evidence." *Id.* Moreover, the policy reiterates that if officers "encounter aliens subject to this designation but who make claims to lawful permanent resident, refugee, or asylee status, or who make claims to be a United States citizen," they "must comply with the procedures set forth in 8 C.F.R. § 235.3(b)(5)," *id.*, and must be referred for an interview by an asylum officer if they express "an intention to apply for asylum or express[] a fear of persecution or torture." *Id.* at 3 (citing 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. §§ 208.30, 235.3(b)(4)). Finally, the guidance requires that all officers "successfully complete forthcoming training on this designation" before being authorized to implement it, and that "during initial implementation of this designation, enhanced ICE oversight mechanisms for expedited removal processing and decision-making must be in place, including senior level supervisory review beyond that required by the regulations." *Id.*[1]

<u>This Lawsuit.</u> On August 6, 2019, three advocacy organizations—but no individuals actually impacted by the Notice—filed this suit seeking immediate injunctive relief. Plaintiffs bring four APA claims and two constitutional claims. They allege that the Notice: (1) was improperly issued without notice-and-comment rulemaking, Comp. ¶¶ 130-34, (2) violates the Due Process Clause by failing to provide "meaningful process," *id.* ¶¶ 136-38, (3) is "not in accordance with law, in excess of statutory jurisdiction ... without observance of procedure required by law" under the APA because it "deprives persons faced with expedited removal of minimal procedures necessary to ensure that the statute is administered fairly and consistent with constitutional due process," *id.* ¶¶ 140-43, (4) "restrict[s] the participation of counsel for individuals in expedited

---

[1] Various other policies concerning the exercise of discretion and available process exist. AR5374-80, 5400-53.

removal," and so violates the INA and APA, *id.* ¶¶ 145-48, (5) "fail[s] to articulate a reasoned explanation," in violation of the APA, *id.* ¶¶ 150-51, and (6) violates the Suspension Clause because it does not permit "judicial review of an expedited removal order." *Id.* 153-55. On August 8, Plaintiffs moved for a preliminary injunction based on Counts 1-5, seeking to enjoin the Notice nationwide. Plaintiffs argue that such relief is necessary because they are irreparably harmed by their inability to comment on the Notice and by the possibility that expedited removal procedures "could" be applied to unidentified members at an unspecified future time. Mot 41-45.

## ARGUMENT

The Court should deny the motion—the Court lacks subject matter jurisdiction over Plaintiffs' claims, Plaintiffs lack Article III standing and are not within the INA's zone of interests, their claims lack merit, the equities are against them, and their requested relief is barred by statute.

## I.     Plaintiffs' Claims are Not Reviewable

### A. The Court Lacks Subject Matter Jurisdiction Over all Plaintiffs' Claims and Plaintiffs are Not Within the Statutory Zone of Interests

Title 8 U.S.C. § 1252(e)(3) authorizes "[j]udicial review of determinations under section 1225(b) of this title and its implementation" in D.C. District Court, "limited to determinations of— (i) whether [section 1225(b)], or any regulation issued to implement such section, is constitutional; or (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General [or Secretary] to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law."[2] Such suits "must be filed no later than 60 days after the date the challenged

---

[2] Title 8 U.S.C. § 1252(a)(2)(A) bars jurisdiction in cases involving orders of expedited removal, "notwithstanding any other provision of law," other than as permitted by section 1252(e). So 28 U.S.C. § 1331, *see* Compl. ¶ 16, cannot separately supply jurisdiction. *AILA*, 18 F. Supp. 2d at 58 (rejecting argument that 28 U.S.C. § 1331 supplies jurisdiction if section 1252(e)(3) does not); *see Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018) (observing that phrase "notwithstanding any other provision of law" in jurisdictional provision necessarily encompasses 28 U.S.C. § 1331).

section, regulation, directive, guideline, or procedure ... is first implemented." *Id.* § 1252(e)(3)(B). The Court lacks jurisdiction under this provision.

*First*, no Plaintiff is an individual who is *presently* subject to expedited removal procedures. Section 1252(e)(3), titled "[c]hallenges on [the] validity of the system," authorizes review of "implementation" of certain expedited removal procedures only if Plaintiffs are in fact subject to "determinations under section 1225(b) of this title." The triggering provision's reference to "[d]eterminations under section 1225(b)" requires just that—a "determination." That is further demonstrated by the fact that section 1252(e)(3) appears in a section titled "[j]udicial review of orders under section 1225(b)(1)." *Id.* Section 1252(e)(3) thus grants jurisdiction only if there is in fact a reviewable "determination[]" or "order[]" "under section 1225(b)." *Id.* § 1252(e)(3)(A). As the D.C. Circuit has already held, these provisions, combined with others in section 1252 mean that "Congress meant to allow litigation challenging the new system by, and only by, *aliens against whom the new procedures had been applied.*" *AILA*, 199 F.3d at 1360 (reversing holding by district court that organizations purporting to speak on behalf of aliens who *could* be subject to expedited removal may invoke section 1252(e)(3), given clear "congressional intent" evidenced by 8 U.S.C. §§ 1252(e)(1), (f), and (g) to bar such claims); *see id.* at 1358 ("We cannot see anything in these provisions allowing litigants ... to raise claims on behalf of those *not party to the lawsuit.*") (emphasis added). Thus, organizations may not invoke section 1252(e)(3). *Id.*

*Second*, the Notice is not reviewable because Section 1225(b)(1)(A)(iii)(I) specifies that such a "designation" is issued "in the sole and unreviewable discretion of the [Secretary]." *Id.* § 1225(b)(1)(A)(iii)(I). A separate provision, 8 U.S.C. § 1252(a)(2)(B)(ii), provides that "*[n]otwithstanding any other provision of law ...* and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review" any "decision

or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the[ir] discretion." (Emphasis added.) The prefatory "[n]otwithstanding any other provision of law" in section 1252(a)(2)(B)(ii) "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18, (1993).

*Third*, although Plaintiffs purport to challenge only the Notice, they necessarily also challenge the existing regulations and policies implementing expedited removal themselves, because their APA and due process claims assert that those regulations provide insufficient *process* to safeguard Plaintiffs' putative members' alleged due process rights. Mot 23-36. But all of those regulations have been operative for years, and so none of those challenges satisfy the jurisdictional requirement that they be filed "no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure ... *is first implemented*." 8 U.S.C. § 1252(e)(3)(B) (emphasis added). The use of the phrase "is first implemented ... so that the 60 days ran from a fixed point," rather than a phrase like 60 days "than from the date of application of [the challenged procedures] to a particular alien" makes clear that the 60-day limitation "is jurisdictional rather than a traditional limitations period," such that when an alien's claims "arise" is irrelevant. *See AILA*, 18 F. Supp. 2d at 47. Indeed, for that reason, this Court concluded that aliens who have had the regulation applied to them outside a specific regulation or policy's relevant 60-day period may not invoke section 1252(e)(3), *id.*, a conclusion the D.C. Circuit affirmed in full. 199 F.3d at 1357. Likewise, this Court recently rejected challenges similar to Plaintiffs' that the statute and regulations are unconstitutional because they "do not allow a recipient of a removal order sufficient opportunity to refute alienage, or extend heightened due process to aliens who have accrued 'meaningful connections' with the United States," because "the 60–day limit on [such] review has

19

long since expired." *Dugdale v. U.S. C.B.P.*, 88 F. Supp. 3d 1, 8 (D.D.C. 2015). "[T]he constitutionality of the sixty-day limit" is now settled law. *AILA*, 199 F.3d at 1356; *see Dugdale*, 88 F. Supp. 3d at 8 (rejecting argument that 60-day limit may be circumvented because court must "leave it to higher authorities to determine whether grounds exist to depart from these holdings"); *Dugdale*, 2015 WL 2124937, at *1 (D.D.C. May 6, 2015), *aff'd Dugdale v. Lynch*, 672 F. App'x 35 (D.C. Cir. 2016) ("*AILA* remains binding precedent").[3]

For all the same reasons, Plaintiffs also cannot show that their interests are "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). The D.C. Circuit's holding in *AILA* that the "Congressional intent" evidenced by 8 U.S.C. § 1252(e)(1), (f), and (g) shows "Congress meant to allow litigation challenging the new system by, and only by, *aliens against whom the new procedures had been applied*," 199 F.3d at 1360 (emphasis added), means organizations have no cognizable cause of action, and so are not within section 1225(b)'s zone of interests.

## B. Plaintiffs Lack Article III Standing

Even if the clear limit on this Court's jurisdiction is elided, *see id.*, Plaintiffs also lack standing. Plaintiffs only advance a claim to associational standing, which must fail. Supp. Br. 1-7. They thus "forfeit [any] claim that [the Court] possess jurisdiction" on other grounds.[4] *Scenic Am., Inc. v. DOT*, 836 F.3d 42, 53 (D.C. Cir. 2016) ("Although a party cannot forfeit a claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction."). Moreover, any standing claim "must be evaluated under the heightened standard for evaluating a motion for summary judgment

---

[3] To the extent Plaintiffs challenge actions or practices as applied to specific aliens, *e.g.*, Mot. 7, 9, 11, 25; Compl. ¶¶ 63-100, section 1252(e)(3) permits review only of *written* directives, policies, or procedures. *AILA*, 18 F. Supp. 2d at 58 ("'as applied' challenge" that the government "is failing to follow the [] Regulations" or challenge to "unwritten" "policies and procedures that have resulted from the regulations" barred); *see Khan v. Holder*, 608 F.3d 325, 331 (7th Cir. 2010) (noting "Congress's decision to bar the unwritten actions of the agency from judicial review").
[4] This includes any assertion of organizational standing, procedural injury, or third-party standing.

in determining whether or not to grant the motion for preliminary injunction." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95, 104 (D.C. Cir. 2019). That showing must be made as to each claim. *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017).

> As to associational standing, each Plaintiff must show through competent evidence that:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977).

