**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
Make the Road New York, *et al.*,                   )
                                                    )
            Plaintiffs,                             )
                                                    )
v.                                                  )        Civil Action No. 1:19-cv-02369-KBJ
                                                    )
Kevin McAleenan, *et al.*,                          )
                                                    )
            Defendants.                             )
_____)


**<u>ADMINISTRATIVE RECORD</u>**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Make the Road New York, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:19-cv-02369-KBJ |
| Kevin McAleenan, *et al.*, | ) | |
| Defendants. | ) | |

## CERTIFIED INDEX TO ADMINISTRATIVE RECORD

| **DOCUMENT** | **PAGE** |
|---|---|
| 1. Implementing the President's Border Security and Immigration Enforcement Improvement Policies | 00001 |
| 2. Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) | 00014 |
| 3. Executive Office for Immigration Review, Pending Cases as of May 30, 2019 | 00034 |
| 4. Executive Office for Immigration Review, Adjudication Statistics: Pending Cases (Apr. 23, 2019) | 00035 |
| 5. United States Citizenship & Immigration Services, Credible Fear and Reasonable Fear Statistics and Nationality Report: Fiscal Year 2018, 4th Quarter, July 1- Sept. 30, 2018 (Nov. 16, 2018) | 00036 |
| 6. United States Citizenship & Immigration Services, Credible Fear Workload Report Summary: January 2019 (Feb. 22, 2019) | 00040 |
| 7. Executive Office for Immigration Review, Adjudication Statistics: Total Asylum Applications (Apr. 23, 2019) | 00044 |
| 8. Department of Homeland Security, Migrant Protection Protocols (Jan. 24, 2019) | 00045 |

| | | |
|---|---|---|
| 9. | Department of Homeland Security, Border Security Metrics Report (May 1, 2018) | 00050 |
| 10. | U.S. Customs and Border Protection, Enforcement Actions Southwest Border Total: Apprehensions and Inadmissible Aliens by Country of Citizenship (FY17–FY19 TD May) | 00118 |
| 11. | United States Citizenship & Immigration Services, Credible Fear & Reasonable Fear Workload: FY06–FY13 Q1 (May 16, 2013) | 00119 |
| 12. | Executive Office for Immigration Review, Adjudication Statistics: Asylum Decision & Filing Rates in Cases Originating with a Credible Fear Claim (Apr. 12, 2019) | 00120 |
| 13. | European Union, Convention Determining the State Responsible for Examining Applications for Asylum Lodged in one of the Member States of the European Communities (Dublin Convention) (June 15, 1990), Official Journal C 254, p.0001-0012 (Aug. 19, 1997) | 00121 |
| 14. | Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769 (Jan. 17, 2017) | 00137 |
| 15. | Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) | 00140 |
| 16. | Executive Office for Immigration Review, Adjudication Statistics: "Family Unit" Data for Select Courts (June 17, 2019) | 00145 |
| 17. | Exec. Order 13767, 82 FR 8793 (Jan. 25, 2017) | 00146 |
| 18. | Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017) | 00151 |
| 19. | Department of Homeland Security, Southwest Border Encounters of Non-Mexican Aliens by Month and Year FY2013–FY2019Q2 | 00155 |
| 20. | U.S. Customs & Border Protection, Southwest Border Enforcement Actions: March Official Reporting (Apr. 1, 2019) | 00157 |
| 21. | U.S. Customs & Border Protection, Southwest Border Total Apprehensions & Inadmissible Aliens FY19 April–September Planning Profile (Apr. 10, 2019) | 00159 |
| 22. | Department of Homeland Security, OTM Caravan Breakdown in Mexico (Apr. 22, 2019) | 00168 |

| 23. | U.S. Customs & Border Protection, Southwest Border Apprehensions by Sector: Fiscal Year 2019 (July 10, 2019) | 00169 |
|---|---|---|
| 24. | U.S.-Mexico Joint Declaration (June 7, 2019) | 00178 |
| 25. | Proposed Interdiction of Haitian Flag Vessels, 5 Op. O.L.C. 242, 244-45 (1981) | 00180 |
| 26. | Stipulated Settlement Agreement, *Flores v. Reno*, No. 85-cv-4544 (C.D. Cal. Jan. 17, 1997) | 00188 |
| 27. | Medecins Sans Frontieres, Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis (May 2017) | 00226 |
| 28. | Remarks by President Trump on the Illegal Immigration Crisis and Border Security, Nov. 1, 2018 | 00258 |
| 29. | Asylum and Withholding of Deportation Procedures, 55 FR 30674 (July 27, 1990) | 00267 |
| 30. | New Rules Regarding Procedures for Asylum and Withholding of Removal, 63 FR 31945 (June 11, 1998) | 00282 |
| 31. | Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999) | 00288 |
| 32. | Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 10620 (Mar. 8, 2004) | 00307 |
| 33. | USBP Nationwide APPs by Time in US FY16 | 00315 |
| 34. | USBP Nationwide APPs MEX OTMs by Sector Disposition FY16 | 00316 |
| 35. | Case Processing Times before EOIR in OCCs – Detained (Sept. 5, 2018) | 00319 |
| 36. | Case Processing Times before EOIR in OCCs – Non-Detained (July 9, 2019) | 00323 |
| 37. | Case Processing Times before EOIR in OCCs – Detained (July 9, 2019) | 00326 |
| 38. | Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 444 (Jan. 3, 1997) | 00330 |

| | | |
|---|---|---|
| 39. | Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 10312 (Mar. 6, 1997) | 00404 |
| 40. | Advance Notice of Expansion of Expedited Removal to Certain Criminal Aliens Held in Federal, State, and Local Jails, 64 FR 51338 (Sept. 22, 1999) | 00488 |
| 41. | Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 FR 68924 (Nov. 13, 2002) | 00491 |
| 42. | Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4771 (Jan. 17, 2017) | 00495 |
| 43. | Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures; Correction, 62 FR 15362 (Apr. 1, 1997) | 00498 |
| 44. | Immigration and Naturalization Service and Executive Office for Immigration Review; Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings, Asylum Procedures; Correction, 62 FR 17048 (Apr. 9, 1997) | 00500 |
| 45. | Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 8353 (Jan. 25, 2017) | 00501 |
| 46. | Eliminating the Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 8431 (Jan. 25, 2017) | 00502 |
| 47. | U.S. Department of Homeland Security, FY 2019 Budget in Brief | 00503 |
| 48. | Department of Homeland Security, Fiscal Year 2019 Congressional Justification, Overview and Performance Report | 00612 |
| 49. | Department of Homeland Security, Office of the Secretary and Executive Management, Operations and Support Fiscal Year 2019 Congressional Justification | 00744 |
| 50. | Department of Homeland Security, Management Directorate Budget Overview, Fiscal Year 2019 Congressional Justification | 00854 |
| 51. | Department of Homeland Security, U.S. Customs and Border Protection Budget Overview, Fiscal Year 2019 Congressional Justification | 01177 |

| 52. | Department of Homeland Security, U.S. Immigration and Customs Enforcement Budget Overview, Fiscal Year 2019 Congressional Justification | 01737 |
|---|---|---|
| 53. | Department of Homeland Security, United States Citizenship and Immigration Services Budget Overview, Fiscal Year 2019 Congressional Justification | 02000 |
| 54. | U.S. Department of Homeland Security, FY 2020 Budget in Brief | 02169 |
| 55. | U.S. Department of Homeland Security, FY 2018-2020 Annual Performance Report | 02262 |
| 56. | Department of Homeland Security, Office of the Secretary and Executive Management, Budget Overview, Fiscal Year 2020 Congressional Justification | 02420 |
| 57. | Department of Homeland Security, Management Directorate, Budget Overview, Fiscal Year 2020 Congressional Justification | 02512 |
| 58. | Department of Homeland Security, U.S. Customs and Border Protection, Budget Overview, Fiscal Year 2020 Congressional Justification | 02819 |
| 59. | Department of Homeland Security, U.S. Immigration and Customs Enforcement, Budget Overview, Fiscal Year 2020 Congressional Justification | 03365 |
| 60. | Department of Homeland Security, United States Citizenship and Immigration Services, Budget Overview, Fiscal Year 2020 Congressional Justification | 03635 |
| 61. | Conference Report, FY 19 Appropriations Act | 03814 |
| 62. | Public Law 116-26 | 04983 |
| 63. | Department of Homeland Security, Credible Fear Case Data FY 2007 to FY 2016 | 04993 |
| 64. | USCIS, Office of Refugee, Asylum, & Int'l Operations, Asylum Div., Asylum Division Officer Training Course, Lesson Plan on Credible Fear of Persecution and Torture Determinations (Feb. 13, 2017) | 04996 |
| 65. | U.S. Border Patrol, Southwest Border Sectors, Total Illegal Alien Apprehensions by Fiscal Year from 1960 to 2017 | 05043 |
| 66. | Executive Office for Immigration Review, Statistics Yearbook, Fiscal Year 2017 | 05044 |

| | | |
|---|---|---|
| 67. | U.S. Border Patrol, Total Illegal Alien Apprehensions by Fiscal Year, FY 2000 to FY 2017 | 05089 |
| 68. | U.S. Customs and Border Protection, Southwest Border Migration FY 2017 | 05092 |
| 69. | U.S. Citizenship and Immigration Services, Asylum Division, Summary of Credible Fear Claims, May 28, 2018 to Aug. 17, 2018 | 05094 |
| 70. | U.S. Customs and Border Protection, Southwest Border Migration FY 2018 | 05095 |
| 71. | Department of Homeland Security, FY 2017 and FY 2018 Q1-Q3 Southwest Border Apprehensions: Outcomes as of FY2018Q3 | 05097 |
| 72. | Executive Office for Immigration Review, Adjudication Statistics FY 2009 to FY 2018 | 05100 |
| 73. | Department of Homeland Security, Secretary's Weekly Immigration Briefing, Oct. 24, 2018 | 05101 |
| 74. | Department of Homeland Security, Senior Leadership Daily Immigration Report, Oct. 25, 2018 | 05126 |
| 75. | Executive Office for Immigration Review, Credible Fear and Reasonable Fear Case Completions by Decision and Nationality Oct. 1, 2017 to Sept. 30, 2018 | 05127 |
| 76. | Executive Office for Immigration Review, Adjudication Statistics, Rates of Asylum filings in Cases Originating with a Credible Fear Claim FY 2008 – FY 2018 | 05132 |
| 77. | Department of Homeland Security, U.S. Border Patrol, Southwest Border Apprehension Outcomes FY 2018 Q1 – Q3 | 05133 |
| 78. | Department of Homeland Security, U.S. Border Patrol, Southwest Border Cohort Outcomes FY 2018 Q1 – Q3 | 05134 |
| 79. | Department of Homeland Security, U.S. Border Patrol, Southwest Border Cohort Outcomes FY 2017 | 05135 |
| 80. | Department of Homeland Security, Senior Leadership Daily Immigration Report, Oct. 30, 2018 | 05136 |
| 81. | U.S. Customs and Border Protection, Southwest Border Migration FY 2019 | 05137 |
| 82. | Department of Homeland Security, Secretary's Weekly Immigration Briefing, Oct. 31, 2018 | 05139 |

| | | |
|---|---|---|
| 83. | U.S. Citizenship and Immigration Services, Asylum Division, Summary of Credible Fear Claims, Date of Data Run: Oct. 31, 2018 | 05162 |
| 84. | U.S. Customs and Border Protection, Aliens Subject to Expedited Removal and Reinstatement of Removal, FY 2006 to Q3 of FY 2018 | 05174 |
| 85. | Department of Homeland Security, Senior Leadership Daily Immigration Report, Nov. 3, 2018 | 05182 |
| 86. | Department of Homeland Security, Expedited Removal and Reinstatement Referrals by arresting agency and country, FY 2006 – FY 2018 | 05183 |
| 87. | Executive Office for Immigration Review, Credible Fear Origin Data, Date of Data Run: Nov. 4, 2018 | 05186 |
| 88. | *Northern Triangle Migrant Flow Study: Final Report, Chapter 8*, National Center for Risk and Economic Analysis of Terrorism Events University of Southern California (Sept. 30, 2018) | 05191 |
| 89. | U.S. Department of Homeland Security FY19 Transfer and Reprogramming Notifications, June 28, 2019 | 05202 |
| 90. | [INTENTIONALLY LEFT BLANK] | 05237 |
| 91. | U.S. Border Patrol Apprehension Statistics, FY 2017 to FY 2018 | 05252 |
| 92. | U.S. Department of Justice FY 2019 Budget Request At a Glance | 05258 |
| 93. | U.S. Department of Justice, Executive Office of Immigration Review FY 2019 Congressional Budget Submission | 05264 |
| 94. | U.S. Department of Justice FY 2020 Budget Request At a Glance | 05293 |
| 95. | U.S. Department of Justice, Executive Office of Immigration Review FY 2020 Congressional Budget Submission | 05301 |
| 96. | ER Encounters with EOIR Hearing Processing Dispositions and No Entry Dates by Admission Code (run date Apr. 1, 2019) | 05331 |
| 97. | [INTENTIONALLY LEFT BLANK] | 05337 |
| 98. | Historical ERO Admin Arrests, FY2010 – FY2019 YTD ERO Administrative Arrests by Fiscal Year (run date July 15, 2019) | 05355 |
| 99. | Immigrant Enforcement Actions: 2006 | 05357 |
| 100. | Immigrant Enforcement Actions: 2007 | 05362 |

| 101. | Immigrant Enforcement Actions: 2008 | 05366 |
|------|-------------------------------------|-------|
| 102. | Immigrant Enforcement Actions: 2009 | 05370 |
| 103. | Memorandum for Field Office Directors, Deputy Field Office Directors, Assistant Field Office directors from Thomas Homan, Executive Associate Director regarding Further Guidance Regarding the Processing and Referral of Aliens Detained in ICE Custody During the Expedited Removal, Reinstatement of Removal, or Administrative Removal Process Who are Seeking Relief or Protection (Dec. 20, 2016) | 05374 |
| 104. | Executive Order 13768 (Jan. 25, 2017) | 05380 |
| 105. | Matthew Seedorff, Federal court documents reveal a human smuggling case under investigation in San Antonio, Fox San Antonio (Dec. 21, 2018) | 05385 |
| 106. | Stephen Dinan, Feds Rescue 67 illegal immigrants from 'deplorable' stash house in New Mexico, Washington Times (Feb. 28, 2019) | 05389 |
| 107. | Memorandum for Special Agents in Charge, Field Office Directors, and Chief Counsels from Julie L. Myers, Assistant Secretary regarding Guidance Relating to INA § 235(c): Removal of Aliens on Security and Related Grounds (Mar. 14, 2007) | 05400 |
| 108. | ICE Directive 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (issued: Dec. 8, 2009; effective: Jan. 4, 2010) | 05402 |
| 109. | ICE Policy # 10009.1, Strategic Use of Expedited Removal Authority (Apr. 5, 2011) | 05412 |
| 110. | Memorandum for Chief Counsel form William J. Howard, Principal Legal Advisor regarding Expansion of Expedited Removal For Border Apprehensions (Aug. 16, 2004) | 05414 |
| 111. | Memorandum from Office of the Executive Associate Commissioner, Field Operations to Regional Directors, District Directors, Border Patrol Sector Chiefs, Officers in Charge (Including SPCs), Asylum Office Directors re Detained Aliens Subject to Expedited Removal (Mar. 31, 1997) | 05416 |
| 112. | Memorandum for Assistant Directors, Field Office directors, Deputy Field Office Directors from John P. Torres, Director regarding Expedited Removal for Salvadoran Nationals (Jan. 22, 2007) | 05418 |
| 113. | Memorandum for Regional Directors regarding Detention Guidelines Effective October 9, 1998 from Michael A. Pearson, Executive Associate Commissioner (Oct. 7, 1998) | 05423 |

114.    Memorandum from Office of Field Operations to Regional Directors,      05435
        District Directors, Asylum Office Directors regarding Expedited Removal:
        Additional Policy Guidance (Dec. 30, 1997)

115.    Memorandum from Victor X. Cerda, Acting Director, to All Field Office    05439
        Directors regarding Expedited Removal Guidance (Sept. 14, 2004)

116.    Enforcement and Removal Operations WRD data regarding average length    05454
        of stay FY 2017 – FY 2019YTD

117.    Enforcement and Removal Operations WRD data and Statistics regarding    05455
        National Docket Summary as of June 29, 2019

118.    Aliens Apprehended by Program and Border Patrol Sector and             05456
        Investigations by Special Agent in Charge (SAC) Jurisdiction: Fiscal Years
        2002 to 2011

119.    Executive Office for Immigration Review, Office of Planning, Analysis,   05462
        and Technology, EOIR Pending Cases as of May 31, 2019

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Make the Road New York, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-02369-KBJ |
| | ) | |
| Kevin McAleenan, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATION OF ADMINISTRATIVE RECORD

My name is Christina Bobb. I am employed with the U.S. Department of Homeland Security ("DHS"), as the Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communication intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security and maintains official Department records. I have held this position since May 2018, including on July 23, 2019, when the Department of Homeland Security issued the Notice entitled, "Designating Aliens for Expedited Removal," 84 Fed. Reg. 35409 (July 23, 2019).

I am the custodian of the signed notice at DHS and of a copy of the administrative record for the Notice for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index was developed by the personnel who developed the Notice and contains all non-

privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered in issuing the Notice.

Executed this 28th day of August, 2019 in Washington, D.C.

_____
Christina Bobb
Executive Secretary



Secretary
U.S Department of Homeland Security
Washington, DC 20528

February 20, 2017

MEMORANDUM FOR:     Kevin McAleenan
                    Acting Commissioner
                    U.S. Customs and Border Protection

                    Thomas D. Homan
                    Acting Director
                    U.S. Immigration and Customs Enforcement

                    Lori Scialabba
                    Acting Director
                    U.S. Citizenship and Immigration Services

                    Joseph B. Maher
                    Acting General Counsel

                    Dimple Shah
                    Acting Assistant Secretary for International Affairs

                    Chip Fulghum
                    Acting Undersecretary for Management

FROM:               John Kelly
                    Secretary

SUBJECT:            **Implementing the President's Border Security and
                    Immigration Enforcement Improvements Policies**

    This memorandum implements the Executive Order entitled "Border Security and Immigration Enforcement Improvements," issued by the President on January 25, 2017, which establishes the President's policy regarding effective border security and immigration enforcement through faithful execution of the laws of the United States. It implements new policies designed to stem illegal immigration and facilitate the detection, apprehension, detention, and removal of aliens who have no lawful basis to enter or remain in the United States. It constitutes guidance to all Department personnel, and supersedes all existing conflicting policy, directives, memoranda, and other guidance regarding this subject matter-to the extent of the conflict-except as otherwise expressly stated in this memorandum.

## A. Policies Regarding the Apprehension and Detention of Aliens Described in Section 235 of the Immigration and Nationality Act.

The President has determined that the lawful detention of aliens arriving in the United States and deemed inadmissible or otherwise described in section 235(b) of the Immigration and Nationality Act (INA) pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders. Detention also prevents such aliens from committing crimes while at large in the United States, ensures that aliens will appear for their removal proceedings, and substantially increases the likelihood that aliens lawfully ordered removed will be removed.

These policies are consistent with INA provisions that mandate detention of such aliens and allow me or my designee to exercise discretionary parole authority pursuant to section 212(d)(S) of the INA only on a case-by-case basis, and only for urgent humanitarian reasons or significant public benefit. Policies that facilitate the release of removable aliens apprehended at and between the ports of entry, which allow them to abscond and fail to appear at their removal hearings, undermine the border security mission. Such policies, collectively referred to as "catch-and-release," shall end.

Accordingly, effective upon my determination of (1) the establishment and deployment of a joint plan with the Department of Justice to surge the deployment of immigration judges and asylum officers to interview and adjudicate claims asserted by recent border entrants; and, (2) the establishment of appropriate processing and detention facilities, U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) personnel should only release from detention an alien detained pursuant to section 235(b) of the INA, who was apprehended or encountered after illegally entering or attempting to illegally enter the United States, in the following situations on a case-by-case basis, to the extent consistent with applicable statutes and regulations:

1. When removing the alien from the United States pursuant to statute or regulation;

2. When the alien obtains an order granting relief or protection from removal or the Department of Homeland Security (OHS) determines that the individual is a U.S. citizen, national of the United States, or an alien who is a lawful permanent resident, refugee, asylee, holds temporary protected status, or holds a valid immigration status in the United States;

3. When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director consents to the alien's withdrawal of an application for admission, and the alien contemporaneously departs from the United States;

4. When required to do so by statute, or to comply with a binding settlement agreement or order issued by a competent judicial or administrative authority;

2

5.   When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director authorizes the alien's parole pursuant to section 212(d)(5) of the INA with the written concurrence of the Deputy Director of ICE or the Deputy Commissioner of CBP, except in exigent circumstances such as medical emergencies where seeking prior approval is not practicable. In those exceptional instances, any such parole will be reported to the Deputy Director or Deputy Commissioner as expeditiously as possible; or

6.   When an arriving alien processed under the expedited removal provisions of section 235(b) has been found to have established a "credible fear" of persecution or torture by an asylum officer or an immigration judge, provided that such an alien affirmatively establishes to the satisfaction of an ICE immigration officer his or her identity, that he or she presents neither a security risk nor a risk of absconding, and provided that he or she agrees to comply with any additional conditions of release imposed by ICE to ensure public safety and appearance at any removal hearings.

To the extent current regulations are inconsistent with this guidance, components will develop or revise regulations as appropriate. Until such regulations are revised or removed, Department officials shall continue to operate according to regulations currently in place.

As the Department works to expand detention capabilities, detention of all such individuals may not be immediately possible, and detention resources should be prioritized based upon potential danger and risk of flight if an individual alien is not detained, and parole determinations will be made in accordance with current regulations and guidance. *See* 8 C.F.R. §§ 212.5, 235.3. This guidance does not prohibit the return of an alien who is arriving on land to the foreign territory contiguous to the United States from which the alien is arriving pending a removal proceeding under section 240 of the INA consistent with the direction of an ICE Field Office Director, ICE Special Agent-in-Charge, CBP Chief Patrol Agent, or CBP Director of Field Operations.

## B. Hiring More CBP Agents/Officers

CBP has insufficient agents/officers to effectively detect, track, and apprehend all aliens illegally entering the United States. The United States needs additional agents and officers to ensure complete operational control of the border. Accordingly, the Commissioner of CBP shall-while ensuring consistency in training and standards-immediately begin the process of hiring 5,000 additional Border Patrol agents, as well as 500 Air & Marine Agents/Officers, subject to the availability of resources, and take all actions necessary to ensure that such agents/officers enter on duty and are assigned to appropriate duty stations, including providing for the attendant resources and additional personnel necessary to support such agents, as soon as practicable.

Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for

3

Management, Chief Financial Officer, and Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### C.  Identifying and Quantifying Sources of Aid to Mexico

The President has directed the heads of all executive departments to identify and quantify all sources of direct and indirect Federal aid or assistance to the Government of Mexico. Accordingly, the Under Secretary for Management shall identify all sources of direct or indirect aid and assistance, excluding intelligence activities, from every departmental component to the Government of Mexico on an annual basis, for the last five fiscal years, and quantify such aid or assistance. The Under Secretary for Management shall submit a report to me reflecting historic levels of such aid or assistance provided annually within 30 days of the date of this memorandum.

### D.  Expansion of the 287(g) Program in the Border Region

Section 287(g) of the INA authorizes me to enter into a written agreement with a state or political subdivision thereof, for the purpose of authorizing qualified officers or employees of the state or subdivision to perform the functions of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States. This grant of authority, known as the 287(g) Program, has been a highly successful force multiplier that authorizes state or local law enforcement personnel to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, transport and conduct searches of an alien for the purposes of enforcing the immigration laws. From January 2006 through September 2015, the 287(g) Program led to the identification of more than 402,000 removable aliens, primarily through encounters at local jails.

Empowering state and local law enforcement agencies to assist in the enforcement of federal immigration law is critical to an effective enforcement strategy. Aliens who engage in criminal conduct are priorities for arrest and removal and will often be encountered by state and local law enforcement officers during the course of their routine duties. It is in the interest of the Department to partner with those state and local jurisdictions through 287(g) agreements to assist in the arrest and removal of criminal aliens.

To maximize participation by state and local jurisdictions in the enforcement of federal immigration law near the southern border, I am directing the Director of ICE and the Commissioner of CBP to engage immediately with all willing and qualified law enforcement jurisdictions that meet all program requirements for the purpose of entering into agreements under 287(g) of the INA.

The Commissioner of CBP and the Director of ICE should consider the operational functions and capabilities of the jurisdictions willing to enter into 287(g) agreements and structure such agreements in a manner that employs the most effective enforcement model for that jurisdiction, including the jail enforcement model, task force officer model, or joint jail enforcement-task force officer model. In furtherance of my direction herein, the Commissioner of

AR00004

CBP is authorized, in addition to the Director of ICE, to accept state services and take other actions as appropriate to carry out immigration enforcement pursuant to 287(g).