Under these standards, Plaintiffs fail to demonstrate standing. To begin, "[t]he threshold requirement for even applying [the associational standing] test is that the organization has actual members or indicia of membership." *AILA*, 18 F. Supp. 2d at 50 n.12; *see Fund Democracy LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002). Plaintiffs submit no evidence that they are traditional membership organizations beyond merely asserting as such. *See* Compl. ¶¶ 18, 21, 24; ECF 13-4 ¶ 6, ECF 13-3 ¶ 6; ECF 13-5 ¶ 6. But that is not enough at the preliminary injunction stage. *Elec. Privacy*, 928 F.3d at 104. Nor do Plaintiffs even attempt to allege that their purported members meet the above test to demonstrate that the organizations are the "functional equivalent of a traditional membership organization." *Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007). Nowhere do they indicate whether any member who allegedly may be subject to the Notice, let alone the seven Doe "members" they obliquely reference, elect the organizations' leadership, serve in the organizations, or finance the organizations' activities. Nor do they allege, much less "set forth by affidavit or other evidence specific facts," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), that their "fortunes [are] tied closely to those members [they] claim[] to be representing," *Leavitt*, 477 F. Supp. 2d at 208. Without more, neither the government nor the Court has any way to assess whether Plaintiffs satisfy this threshold requirement for associational

standing. The Court should reject their claim of standing on this basis alone.

Plaintiffs also have not identified a single member who themselves has Article III standing. That turns on whether they demonstrate "(1) an injury in fact that is concrete and particularized as well as actual or imminent; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision." *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1075 (D.C. Cir. 2014).

Plaintiffs fail this test for several reasons. *First*, they fail to identify the alleged injured members "by name" or "allege facts sufficient to establish harm to th[ose] member[s]." *AILA*, 18 F. Supp. 2d at 51. This requires showing that at least "one *specifically-identified member* has suffered an injury-in-fact." *Am. Chem. Council v. DOT.*, 468 F.3d 810, 820 (D.C. Cir. 2006) (emphasis added). And for good reason: without that information, "how is the court to assure itself" that an association has any members, or confirm that any one of those members "meet[s] all of the[] criteria" necessary to have standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Plaintiffs, however, identify no such member—instead they identify seven "Doe" members who they allege "could" be subject to erroneous removal under the Notice. Supp. Br. 4. But the court cannot merely take Plaintiffs at their word, given their evidentiary burden. *Chamber of Comm. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) ("not enough to aver that unidentified members have been injured").  And they certainly cannot presume an erroneous *future* application of the policy in order to establish standing to challenge the policy now. *See, e.g.*, *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983); *Ashcroft v. Mattis*, 431 U.S. 171, 173 (1977). Moreover, Plaintiffs offer no cognizable basis that their "Doe" members are "constitutionally entitled" to withhold their connection to the organizational members. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958). As this Court held in *AILA*, in part of a decision affirmed by the D.C. Circuit in

full, Plaintiffs *must* "identify some injured member." *AILA*, 18 F. Supp. 2d at 51.

Plaintiffs also fail to allege cognizable injury on behalf of their anonymous "members." Where standing is premised on a projected future injury, Article III demands not merely a possibility of injury, but a showing that the threatened future injury is "certainly impending." *Clapper*, 133 S. Ct. at 1147. But Plaintiffs fail to allege "any concrete application that threatens imminent harm." *Summers*, 555 U.S. at 499. Instead, they merely speculate that their members "*could be* placed in expedited removal proceedings pursuant to the [Notice]" or "fear" that the Notice will be wrongly applied to them, Supp. Br. 2 (emphasis added), and that it applies "broadly to all noncitizens." *Id.*; *see also* Mot. 41-42 (asserting that members "could be erroneously subject to expedited removal").[5] But an alleged "risk" of harm is not sufficient for standing purposes— instead, a plaintiff must show that the feared harm is "certainly impending." *Clapper*, 133 S. Ct. at 1147-50. As the D.C. Circuit has explained, such "someday" speculations are categorically insufficient to demonstrate standing. "It is not enough for the [organization] to assert that it [or its members] might suffer an injury in the future, or even that it is *likely* to suffer an injury at some unknown future time. Such 'someday' injuries are insufficient." *J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600, 606 (D.C. Cir. 1996); *see Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1293 (D.C. Cir. 2007) (holding that "an increased risk of death, physical injury, or property damage from future car accidents" was too "remote and speculative" to confer standing). And that is especially apparent here, where the D.C. Circuit has already rejected

---

[5] Plaintiffs' declarations in support of their Motion allege that various unidentified members "*include* noncitizens that [sic] *would be* subject to the government's expanded expedited removal policy," ECF 13-4 ¶ 7, and they also purport to represent seven Jane and John Does who "fear[]" that the Notice will be applied to them even though they fall outside its scope, *id.* ¶ 13 (LUPE John Doe 1); who will never be subject to the Notice because they have been issued notices to appear in full removal proceedings under 8 U.S.C. § 1229a, ECF 13-3 ¶¶ 13-14 (MRNY John Doe 1, Jane Doe 1); or who Plaintiffs allege are "subject" to the Notice because they are inadmissible and have been here for over fourteen days and under two years, but to whom the Notice has not been applied, *id.* ¶ 12 (MRNY John Doe 1), ECF 13-4 ¶¶ 11-12 (LUPE Jane Doe 1, Jane Doe 2), ECF 13-5 ¶ 11 (WeCount! John Doe 1).

associational standing premised on identical allegations of fears "that members of the associations might some day be subject to summary removal." *AILA*, 199 F.3d at 1357. Such injuries, premised on showing that (1) their members illegally "ent[ered] into the United States," (2) "with no documentation or with fraudulent documentation," and (3) "*will be* found inadmissible and be removed from the United States,"—a "chain of events[that]  is greatly attenuated"—"are, at most, only speculative."[6] *AILA*, 18 F. Supp. 2d at 51; *see Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 195 (D.D.C.), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015) (Jackson, J.) (denying standing based on similar allegations).[7]

Plaintiffs contend that the "threat that members will be placed in expedited removal is 'sufficiently imminent,' because the [Notice], by its own terms, applies immediately and *broadly to all noncitizens* who are *potentially* subject to its terms, and Defendants have represented that implementation of the [Notice] will begin on September 1." Supp. Br. 4 (emphasis added). But "potentially" does not mean "certainly impending," *Clapper*, 133 S. Ct. at 1147, and it certainly does not mean that Plaintiffs' Doe members will be placed in expedited removal. *See Lujan*, 504 U.S. at 560. That is readily distinguishable from *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), relied on by Plaintiffs, Supp. Br. 4, in which injury was imminent because the government had already enforced the specific statute against the plaintiff organization for the "same conduct" and announced a *specific intention* to prosecute the *plaintiff organization* under the challenged

---

[6] Plaintiffs also say that "many" unidentified members previously "*have been subject to enforcement activities* by DHS," *id.*, but utterly fail to explain what types of enforcement activities, or otherwise explain how that makes application of the Notice to any identified member "certainly impending," *Clapper*, 133 S. Ct. at 1147-50, even assuming "past exposure" to general enforcement was sufficient, *Lyons*, 461 U.S. at 102 ("Past exposure" not enough absent "continuing, present adverse effects."). Nor do Plaintiffs asserted "flaws" based on *past events*, Mot. 7-12, 22-32, provide injury where Plaintiffs do not allege these "flaws" have occurred to *them* or have been caused by the Notice, rather than the pre-existing statute and regulations themselves. *See Renal Physicians Ass'n v. U.S. HHS.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007). And Plaintiffs assertions concerning notice-and-comment, even if not forfeited, fail, because deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496.

[7] For the same reasons, the Plaintiffs' claims are not "ripe" as they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

statute. 573 U.S. at 155. No such plaintiff-specific intention is presented here.

Plaintiffs also suggest that the Notice may "chill their [members'] freedom of movement, and freedom to access public spaces and government offices where immigration officers *may* be present" and that "[t]hese individuals now face a heightened fear that any encounter with an immigration officer *could* result in their swift deportation." Supp. Br. 5 (emphasis added). But "a person complaining that government action will make his [illegal] activity more difficult lacks standing because his interest is not 'legally protected,'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006), and aliens lack any "right" to be present "illegally, to seek asylum or otherwise." *East Bay Sanctuary Covenant v. Trump*, --- F. 3d. ---, 2018 WL 8807133, at *12 (9th Cir. Dec. 7, 2018). So "the injury they assert is to a nonexistent right." *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997).[8] And even were that not so, Plaintiffs again resort to "coulds" and "maybes," which is not enough. *Clapper*, 133 S. Ct. at 1147.

### C.  Plaintiffs Lack Any Cause of Action under the APA

Plaintiffs also lack any basis to challenge the Notice under the APA.

First, the APA does not waive sovereign immunity as to claims against the United States when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Absent such a waiver, the Plaintiffs lack any claims under 5 U.S.C. § 706. *See, e.g.*, *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 892 F.3d 434, 441 (D.C. Cir. 2018).

The Notice was issued pursuant to section 1225(b)(1)(A)(iii), which provides that the Secretary "may apply clauses (i) and (ii) of this subparagraph [i.e. the expedited removal

---

[8] Plaintiffs' suggestion that a 2017 Memorandum by the former Secretary "identif[ies] Plaintiffs' members as priorities for arrest and removal," because it designates as priorities for removal individuals who have "committed acts which constitute a chargeable criminal offense," is misplaced. Supp. Br. 4-5 (quoting Memorandum from John Kelly, Secretary of Homeland Security, "Enforcement of the Immigration Laws to Serve the National Interest, February 20, 2017, at 2). Even assuming Plaintiffs had actually identified members of their organizations who were actually the subject of this 2017 Memorandum, that memorandum addresses removal priorities generally and says nothing about whether the expedited removal statute would be applied to the unnamed plaintiffs.

provisions] to any or all aliens described in subclause (II)"—that is, any alien who "has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph"—"as designated by the [Secretary]." 8 U.S.C. § 1225(b)(1)(A)(iii). "Such designation shall be in the *sole and unreviewable discretion* of the [Secretary] and *may be modified at any time*." *Id.* (emphasis added); *see* Mot. 17 (conceding the statute "leaves the substance of the 'designation' to the [Secretary's] 'unreviewable discretion'").