### E.  Commissioning a Comprehensive Study of Border Security

The Under Secretary for Management, in consultation with the Commissioner of CBP, Joint Task Force (Border), and Commandant of the Coast Guard, is directed to commission an immediate, comprehensive study of the security of the southern border (air, land and maritime) to identify vulnerabilities and provide recommendations to enhance border security. The study should include all aspects of the current border security environment, including the availability of federal and state resources to develop and implement an effective border security strategy that will achieve complete operational control of the border.

### F.  Border Wall Construction and Funding

A wall along the southern border is necessary to deter and prevent the illegal entry of aliens and is a critical component of the President's overall border security strategy. Congress has authorized the construction of physical barriers and roads at the border to prevent illegal immigration in several statutory provisions, including section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, 8 U.S.C. § 1103 note.

Consistent with the President's Executive Order, the will of Congress and the need to secure the border in the national interest, CBP, in consultation with the appropriate executive departments and agencies, and nongovernmental entities having relevant expertise-and using materials originating in the United States to the maximum extent permitted by law-shall immediately begin planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, along the land border with Mexico in accordance with existing law, in the most appropriate locations and utilizing appropriate materials and technology to most effectively achieve operational control of the border.

The Under Secretary for Management, in consultation with the Commissioner of CBP shall immediately identify and allocate all sources of available funding for the planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, and develop requirements for total ownership cost of this project, including preparing Congressional budget requests for the current fiscal year (e.g., supplemental budget requests) and subsequent fiscal years.

### G.  Expanding Expedited Removal Pursuant to Section 235(b)(l)(A)(iii)(I) of the INA

It is in the national interest to detain and expeditiously remove from the United States aliens apprehended at the border, who have been ordered removed after consideration and denial of their claims for relief or protection. Pursuant to section 235(b)(1)(A)(i) of the INA, if an immigration officer determines that an arriving alien is inadmissible to the United States under

AR00005

section 212(a)(6)(C) or section 212(a)(7) of the INA, the officer shall, consistent with all applicable laws, order the alien removed from the United States without further hearing or review, unless the alien is an unaccompanied alien child as defined in 6 U.S.C. § 279(g)(2), indicates an intention to apply for asylum or a fear of persecution or torture or a fear of return to his or her country, or claims to have a valid immigration status within the United States or to be a citizen or national of the United States.

Pursuant to section 235(b)(1)(A)(iii)(I) of the INA and other provisions of law, I have been granted the authority to apply, by designation in my sole and unreviewable discretion, the expedited removal provisions in section 235(b)(1)(A)(i) and (ii) of the INA to aliens who have not been admitted or paroled into the United States, who are inadmissible to the United States under section 212(a)(6)(C) or section 212(a)(7) of the INA, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been continuously physically present in the United States for the two-year period immediately prior to the determination of their inadmissibility. To date, this authority has only been exercised to designate for application of expedited removal, aliens encountered within 100 air miles of the border and 14 days of entry, and aliens who arrived in the United States by sea other than at a port of entry.[1]

The surge of illegal immigration at the southern border has overwhelmed federal agencies and resources and has created a significant national security vulnerability to the United States. Thousands of aliens apprehended at the border, placed in removal proceedings, and released from custody have absconded and failed to appear at their removal hearings. Immigration courts are experiencing a historic backlog of removal cases, primarily proceedings under section 240 of the INA for individuals who are not currently detained.

During October 2016 and November 2016, there were 46,184 and 47,215 apprehensions, respectively, between ports of entry on our southern border. In comparison, during October 2015 and November 2015 there were 32,724 and 32,838 apprehensions, respectively, between ports of entry on our southern border. This increase of 10,000–15,000 apprehensions per month has significantly strained DHS resources.

Furthermore, according to EOIR information provided to DHS, there are more than 534,000 cases currently pending on immigration court dockets nationwide—a record high. By contrast, according to some reports, there were nearly 168,000 cases pending at the end of fiscal year (FY) 2004 when section 235(b)(1)(A)(i) was last expanded.[2] This represents an increase of more than 200% in the number of cases pending completion. The average removal case for an alien who is not detained has been pending for more than two years before an immigration judge.[3] In some immigration courts, aliens who are not detained will not have their cases heard by an

---

[1] Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002); Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004); Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902 (Jan. 17, 2017).

[2] Syracuse University, *Transactional Records Access Clearinghouse (TRAC) Data Research*; available at http://trac.syr.edu/phptools/immigration/court_backlog/.

[3] *Id.*

AR00006

immigration judge for as long as five years. This unacceptable delay affords removable aliens with no plausible claim for relief to remain unlawfully in the United States for many years.

To ensure the prompt removal of aliens apprehended soon after crossing the border illegally, the Department will publish in the *Federal Register* a new Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, which may, to the extent I determine is appropriate, depart from the limitations set forth in the designation currently in force. I direct the Commissioner of CBP and the Director of ICE to conform the use of expedited removal procedures to the designations made in this notice upon its publication.

## H. Implementing the Provisions of Section 235(b)(2)(C) of the INA to Return Aliens to Contiguous Countries

Section 235(b)(2)(C) of the INA authorizes the Department to return aliens arriving on land from a foreign territory contiguous to the United States, to the territory from which they arrived, pending a formal removal proceeding under section 240 of the INA. When aliens so apprehended do not pose a risk of a subsequent illegal entry or attempted illegal entry, returning them to the foreign contiguous territory from which they arrived, pending the outcome of removal proceedings saves the Department's detention and adjudication resources for other priority aliens.

Accordingly, subject to the requirements of section 1232, Title 8, United States Code, related to unaccompanied alien children and to the extent otherwise consistent with the law and U.S. international treaty obligations, CBP and ICE personnel shall, to the extent appropriate and reasonably practicable, return aliens described in section 235(b)(2)(A) of the INA, who are placed in removal proceedings under section 240 of the INA—and who, consistent with the guidance of an ICE Field Office Director, CBP Chief Patrol Agent, or CBP Director of Field Operations, pose no risk of recidivism—to the territory of the foreign contiguous country from which they arrived pending such removal proceedings.

To facilitate the completion of removal proceedings for aliens so returned to the contiguous country, ICE Field Office Directors, ICE Special Agents-in-Charge, CBP Chief Patrol Agent, and CBP Directors of Field Operations shall make available facilities for such aliens to appear via video teleconference. The Director of ICE and the Commissioner of CBP shall consult with the Director of EOIR to establish a functional, interoperable video teleconference system to ensure maximum capability to conduct video teleconference removal hearings for those aliens so returned to the contiguous country.

## I. Enhancing Asylum Referrals and Credible Fear Determinations Pursuant to Section 235(b)(1) of the INA

With certain exceptions, any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum. For those aliens who are subject

AR00007

to expedited removal under section 235(b) of the INA, aliens who claim a fear of return must be referred to an asylum officer to determine whether they have established a credible fear of persecution or torture.[4] To establish a credible fear of persecution, an alien must demonstrate that there is a "significant possibility" that the alien could establish eligibility for asylum, taking into account the credibility of the statements made by the alien in support of the claim and such other facts as are known to the officer.[5]

The Director of USCIS shall ensure that asylum officers conduct credible fear interviews in a manner that allows the interviewing officer to elicit all relevant information from the alien as is necessary to make a legally sufficient determination. In determining whether the alien has demonstrated a significant possibility that the alien could establish eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, the asylum officer shall consider the statements of the alien and determine the credibility of the alien's statements made in support of his or her claim and shall consider other facts known to the officer, as required by statute.[6]

The asylum officer shall make a positive credible fear finding only after the officer has considered all relevant evidence and determined, based on credible evidence, that the alien has a significant possibility of establishing eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, based on established legal authority.[7]

The Director of USCIS shall also increase the operational capacity of the Fraud Detection and National Security (FDNS) Directorate and continue to strengthen the integration of its operations to support the Field Operations, Refugee, Asylum, and International Operations, and Service Center Operations Directorate, to detect and prevent fraud in the asylum and benefits adjudication processes, and in consultation with the USCIS Office of Policy and Strategy as operationally appropriate.

The Director of USCIS, the Commissioner of CBP, and the Director of ICE shall review fraud detection, deterrence, and prevention measures throughout their respective agencies and provide me with a consolidated report within 90 days of the date of this memorandum regarding fraud vulnerabilities in the asylum and benefits adjudication processes, and propose measures to enhance fraud detection, deterrence, and prevention in these processes.

## J.  Allocation of Resources and Personnel to the Southern Border for Detention of Aliens and Adjudication of Claims

The detention of aliens apprehended at the border is critical to the effective enforcement of the immigration laws. Aliens who are released from custody pending a determination of their removability are highly likely to abscond and fail to attend their removal hearings. Moreover, the screening of credible fear claims by USCIS and adjudication of asylum claims by EOIR at

---

[4] *See* INA § 235(b)(1)(A)-(B); 8 C.F.R. §§ 235.3, 208.30.
[5] *See* INA § 235(b)(1)(B)(v).
[6] *See id.*
[7] *Id.*

8

detention facilities located at or near the point of apprehension will facilitate an expedited resolution of those claims and result in lower detention and transportation costs.

Accordingly, the Director of ICE and the Commissioner of CBP should take all necessary action and allocate all available resources to expand their detention capabilities and capacities at or near the border with Mexico to the greatest extent practicable. CBP shall focus these actions on expansion of "short-term detention" (defined as 72 hours or less under 6 U.S.C. § 211(m)) capability, and ICE will focus these actions on expansion of all other detention capabilities. CBP and ICE should also explore options for joint temporary structures that meet appropriate standards for detention given the length of stay in those facilities.

In addition, to the greatest extent practicable, the Director of USCIS is directed to increase the number of asylum officers and FDNS officers assigned to detention facilities located at or near the border with Mexico to properly and efficiently adjudicate credible fear and reasonable fear claims and to counter asylum-related fraud.

### K. Proper Use of Parole Authority Pursuant to Section 212(d)(5) of the INA

The authority to parole aliens into the United States is set forth in section 212(d)(5) of the INA, which provides that the Secretary may, in his discretion and on a case-by-case basis, temporarily parole into the United States any alien who is an applicant for admission for urgent humanitarian reasons or significant public benefit. The statutory language authorizes parole in individual cases only where, after careful consideration of the circumstances, it is necessary because of demonstrated urgent humanitarian reasons or significant public benefit. In my judgment, such authority should be exercised sparingly.

The practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration.

Therefore, the Director of USCIS, the Commissioner of CBP, and the Director of ICE shall ensure that, pending the issuance of final regulations clarifying the appropriate use of the parole power, appropriate written policy guidance and training is provided to employees within those agencies exercising parole authority, including advance parole, so that such employees are familiar with the proper exercise of parole under section 212(d)(5) of the INA and exercise such parole authority only on a case-by-case basis, consistent with the law and written policy guidance.

Notwithstanding any other provision of this memorandum, pending my further review and evaluation of the impact of operational changes to implement the Executive Order, and additional guidance on the issue by the Director of ICE, the ICE policy directive establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or

AR00009

torture shall remain in full force and effect.[8] The ICE policy directive shall be implemented in a manner consistent with its plain language. In every case, the burden to establish that his or her release would neither pose a danger to the community, nor a risk of flight remains on the individual alien, and ICE retains ultimate discretion whether it grants parole in a particular case.

### L. Proper Processing and Treatment of Unaccompanied Alien Minors Encountered at the Border

In accordance with section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (codified in part at 8 U.S.C. § 1232) and section 462 of the Homeland Security Act of 2002 (6 U.S.C. § 279), unaccompanied alien children are provided special protections to ensure that they are properly processed and receive the appropriate care and placement when they are encountered by an immigration officer. An unaccompanied alien child, as defined in section 279(g)(2), Title 6, United States Code, is an alien who has no lawful immigration status in the United States, has not attained 18 years of age; and with respect to whom, (1) there is no parent or legal guardian in the United States, or (2) no parent of legal guardian in the United States is available to provide care and physical custody.

Approximately 155,000 unaccompanied alien children have been apprehended at the southern border in the last three years. Most of these minors are from El Salvador, Honduras, and Guatemala, many of whom travel overland to the southern border with the assistance of a smuggler who is paid several thousand dollars by one or both parents, who reside illegally in the United States.

With limited exceptions, upon apprehension, CBP or ICE must promptly determine if a child meets the definition of an "unaccompanied alien child" and, if so, the child must be transferred to the custody of the Office of Refugee Resettlement within the Department of Health and Human Services (HHS) within 72 hours, absent exceptional circumstances.[9] The determination that the child is an "unaccompanied alien child" entitles the child to special protections, including placement in a suitable care facility, access to social services, removal proceedings before an immigration judge under section 240 of the INA, rather than expedited removal proceedings under section 235(b) of the INA, and initial adjudication of any asylum claim by USCIS.[10]

Approximately 60% of minors initially determined to be "unaccompanied alien children" are placed in the care of one or more parents illegally residing in the United States. However, by Department policy and practice, such minors maintained their status as "unaccompanied alien children," notwithstanding that they may no longer meet the statutory definition once they have been placed by HHS in the custody of a parent in the United States who can care for the minor. Exploitation of that policy led to abuses by many of the parents and legal guardians of those minors and has contributed to significant administrative delays in adjudications by immigration

---

[8] ICE Policy No. 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).

[9] *See* 8 U.S.C. § 1232(b)(3).

[10] *See generally* 8 U.S.C. § 1232; INA § 208(b)(3)(C).

10

AR00010

courts and USCIS.

To ensure identification of abuses and the processing of unaccompanied alien children consistent with the statutory framework and any applicable court order, the Director of USCIS, the Commissioner of CBP, and the Director of ICE are directed to develop uniform written guidance and training for all employees and contractors of those agencies regarding the proper processing of unaccompanied alien children, the timely and fair adjudication of their claims for relief from removal, and, if appropriate, their safe repatriation at the conclusion of removal proceedings. In developing such guidance and training, they shall establish standardized review procedures to confirm that alien children who are initially determined to be "unaccompanied alien child[ren]," as defined in section 279(g)(2), Title 6, United States Code, continue to fall within the statutory definition when being considered for the legal protections afforded to such children as they go through the removal process.

### M. Accountability Measures to Protect Alien Children from Exploitation and Prevent Abuses of Our Immigration Laws

Although the Department's personnel must process unaccompanied alien children pursuant to the requirements described above, we have an obligation to ensure that those who conspire to violate our immigration laws do not do so with impunity—particularly in light of the unique vulnerabilities of alien children who are smuggled or trafficked into the United States.

The parents and family members of these children, who are often illegally present in the United States, often pay smugglers several thousand dollars to bring their children into this country. Tragically, many of these children fall victim to robbery, extortion, kidnapping, sexual assault, and other crimes of violence by the smugglers and other criminal elements along the dangerous journey through Mexico to the United States. Regardless of the desires for family reunification, or conditions in other countries, the smuggling or trafficking of alien children is intolerable.

Accordingly, the Director of ICE and the Commissioner of CBP shall ensure the proper enforcement of our immigration laws against any individual who—directly or indirectly—facilitates the illegal smuggling or trafficking of an alien child into the United States. In appropriate cases, taking into account the risk of harm to the child from the specific smuggling or trafficking activity that the individual facilitated and other factors relevant to the individual's culpability and the child's welfare, proper enforcement includes (but is not limited to) placing any such individual who is a removable alien into removal proceedings, or referring the individual for criminal prosecution.

### N. Prioritizing Criminal Prosecutions for Immigration Offenses Committed at the Border

The surge of illegal immigration at the southern border has produced a significant increase in organized criminal activity in the border region. Mexican drug cartels, Central American gangs, and other violent transnational criminal organizations have established sophisticated criminal

11

enterprises on both sides of the border. The large-scale movement of Central Americans, Mexicans, and other foreign nationals into the border area has significantly strained federal agencies and resources dedicated to border security. These criminal organizations have monopolized the human trafficking, human smuggling, and drug trafficking trades in the border region.

It is in the national interest of the United States to prevent criminals and criminal organizations from destabilizing border security through the proliferation of illicit transactions and violence perpetrated by criminal organizations.

To counter this substantial and ongoing threat to the security of the southern border—including threats to our maritime border and the approaches—the Directors of the Joint Task Forces-West, -East, and -Investigations, as well as the ICE-led Border Enforcement Security Task Forces (BESTs), are directed to plan and implement enhanced counternetwork operations directed at disrupting transnational criminal organizations, focused on those involved in human smuggling. The Department will support this work through the Office of Intelligence and Analysis, CBP's National Targeting Center, and the DHS Human Smuggling Cell.

In addition, the task forces should include participants from other federal, state, and local agencies, and should target individuals and organizations whose criminal conduct undermines border security or the integrity of the immigration system, including offenses related to alien smuggling or trafficking, drug trafficking, illegal entry and reentry, visa fraud, identity theft, unlawful possession or use of official documents, and acts of violence committed against persons or property at or near the border.

In order to support the efforts of the BESTs and counter network operations of the Joint Task Forces, the Director of ICE shall increase of the number of special agents and analysts in the Northern Triangle ICE Attaché Offices and increase the number of vetted Transnational Criminal Investigative Unit international partners. This expansion of ICE's international footprint will focus both domestic and international efforts to dismantle transnational criminal organizations that are facilitating and profiting from the smuggling routes to the United States.

## O.  Public Reporting of Border Apprehensions Data

The Department has an obligation to perform its mission in a transparent and forthright manner. The public is entitled to know, with a reasonable degree of detail, information pertaining to the aliens unlawfully entering at our borders.

Therefore, consistent with law, in an effort to promote transparency and renew confidence in the Department's border security mission, the Commissioner of CBP and the Director of ICE shall develop a standardized method for public reporting of statistical data regarding aliens apprehended at or near the border for violating the immigration law. The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public in a medium that can be readily accessed.

AR00012

At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following information must be included: the number of convicted criminals and the nature of their offenses; the prevalence of gang members and prior immigration violators; the custody status of aliens and, if released, the reason for release and location of that release; and the number of aliens ordered removed and those aliens physically removed.

### P. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing this guidance, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

AR00013

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 208**

**RIN 1615–AC34**

# DEPARTMENT OF JUSTICE

## Executive Office for Immigration Review

**8 CFR Parts 1003 and 1208**

[EOIR Docket No. 18–0501; A.G. Order No. 4327–2018]

**RIN 1125–AA89**

## Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Executive Office for Immigration Review, Department of Justice.

**ACTION:** Interim final rule; request for comment.

---

**SUMMARY:** The Department of Justice and the Department of Homeland Security ("DOJ," "DHS," or, collectively, "the Departments") are adopting an interim final rule governing asylum claims in the context of aliens who are subject to, but contravene, a suspension or limitation on entry into the United States through the southern border with Mexico that is imposed by a presidential proclamation or other presidential order ("a proclamation") under section 212(f) or 215(a)(1) of the Immigration and Nationality Act ("INA"). Pursuant to statutory authority, the Departments are amending their respective existing regulations to provide that aliens subject to such a proclamation concerning the southern border, but who contravene such a proclamation by entering the United States after the effective date of such a proclamation, are ineligible for asylum. The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where they would be processed in a controlled, orderly, and lawful manner. This rule would apply only prospectively to a proclamation issued after the effective date of this rule. It would not apply to a proclamation that specifically includes an exception for aliens applying for asylum, nor would it apply to aliens subject to a waiver or exception provided by the proclamation. DHS is amending its regulations to specify a screening

process for aliens who are subject to this specific bar to asylum eligibility. DOJ is amending its regulations with respect to such aliens. The regulations would ensure that aliens in this category who establish a reasonable fear of persecution or torture could seek withholding of removal under the INA or protection from removal under regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").

**DATES:**

*Effective date:* This rule is effective November 9, 2018.

*Submission of public comments:* Written or electronic comments must be submitted on or before January 8, 2019. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern standard time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 18–0501, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 18–0501 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:** Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule;

explain the reason for any recommended change; and include data, information, or authority that supports the recommended change.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 18–0501. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information of which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information of which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in the public docket file of DOJ's Executive Office of Immigration Review ("EOIR"), but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

## II. Purpose of This Interim Final Rule

This interim final rule ("interim rule" or "rule") governs eligibility for asylum and screening procedures for aliens subject to a presidential proclamation or order restricting entry issued pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), or section 215(a)(1) of the INA, 8 U.S.C. 1185(a)(1), that concerns entry to the United States along the southern border with Mexico and is issued on or after the effective date of this rule. Pursuant to statutory authority, the interim rule renders such aliens ineligible for asylum if they enter the United States after the effective date of

such a proclamation, become subject to the proclamation, and enter the United States in violation of the suspension or limitation of entry established by the proclamation. The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where such aliens could seek to enter and would be processed in an orderly and controlled manner. Aliens who enter prior to the effective date of an applicable proclamation will not be subject to this asylum eligibility bar unless they depart and reenter while the proclamation remains in effect. Aliens also will not be subject to this eligibility bar if they fall within an exception or waiver within the proclamation that makes the suspension or limitation of entry in the proclamation inapplicable to them, or if the proclamation provides that it does not affect eligibility for asylum.

As discussed further below, asylum is a discretionary immigration benefit. In general, aliens may apply for asylum if they are physically present or arrive in the United States, irrespective of their status and irrespective of whether or not they arrive at a port of entry, as provided in section 208(a) of the INA, 8 U.S.C. 1158(a). Congress, however, provided that certain categories of aliens could not receive asylum and further delegated to the Attorney General and the Secretary of Homeland Security ("Secretary") the authority to promulgate regulations establishing additional bars on eligibility that are consistent with the asylum statute and "any other conditions or limitations on the consideration of an application for asylum" that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B).

In the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, Congress, concerned with rampant delays in proceedings to remove illegal aliens, created expedited procedures for removing inadmissible aliens, and authorized the extension of such procedures to aliens who entered illegally and were apprehended within two years of their entry. *See generally* INA 235(b), 8 U.S.C. 1225(b). Those procedures were aimed at facilitating the swift removal of inadmissible aliens, including those who had entered illegally, while also expeditiously resolving any asylum claims. For instance, Congress provided that any alien who asserted a fear of persecution would appear before an asylum officer, and that any alien who is determined to

have established a "credible fear"— meaning a "significant possibility . . . that the alien could establish eligibility for asylum" under the asylum statute— would be detained for further consideration of an asylum claim. *See* INA 235(b)(1), (b)(1)(B)(v), 8 U.S.C. 1225(b)(1), (b)(1)(B)(v).

When the expedited procedures were first implemented approximately two decades ago, relatively few aliens within those proceedings asserted an intent to apply for asylum or a fear of persecution. Rather, most aliens found inadmissible at the southern border were single adults who were immediately repatriated to Mexico. Thus, while the overall number of illegal aliens apprehended was far higher than it is today (around 1.6 million in 2000), aliens could be processed and removed more quickly, without requiring detention or lengthy court proceedings.

In recent years, the United States has seen a large increase in the number and proportion of inadmissible aliens subject to expedited removal who assert an intent to apply for asylum or a fear of persecution during that process and are subsequently placed into removal proceedings in immigration court. Most of those aliens unlawfully enter the country between ports of entry along the southern border. Over the past decade, the overall percentage of aliens subject to expedited removal and referred, as part of the initial screening process, for a credible-fear interview jumped from approximately 5% to above 40%, and the total number of credible-fear referrals for interviews increased from about 5,000 a year in Fiscal Year ("FY") 2008 to about 97,000 in FY 2018. Furthermore, the percentage of cases in which asylum officers found that the alien had established a credible fear— leading to the alien's placement in full immigration proceedings under section 240 of the INA, 8 U.S.C. 1229a—has also increased in recent years. In FY 2008, when asylum officers resolved a referred case with a credible-fear determination, they made a positive finding about 77% of the time. That percentage rose to 80% by FY 2014. In FY 2018, that percentage of positive credible-fear determinations has climbed to about 89% of all cases. After this initial screening process, however, significant proportions of aliens who receive a positive credible-fear determination never file an application for asylum or are ordered removed in absentia. In FY 2018, a total of about 6,000 aliens who passed through credible-fear screening (17% of all completed cases, 27% of all completed cases in which an asylum application was filed, and about 36% of

cases where the asylum claim was adjudicated on the merits) established that they should be granted asylum.

Apprehending and processing this growing number of aliens who cross illegally into the United States and invoke asylum procedures thus consumes an ever increasing amount of resources of DHS, which must surveil, apprehend, and process the aliens who enter the country. Congress has also required DHS to detain all aliens during the pendency of their credible-fear proceedings, which can take days or weeks. And DOJ must also dedicate substantial resources: Its immigration judges adjudicate aliens' claims, and its officials are responsible for prosecuting and maintaining custody over those who violate the criminal law. The strains on the Departments are particularly acute with respect to the rising numbers of family units, who generally cannot be detained if they are found to have a credible fear, due to a combination of resource constraints and the manner in which the terms of the Settlement Agreement in *Flores* v. *Reno* have been interpreted by courts. *See* Stipulated Settlement Agreement, *Flores* v. *Reno,* No. 85–cv–4544 (N.D. Cal. Jan. 17, 1997).

In recent weeks, United States officials have each day encountered an average of approximately 2,000 inadmissible aliens at the southern border. At the same time, large caravans of thousands of aliens, primarily from Central America, are attempting to make their way to the United States, with the apparent intent of seeking asylum after entering the United States unlawfully or without proper documentation. Central American nationals represent a majority of aliens who enter the United States unlawfully, and are also disproportionately likely to choose to enter illegally between ports of entry rather than presenting themselves at a port of entry. As discussed below, aliens who enter unlawfully between ports of entry along the southern border, as opposed to at a port of entry, pose a greater strain on DHS's already stretched detention and processing resources and also engage in conduct that seriously endangers themselves, any children traveling with them, and the U.S. Customs and Border Protection ("CBP") agents who seek to apprehend them.