Given these express statutory terms, the statute is "drawn" such that this court has "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The action the statute authorizes the Secretary to take, to "designate," means "[t]o mark out and make known; to point out; to name; indicate." Black's Law Dictionary 447 (6th ed. 1990). Nothing about the phrase "designate," coupled with "sole and unreviewable discretion," lends itself to any meaningful standard the court may apply. There are "no legal norms pursuant to which to evaluate the challenged action," and Plaintiffs have identified no constraints on the agency's case-by-case decisions to institute expedited removal aside from the outer limits imposed by the statute. This Court thus has "no concrete limitation[] to impose on the agency's exercise of discretion." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011). The "language" of the statute is a decisive factor, as it identifies no "applicable legal standards" for reviewing the application of expedited removal. *Id.* Moreover, the discretion accorded to the Secretary constitutes a Congressional recognition that the Executive Branch's judgments "on questions of foreign policy and national interest"—like the terms under which someone may be allowed to enter the United States—"are not subjects fit for judicial involvement," which only

26

buttresses the conclusion that the decision to expand expedited removal and apply it on a case-by-case basis is "committed to agency discretion by law." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 903-04 (D.C. Cir. 2018); *see Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1508 (11th Cir. 1992).

Second, all of Plaintiffs' APA claims are foreclosed because another "statute[] preclude[s] judicial review." 5 U.S.C. § 701(a). The INA provides that "[n]otwithstanding any other provision of law ... no court shall have jurisdiction to review ... any ... decision or action of ... the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of ... the Secretary." 8 U.S.C. § 1252(a)(2)(B)(ii). This provision applies to situations where a statute "calls upon [the agency's] expertise and judgment unfettered by any statutory standard whatsoever," *Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005), or where "decisions where Congress has taken the additional step to specify that the sole authority for the action is in the [Secretary]'s discretion." *Alaka v. Att'y Gen. of U.S.*, 456 F.3d 88, 95 (3d Cir. 2006), *overruled on other grounds*, *Bastargo-Vale v. Barr*, 2019 WL 3772097 (3d Cir. 2019) (en banc). The use of the phrase "sole and unreviewable discretion," which modifies the "designation" the Secretary makes under section 1225(b)(1)(A)(iii) "precludes judicial review of the Secretary's ... determination" under that provision. *See Bakran v. Sec'y, United States Dep't of Homeland Sec.*, 894 F.3d 557, 562 (3d Cir. 2018); *accord, e.g.*, *Gebhardt v. Nielsen,* 879 F.3d 980, 984 (9th Cir. 2018) (similar); *Bremer v. Johnson*, 834 F.3d 925, 930-31 (8th Cir. 2016) (similar). That is even more so here, as section 1225(b)(1)(A)(iii) also provides that the Secretary may modify a "designation" under that provision "at any time." *See, e.g.*, *Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 484 (1st Cir. 2016) (reading phrase "may, at any time" as covered by section 1252(a)(2)(B)(ii)); *Jilin Pharm. v. Chertoff*, 447 F.3d 196, 203 (3d Cir. 2006) (same).

So long as "the agency has authority for the challenged action," "[i]f a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective." *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004). That plainly describes the designation here, as the statute is unambiguous that the Secretary "may apply clauses (i) and (ii) of [section 1225(b)(1)(A)] to any or all aliens described in subclause (II) as designated by the Attorney General." That being so, the "no-review" provision applies. *Id.* But given Section 1252(a)(2)(B)(ii)'s sweep, it is not just limited to a challenge to the underlying "action" that is the Secretary's "designation." *See Struniak v. Lynch*, 159 F.Supp.3d 643, 654 (E.D. Va. 2016) (holding that "§ 1252(a)(2)(B)(ii) strips courts of jurisdiction to review both the ultimate decision that is discretionary and the steps that are a necessary and ancillary part of reaching the ultimate decision"). The "sole and unreviewable" prohibition coupled with section 1252(a)(2)(B)(ii) sweeps much broader. For example, "[t]he standards by which the Secretary reaches a decision within his or her 'sole and unreviewable discretion'—and the methods by which the Secretary adopts those standards—are just as unreviewable as the Secretary's ultimate decisions themselves." *Gebhardt*, 879 F.3d at 987. Likewise, the "no ... judicial review" prohibition forecloses review of "[w]hat evidence the agency requires or considers," *Bremer*, 834 F.3d at 930, "a systemic challenge to the Secretary's interpretation of Congress's" direction to take discretionary action, *see Am. Soc. of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 452 (7th Cir. 2002), or "review of the [agency's] reasons" for that decision. *HP Inc. v. MPHJ Tech. Invs. LLC*, 817 F.3d 1339, 1347 (Fed. Cir. 2016). And "[b]y granting 'sole and unreviewable discretion' to make the [designation], Congress conferred on the Secretary the 'power to make decisions without anyone else's advice and consent,'" such that "a notice-and-comment" APA claim is also barred. *Bremer*, 834 F.3d at 930;

28

*accord Gebhardt*, 879 F.3d at 987 ("notice-and-comment" claim challenges "how the Secretary exercises—or has exercised—his or her 'sole and unreviewable discretion'").

Each of Plaintiffs' APA claims is thus barred. Count 1 alleges the was required to undergo notice-and-comment-rulemaking. Comp. ¶¶ 130-34. But the "sole and unreviewable" nature of the designation bars that claim. *E.g.*, *Amgen*, 357 F.3d at 113; *Gebhardt*, 879 F.3d at 987. Counts 3 and 4 assert that the Notice violates the APA by failing to implement additional procedures beyond those that already exist or by "restricting the participation of counsel for individuals in expedited removal." Comp. ¶¶ 140-43, 145-48. But these are nothing more than a challenge to how the Secretary chooses to implement his discretionary authority, and so are barred. *E.g.*, *Gebhardt*, 879 F.3d at 987; *Thompson*, 279 F.3d at 452.[9] And Count 5 asserts the Notice is unlawful because the Secretary "failed to articulate a reasoned explanation for [his] decision," "failed to consider important aspects of the problem, and offered explanations for their decision that run counter to the evidence before the agency." Compl. ¶¶ 150-51. But these are quintessential "challenge[s to] agency decision[s]" as "arbitrary," or "capricious," and so are barred. *Amgen*, 357 F.3d at 113.

Third, the designation is not a reviewable "final agency action" under the APA. 5 U.S.C. § 704. For agency action to be final, among other things, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Ctr. for Auto Safety v. NHTSA.*, 452 F.3d 798, 806 (D.C. Cir. 2006). Action—like the Notice—that "does not itself adversely affect complainant but only affects his rights adversely on the contingency of

---

[9] Count 2, a due process claim, is also barred under this analysis, to the extent it challenges *how* the Secretary exercised his discretion. Compl. ¶¶ 136-37. *See Jilin* 447 F.3d at 206; *Privett v. Sec'y, Dep't of Homeland Sec.*, 865 F.3d 375, 381 (6th Cir. 2017). "[I]n order to adjudicate these claims, [the Court] would be required to give the Secretary's decision not to [take the actions Plaintiffs demand] a central role in [its] review." *Id.* That, of course "is proscribed by § 1252(a)(2)(B)(ii)." *Id.*. And that is especially apparent, given that the expedited removal statute itself provides all the process aliens subject to it are due. *See Landon*, 459 U.S. at 32. Plaintiffs assert that something more is due, but that is no different than asserting the Secretary should have exercised his discretion to issue new procedures beyond those already in place, and that is expressly barred by section 1252(a)(2)(B)(ii). *See Jilin* 447 F.3d at 206.

future administrative action" fails this test. *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996). The Notice provides that going forward, DHS may exercise "the full scope" of its "statutory authority," 84 Fed. Reg. at 35409, and articulates guidance on the exercise of that discretion. *See id.* at 35412. But unless and until an alien is placed in expedited removal proceedings as result of the Notice, it does "not determine any rights or obligations, nor do[es] [it] have any legal consequences." *Ctr. for Auto Safety*, 452 F.3d at 808; *see Valero Energy Corp. v. EPA*, 927 F.3d 532, 536 (D.C. Cir. 2019). "Practical consequences, such as the threat of having to defend [oneself] in an administrative hearing *should* the agency actually decide to pursue enforcement, are insufficient to bring an agency's conduct under our purview." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) (emphasis added). Plaintiffs cannot credibly argue that the Notice is or will be imminently applied to a single Plaintiff in this lawsuit, and their failure to identify a single actual alien who can means that until "further administrative action" in the form of an order of expedited removal occurs, no final agency action is present.

Plaintiffs accordingly cannot show a likelihood of success on their APA claims under section 553 or 706, including Counts 1, 3, 4, and 5.

## II.    The Government is Likely to Succeed on the Merits

### A.  The Notice Is Not Subject to the APA's Procedural Requirements

Plaintiffs' assert that the Notice is a legislative rule that was improperly issued without notice and comment. Mot. 16-21. That is wrong.

First, where "Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm," a "subsequent statute" may supersede APA procedures. *See Asiana Airlines v. F.A.A.*, 134 F.3d 393, 397 (D.C. Cir. 1998) (citing 5 U.S.C. § 559). That is plainly the case here. As explained, section 1225(b)(1)(A)(iii)(I) provides that the

Secretary "may apply" section 1225(b)(1)(A)(i)-(ii) to certain aliens "as designated by the [Secretary, and] [s]uch designation shall be in the sole and unreviewable discretion of the [Secretary] and may be modified at any time." The clear import of the unfettered discretion accorded the Secretary is to permit the Secretary "to apply the expedited removal procedures to additional classes of aliens within the limits set by the statute if, in the [Secretary's] discretion, such action is operationally warranted" including in "specific situations such as a sudden influx of illegal aliens motivated by political or economic unrest or other events or by a general need to increase the effectiveness of enforcement operations at one or more locations." 62 Fed. Reg. at 10313-314. Notice-and-comment procedures are incompatible with that clear statutory goal, and would eviscerate the statutory purpose that the Secretary be able to "modif[y]" a designation "at any time." 8 U.S.C. § 1225(b)(1)(A)(iii). "[W]hen Congress creates [such] a comprehensive, freestanding scheme with particularized procedures that are different and unique from those provided by the APA," section 553 does not apply. *Envtl. Integrity Project v. U.S. EPA*, 177 F. Supp. 3d 36, 43 (D.D.C. 2016); *see Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 105 (D.D.C. 2006) ("[b]y using the word 'may,' Congress granted the USDA some discretion to issue an interim rule without … notice and comment").