The United States has been engaged in sustained diplomatic negotiations with Mexico and the Northern Triangle countries (Honduras, El Salvador, and Guatemala) regarding the situation on the southern border, but those negotiations have, to date, proved

unable to meaningfully improve the situation.

The purpose of this rule is to limit aliens' eligibility for asylum if they enter in contravention of a proclamation suspending or restricting their entry along the southern border. Such aliens would contravene a measure that the President has determined to be in the national interest. For instance, a proclamation restricting the entry of inadmissible aliens who enter unlawfully between ports of entry would reflect a determination that this particular category of aliens necessitates a response that would supplement existing prohibitions on entry for all inadmissible aliens. Such a proclamation would encourage such aliens to seek admission and indicate an intention to apply for asylum at ports of entry. Aliens who enter in violation of that proclamation would not be eligible for asylum. They would, however, remain eligible for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), or for protections under the regulations issued under the authority of the implementing legislation regarding Article 3 of the CAT.

The Departments anticipate that a large number of aliens who would be subject to a proclamation-based ineligibility bar would be subject to expedited-removal proceedings. Accordingly, this rule ensures that asylum officers and immigration judges account for such aliens' ineligibility for asylum within the expedited-removal process, so that aliens subject to such a bar will be processed swiftly. Furthermore, the rule continues to afford protection from removal for individuals who establish that they are more likely than not to be persecuted or tortured in the country of removal. Aliens rendered ineligible for asylum by this interim rule and who are referred for an interview in the expedited-removal process are still eligible to seek withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), or protections under the regulations issued under the authority of the implementing legislation regarding Article 3 of the CAT. Such aliens could pursue such claims in proceedings before an immigration judge under section 240 of the INA, 8 U.S.C. 1229a, if they establish a reasonable fear of persecution or torture.

## III. Background

### A. Joint Interim Rule

The Attorney General and the Secretary of Homeland Security publish this joint interim rule pursuant to their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002, Public Law 107–296, as amended, transferred many functions related to the execution of federal immigration law to the newly created Department of Homeland Security. The Homeland Security Act of 2002 charges the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the INA, *id.* 1103(a)(3). The Homeland Security Act of 2002 also transferred to DHS some responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). Those authorities have been delegated to U.S. Citizenship and Immigration Services ("USCIS"). USCIS asylum officers determine in the first instance whether an alien's affirmative asylum application should be granted. *See* 8 CFR 208.9.

But the Homeland Security Act of 2002 retained authority over certain individual immigration adjudications (including those related to defensive asylum applications) in DOJ, under the Executive Office for Immigration Review ("EOIR") and subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Thus, immigration judges within DOJ continue to adjudicate all asylum applications made by aliens during the removal process (defensive asylum applications), and they also review affirmative asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 8 U.S.C. 1101(b)(4); 8 CFR 1208.2; *Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA" or "Board"), also within DOJ, in turn hears appeals from immigration judges' decisions. 8 CFR 1003.1. In addition, the INA provides "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this interim rule.

### B. Legal Framework for Asylum

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that precludes an alien from being subject to removal, creates a path to lawful permanent resident status and citizenship, and affords a variety of other benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R–S–C* v. *Sessions,* 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.,* INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed and can travel abroad with prior consent); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for naturalization of lawful permanent residents). Aliens who are granted asylum are authorized to work in the United States and may receive certain financial assistance from the federal government. *See* INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2); 8 U.S.C. 1612(a)(2)(A), (b)(2)(A); 8 U.S.C. 1613(b)(1); 8 CFR 274a.12(a)(5); *see also* 8 CFR 274a.12(c)(8) (providing that asylum applicants may seek employment authorization 150 days after filing a complete application for asylum).

Aliens applying for asylum must establish that they meet the definition of a "refugee," that they are not subject to a bar to the granting of asylum, and that they merit a favorable exercise of discretion. INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A); *see Moncrieffe* v. *Holder,* 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal"); *Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum."). Because asylum is a discretionary form of relief from removal, the alien bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise discretion to grant relief. *See* INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A); *Romulus* v. *Ashcroft,* 385 F.3d 1, 8 (1st Cir. 2004).

Section 208 of the INA provides that, in order to apply for asylum, an applicant must be "physically present" or "arriv[e]" in the United States, "whether or not at a designated port of arrival" and "irrespective of such alien's status"—but the applicant must also "apply for asylum in accordance with" the rest of section 208 or with the expedited-removal process in section 235 of the INA. INA 208(a)(1), 8 U.S.C. 1158(a)(1). Furthermore, to be granted asylum, the alien must demonstrate that he or she meets the statutory definition

of a ''refugee,'' INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A), and is not subject to an exception or bar, INA 208(b)(2), 8 U.S.C. 1158(b)(2). The alien bears the burden of proof to establish that he or she meets these criteria. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); 8 CFR 1240.8(d).

For an alien to establish that he or she is a ''refugee,'' the alien generally must be someone who is outside of his or her country of nationality and ''is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'' INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A).

In addition, if evidence indicates that one or more of the grounds for mandatory denial may apply, an alien must show that he or she does not fit within one of the statutory bars to granting asylum and is not subject to any ''additional limitations and conditions . . . under which an alien shall be ineligible for asylum'' established by a regulation that is ''consistent with'' section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); see 8 CFR 1240.8(d). The INA currently bars a grant of asylum to any alien: (1) Who ''ordered, incited, assisted, or otherwise participated in the persecution of any person on account of'' a protected ground; (2) who, ''having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States''; (3) for whom there are serious reasons to believe the alien ''has committed a serious nonpolitical crime outside the United States'' prior to arrival in the United States; (4) for whom ''there are reasonable grounds for regarding the alien as a danger to the security of the United States''; (5) who is described in the terrorism-related inadmissibility grounds, with limited exceptions; or (6) who ''was firmly resettled in another country prior to arriving in the United States.'' INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi).

An alien who falls within any of those bars is subject to mandatory denial of asylum. Where there is evidence that ''one or more of the grounds for mandatory denial of the application for relief may apply,'' the applicant in immigration court proceedings bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); see also, e.g., Rendon v. Mukasey, 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); Gao v. U.S. Att'y Gen., 500 F.3d 93, 98 (2d Cir.

2007) (applying 8 CFR 1240.8(d) in the context of the persecutor bar); Chen v. U.S. Att'y Gen., 513 F.3d 1255, 1257 (11th Cir. 2008) (same).

Because asylum is a discretionary benefit, aliens who are eligible for asylum are not automatically entitled to it. After demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. See INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the ''Secretary of Homeland Security or the Attorney General may grant asylum to an alien'' who applies in accordance with the required procedures and meets the definition of a ''refugee''). The asylum statute's grant of discretion ''is a broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a 'refugee.''' Komarenko v. INS, 35 F.3d 432, 436 (9th Cir. 1994), overruled on other grounds by Abebe v. Mukasey, 554 F.3d 1203 (9th Cir. 2009) (en banc) (per curiam). Immigration judges and asylum officers exercise that delegated discretion on a case-by-case basis. Under the Board's decision in Matter of Pula, 19 I&N Dec. 467 (BIA 1987), and its progeny, ''an alien's manner of entry or attempted entry is a proper and relevant discretionary factor'' and ''circumvention of orderly refugee procedures'' can be a ''serious adverse factor'' against exercising discretion to grant asylum, id. at 473, but ''[t]he danger of persecution will outweigh all but the most egregious adverse factors,'' Matter of Kasinga, 21 I&N Dec. 357, 367 (BIA 1996).

## C. Establishing Bars to Asylum

The availability of asylum has long been qualified both by statutory bars and by administrative discretion to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum provisions, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to ''establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee'' within the meaning of the title. See 8 U.S.C. 1158(a) (1982); see also INS v. Cardoza-Fonseca, 480 U.S. 421, 427–29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to granting asylum that were modeled on the mandatory bars to eligibility for withholding of deportation under the existing section 243(h) of the INA. See Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980) (''The application will be denied if the alien does not come within the definition of refugee under the Act, is firmly resettled in a third country, or is within one of the undesirable groups described in section 243(h) of the Act, e.g., having been convicted of a serious crime, constitutes a danger to the United States.''). Those regulations required denial of an asylum application if it was determined that (1) the alien was ''not a refugee within the meaning of section 101(a)(42)'' of the INA, 8 U.S.C. 1101(a)(42); (2) the alien had been ''firmly resettled in a foreign country'' before arriving in the United States; (3) the alien ''ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion''; (4) the alien had ''been convicted by a final judgment of a particularly serious crime'' and therefore constituted ''a danger to the community of the United States''; (5) there were ''serious reasons for considering that the alien ha[d] committed a serious non-political crime outside the United States prior to the arrival of the alien in the United States''; or (6) there were ''reasonable grounds for regarding the alien as a danger to the security of the United States.'' See id. at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations while retaining the mandatory bars for aliens who persecuted others on account of a protected ground, were convicted of a particularly serious crime in the United States, firmly resettled in another country, or presented reasonable grounds to be regarded as a danger to the security of the United States. See Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30683 (July 27, 1990); see also Yang v. INS, 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); Komarenko, 35 F.3d at 436 (upholding particularly-serious-crime bar). In the Immigration Act of 1990, Public Law 101–649, Congress added an additional mandatory bar to applying for or being granted asylum for ''[a]n[y] alien who has been convicted of an aggravated felony.'' Public Law 101–649, sec. 515.

In IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended the asylum provisions in section 208 of the INA, 8 U.S.C. 1158. Among other amendments, Congress created three exceptions to section 208(a)(1)'s provision that an alien may apply for asylum, for (1) aliens who can be removed to a safe third country pursuant to bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604(a); *see* INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C).

Congress also adopted six mandatory exceptions to the authority of the Attorney General or Secretary to grant asylum that largely reflect pre-existing bars set forth in the Attorney General's asylum regulations. These exceptions cover (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others on account of a protected ground; (2) aliens convicted of a "particularly serious crime"; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States"; (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who have "firmly resettled in another country prior to arriving in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." Public Law 104–208, div. C, sec. 604(a); *see* INA 201(a)(43), 8 U.S.C. 1101(a)(43).

Although Congress enacted specific exceptions, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two of those exceptions—the bars for "particularly serious crimes" and "serious nonpolitical offenses." While Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime" that "constitutes a danger to the community of the United States." INA 208(b)(2)(A)(ii), (B)(ii). Courts and the Board have long held that this grant of authority also authorizes the Board to

identify additional particularly serious crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Ali* v. *Achim,* 468 F.3d 462, 468–69 (7th Cir. 2006); *Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii). Although these provisions continue to refer only to the Attorney General, the Departments interpret these provisions to also apply to the Secretary of Homeland Security by operation of the Homeland Security Act of 2002. *See* 6 U.S.C. 552; 8 U.S.C. 1103(a)(1).

Congress further provided the Attorney General with the authority, by regulation, to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum under paragraph (1)." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As the Tenth Circuit has recognized, "the statute clearly empowers" the Attorney General to "adopt[] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. By allowing the imposition by regulation of "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The additional limitations on eligibility must be established "by regulation," and must be "consistent with" the rest of section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C).

Thus, the Attorney General in the past has invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within the alien's country of nationality or of last habitual residence. *See* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000). The courts have also viewed section 208(b)(2)(C) as conferring broad discretion, including to render aliens ineligible for asylum based on fraud. *See R–S–C,* 869 F.3d at 1187; *Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

Section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), also establishes certain procedures for consideration of asylum applications. But Congress specified that the Attorney General "may provide

by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B).

In sum, the current statutory framework leaves the Attorney General (and, after the Homeland Security Act, the Secretary) significant discretion to adopt additional bars to asylum eligibility. Beyond providing discretion to further define particularly serious crimes and serious nonpolitical offenses, Congress has provided the Attorney General and Secretary with discretion to establish by regulation any additional limitations or conditions on eligibility for asylum or on the consideration of applications for asylum, so long as these limitations are consistent with the asylum statute.

## D. Other Forms of Protection

Aliens who are not eligible to apply for or be granted asylum, or who are denied asylum on the basis of the Attorney General's or the Secretary's discretion, may nonetheless qualify for protection from removal under other provisions of the immigration laws. A defensive application for asylum that is submitted by an alien in removal proceedings is also deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 208.30(e)(2)–(4), 1208.3(b), 1208.16(a). An immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations issued pursuant to the authority of the implementing legislation regarding Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, div. G, sec. 2242(b); 8 CFR 1208.3(b); *see also* 8 CFR 1208.16–1208.17.

These forms of protection bar an alien's removal to any country where the alien would "more likely than not" face persecution or torture, meaning that the alien would face a clear probability that his or her life or freedom would be threatened on account of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2); *see Kouljinski* v. *Keisler,* 505 F.3d 534, 544–45 (6th Cir. 2007); *Sulaiman* v. *Gonzales,* 429 F.3d 347, 351 (1st Cir. 2005). Thus, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason—for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the alien may be entitled to

statutory withholding of removal if not otherwise barred for that form of protection. INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) ("[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood."). Likewise, an alien who establishes that he or she will more likely than not face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 1208.16(c). But, unlike asylum, statutory withholding and CAT protection do not: (1) Prohibit the Government from removing the alien to a third country where the alien would not face the requisite probability of persecution or torture; (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary benefits (such as protection for derivative family members). *See R–S–C,* 869 F.3d at 1180.

*E. Implementation of Treaty Obligations*

The framework described above is consistent with current U.S. obligations under the 1967 Protocol Relating to the Status of Refugees ("Refugee Protocol"), which incorporates Articles 2 to 34 of the 1951 Convention Relating to the Status of Refugees ("Refugee Convention"), as well as U.S. obligations under Article 3 of the CAT. Neither the Refugee Protocol nor the CAT is self-executing in the United States. *See Khan* v. *Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ('[T]he [Refugee] Protocol is not self-executing."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT "was not self-executing"). These treaties are not directly enforceable in U.S. law, but some of the obligations they contain have been implemented through domestic implementing legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture— through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, not through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41; Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, div. G, sec. 2242(b); 8 CFR 208.16(c), 208.17– 208.18; 1208.16(c), 1208.17–1208.18. Limitations on the availability of asylum that do not affect the statutory withholding of removal or protection under the CAT regulations are consistent with these provisions. *See R– S–C,* 869 F.3d at 1188 & n.11; *Cazun* v. *Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Limitations on eligibility for asylum are also consistent with Article 34 of the Refugee Convention, concerning assimilation of refugees, as implemented by section 208 of the INA, 8 U.S.C. 1158. Section 208 of the INA reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S at 441; *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n. 16; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *R–S–C,* 869 F.3d at 1188; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has long recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation.

Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention. *Cazun,* 856 F.3d at 257 & n.16; *Mejia,* 866 F.3d at 588. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing the issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for statutory withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188.

**IV. Regulatory Changes**

*A. Limitation on Eligibility for Asylum for Aliens Who Contravene a Presidential Proclamation Under Section 212(f) or 215(a)(1) of the INA Concerning the Southern Border*

Pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments are revising 8 CFR 208.13(c) and 8 CFR 1208.13(c) to add a new mandatory bar on eligibility for asylum for certain aliens who are subject to a presidential proclamation suspending or imposing limitations on their entry into the United States pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), or section 215(a)(1) of the INA, 8 U.S.C. 1185(a)(1), and who enter the United States in contravention of such a proclamation after the effective date of this rule. The bar would be subject to several further limitations: (1) The bar would apply only prospectively, to aliens who enter the United States after the effective date of such a proclamation; (2) the proclamation must concern entry at the southern border; and (3) the bar on asylum eligibility would not apply if the proclamation expressly disclaims affecting asylum eligibility for aliens within its scope, or expressly provides for a waiver or exception that entitles the alien to relief from the limitation on entry imposed by the proclamation.

The President has both statutory and inherent constitutional authority to suspend the entry of aliens into the United States when it is in the national interest. *See United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty" that derives from "legislative power" and also "is inherent in the executive power to control the foreign affairs of the nation."); *see also Proposed Interdiction of Haitian Flag Vessels,* 5 Op. O.L.C. 242, 244–45 (1981) ("[T]he sovereignty of the Nation, which is the basis of our ability to exclude all aliens, is lodged in both political branches of the government," and even without congressional action, the President may "act[ ] to protect the United States from massive illegal immigration.").

Congress, in the INA, has expressly vested the President with broad authority to restrict the ability of aliens to enter the United States. Section 212(f) states: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. 1182(f). "By its plain language, [8 U.S.C.] § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States," including the authority "to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA." *Trump* v. *Hawaii,* 138 S. Ct. 2392, 2408 – 12 (2018). For instance, the Supreme Court considered it "perfectly clear that 8 U.S.C. 1182(f) . . . grants the President ample power to establish a naval blockade that would simply deny illegal Haitian immigrants the ability to disembark on our shores," thereby preventing them from entering

the United States and applying for asylum. *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 187 (1993).

The President's broad authority under section 212(f) is buttressed by section 215(a)(1), which states it shall be unlawful "for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. 1185(a)(1). The presidential orders that the Supreme Court upheld in *Sale* were promulgated pursuant to both sections 212(f) and 215(a)(1)—*see* 509 U.S. at 172 & n.27; *see also* Exec. Order 12807 (May 24, 1992) ("Interdiction of Illegal Aliens"); Exec. Order 12324 (Sept. 29, 1981) ("Interdiction of Illegal Aliens") (revoked and replaced by Exec. Order 12807)—as was the proclamation upheld in *Trump* v. *Hawaii, see* 138 S. Ct. at 2405. Other presidential orders have solely cited section 215(a)(1) as authority. *See, e.g.,* Exec. Order 12172 (Nov. 26, 1979) ("Delegation of Authority With Respect to Entry of Certain Aliens Into the United States") (invoking section 215(a)(1) with respect to certain Iranian visa holders).

An alien whose entry is suspended or limited by a proclamation is one whom the President has determined should not enter the United States, or only should do so under certain conditions. Such an order authorizes measures designed to prevent such aliens from arriving in the United States as a result of the President's determination that it would be against the national interest for them to do so. For example, the proclamation and order that the Supreme Court upheld in *Sale,* Proc. 4865 (Sept. 29, 1981) ("High Seas Interdiction of Illegal Aliens"); Exec. Order 12324, directed the Coast Guard to interdict the boats of tens of thousands of migrants fleeing Haiti to prevent them from reaching U.S. shores, where they could make claims for asylum. The order further authorized the Coast Guard to intercept any vessel believed to be transporting undocumented aliens to the United States, "[t]o make inquiries of those on board, examine documents, and take such actions as are necessary to carry out this order," and "[t]o return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws." Exec. Order 12807, sec. 2(c).

An alien whose entry is suspended or restricted under such a proclamation, but who nonetheless reaches U.S. soil contrary to the President's

determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws. For instance, an alien subject to a proclamation who nevertheless entered the country in contravention of its terms generally would be placed in expedited-removal proceedings under section 235 of the INA, 8 U.S.C. 1225, and those proceedings would allow the alien to raise any claims for protection before being removed from the United States, if appropriate. Furthermore, the asylum statute provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival)," and "irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C.] 1225(b)." INA 208(a)(1), 8 U.S.C. 1158(a)(1). Some past proclamations have accordingly made clear that aliens subject to an entry bar may still apply for asylum if they have nonetheless entered the United States. *See, e.g.,* Proc. 9645, sec. 6(e) (Sept. 24, 2017) ("Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats") ("Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.").

As noted above, however, the asylum statute also authorizes the Attorney General and Secretary "by regulation" to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum," INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C), and to set conditions or limitations on the consideration of an application for asylum, INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). The Attorney General and the Secretary have determined that this authority should be exercised to render ineligible for a grant of asylum any alien who is subject to a proclamation suspending or restricting entry along the southern border with Mexico, but who nonetheless enters the United States after such a proclamation goes into effect. Such an alien would have engaged in actions that undermine a particularized determination in a proclamation that the President judged as being required by the national interest: That the alien should not enter the United States.

The basis for ineligibility in these circumstances would be the Departments' conclusion that aliens

who contravene such proclamations should not be eligible for asylum. Such proclamations generally reflect sensitive determinations regarding foreign relations and national security that Congress recognized should be entrusted to the President. *See Trump* v. *Hawaii,* 138 S. Ct. at 2411. Aliens who contravene such a measure have not merely violated the immigration laws, but have also undercut the efficacy of a measure adopted by the President based upon his determination of the national interest in matters that could have significant implications for the foreign affairs of the United States. For instance, previous proclamations were directed solely at Haitian migrants, nearly all of whom were already inadmissible by virtue of other provisions of the INA, but the proclamation suspended entry and authorized further measures to ensure that such migrants did not enter the United States contrary to the President's determination. *See, e.g.,* Proc. 4865; Exec. Order 12807.

In the case of the southern border, a proclamation that suspended the entry of aliens who crossed between the ports of entry would address a pressing national problem concerning the immigration system and our foreign relations with neighboring countries. Even if most of those aliens would already be inadmissible under our laws, the proclamation would impose limitations on entry for the period of the suspension against a particular class of aliens defined by the President. That judgment would reflect a determination that certain illegal entrants—namely, those crossing between the ports of entry on the southern border during the duration of the proclamation—were a source of particular concern to the national interest. Furthermore, such a proclamation could authorize additional measures to prevent the entry of such inadmissible aliens, again reflecting the national concern with this subset of inadmissible aliens. The interim final rule reflects the Departments' judgment that, under the extraordinary circumstances presented here, aliens crossing the southern border in contravention of such a proclamation should not be eligible for a grant of asylum during the period of suspension or limitation on entry. The result would be to channel to ports of entry aliens who seek to enter the United States and assert an intention to apply for asylum or a fear of persecution, and to provide for consideration of those statements there.

Significantly, this bar to eligibility for a grant of asylum would be limited in scope. This bar would apply only prospectively. This bar would further

apply only to a proclamation concerning entry along the southern border, because this interim rule reflects the need to facilitate urgent action to address current conditions at that border. This bar would not apply to any proclamation that expressly disclaimed an effect on eligibility for asylum. And this bar would not affect an applicant who is granted a waiver or is excepted from the suspension under the relevant proclamation, or an alien who did not at any time enter the United States after the effective date of such proclamation.

Aliens who enter in contravention of a proclamation will not, however, overcome the eligibility bar merely because a proclamation has subsequently ceased to have effect. The alien still would have entered notwithstanding a proclamation at the time the alien entered the United States, which would result in ineligibility for asylum (but not for statutory withholding or for CAT protection). Retaining eligibility for asylum for aliens who entered the United States in contravention of the proclamation, but evaded detection until it had ceased, could encourage aliens to take riskier measures to evade detection between ports of entry, and would continue to stretch government resources dedicated to apprehension efforts.

This restriction on eligibility to asylum is consistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). The regulation establishes a condition on asylum eligibility, not on the ability to apply for asylum. *Compare* INA 208(a), 8 U.S.C. 1158(a) (describing conditions for applying for asylum), *with* INA 208(b), 8 U.S.C. 1158(b) (identifying exceptions and bars to granting asylum). And, as applied to a proclamation that suspends the entry of aliens who crossed between the ports of entry at the southern border, the restriction would not preclude an alien physically present in the United States from being granted asylum if the alien arrives in the United States through any border other than the southern land border with Mexico or at any time other than during the pendency of a proclamation suspending or limiting entry.

*B. Screening Procedures in Expedited Removal for Aliens Subject to Proclamations*

The rule would also modify certain aspects of the process for screening claims for protection asserted by aliens who have entered in contravention of a proclamation and who are subject to expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1). Under current procedures, aliens who unlawfully enter

the United States may avoid being removed on an expedited basis by making a threshold showing of a credible fear of persecution at a initial screening interview. At present, those aliens are often released into the interior of the United States pending adjudication of such claims by an immigration court in section 240 proceedings especially if those aliens travel as family units. Once an alien is released, adjudications can take months or years to complete because of the increasing volume of claims and the need to expedite cases in which aliens have been detained. The Departments expect that a substantial proportion of aliens subject to an entry proclamation concerning the southern border would be subject to expedited removal, since approximately 234,534 aliens in FY 2018 who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings.[1] The procedural changes within expedited removal would be confined to aliens who are ineligible for asylum because they are subject to a regulatory bar for contravening an entry proclamation.

1. Under existing law, expedited-removal procedures—streamlined procedures for expeditiously reviewing claims and removing certain aliens— apply to those individuals who arrive at a port of entry or those who have entered illegally and are encountered by an immigration officer within 100 miles of the border and within 14 days of entering. *See* INA 235(b), 8 U.S.C. 1225(b); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004). To be subject to expedited removal, an alien must also be inadmissible under INA 212(a)(6)(C) or (a)(7), 8 U.S.C. 1182(a)(6)(C) or (a)(7), meaning that the alien has either tried to procure documentation through misrepresentation or lacks such documentation altogether. Thus, an alien encountered in the interior of the United States who entered in contravention of a proclamation and who is not otherwise amenable to expedited removal would be placed in proceedings under section 240 of the INA. The interim rule does not invite comment on existing regulations implementing the present scope of expedited removal.