Plaintiffs suggest that Congress may only indicate that section 553 does not apply by saying section 553 "shall not apply." Mot. 18. But Congress need not "employ magical passwords in order to effectuate an exemption from the [APA]." *Marcello v. Bonds*, 349 U.S. 302, 310 (1955). Plaintiffs also suggest that this rule only applies if Congress provides for an "interim final rule []" that takes immediate effect." Mot. 18. But section 1225(b)(1)(A)(iii) goes much further: it authorizes a "designation" with immediate effect that may be modified at "at any time," and need not even be published as an interim final rule on the Federal Register. There is thus no "reasonable

construction" of the statute that would "harmonize with simultaneous application of § 553." *See Asiana*, 134 F.3d at 398.

Second, the Notice was not required to undergo notice-and-comment rulemaking because it is not a "substantive, legislative rule[]." *Clarian Health West, LLC v. Hargan*, 878 F.3d 346, 356 (D.C. Cir. 2017). Rather, it is a "general statement[] of policy," that is exempt from notice-and-comment. 5 U.S.C. § 553(b)(B). A general statement of policy, among other things, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 197. Significantly, however, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position ... in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). By contrast, a "substantive rule" subject to requirements for notice-and-comment rulemaking is one that is "finally determinative of the issues or rights to which it is addressed." *Pacific Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974). These rules are "binding" and have the "force of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979).

Under these principles, the Notice is clearly a general statement of policy. The Notice advises the public that DHS intends to exercise its discretionary authority to the full extent permitted under section 1225(b)(1)(A)(iii) going forward. *See Lincoln*, 508 U.S. at 197. And the Notice makes clear that it does not require officers to exercise discretion in any particular way. *See McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1319 (D.C. Cir. 1988). Rather it provides—through repeated use of the word "may"—that officers retain authority "as an exercise of prosecutorial discretion" to choose whether to place aliens subject to the Notice in either expedited or full removal proceedings even where aliens are "otherwise eligible for placement into expedited removal proceedings." 84 Fed. Reg. at 35,412; *see Assoc. of Flight Attendants-CWA,*

*AFL-CIO v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015) ("language like 'may' and 'should' instead of 'shall' or 'must' suggests that the provisions that follow are meant to be precatory"). The Notice thus has "no binding effect" and leaves individual officers discretion in choosing whether to apply the Notice to individual aliens "regardless of whether the criteria" for expedited removal "are met." *Clarion*, 878 F.3d at 358.[10]

Third, even if the Notice is legislative, it is exempt from notice and comment because the Secretary had "good cause" to find that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). Notice is "'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553," *Util. Solid Waste Activities Grp. v. E.P.A.*, 236 F.3d 749, 754 (D.C. Cir. 2001), and contrary to the public interest "where delay" in the issuance of a notice "could result in serious harm." *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).

As to the public interest, the Secretary concluded that "delayed implementation could lead to a surge in migration across the southern border across a notice-and-comment period," threatening "national security and public safety," and causing possible "destabilizing effect[s] on the region," and "significant loss of human life." 84 Fed. Reg. at 35,413. That is a paradigmatic example of a situation where "the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare." *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (TECA 1983). Indeed, the Secretary's experience, supported by record evidence, "supports the inference that smugglers might similarly communicate the Rule's potentially relevant change in U.S. immigration policy" and in turn precipitate changes in

---

[10] For similar reasons, the Notice is exempt from notice and comment because it is a "rule[] of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(3)(A), that "improv[es] the efficient and effective operations of an agency" without itself "alter[ing] the rights or interests of parties." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). And as to both exemptions, "an agency's decision to embrace additional process," as it did here, 84 Fed. Reg. at 35410, "cannot convert a guidance document into a legislative rule." *Sierra Club v. EPA*, 873 F.3d 946, 952 (D.C. Cir. 2017).

immigration patterns, warranting the application of the good-cause exception. *East Bay*, 354 F. Supp. 3d at 1115. *See* 84 Fed. Reg. at 35,413; AR119, 155-77, 663, 705, 2277, 3510, 4319.

Plaintiffs' contrary arguments fail. They assert that the government's "own actions" show an absence of good cause because prior administrations have not expanded expedited removal to the fullest extent permitted by statute. Mot. 20. But that argument ignores the very premise of the "public interest" prong of the good cause exception: that emergent situations arise that can result in "serious harm" that did not exist before, *Jifry*, 370 F.3d at 1179, or "serious damage to important interests," *Nat'l Fed'n of Fed. Employees v. Divine*, 671 F.2d 607, 611-612 (D.C. Cir. 1982), that necessitate immediate action to prevent the actual harms government actions seek to prevent. Plaintiffs contend that the record lacks evidence that would support the Secretary's conclusion that notice-and-comment "could lead to a surge in migration" seeking to avoid the impact of the Notice. Mot. 20. But the record bears out the Secretary's concern. There has been an unprecedented surge in the number of aliens seeking to enter the country. AR155-77. Southwestern-border family-unit apprehensions are up 469% from the same time in 2018, AR170, and there has been a surge of nearly four times the number of non-Mexican-national apprehensions and inadmissible aliens from May 2018 to May 2019 (121,151 in May 2019 compared to 32,477 in May 2018). AR118. That unprecedented surge is caused by incentives aliens have to illegally enter with children, because they know the government lacks resources to detain families and children. AR188-226, 513, 705, 2277, 3419 4319. And DHS's own operational data, relied on by the Secretary, shows that aliens respond to immigration policies quickly, "creat[ing] a tremendous pull factor that is spurring this illegal immigration and creating an ongoing humanitarian and security crisis." AR2277; *see* AR663 (noting "surges of illegal immigration at the southern border with Mexico" and "policy shifts"); AR705 (noting surges in response to changes in asylum policies); AR4319 (noting "clear

interdependency between the detained population, the surge of families and unaccompanied children (UCs) at the southwest border, and overall transportation and removal expenditures"); AR3510 (noting impact of "surges" on "immediate availability of detention beds").

Plaintiffs respond that there is "no logical reason that a delay in application of expedited removal in the interior and to individuals who have not recently entered would affect Defendants' ability to cope with any purported increase in migration," Mot. 20-21, but that is backwards: delay in applications would "incentive[ize aliens] to enter unlawfully [and] also to attempt to travel quickly into the interior of the United States in an effort to avoid the application of expedited removal." 84 Fed. Reg. at 35412. The Secretary is in the best position to make such predictive judgments, and his judgments here were eminently reasonable (and consistent with past practice). See 67 Fed. Reg. at 68,925; 82 Fed. Reg. at 4904. *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010) ("The Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions.").

As to impracticability, as the Secretary found, "the application of APA's notice-and-comment requirements would defeat a major purpose of the expedited removal provision: [t]o allow the Secretary to authorize immigration officers to respond rapidly, effectively, and flexibly to border security and public safety challenges." 84 Fed. Reg. at 35,413. Indeed, the statute provides that "[s]uch designation shall be in the sole and unreviewable discretion of the Attorney General and *may be modified at any time*." 8 U.S.C. § 1225(b)(1)(A)(iii)(I) (emphasis added); *see also* 8 C.F.R. § 235.3(b)(ii) ("Commisioner's designation shall become effective immediately upon issuance."). The Notice cannot be "effective immediately" or "modified at any time" if notice-and-comment is required, and therefore it is impracticable to provide such notice. *See, e.g.*,

*Jifry*, 370 F.3d at 1176 (statute that permits but does not mandate action "at any time," coupled with national security concerns satisfies good cause); *Coal. for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 20 (D.D.C. 2010) ("good cause" satisfied where "Congress has expressly said that the Secretaries may exercise their judgment in deciding whether interim final rules may be appropriate to implement statutory provisions").

### B.  The Notice Is Consistent with the Statute and the Due Process Clause

The expedited removal system is consistent with any due process rights aliens subject to it may have. This Circuit has already upheld the very same expedited removal provisions challenged by Plaintiffs as applied to aliens who are not "permanent residents or [lack] 'substantial connections' to the United States." *AILA*, 18 F. Supp. 2d at 59, *aff'd*, 199 F.3d 1352. And for good reason: unlawfully present, aliens who have not been admitted or paroled lack any due process rights with respect to their applications for admission other than rights provided by Congress. *Landon*, 459 U.S. at 32; *Dia v. Ashcroft*, 353 F.3d 228, 243 (3d Cir. 2003) (en banc) ("[a]liens only have those statutory rights granted by Congress"). Congress has plainly authorized the Secretary to apply expedited removal procedures to certain inadmissible aliens unlawfully present for two years or less, 8 U.S.C. § 1225(b)(1)(A)(iii)(I), and although Congress did not require it, and "could have created an expedited removal scheme based entirely on the [Secretary's] discretion," *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1085 (9th Cir. 2011), the INS and now DHS have promulgated extensive procedural protections that any alien subject to expedited removal—including under this Notice—is entitled to before they may be removed. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(A), (B); 8 C.F.R. §§ 235.3, 208.30, 1003.42. 1208.30. Given these extensive procedures, that go far beyond anything mandated by Congress, the statute and regulations satisfy any minimal due process protections inadmissible aliens seeking to avoid removal may be entitled

to. *See Zakonaite v. Wolf*, 226 U.S. 272, 275 (1912) (explaining it is "entirely settled" that the "inquiry" concerning an alien's admissibility "may be properly devolved upon an executive department or subordinate officials thereof, and that the findings of fact reached by such officials, after a fair though *summary hearing*, may constitutionally be made conclusive.").

Plaintiffs nevertheless assert that that the Notice is inconsistent with the expedited removal statue because it "includes no procedures to ensure that noncitizens apprehended in the interior of the country, far from the border, and who have resided here for significant periods of time, will receive fair removal determinations," and so raises "serious constitutional problems." Mot. 21-22; *see also* Mot. 14. Based on these alleged "problems," Plaintiffs ask this Court to "appl[y] the canon of constitutional avoidance," to conduct a *Mathews v. Eldridge*, 424 U.S. 319 (1976) balancing and to rewrite the statute to "provide safeguards to [aliens] facing deportation," including a "procedurally fair opportunity to contest the allegations against them and present countervailing evidence." Mot. 22; *see* Mot. 22-36. Plaintiffs do not identify what these procedures might be, suggesting only that they must be something "more" than what currently exists. Mot. 22.