Section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), prescribes procedures in the expedited-removal context for screening an alien's eligibility for asylum. When these provisions were being debated in 1996, legislators expressed particular concern that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative," and that "[t]he asylum system has been abused by those who seek to use it as a means of 'backdoor' immigration." *See* H.R. Rep. No. 104–469, pt. 1, at 107 (1996). Members of Congress accordingly described the purpose of expedited removal and related procedures as "streamlin[ing] rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States." *Id.* at 157; *see Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 41 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (DC Cir. 2000) (rejecting several constitutional challenges to IIRIRA and describing the expedited-removal process as a "summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation").

Congress thus provided that aliens "inadmissible under [8 U.S.C.] 1182(a)(6)(C) or 1182(a)(7)" shall be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); *see* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii) (such aliens shall be referred "for an interview by an asylum officer"). On its face, the statute refers only to proceedings to establish eligibility for an affirmative grant of asylum and its attendant benefits, not to statutory withholding of removal or CAT protection against removal to a particular country.

An alien referred for a credible-fear interview must demonstrate a "credible fear," defined as a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. 1158]." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). According to the House report, "[t]he credible-fear standard [wa]s designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process." H.R. Rep. No. 104–69, at 158.

---

[1] As noted below, in FY 2018, approximately 171,511 aliens entered illegally between ports of entry, were apprehended by CBP, and were placed in expedited removal. Approximately 59,921 inadmissible aliens arrived at ports of entry and were placed in expedited removal. Furthermore, ICE arrested some 3,102 aliens and placed them in expedited removal.

If the asylum officer determines that the alien lacks a credible fear, then the alien may request review by an immigration judge. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). If the immigration judge concurs with the asylum officer's negative credible-fear determination, then the alien shall be removed from the United States without further review by either the Board or the courts. INA 235(b)(1)(B)(iii)(I), (b)(1)(C), 8 U.S.C. 1225(b)(1)(B)(iii)(I), (b)(1)(C); INA 242(a)(2)(A)(iii), (e)(5), 8 U.S.C. 1252(a)(2)(A)(iii), (e)(5); *Pena* v. *Lynch,* 815 F.3d 452, 457 (9th Cir. 2016). By contrast, if the asylum officer or immigration judge determines that the alien has a credible fear—*i.e.,* "a significant possibility . . . that the alien could establish eligibility for asylum," INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)—then the alien, under current regulations, is placed in section 240 proceedings for a full hearing before an immigration judge, with appeal available to the Board and review in the federal courts of appeals, *see* INA 235(b)(1)(B)(ii), (b)(2)(A), 8 U.S.C. 1225(b)(1)(B)(ii), (b)(2)(A); INA 242(a), 8 U.S.C. 1252(a); 8 CFR 208.30(e)(5), 1003.1. The interim rule does not invite comment on existing regulations implementing this framework.

By contrast, section 235 of the INA is silent regarding procedures for the granting of statutory withholding of removal and CAT protection; indeed, section 235 predates the legislation directing implementation of U.S. obligations under Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b) (requiring implementation of CAT); IIRIRA, Public Law 104–208, sec. 302 (revising section 235 of the INA to include procedures for dealing with inadmissible aliens who intend to apply for asylum). The legal standards for ultimately granting asylum on the merits versus statutory withholding or CAT protection are also different. Asylum requires an applicant to ultimately establish a "well-founded fear" of persecution, which has been interpreted to mean a "reasonable possibility" of persecution—a "more generous" standard than the "clear probability" of persecution or torture standard that applies to statutory withholding or CAT protection. *See INS* v. *Stevic,* 467 U.S. 407, 425, 429–30 (1984); *Santosa* v. *Mukasey,* 528 F.3d 88, 92 & n.1 (1st Cir. 2008); *compare* 8 CFR 1208.13(b)(2)(i)(B) *with* 8 CFR 1208.16(b)(2), (c)(2). As a result, applicants who establish eligibility for asylum are not necessarily eligible for statutory withholding or CAT protection.

Current regulations instruct USCIS adjudicators and immigration judges to treat an alien's request for asylum in expedited-removal proceedings under section 1225(b) as a request for statutory withholding and CAT protection as well. *See* 8 CFR 208.3(b), 208.30(e)(2)–(4), 1208.3(b), 1208.16(a). In the context of expedited-removal proceedings, "credible fear of persecution" is defined to mean a "significant possibility" that the alien "could establish eligibility for asylum under section 1158," not CAT or statutory withholding. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Regulations nevertheless have generally provided that aliens in expedited removal should be subject to the same process for considering statutory withholding of removal claims under INA 241(b)(3), 8 U.S.C. 1231(b)(3), and claims for protection under the CAT, as they are for asylum claims. *See* 8 CFR 208.30(e)(2)–(4).

Thus, when the Immigration and Naturalization Service provided for claims for statutory withholding of removal and CAT protection to be considered in the same expedited-removal proceedings as asylum, the result was that if an alien showed that there was a significant possibility of establishing eligibility for asylum and was therefore referred for removal proceedings under section 240 of the INA, any potential statutory withholding and CAT claims the alien might have were referred as well. This was done on the assumption that that it would not "disrupt[ ] the streamlined process established by Congress to circumvent meritless claims." Regulations Concerning the Convention Against Torture, 64 FR 8478, 8485 (Feb. 19, 1999). But while the INA authorizes the Attorney General and Secretary to provide for consideration of statutory withholding and CAT claims together with asylum claims or other matters that may be considered in removal proceedings, the INA does not require that approach, *see Foti* v. *INS,* 375 U.S. 217, 229–30 & n.16 (1963), or that they be considered in the same way.

Since 1999, regulations also have provided for a distinct "reasonable fear" screening process for certain aliens who are categorically ineligible for asylum and can thus make claims only for statutory withholding or CAT protections. *See* 8 CFR 208.31. Specifically, if an alien is subject to having a previous order of removal reinstated or is a non-permanent resident alien subject to an administrative order of removal resulting from an aggravated felony conviction, then he is categorically ineligible for asylum. *See id.* § 208.31(a), (e). Such an alien can be placed in withholding-only proceedings to adjudicate his statutory withholding or CAT claims, but only if he first establishes a "reasonable fear" of persecution or torture through a screening process that tracks the credible-fear process. *See id.* § 208.31(c), (e). Reasonable fear is defined by regulation to mean a "reasonable possibility that [the alien] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." *Id.* § 208.31(c). "This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard." Regulations Concerning the Convention Against Torture, 64 FR at 8485; *see also Garcia* v. *Johnson,* No. 14–CV–01775, 2014 WL 6657591, at *2 (N.D. Cal. Nov. 21, 2014) (describing the aim of the regulations as providing "fair and efficient procedures" in reasonable-fear screening that would comport with U.S. international obligations).

Significantly, when establishing the reasonable-fear screening process, DOJ explained that the two affected categories of aliens should be screened based on the higher reasonable-fear standard because, "[u]nlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum," and may be entitled only to statutory withholding of removal or CAT protection. Regulations Concerning the Convention Against Torture, 64 FR at 8485. "Because the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher." *Id.*

2. Drawing on the established framework for considering whether to grant withholding of removal or CAT protection in the reasonable-fear context, this interim rule establishes a bifurcated screening process for aliens subject to expedited removal who are ineligible for asylum by virtue of entering in contravention of a proclamation, but who express a fear of return or seek statutory withholding or CAT protection. The Attorney General and Secretary have broad authority to

implement the immigration laws, *see* INA 103, 8 U.S.C. 1103, including by establishing regulations, *see* INA 103, 8 U.S.C. 1103(a)(3), and to regulate "conditions or limitations on the consideration of an application for asylum," *id.* 1158(d)(5)(B). Furthermore, the Secretary has the authority—in her "sole and unreviewable discretion," the exercise of which may be "modified at any time"—to designate additional categories of aliens that will be subject to expedited-removal procedures, so long as the designated aliens have not been admitted or paroled nor continuously present in the United States for two years. INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii). The Departments have frequently invoked these authorities to establish or modify procedures affecting aliens in expedited-removal proceedings, as well as to adjust the categories of aliens subject to particular procedures within the expedited-removal framework.[2]

This rule does not change the credible-fear standard for asylum claims, although the regulation would expand the scope of the inquiry in the process. An alien who is subject to a relevant proclamation and nonetheless has entered the United States after the effective date of such a proclamation in contravention of that proclamation would be ineligible for asylum and would thus not be able to establish a "significant possibility . . . [of] eligibility for asylum under section 1158." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). As current USCIS guidance explains, under the credible-fear standard, "[a] claim that has no possibility, or only a minimal or mere possibility, of success, would not meet the 'significant possibility' standard." USCIS, Office of Refugee, Asylum, & Int'l Operations, Asylum Div., *Asylum Officer Basic Training Course, Lesson Plan on Credible Fear* at 15 (Feb. 13, 2017). Consistent with section 235(b)(1)(B)(iii)(III) of the INA, the alien could still obtain review from an immigration judge regarding whether the asylum officer correctly determined that the alien was subject to a limitation

or suspension on entry imposed by a proclamation. Further, consistent with section 235(b)(1)(B) of the INA, if the immigration judge reversed the asylum officer's determination, the alien could assert the asylum claim in section 240 proceedings.

Aliens determined to be ineligible for asylum by virtue of contravening a proclamation, however, would still be screened, but in a manner that reflects that their only viable claims would be for statutory withholding or CAT protection pursuant to 8 CFR 208.30(e)(2)–(4) and 1208.16(a). After determining the alien's ineligibility for asylum under the credible-fear standard, the asylum officer would apply the long-established reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. If the asylum officer determined that the alien had not established the requisite reasonable fear, the alien then could seek review of that decision from an immigration judge (just as the alien may under existing 8 CFR 208.30 and 208.31), and would be subject to removal only if the immigration judge agreed with the negative reasonable-fear finding. Conversely, if either the asylum officer or the immigration judge determined that the alien cleared the reasonable-fear threshold, the alien would be put in section 240 proceedings, just like aliens who receive a positive credible-fear determination for asylum. Employing a reasonable-fear standard in this context, for this category of ineligible aliens, would be consistent with the Department of Justice's longstanding rationale that "aliens ineligible for asylum," who could only be granted statutory withholding of removal or CAT protection, should be subject to a different screening standard that would correspond to the higher bar for actually obtaining these forms of protection. *See* Regulations Concerning the Convention Against Torture, 64 FR at 8485 ("Because the standard for showing entitlement to these forms of protection . . . is significantly higher than the standard for asylum . . . the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.").

The screening process established by the interim rule will accordingly proceed as follows. For an alien subject to expedited removal, DHS will ascertain whether the alien seeks protection, consistent with INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). All aliens seeking asylum, statutory withholding of

removal, or CAT protection will continue to go before an asylum officer for screening, consistent with INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). The asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to a proclamation entry bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.

If, however, an alien lacks a significant possibility of eligibility for asylum because of the proclamation bar, then the asylum officer will make a negative credible-fear finding. The asylum officer will then apply the reasonable-fear standard to assess the alien's claims for statutory withholding of removal or CAT protection.

An alien subject to the proclamation-based asylum bar who clears the reasonable-fear screening standard will be placed in section 240 proceedings, just as an alien who clears the credible-fear standard will be. In those proceedings, the alien will also have an opportunity to raise whether the alien was correctly identified as subject to the proclamation ineligibility bar to asylum, as well as other claims. If an immigration judge determines that the alien was incorrectly identified as subject to the proclamation, the alien will be able to apply for asylum. Such aliens can appeal the immigration judge's decision in these proceedings to the BIA and then seek review from a federal court of appeals.

Conversely, an alien who is found to be subject to the proclamation asylum bar and who does not clear the reasonable-fear screening standard can obtain review of both of those determinations before an immigration judge, just as immigration judges currently review negative credible-fear and reasonable-fear determinations. If the immigration judge finds that either determination was incorrect, then the alien will be placed into section 240 proceedings. In reviewing the determinations, the immigration judge will decide de novo whether the alien is subject to the proclamation asylum bar. If, however, the immigration judge affirms both determinations, then the alien will be subject to removal without further appeal, consistent with the existing process under section 235 of the INA. In short, aliens subject to the proclamation eligibility bar to asylum will be processed through existing procedures by DHS and EOIR in accordance with 8 CFR 208.30 and 1208.30, but will be subject to the

---

[2] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769 (Jan. 17, 2017); Designating Aliens For Expedited Removal, 69 FR 48877; Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 10620 (March 8, 2004); New Rules Regarding Procedures for Asylum and Withholding of Removal, 63 FR 31945 (June 11, 1998); Asylum Procedures, 65 FR 76121; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999).

reasonable-fear standard as part of those procedures with respect to their statutory withholding and CAT protection claims.[3]

2. The above process will not affect the process in 8 CFR 208.30(e)(5) for certain existing statutory bars to asylum eligibility. Under that regulatory provision, many aliens who appear to fall within an existing statutory bar, and thus appear to be ineligible for asylum, can nonetheless be placed in section 240 proceedings if they are otherwise eligible for asylum and obtain immigration judge review of their asylum claims, followed by further review before the BIA and the courts of appeals. Specifically, with the exceptions of stowaways and aliens entering from Canada at a port of entry (who are generally ineligible to apply for asylum by virtue of a safe-third-country agreement), 8 CFR 208.30(e)(5) provides that "if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the [INA] . . . [DHS] shall nonetheless place the alien in proceedings under section 240 of the [INA] for full consideration of the alien's claim."

The language providing that the agency "shall nonetheless place the alien in proceedings under section 240 of the [INA]" was promulgated in 2000 in a final rule implementing asylum procedures after the 1996 enactment of IIRIRA. *See Asylum Procedures*, 65 FR at 76137. The explanation for this change was that some commenters suggested that aliens should be referred to section 240 proceedings "regardless of any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the [INA]. The Department has adopted that suggestion and has so amended the regulation." *Id.* at 76129.

This rule will avoid a textual ambiguity in 8 CFR 208.30(e)(5), which is unclear regarding its scope, by adding a new sentence clarifying the process

applicable to an alien barred under a covered proclamation. *See* 8 CFR 208.30(e)(5) (referring to an alien who "appears to be subject to one or more of the mandatory bars to . . . asylum contained in section 208(a)(2) and 208(b)(2) of the [INA]"). By using a definite article ("the mandatory bars to . . . asylum") and the phrase "contained in," 8 CFR 208.30(e)(5) may refer only to aliens who are subject to the defined mandatory bars "contained in" specific parts of section 208 of the INA, such as the bar for aggravated felons, INA 208(b)(2)(B)(i), 8 U.S.C. 1558(b)(2)(B)(i), or the bar for aliens reasonably believed to be a danger to U.S. security, INA 208(b)(2)(A)(iv), 8 U.S.C. 1158(b)(2)(A)(iv). It is thus not clear whether an alien subject to a further limitation or condition on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA would also be subject to the procedures set forth in 8 CFR 208.30(e)(5). Notably, the preamble to the final rule adopting 8 CFR 208.30(e)(5) indicated that it was intended to apply to "any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the [INA]," and did not address future regulatory ineligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Asylum Procedures*, 65 FR at 76129. This rule does not resolve that question, however, but instead establishes an express regulatory provision dealing specifically with aliens subject to a limitation under section 212(f) or 215(a)(1) of the INA.

## C. Anticipated Effects of the Rule

1. The interim rule aims to address an urgent situation at the southern border. In recent years, there has been a significant increase in the number and percentage of aliens who seek admission or unlawfully enter the United States and then assert an intent to apply for asylum or a fear of persecution. The vast majority of such assertions for protection occur in the expedited-removal context, and the rates at which such aliens receive a positive credible-fear determination have increased in the last five years. Having passed through the credible-fear screening process, many of these aliens are released into the interior to await further section 240 removal proceedings. But many aliens who pass through the credible-fear screening thereafter do not pursue their claims for asylum. Moreover, a substantial number fail to appear for a section 240 proceeding. And even aliens who passed through credible-fear screening and apply for asylum are granted it at a low rate.

Recent numbers illustrate the scope and scale of the problems caused by the disconnect between the number of aliens asserting a credible fear and the number of aliens who ultimately are deemed eligible for, and granted, asylum. In FY 2018, DHS identified some 612,183 inadmissible aliens who entered the United States, of whom 404,142 entered unlawfully between ports of entry and were apprehended by CBP, and 208,041 presented themselves at ports of entry. Those numbers exclude the inadmissible aliens who crossed but evaded detection, and interior enforcement operations conducted by U.S. Immigration and Customs Enforcement ("ICE"). The vast majority of those inadmissible aliens—521,090—crossed the southern border. Approximately 98% (396,579) of all aliens apprehended after illegally crossing between ports of entry made their crossings at the southern border, and 76% of all encounters at the southern border reflect such apprehensions. By contrast, 124,511 inadmissible aliens presented themselves at ports of entry along the southern border, representing 60% of all port traffic for inadmissible aliens and 24% of encounters with inadmissible aliens at the southern border.

Nationwide, DHS has preliminarily calculated that throughout FY 2018, approximately 234,534 aliens who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings. Of that total, approximately 171,511 aliens were apprehended crossing between ports of entry; approximately 59,921 were inadmissible aliens who presented at ports of entry; and approximately 3,102 were arrested by ICE and referred to expedited removal.[4] The total number of aliens of all nationalities referred to expedited-removal proceedings has significantly increased over the last decade, from 161,516 aliens in 2008 to approximately 234,534 in FY 2018 (an overall increase of about 45%). Of those totals, the number of aliens from the Northern Triangle referred to expedited-removal proceedings has increased from 29,206 in FY 2008 (18% of the total

---

[3] Nothing about this screening process or in this interim rule would alter the existing procedures for processing alien stowaways under the INA and associated regulations. An alien stowaway is unlikely to be subject to 8 CFR 208.13(c)(3) and 1208.13(c)(3) unless a proclamation specifically applies to stowaways or to entry by vessels or aircraft. INA 101(a)(49), 8 U.S.C. 1101(a)(49). Moreover, an alien stowaway is barred from being placed into section 240 proceedings regardless of the level of fear of persecution he establishes. INA 235(a)(2), 8 U.S.C. 1225(a)(2). Similarly, despite the incorporation of a reasonable-fear standard into the evaluation of certain cases under credible-fear procedures, nothing about this screening process or in this interim rule implicates existing reasonable-fear procedures in 8 CFR 208.31 and 1208.31.

[4] All references to the number of aliens subject to expedited removal in FY 2018 reflect data for the first three quarters of the year and projections for the fourth quarter of FY 2018. It is unclear whether the ICE arrests reflect additional numbers of aliens processed at ports of entry. Another approximately 130,211 aliens were subject to reinstatement, meaning that the alien had previously been removed and then unlawfully entered the United States again. The vast majority of reinstatements involved Mexican nationals. Aliens subject to reinstatement who express a fear of persecution or torture receive reasonable-fear determinations under 8 CFR 208.31.

161,516 aliens referred) to approximately 103,752 in FY 2018 (44% of the total approximately 234,534 aliens referred, an increase of over 300%). In FY 2018, nationals of the Northern Triangle represented approximately 103,752 (44%) of the aliens referred to expedited-removal proceedings; approximately 91,235 (39%) were Mexican; and nationals from other countries made up the remaining balance (17%). As of the date of this rule, final expedited-removal statistics for FY 2018 specific to the southern border are not available. But the Departments' experience with immigration enforcement has demonstrated that the vast majority of expedited-removal actions have also occurred along the southern border.

Once in expedited removal, some 97,192 (approximately 41% of all aliens in expedited removal) were referred for a credible-fear interview with an asylum officer, either because they expressed a fear of persecution or torture or an intent to apply for protection. Of that number, 6,867 (7%) were Mexican nationals, 25,673 (26%) were Honduran, 13,433 (14%) were Salvadoran, 24,456 (25%) were Guatemalan, and other nationalities made up the remaining 28% (the largest proportion of which were 7,761 Indian nationals).

In other words: Approximately 61% of aliens from Northern Triangle countries placed in expedited removal expressed the intent to apply for asylum or a fear of persecution and triggered credible-fear proceedings in FY 2018 (approximately 69% of Hondurans, 79% of Salvadorans, and 49% of Guatemalans). These aliens represented 65% of all credible-fear referrals in FY 2018. By contrast, only 8% of aliens from Mexico trigger credible-fear proceedings when they are placed in expedited removal, and Mexicans represented 7% of all credible-fear referrals. Other nationalities compose the remaining 26,763 (28%) referred for credible-fear interviews.

Once these 97,192 aliens were interviewed by an asylum officer, 83,862 cases were decided on the merits (asylum officers closed the others).[5]

Those asylum officers found a credible fear in 89% (74,574) of decided cases—meaning that almost all of those aliens' cases were referred on for further immigration proceedings under section 240, and many of the aliens were released into the interior while awaiting those proceedings.[6] As noted, nationals of Northern Triangle countries represent the bulk of credible-fear referrals (65%, or 63,562 cases where the alien expressed an intent to apply for asylum or asserted a fear). In cases where asylum officers decided whether nationals of these countries had a credible fear, they received a positive credible-fear finding 88% of the time.[7] Moreover, when aliens from those countries sought review of negative findings by an immigration judge, they obtained reversals approximately 18% of the time, resulting in some 47,507 cases in which nationals of Northern Triangle countries received positive credible-fear determinations.[8] In other words: Aliens from Northern Triangle countries ultimately received a positive credible-fear determination 89% of the time. Some 6,867 Mexican nationals were interviewed; asylum officers gave them a positive credible-fear determination in 81% of decided cases (4,261), and immigration judges

reversed an additional 91 negative credible-fear determinations, resulting in some 4,352 cases (83% of cases decided on the merits) in which Mexican nationals were referred to section 240 proceedings after receiving a positive credible-fear determination.

These figures have enormous consequences for the asylum system writ large. Asylum officers and immigration judges devote significant resources to these screening interviews, which the INA requires to happen within a fixed statutory timeframe. These aliens must also be detained during the pendency of expedited-removal proceedings. *See* INA 235(b), 8 U.S.C. 1225(b); *Jennings* v. *Rodriguez,* 138 S. Ct. 830, 834 (2018). And assertions of credible fear in expedited removal have rapidly grown in the last decade—especially in the last five years. In FY 2008, for example, fewer than 5,000 aliens were in expedited removal (5%) and were thus referred for a credible-fear interview. In FY 2014, 51,001 referrals occurred (representing 21% of aliens in expedited removal). The credible-fear referral numbers today reflect a 190% increase from FY 2014 and a nearly 2000% increase from FY 2008. Furthermore, the percentage of cases in which asylum officers found that aliens had established a credible fear—leading to the aliens being placed in section 240 removal proceedings— has also increased in recent years. In FY 2008, asylum officers found a credible fear in about 3,200 (or 77%) of all cases. In FY 2014, asylum officers found a credible fear in about 35,000 (or 80%) of all cases in which they made a determination. And in FY 2018, asylum officers found a credible fear in nearly 89% of all such cases.

Once aliens are referred for section 240 proceedings, their cases may take months or years to adjudicate due to backlogs in the system. As of November 2, 2018, there were approximately 203,569 total cases pending in the immigration courts that originated with a credible-fear referral—or 26% of the total backlog of 791,821 removal cases. Of that number, 136,554 involved nationals of Northern Triangle countries (39,940 cases involving Hondurans; 59,702 involving Salvadoran nationals; 36,912 involving Guatemalan nationals). Another 10,736 cases involved Mexican nationals.

In FY 2018, immigration judges completed 34,158 total cases that originated with a credible-fear referral.[9]

---

[5] DHS sometimes calculates credible-fear grant rates as a proportion of all cases (positive, negative, and closed cases). Because this rule concerns the merits of the screening process and closed cases are not affected by that process, this preamble discusses the proportions of determinations on the merits when describing the credible-fear screening process. This preamble does, however, account for the fact that some proportion of closed cases are also sent to section 240 proceedings when discussing the number of cases that immigration judges completed involving aliens referred for a credible-fear interview while in expedited-removal proceedings.

[6] Stowaways are the only category of aliens who would receive a positive credible-fear determination and go to asylum-only proceedings, as opposed to section 240 proceedings, but the number of stowaways is very small. Between FY 2013 and FY 2017, an average of roughly 300 aliens per year were placed in asylum-only proceedings, and that number includes not only stowaways but all classes of aliens subject to asylum-only proceedings. 8 CFR 1208.2(c)(1) (describing 10 categories of aliens, including stowaways found to have a credible fear, who are subject to asylum-only proceedings).

[7] Asylum officers decided 53,205 of these cases on the merits and closed the remaining 10,357 (but sent many of the latter to section 240 proceedings). Specifically, 25,673 Honduran nationals were interviewed; 21,476 of those resulted in a positive screening on the merits, 2,436 received a negative finding, and 1,761 were closed—meaning that 90% of all Honduran cases involving a merits determination resulted in a positive finding, and 10% were denied. Some 13,433 Salvadoran nationals were interviewed; 11,034 of those resulted in a positive screening on the merits 1,717 were denied, and 682 were closed—meaning that 86% of all Salvadoran cases involving a merits determination resulted in a positive finding, and 14% were denied. Some 24,456 Guatemalan nationals were interviewed; 14,183 of those resulted in a positive screening on the merits, 2,359 were denied, and 7,914 were closed—meaning that 86% of all Guatemalan cases involving a merits determination resulted in a positive finding, and 14% were denied. Again, the percentages exclude closed cases so as to describe how asylum officers make decisions on the merits.