Plaintiffs' claims are without merit. To begin, Plaintiffs' assertion that the Notice "includes no procedures to ensure that noncitizens apprehended in the interior of the country ... will receive fair removal determinations," Mot. 22, is misplaced. The Notice does nothing more than announce that DHS will begin exercising its full discretionary authority under section 1225(b)(1)(A)(iii)(I) to "apply" the expedited removal statute to certain aliens not covered by previous designations encountered in the interior of the country who cannot show they have been lawfully present for more than two years. The Notice thus "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 197. Such public notice of a change in the Sovereign's exercise of its prosecutorial discretion "creates no new []

offenses but merely extends jurisdiction over certain classes of offenses defined elsewhere" by the statute. *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 504 n.5 (1979). It is the statute and regulations that establish the "procedures" aliens subject to expedited removal receive, and there is "nothing anomalous about the fact that a change in the administrative regulations may effectively broaden or narrow the scope" of who may be subject to the statute. *Foti v. I.N.S..*, 375 U.S. 217, 229 (1963).

i.      *Plaintiffs' Claims are Foreclosed by AILA v. Reno, 18 F. Supp. 2d 38 (D.D.C. 1998), aff'd, 199 F.3d 1352 (D.C. Cir. 2000)*

Plaintiffs' artfully plead challenge to the Notice thus can only be understood as a challenge to the existing statutory and regulatory procedures currently in place. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(A), (B); 8 C.F.R. §§ 235.3, 208.30, 1003.42. 1208.30. But this Court and the D.C. Circuit have *upheld* the constitutional and statutory legality of the expedited removal statute and its implementing regulations, which apply equally to all aliens subject to expedited removal. *See AILA*, 18 F. Supp. 2d at 58-60, *aff'd*, 199 F.3d at 1357. Plaintiffs suggest otherwise by failing to address, let alone acknowledge, that these cases, and more importantly, the statute and each of the relevant regulations, have existed in their present form for years. Plaintiffs' efforts to re-litigate those issues are time-barred. 8 U.S.C. § 1252(e)(3)(B).

In *AILA*, various plaintiffs alleged that expedited removal and its implementing regulations "violate[d] Congress's intent" of "establish[ing] fair procedures" by "providing insufficient protections, therefore creating an unreasonably high risk that individuals will be erroneously removed." *AILA*, 18 F. Supp. 2d at 52-53. Among other things, plaintiffs alleged the implementing regulations failed to provide "fair procedures" because they did not allow aliens to (1) "communicat[e] with family, friends and counsel during secondary inspection," (2) failed "to provide adequate language interpretation at secondary inspection," "adequate access to and

participation of counsel prior to and during the secondary inspection, "adequate information on charges and procedures, the opportunity to contest those charges," or "review of removal orders," (3) impermissibly allowed application of the procedures "to individuals with facially valid documents," and because (4) the agency did not follow the regulations in individual cases and (5) the statute and regulations violated the due process rights of inadmissible aliens. *Id.* at 53, 57-58. This Court rejected those claims in full, *id.* at 52-60, a decision the Court of Appeals found so persuasive it remarked that "[w]e see no reason to disturb the district court's analysis, and so we affirm the dismissal of these claims substantially for the reasons states in the court's thorough opinion." *AILA*, 199 F.3d at 1357.

First, this Court reasoned the Attorney General's regulations implementing the statute were "entitled to the highest degree of deference where Congress has delegated to the agency the authority 'to promulgate standards or classifications.'" *Id.* at 53 (quoting *Am. Fed'n of Labor v. Donovan*, 757 F.2d 330, 341 (D.C.Cir.1985)).

Next, the Court addressed and rejected each of plaintiffs' claims. As to the regulatory right to "consult with a person or persons of the alien's choosing prior to the [credible fear] interview," 8 U.S.C. § 1225(b)(1)(B)(iv), which Plaintiffs asserted required access to an attorney at various stages of the inspection and admission process, the Court held that "the Attorney General reasonably concluded" consultation could be limited as the Attorney General's regulation proposed. *AILA*, 18 F. Supp. 2d at 52, 55. As to "adequate language interpretation," the Court held that the statute did not require interpreters, but the regulations nevertheless provided for "interpretive assistance," and that such provision was more than adequate under the statute. *Id.* at 55. As to plaintiffs' assertion that the statute did not provide a meaningful opportunity to "contest" the "charges" against an alien, *id.*, the Court held that the statute did "not set forth any requirement

or notice, opportunity for rebuttal, or review," *id.* at 56, but the regulations nevertheless require that aliens "be advised of the inadmissibility charges against them and be given an opportunity to respond," and "Plaintiffs cannot impose upon the Attorney General any obligation to afford more procedures than the governing statute explicitly requires or that she has chosen to afford in her discretion." *Id.* As to plaintiffs' claim that "expedited removal procedures should apply only to aliens whose travel documentation is 'facially' invalid," *id.*, the Court reasoned that the statute contains no such requirement, and in fact mandates that officers inspect aliens for admission and consider their admissibility even if they have a facially valid visa. *Id.* at 57. These claims are indistinguishable from many of Plaintiffs' claims in this case. Mot. 23-41.

In *AILA*, as here, Plaintiffs also asserted that the government was "failing to follow the Interim Regulations" as "applied" to plaintiffs and aliens similarly situated. *Id.* at 57. As noted, the Court rejected this claim, concluding that "based on the clear language of [section 1252(e)(3)(A)(ii)], this Court cannot review unwritten policies or practices but rather must limit its review to a 'regulation, a written policy directive, written policy guideline, or written procedure.'" *Id.* at 58. These claims are indistinguishable from Plaintiffs' allegations here that immigration officers in isolated cases do not follow the implementing regulations. Mot. 7-12; 22-32. Indeed, these claims are even more remote than those in *AILA* because they are based on hearsay declarations from attorneys concerning individuals that are not parties in this suit and that no organization claims to represent. *Id.* As in *AILA*, then, this claim is not plausible.

Finally, in *AILA*, as here, plaintiffs alleged that the expedited removal statute and its implementing regulations violate the Due Process Clause because "individuals will be erroneously removed from the United States and thus deprived of liberty and property" and because the expedited removal system "creates an unreasonably high danger that those entitled to enter the

United States ... will be erroneously removed." *Id.* at 58. The Court rejected that claim as well, concluding that "aliens seeking initial admission to the United States have no constitutional rights with respect to their immigration status," and thus lack due process rights with respect to their applications for admission that "permanent residents or those with 'substantial connections' to the United States" have. *Id.* at 59. Absent such "substantial connections," which the Court defined as something more than "regularly com[ing] to the United States [lawfully] to visit [family]," aliens "cannot avail themselves of the protections of the Fifth Amendment to guarantee certain procedures with respect to their admission." *Id.* So too here: Plaintiffs do not identify a single individual alien by name who has substantial connections to this country, let alone demonstrate that all aliens subject to expedited removal under the Notice as a class—those physically present unlawfully anywhere from 15 days to two years—possess "substantial connections" such that they may even invoke the Due Process Clause to demand procedures greater than those provided by statute, much less ask this Court to invalidate section 1225(b)(1) on its face on that basis. Accordingly, *AILA*, both in this Court and the D.C. Circuit, make clear that Plaintiffs cannot demonstrate any likelihood of success on the merits of Count 2.

### ii.    *Plaintiffs' Due Process Claims Fail on their Merits*

Even assuming Plaintiffs claims are not foreclosed by *AILA* and are not otherwise time-barred under section 1252(e)(3)(B), they are meritless.

Aliens subject to expedited removal lack any Fifth-Amendment-protected liberty interest in remaining in this country once they receive the process available to them under the statute and its implementing regulations. "[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon*, 459 U.S. 21, 32 (1982). Thus, "[a]liens only

have those statutory rights granted by Congress." *Dia*, 353 F.3d at 243; *see Legal Assistance for Vietnamese Asylum Seekers v. DOS*, 104 F.3d 1349, 1352 (D.C. Cir. 1997) ("plaintiffs do not have a substantive right to any particular process for having their applications considered").

Through section 1225(b)(1)(A)(iii), Congress provided that any alien not lawfully admitted or paroled into the country and physically present for less than two years could be subject to expedited removal procedures, and if found inadmissible and lacking a credible fear of persecution, may be removed immediately. Section 1225(b)(1)(B)(iii) thus provides the "statutory," that is, "rights" this class of aliens has, *Dia*, 353 F.3d at 243, with respect to their ability to remain in this country, which do not include any right to specific procedures, let alone full removal proceedings under section 1229a. *See Barajas-Alvarado*, 655 F.3d at 1085 ("Congress could have created an expedited removal scheme based entirely on the [Secretary's] discretion, [but] it created" "limited procedural rights for arriving aliens" subject to expedited removal). That being so, Plaintiffs cannot assert any liberty interest in obtaining legal entry into the United States beyond those already provided by statute and regulation, and so have no basis to insist that this Court impose the "procedural" protections beyond those already provided by statute and regulation. *See Legal Assistance*, 104 F.3d at 1352. Moreover, because Plaintiffs assert a facial challenge to section 1225(b)(1) as applied to all aliens within its reach under the July 23 Notice, they "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "The fact that [section 1225(b)(1)(B)] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.*

Plaintiffs cannot make this "difficult" showing, *id.*, because Plaintiffs cannot demonstrate that aliens who enter unlawfully and are present here for two years or less, as a class, are entitled to *any* due process rights with respect to their admission to this country beyond those provided by

statute, much less a right not to be removed expeditiously from the country after receiving the process provided by section 1225(b)(1) and its implementing regulations. *See Landon*, 459 U.S. at 32; *Knauff*, 338 U.S. at 544. Congress routinely, and permissibly, makes rules concerning aliens that "depend on both the character and the duration of his residence," *Mathews v. Diaz*, 426 U.S. 67, 83 (1976), and it is well-settled that "aliens receive constitutional protections when they have come within the territory of the United States and developed *substantial connections* with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (emphasis added). Only "once an alien *gains admission* to our country and *begins to develop the ties that go with permanent residence* [does] his constitutional status change[] accordingly." *Landon*, 459 U.S. at 32 (emphasis added).