[8] Immigration judges in 2018 reversed 18% (288) of negative credible-fear determinations involving Hondurans, 19% (241) of negative credible-fear determinations involving Salvadorans, and 17% (285) of negative credible-fear determinations involving Guatemalans.

[9] All descriptions of case outcomes before immigration judges reflect initial case completions by an immigration judge during the fiscal year
Continued

Those aliens were likely referred for credible-fear screening between 2015 and 2018; the vast majority of these cases arose from positive credible-fear determinations as opposed to the subset of cases that were closed in expedited removal and referred for section 240 proceedings. In a significant proportion of these cases, the aliens did not appear for section 240 proceedings or did not file an application for asylum in connection with those proceedings. In FY 2018, of the 34,158 completions that originated with a credible-fear referral, 24,361 (71%) were completed by an immigration judge with the issuance of an order of removal. Of those completed cases, 10,534 involved in absentia removal orders, meaning that in approximately 31% of all initial completions in FY 2018 that originated from a credible-fear referral, the alien failed to appear at a hearing. Moreover, of those 10,534 cases, there were 1,981 cases where an asylum application was filed, meaning 8,553 did not file an asylum application and failed to appear at a hearing. Further, 40% of all initial completions originating with a credible-fear referral (or 13,595 cases, including the 8,553 aliens just discussed) were completed in FY 2018 without an alien filing an application for asylum. In short, in nearly half of the cases completed by an immigration judge in FY 2018 involving aliens who passed through a credible-fear referral, the alien failed to appear at a hearing or failed to file an asylum application.

Those figures are consistent with trends from FY 2008 through FY 2018, during which time DHS pursued some 354,356 cases in the immigration courts that involved aliens who had gone through a credible-fear review (i.e., the aliens received a positive credible-fear determination or their closed case was referred for further proceedings). During this period, however, only about 53% (189,127) of those aliens filed an asylum application, despite the fact that they were placed into further immigration proceedings under section 240 because they alleged a fear during expedited-removal proceedings.

Even among those aliens who received a credible-fear interview, filed for asylum, and appeared in section 240 proceedings to resolve their asylum claims—a category that would logically include the aliens with the greatest confidence in the merits of their claims—only a very small percentage received asylum. In FY 2018 immigration judges completed 34,158 cases that originated with a credible-fear referral; only 20,563 of those cases involved an application for asylum, and immigration judges granted only 5,639 aliens asylum. In other words, in FY 2018, less than about 6,000 aliens who passed through credible-fear screening (17% of all completed cases, 27% of all completed cases in which an asylum application was filed, and about 36% of cases where the asylum claim was adjudicated on the merits) established that they should be granted asylum. (An additional 322 aliens received either statutory withholding or CAT protection.) Because there may be multiple bases for denying an asylum application and immigration judges often make alternative findings for consideration of issues on appeal, EOIR does not track reasons for asylum denials by immigration judges at a granular level. Nevertheless, experience indicates that the vast majority of those asylum denials reflect a conclusion that the alien failed to establish a significant possibility of persecution, rather than the effect of a bar to asylum eligibility or a discretionary decision by an immigration judge to deny asylum to an alien who qualifies as a refugee.

The statistics for nationals of Northern Triangle countries are particularly illuminating. In FY 2018, immigration judges in section 240 proceedings adjudicated 20,784 cases involving nationals of Northern Triangle countries who were referred for credible-fear interviews and then referred to section 240 proceedings (i.e., they expressed a fear and either received a positive credible-fear determination or had their case closed and referred to section 240 proceedings for an unspecified reason). Given that those aliens asserted a fear of persecution and progressed through credible-fear screening, those aliens presumably would have had the greatest reason to then pursue an asylum application. Yet in only about 54% of those cases did the alien file an asylum application. Furthermore, about 38% of aliens from Northern Triangle countries who were referred for credible-fear interviews and passed to section 240 proceedings did not appear, and were ordered removed in absentia. Put

differently: Only a little over half of aliens from Northern Triangle countries who claimed a fear of persecution and passed threshold screening submitted an application for asylum, and over a third did not appear at section 240 proceedings.[10] And only 1,889 aliens from Northern Triangle countries were granted asylum, or approximately 9% of completed cases for aliens from Northern Triangle countries who received a credible-fear referral, 17% of the cases where such aliens filed asylum applications in their removal proceedings, and about 23% of cases where such aliens' asylum claims were adjudicated on the merits. Specifically, in FY 2018, 536 Hondurans, 408 Guatemalans, and 945 Salvadorans who initially were referred for a credible-fear interview (whether in FY 2018 or earlier) and progressed to section 240 proceedings were granted asylum.

The Departments thus believe that these numbers underscore the major costs and inefficiencies of the current asylum system. Again, numbers for Northern Triangle nationals—who represent the vast majority of aliens who claim a credible fear—illuminate the scale of the problem. Out of the 63,562 Northern Triangle nationals who expressed an intent to apply for asylum or a fear of persecution and received credible-fear screening interviews in FY 2018, 47,507 received a positive credible-fear finding from the asylum officer or immigration judge. (Another 10,357 cases were administratively closed, some of which also may have been referred to section 240 proceedings.) Those aliens will remain in the United States to await section 240 proceedings while immigration judges work through the current backlog of nearly 800,000 cases—136,554 of which involve nationals of Northern Triangle countries who passed through credible-

---

unless otherwise noted. All references to applications for asylum generally involve applications for asylum, as opposed to some other form of protection, but EOIR statistics do not distinguish between, for instance, the filing of an application for asylum or the filing of an application for statutory withholding. As noted, an application for asylum is also deemed an application for other forms of protection, and whether an application will be for asylum or only for some other form of protection is often a post-filing determination made by the immigration judge (for instance, because the one-year filing bar for asylum applies).

[10] These percentages are even higher for particular nationalities. In FY 2018, immigration judges adjudicated 7,151 cases involving Hondurans whose cases originated with a credible-fear referral in expedited-removal proceedings. Of that 7,151, only 49% (3,509) filed an application for asylum, and 44% (3,167) had their cases completed with an in absentia removal order because they failed to appear. Similarly, immigration judges adjudicated 5,382 cases involving Guatemalans whose cases originated with a credible-fear referral; only 46% (2,457) filed an asylum application, and 41% (2,218) received in absentia removal orders. The 8,251 Salvadoran cases had the highest rate of asylum applications (filed in 65% of cases, or 5,341), and 31% of the total cases (2,534) involved in absentia removal orders. Numbers for Mexican nationals reflected similar trends. In FY 2018, immigration judges adjudicated 3,307 cases involving Mexican nationals who progressed to section 240 proceedings after being referred for a credible-fear interview; 49% of them filed applications for asylum in these proceedings, and 25% of the total cases resulted in an in absentia removal order.

fear screening interviews. Immigration judges adjudicated 20,784 cases involving such nationals of Northern Triangle countries in FY 2018; slightly under half of those aliens did not file an application for asylum, and over a third were screened through expedited removal but did not appear for a section 240 proceeding. Even when nationals of Northern Triangle countries who passed through credible-fear screening applied for asylum (as 11,307 did in cases completed in FY 2018), immigration judges granted asylum to only 1,889, or 17% of the cases where such aliens filed asylum applications in their removal proceedings. Immigration judges found in the overwhelming majority of cases that the aliens had no significant possibility of persecution.

These existing burdens suggest an unsustainably inefficient process, and those pressures are now coupled with the prospect that large caravans of thousands of aliens, primarily from Central America, will seek to enter the United States unlawfully or without proper documentation and thereafter trigger credible-fear screening procedures and obtain release into the interior. The United States has been engaged in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (Guatemala, El Salvador, and Honduras) about the problems on the southern border, but those negotiations have, to date, proved unable to meaningfully improve the situation.

2. In combination with a presidential proclamation directed at the crisis on the southern border, the rule would help ameliorate the pressures on the present system. Aliens who could not establish a credible fear for asylum purposes due to the proclamation-based eligibility bar could nonetheless seek statutory withholding of removal or CAT protection, but would receive a positive finding only by establishing a reasonable fear of persecution or torture. In FY 2018, USCIS issued nearly 7,000 reasonable-fear determinations (*i.e.*, made a positive or negative determination)—a smaller number because the current determinations are limited to the narrow categories of aliens described above. Of those determinations, USCIS found a reasonable fear in 45% of cases in 2018, and 48% of cases in 2017. Negative reasonable-fear determinations were then subject to further review, and immigration judges reversed approximately 18%.

Even if rates of positive reasonable-fear findings increased when a more general population of aliens became subject to the reasonable-fear screening

process, this process would better filter those aliens eligible for that form of protection. Even assuming that grant rates for statutory withholding in the reasonable-fear screening process (a higher standard) would be the same as grant rates for asylum, this screening mechanism would likely still allow through a significantly higher percentage of cases than would likely be granted. And the reasonable-fear screening rates would also still allow a far greater percentage of claimants through than would ultimately receive CAT protection. Fewer than 1,000 aliens per year, of any nationality, receive CAT protection.

To the extent that aliens continued to enter the United States in violation of a relevant proclamation, the application of the rule's bar to eligibility for asylum in the credible-fear screening process (combined with the application of the reasonable-fear standard to statutory withholding and CAT claims) would reduce the number of cases referred to section 240 proceedings. Finally, the Departments emphasize that this rule would not prevent aliens with claims for statutory withholding or CAT protection from having their claims adjudicated in section 240 proceedings after satisfying the reasonable-fear standard.

Further, determining whether an alien is subject to a suspension of entry proclamation would ordinarily be straightforward, because such orders specify the class of aliens whose entry is restricted. Likewise, adding questions designed to elicit whether an alien is subject to an entry proclamation, and employing a bifurcated credible-fear analysis for the asylum claim and reasonable-fear review of the statutory withholding and CAT claims, will likely not be unduly burdensome. Although DHS has generally not applied existing mandatory bars to asylum in credible-fear determinations, asylum officers currently probe for this information and note in the record where the possibility exists that a mandatory bar may apply. Though screening for proclamation-based ineligibility for asylum may in some cases entail some additional work, USCIS will account for it under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*, as needed, following issuance of a covered proclamation. USCIS asylum officers and EOIR immigration judges have almost two decades of experience applying the reasonable-fear standard to statutory withholding and CAT claims, and do so in thousands of cases per year already (13,732 in FY 2018 for both EOIR and USCIS). *See, e.g.*, Memorandum for All Immigration Judges, et al., from The

Office of the Chief Immigration Judge, Executive Office for Immigration Review at 6 (May 14, 1999) (explaining similarities between credible-fear and reasonable-fear proceedings for immigration judges).

That said, USCIS estimates that asylum officers have historically averaged four to five credible-fear interviews and completions per day, but only two to three reasonable-fear case completions per day. Comparing this against current case processing targets, and depending on the number of aliens who contravene a presidential proclamation, such a change might result in the need to increase the number of officers required to conduct credible-fear or reasonable-fear screenings to maintain current case completion goals. However, current reasonable-fear interviews are for types of aliens (aggravated felons and aliens subject to reinstatement) for whom relevant criminal and immigration records take time to obtain, and for whom additional interviewing and administrative processing time is typically required. The population of aliens who would be subject to this rule would generally not have the same type of criminal and immigration records in the United States, but additional interviewing time might be necessary. Therefore, it is unclear whether these averages would hold once the rule is implemented.

If an asylum officer determines that credible fear has been established but for the existence of the proclamation bar, and the alien seeks review of such determination before an immigration judge, DHS may need to shift additional resources towards facilitating such review in immigration court in order to provide records of the negative credible-fear determination to the immigration court. However, ICE attorneys, while sometimes present, generally do not advocate for DHS in negative credible-fear or reasonable-fear reviews before an immigration judge.

DHS would, however, also expend additional resources detaining aliens who would have previously received a positive credible-fear determination and who now receive, and challenge, a negative credible-fear and reasonable-fear determination. Aliens are generally detained during the credible-fear screening, but may be eligible for parole or release on bond if they establish a credible fear. To the extent that the rule may result in lengthier interviews for each case, aliens' length of stay in detention would increase. Furthermore, DHS anticipates that more negative determinations would increase the number of aliens who would be

detained and the length of time they would be detained, since fewer aliens would be eligible for parole or release on bond. Also, to the extent this rule would increase the number of aliens who receive both negative credible-fear and reasonable-fear determinations, and would thus be subject to immediate removal, DHS will incur increased and more immediate costs for enforcement and removal of these aliens. That cost would be counterbalanced by the fact that it would be considerably more costly and resource-intensive to ultimately remove such an alien after the end of section 240 proceedings, and the desirability of promoting greater enforcement of the immigration laws.

Attorneys from ICE represent DHS in full immigration proceedings, and immigration judges (who are part of DOJ) adjudicate those proceedings. If fewer aliens are found to have credible fear or reasonable fear and referred to full immigration proceedings, such a development will allow DOJ and ICE attorney resources to be reallocated to other immigration proceedings. The additional bars to asylum are unlikely to result in immigration judges spending much additional time on each case where the nature of the proclamation bar is straightforward to apply. Further, there will likely be a decrease in the number of asylum hearings before immigration judges because certain respondents will no longer be eligible for asylum and DHS will likely refer fewer cases to full immigration proceedings. If DHS officers identify the proclamation-based bar to asylum (before EOIR has acquired jurisdiction over the case), EOIR anticipates a reduction in both in-court and out-of-court time for immigration judges.

A decrease in the number of credible-fear findings and, thus, asylum grants would also decrease the number of employment authorization documents processed by DHS. Aliens are generally eligible to apply for and receive employment authorization and an Employment Authorization Document (Form I–766) after their asylum claim has been pending for more than 180 days. *See* INA 208(d)(5)(A)(iii), 8 U.S.C. 1158(d)(5)(A)(iii); 8 CFR 1208.7(a)(1)(2). This rule and any associated future presidential proclamations would also be expected to have a deterrent effect that could lessen future flows of illegal immigration.

3. The Departments are not in a position to determine how all entry proclamations involving the southern border could affect the decision calculus for various categories of aliens planning to enter the United States through the southern border in the near future. The

focus of this rule is on the tens of thousands of aliens each year (97,192 in FY 2018) who assert a credible fear in expedited-removal proceedings and may thereby be placed on a path to release into the interior of the United States. The President has announced his intention to take executive action to suspend the entry of aliens between ports of entry and instead to channel such aliens to ports of entry, where they may seek to enter and assert an intent to apply for asylum in a controlled, orderly, and lawful manner. The Departments have accordingly assessed the anticipated effects of such a presidential action so as to illuminate how the rule would be applied in those circumstances.

a. *Effects on Aliens.* Such a proclamation, coupled with this rule, would have the most direct effect on the more than approximately 70,000 aliens a year (as of FY 2018) estimated to enter between the ports of entry and then assert a credible fear in expedited-removal proceedings.[11] If such aliens contravened a proclamation suspending their entry unless they entered at a port of entry, they would become ineligible for asylum, but would remain eligible for statutory withholding or CAT protection. And for the reasons discussed above, their claims would be processed more expeditiously. Conversely, if such aliens decided to instead arrive at ports of entry, they would remain eligible for asylum and would proceed through the existing credible-fear screening process.

Such an application of this rule could also affect the decision calculus for the estimated 24,000 or so aliens a year (as of FY 2018) who arrive at ports of entry along the southern border and assert a credible fear in expedited-removal proceedings.[12] Such aliens would likely face increased wait times at a U.S. port of entry, meaning that they would spend

more time in Mexico. Third-country nationals in this category would have added incentives to take advantage of Mexican asylum procedures and to make decisions about travel to a U.S. port of entry based on information about which ports were most capable of swift processing.

Such an application of this rule could also affect aliens who apply for asylum affirmatively or in removal proceedings after entering through the southern border. Some of those asylum grants would become denials for aliens who became ineligible for asylum because they crossed illegally in contravention of a proclamation effective before they entered. Such aliens could, however, still obtain statutory withholding of removal or CAT protection in section 240 proceedings.

Finally, such a proclamation could also affect the thousands of aliens who are granted asylum each year. Those aliens' cases are equally subject to existing backlogs in immigration courts, and could be adjudicated more swiftly if the number of non-meritorious cases declined. Aliens with meritorious claims could thus more expeditiously receive the benefits associated with asylum.

b. *Effects on the Departments' Operations.* Applying this rule in conjunction with a proclamation that channeled aliens seeking asylum to ports of entry would likely create significant overall efficiencies in the Departments' operations beyond the general efficiencies discussed above. Channeling even some proportion of aliens who currently enter illegally and assert a credible fear to ports of entry would, on balance, be expected to help the Departments more effectively leverage their resources to promote orderly and efficient processing of inadmissible aliens.

At present, CBP dedicates enormous resources to attempting to apprehend aliens who cross the southern border illegally. As noted, CBP apprehended 396,579 such aliens in FY 2018. Such crossings often occur in remote locations, and over 16,000 CBP officers are responsible for patrolling hundreds of thousands of square miles of territory, ranging from deserts to mountainous terrain to cities. When a United States Border Patrol ("Border Patrol" or "USBP") agent apprehends an alien who enters unlawfully, the USBP agent takes the alien into custody and transports the alien to a Border Patrol station for processing—which could be hours away. Family units apprehended after crossing illegally present additional logistical challenges, and may require additional agents to assist

---

[11] The Departments estimated this number by using the approximately 171,511 aliens in FY 2018 who were referred to expedited removal after crossing illegally between ports of entry and being apprehended by CBP. That number excludes the approximately 3,102 additional aliens who were arrested by ICE, because it is not clear at this time whether such aliens were ultimately processed at a port of entry. The Departments also relied on the fact that approximately 41% of aliens in expedited removal in FY 2018 triggered credible-fear screening.

[12] The Departments estimated this number by using the approximately 59,921 aliens in FY 2018 who were referred to expedited removal after presenting at a port of entry. That number excludes the approximately 3,102 additional aliens who were arrested by ICE, because it is not clear at this time whether such aliens were ultimately processed at a port of entry. The Departments also relied on the fact that approximately 41% of aliens in expedited removal in FY 2018 triggered credible-fear screening.

with the transport of the illegal aliens from the point of apprehension to the station for processing. And apprehending one alien or group of aliens may come at the expense of apprehending others while agents are dedicating resources to transportation instead of patrolling.

At the Border Patrol station, a CBP agent obtains an alien's fingerprints, photographs, and biometric data, and begins asking background questions about the alien's nationality and purpose in crossing. At the same time, agents must make swift decisions, in coordination with DOJ, as to whether to charge the alien with an immigration-related criminal offense. Further, agents must decide whether to apply expedited-removal procedures, to pursue reinstatement proceedings if the alien already has a removal order in effect, to authorize voluntary return, or to pursue some other lawful course of action. Once the processing of the alien is completed, the USBP temporarily detains any alien who is referred for removal proceedings. Once the USBP determines that an alien should be placed in expedited-removal proceedings, the alien is expeditiously transferred to ICE custody in compliance with federal law. The distance between ICE detention facilities and USBP stations, however, varies. Asylum officers and immigration judges review negative credible-fear findings during expedited-removal proceedings while the alien is in ICE custody.

By contrast, CBP officers are able to employ a more orderly and streamlined process for inadmissible aliens who present at one of the ports of entry along the southern border—even if they claim a credible fear. Because such aliens have typically sought admission without violating the law, CBP generally does not need to dedicate resources to apprehending or considering whether to charge such aliens. And while aliens who present at a port of entry undergo threshold screening to determine their admissibility, *see* INA 235(b)(2), 8 U.S.C. 1225(b)(2), that process takes approximately the same amount of time as CBP's process for obtaining details from aliens apprehended between ports of entry. Just as for illegal entrants, CBP officers at ports of entry must decide whether inadmissible aliens at ports of entry are subject to expedited removal. Aliens subject to such proceedings are then generally transferred to ICE custody so that DHS can implement Congress's statutory mandate to detain such aliens during the pendency of expedited-removal proceedings. As with

stations, ports of entry vary in their proximity to ICE detention facilities.

The Departments acknowledge that in the event all of the approximately 70,000 aliens per year who cross illegally and assert a credible fear instead decide to present at a port of entry, processing times at ports of entry would be slower in the absence of additional resources or policies that would encourage aliens to enter at less busy ports. Using FY 2018 figures, the number of aliens presenting at a port of entry would rise from about 124,511 to about 200,000 aliens if all illegal aliens who assert a credible fear went to ports of entry. That would likely create longer lines at U.S. ports of entry, although the Departments note that such ports have variable capacities and that wait times vary considerably between them. The Departments nonetheless believe such a policy would be preferable to the status quo. Nearly 40% of inadmissible aliens who present at ports of entry today are Mexican nationals, who rarely claim a credible fear and who accordingly can be processed and admitted or removed quickly.

Furthermore, the overwhelming number of aliens who would have an incentive under the rule and a proclamation to arrive at a port of entry rather than to cross illegally are from third countries, not from Mexico. In FY 2018, CBP apprehended and referred to expedited removal an estimated 87,544 Northern Triangle nationals and an estimated 66,826 Mexican nationals, but Northern Triangle nationals assert a credible fear over 60% of the time, whereas Mexican nationals assert a credible fear less than 10% of the time. The Departments believe that it is reasonable for third-country aliens, who appear highly unlikely to be persecuted on account of a protected ground or tortured in Mexico, to be subject to orderly processing at ports of entry that takes into account resource constraints at ports of entry and in U.S. detention facilities. Such orderly processing would be impossible if large proportions of third-country nationals continue to cross the southern border illegally.

To be sure, some Mexican nationals who would assert a credible fear may also have to spend more time waiting for processing in Mexico. Such nationals, however, could still obtain statutory withholding of removal or CAT protection if they crossed illegally, which would allow them a safeguard against persecution. Moreover, only 178 Mexican nationals received asylum in FY 2018 after initially asserting a credible fear of persecution in expedited-removal proceedings, indicating that the category of Mexican

nationals most likely to be affected by the rule and a proclamation would also be highly unlikely to establish eligibility for asylum.

**Regulatory Requirements**

*A. Administrative Procedure Act*

While the Administrative Procedure Act ("APA") generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** for a period of public comment, it provides an exception "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B). This exception relieves agencies of the notice-and-comment requirement in emergency situations, or in circumstances where "the delay created by the notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir. 1991); *see also Nat'l Fed'n of Federal Emps.* v. *Nat'l Treasury Emps. Union,* 671 F.2d 607, 611 (D.C. Cir. 1982); *United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010). Agencies have previously relied on this exception in promulgating a host of immigration-related interim rules.[13] Furthermore, DHS has invoked this exception in promulgating rules related to expedited removal—a context in which Congress recognized the need for dispatch in addressing large volumes of aliens by giving the Secretary significant discretion to "modify at any time" the classes of aliens who would be subject to such procedures. *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I).[14]

---

[13] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require additional documentation from certain Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over six months).

[14] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR at 4770 (claiming good cause exception because the ability to detain certain Cuban nationals "while admissibility and identity are
Continued

The Departments have concluded that the good-cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Notice and comment on this rule, along with a 30-day delay in its effective date, would be impracticable and contrary to the public interest. The Departments have determined that immediate implementation of this rule is essential to avoid creating an incentive for aliens to seek to cross the border during pre-promulgation notice and comment under 5 U.S.C. 553(b) or during the 30-day delay in the effective date under 5 U.S.C. 553(d).

DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR at 4770. DHS in particular cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." *Id.* DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." *Id.* DHS concluded: "[A] surge could result in significant loss of human life." *Id.; accord, e.g.,* Designating Aliens For Expedited Removal, 69 FR 48877 (noting similar destabilizing incentives for a surge during a delay in the effective date); Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR at 5907 (finding the good-cause exception applicable

because of similar short-run incentive concerns).

These same concerns would apply here as well. Pre-promulgation notice and comment, or a delay in the effective date, could lead to an increase in migration to the southern border to enter the United States before the rule took effect. For instance, the thousands of aliens who presently enter illegally and make claims of credible fear if and when they are apprehended would have an added incentive to cross illegally during the comment period. They have an incentive to cross illegally in the hopes of evading detection entirely. Even once apprehended, at present, they are able to take advantage of a second opportunity to remain in the United States by making credible-fear claims in expedited-removal proceedings. Even if their statements are ultimately not found to be genuine, they are likely to be released into the interior pending section 240 proceedings that may not occur for months or years. Based on the available statistics, the Departments believe that a large proportion of aliens who enter illegally and assert a fear could be released while awaiting section 240 proceedings. There continues to be an "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." Designating Aliens For Expedited Removal, 69 FR at 48878.

Furthermore, there are already large numbers of migrants—including thousands of aliens traveling in groups, primarily from Central America— expected to attempt entry at the southern border in the coming weeks. Some are traveling in large, organized groups through Mexico and, by reports, intend to come to the United States unlawfully or without proper documentation and to express an intent to seek asylum. Creating an incentive for members of those groups to attempt to enter the United States unlawfully before this rule took effect would make more dangerous their already perilous journeys, and would further strain CBP's apprehension operations. This interim rule is thus a practical means to address these developments and avoid creating an even larger short-term influx; an extended notice-and-comment rulemaking process would be impracticable.