Such connections require a showing that the alien was "in the United States voluntarily and ... had accepted some societal obligations," *id.* at 273, which, as this Court has recognized, means something more than "regularly com[ing] to the United States [lawfully] to visit [family]." *AILA*, 18 F. Supp. 2d at 60 n.17. Other courts have suggested that lawfully studying for four years at an American university would be sufficient, while certain lawfully admitted aliens such as "tourists, business visitors, and all student visa holders" might not satisfy that test, *see Ibrahim v. DHS.*, 669 F.3d 983, 997 (9th Cir. 2012), that presence for *several years* combined with the grant of lawful status might be sufficient, *see Osorio-Martinez v. U.S. Att'y Gen.*, 893 F.3d 153, 168 (3d Cir. 2018), or that the "regular and *lawful entry* of the United States pursuant to a valid border-crossing card and [] *acquiescence in the U.S. system of immigration*" can "constitute [] voluntary acceptance of societal obligations." *Martinez–Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) (emphasis added); *see also United States v. Meza-Rodriguez*, 798 F.3d 664, 670–71 (7th Cir. 2015) (presence for 20 years plus attendance at American public school). While there is no firm

definition, what is clear is that *none* of the aliens subject to section 1225(b)(1) as expanded by the Notice will have been *lawfully admitted* or have been *lawfully* in this country, and so have not formed voluntary societal obligations and will, in most circumstances, lack substantial connections under any of these formulations. Plaintiffs thus cannot make the threshold showing that "no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745.

Plaintiffs invoke the canon of "constitutional avoidance" and *Mathews v. Eldridge*, 424 U.S. 319 (1976), asserting that the canon allows the Court "to interpret immigration statutes to provide safeguards" to aliens that do not exist in the statute, and that under the three-factor balancing established in *Mathews*, the expedited removal statute and regulations are insufficient to adequately protect the alleged liberty interests of aliens otherwise subject to expedited removal. Mot. 22; *see also* Mot 23-36. These claims fail.

To begin, Plaintiffs' invocation of "constitutional avoidance" as a basis to second-guess the statute and its implementing regulations is meritless. "The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction. In the absence of more than one plausible construction, the canon simply has no application." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018). That Plaintiffs believe the statute *could* raise constitutional concerns in as-applied circumstances is irrelevant: "Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to choose between competing plausible interpretations of a statutory text," and only where the statute is in fact "ambiguous." *Id.* at 843-44. But there is nothing remotely ambiguous about section 1225(b)(1)(A)(iii). "If an immigration officer *determines* that an alien ... who is arriving in the United States *or is described in clause (iii)* is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer

*shall* order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added). That provision reaches any "alien ... who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that [he] has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph," so long as the Secretary so "designate[s]." *Id.* § 1225(b)(1)(A)(iii). Nothing about these provisions presents "competing plausible interpretations" of the text. *Jennings*, 138 S. Ct. at 842. "The expedited removal statutes are express and unambiguous. The clarity of the language forecloses acrobatic attempts at interpretation." *Castro v. DHS.*, 835 F.3d 422, 432 (3d Cir. 2016). The statue unambiguously describes who may be subject to it, and authorizes the Secretary to apply the statute to those people "at any time." Thus, reliance on the avoidance canon is entirely misplaced. *See F.C.C. v. Fox Television Stations*, *Inc.*, 556 U.S. 502, 516 (2009) ("We know of no precedent for applying [the canon] to limit the scope of authorized executive action").

Even were there any ambiguity permitting application of *Mathews* through the backdoor of the canon, only after a claim "survives substantive due process scrutiny" is the procedural due process analysis—to ensure that such government action is implemented in a fair manner— utilized. *Salerno*, 481 U.S. at 746. If *Mathews* provides the appropriate framework, Plaintiffs' claims still fail. The core requirement of due process is simply "notice and an opportunity to be heard." *Yamataya v. Fisher*, 189 U.S. 86, 100 (1903). What constitutes adequate notice and opportunity depends on the circumstances, as "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

45

Assessing what is required turns on: the private interests at stake, the risk of erroneous deprivation and the probable value of additional safeguards, and the government's interests. *Id.* at 33.

Plaintiffs assert that inadmissible aliens categorically have a private interest in avoiding removal. Mot. 23. But an "expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause," *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983), and, as noted, Congress has determined that aliens who enter unlawfully and are present for two years or less *as a class* lack any liberty interest in avoiding removal or to certain procedures when they contest their removal. 8 U.S.C. § 1225(b)(1)(B)(III)(ii); *see e.g.*, *Landon*, 459 U.S. at 32; *Knauff*, 338 U.S. at 544. They are entitled only to "those statutory rights granted by Congress." *Dia*, 353 F.3d at 243. Indeed, any liberty interest aliens have with respect to removal is satisfied by the administrative process available through expedited removal. "The provision targets aliens who have either no residence here or only a limited residence. Such an alien's interest in remaining in the United States is therefore much more limited than that of an alien already living here who has been placed in formal removal proceedings. *United States v. Peralta-Sanchez*, 847 F.3d 1124, 1135 (9th Cir.), *opinion withdrawn on grant of reh'g*, 868 F.3d 852 (9th Cir. 2017). Moreover, "it is well established that Congress is constitutionally authorized to provide for expedited removals without [judicial] review." *United States v. Villarreal Silva*, 931 F.3d 330, 335 (4th Cir. 2019). "The power to expel aliens, being essentially a power of the political branches of government, the legislative and executive, may be exercised entirely through executive officers, with such opportunity for judicial review of their action as Congress may see fit to authorize or permit." *Carlson v. Landon*, 342 U.S. 524, 537 (1952). The very case on which Plaintiffs rely, *Yamataya v. Fisher*, 189 U.S. 86 (1903), Mot. 34-36, concluded that any liberty interest an alien who was *lawfully admitted* had was satisfied by summary administrative procedures consisting of an in-

person interview by an immigration officer and the possibility of administrative appeal, without any further review. *See* 189 U.S. at 102. Thus for more than a century it has been "entirely settled" that the "inquiry" concerning an alien's admissibility "may be properly devolved upon an executive department or subordinate officials thereof, and that the findings of fact reached by such officials, after a fair though *summary hearing*, may constitutionally be made conclusive." *Zakonaite*, 226 U.S. at 275 (emphasis added); *see also Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. (18 How.) 272, 284 (1855).

Plaintiffs also assert that there is an allegedly "significant risk" that aliens subject to expedited removal "will be erroneously threatened with swift deportation even though they are not properly subject to expedited removal at all," Mot. 24, because the regulations do not "ensure compliance with the limited procedures the government currently affords." Mot. 27; *see* Mot. 24-30. But, again, Plaintiffs do not identify a single alien subject to expedited removal, and so ask this Court to assess expedited removal in a vacuum. Plaintiffs' reliance on hearsay, extra-record declarations concerning isolated examples of alleged errors in specific cases does not demonstrate a categorical likelihood of deprivation of liberty, as even if they are true, due process "rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions" or "the result obtained in any individual case." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320 (1985). Nor does due process "require that the procedures used to guard against an erroneous deprivation ... be so comprehensive as to preclude any possibility of error." *Id.* As applied challenges exist for such circumstances. *Cf.* 8 U.S.C. § 1252(e)(2) (allowing for limited review of status claims in habeas).

With this in mind, Plaintiffs' allegations of erroneous deprivation ring false. The "risk of erroneous deprivation" is categorically low for aliens never admitted who cannot show any

evidence of lawful presence. Moreover, the analysis required to determine whether an alien may be subject to expedited removal proceedings is straightforward: the immigration officer need determine only whether an alien was admitted or paroled and has valid documents to enter or remain in the United States or has misrepresented material information about himself, and to then determine if the alien has been present for two years or less. *See* 8 U.S.C. § 1225(b)(1). This is a relatively simple exercise: either the alien has valid documents or he does not. And in the event that the alien asserts he should not be subject to expedited removal, because he is a lawful permanent resident, refugee, asylee, or claims to be a U.S. citizen, the regulations require that a thorough inquiry occur, both before the immigration officer and an immigration judge, before any removal can proceed. *Supra* 9-10; *see United States v. Quinteros Guzman*, No. 3:18-CR-00031-001, 2019 WL 3220576, at *11 (W.D. Va. July 17, 2019) (finding no deprivation in similar circumstances). Those procedures are even more robust in light of ICE's policy guidance, which articulates robust procedures officers must abide by and various types of evidence an alien may rely on to show that he is not properly subject to expedited removal, as well as requiring *three* levels of administrative review. *See* ICE Policy 11058.1. Plaintiffs thus fail to demonstrate as a categorical matter that the risk of erroneous deprivation is high or what added value additional procedures—which they do not bother to articulate—might add. That must be weighed against the fact that "requiring more process would fundamentally alter Congress's scheme without adding any significant protection for aliens in expedited removal proceedings." *Peralta*, 47 F.3d at 1137.

Plaintiffs nevertheless assert that the Congressional scheme "creates a significant risk that noncitizens subject to the [Notice] will be erroneously denied the opportunity, provided by statute, to withdraw their applications for admission." Mot. 29 (citing 8 U.S.C. § 1225(a)(4)). Withdrawal relief, however, itself demonstrates that the alien unlawfully entered or attempted to enter or is

unlawfully present in the United States, meaning that the alien was properly subject to expedited removal proceedings in the first place. In other words, withdrawal relief simply provides an alternative avenue of removal. *See* 8 U.S.C. § 1225(a)(4); 8 C.F.R. § 235.4. This argument does not prove that additional procedures would be of assistance in preventing an alien from being wrongfully placed in expedited removal proceedings or wrongfully removed as a result.