Alternatively, the Departments may forgo notice-and-comment procedures and a delay in the effective date because this rule involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). The flow of aliens across the

southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy interests of the United States. *See, e.g.,* Exec. Order 13767 (Jan. 25, 2017). Presidential proclamations invoking section 212(f) or 215(a)(1) of the INA at the southern border necessarily implicate our relations with Mexico and the President's foreign policy, including sensitive and ongoing negotiations with Mexico about how to manage our shared border.[15] A proclamation under section 212(f) of the INA would reflect a presidential determination that some or all entries along the border "would [be] detrimental to the interests of the United States." And the structure of the rule, under which the Attorney General and the Secretary are exercising their statutory authority to establish a mandatory bar to asylum eligibility resting squarely on a proclamation issued by the President, confirms the direct relationship between the President's foreign policy decisions in this area and the rule.

For instance, a proclamation aimed at channeling aliens who wish to make a claim for asylum to ports of entry at the southern border would be inextricably related to any negotiations over a safe-third-country agreement (as defined in INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A)), or any similar arrangements. As noted, the vast majority of aliens who enter illegally today come from the Northern Triangle countries, and large portions of those aliens assert a credible fear. Channeling those aliens to ports of entry would encourage these aliens to first avail themselves of offers of asylum from Mexico.

Moreover, this rule would be an integral part of ongoing negotiations with Mexico and Northern Triangle countries over how to address the influx of tens of thousands of migrants from Central America through Mexico and into the United States. For instance, over the past few weeks, the United States has consistently engaged with the Security and Foreign Ministries of El Salvador, Guatemala, and Honduras, as well as the Ministries of Governance and Foreign Affairs of Mexico, to

---

determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety"); Designating Aliens For Expedited Removal, 69 FR at 48880 (claiming good cause exception for expansion of expedited-removal program due to "[t]he large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries," as well as "the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations").

---

[15] For instance, since 2004, the United States and Mexico have been operating under a memorandum of understanding concerning the repatriation of Mexican nationals. Memorandum of Understanding Between the Department of Homeland Security of the United States of America and the Secretariat of Governance and the Secretariat of Foreign Affairs of the United Mexican States, on the Safe, Orderly, Dignified and Humane Repatriation of Mexican Nationals (Feb. 20, 2004). Article 6 of that memorandum reserves the movement of third-country nationals through Mexico and the United States for further bilateral negotiations.

AR00030

discuss how to address the mass influx of aliens traveling together from Central America who plan to seek to enter at the southern border. Those ongoing discussions involve negotiations over issues such as how these other countries will develop a process to provide this influx with the opportunity to seek protection at the safest and earliest point of transit possible, and how to establish compliance and enforcement mechanisms for those who seek to enter the United States illegally, including for those who do not avail themselves of earlier offers of protection. Furthermore, the United States and Mexico have been engaged in ongoing discussions of a safe-third-country agreement, and this rule will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations.

This rule thus supports the President's foreign policy with respect to Mexico and the Northern Triangle countries in this area and is exempt from the notice-and-comment and delayed-effective-date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exporters & Importers-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

Invoking the APA's foreign affairs exception is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. This rulemaking explained that it was covered by the foreign affairs exception because it was "consistent with U.S. foreign policy goals"—specifically, the "continued effort to normalize relations between the two countries." Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS and the State Department recently provided notice that they were eliminating an exception to expedited removal for certain Cuban nationals. The notice explained that the change in policy was subject to the foreign affairs exception because it was "part of a major foreign policy initiative

announced by the President, and is central to ongoing diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries." Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR at 4904–05.

For the foregoing reasons, taken together, the Departments have concluded that the foreign affairs exemption to notice-and-comment rulemaking applies.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

*C. Unfunded Mandates Reform Act of 1995*

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*D. Congressional Review Act*

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

*E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)*

This interim final rule is not a "significant regulatory action" under section 3(f) of Executive Order 12866 because the rule is exempt under the foreign-affairs exemption in section 3(d)(2) as part of the actual exercise of diplomacy. The rule is consequently also exempt from Executive Order

13771 because it is not a significant regulatory action under Executive Order 12866. Though the potential costs, benefits, and transfers associated with some proclamations may have any of a range of economic impacts, this rule itself does not have an impact aside from enabling future action. The Departments have discussed what some of the potential impacts associated with a proclamation may be, but these impacts do not stem directly from this rule and, as such, they do not consider them to be costs, benefits, or transfers of this rule.

This rule amends existing regulations to provide that aliens subject to restrictions on entry under certain proclamations are ineligible for asylum. The expected effects of this rule for aliens and on the Departments' operations are discussed above. As noted, this rule will result in the application of an additional mandatory bar to asylum, but the scope of that bar will depend on the substance of relevant triggering proclamations. In addition, this rule requires DHS to consider and apply the proclamation bar in the credible-fear screening analysis, which DHS does not currently do. Application of the new bar to asylum will likely decrease the number of asylum grants. By applying the bar earlier in the process, it will lessen the time that aliens who are ineligible for asylum and who lack a reasonable fear of persecution or torture will be present in the United States. Finally, DOJ is amending its regulations with respect to aliens who are subject to the proclamation bar to asylum eligibility to ensure that aliens who establish a reasonable fear of persecution or torture may still seek, in proceedings before immigration judges, statutory withholding of removal under the INA or CAT protection.

*Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Paperwork Reduction Act

This rule does not propose new or revisions to existing ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

### List of Subjects

#### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 1003

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and functions (Government agencies).

#### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### Regulatory Amendments
### DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

### PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as fol1ows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229, 8 CFR part 2.

■ 2. In § 208.13, add paragraph (c)(3) to read as follows:

#### § 208.13   Establishing asylum eligibility.

*     *     *     *     *

(c) * * *

(3) *Additional limitation on eligibility for asylum.* For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order

expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

■ 3. In § 208.30, revise the section heading and add a sentence at the end of paragraph (e)(5) to read as follows:

#### § 208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act or whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act.

*     *     *     *     *

(e) * * *

(5) * * * If the alien is found to be an alien described in 8 CFR 208.13(c)(3), then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture if the alien establishes a reasonable fear of persecution or torture. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

*     *     *     *     *

Approved:

Dated: November 5, 2018.

**Kirstjen M. Nielsen,**
*Secretary of Homeland Security.*

### DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

### PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 4. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28

U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 5. In § 1003.42, add a sentence at the end of paragraph (d) to read as follows:

#### § 1003.42   Review of credible fear determination.

*     *     *     *     *

(d) * * * If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) prior to any further review of the asylum officer's negative determination.

*     *     *     *     *

### PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as fol1ows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 7. In § 1208.13, add paragraph (c)(3) to read as follows:

#### § 1208.13   Establishing asylum eligibility.

*     *     *     *     *

(c) * * *

(3) *Additional limitation on eligibility for asylum.* For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

■ 8. In § 1208.30, revise the section heading and add paragraph (g)(1) to read as follows:

**§ 1208.30 Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act or whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act.**

\* \* \* \* \*

(g) \* \* \*

(1) *Review by immigration judge of a mandatory bar finding.* If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3). If the immigration judge finds that the alien is not described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

\* \* \* \* \*

Dated: November 6, 2018.

**Jefferson B. Sessions III,**
*Attorney General.*

[FR Doc. 2018–24594 Filed 11–8–18; 4:15 pm]

**BILLING CODE 4410–30–P; 9111–97–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2018–0589; Product Identifier 2018–NM–021–AD; Amendment 39–19489; AD 2018–23–03]**

**RIN 2120–AA64**

**Airworthiness Directives; Airbus SAS Airplanes**

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** We are adopting a new airworthiness directive (AD) for certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. This AD was prompted by reports of false resolution advisories (RAs) from certain traffic collision avoidance systems (TCASs). This AD requires modification or replacement of certain TCAS processors. We are issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective December 14, 2018.

The Director of the Federal Register approved the incorporation by reference of certain publications listed in this AD as of December 14, 2018.

**ADDRESSES:** For service information identified in this final rule, contact Honeywell Aerospace, Technical Publications and Distribution, M/S 2101–201, P.O. Box 52170, Phoenix, AZ 85072–2170; phone: 602–365–5535; fax: 602–365–5577; internet: *http://www.honeywell.com*. You may view this service information at the FAA, Transport Standards Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. It is also available on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0589.

**Examining the AD Docket**

You may examine the AD docket on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0589; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this final rule, the regulatory evaluation, any comments received, and other information. The address for Docket Operations (phone: 800–647–5527) is U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

**FOR FURTHER INFORMATION CONTACT:** Steven Dzierzynski, Aerospace Engineer, Avionics and Administrative Services Section, FAA, New York ACO Branch, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7367; fax 516–794–5531.

**SUPPLEMENTARY INFORMATION:**

**Discussion**

We issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 by adding an AD that would apply to certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. This AD was prompted by reports of false RAs from certain TCASs. The NPRM proposed to require modification or replacement of certain TCAS processors. We are issuing this AD to address the occurrence of false RAs from the TCAS, which could lead to a loss of separation from other airplanes, possibly resulting in a mid-air collision.

The European Aviation Safety Agency (EASA), which is the Technical Agent for the Member States of the European Union, has issued EASA AD 2017–0196, dated October 5, 2017 (referred to after this as the Mandatory Continuing Airworthiness Information, or ''the MCAI''), to correct an unsafe condition for certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. The MCAI states:

Since 2012, a number of false TCAS resolution advisories (RA) have been reported by various European Air Navigation Service Providers. EASA has published certification guidance material for collision avoidance systems (AMC 20–15) which defines a false TCAS RA as an RA that is issued, but the RA condition does not exist. It is possible that more false (or spurious) RA events have occurred, but were not recorded or reported. The known events were mainly occurring on Airbus single-aisle (A320 family) aeroplanes, although several events have also occurred on Airbus A330 aeroplanes. Investigation determined that the false RAs are caused on aeroplanes with a Honeywell TPA–100B TCAS processor installed, P/N [part number] 940–0351–001. This was caused by a combination of three factors: (1) Hybrid surveillance enabled; (2) processor connected to a hybrid GPS [global positioning system] source, without a direct connection to a GPS source; and (3) an encounter with an intruder aeroplane with noisy (jumping) ADS–B Out position.

EASA previously published Safety Information Bulletin (SIB) 2014–33 to inform owners and operators of affected aeroplanes about this safety concern. At that time, the false RAs were not considered an unsafe condition. Since the SIB was issued, further events have been reported, involving a third aeroplane.

This condition, if not corrected, could lead to a loss of separation with other aeroplanes, possibly resulting in a mid-air collision.

Prompted by these latest findings, and after review of the available information, EASA reassessed the severity and rate of occurrence of false RAs and has decided that mandatory action must be taken to reduce the rate of occurrence, and the risk of loss of separation with other aeroplanes. Honeywell International Inc. published Service Bulletin

## Executive Office for Immigration Review (EOIR)
## Pending Cases as of May 30, 2019

Pending Cases shown with I-589 Applications as of May 30, 2019

| FY | Pending I-862 and I-863 cases | Pending I-862 and I-863 cases with Asylum Application |
|---|---|---|
| 2019 (as of May 30, 2019) | 904,189 | 436,382 |

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
# ADJUDICATION STATISTICS

## Pending Cases[1]



| FY | Pending Cases at End of Fiscal Year |
|---|---|
| 2008 | 186,095 |
| 2009 | 223,761 |
| 2010 | 262,718 |
| 2011 | 298,148 |
| 2012 | 327,527 |
| 2013 | 356,167 |
| 2014 | 430,004 |
| 2015 | 459,915 |
| 2016 | 521,284 |
| 2017 | 655,698 |
| 2018 | 794,316 |
| 2019 (Second Quarter)[1] | 876,552 |

Data Generated: April 23, 2019
[1] Pending cases equals removal, deportation, exclusion, asylum-only, and withholding only.
[2] FY 2019 Second Quarter through March 31, 2019.

## Credible Fear Workload Report Summary
### FY 2018 Total Caseload

| | Totals | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 99,035 | 7,296 | 7,307 | 7,462 | 8,121 | 6,621 | 8,266 | 8,500 | 9,968 | 9,742 | 6,565 | 8,957 | 8,957 |
| Interviews Conducted | 85,018 | 5,339 | 6,365 | 6,926 | 7,280 | 5,699 | 7,280 | 7,142 | 8,877 | 8,941 | 6,065 | 8,066 | 8,663 |
| All Decisions | 97,728 | 6,359 | 7,494 | 7,164 | 8,108 | 6,880 | 8,640 | 7,869 | 10,067 | 10,080 | 7,155 | 8,755 | 9,157 |
| Fear Established (Y) | 87,077 | 4,797 | 6,799 | 6,346 | 7,234 | 6,076 | 7,766 | 7,072 | 8,079 | 8,746 | 6,179 | 7,472 | 7,200 |
| Fear Not Established (N) | 9,659 | 531 | 591 | 669 | 715 | 676 | 767 | 719 | 821 | 1,314 | 945 | 1,082 | 829 |
| Closings | 13,392 | 1,031 | 1,122 | 889 | 1,222 | 1,070 | 1,526 | 975 | 1,167 | 1,294 | 964 | 1,034 | 1,098 |

## Credible Fear Workload Report by Month Total Caseload

**OCT. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,296 | 859 | 46 | 10 | 152 | 5,390 | 244 | 71 | 122 | 3 | 65 | 202 |
| Interviews Conducted | 5,339 | 625 | 40 | 2 | 89 | 3,943 | 199 | 41 | 149 | 16 | 42 | 193 |
| All Decisions | 6,359 | 811 | 68 | 2 | 108 | 4,675 | 203 | 50 | 172 | 16 | 49 | 205 |
| Fear Established (Y) | 4,797 | 502 | 37 | 2 | 64 | 3,504 | 192 | 30 | 127 | 14 | 35 | 189 |
| Fear Not Established (N) | 531 | 124 | 4 | 0 | 24 | 328 | 11 | 2 | 19 | 1 | 1 | 6 |
| Closings | 1,031 | 185 | 27 | 0 | 19 | 743 | 4 | 9 | 14 | 1 | 2 | 29 |

**NOV. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,307 | 538 | 167 | 44 | 153 | 5,590 | 352 | 71 | 122 | 3 | 65 | 202 |
| Interviews Conducted | 6,365 | 625 | 46 | 1 | 136 | 4,972 | 322 | 21 | 147 | 1 | 20 | 202 |
| All Decisions | 7,494 | 660 | 75 | 1 | 163 | 5,808 | 346 | 25 | 160 | 2 | 22 | 231 |
| Fear Established (Y) | 5,781 | 411 | 94 | 1 | 124 | 4,556 | 310 | 21 | 127 | 1 | 19 | 196 |
| Fear Not Established (N) | 591 | 155 | 11 | 0 | 13 | 425 | 20 | 1 | 19 | 1 | 2 | 6 |
| Closings | 1,122 | 188 | 28 | 0 | 26 | 839 | 24 | 4 | 14 | 1 | 2 | 29 |

**DEC. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,462 | 698 | 375 | 28 | 125 | 5,135 | 364 | 201 | 191 | 39 | 44 | 262 |
| Interviews Conducted | 6,265 | 488 | 402 | 18 | 131 | 4,412 | 271 | 96 | 181 | 0 | 47 | 219 |
| All Decisions | 7,164 | 632 | 434 | 18 | 152 | 5,043 | 288 | 106 | 196 | 0 | 61 | 235 |
| Fear Established (Y) | 5,606 | 363 | 367 | 17 | 108 | 4,011 | 260 | 84 | 159 | 0 | 41 | 213 |
| Fear Not Established (N) | 669 | 123 | 37 | 1 | 23 | 411 | 24 | 12 | 25 | 0 | 6 | 6 |
| Closings | 889 | 149 | 30 | 0 | 21 | 621 | 18 | 10 | 12 | 0 | 13 | 15 |

**JAN. 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,121 | 883 | 400 | 15 | 108 | 5,675 | 432 | 73 | 203 | 14 | 127 | 191 |
| Interviews Conducted | 6,926 | 725 | 283 | 1 | 77 | 5,046 | 373 | 33 | 162 | 1 | 61 | 164 |
| All Decisions | 8,108 | 922 | 357 | 3 | 94 | 5,840 | 406 | 42 | 194 | 1 | 69 | 188 |
| Fear Established (Y) | 6,171 | 559 | 259 | 1 | 67 | 4,556 | 337 | 29 | 146 | 1 | 55 | 158 |
| Fear Not Established (N) | 715 | 175 | 21 | 0 | 9 | 443 | 37 | 4 | 14 | 0 | 6 | 6 |
| Closings | 1,222 | 188 | 74 | 2 | 18 | 841 | 32 | 9 | 34 | 0 | 8 | 16 |

**FEB. 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 6,621 | 653 | 217 | 5 | 120 | 4,878 | 255 | 74 | 153 | 39 | 47 | 184 |
| Interviews Conducted | 5,699 | 566 | 167 | 7 | 96 | 4,061 | 270 | 121 | 140 | 68 | 44 | 262 |
| All Decisions | 6,880 | 787 | 149 | 8 | 106 | 4,926 | 304 | 142 | 156 | 78 | 99 | 155 |
| Fear Established (Y) | 5,104 | 459 | 114 | 6 | 70 | 3,781 | 265 | 104 | 116 | 67 | 76 | 122 |
| Fear Not Established (N) | 676 | 157 | 20 | 0 | 23 | 411 | 24 | 11 | 15 | 5 | 10 | 8 |
| Closings | 1,070 | 151 | 15 | 2 | 35 | 740 | 23 | 27 | 33 | 6 | 13 | 25 |

**MARCH 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,266 | 787 | 389 | 7 | 82 | 5,959 | 270 | 82 | 153 | 4 | 151 | 383 |
| Interviews Conducted | 7,280 | 609 | 363 | 5 | 57 | 5,531 | 166 | 26 | 157 | 0 | 107 | 257 |
| All Decisions | 8,640 | 683 | 386 | 8 | 126 | 6,615 | 205 | 40 | 180 | 0 | 100 | 297 |
| Fear Established (Y) | 7,766 | 435 | 301 | 8 | 117 | 4,894 | 141 | 27 | 141 | 0 | 81 | 241 |
| Fear Not Established (N) | 767 | 124 | 47 | 0 | 17 | 533 | 19 | 14 | 14 | 0 | 5 | 8 |
| Closings | 1,526 | 124 | 38 | 0 | 40 | 1,198 | 45 | 9 | 26 | 0 | 14 | 32 |

**APRIL 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,500 | 812 | 224 | 16 | 138 | 6,092 | 474 | 77 | 153 | 14 | 213 | 287 |
| Interviews Conducted | 7,142 | 753 | 207 | 9 | 93 | 4,867 | 482 | 44 | 149 | 1 | 217 | 330 |
| All Decisions | 7,869 | 905 | 246 | 9 | 97 | 5,249 | 551 | 52 | 174 | 1 | 249 | 336 |
| Fear Established (Y) | 6,779 | 556 | 187 | 7 | 69 | 4,209 | 453 | 39 | 160 | 0 | 216 | 277 |
| Fear Not Established (N) | 719 | 163 | 26 | 2 | 18 | 435 | 36 | 6 | 12 | 0 | 20 | 40 |
| Closings | 975 | 157 | 27 | 2 | 18 | 626 | 64 | 12 | 9 | 1 | 8 | 21 |

**MAY 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,968 | 1,106 | 337 | 45 | 103 | 7,025 | 654 | 67 | 184 | 4 | 140 | 303 |
| Interviews Conducted | 7,280 | 924 | 263 | 27 | 91 | 6,452 | 556 | 59 | 156 | 0 | 109 | 240 |
| All Decisions | 10,067 | 1,107 | 309 | 35 | 119 | 7,279 | 570 | 71 | 170 | 0 | 127 | 280 |
| Fear Established (Y) | 8,079 | 730 | 212 | 28 | 78 | 6,040 | 484 | 51 | 137 | 0 | 97 | 242 |
| Fear Not Established (N) | 821 | 210 | 49 | 6 | 20 | 754 | 43 | 12 | 23 | 0 | 16 | 27 |
| Closings | 1,167 | 210 | 49 | 6 | 20 | 754 | 43 | 12 | 30 | 0 | 16 | 27 |

**JUNE 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,742 | 939 | 402 | 72 | 76 | 6,547 | 532 | 73 | 203 | 14 | 419 | 467 |
| Interviews Conducted | 8,941 | 878 | 420 | 54 | 40 | 6,126 | 521 | 43 | 189 | 2 | 351 | 317 |
| All Decisions | 10,080 | 1,034 | 488 | 55 | 37 | 6,988 | 566 | 59 | 225 | 1 | 368 | 269 |
| Fear Established (Y) | 7,472 | 668 | 316 | 49 | 26 | 5,224 | 479 | 34 | 178 | 1 | 281 | 216 |
| Fear Not Established (N) | 1,314 | 176 | 76 | 4 | 7 | 913 | 66 | 5 | 29 | 0 | 38 | 2 |
| Closings | 1,294 | 190 | 96 | 2 | 8 | 851 | 21 | 20 | 18 | 0 | 57 | 31 |

**JULY 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 6,565 | 1,126 | 432 | 44 | 117 | 3,686 | 394 | 77 | 88 | 2 | 354 | 245 |
| Interviews Conducted | 6,065 | 840 | 242 | 37 | 80 | 3,680 | 375 | 59 | 91 | 0 | 333 | 316 |
| All Decisions | 7,155 | 950 | 287 | 37 | 136 | 4,384 | 403 | 72 | 107 | 0 | 395 | 384 |
| Fear Established (Y) | 5,246 | 640 | 163 | 27 | 83 | 3,231 | 343 | 39 | 77 | 0 | 297 | 346 |
| Fear Not Established (N) | 945 | 145 | 45 | 4 | 14 | 616 | 32 | 14 | 14 | 0 | 34 | 11 |
| Closings | 964 | 165 | 78 | 5 | 28 | 537 | 28 | 19 | 16 | 0 | 61 | 27 |

**AUGUST 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 10,230 | 1,492 | 127 | 42 | 230 | 6,966 | 637 | 74 | 156 | 15 | 277 | 194 |
| Interviews Conducted | 8,066 | 1,167 | 167 | 34 | 174 | 5,405 | 488 | 63 | 118 | 0 | 277 | 174 |
| All Decisions | 8,755 | 1,249 | 235 | 34 | 223 | 5,766 | 503 | 72 | 131 | 0 | 316 | 226 |
| Fear Established (Y) | 6,639 | 932 | 179 | 29 | 135 | 4,339 | 422 | 64 | 82 | 0 | 260 | 197 |
| Fear Not Established (N) | 1,082 | 249 | 50 | 3 | 39 | 917 | 26 | 8 | 21 | 0 | 38 | 2 |
| Closings | 1,034 | 138 | 31 | 1 | 43 | 710 | 33 | 3 | 28 | 0 | 14 | 10 |

**SEPTEMBER 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,957 | 1,243 | 457 | 45 | 136 | 6,054 | 461 | 94 | 111 | 0 | 122 | 234 |
| Interviews Conducted | 8,053 | 987 | 410 | 13 | 118 | 5,577 | 476 | 52 | 116 | 0 | 154 | 150 |
| All Decisions | 9,157 | 1,246 | 470 | 13 | 99 | 6,375 | 497 | 41 | 114 | 0 | 153 | 154 |
| Fear Established (Y) | 7,200 | 916 | 377 | 5 | 62 | 5,054 | 425 | 21 | 105 | 0 | 128 | 137 |
| Fear Not Established (N) | 1,082 | 142 | 29 | 0 | 21 | 563 | 42 | 6 | 6 | 0 | 6 | 11 |
| Closings | 1,098 | 188 | 64 | 3 | 18 | 758 | 30 | 2 | 3 | 0 | 14 | 10 |

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

U.S. Citizenship and Immigration Services



AR00036

## Reasonable Fear Workload Report Summary
### FY 2018 Total Caseload

| | Totals | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 11,101 | 862 | 856 | 855 | 922 | 775 | 888 | 915 | 1,041 | 979 | 969 | 1,125 | 914 |
| Interviews Conducted | 7,212 | 579 | 528 | 528 | 491 | 480 | 642 | 598 | 737 | 746 | 546 | 751 | 586 |
| All Decisions | 10,964 | 896 | 839 | 837 | 786 | 785 | 952 | 910 | 1,066 | 1,065 | 883 | 1,079 | 866 |
| Fear Established (Y) | 3,161 | 273 | 229 | 221 | 235 | 244 | 313 | 276 | 322 | 308 | 212 | 287 | 241 |
| Fear Not Established (N) | 3,826 | 306 | 283 | 306 | 258 | 249 | 313 | 304 | 373 | 393 | 311 | 435 | 295 |
| Closings | 3,977 | 317 | 317 | 327 | 310 | 293 | 326 | 330 | 371 | 364 | 360 | 357 | 330 |