Plaintiffs also suggest that "safeguards would mitigate the risk of error," for example by requiring "greater notice of, and an opportunity to rebut, the government's adverse evidence." Mot. 30. They further suggest that the statute must be read to require additional procedures for "fair determinations," Mot. 36, insinuating the statute and regulations are devoid of any procedural safeguards. But as discussed, such procedures requiring notice and an opportunity to confront evidence and demonstrate that an alien was admitted or parole and has been continuously present for more than two years or otherwise is not properly subject to expedited removal have existed since 1996. *Supra* 8-12, 38. Moreover, aliens who would otherwise be subject to expedited removal, but who express an intent to seek asylum or who claim a fear of persecution or torture, or claim to have lawful status, are entitled to further process under § 1225 before removal can take place, *id*. § 1225(b)(1)(A)(i); 8 C.F.R. § 1235.3(b)(4), (5), including the right to a non-adversarial interview before a trained asylum officer, administrative review before an immigration judge, and judicial review in limited habeas proceedings. 8 U.S.C. § 1252(e)(2); 8 C.F.R. §§ 235.3; 1208.30. Likewise, aliens asserting that they should not be subject to expedited removal because they are a citizen, lawful permanent resident, asylee, or refugee, may seek relief in habeas in as-applied cases. *id.*, and should they so demonstrate, they are entitled to further proceedings under section 1229a. *Id.* § 1252(e)(4). Aliens who because of their status or asylum claims should not be subject to immediate removal thus have ample procedural protections in administrative and habeas

proceedings, and Plaintiffs point to no evidence suggesting that such aliens are being wrongfully removed via expedited removal because of a lack of additional process as a general matter.[11]

Plaintiffs further assert that the government must "bear the burden of showing that the noncitizen is not admitted or paroled, and of establishing removability." Mot. 31-32. But that would require declaring section 1225(b)—which requires that aliens bear the burden of demonstrating their entitlement to be admitted to this country or to asylum, 8 U.S.C. § 1225(b)(1)(A)(i), (b)(2)(A), 1229a(c)(2)(A)—unlawful. Congress's decision on who should bear the burden is as is should be, as it is aliens seeking admission—not the government—that have information about their right, if any, to enter, which is what led Congress to conclude that such aliens as a *class*, when "released into the general population," "do not return for their hearings," H.R. Rep. No. 104-469, 117-18, thus necessitating expedited removal in the first place.

Finally, Plaintiffs assert that requiring the government to provide "safeguards similar to ... those [provided] in regular removal proceedings," would not interfere with the government's weighty interest in being able to effectively enforce the expedited removal statute. Mot. 31-32. But requiring such procedures would effectively eliminate expedited removal as an enforcement tool. *See Castro v. DHS*, 163 F. Supp. 3d 157, 174 (E.D. Pa. 2016) ("The procedures Petitioners urge— necessitating pleadings, formal court proceedings, evidentiary review, and the like—would make expedited removal of arriving aliens impossible."), *aff'd*, 835 F.3d 422. And that tool is necessary "to expedite the removal from the United States of aliens who indisputably have no authorization

---

[11] To the extent Plaintiffs assert that asylum-seekers require process beyond that already provided, that provides no basis to enjoin the statute facially. *See Salerno*, 481 U.S. at 746. First, it does not distinguish them from aliens seeking asylum under the existing expedited removal regime, which was upheld by this Court 20 years ago.  Nor would it permit relief even as applied to asylum-seekers alone. Asylum is a discretionary benefit, not an "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). Applicants for admission thus lack any liberty interest in specific procedures for adjudicating their asylum claims. *See, e.g.*, *Jean-Louis v. U.S. Att'y Gen.*, 582 F.3d 462, 465-66 n.4 (3d Cir. 2009); *Ukrainian-American Bar Ass'n v. Baker*, 893 F.2d 1374, 1382 (D.C. Cir. 1990). For inadmissible aliens on U.S. soil who may seek asylum, "the statutory requirement is sufficient procedural due process" because it provides notice and an opportunity be heard. *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 332 (D.C. Cir. 1989).

to be admitted," H.R. Rep. 104-828 at 209, and for dealing with the "crisis at the land border" which involves "hundreds of thousands of illegal aliens" entering each year. H.R. Rep. No. 469 at 107; *see id.* at 117 ("The threat of expedited exclusion, which has been considered by Congress since 1993, may also have had a deterrent effect."). In such circumstances, "[t]he government's interest in efficient administration of the immigration laws at the border also is weighty. Further, it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Landon*, 459 U.S. at 34; *Castro*, 163 F. Supp. 3d at 174 ("although Petitioners have a considerable interest in rigorous administrative procedures, the Government's need for expedition and finality is greater still").

Thus, most, if not all, aliens subject to the Notice will lack the degree of due process rights that makes *Mathews* applicable in the first place. But for those few who may invoke *Mathews*, the applicable statute, regulations, and policy guidance more than adequately safeguard any minimal due process rights aliens who enter illegally and are present for two years or less may have.

### C.  The Notice Is Not Arbitrary or Capricious.

Plaintiffs contend that for the same "reasons" as their due process claim, the Notice is "arbitrary and capricious" under the APA because the Notice does not "implement" the expansion of expedited removal "in a way that ensures its fair application." Mot. 37. They assert that the agency was required to consider extra-record evidence marshaled by Plaintiffs' counsel in this case, *id.*, and therefore failed to consider "important aspects of the problem" in implementing the Notice. *Id.* This claim is meritless.

First, it fails for the same reasons Plaintiffs' due process claim fails: the Notice itself does not create or contract any substantive or procedural rights. It is the underlying statute and regulations that do that. Second, Plaintiffs cannot invoke the APA's arbitrary and capricious

provision to because the decision to issue a new designation is committed to agency discretion by law, so section 706(2)(A) does not apply. *See* 5 U.S.C. § 701(a)(2); *supra* 25-30. Third, even if the APA applies, there is no requirement that an *agency* contemplate the constitutional sufficiency of actions *taken by Congress* in order for its decision to be considered reasoned. Congress has already made that decision, this court and the D.C. Circuit have already upheld it, and the agency thus lacked any "authority to second-guess Congress' calculations." *Pub. Citizen v. F.T.C.*, 869 F.2d 1541, 1557 (D.C. Cir. 1989). Even were that not so, the way to show that the substance of agency action is contrary to Congress's intentions is to cite to contrary statutory provisions. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001). There is no requirement that the agency itself second-guess Congress in considering whether to act, only that the agency not consider "factors which Congress has not intended it to consider," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983), a claim Plaintiffs wisely do not advance. Indeed, the court "must give appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency," *Time Warner*, 240 F.3d at 1133, and "may not substitute [its] judgment for that of the Secretary" *Dep't of Commerce*, 139 S. Ct. at 2569. And finally Plaintiffs cannot amass a cherry-picked, self-serving record for litigation purposes, and then submit it to the Court asserting that the agency should have considered it with or without notice-and-comment. APA review, where it is permitted, is limited to the "record that was before the Secretary at the time he made his decision," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

*That* record amply supports Secretary's conclusions that the Notice would allow DHS "to use more effectively and efficiently its limited resources to fulfill its mission to enforce the

immigration laws and ensure the security of the Nation's borders," given "the ongoing crisis at the southern border, the large number of aliens who entered illegally and were apprehended and detained within the interior of the United States, and DHS's insufficient detention capacity both along the border and in the interior," the "historic backlog of removal cases," and to combat alien smuggling that circumvents prior designations by relying on "'safe houses' that are located more than 100 miles from the nearest land border." 84 Fed. Reg. at 35411-12; *see id.* at 35411-14 (describing "burden and capacity issues currently faced by DHS," numbers of aliens encountered yearly on the interior who could be removed under the new Notice, detention constraints faced by DHS, impacts of immigration court backlog, and the many statutory and regulatory procedural protections aliens subject to the Notice are entitled to); AR34-44, 118-20, 155-77, 188-226, 315-29, 503-3813, 4319, 5252-5336, 5355-56, 5385-99, 5454-63.

### D.  The Notice is Consistent with the INA's Access to Counsel Provision

Plaintiffs contend that the APA and INA "provide noncitizens the right to representation, at their own expense, in expedited removal proceedings." Mot. 38. They are wrong.

Far from providing a right to counsel, the statute provides that for aliens "eligible for [a credible fear] interview" only, such person "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General [or the Secretary" and that "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process."  8 U.S.C. § 1225(b)(1)(B)(iv); *see* 8 C.F.R. § 208.30(d)(4) (same). Regulations implementing the INA's statutory right to counsel in full removal proceedings (8 U.S.C. §§ 1229a(b)(4)(A), 1362) further clarify that the right to counsel in full removal proceedings under section 1229a does *not* apply in expedited removal proceedings. *See* 8 C.F.R. § 287.3(c) (providing for right to be "advised" of "right to be represented

at no expense to the Government," "*[e]xcept in the case of an alien subject to the expedited removal provisions*." (emphasis added)). Thus, no statute or regulation provides Plaintiffs any right to counsel beyond the consultation provision of section 1225(b)(1)(B)(iv). *See, e.g.*, *Barajas-Alvarado*, 655 F.3d at 1088 (holding that in light of statute and regulation, "claim that [alien in expedited removal] was denied his right to counsel, is meritless on its face"); *United States v. Grande*, 623 F. App'x 858, 860 (9th Cir. 2015) (same, alien apprehended inside the country); *Quinteros*, 2019 WL 3220576, at *9 ("[N]o such right is specified in the [] statute or implementing regulations."); *cf. AILA*, 18 F. Supp. 2d at 54 ("Attorney General reasonably [limited] consultation [to] the time between an alien's secondary inspection and credible fear interview").

Plaintiffs' contrary arguments fail. First, they allege that the APA requires counsel in expedited removal proceedings because 5 U.S.C. § 555(b) "provides that 'a person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel," Mot. 38 (quoting § 555(b)), and that the statute cannot "be read" to displace any procedural safeguard the APA provides." Mot. 39. Plaintiffs cite no case adopting their argument, and for good reason: "deportation proceeding[s] [are] not subject to the APA." *Ardestani*, 502 U.S. at 134 (explaining that "the INA shall be the sole and exclusive procedure for determining the deportability of an alien under this section."); *Marcello*, 349 U.S. at 309 ("[W]hen in this very particularized adaptation there was a departure from the [APA] ... surely it was the intention of the Congress to have the deviation apply and not the general model."). Thus, "the APA's provision regarding representation by counsel does not apply to an expedited removal hearing under § 1225(b)(1)." *Quinteros*, 2019 WL 3220576, at *10.