## Reasonable Fear Workload Report Monthly Caseload by Office

### OCT. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 862 | 142 | 121 | 11 | 48 | 277 | 50 | 18 | 46 | | 38 | 57 |
| Interviews Conducted | 579 | 72 | 42 | 0 | 43 | 193 | 37 | 8 | 40 | | 23 | 40 |
| All Decisions | 896 | 107 | 0 | 0 | 82 | 274 | 70 | 44 | 21 | | 39 | 58 |
| Fear Established (Y) | 273 | 31 | 15 | 0 | 18 | 70 | 24 | 0 | 12 | | 18 | 30 |
| Fear Not Established (N) | 306 | 42 | 26 | 0 | 25 | 121 | 15 | 8 | 14 | | 5 | 10 |
| Closings | 317 | 62 | 66 | 0 | 9 | 83 | 7 | 7 | 4 | | 16 | 18 |

### NOV. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 856 | 133 | 99 | 17 | 47 | 370 | 33 | 36 | 22 | 4 | 38 | 57 |
| Interviews Conducted | 528 | 83 | 55 | 1 | 37 | 224 | 25 | 12 | 27 | 1 | 23 | 40 |
| All Decisions | 839 | 147 | 121 | 1 | 55 | 335 | 45 | 19 | 30 | 1 | 39 | 58 |
| Fear Established (Y) | 229 | 40 | 23 | 0 | 15 | 73 | 15 | 23 | 19 | 0 | 18 | 30 |
| Fear Not Established (N) | 283 | 40 | 31 | 1 | 22 | 138 | 13 | 8 | 14 | 1 | 5 | 10 |
| Closings | 317 | 67 | 67 | 0 | 16 | 124 | 8 | 4 | 4 | 0 | 16 | 18 |

### DEC. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 855 | 150 | 90 | 11 | 54 | 315 | 44 | 40 | 21 | 2 | 36 | 81 |
| Interviews Conducted | 528 | 97 | 51 | 5 | 34 | 168 | 28 | 21 | 19 | 0 | 11 | 44 |
| All Decisions | 837 | 155 | 101 | 6 | 50 | 339 | 38 | 25 | 34 | 0 | 29 | 59 |
| Fear Established (Y) | 221 | 40 | 20 | 1 | 11 | 63 | 10 | 14 | 20 | 0 | 6 | 36 |
| Fear Not Established (N) | 306 | 59 | 31 | 4 | 23 | 146 | 13 | 7 | 9 | 0 | 3 | 8 |
| Closings | 310 | 56 | 50 | 1 | 16 | 130 | 8 | 4 | 5 | 0 | 18 | 14 |

### JAN. 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 922 | 161 | 106 | 14 | 66 | 326 | 28 | 28 | 50 | 3 | 36 | 81 |
| Interviews Conducted | 491 | 98 | 25 | 6 | 45 | 190 | 21 | 19 | 32 | 0 | 11 | 44 |
| All Decisions | 786 | 164 | 80 | 8 | 54 | 302 | 30 | 24 | 36 | 0 | 29 | 59 |
| Fear Established (Y) | 235 | 49 | 12 | 2 | 13 | 74 | 7 | 11 | 23 | 0 | 8 | 36 |
| Fear Not Established (N) | 258 | 49 | 14 | 4 | 31 | 118 | 12 | 9 | 9 | 0 | 3 | 8 |
| Closings | 293 | 66 | 54 | 2 | 10 | 110 | 11 | 4 | 4 | 0 | 18 | 14 |

### FEB. 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 775 | 102 | 102 | 10 | 54 | 315 | 54 | 21 | 44 | 1 | 30 | 74 |
| Interviews Conducted | 480 | 83 | 50 | 13 | 38 | 168 | 28 | 13 | 21 | 0 | 11 | 39 |
| All Decisions | 785 | 141 | 100 | 13 | 52 | 294 | 38 | 19 | 32 | 2 | 33 | 56 |
| Fear Established (Y) | 244 | 52 | 19 | 5 | 17 | 69 | 11 | 7 | 15 | 2 | 13 | 25 |
| Fear Not Established (N) | 249 | 45 | 23 | 8 | 19 | 109 | 15 | 7 | 10 | 0 | 6 | 13 |
| Closings | 292 | 44 | 58 | 0 | 16 | 116 | 12 | 7 | 7 | 0 | 14 | 18 |

### MARCH 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 888 | 140 | 117 | 8 | 56 | 337 | 62 | 37 | 27 | 3 | 17 | 74 |
| Interviews Conducted | 642 | 90 | 54 | 2 | 34 | 276 | 69 | 15 | 21 | 19 | 17 | 39 |
| All Decisions | 952 | 123 | 115 | 2 | 53 | 409 | 76 | 30 | 28 | 27 | 33 | 56 |
| Fear Established (Y) | 313 | 42 | 28 | 0 | 14 | 122 | 33 | 4 | 17 | 15 | 13 | 25 |
| Fear Not Established (N) | 313 | 42 | 21 | 0 | 19 | 156 | 28 | 12 | 12 | 4 | 6 | 13 |
| Closings | 326 | 39 | 66 | 0 | 20 | 131 | 15 | 14 | 1 | 8 | 14 | 18 |

### APRIL 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 915 | 167 | 95 | 11 | 44 | 410 | 43 | 32 | 21 | 2 | 53 | 87 |
| Interviews Conducted | 598 | 124 | 53 | 8 | 32 | 242 | 44 | 27 | 14 | 8 | 17 | 27 |
| All Decisions | 910 | 126 | 93 | 3 | 16 | 377 | 69 | 36 | 34 | 9 | 47 | 64 |
| Fear Established (Y) | 276 | 58 | 18 | 3 | 10 | 97 | 33 | 9 | 17 | 4 | 12 | 16 |
| Fear Not Established (N) | 304 | 53 | 31 | 3 | 20 | 145 | 15 | 9 | 6 | 0 | 10 | 12 |
| Closings | 330 | 61 | 46 | 1 | 7 | 135 | 11 | 14 | 5 | 0 | 21 | 13 |

### MAY 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,041 | 142 | 126 | 12 | 51 | 468 | 47 | 28 | 30 | 9 | 41 | 87 |
| Interviews Conducted | 737 | 145 | 83 | 6 | 35 | 306 | 40 | 22 | 25 | 0 | 23 | 52 |
| All Decisions | 1,066 | 222 | 147 | 9 | 47 | 418 | 59 | 35 | 26 | 0 | 39 | 64 |
| Fear Established (Y) | 322 | 67 | 24 | 7 | 12 | 125 | 15 | 14 | 9 | 0 | 12 | 20 |
| Fear Not Established (N) | 373 | 67 | 38 | 1 | 17 | 173 | 16 | 20 | 10 | 0 | 10 | 21 |
| Closings | 371 | 76 | 85 | 1 | 17 | 130 | 12 | 10 | 2 | 0 | 17 | 21 |

### JUNE 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 979 | 156 | 120 | 11 | 67 | 358 | 55 | 30 | 46 | 29 | 39 | 66 |
| Interviews Conducted | 746 | 143 | 77 | 9 | 42 | 272 | 44 | 27 | 16 | 4 | 23 | 17 |
| All Decisions | 1,065 | 164 | 165 | 5 | 57 | 422 | 62 | 17 | 44 | 8 | 63 | 64 |
| Fear Established (Y) | 308 | 57 | 46 | 4 | 17 | 100 | 14 | 4 | 8 | 0 | 31 | 19 |
| Fear Not Established (N) | 393 | 52 | 55 | 1 | 22 | 180 | 28 | 11 | 11 | 0 | 19 | 10 |
| Closings | 364 | 55 | 64 | 0 | 18 | 142 | 20 | 3 | 3 | 0 | 41 | 15 |

### JULY 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 969 | 186 | 153 | 18 | 56 | 346 | 39 | 47 | 30 | 9 | 41 | 66 |
| Interviews Conducted | 546 | 89 | 63 | 6 | 39 | 241 | 19 | 14 | 27 | 0 | 23 | 17 |
| All Decisions | 883 | 158 | 170 | 10 | 49 | 362 | 30 | 23 | 35 | 0 | 61 | 45 |
| Fear Established (Y) | 212 | 40 | 23 | 4 | 6 | 84 | 12 | 4 | 11 | 0 | 20 | 10 |
| Fear Not Established (N) | 311 | 40 | 38 | 4 | 29 | 143 | 8 | 14 | 14 | 0 | 21 | 10 |
| Closings | 360 | 78 | 49 | 2 | 14 | 135 | 10 | 8 | 9 | 0 | 30 | 25 |

### AUGUST 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,125 | 187 | 101 | 12 | 48 | 534 | 57 | 22 | 39 | 0 | 64 | 51 |
| Interviews Conducted | 751 | 126 | 84 | 12 | 31 | 329 | 44 | 15 | 36 | 0 | 40 | 33 |
| All Decisions | 1,079 | 165 | 154 | 12 | 48 | 473 | 44 | 18 | 38 | 0 | 91 | 57 |
| Fear Established (Y) | 287 | 45 | 28 | 5 | 13 | 120 | 17 | 4 | 11 | 0 | 31 | 25 |
| Fear Not Established (N) | 435 | 64 | 44 | 7 | 25 | 220 | 19 | 9 | 11 | 0 | 19 | 10 |
| Closings | 357 | 76 | 82 | 0 | 15 | 133 | 8 | 2 | 3 | 0 | 24 | 15 |

### SEPTEMBER 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 914 | 149 | 132 | 18 | 56 | 372 | 33 | 24 | 36 | 4 | 45 | 49 |
| Interviews Conducted | 586 | 112 | 59 | 6 | 25 | 284 | 27 | 12 | 27 | 0 | 25 | 14 |
| All Decisions | 866 | 170 | 102 | 10 | 43 | 391 | 32 | 21 | 24 | 0 | 48 | 45 |
| Fear Established (Y) | 241 | 48 | 14 | 1 | 7 | 119 | 12 | 4 | 11 | 0 | 20 | 6 |
| Fear Not Established (N) | 295 | 43 | 26 | 5 | 14 | 172 | 11 | 8 | 8 | 0 | 11 | 10 |
| Closings | 330 | 79 | 82 | 0 | 22 | 135 | 10 | 8 | 9 | 0 | 27 | 13 |



The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

**U.S. Citizenship and Immigration Services**



AR00037

# Monthly Credible and Reasonable Fear Nationality Reports

## Credible Fear Nationality Report
### October 2017 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | GUATEMALA | 2,126 |
| 2 | HONDURAS | 1,399 |
| 3 | EL SALVADOR | 1,127 |
| 4 | MEXICO | 701 |
| 5 | INDIA | 599 |

## Reasonable Fear Nationality Report
### October 2017 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 313 |
| 2 | HONDURAS | 164 |
| 3 | GUATEMALA | 160 |
| 4 | EL SALVADOR | 149 |
| 5 | UNKNOWN | 24 |

## Credible Fear Nationality Report
### November 2017 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | GUATEMALA | 2,144 |
| 2 | HONDURAS | 1,509 |
| 3 | EL SALVADOR | 1,222 |
| 4 | INDIA | 551 |
| 5 | MEXICO | 533 |

## Reasonable Fear Nationality Report
### November 2017 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 302 |
| 2 | HONDURAS | 209 |
| 3 | GUATEMALA | 161 |
| 4 | EL SALVADOR | 134 |
| 5 | BRAZIL | 14 |

## Credible Fear Nationality Report
### December 2017 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | GUATEMALA | 2,247 |
| 2 | HONDURAS | 1,576 |
| 3 | EL SALVADOR | 1,153 |
| 4 | INDIA | 689 |
| 5 | MEXICO | 467 |

## Reasonable Fear Nationality Report
### December 2017 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 292 |
| 2 | GUATEMALA | 200 |
| 3 | HONDURAS | 178 |
| 4 | EL SALVADOR | 124 |
| 5 | BRAZIL | 16 |

## Credible Fear Nationality Report
### January 2018 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | GUATEMALA | 2,365 |
| 2 | HONDURAS | 1,948 |
| 3 | EL SALVADOR | 1,059 |
| 4 | INDIA | 728 |
| 5 | MEXICO | 630 |

## Reasonable Fear Nationality Report
### January 2018 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 286 |
| 2 | HONDURAS | 244 |
| 3 | GUATEMALA | 194 |
| 4 | EL SALVADOR | 146 |
| 5 | BRAZIL | 14 |

## Credible Fear Nationality Report
### February 2018 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | GUATEMALA | 1,981 |
| 2 | HONDURAS | 1,648 |
| 3 | EL SALVADOR | 755 |
| 4 | MEXICO | 649 |
| 5 | CUBA | 325 |

## Reasonable Fear Nationality Report
### February 2018 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 285 |
| 2 | HONDURAS | 175 |
| 3 | GUATEMALA | 146 |
| 4 | EL SALVADOR | 103 |
| 5 | DOMINICAN REPUBLIC | 5 |

## Credible Fear Nationality Report
### March 2018 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | GUATEMALA | 2,044 |
| 2 | HONDURAS | 1,115 |
| 3 | EL SALVADOR | 705 |
| 4 | MEXICO | 868 |
| 5 | CUBA | 181 |

## Reasonable Fear Nationality Report
### March 2018 (FY 2018)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 330 |
| 2 | HONDURAS | 212 |
| 3 | GUATEMALA | 175 |
| 4 | EL SALVADOR | 132 |
| 5 | BRAZIL | 12 |

**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR00038

| Credible Fear Nationality Report April 2018 (FY 2018) | | | | Reasonable Fear Nationality Report April 2018 (FY 2018) | |
|---|---|---|---|---|---|
| **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 HONDURAS | 2,531 | | 1 | MEXICO | 283 |
| 2 GUATEMALA | 1,878 | | 2 | HONDURAS | 231 |
| 3 EL SALVADOR | 972 | | 3 | GUATEMALA | 178 |
| 4 MEXICO | 613 | | 4 | EL SALVADOR | 140 |
| 5 CUBA | 546 | | 5 | BRAZIL | 12 |

| Credible Fear Nationality Report May 2018 (FY 2018) | | | | Reasonable Fear Nationality Report May 2018 (FY 2018) | |
|---|---|---|---|---|---|
| **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 HONDURAS | 2,952 | | 1 | MEXICO | 317 |
| 2 GUATEMALA | 2,406 | | 2 | HONDURAS | 242 |
| 3 EL SALVADOR | 1,245 | | 3 | GUATEMALA | 218 |
| 4 INDIA | 686 | | 4 | EL SALVADOR | 166 |
| 5 MEXICO | 654 | | 5 | BRAZIL | 11 |

| Credible Fear Nationality Report June 2018 (FY 2018) | | | | Reasonable Fear Nationality Report June 2018 (FY 2018) | |
|---|---|---|---|---|---|
| **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 HONDURAS | 3,169 | | 1 | MEXICO | 307 |
| 2 GUATEMALA | 2,348 | | 2 | HONDURAS | 269 |
| 3 EL SALVADOR | 1,416 | | 3 | GUATEMALA | 198 |
| 4 INDIA | 691 | | 4 | EL SALVADOR | 156 |
| 5 CUBA | 621 | | 5 | BRAZIL | 14 |

| Credible Fear Nationality Report July 2018 (FY 2018) | | | | Reasonable Fear Nationality Report July 2018 (FY 2018) | |
|---|---|---|---|---|---|
| **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 HONDURAS | 1,617 | | 1 | MEXICO | 328 |
| 2 GUATEMALA | 1,427 | | 2 | HONDURAS | 215 |
| 3 EL SALVADOR | 959 | | 3 | GUATEMALA | 203 |
| 4 INDIA | 677 | | 4 | EL SALVADOR | 151 |
| 5 CUBA | 480 | | 5 | BRAZIL | 19 |

| Credible Fear Nationality Report August 2018 (FY 2018) | | | | Reasonable Fear Nationality Report August 2018 (FY 2018) | |
|---|---|---|---|---|---|
| **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 HONDURAS | 2,636 | | 1 | MEXICO | 322 |
| 2 GUATEMALA | 2,035 | | 2 | HONDURAS | 311 |
| 3 INDIA | 1,343 | | 3 | GUATEMALA | 261 |
| 4 EL SALVADOR | 1,342 | | 4 | EL SALVADOR | 144 |
| 5 CUBA | 772 | | 5 | NICARAGUA | 31 |

| Credible Fear Nationality Report September 2018 (FY 2018) | | | | Reasonable Fear Nationality Report September 2018 (FY 2018) | |
|---|---|---|---|---|---|
| **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 HONDURAS | 2,541 | | 1 | MEXICO | 281 |
| 2 GUATEMALA | 1,728 | | 2 | HONDURAS | 268 |
| 3 EL SALVADOR | 1,284 | | 3 | GUATEMALA | 173 |
| 4 INDIA | 870 | | 4 | EL SALVADOR | 119 |
| 5 NICARAGUA | 604 | | 5 | NICARAGUA | 24 |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

**Credible Fear Workload Report Summary**
**FY2019 Total Caseload**

| | Totals | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 35,310 | 9,446 | 7,918 | 8,070 | 9,876 | | | | | | | | |
| Interviews Conducted | 28,847 | 7,773 | 7,487 | 6,933 | 6,654 | | | | | | | | |
| All Decisions | 32,188 | 8,593 | 7,848 | 8,405 | 7,342 | | | | | | | | |
| Fear Established (Y) | 25,060 | 6,902 | 6,000 | 6,460 | 5,698 | | | | | | | | |
| Fear Not Established (N) | 3,403 | 721 | 1,028 | 881 | 773 | | | | | | | | |
| Closings | 3,725 | 970 | 820 | 1,064 | 871 | | | | | | | | |

| October 2018 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | 9,446 | 1,140 | 385 | 18 | 133 | 6,509 | 601 | 138 | 131 | - | 138 | 253 |
| Interviews Conducted | 7,773 | 1,192 | 273 | 15 | 113 | 5,110 | 498 | 111 | 122 | - | 120 | 219 |
| All Decisions | 8,593 | 1,178 | 259 | 25 | 158 | 5,822 | 508 | 149 | 139 | - | 151 | 204 |
| Fear Established (Y) | 6,902 | 842 | 188 | 20 | 108 | 4,782 | 435 | 104 | 120 | - | 124 | 179 |
| Fear Not Established (N) | 721 | 145 | 22 | 3 | 34 | 400 | 56 | 22 | 13 | - | 17 | 9 |
| Closings | 970 | 191 | 49 | 2 | 16 | 640 | 17 | 23 | 6 | - | 10 | 16 |

| November 2018 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | 7,918 | 909 | 279 | 23 | 191 | 5,918 | 476 | 127 | 81 | - | 122 | 224 |
| Interviews Conducted | 7,487 | 934 | 198 | 20 | 168 | 5,266 | 412 | 108 | 84 | - | 101 | 196 |
| All Decisions | 7,848 | 1,109 | 231 | 22 | 151 | 5,376 | 436 | 124 | 77 | - | 101 | 221 |
| Fear Established (Y) | 6,000 | 803 | 178 | 20 | 120 | 4,108 | 352 | 84 | 67 | - | 84 | 184 |
| Fear Not Established (N) | 1,028 | 152 | 18 | - | 14 | 742 | 49 | 24 | 9 | - | 4 | 16 |
| Closings | 820 | 154 | 35 | 2 | 17 | 526 | 35 | 16 | 1 | - | 13 | 21 |

| December 2018 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | 8,070 | 1,212 | 277 | 13 | 189 | 5,363 | 433 | 215 | 61 | 9 | 133 | 165 |
| Interviews Conducted | 6,933 | 840 | 246 | 4 | 151 | 4,858 | 411 | 150 | 41 | - | 109 | 123 |
| All Decisions | 8,405 | 1,000 | 319 | 7 | 210 | 5,928 | 448 | 180 | 49 | - | 122 | 142 |
| Fear Established (Y) | 6,460 | 685 | 230 | 3 | 142 | 4,670 | 362 | 121 | 41 | - | 94 | 112 |
| Fear Not Established (N) | 881 | 152 | 30 | 1 | 31 | 556 | 53 | 26 | 3 | - | 14 | 15 |
| Closings | 1,064 | 163 | 59 | 3 | 37 | 702 | 33 | 33 | 5 | - | 14 | 15 |

| January 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | 9,876 | 1,434 | 466 | 14 | 164 | 6,591 | 498 | 154 | 68 | 81 | 152 | 254 |
| Interviews Conducted | 6,654 | 796 | 258 | 5 | 144 | 4,524 | 350 | 147 | 69 | 33 | 122 | 206 |
| All Decisions | 7,342 | 939 | 286 | 5 | 156 | 4,914 | 405 | 164 | 78 | 36 | 125 | 234 |
| Fear Established (Y) | 5,698 | 637 | 172 | 5 | 101 | 3,984 | 298 | 118 | 60 | 31 | 98 | 194 |
| Fear Not Established (N) | 773 | 159 | 49 | - | 36 | 426 | 46 | 28 | 10 | 2 | 8 | 9 |
| Closings | 871 | 143 | 65 | - | 19 | 504 | 61 | 18 | 8 | 3 | 19 | 31 |

| February 2018 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

| March 2018 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |



**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR00040

### April 2019 (FY 2019)

|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

### May 2019 (FY 2019)

|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

### June 2019 (FY 2019)

|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

### July 2019 (FY 2019)

|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

### August 2019 (FY 2019)

|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

### September 2019 (FY 2019)

|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

**Monthly Credible Fear Top 5 Nationalities Received**
**Fiscal Year 2019**

| Monthly Credible Fear Nationality Report | |
|---|---|
| October-18 | |
| Nationality | Receipts |
| 1 HONDURAS | 2,507 |
| 2 GUATEMALA | 1,936 |
| 3 EL SALVADOR | 1,337 |
| 4 INDIA | 852 |
| 5 CUBA | 786 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| November-18 | |
| Nationality | Receipts |
| 1 HONDURAS | 1,857 |
| 2 GUATEMALA | 1,482 |
| 3 EL SALVADOR | 997 |
| 4 CUBA | 870 |
| 5 INDIA | 713 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| December-18 | |
| Nationality | Receipts |
| 1 HONDURAS | 1,853 |
| 2 GUATEMALA | 1,695 |
| 3 CUBA | 1,091 |
| 4 EL SALVADOR | 939 |
| 5 INDIA | 645 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| January-19 | |
| Nationality | Receipts |
| 1 HONDURAS | 3,327 |
| 2 GUATEMALA | 1,747 |
| 3 EL SALVADOR | 1,145 |
| 4 CUBA | 1,005 |
| 5 INDIA | 508 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| February-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| March-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| April-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| May-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| June-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| July-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| August-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| September-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |



U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

Credible Fear Processing Times
FY 2019 through January 2019

| FY2019 - All Credible Fear cases | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Decisions Served (Any Period) | 28,495 | | 7,633 | 7,031 | 7,351 | 6,480 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Completions (Closings + Served) | 32,219 | | 8,603 | 7,851 | 8,414 | 7,351 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 Days or Less | 16,775 | 52.1% | 4,934 | 3,237 | 4,700 | 3,904 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Over 10 Days | 15,444 | 47.9% | 3,669 | 4,614 | 3,714 | 3,447 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Percent Timely Completed | 52.1% | | 57.4% | 41.2% | 55.9% | 53.1% | | | | | | | | | |



U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR00043

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Total Asylum Applications[1]



| Fiscal Year | Filed | Granted | Total Receipts : Total Grants Ratio |
|---|---|---|---|
| 2008 | 42,836 | 8,777 | 4.88:1 |
| 2009 | 35,811 | 8,384 | 4.27:1 |
| 2010 | 32,882 | 8,234 | 3.99:1 |
| 2011 | 41,459 | 9,866 | 4.2:1 |
| 2012 | 44,562 | 10,460 | 4.26:1 |
| 2013 | 43,439 | 9,690 | 4.48:1 |
| 2014 | 47,491 | 8,559 | 5.54:1 |
| 2015 | 63,562 | 8,108 | 7.83:1 |
| 2016 | 82,224 | 8,684 | 9.46:1 |
| 2017 | 144,053 | 10,537 | 13.67:1 |
| 2018 | 162,060 | 13,168 | 12.3:1 |
| 2019 (Second Quarter[2]) | 103,658 | 7,563 | 13.7:1 |

Data Generated: April 23, 2019
[1] Total (affirmative and defensive) asylum applications filed and total asylum applications granted (initial case completions) in removal, deportation, exclusion, and asylum-only proceedings.
[2] FY 2019 Second Quarter through March 31, 2019.

 Official website of the Department of Homeland Security

 U.S. Department of
Homeland Security

# Migrant Protection Protocols

**Release Date:**  January 24, 2019

*"We have implemented an unprecedented action that will address the urgent humanitarian and security crisis at the Southern border. This humanitarian approach will help to end the exploitation of our generous immigration laws. The Migrant Protection Protocols represent a methodical commonsense approach, exercising long-standing statutory authority to help address the crisis at our Southern border." – Secretary of Homeland Security Kirstjen M. Nielsen*

## What Are the Migrant Protection Protocols?

The Migrant Protection Protocols (MPP) are a U.S. Government action whereby certain foreign individuals entering or seeking admission to the U.S. from Mexico – illegally or without proper documentation – may be returned to Mexico and wait outside of the U.S. for the duration of their immigration proceedings, where Mexico will provide them with all appropriate humanitarian protections for the duration of their stay.

## Why is DHS Instituting MPP?

The U.S. is facing a security and humanitarian crisis on the Southern border. The Department of Homeland Security (DHS) is using all appropriate resources and authorities to address the crisis and execute our missions to secure the borders, enforce immigration and customs laws, facilitate legal trade and travel, counter traffickers, smugglers and transnational criminal organizations, and interdict drugs and illegal contraband.