Plaintiffs insist that neither *Ardestani* nor *Marcello* foreclose their claim because those cases relied on the statutory text delineating that the INA as it existed at the time "shall be the sole

and exclusive procedure for determining the deportability of an alien," while section 1225(b)(1) "contains no such 'sole and exclusive language.'" Mot. 40. But that is far too cramped a reading of *Ardestani*  and *Marcello*, which both hold generally that the APA does not supplant the INA because the INA establishes a comprehensive and exclusive framework governing removal proceedings, including attendant procedural protections, irrespective of isolated statutory language in parts of the statute. Indeed, when "Congress passed the legislation including the expedited removal procedures, it did so against the background of the holdings in *Marcello* and *Ardestani*, which had established the general proposition that the APA did not apply to immigration proceedings, at least with respect to hearings." *See Quinteros*, 2019 WL 3220576, at *10. Moreover, the argument fails on its own terms. 8 U.S.C. § 1229a(a)(3) provides that "*[u]nless otherwise specified in this chapter*, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States." (Emphasis added.) But section 1225(b)(1) is precisely such a statute "specif[ying]" a different procedure, governing "application[s] for admission" by "aliens arriving in the United States and certain other aliens who have not been admitted or paroled." 8 U.S.C. § 1225(b)(1) (Title). Indeed, Congress knows well how to specifically provide for counsel, and it simply did not do so here.[12]

Plaintiffs resort to the INA's provision providing a statutory right to counsel at no expense to the government in "'[i]n any removal proceedings before an immigration judge.'" Mot. 40 (quoting 8 U.S.C. § 1362). Plaintiffs, citing no authority, suggest that "[i]mmigration judge review of a negative credible fear finding ... is clearly a 'removal proceeding before an immigration judge.'" *Id*. But section 1362 applies only to "removal proceedings," a specific type of proceeding governed by 8 U.S.C. § 1229a. *See* 8 U.S.C. § 1229a (Title, "Removal proceedings"). Expedited

---

[12] Other provisions explicitly provide a right to representation at no cost to the government. 8 U.S.C. § 1228(b)(4)(B) (aggravated felons in administrative proceedings), 1229a(1)(E (normal proceedings)). Section 1225(b)(1) does not.

removal proceedings are not such proceedings, so the fact that an immigration judge may review a credible fear determination is irrelevant. Indeed, section 1225(b)(1)(B)(iv)'s "consult" provision expressly governs "the [credible fear] interview *or any review thereof*," (emphasis added), *i.e.* "immigration judge review of a negative credible fear finding." Mot. 40.  The contrary "cases cited by [Plaintiffs, Mot. 41,] involve aliens in more formal removal proceedings, where the regulations provide a right of counsel, as compared to expedited removal proceedings, where they do not," *Barajas-Alvarado*, 655 F.3d at 1088, and so this argument fails.

### III.   The Other Preliminary Injunction Factors Foreclose Issuing an Injunction.

A preliminary injunction would irreparably harm the United States and the public. It is always in the public interest to protect the country's borders and enforce its immigration laws. *See Landon*, 459 U.S. at 34. An injunction would inflict profound harm on the government, and specifically, the allocation of "limited government resources" to deal with "increasing number of aliens ... apprehended within the United States." 84 Fed. Reg. at 3541. An injunction would thus frustrate the Government's ability to "use more effectively and efficiently its limited resources" "in light of the ongoing crisis at the southern border, the large number of aliens who entered illegally and were apprehended and detained within the interior of the United States, and DHS's insufficient detention capacity." *Id.* Moreover, an injunction would inflict serious harm on the government because it would "take[] off the table one of the few congressionally authorized measures available" to remove the thousands of aliens arriving in this country illegally and absconding into the interior on a daily basis. *See Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). The public interest factor also weighs against granting Plaintiffs' motion, as the public interest "favors the efficient administration of the immigration laws at the border," *id.*, and an injunction would frustrate the "public interest in effective measures to prevent the entry of

illegal aliens" at the Nation's borders. *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981).

Against this, "the basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). The "failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The D.C. Circuit "has set a high standard for irreparable injury. First, the injury must be both certain and great; it must be actual and not theoretical." *Id.* "The moving party must show" that the "injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* "Second, the injury must be beyond remediation,"; "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough." *Id.* Rather, Plaintiffs must show alleged injury is "certain and great" and must "substantiat[e]" that showing with evidence.[13] *Wis. Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). The vague, generalized averments Plaintiffs offer fall well-short of this exacting standard.

Plaintiffs primarily contend that some unidentified cohort of their "members" "could" at some future date, "be placed in expedited removal." Mot. 41-42. But these vague speculations premised on subjective, amorphous fears that some unidentified member *could* be subject to the immigration laws of this country *if* the Executive decides to enforce the statute as to them at some *unknown* time in the *future* fails to show irreparable harm. *See England*, 454 F.3d at 298. "Such an injury is far too speculative to warrant preliminary injunctive relief .... [T]he hypothetical nature of their tangible injury ... underscores the absence in this proceeding of any discrete injury that is of such imminence that equitable relief is urgently necessary." *Id.*; *see Bill Barret Corp. v. U.S.*

---

[13] The showing required for irreparable harm is substantially higher than for Article III injury. *See, e.g.*, *Friends of Animals v. United States Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 65 (D.D.C. 2017)

*DOI*, 601 F. Supp. 2d 331, 336 (D.D.C. 2009) (no harm "in the absence of ... evidence at this stage establishing that the harm BBC alleges is *likely* to occur"); *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) ("claim of imminent irreparable harm is, at best, remote and speculative" and amounts to "basically predicting that many of their claims for reimbursement for PMDs will be denied.").[14] Given the shortcomings of their declarations, Plaintiffs' harm claims reduce to an assertion that the statute *might* be applied to any alien *potentially* subject to it in the *future*, but given Plaintiffs' failure to identify a single actual member by name who can assert imminent harms, that claim impermissibly relies on alleged harm to third parties, *East Bay*, 909 F.3d at 1240, rather than actual harms to *themselves*. Plaintiffs' vague allusion to unspecified "ICE enforcement activities," Mot. 42, is even more dubious, and amounts to asking this Court to make an irreparable harm finding based on conduct not even at issue in this lawsuit.

Plaintiffs' also impermissibly conflate harm to their members, who again, are not parties in this lawsuit, with harms to the organizations *themselves*. As to the organizations, the sole harm alleged is an assertion that they are being "depriv[ed] of a procedural protection to which [they are] entitled" under the APA. Mot. 43. But the loss of an opportunity to comment is not sufficient. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Plaintiffs, suggest otherwise (Mot. 43), but they fail to acknowledge law in this Circuit that provides that a putative procedural violation does not produce irreparable injury because the violation has already occurred and can "be remedied by a decision on the merits" (by requiring the agency to re-do the decision using the proper procedures). *See Elk Assoc. Funding Corp. v. U.S. Small Bus. Admin*., 858 F. Supp. 2d 1, 31 (D.D.C. 2012). Thus, "irreparable injury cannot stand on procedural violation alone." *Am. Ass'n*

---

[14] Plaintiffs make no effort to identify the individuals who "could," Mot. 41-42, in the future be affected by the Notice. *See* Austin Decl., ¶¶ 12-14; Valdez-Cox Decl. ¶¶ 11-13. This buttresses the conclusion that no irreparable harm would ensue if the motion is denied, as Plaintiffs have not even availed themselves of mechanisms—such as filing under seal to safeguard identities—to substantiate their claims of harm. *See AILA*, 18 F. Supp. 2d at 51 (rejecting harm allegations where organizations "point[ed] to no identifiable member or members for which the Court can evaluate the harm").

*for Homecare v. Leavitt*, 2008 WL 2580217, *5 (D.D.C. June 30, 2008). And even if credited, those administrative inconveniences do not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), including the "efficient administration of the immigration laws at the border," *Innovation Law Lab*, 924 F.3d at 510.

## IV.    Any Interim Relief Must Be Sharply Limited.

Even if Plaintiffs were entitled to any relief, because Plaintiffs invoke associational standing only, it would need to be strictly limited to individual aliens who are members of the organizations currently in expedited removal and actually identified by plaintiffs in this suit.

First, Article III and equitable principles require that relief be no broader than necessary to redress the Plaintiffs' injuries. Under Article III, "[a] plaintiff's remedy must be tailored to redress the *plaintiff's* particular injury," *Gill*, 138 S. Ct. at 1934 (emphasis added), and the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the *plaintiffs*." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (emphasis added). Plaintiffs bear the burden off showing that something short of the nationwide injunction they seek will not fully redress their particular injuries, given that it is their burden to demonstrate their entitlement to an injunction, *see Winter v. NRDC*, 555 U.S. 7, 20 (2008). They cannot make that showing because an injunction as to aliens actually in expedited removal proceedings who Plaintiffs identify as dues paying members would provide them full interim relief.

Second, the INA itself prohibits the injunction Plaintiffs seek. Section 1252(e)(1) provides that "no court may—(A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection." As to section 1252(e)(3),

the sole remedy authorized is a "determination[]" on the *merits* of "whether [section 1225(b)], or any regulation issued to implement such section, is constitutional" or "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General [or Secretary] to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law."

Section 1252(e)(3), however, does not provide for any *interim* relief premised on such a determination. Instead, the only authority for such relief is found at section 1252(f), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions part IV of this subchapter [*i.e.* 8 U.S.C. §§ 1221-32] other than with respect to the *application of such provisions to an individual alien against whom proceedings under such part have been initiated*." (Emphasis added). The proposed injunction runs afoul of this prohibition because it would enjoin "operation" of section 1225(b)(1)(A)(iii)(I), which confers on the Secretary the authority to "modif[y]" expedited removal designations "at any time," and therefore authorized the Secretary to apply section 1225(b)(1)(A) to any alien subject to it. The injunction Plaintiffs' seek would enjoin application of section 1225(b)(1)(A) as written to every alien who is currently (or in the future will be) present for more than 14 days and less than two years. But just as Congress authorized litigation "by, and only by, aliens against whom the new procedures had been applied," *AILA*, 199 F.3d at 1360, it also only authorized preliminary relief as to "alien[s] against whom proceedings under *such part* have been initiated," meaning aliens who are placed in expedited removal proceedings under the Notice. 8 U.S.C. § 1252(f)(1).

## CONCLUSION

For these reasons, the Court should deny the motion for a preliminary injunction.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

WILLIAM C. PEACHEY
Director

By: /s/ *Erez Reuveni*
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov

KATHRYNE GRAY
ARCHITH RAMKUMAR
Trial Attorneys

Dated: August 28, 2019              *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2019, I electronically filed the foregoing document with the Clerk of the Court for the United States Court District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Erez Reuveni*
EREZ REUVENI
Assistant Director
United States Department of Justice
Civil Division