AR00045

Case 1:19-cv-02369-KBJ   Document 26-1   Filed 08/28/19   Page 58 of 74

MPP will help restore a safe and orderly immigration process, decrease the number of those taking advantage of the immigration system, and the ability of smugglers and traffickers to prey on vulnerable populations, and reduce threats to life, national security, and public safety, while ensuring that vulnerable populations receive the protections they need.

Historically, illegal aliens to the U.S. were predominantly single adult males from Mexico who were generally removed within 48 hours if they had no legal right to stay; now over 60% are family units and unaccompanied children and 60% are non-Mexican. In FY17, CBP apprehended 94,285 family units from Honduras, Guatemala, and El Salvador (Northern Triangle) at the Southern border. Of those, 99% remain in the country today.

Misguided court decisions and outdated laws have made it easier for illegal aliens to enter and remain in the U.S. if they are adults who arrive with children, unaccompanied alien children, or individuals who fraudulently claim asylum. As a result, DHS continues to see huge numbers of illegal migrants and a dramatic shift in the demographics of aliens traveling to the border, both in terms of nationality and type of aliens- from a demographic who could be quickly removed when they had no legal right to stay to one that cannot be detained and timely removed.

In October, November, and December of 2018, DHS encountered an average of 2,000 illegal and inadmissible aliens a day at the Southern border. While not an all-time high in terms of overall numbers, record increases in particular types of migrants, such as family units, travelling to the border who require significantly more resources to detain and remove (when our courts and laws even allow that), have overwhelmed the U.S. immigration system, leading to a "system" that enables smugglers and traffickers to flourish and often leaves aliens in limbo for years. This has been a prime  cause of our near-800,000 case backlog in immigration courts and delivers no consequences to aliens who have entered illegally.

Smugglers and traffickers are also using outdated laws to entice migrants to undertake the dangerous journey north where on the route migrants report high rates of abuse, violence, and sexual assault. Human smugglers and traffickers exploit migrants and seek to turn human misery into profit. Transnational

AR00046

criminal organizations and gangs are also deliberately exploiting the situation to bring drugs, violence, and illicit goods into American communities.  The activities of these smugglers, traffickers, gangs and criminals endanger the security of the U.S., as well as partner nations in the region.

The situation has had severe impacts on U.S. border security and immigration operations.  The dramatic increase in illegal migration, including unprecedented number of families and fraudulent asylum claims is making it harder for the U.S. to devote appropriate resources to individuals who are legitimately fleeing persecution. In fact, approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges. Because of the court backlog and the impact of outdated laws and misguided court decisions, many of these individuals have disappeared into the country before a judge denies their claim and simply become fugitives.

The MPP will provide a safer and more orderly process that will discourage individuals from attempting illegal entry and making false claims to stay in the U.S., and allow more resources to be dedicated to individuals who legitimately qualify for asylum.

## What Gives DHS the Authority to Implement MPP?

Section 235 of the Immigration and Nationality Act (INA) addresses the inspection of aliens seeking to be admitted into the U.S. and provides specific procedures regarding the treatment of those not clearly entitled to admission, including those who apply for asylum.  Section 235(b)(2)(C) provides that "in the case of an alien  . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the U.S.," the Secretary of Homeland Security "may return the alien to that territory pending a [removal] proceeding under § 240" of the INA."  The U.S. has notified the Government of Mexico that it is implementing these procedures under U.S. law.

## Who is Subject to MPP?

With certain exceptions, MPP applies to aliens arriving in the U.S. on land from Mexico (including those apprehended along the border) who are not clearly

AR00047

admissible and who are placed in removal proceedings under INA § 240.  This includes aliens who claim a fear of return to Mexico at any point during apprehension, processing, or such proceedings, but who have been assessed not to be more likely than not to face persecution or torture in Mexico. Unaccompanied alien children and aliens in expedited removal proceedings will not be subject to MPP.  Other individuals from vulnerable populations may be excluded on a case-by-case basis.

## How Will MPP Work Operationally?

Certain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim.  Instead, these aliens will be given a "Notice to Appear" for their immigration court hearing and will be returned to Mexico until their hearing date.

While aliens await their hearings in Mexico, the Mexican government has made its own determination to provide such individuals the ability to stay in Mexico, under applicable protection based on the type of status given to them.

Aliens who need to return to the U.S. to attend their immigration court hearings will be allowed to enter and attend those hearings.  Aliens whose claims are found meritorious by an immigration judge will be allowed to remain in the U.S. Those determined to be without valid claims will be removed from the U.S. to their country of nationality or citizenship.

DHS is working closely with the U.S. Department of Justice's Executive Office for Immigration Review to streamline the process and conclude removal proceedings as expeditiously as possible.

## Will Migrants in MPP Have Access to Counsel?

Consistent with the law, aliens in removal proceedings can use counsel of their choosing at no expense to the U.S. Government.  Aliens subject to MPP will be

AR00048

afforded the same right and provided with a list of legal services providers in the area which offer services at little or no expense to the migrant.

# What Are the Anticipated Benefits of MPP?

Every month, tens of thousands of individuals arrive unlawfully at the Southern Border.  MPP will reduce the number of aliens taking advantage of U.S. law and discourage false asylum claims.  Aliens will not be permitted to disappear into the U.S. before a court issues a final decision on whether they will be admitted and provided protection under U.S. law.  Instead, they will await a determination in Mexico and receive appropriate humanitarian protections there.  This will allow DHS to more effectively assist legitimate asylum-seekers and individuals fleeing persecution, as migrants with non-meritorious or even fraudulent claims will no longer have an incentive for making the journey.  Moreover, MPP will reduce the extraordinary strain on our border security and immigration system, freeing up personnel and resources to better protect our sovereignty and the rule of law by restoring integrity to the American immigration system.

# Additional Information

- Secretary Nielsen Implementation Memo (/publication/policy-guidance-implementation-migrant-protection-protocols) (January 25, 2019, PDF)

Topics:  Border Security (/topics/border-security) , Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords:  Border Security (/keywords/border-security) , immigration enforcement (/keywords/immigration-enforcement) , southwest border (/keywords/southwest-border)

Last Published Date: January 29, 2019

AR00049



# Department of Homeland Security Border Security Metrics Report

*May 1, 2018*



AR00050

# Message from Homeland Security

May 1, 2018

The "Department of Homeland Security Border Security Metrics Report" is submitted pursuant to the Fiscal Year (FY) 2017 National Defense Authorization Act (NDAA), which directs that "Not later than 180 days after the date of the enactment of this section, the Secretary (of Homeland Security) shall develop metrics, informed by situational awareness, to measure the effectiveness of security between ports of entry, at ports of entry, in the maritime environment and to measure the effectiveness of the aviation assets and operations of Air and Marine Operations of U.S. Customs and Border Protection."  The Act further directs the Secretary to annually assess, report, and implement the specified metrics.

The outcome-based performance measures called for by the Act are the most comprehensive, rigorous set of border security metrics required of the Department of Homeland Security (DHS) to date.  Through previous efforts, DHS has established processes and procedures to collect and analyze essential data to meet most, but not all, of the Act's requirements.  This initial report identifies which measures are still unavailable; DHS commits to continuing efforts to produce all the measures required by the Act no later than submission of the next annual report.

DHS considers this report to be the beginning of a consequential dialogue with Congress and the American public wherein defensible data create the foundation for discussions of border security policies and strategies.  This initial report focuses on providing data and information on DHS methodological approaches.  In accordance with the Act, future annual reports will include trend analysis of the measures being reported.

Thank you for your continuing support and commitment to strengthening the operating effectiveness of DHS.

Pursuant to congressional requirements, this notification is being provided to the following Members of Congress:

> The Honorable Ron Johnson
> Chairman, Senate Committee on Homeland Security and Governmental Affairs

> The Honorable Claire McCaskill
> Ranking Member, Senate Committee on Homeland Security and Governmental Affairs

> The Honorable Michael McCaul
> Chairman, House Committee on Homeland Security

> The Honorable Bennie Thompson
> Ranking Member, House Committee on Homeland Security

Inquiries relating to this report may be directed to the DHS Office of Legislative Affairs at (202) 447-5890.

AR00051

Sincerely,


James W. McCament
Deputy Under Secretary
Office of Strategy, Policy, and Plans

AR00052



# DHS Border Security Metrics Report

## Table of Contents

I.      Legislative Language ................................................................................................5

II.     Introduction............................................................................................................6

III.    SEC. 1092 BORDER SECURITY METRICS ............................................................9

§ 1092 (b) METRICS FOR SECURING THE BORDER BETWEEN PORTS OF ENTRY ..........................9

§ 1092 (c) METRICS FOR SECURING THE BORDER AT PORTS OF ENTRY...................................33

§ 1092 (d) METRICS FOR SECURING THE MARITIME BORDER ...................................................44

§ 1092 (e) AIR AND MARINE SECURITY METRICS IN THE LAND DOMAIN ...............................51

§ 1092 (g)(3)(D) Other Appropriate Information ....................................................................56

IV.     Conclusion .............................................................................................................62

Appendix A – Repeated Trials Model Methodology.............................................................63

Appendix B – Drugs Seizures – All Ports of Entry ...............................................................66

AR00053

# I.    Legislative Language

Section 1092 of the FY 2017 National Defense Authorization Act (NDAA), signed into law December 23, 2016, directs the Secretary of Homeland Security to provide annually to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate specific "Metrics for Securing the Border Between Ports of Entry," "Metrics for Securing the Border At Ports of Entry," "Metrics for Securing the Maritime Border," and "Air and Marine Security Metrics in the Land Domain." The NDAA further directs that the Secretary "in accordance with applicable privacy laws, make data related to apprehensions, inadmissible aliens, drug seizures, and other enforcement actions available to the public, law enforcement communities, and academic research communities."

5

AR00054

# II.  Introduction

As President Donald Trump indicated in Executive Order 13767 "Border Security and Immigration Enforcement Improvements" (January 25, 2017), border security is critically important to the national security of the United States.  The Department's ability to measure its border-security inputs, activities, outputs, and outcomes is essential to the effective and efficient management of the Department, including management of the new activities and investments directed by the President's Executive Orders on border security and immigration enforcement.

Comprehensive and rigorous performance management data provide DHS leadership with the foundation to support responsible evidence-based decision-making for resource allocation and investments and for operational and mission management.  Further, DHS implementation of this approach provides a pair of unifying border security goals under the Department's mission to secure and manage U.S. borders.  As summarized in the DHS Quadrennial Homeland Security Review (QHSR), the Department's first two goals under the border security mission area are to "Secure U.S. Air, Land, and Sea Borders and Approaches" by preventing illegal entry and to "Safeguard and Expedite Lawful Travel and Trade" by safeguarding key nodes, conveyances, and pathways, and by managing the risk of people and goods in transit.  Ultimately, the border security metrics described in this report are designed to assess the ability of the Department's border security policies and investments to achieve these outcomes.

For analytic purposes, the metrics included in this report may be divided into four categories:

- Inputs:  Resources acquired or expended to secure the border.  Examples of border security inputs include the number of U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) officers and U.S. Border Patrol (USBP) agents deployed, miles of fencing and other border infrastructure, and numbers of aircraft committed to the border security mission.
- Activities:  Specific actions taken to secure the border.  Examples of border security activities include illegal border crossers apprehended, travelers admitted or denied admission at ports of entry (POE), and pounds of narcotics seized.
- Outputs:  Immediate results of enforcement activities as they relate to the border security goals.  Examples of border security outputs include the rate at which intending unlawful border crossers are apprehended or interdicted, and the accuracy of screening results for travelers and goods at POEs.
- Outcomes:  The ultimate impacts of border security policies.  As defined by the QHSR, the most important border security outcomes are the numbers of illegal migrants and quantities of illegal goods entering the United States (Goal 2.1), and the ease with which lawful travelers and goods pass through POEs (Goal 2.2).

In general, border security *inputs* and *activities* are directly observable and can be measured with a high degree of reliability.  Policymakers have direct control over resource allocation, and data on inputs are available in budget and acquisitions documents.  Operational agencies also track enforcement activities as part of their case management process.  In short, the Department knows exactly how many agents it deploys, how many miles of fence it erects, how many aliens it apprehends, and how many travelers it admits.  Input and activity measures tend to provide insight into the level and type of enforcement effort undertaken—what the Department is

6

doing—that are useful for workload management and tactical decision-making; but in and of themselves these metrics typically provide limited insight into the state of border security.

*Outcome* and *output* measures often provide more insight than inputs and activities when it comes to evaluating border security and may be powerful tools for policy and program evaluation. Yet many output and outcome metrics are difficult to measure directly because illegal border crossers actively seek to evade detection, and some flows are undetected and therefore can never be measured directly. This challenge is nearly universal when measuring illegal activities, which is why law enforcement agencies typically rely on crime *reports* as indicators of *total* criminal activities, for example. Measuring border security outputs and outcomes is also difficult because of the diversity and complexity of the enforcement mission along the United States' 6,000 miles of land borders, 95,471 miles of coastline, and 350 POEs. Moreover, enforcement outcomes only partially depend on border security policies, since immigration flows also reflect numerous factors outside enforcement agencies' control, including the broader set of U.S. immigration policies and numerous economic, demographic, and other structural factors.

Historically, DHS and the legacy Immigration and Naturalization Service addressed these measurement challenges by relying on alien apprehensions (an activity metric) as a proxy measure of illegal immigration between POEs (an outcome metric). More recently, CBP and DHS have initiated a number of new estimation strategies to better model unknown flows. These efforts have focused primarily on border security between POEs in the land domain (NDAA § 1092(b)), a domain that has been identified by Congress and the last several Administrations as a top enforcement priority. Some of this research remains a work in progress as DHS is not yet able to validate certain modeling assumptions or to quantify the uncertainty around its new estimation techniques. In addition, many of the metrics in this report remain limited to the southwest border. The Department's future work on border metrics will continue to refine these new indicators of border security between POEs and expand data collection and methodologies to the northern border, while also developing additional indicators of border security, including those identified as incomplete in this report.

Pursuant to the NDAA, this report covers a mix of input, activity, output, and outcome metrics between POEs, at POEs, in the maritime domain, and with respect to air and marine security in the land domain. While most of these measures involve data the Department has tracked for many years, some remain under development or fall outside the scope of the Department's existing measurement methodologies. This report includes the following information for each border security metric:
- Definition of the metric and brief description of how the metric contributes to the Department's understanding of border security;
- Discussion of the Department's current methodology for producing the metric and related methodological limitations; and
- Available data, including historical data where possible, and brief discussion of implications for the current state of border security.

The following sections of this report provide this information for each metric directed by the NDAA. In addition to the specific metrics identified in sections §1092(b) – (e), this report

AR00056

includes supplemental measures that inform the Department's assessment of the state of border security between POEs, as directed by NDAA § 1092(g)(3)(D).

AR00057

# III.  SEC. 1092 BORDER SECURITY METRICS

## § 1092(b) Metrics for Securing the Border between Ports of Entry

### § 1092(b)(1)(A)(i) Attempted Unlawful Border Crosser Apprehension Rate

**Definition**

In general, the attempted unlawful border crosser apprehension rate is defined as the proportion of attempted border crossers that is apprehended by USBP:

$$Apprehension\ Rate = \frac{Apprehensions}{Unlawful\ Entry\ Attempts}$$

While USBP has reliable administrative data on apprehensions, the Department does not have an exact count of unlawful entry attempts since an unknown number of illegal border crossers evade detection.  As a result of this so-called "denominator problem," the Department must estimate the apprehension rate.  Current methodologies allow DHS to produce two apprehension rate estimates:

*Model-based Apprehension Rate* ($AR_{Model\text{-based}}$) – Based on statistical modeling, the estimated share of all attempted unlawful border crossers between land POEs that is apprehended.

*Observational Apprehension Rate* ($AR_{Observational}$) – Based on direct (unlawful border crossers observed by USBP) and indirect (residual evidence of a border crosser, i.e. footprints) observations of attempted unlawful border crossers, the estimated share of observed attempted unlawful border crossers that is apprehended.

The apprehension rate is an *output measure* that describes the difficulty of illegally crossing the border successfully.

A conceptual limitation of apprehension rate data is that they include information about border *apprehensions*, but exclude information about *turn backs* (see section 1092 (b)(1)(A)(iv) for definition), which are a key element of USBP's enforcement strategy, with underlying operational implications.  In this sense, measures of the apprehension rate understate USBP's overall enforcement success rate.  On the other hand, some analysts consider information about turn backs difficult to interpret since an unknown share of turn backs make additional entry attempts.

9

AR00058

**Methodology and Limitations**

*Model-based Apprehension Rate*

The Model-based Apprehension Rate is based on the repeated trials model (RTM) methodology. As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossers, which focuses on a relatively small share of attempted unlawful border crossers.  Following the calculation of the PAR, the AR$_{Model-based}$ methodology consists of four additional steps.

First, all attempted unlawful border crossers are divided into two groups, which are labeled "impactable" and "non-impactable" by traditional DHS enforcement policies.  Impactable border crossers include adults without children who are not asylum seekers and (prior to 2017) are not from Cuba.  Aliens in this group are described as impactable because they are generally subject to the full range of DHS and Department of Justice (DOJ) enforcement consequences, and therefore potentially impacted by existing border enforcement.  Non-impactable border crossers include unaccompanied minors, family units, individuals who request asylum, and (prior to 2017) Cubans.  Aliens in this group are described as non-impactable because, historically, they have usually been released into the United States with a Notice to Appear in immigration court for legal proceedings on a future date, rather than being subject to immediate DHS enforcement consequences.  These aliens are assumed generally to be "non-impactable" by traditional DHS enforcement activities at the border because even if they are apprehended they are typically unlikely to be immediately removed or returned.[1]

Second, the AR$_{Model-based}$ methodology assumes an apprehension rate for each of these two groups:  1) all attempted unlawful border crossers in the impactable population are assumed to be apprehended at the partial apprehension rate generated by the RTM methodology; and 2) all unlawful border crossers in the non-impactable population are assumed to intentionally present themselves to a USBP agent or OFO officer and therefore to have a 100 percent apprehension rate.  Notably, these assumptions do not reflect the actual behavior of all border crossers, as noted below, but they serve to construct a probability model.

Third, the Partial Apprehension Rate is used to calculate the total number of impactable aliens making illegal entry attempts.  The methodology assumes (in the previous step) that all impactable aliens are apprehended at the PAR rate generated by the RTM methodology:

$$PAR = \frac{Apprehensions_{Impactable}}{Attempts_{Impactable}}$$

---

[1] Cubans were considered "non-impactable" between 1995 and January 2017 because they were routinely granted parole into the United States if they reached U.S. soil, under the wet-foot/dry-foot policy.  The Obama Administration terminated the special parole component of the wet-foot/dry-foot policy in January 2017.

AR00059

Mathematically, this equation can be re-arranged to define the total number of impactable aliens making an illegal entry attempt as follows:

$$Attempts_{Impactable} = \frac{Apprehensions_{Impactable}}{PAR}$$

Since non-impactable aliens are assumed to have a 100% apprehension rate, the number of entry attempts of non-impactable aliens is equal to the number of their apprehensions.

Finally, the Total Apprehension Rate is calculated as a weighted average of the total numbers of impactable and non-impactable aliens attempting unlawful entry times their respective apprehension rates:

$$AR_{Model-based} = \frac{(Attempts_{Impactable} * PAR) + (Attempts_{Non-impactable} * 100\%)}{(Attempts_{Impactable} + Attempts_{Non-impactable})}$$

The current $AR_{Model-based}$ methodology makes a number of assumptions that cannot be fully validated. First, the $AR_{Model-based}$ methodology builds on the RTM's partial apprehension rate, and so incorporates all of the RTM modeling assumptions and associated limitations discussed in Appendix A. In addition, the current $AR_{Model-based}$ methodology also assumes: that the entire cohort of border crossers can be divided into impactable and non-impactable groups, that the entire impactable group is apprehended at the same rate as RTM aliens included in the PAR analysis, and that the entire non-impactable group is apprehended 100 percent of the time. Each of these additional assumptions introduces potential biases into the estimated apprehension rate.

The Department has not precisely quantified the impact of these assumptions on the $AR_{Model-based}$ estimates. For these reasons, DHS considers the $AR_{Model-based}$ methodology to be a work in progress. DHS is working to refine the $AR_{Model-based}$ methodology to address these limitations and to more precisely describe their impact on the $AR_{Model-based}$ estimate. The estimated apprehension rates reported here may be updated in the future as the Department continues to refine the model-based estimation methodology.

*Observational Apprehension Rate*

The Observational Apprehension Rate is calculated as the ratio of USBP apprehensions to the sum of apprehensions and observed (directly or indirectly) got aways:

$$AR_{Observational} = \frac{Apprehensions}{Apprehensions + Got\ Aways}$$

"Got aways" are defined as subjects at the southwest border who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.

Since 2014, USBP has implemented a standard, southwest border-wide methodology for determining when to report a subject as a got away. Some subjects are observed directly as evading apprehension or turning back; others are acknowledged as got aways or turn backs after

AR00060

agents follow evidence that indicate entries have occurred such as foot sign (i.e. tracks), sensor activations, interviews with apprehended subjects, camera views, and communication between and among stations and sectors.  The scope of these data includes all areas of the southwest land border at or below the northernmost law enforcement posture (typically a USBP checkpoint) within a given area of responsibility, and those individuals apprehended less than 30 days after entering the United States.

In an effort to maintain reliable best practices, command staff at all southern border stations ensure all agents are aware of and utilize proper definitions for apprehensions, got aways and turn backs at their respective stations.  They also ensure the necessary communication takes place between and among sectors and stations to minimize double-counting when subjects cross more than one station's area of responsibility. In addition to station-level safeguards, designated USBP Headquarters components validate data integrity by utilizing various data quality reports.

The primary limitation to $AR_{Observational}$ is that the denominator excludes an unknown number of unobserved got aways.  Over the past several years, DHS has invested millions of dollars in technology that has facilitated the ability to see and detect more at the border.  Improvements in situational awareness give DHS an ever-increasing, real-time ability to understand how much illegal activity agents are encountering at the immediate border and their ability to respond.  As a result, despite the fact that overall border entries are substantially lower today than in any previous fiscal year, agents are currently interdicting slightly *lower* percentages of the total known flow.  This observation reflects USBP's increased domain awareness—i.e., that through technological advances, the agency has improved its awareness of illegal entry attempts (known got aways)—rather than experienced a drop in enforcement effectiveness.  Increasing situational awareness narrows the gap between the known and unknown flow, and puts DHS in a position to build ever better observational estimates of border security.  The Department will continue to refine these observational estimates and is currently working on a methodology to estimate their statistical reliability.

An additional methodological limitation is that the estimated count of got aways aggregates potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to establish reliable turn back and got away methodologies, as discussed above.

**Available Data and Discussion**

Table 1 provides the estimated model-based apprehensions rate for FY 2003 – FY 2016 and the estimated observational apprehension rate for FYs 2006-2016, the years for which these data are available.

AR00061

Table 1:  Model-Based and Observational Apprehension Rates, FY 2000 – FY 2016

| Fiscal Year | Model-based Apprehension Rate | Observational Apprehension Rate |
|---|---|---|
| 2003 | 34.1 | NA |
| 2004 | 37.0 | NA |
| 2005 | 39.1 | NA |
| 2006 | 39.2 | 63.5 |
| 2007 | 40.2 | 64.1 |
| 2008 | 44.6 | 67.7 |
| 2009 | 47.2 | 70.7 |
| 2010 | 46.6 | 74.4 |
| 2011 | 46.1 | 79.4 |
| 2012 | 48.0 | 77.5 |
| 2013 | 51.0 | 70.8 |
| 2014 | 65.5 | 74.8 |
| 2015 | 63.5 | 76.7 |
| 2016 | 64.8 | 79.4 |

Since FY 2003, the model-based apprehension rate has climbed from less than 35 percent to nearly 65 percent in FY 2016.  These increases reflect a higher apprehension rate for "impactable" border crossers as well as an increase in the share of border crossers who are "non-impactable" and therefore assumed to be apprehended 100 percent of the time.

The observational apprehension rate has also shown improvements since FY 2006.  Despite its limitations, the upward trend in $AR_{Observational}$ is noteworthy because it independently reinforces the upward trend observed in the model-based estimate.  Moreover, with increasing situational awareness along the border during this period, it is likely that CBP detects an increasing share of total got aways over time.  As a result, the upward trend in $AR_{Observational}$ likely under-estimates the actual increase in the total share of attempted border crossers that is apprehended.

## § 1092(b)(1)(A)(ii) Detected unlawful entries

**Definition**

*Detected unlawful entries* – The total number of attempted unlawful border crossers between land POEs who are directly or indirectly observed or detected by USBP.

Detected unlawful entries is an *outcome measure* that describes the numbers of migrants detected crossing or attempting to cross the border unlawfully.  Detected unlawful entries is not a comprehensive outcome measure since it excludes undetected unlawful entries, as discussed below.  The ratio of detected to undetected unlawful entries, also discussed below, is an *output measure* that describes the Department's ability to detect unlawful entries.

13

AR00062