**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MAKE THE ROAD NEW YORK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 19-cv-2369 (KBJ) |
| | ) | |
| KEVIN McALEENAN, *Acting Secretary* | ) | |
| *of the Department of Homeland Security*, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

TABLE OF CONTENTS

I.   **Introduction** ...................................................................................................... 1

II.  **Background** ...................................................................................................... 7

    A. The Immigration And Nationality Act's Expedited Removal Provision .............. 7

    B. Agency Implementation Of The INA's Expedited Removal Provision .............. 12

        1.  Prior Section 1225(b)(1)(A)(iii) Expedited Removal Designations ......... 13

        2.  Acting DHS Secretary Kevin McAleenan's Notice Of July 23, 2019 ...... 15

    C. Judicial Review Of Legal Claims Regarding Expedited Removal ..................... 18

III. **Procedural History** ....................................................................................... 23

IV. **Motions For Preliminary Injunctions In Cases Challenging Agency Action** ........ 25

V.   **Analysis** ...................................................................................................... 28

    A. Plaintiffs Have A Likelihood Of Succeeding With Respect To Their
       Administrative Procedure Act ("APA") Claims ................................................ 29

        1.  Plaintiffs Are Likely To Be Able To Demonstrate That Article III's
           Jurisdictional And Standing Requirements Are Satisfied ...................... 30

           a.  It is likely that this Court has subject-matter jurisdiction to consider
               Plaintiffs' APA claims under 28 U.S.C. § 1331 ............................. 31

           b.  It is likely that Plaintiffs have associational standing .................... 43

        2.  Plaintiffs Are Likely To Be Able To Establish That The APA Provides A

Cause Of Action For Their Claims That DHS Has Committed Procedural Violations ....................................................................................49

    a.  It is unlikely that the INA provides a cause of action for Plaintiffs' procedural claims ........................................................51

    b.  It is unlikely that the INA commits to agency discretion the process by which the section 1225(b)(1)(A)(iii) expedited removal designation is to be determined.......................................................56

  3.  Plaintiffs Are Likely To Succeed On The Merits Of Their APA Arguments 65

    a.  The APA requires that agencies seek public comment prior to rulemaking, and that they conduct their deliberations so as to minimize the risk of reaching arbitrary and capricious conclusions. 66

    b.  It is likely that DHS needed to proceed through notice and comment rulemaking prior to issuing the July 23rd Notice and that no good cause exists for the agency not to have complied with these mandates in this instance ...........................................................71

    c.  It is likely that the July 23rd Notice resulted from arbitrary and capricious decision making.........................................................83

B.  If Plaintiffs' Members Are Subjected To DHS's Expanded Expedited Removal Policy During The Pendency Of This Lawsuit, They Will Suffer Irreparable Harm 96

C.  Both The Balance Of The Equities And The Public's Interest Weigh In Favor Of The Issuance Of A Preliminary Injunction.......................................................103

D.  Defendants' Argument That Any Injunction Can Only Restrict Agency Action As To *These* Plaintiffs Cannot Be Countenanced .................................................107

**VI.  Conclusion** .......................................................................................119

## I.   INTRODUCTION

Administrative agencies have long been required by law to adhere to certain procedural standards when they evaluate options and assess alternatives with respect to the implementation of policy objectives. *See, e.g.*, 5 U.S.C. § 553(b)–(c) (requiring agencies to provide notice and solicit public participation as part of agency rulemaking, commonly known as "notice and comment"). This is by design; statutory requirements that pertain to *how* an agency conducts its internal deliberations are intended to promote transparency and to prevent arbitrary decision making by unelected government officials. *See Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980) ("The essential purpose of according . . . notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." (footnote omitted)); *Wong Yang Sun v. McGrath*, 339 U.S. 33, 40–41 (1950), *superseded by statute on other grounds* (explaining that the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, was enacted to supplant unregulated rule making by independent commissions, and that one of the Act's "fundamental . . . purpose[s]" was "to curtail and change the practice of embodying in one person or agency the duties of prosecutor and judge"). Thus, even when an agency has the authority to make a final policy decision, procedural mandates that constrain its decision making processes operate as safeguards of individual liberty, and therefore, are entirely consistent with foundational democratic and constitutional norms.

The instant case requires this Court to determine whether, *inter alia*, the Department of Homeland Security ("DHS") unlawfully dispensed with core procedural

prerequisites when it suddenly announced that the agency was designating undocumented non-citizens who have been in this country for up to two years, and who are located far beyond the border, as eligible for "expedited removal" from the United States.  Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409, 35,409 (July 23, 2019).[1]  Generally speaking, expedited removal is the statutory authorization that enables federal immigration officers to slate certain undocumented non-citizens for rapid deportation "without further hearing or review[.]"  8 U.S.C. § 1225(b)(1)(A)(i).

Prior to July 23, 2019, DHS had authorized expedited removal with respect to undocumented non-citizens who arrived in the United States by land only if such persons were encountered near the border and had been in the country for no longer than 14 days.  See 84 Fed. Reg. at 35,409.  In a "Notice" that DHS published in the Federal Register on July 23, 2019 (more than two and half years after President Donald Trump issued an executive order that demanded that DHS expand its established expedited removal practices), the agency instantly authorized line immigration-enforcement agents to apply expedited removal to non-citizens encountered anywhere in the United States for up to two years after the non-citizen arrived in the United States, effective immediately.  See id.  This abrupt change in the official policies that govern DHS's deportation practices is the subject of the legal claims that have been presented to the Court in this case.

Three immigrant-rights organizations—Make the Road New York, La Union Del Pueblo Entero ("LUPE"), and WeCount! (collectively, "Plaintiffs")—have filed the

---

[1] The Court uses the term "undocumented non-citizens" throughout this Memorandum Opinion to refer to persons born abroad—the federal immigration statutes call them "aliens"—who are deemed "inadmissible" under 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7) because they have not received authorization to come into, or remain, in the United States.

instant lawsuit against DHS, its Secretary, and other agency officials (collectively, "DHS" or "Defendants").  Plaintiffs allege, among other things, that DHS's July 23rd Notice violated the Administrative Procedure Act ("APA"), because the agency did not engage in notice and comment rulemaking prior to issuing the July 23rd Notice, and also because DHS failed to take the established flaws in the preexisting expedited removal system into account before it reached the conclusion that the expedited removal process should be applied to a broader category of non-citizens.  (*See* Compl., ECF No. 1, ¶¶ 129–34, 149–51.)[2]

Before this Court at present is a motion for a preliminary injunction that Plaintiffs have filed "to prevent severe and irreparable harm" to their members while the parties litigate the myriad legal issues that this legal action raises.  (Pls.' Mot. for a Prelim. Inj. ("Pls.' Mot."), ECF No. 13, at 2.)[3]  The array of legal issues that this Court must ultimately decide includes whether the APA even applies to the expedited-removal designations that the DHS Secretary makes under 8 U.S.C. § 1225(b)(1)(A)(iii)(I), and the parties have made various arguments that, at bottom, relate to that key question.  As a threshold matter, Plaintiffs contend that this Court has subject-matter jurisdiction over their APA challenges under the circumstances that are expressly addressed in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and that at least

---

[2] Plaintiffs also assert that, under the Due Process Clause of the U.S. Constitution, the July 23rd Notice provides insufficient process to people who are apprehended in the interior of the United States (far from the border), and who have lived continuously in this country for extended periods of time.  (*See, e.g.*, Pls.' Mem. in Supp. of Mot. for a Prelim. Inj., ECF No. 13-1, at 48–49.)  This Court need not evaluate the merits of Plaintiffs' Due Process claim, or their similar Suspension Clause accusation, for the reasons explained in this Memorandum Opinion (*see infra*, n.12), and it has not done so.

[3] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

seven of their members have Article III standing to pursue the instant APA claims. Plaintiffs also assert that they have a likelihood of success on the merits of their claims that DHS has violated the APA, and that without a preliminary injunction to prevent enforcement of the policy change announced in the July 23rd Notice, their members will suffer irreparable harm.  Defendants respond that this Court cannot review Plaintiffs' claims consistent with its power under Article III, either because Congress intended to preclude the exercise of subject-matter jurisdiction over the Secretary's expedited removal designations or because Plaintiffs lack standing and a cause of action to bring these kinds of claims.  Defendants also maintain that Plaintiffs are unlikely to succeed on the merits of their contention that the July 23rd Notice was procedurally defective or otherwise violates the law.

For the reasons explained fully below, Plaintiffs' motion for a preliminary injunction will be **GRANTED**, and as a result, DHS will be **PRELIMINARILY ENJOINED** from enforcing the expedited removal expansion that the Acting DHS Secretary prescribed in the July 23rd Notice while the instant claims are being litigated, pending further order of this Court.  In short, the Court finds that Plaintiffs are likely to be able to establish successfully that the Court has subject-matter jurisdiction under section 1331 of Title 28 of the United States Code; that the INA's section 242 (8 U.S.C. § 1252) does not strip the federal courts of jurisdiction over APA claims like the ones that Plaintiffs are asserting; that the APA, rather than the INA, provides the cause of action for Plaintiffs' procedural claims; and that Congress did not intend to commit implementation of the expedited removal process it authorized entirely to agency discretion such that the APA cause of action is precluded.  In addition, given Plaintiffs'

4

identification of members who attest to being subject to the challenged policy, these Plaintiff-organizations are also likely to be able to demonstrate that they have associational standing, and the Court further finds, at least preliminarily, that the effect of the July 23rd Notice is likely sufficiently binding to qualify as a rule to which the APA's notice-and-comment procedures apply.

Plaintiffs are also likely to succeed on the merits of their contention that the July 23rd Notice is arbitrary and capricious, and therefore unlawful, because DHS failed to address significant flaws in the expedited removal system, nor does it appear that the agency considered the potential impact of the expansion of that system on settled undocumented non-citizens and their communities. Unlike private citizens, government officials are required by law to engage in reasoned decision making that takes into account all of the facts and circumstances that are relevant to their consequential policy determinations. Based on the record presented here, the Court finds it likely that, with respect to the July 23rd Notice, DHS failed to do so.

The Court also concludes that a preliminary injunction is warranted while this lawsuit is pending, because Plaintiffs have demonstrated that they have members who are subject to the expanded expedited removal policy, and that those members, and others, might suffer irreparable harm in the absence of a preliminary injunction. The record also supports a finding that the fear caused by DHS's current threat to commence enforcement of its expanded expedited removal policy may be presently harming Plaintiffs' members and others in immigrant communities. Moreover, given the potential for mistaken application of the expedited removal practice to persons who are not otherwise subject to deportation, which has serious implications for society writ

large, the Court finds that interim injunctive relief is in the public's interest, while, on the other hand, it is unlikely that the issuance of such an injunction would harm DHS or the public to such an extent that that injury would outweigh the benefits of preserving the status quo while this matter is under review.

Finally, in ordering the preliminary relief that Plaintiffs have requested, this Court squarely rejects DHS's argument that any injunctive relief that is issued in this case, whether preliminary or permanent, can only prohibit application of the agency's unlawful rule *as it applies to these plaintiffs*.  (*See* Defs.' Mem. in Opp'n to the Mot. for Prelim. Inj. ("Defs.' Opp'n"), ECF No. 25, at 75–76.)  This contention is not only flatly inconsistent with the plain language of the APA, it is also entirely impractical when invoked in the realm of judicial review of administrative action.  The APA states in no uncertain terms that, to remedy defective rulemaking after a plaintiff successfully challenges the process that an agency has used to promulgate a rule, the reviewing court must "hold unlawful and set aside" the challenged agency action, 5 U.S.C. § 706(2), and that is precisely what this Court's injunction does, as a preliminary matter, pending full litigation of the issues in this case.  This statutorily prescribed remedy has nothing to do with the standing or status of the plaintiff-challengers.  Nor is there anything "nationwide" about the resulting prohibition (Defs.' Opp'n at 75); indeed, such an injunction pertains *only* to an agency's act of enacting the defective rule; it is addressed *only* to the agency that has failed to adhere to the required rulemaking procedures; and it binds *only* that particular entity with respect to the rule in question.  Thus, the injunctive relief that the APA plainly prescribes is a targeted restriction that, by statute, essentially treats an unlawfully promulgated agency rule as void *ab initio* due to the

agency's failure to adhere to the APA's procedural mandates.

Apparently unwilling to accept that required result, the government has conjured up a strawman by insisting that, even when a plaintiff successfully establishes that an agency's rulemaking is fatally flawed, federal district courts must avoid enjoining an agency rule on a "nationwide" basis.  (*See* Defs.' Opp'n at 75.)  As explained below, injunctions that invalidate procedurally deficient agency rules on APA grounds, and thereby prohibit an agency from enforcing those rules, do no such thing.  If this Court's Order preliminarily prohibiting DHS from enforcing the expedited removal policy the agency announced in the July 23rd Notice reverberates nationally, that is simply and solely because DHS previously decided to apply its potentially defective rule nationwide.

## II.    BACKGROUND

### A.    The Immigration And Nationality Act's Expedited Removal Provision

"The Immigration and Nationality Act sets forth the conditions under which a foreign national may be admitted to and remain in the United States and grants the Department of Homeland Security the discretion to initiate removal proceedings." *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 171 (D.D.C. 2015) (citing 8 U.S.C. §§ 1181–82, 1184, 1225, 1227–29, 1306, 1324–25).  With respect to the removal of unauthorized non-citizens, the INA, which was enacted in 1952, has always generally provided that "[a]n immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien[,]" 8 U.S.C. § 1229a(a)(1), and in the context of such proceedings before an immigration judge, the INA makes clear that non-citizens are to be afforded certain rights, including the right to counsel, to examine and cross-examine

witnesses, to present evidence, and to appeal, *see id*. § 1229a(b). However, 44 years after the INA was enacted, Congress undertook an extensive border-security reform effort that ultimately resulted in its adoption of a piece of legislation known as the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C., Title I, 110 Stat. 3009-546 (1996), which authorized an alternative, truncated process for the removal of certain non-citizens.

To understand the IIRIRA's impact, it is helpful to have a sense of what preceded it. "Before IIRIRA's passage, United States immigration law established 'two types of proceedings in which aliens can be denied the hospitality of the United States: deportation hearings and exclusion hearings.'" *Vartelas v. Holder*, 566 U.S. 257, 261 (2012) (quoting *Landon v. Plasencia*, 459 U.S. 21, 25 (1982)). "The deportation hearing [was] the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing [was] the usual means of proceeding against an alien outside the United States seeking admission." *Landon*, 459 U.S. at 25. Deportation hearings provided more procedural safeguards than exclusion hearings did, such as notice, the right to appeal, and the right to designate the country of deportation. *See id.* at 26. However, "[i]n IIRIRA, Congress abolished the distinction between exclusion and deportation procedures and created a uniform proceeding known as 'removal.'" *Vartelas*, 566 U.S. at 262 (citing 8 U.S.C. §§ 1229, 1229a; *Judulang v. Holder*, 556 U.S. 42, 45–46 (2011)).

The impetus for this statutory change was, apparently, Congress's determination that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States [were] cumbersome and duplicative[.]" H.R. Rep. No. 104-469, at 107 (1996).

Thus, Congress reformed those procedures in the IIRIRA, and created a removal

process that contained procedural options that varied based on the undocumented non-

citizen's arrival status.  The House Committee on the Judiciary explained at the time of

the IIRIRA's enactment that "[a]liens who arrive in the United States with no valid

documents will be removed on an expedited basis[,]" except for those "with credible

asylum claims[,]" who would be allowed to pursue those claims, and "[f]or illegal

aliens already present in the U.S., there will be a single form of removal proceeding,

with a streamlined appeal and removal process."  *Id*. at 107–08; *see also O.A. v. Trump*,

Civ. No. 18-2718, 2019 WL 3536334, at *3 (D.D.C. Aug. 2, 2019) (noting that,

"[a]mong other changes, IIRIRA established two types of removal proceedings").

        As relevant here, the IIRIRA explicitly designates *certain* non-citizens as

potentially subject to the fast-track, near-immediate ejection removal procedure that is

commonly referred to as "expedited removal."  Specifically, Congress amended section

235 of the INA (presently codified as 8 U.S.C. § 1225) to address "Inspections of aliens

arriving in the United States and certain other aliens who have not been admitted or

paroled[,]" and to provide for the "[s]creening" of such individuals, as follows:

   **(i)**      **In general**

> If an immigration officer determines that an alien . . . who is
> arriving in the United States or is described in clause (iii) is
> inadmissible . . . , the officer shall order the alien removed
> from the United States without further hearing or review
> unless the alien indicates either an intention to apply for
> asylum . . . or a fear of persecution.

8 U.S.C. § 1225(b)(1)(A)(i).[4]  Thus, under the IIRIRA's expedited removal process, "an

---

[4] The inadmissibility determination under this provision is governed by Title 8, sections 1182(a)(6)(C) and 1182(a)(7).  The former makes inadmissible "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation,

arriving alien can be denied entry into the U.S. by an immigration officer because of misrepresentation, use of fraudulent documents, or lack of any documents[,]" and "[t]he alien may be ordered removed without a hearing before an immigration judge, and without administrative or judicial review."  H.R. Rep. No. 104-469, at 157.

Notably, under federal immigration statutes and their accompanying regulations as they currently exist, there is a substantial difference between being permitted to engage in regular removal proceedings and being subjected to expedited removal. "Regular, or 'formal,' removal proceedings allow aliens to challenge their removal in administrative proceedings with various procedural guarantees, including the rights to written notice of the charge of removability, to counsel, to appear at a hearing before an immigration judge and to present evidence, to appeal an adverse decision to the Board of Immigration Appeals ('BIA'), and to seek judicial review."  *O.A.*, 2019 WL 3536334, at *3; *see also id.* (explaining, further, that "[a]n alien placed in formal removal proceedings may avoid removal by establishing, through the adversarial process, that she is eligible for asylum, withholding of deportation, or some other form of relief").  By contrast, the Code of Federal Regulations makes clear that, for expedited removal, an immigration officer need only question and record the non-citizen's statement concerning her "identity, alienage, and inadmissibility," 8 C.F.R. § 235.3(b)(2)(i), and allow the non-citizen to present evidence that she has been admitted or paroled, *see id.* § 235.3(b)(6), before ordering the non-citizen removed. The immigration officer "will attempt to verify the alien's status through a check of all

---

or admission into the United States[,]" 8 U.S.C. § 1182(a)(6)(C), while the latter makes inadmissible any immigrant who does not have "a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document . . . and a valid unexpired passport, or other suitable travel document or document of identity and nationality[,]" *id.* § 1182(a)(7).

available Service data systems"; however, "[t]he burden rests with the alien to satisfy the examining immigration officer of the claim of lawful admission or parole." *Id.*[5]

The regulations do require that "[i]nterpretative assistance . . . be used if necessary to communicate with the alien," *id.* § 235.3(b)(2)(i), and if the non-citizen "indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer[,]" *id.* § 235.3(b)(4). Once the immigration officer orders the non-citizen removed, a supervisor reviews the order before it is considered final, *see id.* § 235.3(b)(7), but there is no right to appeal of the order of removal or to any hearing before an immigration judge, *see id.* § 235.3(b)(2)(ii).

According to the House Judiciary Committee, when Congress adopted expedited removal in the IIRIRA in 1996, it specifically found that rapid removal procedures were "necessary" because "thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S.[,]" and it determined that "[u]nless such aliens claim to be U.S. nationals, or state a fear of persecution, there is no requirement under the Constitution or international treaty to do anything other than return them, as promptly as possible, to where they boarded the plane to come here." H.R. Rep. No. 104-469, at 158. Thus, "[t]he purpose of [the IIRIRA's expedited

---

[5] If "[a]n alien['s] claim to lawful permanent resident, refugee, asylee status, or U.S. citizen status cannot be verified," the non-citizen "will be advised of the penalties for perjury, and will be placed under oath or allowed to make a declaration[.]" 8 C.F.R. § 235.3(b)(5)(i). Once this has occurred, "[t]he immigration officer shall issue an expedited order of removal . . . and refer the alien to [an] immigration judge for review of the order[.]" *Id.* Pending that review, "[t]he person shall be detained[,]" unless deemed eligible for parole. *Id.*; *see also id.* § 235.3(b)(5)(iv). Also, "[t]here is no appeal from the decision of the immigration judge" reviewing the immigration officer's order of removal. *Id.* § 235.3(b)(5)(iv).

removal] provisions is to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States, while providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly assessed by officers with full professional training in adjudicating asylum claims."  H.R. Rep. No. 104-828, at 209 (1996) (Conf. Rep.).

**B.  Agency Implementation Of The INA's Expedited Removal Provision**

As noted, the statutory provision that authorizes expedited removal— section 1225(b)(1) of Title 8 of the United States Code, which is also sometimes referred to as "section 235(b)(1)" of the INA—specifically states that an undocumented non-citizen is subject to removal without a hearing or review if he is "arriving in the United States" *or* if he is "described in clause (iii)" of that provision.  8 U.S.C. § 1225(b)(1)(A)(i).  Clause (iii), in turn, authorizes the Attorney General to "apply" the expedited removal process to "any and all aliens" that fit a broad category of undocumented non-citizens that Congress generally describes, "as designated by the Attorney General[.]"  *Id.* § 1225(b)(1)(A)(iii)(I).  And the statute further describes the category of persons from which the Attorney General may choose to designate classes of individuals for expedited removal, as follows:  "[a]n alien described in this clause is an alien . . . who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility[.]" *Id.* § 1225(b)(1)(A)(iii)(II).

The statute also states that the designation of which particular classes of "aliens" will be subject to expedited removal within the scope of this provision will be

made "in the sole and unreviewable discretion" of the Attorney General and "may be modified at any time." *Id.* § 1225(b)(1)(A)(iii)(I); *see also* H.R. Rep. No. 104-828, at 209 ("The provisions also may be applied, in the sole and unreviewable discretion of the Attorney General, to an alien who has not been paroled or admitted into the United States and who cannot affirmatively show to an immigration officer that he or she has been continuously present in the United States for a period of 2 years immediately prior to the date of the officer's determination.").  To date, the Attorney General and DHS (the agency to whom the Attorney General has now delegated his authority to make clause (iii) designations have identified classes of non-citizens that will be subject to the INA's expedited removal process, per section 1225(b)(1)(A)(iii), on four occasions.

      1.    <u>Prior Section 1225(b)(1)(A)(iii) Expedited Removal Designations</u>

First, when the IIRIRA's expedited removal provision initially went into effect (on April 1, 1997), Attorney General Janet Reno opted to subject to expedited removal only "arriving aliens" seeking entry into the United States.  *See* 62 Fed. Reg. 10,312, 10,312–13 (Mar. 6, 1997).[6]  Thus, no foreign national who was already inside the United States and who had not been admitted or paroled was initially exposed to the expedited removal process.  *See id.*  Moreover, the Attorney General expressly "acknowledge[d] that application of the expedited removal provisions to aliens already in the United States [would] involve more complex determinations of fact and [would] be more difficult to manage"; therefore, the government sought "to gain insight and experience by initially applying these new provisions on a more limited and controlled basis." *Id.*

---

[6] Attorney General Reno's Notice also delegated her authority to designate who can be subject to expedited removal to the Immigration and Naturalization Service.  *See* 62 Fed. Reg. at 10,312.

In 2002, the Immigration and Naturalization Service invoked the authority that had been given to it under section 1225(b)(1)(A)(iii) to designate as subject to expedited removal "all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility by a Service officer[.]"  67 Fed. Reg. 68,924, 68,925 (Nov. 13, 2002). The agency justified this new designation by stating that it "believe[d] that implementing the expedited removal provisions, and exercising its authority to detain this class of aliens . . . , will assist in deterring surges in illegal migration by sea, including potential mass migration, and preventing loss of life."  *Id.* at 68,924. According to the agency, the designation "will deter additional aliens from taking to the sea and traveling illegally to the United States.  Illegal migration by sea is perilous and the Department of Justice has repeatedly cautioned aliens considering similar attempts to reject such a hazardous voyage."  *Id.* at 68,925.

In 2004, DHS[7] exercised its designation authority once more, expanding expedited removal beyond those individuals who arrive by sea, to include "[a]liens . . . who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter."  69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004).  According to the agency, "exercising its statutory authority to

---

[7] In 2002, Congress abolished the Immigration and Naturalization Service, and thus transferred its designation authority under the INA to DHS.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002); 6 U.S.C. § 557.

place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected." *Id.* at 48,877.  The agency maintained that expedited removal is "a valuable tool[,]" and that, "[p]resently DHS officers cannot apply expedited removal procedures to the nearly 1 million aliens who are apprehended each year in close proximity to the borders after illegal entry"; the agency also emphasized that "[i]t is not logistically possible for DHS to initiate formal removal proceedings against all such aliens." *Id.* at 48,878.

DHS further acknowledged that "[t]his is primarily a problem along the southern border, and thus the majority of such aliens are Mexican nationals, who are 'voluntarily' returned to Mexico without any formal removal order[,]" and "[b]ased upon anecdotal evidence, many of those who are returned to Mexico seek to reenter the U.S. illegally, often within 24 hours of being voluntarily returned[.]" *Id.*  Additionally, "[b]ecause DHS lacks the resources to detain all third-country nationals (aliens who are neither nationals of Mexico nor Canada) who have been apprehended after illegally crossing into the U.S. from both the northern and southern land borders, many of these aliens are released in the U.S. each year with a notice to appear for removal proceedings[,]" but, the agency noted, "[m]any of these aliens subsequently fail to appear for their removal proceedings, and then disappear in the U.S." *Id.*

      2.   Acting DHS Secretary Kevin McAleenan's Notice Of July 23, 2019

DHS's third and most recent expansion of the expedited removal designation occurred on July 23, 2019, and is the subject of Plaintiffs' complaint.  On that date, the

Acting Secretary of DHS issued a "Notice" in the Federal Register that stated that he was "exercising his statutory authority through this Notice to designate for expedited removal the following categories of aliens not previously designated[,]" 84 Fed. Reg. at 35,409, effective immediately:

> [a]liens . . . who either (a) did not arrive by sea, are encountered by an immigration officer anywhere in the United States more than 100 air miles from a U.S. international land border, and have not been physically present in the United States continuously for the two-year period immediately prior to the date of the determination of inadmissibility, or (b) did not arrive by sea, are encountered by an immigration officer within 100 air miles from a U.S. international land border, and have been physically present in the United States continuously at least 14 days but less than two years immediately prior to the date of the determination of inadmissibility.

*Id.* at 35,414; *see also id.* at 35,410.  According to the Notice, this "New Designation" (as the Notice refers to it) is intended to "harmonize the authorization for aliens arriving by land with the existing authorization for aliens arriving by sea." *Id.* at 35,409.  Thus, while distance from the border, means of arrival, and the relative recency of an undocumented non-citizen's arrival in the United States had previously been distinguishing factors that determined one's risk of being subjected to expedited removal, under DHS's New Designation, an undocumented non-citizen who arrives by land and is "encountered" anywhere in the United States "bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the United States continuously" for at least two years, *id.* at 35,414, and if he is unable to satisfy this burden, he can be subjected to expedited removal, at the discretion of an immigration official.[8]

---

[8] The July 23rd Notice does not alter the substantial degree of officer discretion that DHS has always afforded with respect to whether expedited removal will be imposed in any given case.  That is, even if an undocumented non-citizen is covered by the expanded designation, the immigration officer who is

Acting DHS Secretary McAleenan's July 23rd Notice spells out reasons for the agency's reasons for pursuing this policy change.  The Notice maintains that the New Designation will "enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations." *Id.* at 35,409. The agency states that it "is issuing the New Designation to use more effectively and efficiently its limited resources to fulfill its mission to enforce the immigration laws and ensure the security of the Nation's borders[,]" and that "[f]ully implementing expedited removal will help to alleviate some of the burden and capacity issues currently faced by DHS and [the Department of Justice] by allowing DHS to remove certain aliens encountered in the interior more quickly, as opposed to placing those aliens in more time-consuming removal proceedings." *Id.* at 35,411.  Additionally, "ICE will be able to use expedited removal for certain aliens who[m] it arrests in the interior, which will likely result in those aliens spending less time in ICE detention than if they were placed in full removal proceedings[,]" which "will more quickly make available additional ICE bed space, which can be used for additional interior arrests and removals." *Id.*  Finally, the agency explains that it "expects that the New Designation will help mitigate additional backlogs in the immigration courts and will reduce the significant costs to the government associated with full removal proceedings before an immigration judge, including the costs of a longer detention period and government

---

considering the matter has "broad discretion to apply expedited removal" or to "permit certain aliens otherwise eligible for placement into expedited removal proceedings" to resolve their immigration status through other means, including by placement in "full removal proceedings[.]"  84 Fed. Reg. at 35,412.  Moreover, if an undocumented non-citizen who has been pegged for expedited removal claims "under oath, after being warned of the penalties for perjury," that he is entitled to remain in the United States as an authorized permanent resident, refugee, asylum asylee, or citizen, the Notice provides that he will receive "prompt review of th[e] determination" that he is subject to expedited removal.  *Id*. at 35,411.

representation in those proceedings." *Id.* at 35,412.

Whatever its motivation, per the July 23rd Notice, DHS has now designated for expedited removal the entire category of persons that the INA's section 235(b)(1)(A)(iii)(II) describes.  DHS implemented this policy change approximately 30 months after President Trump signed an Executive Order specifically calling on DHS to expand expedited removal to its full possible scope, *see* Exec. Order No. 13,767, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8,793, 8,796 (Jan. 30, 2017), and some 29 months after former Secretary of DHS John Kelly issued a memorandum that expressed DHS's intention to expand the application of the expedited removal process, as the President requested.[9]  In the time that elapsed between then-DHS Secretary Kelly's memorandum of February 20, 2017, and the Federal Register Notice of July 23, 2019, DHS did not issue a proposed rule that notified the public that the agency was considering this change, nor did it otherwise solicit public comment regarding its generally expressed intent to expand the expedited removal designation to the fullest extent authorized by statute.  However, the July 23rd Notice itself invites "[i]nterested persons" to "submit written comments" about the New Designation, via the federal government's rulemaking website.  84 Fed. Reg. at 35,410.

## C.     Judicial Review Of Legal Claims Regarding Expedited Removal

The IIRIRA not only establishes that certain undocumented non-citizens can be designated in the sole discretion of administrative authorities as subject to the expedited

---

[9] *See Implementing the President's Border Security and Immigration Enforcement Improvement Policies*, U.S. Department of Homeland Security, 5–7 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.

removal process, it also addresses whether and to what extent the federal courts can entertain challenges to various aspects of the statutorily prescribed expedited removal scheme. Indeed, as part of its enactment of the IIRIRA, Congress crafted an entirely new judicial review provision within the INA that is expressly entitled "Judicial review of orders of removal[,]" 8 U.S.C. § 1252, which is codified at section 1252 of Title 8 of the United States Code, and is also known as "section 242." *See also* IIRIRA, Pub. L. No. 104-208, Div. C., Title I, § 306, 110 Stat. 3009-546, 607–12 (1996).

Two subsections of the aforementioned judicial review provision plainly pertain to this Court's review of claims relating to the statutory section that authorizes expedited removal (8 U.S.C. § 1225(b)(1)): namely, sections 1252(a)(2)(A) and 1252(e). *See* 8 U.S.C. § 1252(a)(2)(A) ("Review relating to section 1225(b)(1)"); *id.* § 1252(e)("Judicial review of orders under section 1225(b)(1)"). To aid the reader, relevant portions of these two sections, and others, are appended to this Memorandum Opinion in their entirety. (*See infra,* Appendix.)

Section 1252(a)(2)(A) is the first of a series of judicial review provisions that Congress lays out in the IIRIRA regarding "[m]atters *not* subject to judicial review." 8 U.S.C. § 1252(a)(2) (emphasis added). Prior to broaching this subject, the statute plainly distinguishes, on the one hand, judicial review of final orders of removal that result from *standard* removal procedures (which are reviewed by Courts of Appeals), *see id.* § 1252(a)(1); *see also O.A.*, 2019 WL 3536334, at *9, from, on the other hand, judicial review of final orders of removal that result from the section 1225(b)(1) expedited removal process. Section 1252(a)(2) then lists "[r]eview relating to section 1225(b)(1)" as the first of four categories of matters concerning removal orders in

which judicial review has been restricted.  That section reads, in relevant part:

### (2) Matters not subject to judicial review

#### (A) Review relating to section 1225(b)(1)

Notwithstanding any other provision of law (statutory or nonstatutory),[10] . . . no court shall have jurisdiction to review—

(i)      except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,

(ii)     except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

(iii)    the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or

(iv)    except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

8 U.S.C. § 1252(a)(2)(A).

The IIRIRA's judicial review provision thus plainly homes in on the expedited removal process prescribed in section 1225(b)(1), and generally prohibits courts from exercising jurisdiction with respect to four categories of legal actions—to wit, actions that challenge: (1) "individual determinations" or bring "any other cause or claim arising from or relating to the implementation or operation of an order of [expedited] removal," *id.* § 1252(a)(2)(A)(i); (2) the Attorney General's decision "to invoke the provisions" of the expedited removal statute, *id.* § 1252(a)(2)(A)(ii); (3) "the application of" the expedited removal statute "to individual aliens," including the consideration and resolution of asylum claims made by individuals subject to expedited

---

[10] The "(statutory or nonstatutory)" language was added in 2005.  *See* REAL ID Act of 2005, Pub. L. No. 109-13, Div. B., Title I, § 106, 119 Stat. 231, 310 (2005).

removal, *id.* § 1252(a)(2)(A)(iii); and (4) the "procedures and policies" that the Attorney General adopts "to implement the provisions" of the expedited removal statute, *id.* § 1252(a)(2)(A)(iv). *See also* H.R. Rep. No. 104-828, at 219 (explaining that, in general, under section 1252(a)(2)(A), "no court shall have jurisdiction to review any individual determination or cause or claim arising from the implementation or operation of an order of removal" under the expedited removal statute, and no court can "review . . . a decision by the Attorney General to invoke [the expedited removal statute], the application of such section to individual aliens (including the determination . . . regarding credible fear of persecution), or . . . procedures and policies to implement [the expedited removal provision]"). Significantly for present purposes, with one exception, Congress has made each of these jurisdictional limitations *expressly* subject to the provisions of subsection (e). *See* 8 U.S.C. § 1252(a)(2)(A)(i), (ii), (iv) (opening with "*except as provided in subsection (e)*" (emphasis added)). And in so doing, the statute carves out exceptions to the jurisdictional restrictions, and also further clarifies what courts can and cannot do with respect to legal challenges that relate to the expedited removal process.

For its part, section 1252(e) is entitled "Judicial review of orders under section 1225(b)(1)[.]" *Id.* § 1252(e). The section has five subdivisions, each of which speaks to one or more aspects of a federal court's power to review certain types of claims and/or afford certain types of relief. *See, e.g.*, *id.* § 1252(e)(1) (addressing "[l]imitations on relief[,]" and prohibiting, among other things, "declaratory, injunctive or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)" except under specified circumstances); *id.*

§ 1252(e)(2) (permitting habeas review of expedited removal orders, with limitations); *id.* § 1252(e)(5) (providing, with respect to a case in which "an alien has been ordered removed under section 1225(b)(1)[,]" that the court's "[s]cope of inquiry" is restricted to a determination of "whether such an order in fact was issued and whether it relates to the petitioner" and does not include "whether the alien is actually inadmissible"); *see also* H.R. Rep. No. 104-828, at 219 (explaining that "[i]ndividual determinations under [section 1225(b)(1)] may only be reviewed under [section 1252(e)(1)–(2)]").  It is the *third* subdivision of subsection (e)—8 U.S.C. § 1252(e)(3)—that is most pertinent for present purposes, as it forms the basis for many of the jurisdictional claims and arguments that are at issue in this case.

The title of section 1252(e)(3) is "[c]hallenges on validity of the system[.]"  8 U.S.C. § 1252(e)(3).  In their entirety, the provisions of that statute state:

**(3) Challenges on validity of the system**

**(A)  In general**

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

**(i)** whether such section, or any regulation issued to implement such section, is constitutional; or

**(ii)** whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

**(B)  Deadlines for bringing actions**

Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

**(C)   Notice of appeal**

A notice of appeal of an order issued by the District Court under this paragraph may be filed not later than 30 days after the date of issuance of such order.

**(D)   Expeditious consideration of cases**

It shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.

*Id.* From the plain language of the text of this provision, it is clear that the statute comprehensively addresses the particular circumstances under which challenges to the validity of the expedited removal system are not permitted, *see* H.R. Rep. No. 104-828, at 220–21 ("[J]udicial review . . . is limited to whether [section 1225(b)(1)], or any regulations issued pursuant to that section, is constitutional, or whether the regulations, or a written policy directive, written policy guidance, or written procedures issued by the Attorney General are consistent with the INA or other law."), as well as the time frame in which any such challenge must be brought and considered.

## III.   PROCEDURAL HISTORY

As explained in Part I.B.2, above, on July 23, 2019, Acting DHS Secretary Kevin McAleenan announced that the agency was "exercis[ing] the full remaining scope of its statutory authority to place in expedited removal, with limited exceptions, aliens determined to be inadmissible . . . who have not been admitted or paroled into the United States, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the

determination of inadmissibility." 84 Fed. Reg. at 35,409. Plaintiffs filed the instant

lawsuit on August 6, 2019 (*see* Compl.), bringing six claims under the APA, the INA,

and the Constitution. Plaintiffs specifically allege that, "[i]n addition to violating the

APA, expanding expedited removal to individuals apprehended in the interior of the

United States who have been living in the country for extended periods of time violates

the Due Process Clause of the Fifth Amendment, because it deprives them a meaningful

opportunity and process to contest removal before they are deported." (*Id.* ¶ 11.)

Additionally, Plaintiffs claim that "the expanded use of expedited removal violates

federal statutes requiring that noncitizens appearing before an immigration officer or

immigration judge be permitted to be represented by counsel." (*Id.*)

Plaintiffs filed a motion for a preliminary injunction on August 8, 2019, seeking

to enjoin Defendants from applying expedited removal as laid out in the notice of July

23, 2019, pending the resolution of their lawsuit. (*See* Pls.' Mot.) Per an Order of the

Court that issued on August 14, 2019 (*see* Min. Order of Aug. 14, 2019), the parties

proceeded to brief the issues raised in Plaintiffs' preliminary injunction motion,

including concerns that defense counsel had raised in a conference call with Plaintiffs

and the Court regarding Plaintiffs' standing to pursue their claims. (*See* Pls.' Suppl. Br.

in Supp. of Prelim. Inj. ("Pls.' Suppl. Br."), ECF No. 23; Defs.' Opp'n, ECF No. 25;

Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' Reply"), ECF No. 28.)[11]

In the motion for a preliminary injunction, Plaintiffs argue that they have

---

[11] 17 states and the District of Columbia also filed an amicus brief in support of Plaintiffs' motion for a preliminary injunction on August 21, 2019. (*See* ECF No. 24-1.) In their brief, the states argue that DHS's expansion of expedited removal will undermine their ability to protect the rights and interests of their residents, and will harm "individuals, families, communities, and the public served by amici states[.]" (*Id.* at 26 (capitalization altered).)

associational standing to bring this lawsuit (*see generally* Pls.' Suppl. Br.); that they are likely to succeed on the merits of their individual claims (*see* Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), ECF No. 13-1, at 25–52); and that the remaining factors that the Court must consider in assessing whether or not to grant preliminary injunctive relief weigh in their favor (*see id.* at 52–55). Defendants respond in opposition that Plaintiffs' claims are not justiciable, because the Court lacks subject-matter jurisdiction (*see* Defs.' Opp'n at 33–36); that Plaintiffs lack standing (*see id.* at 36–41); and that Plaintiffs lack a cause of action to bring their claims under the APA (*see id.* at 41–46). Defendants further maintain that Plaintiffs' claims are meritless (*see id.* at 46–72), and that the remaining preliminary-injunction factors weigh in DHS's favor (*see id.* at 72–75). Finally, Defendants insist that "any interim relief must be sharply limited." (*Id.* at 75 (capitalization altered).)

This Court held a hearing regarding Plaintiffs' motion for a preliminary injunction on September 6, 2019, and took the motion under advisement. (*See* Min. Entry of Sept. 6, 2019; Hr'g Tr. ("AM Hr'g Tr."), ECF No. 32; Hr'g Tr. ("PM Hr'g Tr."), ECF No. 33.)

## IV.  MOTIONS FOR PRELIMINARY INJUNCTIONS IN CASES CHALLENGING AGENCY ACTION

Federal Rule of Civil Procedure 65 authorizes a plaintiff who fears that a defendant's actions will irreversibly and irremediably injure the plaintiff's interests before the court can rule on legal claims that the plaintiff has filed to seek a court order that "preserve[s] the relative positions of the parties until a trial on the merits can be held[,]" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); in other words, an order that preserves the status quo, *see* Fed. R. Civ. P. 65.

When a plaintiff invokes this rule to claim that he will be irreparably injured by the unlawful actions of a federal administrative agency, the typical request asks the court to suspend implementation of the challenged agency action during the pendency of the lawsuit, which is an authorized means of preserving the status quo and preventing harm to the plaintiff pending the outcome of the litigation. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 14–15 (D.C. Cir. 2016); *League of Women Voters of U.S. v. Newby*, 671 Fed. App'x 820, 821 (D.C. Cir. 2016) (per curiam); *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 622–23 (D.C. Cir. 1980).  It is well established that "[t]he grant or denial of a [requested] preliminary injunction rests in the discretion of the trial court."  11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2949 (3d ed. 2019).

Regardless of whether a plaintiff is seeking a preliminary injunction in a case challenging agency action or in a standard civil action brought against a private defendant, a motion for a preliminary injunction "require[s] the Court to assess prospectively the merits of the plaintiffs' case and their need for immediate judicial intervention."  *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 203 (D.D.C. 2011).  Moreover, any such injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted); *see also Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (per curiam).  Indeed, "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S.

968, 972 (1997) (internal quotation marks, citation, and emphasis omitted).

Give the movant's burden of persuasion, "[e]vidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction." *Id.*; *see also id.* (explaining that the strict evidentiary standards required for summary judgment do not necessarily apply for preliminary injunctions, given the need for speedy resolution, and because issuing a preliminary injunction does not replace the need for a trial on the merits). In particular, to be granted a preliminary injunction, the movant "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest." *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 38 (D.D.C. 2014) (alterations omitted) (quoting *Winter*, 555 U.S. at 20)). And when analyzing these four factors, "a district court must balance the strengths of the requesting party's arguments in each of the four required areas. If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.* (internal quotation marks and ellipsis omitted) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). That being said, "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted).

It is also clear beyond cavil that the most significant factors of the preliminary injunction test are likelihood of the movant's success on the merits of his claims and whether or not he is likely to suffer irreparable injury while the lawsuit is pending, because these factors relate directly to the purpose of a preliminary injunction. "It is

particularly important for the movant to demonstrate a substantial likelihood of success

on the merits[,]" because "absent a 'substantial indication' of likely success on the

merits, 'there would be no justification for the court's intrusion into the ordinary

processes of administration and judicial review.'" *Hubbard v. United States*, 496 F.

Supp. 2d 194, 198 (D.D.C. 2007) (quoting *Am. Bankers Ass'n v. Nat'l Credit Union

Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999)).   Moreover, "the basis of injunctive

relief in the federal courts has always been irreparable harm and inadequacy of legal

remedies," *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal quotation marks and

citation omitted), because a preliminary injunction entitles the movant to judicial

intervention before a ruling on the merits precisely because "the applicant is likely to

suffer irreparable harm before a decision on the merits can be rendered."   Wright,

Miller, & Kane, § 2948.1.

## V.    ANALYSIS

As noted above, a federal court that invokes its authority to enjoin an agency's

conduct preliminarily pending the court's final order in the matter is thereby effectively

accelerating provision of the relief that the plaintiff seeks, prior to the conclusion of the

litigation.   Thus, before a preliminary injunction issues, this Court must be persuaded

that there is a substantial likelihood that the plaintiff will eventually prevail on the

merits and that interim injunctive relief is warranted because the plaintiff will suffer

irreparable harm without such relief.   *See Sampson*, 415 U.S. at 88; *Apotex, Inc. v.

Sebelius*, 700 F. Supp. 2d 138, 140 (D.D.C. 2010).   For the reasons explained below,

this Court concludes that Plaintiffs Make the Road New York, LUPE, and WeCount! are

likely to be successful with respect to the merits of the APA claims they have brought

in this case, and that the irreparable injury, balance of the harms, and public interest factors also support the issuance of a preliminary injunction.  The Court further imposes a preliminary injunction that prevents DHS from enforcing the expanded expedited removal policy announced in the July 23rd Notice with respect to anyone to whom the designation in the Notice would apply while the question of the legal propriety of the agency's action is pending in this Court, consistent with the plain language of the APA.

> **A.    Plaintiffs Have A Likelihood Of Succeeding With Respect To Their Administrative Procedure Act ("APA") Claims**

A court's determination of a plaintiff's likelihood of success with respect to the legal claims they have brought involves various considerations, including the plaintiff's potential of carrying threshold burdens such as the requirement that a plaintiff demonstrate subject-matter jurisdiction and Article III standing.  *See Shelley*, 775 F. Supp. 2d at 203 ("[I]n evaluating plaintiffs' likelihood of success on the merits, the Court must determine that it may properly exercise jurisdiction over the action."); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("In determining whether the plaintiff has 'a substantial likelihood of success on the merits,' . . . [courts] have considered whether the plaintiff has a 'substantial likelihood of standing'—that is, whether the plaintiff is likely to be able to demonstrate standing at the summary judgment stage.").  In the instant case, it is likely that the Court has jurisdiction over Plaintiffs' APA claims and that Plaintiffs have associational standing. Plaintiffs are also likely to be successful with respect to their claims that the APA's

procedural mandates apply and that DHS's July 23rd Notice violated its notice-and-comment and non-arbitrary rulemaking requirements.[12]

       1.      <u>Plaintiffs Are Likely To Be Able To Demonstrate That Article III's Jurisdictional And Standing Requirements Are Satisfied</u>

Because federal courts are courts of limited jurisdiction, the threshold concern of any plaintiff is to demonstrate that the Court has subject matter jurisdiction to review the claims alleged and that the plaintiffs themselves have standing to bring such claims in federal court.  *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [federal courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction[.]" (internal citations omitted)); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of Article III standing]." (citation omitted)).  Here, Plaintiffs maintain that this Court has subject matter jurisdiction over their APA claims pursuant to two federal statutes: 28 U.S.C. § 1331 and 8 U.S.C. § 1252(e)(3).  (*See* Compl. ¶ 16 (alleging that section 1252(e)(3) provides jurisdiction in the United States District Court for the District of Columbia over "'[c]hallenges [to the] validity of the system,'" and stating that "[t]he Court also has jurisdiction under 28 U.S.C. § 1331" (first and second alterations in original)).)  Plaintiffs also assert that "[a]ll three Plaintiff Organizations . . . have

---

[12] Given this Court's finding that Plaintiffs are likely to succeed on the merits of those two claims (Counts One and Five of Plaintiffs' complaint), the Court need not address Plaintiffs' other allegations—*i.e.*, their claims that DHS's expanded expedited removal designation breaches the Constitution's Due Process Clause (Count Two), the INA and the APA's requirement that DHS provide meaningful process (Count Three), the INA's and APA's right to counsel in particular (Count Four), and the Constitution's Suspension Clause (Count Six).  *See infra* Part V.A; *see also, e.g.*, *FTC v. Mallett*, 818 F. Supp. 2d 142, 148 n.5 (D.D.C. 2011) (noting that "[b]ecause the Court finds that the FTC has shown a likelihood of success on the merits of its first claim . . . , it need not address whether the FTC has also established a likelihood of success on the merits of its [other] claims").

associational standing to challenge" the July 23rd Notice (Pls.' Suppl. Br. at 5), because "[e]ach Plaintiff Organization has one or more members with standing to challenge" the July 23rd Notice (*id.*), the interests Plaintiffs seek to protect are germane to the organizations' purposes (*see id.* at 10), and the issues involved in this matter do not require the participation of individual members to be resolved properly (*see id.* at 11).

Testing these propositions requires this Court to evaluate the jurisdictional basis for its own power to review claims like the ones Plaintiffs have raised, which necessarily includes an examination of the interaction between federal question jurisdiction under section 1331 and the INA's judicial review provision under the circumstances presented here.  The Court must also determine whether it is likely that these Plaintiff organizations have members who have a redressable injury-in-fact that is sufficient to support Plaintiffs' assertion of Article III standing.  For the following reasons, this Court finds, as a preliminary matter, that Plaintiffs are likely to succeed in establishing that their APA claims satisfy Article III's jurisdiction and standing requirements.

           a.       *It is likely that this Court has subject-matter jurisdiction to consider Plaintiffs' APA claims under 28 U.S.C. § 1331*

Plaintiffs' argument that this Court has subject-matter jurisdiction under section 1331 of Title 28 to consider their APA claims is likely correct, as a general matter, since the D.C. Circuit has long held that a federal court's jurisdiction to consider claims challenging agency action under the APA derives from the "so-called 'federal question' statute, 28 U.S.C. § 1331, which grants the district court 'original jurisdiction o[ver] all civil actions arising under the Constitution, laws, or treaties of the United States[.]'" *Oryszak v. Sullivan*, 576 F.3d 522, 524–25 (D.C. Cir. 2009).  Indeed, it is by now well

established that "while many APA claims are brought pursuant to a separate substantive statute, a court may alternatively have jurisdiction under Section 1331 over a claim under the APA, based on allegations that an agency action was arbitrary and capricious or that an agency took action without observing procedures required by law." *Seeger v. Dep't of Defense*, 306 F. Supp. 3d 265, 276 (D.D.C. 2008) (citing *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006)).

For what it's worth, in this Court's view, it is doubtful that the INA provides a separate font of jurisdictional authority, as Plaintiffs assert. This is because the statutory provision upon which Plaintiffs rely for this jurisdictional argument—section 1252(e)(3)—is not couched in jurisdictional terms. *Cf. Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006) (explaining that a statutory restriction on judicial review that "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts" is not jurisdictional).[13] Moreover, the only part of the INA's judicial review provision that expressly references "jurisdiction" is section 1252(a), and that provision is plainly devoted to laying out *restrictions* on the court's jurisdiction to consider certain claims. Subdivision (a) unquestionably pertains to when jurisdiction is

---

[13] It is well established that not every statute that addresses the circumstances under which judicial review is "available," 8 U.S.C. § 1252(e)(3), qualifies as a jurisdictional provision. *See, e.g.*, *Califano v. Sanders*, 430 U.S. 99, 104–05 (holding that APA does not grant subject-matter jurisdiction to review agency action, despite the fact that "the statute undoubtedly evinces Congress' intention and understanding that judicial review should be widely available to challenge the actions of federal administrative officials"). And while section 1253(e) plainly places review authority for the claims that it preserves in the U.S. District Court for the District of Columbia, in the absence of any jurisdictional language, it is likely that the better reading of this part of the provision is that it indicates Congress's intent regarding venue rather than establishing subject-matter jurisdiction. *See, e.g.*, *Panhandle E. Pipe Line Co. v. Fed. Power Comm'n*, 324 U.S. 635, 638–39 (1945) (interpreting statute that authorized plaintiffs to "obtain a review of such order in the circuit court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia" and holding that the language "goes to venue not to jurisdiction"); *cf. Oryszak*, 576 F3d at 524 (interpreting the APA's own judicial review provision to provide a limited cause of action, but not jurisdiction).

*not* available, and makes no affirmative statement about what a federal court *does* have the power to consider with respect to claims pertaining to orders for expedited removal and the implementation of the INA's expedited removal procedures.  Thus, in this Court's view, section 1252(a) reads much more like a jurisdiction-*stripping* provision than one that establishes subject-matter jurisdiction independent of any other source. *See, e.g.*, 22 U.S.C. § 6450 ("No court shall have jurisdiction to review any Presidential determination or agency action under this chapter or any amendment made by this chapter."); 42 U.S.C. § 9622(e)(3)(C) ("[N]o court shall have jurisdiction to review the nonbinding preliminary allocation of responsibility.").

In any event, as already mentioned, section 1331 of Title 28 provides subject-matter jurisdiction for a federal court to consider challenges to agency action such as the APA claims that Plaintiffs bring here, as a general matter.  *See Chrysler v. Brown*, 441 U.S. 281, 417 n.47 (1979).  Given the language of the judicial review provision of the INA, however, the key jurisdictional question becomes whether the INA *divests* this Court of the power that it would otherwise have had to review Plaintiffs' APA claims. *See Tex. Alliance for Home Care Servs. v. Sebelius*, 681 F.3d 402, 408 (D.C. Cir. 2012); *see also Ass'n of Nat'l Advertisers v. FTC*, 617 F.2d 611, 619 (D.C. Cir. 1979) (holding that "[g]eneral federal question jurisdiction . . . gives the district courts the power to review agency action *absent a preclusion of review statute*" (emphasis added)); *Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 58 (D.D.C. 1998) (rejecting plaintiffs' argument that, "even if the Court finds that the plaintiffs' claims are not reviewable under INA § 242(e)(3), the Court would still have federal question jurisdiction under 28 U.S.C. § 1331 over many of these claims").  After a careful review of the statutory

provisions at issue, this Court concludes that the INA does not bar the Court's exercise of subject-matter jurisdiction over Plaintiffs' APA claims.

First of all, when considered in context, the language of the INA's section 1252 establishes that, while Congress has revoked the jurisdiction of the federal courts to consider *certain* claims pertaining to the expedited removal process, this Court's power to consider claims that relate to a regulation or a written policy of DHS "to implement" expedited removal is plainly preserved.  Beginning with section 1252(a)(2)(A), Congress makes clear that "[n]otwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to review" legal claims concerning expedited removal—including claims that challenge "a decision by [DHS] to invoke the provisions" of the expedited removal statute, 8 U.S.C. § 1252(a)(2)(A)(ii), or "procedures and policies adopted by [DHS] to implement the provisions" of the expedited removal statute, *id.* § 1252(a)(2)(A)(iv)—"*except as provided in subsection (e),*" *id.* § 1252(a)(2)(A)(i), (ii), (iv) (emphasis added).  Subsection (e) thus operates as a carveout from subdivision (a)(2)'s jurisdiction-stripping function.

Subdivision (e)(3) then specifically states that United States District Court for the District of Columbia has the power to review "determinations under section 1225(b) of this title and its implementation[,]" *id.* § 1252(e)(3)(A), so long as the claim at issue concerns (1) whether section 1225(b), or "any regulation issued to implement [that] section," is unconstitutional, *id.* § 1252(e)(3)(A)(i), or (2) whether "a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement" section 1225(b) is inconsistent with the INA "or is otherwise in violation of law[,]" *id.*

§ 1252(e)(3)(A)(ii).  Consequently, in practical effect, "[s]ection 1252(e)(3) vests exclusive jurisdiction in the United States District Court for the District of Columbia to review '[c]hallenges [to the] validity of the [expedited removal] system[]'" and "[s]uch systemic challenges include . . . challenges claiming that a given regulation or written policy directive, guideline, or procedure is inconsistent with law."  *Grace v. Whitaker*, 344 F. Supp. 3d 96, 115 (D.D.C. 2018) (alterations in original) (ellipsis added) (quoting 8 U.S.C. § 1252(e)(3))).

As relevant here, this Court has little doubt that Plaintiffs' APA claims assailing DHS's July 23rd Notice qualify as challenges to "a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General *to implement*" section 1225(b).  8 U.S.C. § 1252(e)(3)(A)(ii) (emphasis added).  Far from attacking any particular expedited removal determination or the substance of DHS's expanded expedited removal designation, Plaintiffs' complaint claims that the procedures DHS used (or failed to use) when exercising its authority under section 235(b)(1)(A)(iii) to designate a new class of non-citizens to expedited removal pursuant to that provision violates the APA.  (*See* Compl. ¶¶ 129–34, 149–51.)  This Court agrees with Plaintiffs that a challenge to the procedures DHS used when it exercised its discretion to designate categories of persons as subject to expedited removal is an attack on DHS's implementation of the expedited removal scheme.  (*See* Pls.' Reply at 18 (explaining that Plaintiffs are challenging "the manner in which Defendants *implement* the designation decision, including the process by which that designation is made, as well as the manner in which Defendants implement the expedited removal statute through written rules and policies that set out the

procedures that apply in expedited removal proceedings" (emphasis in original)).)
Thus, per the plain text of section 1252(e)(3), the United States District Court for the
District of Columbia retains the power to review claims that a written policy of DHS
has implemented the agency's designation authority as set forth in the INA's section
1225(b) in a manner that violates law (namely, the APA), despite the jurisdiction-
stripping force of section 1252(a)(2).

The primary thrust of Defendants' opposition to this jurisdictional analysis is the
strange contention that only individuals *who are subject to* an expedited removal order
under the INA's section 1225(b)(1) can challenge the implementation of the expedited
removal scheme under section 1252(e)(3), yet "no Plaintiff [in the instant case] is an
individual who is presently subject to expedited removal procedures." (Defs.' Opp'n at
34; *see also id.* ("The triggering provision's reference to 'determinations under section
1225(b)' requires just that—a 'determination.'").) This amounts to an argument that an
actual removal order—or at least its potential—is a prerequisite to this Court's power to
consider challenges to the expedited removal system under section 1252(e). (*See id.*)
But that articulation of the scope of this Court's subject-matter jurisdiction finds no
support in the relevant statutory text.

To understand why this is so, one must first acknowledge that "[t]he INA plainly
distinguishes among three different [DHS] decisions—'designation,' 'implementation,'
and 'determination'—and expresses a clear intent to provide judicial review over the
latter two." (Pls.' Reply at 18–19 (citing 8 U.S.C. § 1252(e)(3)).)[14]  Contrary to

---

[14] Black's Law Dictionary defines "designation" as "[t]he act of choosing someone or something for a
particular purpose[,]" Black's Law Dictionary 541 (10th ed. 2014), and "determination" as "[t]he act of
deciding something officially; esp[ecially], a final decision by a court or administrative agency[,]" *id.*
544.  Black's Law Dictionary does not define "implementation," but Merriam-Webster's Collegiate

Defendants' contentions, nothing in the text of the INA's section 242(e)(3)(A) requires that a *determination* that a particular individual will be placed in expedited removal proceedings be made in order for the D.C. district court to have the power to consider a challenge to the *implementation* of the statutory provision governing expedited removal. Indeed, as the judge in *O.A. v. Trump*, Civ. No. 18-2718, 2019 WL 3536334, (D.D.C. Aug. 2, 2019), recently observed, "[t]he language of § 1252(e)(3) is plain: it applies to *both* 'judicial review of determinations' made under the expedited removal provision *and* to judicial review of the 'implementation' of that provision[,]" *id.* at *19 (emphasis added).

This Court, too, has no doubt that Congress intended to authorize the federal district court in the District of Columbia to review challenges to both "determinations" made under section 1225(b) and the "implementation" of the process of expedited removal that that statutory provision establishes.  8 U.S.C. § 1252(e)(3).  Thus, this Court rejects defense counsel's vigorous efforts to characterize section 1252(e)(3)'s reference to "implementation" as relating to the decision to subject a particular individual to the expedited removal process. (*See* AM Hr'g Tr. at 35:21–23 ("You have to have an individual who is in these proceedings to have jurisdiction under Section 1252(e)(3).").)  Not only does this characterization make little sense in the context of section 1252(e)(3)'s preservation of challenges to the validity of the system, it is also

---

Dictionary defines "implement" as "carry out, accomplish; esp[ecially] to give practical effect to and ensure of actual fulfillment by concrete measures[.]"  Merriam-Webster's Collegiate Dictionary 624 (11th ed. 2003).  While the INA does not itself provide definitions for these terms, the distinction between the terms "designation," "implementation," and "determination" appears to have been maintained consistently throughout the relevant sections of the INA.  *See, e.g.,* 8 U.S.C. § 1252(a)(2)(A) (precluding jurisdiction over "any individual *determination*" or "any other cause of action or claim arising from or relating to *implementation* or operation of an order of removal" (emphasis added)); *id.* § 1252(e)(3)(A) (governing judicial review of "*determinations* under section 1225(b) of this title and its *implementation*" (emphasis added)).

unfaithful to language that Congress uses in that provision.  As the court in *O.A.* ably explained, although "[o]ne might argue that 'its implementation' refers to implementation of the removal order, and not to implementation of § 1225(b)[,] [t]hat . . . is not the best reading of the provision[;] [a]mong other things, the reference to 'implementation' is in the singular, as is the reference to 'section 1225(b),' while the reference to 'determinations' is in the plural."  2019 WL 3536334, at *19 n.12.

Defendant's best argument in this regard is the fact that section 1252(e) itself is entitled "[j]udicial review of orders under section 1225(b)(1)[.]"  8 U.S.C. § 1252(e). But this language cannot be read to mean that judicial review is limited to challenges that pertain to expedited removal determinations when, within that very provision, Congress says in no uncertain terms judicial review is also available for challenges to the "implementation" of section 1225(b)(1).  *Id.* § 1252(e)(3)(A); *see also O.A*, 2019 WL 3536334, at *19 (rejecting argument that section 1252(e) limited the court's jurisdiction to cases in which DHS has issued a final expedited-removal order).  Along these same lines, Defendants have not explained how the being-in-expedited-removal-proceedings prerequisite that they insist lurks in the interstices of the provisions of section 1252 could have been overlooked by Congress when it spelled out in considerable detail the exact circumstances under which the federal district court in the District of Columbia may consider (and the appellate courts may review) a challenge to the implementation of section 1225(b)(1).  Defendants also fail to say how the removal-order requirement jibes with Congress's unambiguous mandate that any legal action challenging the "section, regulation, directive, guideline, or procedure" must be filed in court "no later than 60 days after the date" such provision or practice "is first

implemented." 8 U.S.C. § 1252(e)(3)(B); *see also O.A.*, 2019 WL 3536334, at *19

(noting that the "suggestion that review is nonetheless unavailable unless and until

[DHS] makes a final determination of expedited removal is both unsupported by the text

and at odds with the fact that a challenge must be brought within sixty days of the 'first

implement[ation]' of a challenged regulation[.]" (second alteration in original) (citing

*Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d at 1354)).

Perhaps most importantly for present purposes, Defendants have offered no

reason *why* Congress would possibly have predicated this Court's jurisdiction to review

claims regarding the implementation of the expedited removal scheme (which the INA

explicitly references and expressly preserves) on the existence of a determination that

an individual be subject to expedited removal procedures, and this unanswered inquiry

is especially mysterious given that the INA restricts the exercise of federal court

jurisdiction to review the propriety of individual expedited removal determinations.

*See, e.g.*, 8 U.S.C. § 1252(a)(2)(A)(i).  In other words, does it make any sense that a

Congress that would take care to carve out and preserve implementation challenges, as

distinguished from challenges to individual determinations regarding removal, would

then implicitly tether these two types of claims together, by making implementation

challenges available only if brought by a person who has received an individualized

expedited-removal determination that cannot itself be challenged unless he can

plausibly claim that his own determination is unconstitutional or unlawful (as opposed

to merely imprudent or wrong)?  To agree with Defendants' reading of section

1252(e)(3), one would have to assume that Congress intended to erect a virtually

unscalable threshold barrier to this Court's power to consider claims that its statute plainly authorizes—a set of circumstances that this Court finds highly unlikely.

Nor can Defendants rely on *American Immigration Lawyers Association v. Reno* (hereinafter referred to as "*AILA*"), 199 F.3d 1352 (D.C. Cir. 2000), to propel this jurisdictional argument forward.  To be sure, the D.C. Circuit did state in that case that "Congress meant to allow litigation challenging the [expedited removal] system by, and only by, aliens against whom the new procedures had been applied." *Id.* at 1360; (*see also* Defs.' Opp'n at 18.)  But that statement was made in the specific context of an analysis of whether or not the plaintiff organizations in that case could assert *third-party standing* on behalf of "unnamed aliens who were or might be subject to [expedited removal][.]" *AILA*, 199 F.3d at 1357.  The panel was particularly focused on the broad "sweep" of those plaintiffs' proposition that they had standing to represent "nearly all aliens anywhere in the world who have tried or will try to enter the United States[,]" *id.* at 1359, and in analyzing *that* question, the court searched for "signs" in section 1252 regarding what Congress meant to authorize, *id.*, and came away with "the distinct impression" that Congress did not intend to override the traditional presumption against third-party standing, *id.* at 1360; *see also id.* at 1357 ("[O]ne of the judicially self-imposed limits on the exercise of federal jurisdiction is the general prohibition on a litigant's raising another person's legal rights." (internal quotation marks and citation omitted)).  Thus, *AILA* does not speak to the question before *this* Court, which is whether the provision of the INA that authorizes challenges to the validity of the expedited removal system permits the U.S. District Court for the District of Columbia to exercise jurisdiction over challenges to the implementation of section 1225(b)'s

expedited removal process, even if the plaintiff has not been placed in expedited removal proceedings under section 1225(b)(1).[15]   And in this Court's view, section 1252 undoubtedly reflects Congress's intent to preserve the subject-matter jurisdiction of at least one federal district court (the U.S. District Court for the District of Columbia) to review challenges to the implementation of the expedited removal process; challenges that necessarily extend beyond mere claims regarding an expedited removal determination.

Defendants' other tack on the jurisdictional waters is an attempt to invoke section 1252(a)(2)(B)(ii) of the INA as the statutory provision that bars this Court's subject-matter jurisdiction under the circumstances presented here.  (*See* Defs.' Opp'n at 34–35.)  This approach fares no better.  Section 1252(a)(2)(B)(ii) states in relevant part that, "[n]otwithstanding any other provision of law (statutory or nonstatutory), . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review" any "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the[ir] discretion."  8 U.S.C. § 1252(a)(2)(B)(ii).  At first glance, one might think that this provision obviously precludes this Court's exercise of subject-matter jurisdiction over Plaintiffs' APA claims, because section 1225(b)(1)(A)(iii) of the INA grants the Attorney General "the sole and unreviewable discretion" to designate the classes of non-citizens subject to

---

[15] Not only is *AILA* inapposite as far as this jurisdictional question is concerned, given that it was issued in 2000—which "was like a million years ago in terms of standing jurisprudence" (AM Hr'g Tr. 78:18–20)—it most certainly also fails to capture the current state of the law with respect to Article III standing.

expedited removal, within the limits that Congress has established. *Id.* § 1225(b)(1)(A)(iii)(I). But recall that section 1252(a)(2)(B) is the *second* of four categories of "[m]atters not subject to judicial review" that are laid out in the INA's judicial review provision (*see supra* Part II.C), and the *first* category—section 1252(a)(2)(A)—is the one that expressly relates to Plaintiffs' challenges to the expedited removal process. *See* 8 U.S.C. § 1252(a)(2)(A) (entitled "[r]eview relating to section 1225(b)(1)").

What is more, section 1252(a)(2)(B) relates to judicial review of "[d]enials of discretionary relief[,]" *id.* § 1252(a)(2)(B), and nothing about Plaintiffs' claims challenges *relief* at all, much less discretionary relief or denials thereof. Plaintiffs do not even attempt to challenge DHS's new "designation," *i.e.*, "the decision as to what categories of noncitizens will be subject to expedited removal." (Pls.' Reply at 18.) Rather, Plaintiffs claim that "the manner in which Defendants [have] *implement[ed]* the designation decision, including the process by which that designation [was] made, as well as the manner in which Defendants [have] implement[ed] the expedited removal statute through written rules and policies that set out the procedures that apply in expedited removal proceedings" is unlawful. (*Id.* (emphasis in original).) And as the Court will explain below (*see infra* Part V.A.2.b), it appears that the requirement that DHS proceed through notice and comment rulemaking, as well as the requirement that the agency's decision making be reasoned, are *not* within the agency's discretion, even if the final designation can be determined by DHS in its "sole and unreviewable discretion[.]" 8 U.S.C. § 1225(b)(1)(A)(iii)(I).

Therefore, Defendants are hard pressed to maintain that section 1252(a)(2)(B)

prevents this Court from exercising jurisdiction over Plaintiffs' APA claims.  *See Heredia Mons v. McAleenan*, Civ. No. 19-1593 (JEB), 2019 WL 4225322, at *4 (D.D.C. Sept. 5, 2019) ("Where plaintiffs challenge an overarching agency action as unlawful[,] . . . Supreme Court and Circuit precedent dictate that such a challenge does not fall within § 1252's jurisdictional bar." (citing *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 176–77 (D.D.C. 2015)).[16]

> b.   *It is likely that Plaintiffs have associational standing*

Defendants' arguments concerning Plaintiffs' lack of Article III standing to bring the APA claims at issue here fail for similar reasons.  To begin, the Court recognizes that Plaintiffs bear the burden of establishing that they have standing to sue, *see Lujan*, 504 U.S. at 561; and, for present purposes, Plaintiffs assert that they "have associational" standing to pursue this legal action.  (Pls.' Suppl. Br. at 5.)  In order to demonstrate associational standing, an organization must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 815 (D.C. Cir. 2006) (internal quotation marks and citations omitted).  Moreover, to satisfy the first prong of this associational standing test, Plaintiffs must show that they have "at least one member"

---

[16] Defendants also argue that this Court lacks subject-matter jurisdiction to consider Plaintiffs' claims because "they necessarily also challenge the existing regulations and policies implementing expedited removal themselves, because [Plaintiffs'] APA and due process claims assert that those regulations provide insufficient process to safeguard Plaintiffs' putative members' alleged due process rights" (Defs.' Opp'n at 35 (emphasis omitted) (citing Pls.' Mem. at 34–47)), and therefore, the Court is time-barred from considering those claims (*see id.*); *see also* 8 U.S.C. § 1252(e)(3)(B).  Because the Court does not address Plaintiffs' due-process and due-process-related claims in this Opinion, it similarly does not address Defendants' jurisdictional argument with respect to those claims.

who has suffered, or imminently will suffer, an injury-in-fact, meaning an injury that is (1) "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) "fairly traceable to the challenged action of the defendant"; and (3) "likely, as opposed to merely speculative, . . . [to] be redressed by a favorable decision." *Id.* (internal quotation marks and citations omitted); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015).   In this Court's view, Plaintiffs are likely to be able to satisfy these associational standing requirements for several reasons.

First, Plaintiffs have offered evidence that demonstrates that some of their members would probably have standing in their own right.   Plaintiff Make the Road New York, for example, has provided sworn declarations (including affidavits from three pseudonymous members), and based on these statements, asserts that "at least three members . . . could be placed in expedited removal proceedings pursuant to the [July 23rd] Rule, because they entered without inspection, and have been continuously present in the United States for less than two years."   (Pls.' Suppl. Br. at 6; *see also, e.g.*, Exs. 1–3 to Pls.' Reply, ECF Nos. 28-2, 28-3, 28-4 (declarations of pseudonymous members).)   Thus, Plaintiffs have shown that at least one identified member faces an injury that is "concerted and particularized[,]" *Am. Chem. Council*, 468 F.3d at 815 (internal quotation marks omitted)—*i.e.*, that the member could be placed in expedited removal, rather than the traditional removal proceedings that would otherwise have been required and that would have afforded the individual significantly more procedural safeguards; that the injury is "fairly traceable to the challenged action of the defendant[s][,]" *id.* (internal quotation marks omitted), *i.e.*, that the member could not

have been subject to expedited removal had the agency not issued the July 23rd

designation; and that the injury is likely to be redressed by a favorable opinion, *i.e.*,

that if the Court finds the July 23rd designation invalid, the member could not be

subjected to expedited removal.[17]

With respect to whether these individual members' alleged injury is "actual or

imminent, not conjectural or hypothetical[,]" *id.* (internal quotation marks omitted), this

Court concludes, at least preliminarily, that it is.  Being deprived of the procedural

protections that would otherwise be available prior to a consequential determination

such as removal from the United States is a recognized harm, so long as the plaintiff

"show[s] that 'the procedures in question are designed to protect some threatened

concrete interest of his that is the ultimate basis of his standing.'"  *Ctr. for Law &*

*Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (emphasis omitted)

(quoting *Lujan*, 504 U.S. at 573 n.8).  And while none of Plaintiffs' members have

already been placed into the expedited removal process pursuant to the July 23rd Notice

—to date, apparently *no* individuals have been so treated (*see* Joint Statement

Concerning the Court's Sept. 6, 2019 Min. Order ("Joint Statement"), ECF No. 31, at

2)—Plaintiffs' members plainly face sufficiently *imminent* injury to have Article III

---

[17] Defendants suggest that Plaintiffs cannot establish associational standing without identifying the
allegedly injured members by name.  (*See* Defs.' Opp'n at 38 ("[Plaintiffs] fail to identify the alleged
injured members 'by name' or 'allege facts sufficient to establish harm to those members.'" (quoting
*Am. Immigration Laws. Ass'n*, 18 F. Supp. 2d at 51 (alterations omitted)).)  Not so.  *See, e.g.*, *NAACP
v. Trump*, 298 F. Supp. 3d 209, 225 & n.10 (D.D.C. 2018).  And, once again, Defendants quote a D.C.
Circuit case out of context.  (*See* Defs.' Opp'n at 38 ("This requires showing that at least 'one
*specifically-identified member* has suffered an injury-in-fact.'" (emphasis in original) (quoting *Am.
Chem. Council*, 468 F.3d at 820).)  Plaintiffs have specifically identified at least three members who
aver that they are within the category of persons to whom the July 23rd Notice is directed, and that they
will be injured if that new policy is enforced anytime soon.  The Court is satisfied that Plaintiffs have
met their burden of identifying members who likely meet the standing criteria.

standing.  This is because, by its own terms, the July 23rd Notice publicly authorized immigration officers to subject undocumented non-citizens who are apprehended anywhere in the United States and have been present here for two years or less to expedited removal "effective immediately," 84 Fed. Reg. at 35,410, and in the context of this litigation, DHS has repeatedly represented that the agency's enforcement of these newly expanded expedited removal procedures would begin as early as September 1, 2019 (*see, e.g.,* Teleconf. Tr., ECF No. 22, at 3:7–8 ("[T]hey intend to deport beginning September 1st.")).[18]  DHS has also vigorously maintained that there was simply not enough time for the agency to adhere to the APA's notice and comment procedures prior to the adoption of the New Designation, given the pressing need for swift application of this new policy.  (*See* Defs.' Opp'n at 49–50); *see also* 84 Fed. Reg. at 35,413 (implying that, given the state of affairs at the border, DHS needs to begin enforcing the New Designation policy immediately).  It is well established that, with respect to Article III standing, "threatened" agency action in the form of an announced policy change must be taken just as seriously as already-completed injury, "because administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014).  Thus, this Court finds that DHS's own words and actions are likely to be sufficient to support Plaintiffs' argument that there now exists a substantial threat of imminent harm to their members.

DHS's only retort is to point to platitudes plucked from cases and to suggest generally that a plaintiff's injuries cannot be speculative.  (*See, e.g.*, Defs.' Opp'n at 39

---

[18] DHS has since stated that it would start enforcing the new designation as soon as September 27, 2019.  (*See* Joint Statement at 2.)

("'It is not enough for the [organization] to assert that it [or its members] might suffer an injury in the future, or even that it is *likely* to suffer an injury at some unknown future time.  Such "someday" injuries are insufficient.'" (alterations and emphasis in original) (quoting *J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600, 606 (D.C. Cir. 1996))); *id.* at 40 ("'[P]otentially' does not mean 'certainly impending,' and it certainly does not mean that Plaintiffs' Doe members will be placed in expedited removal." (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013))).)  But there is nothing speculative about a threatened injury if the one who makes the threat simultaneously and unequivocally states that he intends to inflict the threatened harm as soon as possible and without further warning.  And that, in effect, is precisely what DHS has done, even as it now maintains that there is no imminent risk of harm.  In this context, DHS cannot expect to have its cake (by purposefully threatening to subject settled, undocumented non-citizens to expedited removal in a manner that elicits widespread fear) without eating it, when representatives of the targeted individuals seek access to the courts on the grounds that their members are afraid.  (*See* Pls.' Reply at 43 ("Defendants' position is illogical; they cannot implement a wide-ranging and aggressive policy but nevertheless claim that individuals subject to that policy are not at risk.").)

It is also clear that, as a matter of law, a plaintiff need not even show that harm is "certainly impending" to establish Article III standing; she "may instead show a 'substantial risk' that the anticipated harm will occur."  *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) (citing *Susan B. Anthony List*, 573 U.S. at 158).  The D.C. Circuit has affirmed that "the proper way to analyze an increased-risk-

of-harm claim is to consider the ultimate alleged harm . . . as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Id.* (ellipsis in original) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017)); *cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (finding that "the predictable effect of Government action on the decisions of third parties" was sufficient to establish standing).  Moreover, the series of events that failed to persuade the Supreme Court that the plaintiffs in *Clapper v. Amnesty International USA* faced such imminent injury involved "a series of independent actors, including intelligence officials and Article III judges, [exercising] their independent judgment in a specific way." *Attias*, 865 F.3d at 628.  Here, on the other hand, DHS alone made the New Designation effective as of July 23, 2019, *see* 84 Fed. Reg. at 35,410, and no other independent policymakers need to take any action in order for the feared injury to be inflicted on the undocumented non-citizens to whom the new policy might apply.  Thus, Defendants' contention that the July 23rd Notice does not pose a "substantial risk" of harm to Plaintiffs' identified members is untenable.

As a final note, there seems to be agreement that Plaintiffs have a high likelihood of establishing that they have they have satisfied the other associational standing criteria, given that Defendants do not appear to dispute that the interests Plaintiffs seek to protect are germane to the organizations' purposes, or that this matter does not require individual members' participation.  (*See* Pls.' Suppl. Br. at 10–11.)  Thus, based on its finding that Plaintiffs are likely to be able to establish that at least one identified individual member would otherwise have standing to sue in their own right for the

reasons just explained, this Court concludes that Plaintiffs have a substantial likelihood of being able to demonstrate associational standing.  *See Elec. Privacy Info. Ctr.*, 928 F.3d at 104.

2.   <u>Plaintiffs Are Likely To Be Able To Establish That The APA Provides A Cause Of Action For Their Claims That DHS Has Committed Procedural Violations</u>

Turning to another potential impediment to Plaintiffs' success with respect to the claims it has brought in this Court, the Court notes that any plaintiff must have a cause of action (*i.e.*, legal authorization to pursue the claim he brings), and this requirement implicates a different set of issues than the question of whether the Court has subject-matter over each such claim.  *See, e.g.*, *Brown v. FEC*, 386 F. Supp. 3d 16, 28 (D.D.C. 2018) (concluding that plaintiffs were "unlikely to succeed on the merits of" a count that "contains no discernible cause of action"); *see also Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction.").  In the instant case, Plaintiffs appear to maintain that *both* the INA *and* the APA provide a cause of action that Plaintiffs can rely upon with respect to their procedural challenges to the July 23rd Designation.  (*See, e.g.*, Pls.' Reply at 18–21.)  And it is true that, as a general matter, under the APA, any person "adversely affected or aggrieved" by agency action has a statutory right to seek "judicial review" of that agency decision.  5 U.S.C. § 702.  But it is also clear that "'if an adequate remedy at law exists' for the agency action about which the plaintiff complains, then 'equitable relief is not available under the APA.'"  *R.J. Reynolds Tobacco Co. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 356, 378 (D.D.C. 2015) (quoting *Cohen v. United States*, 650 F.3d 717, 731 (D.C. Cir. 2011); *see also* 5 U.S.C. § 704 ("Agency action

made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").

Thus, if the INA provides a cause of action with respect to Plaintiffs' claims, then the APA cannot *also* provide a cause of action, as Plaintiffs have suggested.  (*See, e.g.*, Pls.' Reply at 20–21.)[19]  Furthermore, even when the APA provides the only remedy and thus might otherwise apply, that statute contains an exception, such that the APA will *not* be deemed to provide a cause of action to challenge agency decisions that have been "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *see also Oryszak*, 576 F.3d at 526 (holding that "the APA provides no cause of action" for the court to review an agency determination that has been committed to agency discretion by law).

Consequently, whether or not the INA provides a cause of action for the procedural claims that Plaintiffs bring here, and whether or not Plaintiffs' claims concern matters that are "committed to agency discretion by law" and thus do not give rise to a cause of action under the APA, are crucial threshold questions that might well extinguish Plaintiffs' likelihood of being able to succeed on their claims that DHS has engaged in unlawful action in violation of the APA.  The Court has examined these

---

[19] To be fair, Plaintiffs have provided mixed messages regarding their position as to whether or not the INA's "[s]ection 1252(e)(3) . . . provid[es] a specific cause of action for injunctive relief for Plaintiffs' claims."  (Pls.' Reply at 20–21 (quoting 8 U.S.C. § 1252(e)(3)(A)).)  In Plaintiffs' briefs and during the motion hearing, Plaintiffs' counsel stated that section 1252(e)(3) "does specifically provide for . . . review of certain types of claims and, as such, is a cause of action."  (AM Hr'g Tr. at 10:23–25.)  But, later, counsel clarified that the INA provides the cause of action only for Plaintiffs' "*second* and . . . *fourth* claims" (*id.* at 12:1–2; *see also id.* at 12:20–24), *i.e.*, Plaintiffs' claims that the July 23rd designation violates either the substantive requirements of the Due Process Clause or the INA (*see* Pls.' Mem. at 32–47), and that the July 23rd designation violates the right to counsel under the INA (*see id.* at 49–52).  Thus, at this point, Plaintiffs may be relying solely on the APA for the cause of action for their notice-and-comment and arbitrary-and-capricious claims.  (*See* AM Hr'g Tr. at 13:6–8.)

possibilities, and concludes for the following reasons that the APA's authorization to bring a claim against an administrative agency on the grounds that the agency has committed procedural violations of the type the APA prohibits is a cause of action this is likely to be deemed available to these Plaintiffs.

a. *It is unlikely that the INA provides a cause of action for Plaintiffs' procedural claims*

To begin, it is significant that the text of the INA does not prescribe particular procedural requirements for the Attorney General (or his assignees) to follow when he exercises his discretion to designate the categories of persons who will be subject to expedited removal pursuant to the INA's section 1225(b)(1)(A)(iii), nor does that statute explicitly provide aggrieved persons with the opportunity to police the government's conduct in this regard by filing an action in court. Yet, section 1252(e)(3) *does* make a legal action "available" if a plaintiff maintains that the "implementation" of the expedited removal process is unconstitutional or unlawful. 8 U.S.C. § 1252(e)(3). In this Court's view, rather than providing plaintiffs with a cause of action to challenge the government's implementation of the expedited removal system, section 1252(e)(3), read in conjunction with section 1252(a)(2), is doing the work of clarifying that, despite the severely restricted scope of jurisdiction to consider claims involving expedited removal that the INA imposes, the United States District Court for the District of Columbia is still open for business as far as implementation claims that allege a violation of the constitution or other laws are concerned. This Court has previously expressed its skepticism about whether section 1252(e)(3) confers jurisdiction on the U.S. District Court for the District of Columbia or any other federal court. (*See, supra,* Part V.A.1.a.) Here, the Court observes that the text of section

1252(e)(3) also raises doubts about whether Congress intended to authorize plaintiffs who have implementation challenges to utilize *that* statute to bring claims, particularly claims for which there is no other authorization.

The first clue that section 1252(e)(3) is merely clearing a path for this Court's review of existing legal claims, rather than crafting a new cause of action, is the language that Congress has used; typically, a statute that creates a cause of action expressly confers upon an aggrieved party the right to bring an action in court to challenge specified conduct.  *See Lee v. USAID*, 859 F.3d 74, 77 (D.C. Cir. 2017); *see, e.g*, 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is *entitled* to judicial review thereof." (emphasis added)); 8 U.S.C. § 1503 ("If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person *may institute* an action[.]" (emphasis added)).  Not so here: the most Congress has mustered is the statement that judicial review of the implementation of the expedited removal system is "available," which is hardly the type of ringing endorsement of legal action that courts have generally required as indicative of a statute that confers on plaintiffs the right to be in federal court.  *See O.A.*, 2019 WL 3536334, at *18 ("[Defendants] fail to identify any feature of § 1252(e)(3) suggesting that it provides a cause of action, much less an exclusive cause of action for claims brought challenging implementation of the expedited removal statute."); *cf. Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 988–89 (D.C. Cir. 1973) (noting, with respect to the

FTC Act, that "[t]he Act nowhere purports to confer upon private individuals, either consumers or business competitors, a right of action to enjoin the practice prohibited by the Act or to obtain damages following the commission of such acts").  And, indeed, "in those cases finding . . . implied private remedies, the statute in question at least prohibited certain conduct or created federal rights in favor of private parties."  *Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979) (collecting cases).  Section 1252(e)(3) "neither confers rights on private parties nor proscribes any conduct as unlawful."  *Id.*

Second, the breadth of the potential legal claims that might be brought due to the availability of a right to challenge the implementation of expedited removal system as violative of "the law" under section 1252(e)(3) is staggering, and that, too, cuts against interpreting that statutory provision as creating a cause of action in and of itself.  A complex administrative program can violate provisions of law in innumerable ways, only some of which Congress may have intended to give rise to a legal action in federal court.  *Cf. Ctr. for Biological Diversity v. McAleenan*, No. 18-cv-655, 2019 WL 4228362, at *4 (D.D.C. Sept. 4, 2019) (explaining that, in another part of the IIRIRA, Congress's use of the phrase "all law" rather than "all legal requirements" as it relates to the DHS Secretary's waiver authority clarified the legislature's intent to permit the agency to address "*any* local, state[,] or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure'" (emphasis added) (internal quotation marks and citation omitted)).  This Court finds it highly unlikely that, through the enactment of section 1252(e)(3), Congress's intent was to create a vehicle for this Court's review of any and all claimed violations of any and

all legal provisions that might relate to the implementation of the INA's expedited

removal process.  Indeed, at the very least, reading section 1252(e) to open the door to

all sorts of challenges based on any potentially violative conduct cuts against the

primary thrust of the INA's judicial review provision, which is indisputably to *limit*,

rather than expand, the number and nature of the attacks that can be launched against

the expedited removal process.

Third, and similarly, with the possible exception of an *ultra vires* claim, it is not

at all clear that Congress envisioned allowing plaintiffs to bring challenges to the

validity of the expedited removal system pursuant to section 1252(e)(3) if such

challenges *are not of the type that could otherwise have been made* to enforce the

provisions of law that the defendant has allegedly violated.  Section 1252(e)(3)(ii)

plainly permits a plaintiff to claim that DHS's implementation of the expedited removal

process is "not consistent with applicable provisions of this subchapter" (*i.e.*, is *ultra*

*vires*) or "is otherwise in violation of law."  8 U.S.C. § 1252(e)(3)(ii).  The question is

whether, through this language, Congress sought to permit plaintiffs to police DHS's

compliance with the universe of potentially applicable legal requirements under

circumstances in which there would have otherwise been no relief with respect to that

violation?  This Court finds that doubtful.  *Cf. Inst. for Truth & Marketing* v. *Total*

*Health Network Corp.*, 321 F. Supp. 3d 76, 86 (explaining that "[t]he fact that Congress

did not provide a federal cause of action for violations of the FTC Act in the first place

strongly suggests that Congress did not believe.  And it is also, quite frankly,

impractical to view the INA as establishing a cause of action for claims relating to the

designation of categories of person subject to expedited removal under

section 1225(b)(1)(A)(iii), because that statute itself does not establish standards that

govern DHS's exercise of its discretion to make such designations.  So, if section

1252(e)(3)'s judicial review provision is interpreted to create a cause of action for the

claims that Plaintiffs bring, what substantive standards is this Court to use to determine

whether DHS has committed an actionable violation?

The takeaway is that this Court finds it highly unlikely that the INA itself

provides a cause of action for judicial relief with respect to a claim that DHS has

implemented the expedited removal process in violation of law.[20]  In this Court's view,

both the substantive standards for making any such claim, and the authorization for

seeking to enforce those substantive standards, must come from elsewhere.  Luckily for

Plaintiffs, the procedural standards that an agency must use, as well as the authorization

for Plaintiffs to sue to enforce them, are present in the APA.  *See Block v. Cmty.*

*Nutrition Inst.*, 467 U.S. 340, 345 (1984) (explaining that, among other things, "[t]he

APA confers a general cause of action upon persons 'adversely affected or aggrieved by

agency action within the meaning of a relevant statute'" (quoting 5 U.S.C. § 702)); *see*

*also North Am.'s Bldg. Trade Unions v. OSHA*, 878 F.3d 271, 282 (D.C. Cir. 2017)

---

[20] The possible exception to this is a plaintiff's claim that an implementation action "is not consistent with [the] applicable provisions of [the INA]," 8 U.S.C. § 1252(e)(3)(ii), which, of course, necessarily relates to the substantive standards that the INA itself prescribes.  Arguably, however, the claim that DHS has violated provisions of the INA does not need, and does not rely upon, an authorization to pursue relief that is embedded in the statute; instead, the authority to bring a claim of that nature exists, presumptively, with respect to every statute that confers guided discretion upon agency actors.  *See Adamski v. McHugh*, 304 F. Supp. 3d 227, 236–37 (D.D.C. 2015) (describing "*ultra vires* claim that can be brought in federal court '[i]f a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision[,]'" and explaining that "this type of *ultra vires* claim derives from the contention that the agency has acted without the authority to do so" (first alteration in original) (quoting *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996)).  In any event, here, Plaintiffs are generally maintaining that their claims concerning the notice-and-comment and arbitrariness violations that DHS allegedly committed with respect to its July 23rd Notice can proceed despite the restrictions in the INA because the agency has acted "otherwise in violation of law."  (*See* Pls.' Mem. at 13 (explaining that "[t]he July 23 Rule is illegal[,]" in part because it violates the APA).

("The APA governs the procedural challenge to ensure the Rule is not promulgated "without observance of procedure required by law." (quoting 5 U.S.C. § 706(2)(D)); *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (citing 5 U.S.C. § 706(2)(A) as governing arbitrary-and-capricious review).

> b.   *It is unlikely that the INA commits to agency discretion the process by which the section 1225(b)(1)(A)(iii) expedited removal designation is to be determined*

That all said, what the APA giveth, it can also taketh away.  Indeed, it is well established that "[t]he APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,' *but withdraws that cause of action* to the extent the relevant statute 'preclude[s] judicial review[.]'"  *Block*, 467 U.S. at 340 (emphasis added) (second alteration in original) (quoting 5 U.S.C. §§ 702, 701(a)(1)).  And, thus, we arrive at Defendants' primary argument with respect to the key question of whether the APA even applies to the matter at hand:  Defendants insist that Plaintiffs have no cause of action to pursue their APA claims in this Court, because the Acting DHS Secretary's July 23rd designation was an "agency action . . . committed to agency discretion by law."  5 U.S.C. § 701(a)(2); (*see also* Defs.' Opp'n at 41–43).

To support this contention, Defendants rely primarily if not exclusively on the language of the INA's section 1225(b)(1)(A)(iii)(I), which does provide DHS with the "sole and unreviewable discretion" to designate which categories of undocumented non-citizens will be subject to expedited removal (within the outer limits that Congress has set), and further states that any such designation "may be modified at any time."  8 U.S.C. § 1225(b)(1)(A)(iii)(I).  Defendants take this statutory authorization to mean that the DHS Secretary can make any determination that he wants to with respect to the

section 1225(b)(1)(A)(iii) designation, and that there are no "meaningful standards" for this Court to apply when it is asked to determine whether the agency's implementation of its discretion is unlawful.  But it is more likely that Congress intended to confer to the agency the ultimate authority to *make* the decision of who will be subject to expedited removal under the statute, which is not the same thing as giving the agency sole discretion to determine the *manner* in which that decision will be made.  Moreover, distinguishing between substance and procedure in this manner is entirely consistent with Congress's ordinary practices when it sets outer boundaries and gives an administrative agency authority to fill in the details.  *See, e.g.*, *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1147–48 (D.C. Cir. 2013) (ruling that Environmental Protection Agency's rulemaking was procedurally flawed in context of setting emissions standards under 42 U.S.C. § 7429(a)(2), in which Congress set floor but afforded agency broad discretion otherwise); 21 U.S.C. § 346a(b)(4) (requiring that the Food and Drug Administration proceed through notice and comment rulemaking if it opts to depart from any maximum residue level for a pesticide chemical established by the Codex Alimentarius Commission).

So it is here.  In the text of the INA, Congress specifies, *inter alia*, that an immigration officer "shall order [an] alien removed from the United States without further hearing or review" upon determining that said "alien" is a person "described in clause (iii)" and is "inadmissible."  8 U.S.C. § 1225(b)(1)(A)(i).  Clause (iii) both delegates to the agency the "sole and unreviewable" discretion to designate the categories of aliens who fit these circumstances that will be subjected to expedited removal, *id.* § 1225(b)(1)(A)(iii)(I), and also establishes the outside parameters within

which this designation determination must be made, *see id.* § 1225(b)(1)(A)(iii)(II)

("An alien described in this clause is an alien . . . who has not been admitted or paroled

into the United States, and who has not affirmatively shown, to the satisfaction of an

immigration officer, that the alien has been physically present in the United States

continuously for the 2-year period immediately prior to the date of the determination of

inadmissibility under this subparagraph.").  Nothing in this statute speaks to *how* the

agency is to reach its conclusion regarding the category of aliens to which expedited

removal will apply; moreover, and significantly for present purposes, nothing in the

statute *relieves* the agency from its obligation to make that discretionary decision in the

ordinary course, consistent with any otherwise applicable procedural requirements.

Indeed, Congress was undoubtedly aware of the APA's procedural mandates when it

penned the amendments to the INA that gave birth to the expedited removal process, yet

it was silent about whether or not the agency had a duty to make the discretionary

section 1225(b)(1)(A)(iii) designation determination after providing public notice and

receiving comment, and whether or not the agency had to engage in reasoned decision

making to select the categories of persons who would be subject to expedited removal

under the statute.  In this Court's view, it is also quite telling that Congress did *not*

stand idly by with respect to the prospect that the agency might be held to account for

flaws in the implementation of the expedited removal system; to the contrary, it

expressly allowed for review of such challenges under section 1252(e)(3).  Thus,

insofar as Plaintiffs here are claiming that "the manner in which Defendants *implement*

the designation decision, including the process by which that designation is made" is

unlawful (Pls.' Reply at 18 (emphasis in original)), there is nothing in the INA that

demonstrates that Congress intended to commit *that* matter to the agency's discretion, and in fact, the language of section 1252(e)(3) appears to leave the door wide open for "[j]udicial review of . . . section 1225(b)['s] . . . implementation[.]"  8 U.S.C. § 1252(e)(3).

Notably, this analysis of Defendants' "committed to agency discretion" argument is entirely consistent with binding precedent about how that exception to APA review must be interpreted.  "To give effect to § 706(2)(A) and to honor the presumption of review, [the Supreme Court] ha[s] read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"  *Weyerhaeuser Co.*, 139 S. Ct. at 370 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).  Indeed, "[t]he few cases in which [the Supreme Court] ha[s] applied the § 701(a)(2) exception involved agency decisions that courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation, or a decision not to reconsider a final action."  *Id.* (internal citations omitted).  Defendants struggle valiantly to shoehorn the instant case into this narrow framework (*see* Defs.' Opp'n at 45 (arguing that Plaintiffs' notice-and-comment claims are barred due to the "'sole and unreviewable' nature of the designation")), but doing so requires them to distort Plaintiffs' claims beyond all recognition (*see, e.g.*, *id.* (characterizing Plaintiffs' claims concerning substantive violations of the INA as "nothing more than a challenge how the Secretary chooses to implement his discretionary authority," which, according to Defendants, is barred by language of section 1225(b)(1)(A)(iii)(I)).  But, again, Plaintiffs' core contention with respect to the

APA is that Acting DHS Secretary McAleenan failed to use the required *procedures* to implement the expedited removal authority provided to him by Congress when the agency issued the July 23rd New Designation, *not* that the agency's designation, in and of itself, was unlawful.  (*See* Pls.' Reply at 18 ("Plaintiffs are not challenging the 'designation' at all.").)  And no one appears to dispute that there are procedural standards established in the APA that address the process that an agency must follow when it undertakes its discretionary power to promulgate a rule.

Thus, even if Congress has granted DHS broad discretion—and perhaps even the "most possible discretion[,]" as defense counsel insisted at the motion hearing (AM Hr'g Tr. at 68:18)—to make the final section 1225(b)(1)(A)(iii) designation, due to the agency's foreign policy chops or otherwise (*see* Defs.' Opp'n at 42), that grant does not necessarily carry with it the freedom to make the ultimate discretionary determination *however the agency wants to* (*see* AM Hr'g Tr. at 67:15–20 (Court explains that this may be "a world in which discretion is conferred, and in so doing, Congress is saying [the agency] get[s] the final word. . . . [B]ut that does not necessarily indicate Congress's intent to allow [the agency] to use a Ouija board[.]"); *see also id.* at 67:21–23 ("That the APA still applies as to how [the agency] make[s] that determination [is] not inconsistent with language in which Congress says [the agency] get[s] to decide [the final policy].").  Moreover, and similarly, the fact that an agency might well reach the same conclusion about the ultimate discretionary issue if it makes the decision randomly as it would have if it followed the necessary process is neither here nor there when it comes to deciding whether Congress intended for the APA's procedures to be followed.  (*See id.* at 61:13–17 ("The Ouija board can come up with the ultimate

decision that the agency also comes up with once it does the right procedures.  But the

APA says they've got to do the right procedures.  They can't just do it randomly.").);

*cf. Pierce v. Dist. of Columbia*, 128 F. Supp. 3d 250, 271 (D.D.C. 2015) ("even a

broken clock  gets the time right twice a day" (citing Charles Clay Doyle et al.,

*Dictionary of Modern Proverbs* 287 (2012)).  In other words, without regard to

Congress's intent to vest an agency with unreviewable discretion to make a substantive

decision, it can also intend for the APA to apply to constrain an agency's decision

making process with respect to that entirely discretionary judgment call, and when it

does, an agency that fails to follow the mandated process risks having its policy

decision "held unlawful and set aside" under the APA.  5 U.S.C. § 706(2).[21]

The cases that Defendants cite do not detract from this conclusion, for the very

simple reason that each of those cited authorities involves a challenge to the substantive

*decision* that the agency has made; *not* to its decision making process.  *See, e.g.*,

*Gebhardt v. Nielsen*, 879 F.3d 980, 984–85 (9th Cir. 2018) (finding that judicial review

was precluded with respect to the Secretary's "'sole and unreviewable discretion' to

make 'no risk' determinations" under the Adam Walsh Act, 8 U.S.C.

§ 1154(a)(1)(A)(viii)(I)); *Bremer v. Johnson*, 834 F.3d 925, 930 (8th Cir. 2016) (same);

*Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 484 (1st Cir. 2016)

(finding that decision to revoke an individual's visa petition "is discretionary, and so

not subject to judicial review"); *Jilin Pharm. v. Chertoff*, 447 F.3d 196, 203–04 (3d Cir.

2006) (same); *cf. Amgen, Inc. v. Smith*, 357 F.3d 103, 112–13 (D.C. Cir. 2004) ("[W]e

---

[21] As this Court suggested at the outset, one might argue that Congress's intent to constrain an agency's decision making process through application of the APA is an even more evident (and important) when a statute simultaneously provides an agency with a substantial amount of discretion to make a consequential policy determination.

construe [the relevant statutory provision] to prevent review only of those 'other adjustments' that the Medicare Act authorizes the Secretary to make; in other words, the preclusion on review of 'other adjustments' extends no further than the Secretary's statutory authority to make them.").  And DHS gets no additional traction from its observation that Congress has authorized the agency to modify the discretionary designation regarding who will be subject to expedited removal "at any time."  (Defs.' Opp'n at 19, 42 (emphasis omitted) (quoting 8 U.S.C. § 1225(b)(1)(A)(iii)).)  This language comes nowhere close to expressing clearly Congress's intention to override the presumptive applicability of the APA.  *See Abbott Labs. v. Gardner*, 387 U.S. 126, 140 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (noting that the APA "embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,' so long as no statute precludes such relief or the action is not one committed by law to agency discretion" (quoting 5 U.S.C. § 702; citing 5 U.S.C. § 701(a)). *see also, e.g.*, *Sackett v. EPA*, 566 U.S. 120, 129–30 (2012) (outlining cases in which the Supreme Court has ruled that statutes had overcome the APA's presumption of reviewability); *Eagle Trust Fund v. USPS*, 365 F. Supp. 3d 57, 64–65 (D.D.C. 2019) ("Congress has expressly exempted USPS actions from review under the APA, with limited exceptions." (emphasis omitted) (citing 39 U.S.C. § 410(a))).  And Congress's "at any moment" reference could just as easily be construed to mean that DHS can modify the section designation at any time *after the enactment of the IIRIRA in 1996*, without additional authorization from Congress, rather than as an indication of Congress's intent to authorize DHS to be able to change the

designation at a moment's notice and without public input.  And, of course, even if Congress intended the moment's-notice reading of "at any time," that interpretation is not necessarily inconsistent with the APA's application under the circumstances presented here, because the APA itself permits an agency to respond to changed circumstances quickly—without first engaging in notice and comment or similar procedures—when there is "good cause" for doing so.  5 U.S.C. § 553(b)(B); (*see also infra* Part V.3.b.)

In short, the key to understanding why Defendants' cause-of-action argument fails is the recognition that Plaintiffs here are clearly claiming that *the process* that DHS employed to arrive at its conclusion that the Acting DHS Secretary should exercise his discretion to expand the expedited removal process to the fullest extent allowed by the law was fatally flawed under the standards laid out in the APA.  (*See* Compl. ¶¶ 129–34 (citing 5 U.S.C. § 553, which requires agencies to employ notice and comment procedures when "[r]ule making"); *id.* ¶¶ 149–51 (citing 5 U.S.C. § 706(2)(a), which requires that courts "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law"); Pls.' Mem. at 26–32 (arguing that DHS violated the APA by failing to engage in notice and comment rulemaking); *id.* at 47–49 (arguing that DHS violated the APA by implementing the July 23rd Notice without "accounting for the serious procedural flaws" in the existing expedited removal system).)  Given these claims, this Court finds it unlikely that the INA (which places the designation *decision* in the sole and exclusive purview of the agency, but says nothing about the *process* the agency employs to reach that

conclusion) commits the agencies' decision making process to DHS's discretion in a manner that renders the APA's procedural mandates inapplicable.

To put a finer point on this conclusion, the Court offers the following concrete example:  DHS might well be right that Congress intended to commit entirely to the agency the discretion to decide whether to expose to expedited removal undocumented non-citizens who have been in the this country for, say, six months or less, versus 12 months or less, versus 18 months or less, and so on (up to the statutory limit of two years).  And it is also true that there is no meaningful legal standard that this Court can employ to determine whether the agency's selection of six or 12 or 18 months as the required term of residence to avoid expedited removal constitutes a violation of the INA.  But that statute also plainly preserves this Court's power to review a claim that DHS's implementation of the expedited removal process is unlawful; therefore, the INA's plain text unambiguously indicates that Congress did *not* intend to remove claims about the *manner* in which DHS exercises its discretion entirely off the table of potential claims for relief that can be brought against the agency.  Moreover, as this Court has already determined, the APA itself provides a fitting and available cause of action to bring such a procedural-violation claim in this Court.  *See also Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 718 F.3d 974, 977 (D.C. Cir. 2013) (per curiam) (noting that a 'statute can confer on an agency a high degree of discretion, and yet a court might still have an obligation to review the agency's exercise of its discretion to avoid abuse,' especially on procedural grounds" (quoting 3 Richard J. Pierce, Jr., Administrative Law Treatise § 17.6 (4th ed. 2002)); *cf. Nation v. Dalton*, 107 F. Supp. 2d 37, 42–43 (D.D.C. 2000) ("Because adjudication of plaintiff's 'claims

requires the [Court] to determine only whether the Secretary's decision making process was deficient, not whether his decision was correct,' it would not require the Court to substitute its judgment for that of the Secretary in the sensitive area of military personnel decisions." (alteration in original) (quoting *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1511–12 (D.C. Cir. 1989))).

### 3. Plaintiffs Are Likely To Succeed On The Merits Of Their APA Arguments

The Court has now concluded that Plaintiffs are likely to succeed in establishing that this Court has subject-matter jurisdiction over the procedural claims they have brought under the APA and also in demonstrating that they have associational standing. (*See supra* Part V.A.1)  It is also likely that the APA provides a cause of action for the procedural violations that Plaintiffs' complaint alleges, notwithstanding the fact that the INA commits the section 1225(b)(1) designation decision entirely to DHS's discretion. (*See supra* Part V.A.2.)  This brings us to the heart of the claims that Plaintiffs are making in this action regarding the alleged impropriety of DHS's decisionmaking process.  As explained above, Plaintiffs maintain that DHS failed to engage in required notice and comment rulemaking before implementing the July 23rd Notice, in violation of the APA (*see* Compl. ¶¶ 129–34), and that the July 23rd Notice was adopted in an arbitrary and capricious fashion, also in violation of the APA (*see id.* ¶¶ 149–51).  For the purpose of the instant motion for a preliminary injunction, and given the well-worn procedural standards that the APA establishes for the proper conduct of administrative agencies, this Court concludes that Plaintiffs are likely to prevail on the merits of these claims.

a.   *The APA requires that agencies seek public comment prior to rulemaking, and that they conduct their deliberations so as to minimize the risk of reaching arbitrary and capricious conclusions*

One must be clear eyed about the particular duties that a statute imposes in order to evaluate properly the likelihood that a plaintiff will be able to demonstrate that the defendant has breached those obligations, as a matter of fact and law.  To this end, here, it is important to understand that a key component of the Administrative Procedure Act is Congress's requirement that an agency provide notice to the public, and an opportunity for members of the public to comment, prior to agency rulemaking (whether promulgation, amendment, modification, or repeal).  *See* 5 U.S.C. § 553(b)–(c); *see also Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (explaining that notice and comment requirements fulfill "policy goals of maximum participation and full information").  Specifically, the APA generally requires that the agency publish "notice of proposed rulemaking . . . in the Federal Register," and that such notice include "a statement of the time, place, and nature of public rule making proceedings"; "reference to the legal authority under which the rule is proposed"; and "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b), (b)(1)–(3).  Then, after publishing the notice of proposed rulemaking, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments[.]"  *Id.* § 553(c).  Furthermore, "[a]fter [its] consideration of the relevant matter presented," the APA directs that "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."  *Id.*; *cf. Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977) ("[T]he opportunity to comment

is meaningless unless the agency responds to significant points raised by the public." (citation omitted)).

Notably, not every kind of action that an agency undertakes is subject to the APA's notice and comment requirements.  Indeed, the APA expressly exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice[.]"  5 U.S.C. § 553(b)(A).  What is left (*i.e.*, those rules that are not exempted from notice and comment by section 553(b)(A)) are typically referred to as "substantive" or "legislative" rules.  *See Clarian Health West, LLC v. Hargan*, 878 F.3d 346, 356 (D.C. Cir. 2017); *U.S. Tel. Ass'n v. FCC*, 28 F.3d 1232, 1234 (D.C. Cir. 1994).  The question of whether an agency action qualifies as a substantive rule that is required to proceed through notice and comment rulemaking is a pure question of law that does not require any special "deference . . . to an agency's characterization of its own rule."  *Clarian Health West, LLC v. Burwell*, 206 F. Supp. 3d 393, 407 (D.D.C. 2016), *rev'd on other grounds sub nom. Clarian Health West, LLC v. Hargan*, 878 F.3d 346 (D.C. Cir. 2017) (citations omitted); *see also Am. Hosp. Ass'n*, 834 F.2d at 1056 ("[W]e are not compelled to defer to agency characterizations of rules as 'general statements of policy[.]'"); *Citizens to Save Spencer Cty. v. EPA*, 600 F.2d 844, 879 n.171 (D.C. Cir. 1979) (finding that agency's "characterizations of these rules as interpretive . . . are of no avail").

Even when an agency promulgates a substantive rule that would otherwise be required to proceed through notice and comment procedures, the APA does not require the agency to engage in notice and comment rulemaking "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the

rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B).  Notice-and-comment is considered "'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553," *Util. Solid Waste Activities Grp. v. EP*A, 236 F.3d 749, 754 (D.C. Cir. 2001) (citation and alteration omitted), and notice-and-comment has been deemed "contrary to the public interest" when "delay could result in serious harm[,]" *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).

However, courts need not defer to an agency's own finding of good cause, *see Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014), and "circumstances justifying reliance on [the good cause] exception are indeed rare and will be accepted only after the court has examined closely proffered rationales justifying the elimination of public procedures." *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981) (internal quotation marks, citation, and alteration omitted).  "[T]he good-cause inquiry is 'meticulous and demanding[,]'" *Sorenson Commc'ns*, 755 F.3d at 706 (quoting *N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980)), and the agency must point to "more than an unsupported assertion[,]" including "factual findings" and "record support proving the emergency," *id.* at 707.

In addition to requiring notice and comment rulemaking where applicable, the Supreme Court has also made quite clear that, under the APA, an administrative agency cannot promulgate rules in an arbitrary or capricious fashion.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).  The

APA itself requires that a court that is reviewing a challenged agency decision shall "hold unlawful and set aside agency action, findings, and conclusions found to be[,]" among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Furthermore, a trusted text—Black's Law Dictionary—defines "arbitrary" as "[d]epending on individual discretion; of, relating to, or involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures" or "founded on prejudice or preference rather than on reason or fact." Black's Law Dictionary 125 (10th ed. 2014). Likewise, a "capricious" decision is defined as a decision that is "contrary to the evidence or established rules of law." *Id.* at 254. Thus, by prohibiting "arbitrary" or "capricious" rulemaking, the APA mandates that agencies must consider relevant "facts, circumstances, fixed rules, or procedures[,]" and must ignore "prejudice or preference" that is not grounded in fact, *id.* at 125, when they undertake to exercise the discretion that they have been given under the law.

Notably, when it evaluates agency actions for alleged arbitrariness, a federal court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks and citation omitted). This standard is "very deferential[,]" and the law "forbids a court from substitut[ing] its judgment for that of the agency." *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016) (second alteration in original) (internal quotation marks and citation omitted). Thus, at the end of the day, an agency action must "be upheld as long as the [agency has] considered the relevant factors" and

69

has "articulated" a rational explanation for the choice it made, given the facts that it found. *Am. Rivers v. Fed. Energy Regulatory Comm'n*, 895 F.3d 32, 45 (D.C. Cir. 2018) (internal quotation marks and citation omitted). The required deference does not countenance "rubber stamp[ing] agency actions," however. *Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 74 (D.D.C. 2013) (internal quotation marks and citation omitted). To the contrary, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking[,]" *Judulang v. Holder*, 565 U.S. 42, 53 (2011), and the Supreme Court has long held that if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or reached a decision that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" *State Farm*, 463 U.S. at 43, then the reviewing court *must* "hold unlawful and set aside" the agency action, as the APA requires, 5 U.S.C. § 706(2).

This all means that, as this Court explained during the motion hearing, government officials are different from private actors when it comes to determining policy—agencies have to seek public input and engage in reasoned deliberations, at the risk of having a federal court invalidate their policy decisions, while, of course, private decision makers have no similar duty. (*See, e.g.*, AM Hr'g Tr. at 67:15–23.) Indeed, private individuals are free to engage in whatever decision making process suits their fancy when they choose their course of conduct. By contrast, under federal law, government actors who make policy decisions in their official capacities cannot succumb to whims or passions while rulemaking; instead, they must carefully evaluate

all of the relevant facts and circumstances and take into account the feedback they have to solicit and receive from interested members of the public. *See* 5 U.S.C. §§ 553(b)– (c), 706(2)(A). Put in common parlance, if a policy decision that an agency makes is of sufficient consequence that it qualifies as an agency rule, then arbitrariness in deciding the contours of that rule—*e.g.*, decision making by Ouija board or dart board, rock/paper/scissors, or even the Magic 8 Ball—simply will not do. There are well-established legal constraints on the *manner* in which an agency exercises its discretion to make discretionary policy decisions, and there are also legally established consequences if an agency does not adhere to these procedural requirements when it determines the policies that it imposes. *See, e.g., Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1008–09 (D.C. Cir. 2014) (invalidating EPA action under section 706(2)(A) of the APA); *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013) (vacating EPA rule for failure to proceed through notice and comment rulemaking); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839, 845 (D.C. Cir. 2006) (vacating FERC actions under section 706(2)(A) of the APA); *Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003) (vacating FCC rule for failure to proceed through notice and comment rulemaking).

> b.   *It is likely that DHS needed to proceed through notice and comment rulemaking prior to issuing the July 23rd Notice and that no good cause exists for the agency not to have complied with these mandates in this instance*

DHS points out that, in order to succeed with respect to a notice-and-comment claim brought under the APA, the plaintiff must show that that the defendant-agency' challenged activity constitutes a "final agency action," and that the agency took that action without first engaging in the mandated notice and comment procedures (*see*

Defs.' Opp'n at 45–46), and it maintains that Plaintiffs will fail to satisfy these

elements with respect to a notice-and-comment claim that they have brought to

challenge Acting Secretary McAleenan's July 23rd Notice for various reasons, the most

significant of which is that, according to DHS, the July 23rd Notice does not qualify as

"a reviewable 'final agency action[.]'"  (*Id.* at 45 (quoting 5 U.S.C. § 704).)[22]  This

Court explains, in the discussion that follows, why DHS's characterization of the July

23rd Notice must be rejected, and why the Court has concluded that it is by far more

likely that the New Designation that is set forth in the July 23rd Notice counts as a final

agency action that the agency needed to promulgate pursuant to the APA's notice and

comment procedure.

First of all, there can be no dispute that, for APA purposes, "[a]n 'agency action'

includes any 'rule,'" which the APA defines in relevant part as "'an agency statement

of general or particular applicability and future effect designed to implement, interpret,

or prescribe law or policy[.]'"  *Abbott Labs.*, 387 U.S. at 149 (quoting 5 U.S.C.

§ 551(13), (4)).  Moreover, any such "[a]gency action is considered final to the extent

that it imposes an obligation, denies a right, or fixes some legal relationship." *Reliable

Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C.

Cir. 2003) (citation omitted).  Thus, a "[f]inal agency action 'mark[s] the consummation

of the agency's decisionmaking process' and is 'one by which rights or obligations have

---

[22] While, technically, DHS's brief casts this argument as a reason why the APA does not provide a
cause of action (*see* Defs.' Mem. at 41), this Court perceives it as a reason why *these* Plaintiffs cannot
avail themselves of the cause of action that the APA provides.  Thus, DHS's lack-of-final-agency-
action contention relates to the merits of Plaintiffs' claims, and the Court considers it in this part of the
Memorandum Opinion accordingly.

been determined, or from which legal consequences will flow.'" *Id.* (second alteration in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

To the Court, it seems fairly obvious that "legal consequences will flow" from Acting DHS Secretary McAleenan's July 23rd designation. *Bennet*, 520 U.S. at 178. The Notice itself specifically acknowledges that, before the agency issued that statement, immigration officers could not have subjected an undocumented non-citizen who had arrived by land and had been present in the United States for more than 14 days to the expedited removal process, whereas, as of July 23, 2019, pursuant to the issuance of the Notice, such officers were authorized to do so. *See* 83 Fed. Reg. at 35,411 (notifying the public that Acting Secretary McAleenan was "[f]ully exercising DHS's statutory expedited removal authority to include certain aliens who would not be subject to expedited removal under the Previous Designations"); *see also id.* ("Under the New Designation, ICE will be able to use expedited removal for certain aliens who[m] it arrests in the interior[.]"). Furthermore, it appears that, just as with the regulation that the Supreme Court found to be a final agency action in *Abbott Laboratories v. Gardner*, the July 23rd Notice published here "is quite clearly definitive. There is no hint that this regulation is informal, or only the ruling of a subordinate official, or tentative." 387 U.S. at 151 (internal citations omitted). Additionally, and importantly, the policy change that the Notice announced "was made effective upon publication," *id.*, and the DHS Secretary made clear that the "*immediate implementation* of DHS's full statutory authority over expedited removal" was "warrant[ed][,]" 84 Fed. Reg. at 35,412 (emphasis added).

73

Defendants' insistence that "unless and until an alien is placed in expedited removal proceedings as [a] result of the [July 23rd] Notice," the designation is not a final agency action (Defs.' Opp'n at 46) is clearly misguided, and thus easily dismissed. From the start, DHS relies on the questionable proposition that "Plaintiffs cannot credibly argue that the Notice is or will be *imminently* applied to a single Plaintiff in this lawsuit," and on this basis, it argues that "until 'further administrative action' in the form of an order of expedited removal occurs, no final agency action is present." (*Id.*)  But DHS's has not offered a single case that supports its spurious suggestion that a plaintiff's standing to sue (which is it likely that these Plaintiffs have, as the Court explains in Part V.A.1.b, *supra*), or lack thereof, has anything whatsoever to do with whether or not a challenged regulation constitutes a final agency action.  And try as they might to muddy the waters by floating this untenable theory, buoyed by inapposite case law, Defendants have done little to sink this Court's confidence that the appropriate point of reference when evaluating whether an agency has engaged in a final agency action is *the agency's conduct*, not its purported effect on the plaintiff, and that the July 23rd Notice is sufficiently definitive to qualify as a final agency action, despite the fact that it has yet to be applied to these Plaintiffs or, for that matter, anyone else.  *See Bennett*, 520 U.S. at 178 (explaining that final agency action "mark[s] the 'consummation' of the agency's decisionmaking process," as opposed to "be[ing] of a merely tentative or interlocutory nature" (citation omitted)).

Defendants' argument that Plaintiffs *still* cannot succeed on the merits of their claim that the agency has improperly promulgated a final rule because Acting Secretary McAleenan's July 23rd Notice is merely a general statement of policy, rather than a

*substantive* rule that needed to be subjected to notice and comment procedures (*see* Defs.' Opp'n at 19), is also seemingly mistaken.  DHS urges the Court to conclude that the July 23rd Notice "merely 'advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power'" (*id*. at 19 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993)); *see also* Defs.' Opp'n at 48–49)), insofar as the Notice states only "that DHS intends to exercise its discretionary authority to the full extent permitted under section 1225(b)(1)(A)(iii) going forward" (*id*. at 48), and "does not require officers to exercise discretion in any particular way" (*id*.).  Indeed, says DHS, the Notice quite clearly "provides—through repeated use of the word 'may'—that officers retain authority 'as an exercise of prosecutorial discretion' to choose whether to place aliens subject to the Notice in either expedited or full removal proceedings even where aliens are 'otherwise eligible for placement into expedited removal proceedings.'"  (*Id*. (quoting 84 Fed. Reg. at 35,412).)

DHS appears to misunderstand the established distinction between substantive rules that require notice and comment rulemaking and general statements of policy, which do not.  The D.C. Circuit has explained that "a substantive rule 'establishes a standard of conduct which has the force of law' in subsequent proceedings," whereas "'[a] general statement of policy, on the other hand, does not establish a 'binding norm[]'" and "is not finally determinative of the issues or rights to which it is addressed." *Am. Hosp. Ass'n*, 834 F.2d at 1046 (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974)).  In other words, unlike a substantive rule, "[t]he agency cannot apply or rely upon a general statement of policy as law[.]'" *Id*.

This binding D.C. Circuit precedent plainly supports a finding that the July 23rd Notice, which was published in the Federal Register and expressly purports to be a designation under 8 U.S.C. § 1225(b)(1)(A)(iii) that provides immigration officers with previously unavailable authority to place certain undocumented non-citizens on the expedited removal track, counts as a substantive rule that DHS needed to promulgate through the notice and comment process.[23]   The hallmarks of agency rulemaking are clearly evident: the DHS-proclaimed that the New Designation "*modifies* or *adds* to a legal norm based on the agency's *own authority*."   *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (emphasis in original).   And as noted, prior to July 23, 2019, immigration officers under DHS's command could not have subjected the newly designated class of non-citizens to expedited removal; however, per the July 23rd Notice, they now can.[24]   DHS cannot deny (and, indeed, it incessantly repeats) the fact that the agency exercised its statutory authority under the INA's section 235(b)(1)(A)(iii)(I) when it issued the Notice.   *See, e.g.*, 84 Fed. Reg. at 35,413; (AM Hr'g Tr. at 66:17–67:6).   Thus, it appears to have conceded that its "authority" to have issued the July 23rd Notice "flows from a congressional delegation to promulgate

---

[23] The D.C. Circuit has also helpfully "observed" that while "an agency's characterization of its own action . . . is a factor that we do consider[,]" that characterization is "not decisive." *Am. Hosp. Ass'n*, 834 F.2d at 1047.  Thus, this Court is not bound by DHS's feeble attempt to cast the July 23rd Notice as merely the agency's stated (and published) intention to pursue some policy in the future.  (*See* Defs.' Opp'n at 48.)  Moreover, the Notice itself makes it crystal clear that, *effective immediately*, undocumented non-citizens who have not been admitted or paroled and who cannot establish that they have been continuously present in the United States for at least two years may be subject to expedited removal.

[24] And, again, it makes no difference to the rule's proper characterization that no immigration officer has yet pulled the trigger with respect to the authority that the July 23rd Notice provides.  DHS might well intend to train the officers who now have this authority (*see* AM Hr'g Tr. at 35:10–12), and such training might cause a delay in the execution of the agency's New Designation (*see id.* at 35:12–14), but that is of no moment when the question on the table is whether DHS has exercised its statutory authority to implement a rule that governs such officers' conduct.

substantive rules, to engage in supplementary lawmaking." *Syncor Int'l Corp.*, 127 F.3d at 95.  And, as a result, the Court is likely to find that "the agency [was] engaged in lawmaking [such] that the APA require[d] it to comply with notice and comment." *Id.*

Defendants' other argument in opposition to a finding that the July 23rd Notice should be deemed a substantive rule—*i.e.*, that ICE officers retain discretion to place those non-citizens subject to expedited removal into those proceedings, so the July 23rd Notice cannot be deemed a substantive rule that triggers the notice-and-comment duty—is even less persuasive.  The D.C. Circuit has long held that "[i]t is enough for the agency's statement to 'purport to bind' those subject to it, that is, to be cast in 'mandatory language' so 'the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences.'" *Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383–84 (D.C. Cir. 2002)).  So it is here.  Although individual immigration officers have the power to opt on a case-by-case basis to stay their hands with respect to their new-found authority, the New Designation plainly binds the undocumented non-citizens who make up the newly designated class, and it places them at risk of being targeted for expedited removal, when they were not in such jeopardy before.  Explained in a different fashion, the potential benevolence of individual line-agents is cold comfort from the standpoint of those persons who are located far from the border and are now in the agency's crosshairs, when, prior to the New Designation, they were not.  The D.C. Circuit rejected similar agency deflection from the significance of the potentially less-than-uniform impact of its policy change in *Electronic Privacy Information Center v. United*

*States Department of Homeland Security*.  *See* 653 F.3d at 7 (noting, with respect to a

challenge to the Transportation Security Administration's ("TSA") decision to use

advanced imaging technology ("AIT") to screen airline passengers, instead of

magnetometers, that "[t]he TSA seems to think it significant that there are no AIT

scanners at some airports and [that] the agency retains the discretion to stop using the

scanners where they are in place[,]" and explaining that "[m]ore clearly significant is

that a passenger is bound to comply with whatever screening procedure the TSA is

using on the date he is to fly at the airport from which his flight departs").  This Court,

too, finds it doubtful that the fact that the July 23rd Notice allows officers discretion to

apply the binding policy that the Notice plainly adopts defeats the conclusion that the

Notice counts a substantive rule.

　　　Finally, the Court notes that DHS's underdeveloped, hail-Mary assertion that the

July 23rd Notice is not subject to notice and comment rulemaking procedures because it

is subject to the "agency rule" exemption (*see* Defs.' Opp'n at 49 n.10) likely fails as

well.  "A useful articulation of [that] exemption's critical feature is that it covers

agency actions that do not themselves alter the rights or interests of parties, although it

may alter the manner in which parties present themselves or their viewpoints to the

agency."  *Am. Hosp. Ass'n*, 834 F.2d at 1047 (quoting *Batterton*, 648 F.2d at 707).  As

outlined above, the July 23rd designation undeniably alters the rights and interests of

those non-citizens who otherwise could not have been subject to expedited removal.

　　　Given that (1) Plaintiffs are likely to be able to establish that the July 23rd

Notice qualifies as a substantive rule, (2) Congress did not expressly except the

expedited removal designation that DHS is authorized to issue under the INA's section

1225(b)(1)(A)(iii)(I) from the APA's procedural requirements, and (3) DHS did not notify the public of the New Designation or seek public comment prior to announcing that the New Designation was a fully effective statement of agency policy, the only remaining factor that might thwart Plaintiffs' success with respect to establishing the claimed violation of the APA's notice and comment requirements is whether there was good cause for DHS to issue this rule without engaging in notice and comment rulemaking. *See Council of S. Mountains*, 653 F.2d at 580. Defendants dutifully try this tack. (*See* Defs.' Opp'n at 49–52.) But record facts are pesky; here, the agency's own conduct in waiting *two and a half years* to issue the New Designation after the President first brought this matter to the agency's attention, and also its own statements (made in the course of this litigation) confidently asserting that none of Plaintiffs' members are in danger, will likely impede the agency's progress with respect to any good-cause showing.

First, though, it is important to address Defendants' broad contention that the INA itself dispenses with the need to show good cause with respect to any particular implementation decision by the agency. DHS asserts that "[t]he clear import of the unfettered discretion accorded the Secretary [in section 1225(b)(1)(A)(iii)] is to permit the Secretary 'to apply the expedited removal procedures to additional classes of aliens within the limits set by the statute if, in the [Secretary's] discretion, such action is operationally warranted'" and in the agency's view, that "includ[es] in 'specific situations such as a sudden influx of illegal aliens motivated by political or economic unrest or other events or by a general need to increase the effectiveness of enforcement operations at one or more locations.'" (Defs.' Opp'n at 47 (second alteration in

original) (quoting 62 Fed. Reg. at 10,313–14).)  In other words, according to

Defendants, "[n]otice-and-comment procedures are incompatible with that clear

statutory goal, and would eviscerate the statutory purpose that the Secretary be able to

'modif[y]' a designation 'at any time.'"  (*Id.* (second alteration in original) (quoting 8

U.S.C. § 1225(b)(1)(A)(iii)).)

Defendants' arguments in this regard are not likely to succeed.  In a nutshell, this

Court sees nothing in the INA that suggests that Congress intended to *displace* the

standard order when it comes to agency decision making; for example, unlike other

statutes, the INA's expedited removal provisions do *not* establish "a comprehensive,

freestanding scheme with particularized procedures that are different and unique from

those provided by the APA," such that it is clear that Congress intend for DHS not to

follow the APA's notice-and-comment prescriptions.  *Envtl. Integrity Proj. v. EPA*, 177

F. Supp. 3d 36, 43 (D.D.C. 2016) (internal quotation marks omitted); (*see also* Defs.'

Opp'n at 47 (quoting same)).  And, again, the mere fact that section

1225(b)(1)(A)(iii)(I) states that DHS may modify the designation as to who is subject to

expedited removal "at any time," does not mean Congress wanted DHS to be allowed to

modify the designation randomly, without giving considered thought to that decision,

and at a moment's notice.  (*See supra* Part V.2.b.)

And with respect to the New Designation that Acting Secretary McAleenan

announced on July 23, 2019, there appears to be no good reason why DHS failed to

solicit public comment that might well have brought additional and significant

information to light.  DHS's assertion that it would have been "impracticab[le]" to do

so under the circumstances presented here (Defs.' Opp'n at 51 (citing 84 Fed. Reg. at

35,413)) makes a mockery of that otherwise legitimate criterion; indeed, DHS appears to have had nothing but time—29 months, to be exact—between then-Secretary Kelly's public announcement that the agency would be implementing a new expedited removal designation and the agency's actual issuance of the July 23rd Notice, and, surely, it was possible for DHS to have laid the necessary groundwork and to craft a proposed rule for submission to the public in that span. What its impracticality argument *really* conveys is the agency's mistaken conclusion that it did not need to do so (*see id.* (arguing that "[t]he Notice cannot be 'effective immediately' or 'modified at any time' if notice-and-comment is required, and therefore it is impracticable to provide such notice")), but that is not the stuff of which a valid "impracticability" argument is made.

Nor can Defendants credibly contend that this Court should find good cause for its failure to comply with the APA's procedural requirements when it promulgated the New Designation based on the public's interest in the agency's being in a position to respond to a "surge" at the border. 84 Fed. Reg. at 35,413; (*see also* Defs.' Opp'n at 49 (arguing that notice and comment rulemaking was "contrary to the 'public interest'" within the meaning of 5 U.S.C. § 553(b)(B))), given that "'delayed implementation could lead to a surge in migration across the southern border across a notice-and-comment period,' threatening 'national security and public safety,' and causing possible 'destabilizing effect[s] on the region,' and 'significant loss of human life'" (*id.* (alteration in original) (quoting 84 Fed. Reg. at 35,413)). As noted, this Court need *not* defer to the agency's judgment about whether or not it had the need to move quickly, *see Sorenson Commc'ns Inc.*, 755 F.3d at 706, but DHS has also repeatedly suggested (in the context of this litigation) that, really, no one needs to worry about its execution

of this new policy, because the agency may not be moving to enforce expeditious removal of settled undocumented non-citizens per the power of the July 23rd Notice anytime soon.  (*See, e.g.*, Defs.' Opp'n at 39–41; AM Hr'g Tr. at 35:8–14.)

Such representations contradict—and undermine—the agency's contention that the reason notice-and-comment was, in the agency's view, expendable, was that it had to implement the New Designation policy *fast*, to provide it with tools to deal with "the ongoing crisis" at the border.  84 Fed. Reg. at 35,411.  And it is hard to know *which* of the agency's representations to credit, because if there is no imminent threat that Plaintiffs' members will be subjected to expedited removal under the July 23rd Notice, and the execution of that Notice is not an agency priority, how much weight can its assertions about its need to hastily "remov[e] from the United States . . . aliens who cannot establish a credible fear of persecution or torture[,]" *id*. at 35,412, such that notice and comment procedures were not required prior to its issuance of the New Designation, be given?

Thus, in the end, it is not likely that this Court will be persuaded that DHS had good cause for side-stepping the ordinary rulemaking gauntlet, or that skipping the notice and comment procedure was in the public's interest, due to the agency's need to rise rapidly to meet the challenge that an influx of undocumented non-citizens at the border presents.  The fact is, DHS did *not* respond quickly to a purported urgent need to issue the New Designation.  Instead, it waited for more than two years after the President publicly identified the need before it actually issued its Notice.  Furthermore, DHS showed no urgency even after the policy that it announced became effective; indeed, somewhat inexplicably, the agency announced, on July 23, 2019, that the New

Designation was "effective immediately," *id.* at 35,410, but failed to take any steps to *enforce* that policy until 40 days later, on September 1, 2019 (*see, e.g.*, Teleconf. Tr. at 3:7–8). And here, still, government counsel reminds us that the agency has not yet acted to impose the policy on an any of the individuals whom it affects. (*See* AM Hr'g Tr. at 35:8–14.) But DHS also invites the Court to find, as a matter of law, that "a surge in migration" can happen quickly (Defs.' Opp'n at 49 (quoting 84 Fed. Reg. at 35,413)), and that this mere prospect justifies the agency's failure to comply with the APA with respect to promulgating the rule that it has not yet chosen to enforce. All things considered, this Court is unlikely to accept that contention.

Consequently, the much more likely scenario is that the Court will conclude at the end of the day that DHS was required by the APA to provide the public with notice, and an opportunity to comment, before the agency adopted the New Designation and announced that policy change. In addition, the Court is likely to conclude that there was no good reason for DHS to fail to comply the APA's notice and comment requirements, under the circumstances presented in this case. As a result, Plaintiffs have a likelihood of succeeding on the merits of their notice-and-comment claim.

> c.   *It is likely that the July 23rd Notice resulted from arbitrary and capricious decision making*

Based on the evidence presented here, it is also likely that Plaintiffs will be successful in persuading the Court that DHS's New Designation rule was promulgated in an arbitrary and capricious fashion. Plaintiffs' primary argument in this regard is that, even now, DHS "fails to acknowledge . . . the due process problems in the existing expedited removal system," and they argue that, due to this unexplained oversight, the record amply demonstrates that the agency cannot have "ensure[d]" the New

Designation's "fair application to those newly subject to the Rule."  (Pls.' Mem. at 47 (capitalization altered).)  And with respect to their contention that problems abound, Plaintiffs bring the receipts; the evidence includes supporting declarations that outline the flaws in the existing expedited removal system.  (*See id.* at 18–23.)  Boiled to bare essence, Plaintiffs' arbitrariness claim appears to be that the flaws in the pre-existing scheme were so glaring that the agency's failure to account for them when it adopted the New Designation renders the July 23rd Notice irretrievably infirm.

For example, according to Plaintiffs, prior applications of the expedited removal policy featured erroneous identifications of persons as being subject to removal (*see id.* at 19), as well as instances in which such erroneously identified persons were also *actually* deported (*see id.* at 18–19).  In addition, there have allegedly been egregious errors in recording "material statements made by noncitizens who express a fear of persecution or torture" (*id.* at 19; *see id.* at 19–21); failures to provide translators (*see id.* at 22); and failures "to advise noncitizens that they may request to withdraw their applications for admission, which allows noncitizens to leave the United States voluntarily and avoid penalties that include permanent inadmissibility to the country" (*id.*).  Plaintiffs also say that evidence concerning these and other problems was widely available before DHS issued the July 23rd Notice; for example, it is purportedly included in studies that the United States Commission on International Religious Freedom, a government entity, has conducted.  (*See, e.g.*, *id.* at 18 (citing U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 4-5, 10 (2005); U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* 2 (2016)).)

Amici contend that "DHS's decision to expand expedited removal will inflict broad and systemic harm on the individuals, families, communities, and the broader public" (Amicus Br. at 26), because "[p]eople who have lived in this country for one or two years . . . have begun to build lives here.  They contribute to our economy and civic life in countless ways" (*id.* at 26–27).  Amici note, for example, that "undocumented immigrants in California each year contribute an estimated $3 billion in state and local taxes" (*id.* at 27),[25] and that "[u]ndocumented immigrants in New Jersey paid an estimated $587.4 million in state and local taxes in 2014" (*id.* at 27–28).[26]  Amici also outline the impact that DHS's expanded expedited removal designation could have on children and families, as "millions of people live in 'mixed-status' households, where one or both parents may be undocumented, while some or all of the children (and, sometimes, a spouse) are U.S. citizens."  (*Id.* at 28.)[27]  Amici maintain that "[e]xpanding expedited removal means that these 'mixed-status' families face separation with little or no time to prepare" (*id.*), and, indeed, according to the amicus brief, "[s]tudies show that children faced with the likelihood of a family member['s] deportation can experience serious mental health problems, including depression, anxiety, self-harm, and regression" (*id.*).[28]  Amici also contend that "deporting a

---

[25] Citing Inst. on Taxation & Econ. Policy, *State and Local Tax Contributions of Undocumented Californians*, at 1 (Apr. 2017), https://tinyurl.com/ITEP-Taxes.

[26] Citing Am. Immigration Council, *Immigrants in New Jersey*, at 4 (Oct. 13, 2017), https://tinyurl.com/AmIC-NJ.

[27] Citing Randy Capps, et al., Urban Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, at 8–12 (Sept. 2015), https://tinyurl.com/CappsMPI.

[28] Citing Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120-136 (2011); Capps, *Implications of Immigration Enforcement Activities*, at 8-9.  "In one [such] study, children with deported parents refused to eat, pulled out their hair, had persistent stomachaches and headaches, engaged in substance abuse, lost interest in daily activities, and had trouble maintaining positive relationships with non-deported parents."  (Amicus Br. at 29 (citing

family's financial breadwinner can lead to economic hardship and loss of housing for remaining family members, and can put children, seniors, and disabled family members at serious risk[,]" such that, "[a]s a result of increased deportations under the new rule, many families will be forced to seek increased social services[.]"  (*Id.* at 29.)[29]

All that said, what matters for present purposes is whether DHS *disputes* any of these accounts of the lived experiences of settled, undocumented non-citizens and the potential impact of their coming into contact with DHS's expedited-removal practices, and if not, whether the agency *took that into account* when it determined that the expedited removal policy should be expanded.  In this regard, the Court observes that nowhere in DHS's brief does the agency say: "your Honor, what Plaintiffs are representing about the state of affairs that might occur as a result of the expansion of our expedited removal practice is wrong" or that "Plaintiffs' accounts of what might happen are grossly exaggerated."  And in the absence of any such representation, the Court is left to wonder *where* in the administrative record does the agency consider, and attempt to address, these flaws and issues as part of its decision making process regarding whether or not to adopt this new policy?  There is no question in this Court's mind that an agency cannot possibly conduct reasoned, non-arbitrary decision making concerning policies that might impact *real* people and not take such *real life circumstances* into account.  *See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1113 (D.C. Cir. 2019) ("[T]he Commission's decision does not indicate that it considered the

---

Heather Koball, et al., Urb. Inst., *Health and Social Services Needs of US-Citizen Children with Detained or Deported Immigrant Parents*, at 5 (Sept. 2015), https://tinyurl.com/MIRFinal; Mary Papenfuss, *Weeping Girl Left Abandoned by ICE Pleads with 'Government' to 'Let my Parent be Free'*, Huffington Post (Aug. 8, 2019), https://tinyurl.com/Papenfuss-HuffPost).)

[29] Citing Capps, *Implications of Immigration Enforcement Activities*, at 9–14, 17–22.

effect of eliminating the enhanced subsidy for non-facilities-based providers, namely that many low-income consumers on Tribal lands will lose access to affordable telecommunications service."); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017) (finding that agency failed to address the "relevant environmental concern" and "denied its very existence").

Because of the potentially serious implications that DHS's expansion of expedited removal might have on the persons who would be subjected to expedited removal under the New Designation, as well as the potential impact on their families and the communities in which they live—DHS admits that its new designation could subject "hundreds of thousands" of non-citizens to rapid removal, 84 Fed. Reg. at 35,411; (*see also* Defs.' Opp'n at 66–67)—the Court is persuaded that there is a substantial likelihood that DHS "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, before issuing the July 23rd Notice, and as result, that the agency failed to engage in reasoned decision making, as required by law, *see* 5 U.S.C. § 706(2)(A).  In particular, it appears to the Court that DHS only considered the *upsides* of the New Designation in terms of its potential effects on "national security and public safety" and the fact that the rule had the potential of "reducing government costs[.]"  84 Fed. Reg. at 35,409.  But there is no evident consideration of the considerable *downsides* of adopting a policy that, in many respects, could significantly impact people's everyday lives in many substantial, tangible, and foreseeable ways.

To be clear:  DHS is more than entitled to consider the issues that it *did* take into account, *i.e.*, whether expanding expedited removal in the manner outlined in the July 23rd Notice would "alleviate some of the burden and capacity issues currently faced by

DHS and [the Department of Justice][,]" *id.* at 35,411; or would "more quickly make available additional ICE bed space, which can be used for additional interior arrests and removals[,]" *id.*; or would "mitigate additional backlogs in the immigration courts" and "reduce the significant costs to the government associated with full removal proceedings before an immigration judge, including the costs of a longer detention period and government representation in those proceedings[,]" *id.* at 35,412.  These are all relevant and important considerations, and the fact that the agency lists them in the July 23rd Notice suggests that the agency may well have gone part-way to where it needs to be on the continuum between reasoned decision making and irrationality.  But an agency cannot consider *only* the perceived shiny bright spots of a policy that it is mulling—the silver lining, if you will.  To make a reasoned decision that passes muster under the APA, the agency must *also* attempt to forecast the storm clouds that might be spawned if it adopts the proposed policy, and it must at least acknowledge the potential impact that such dark clouds might actually have on the people and communities the policy would affect.

With respect to the policy at issue here, the potential devastation is *so* obvious that DHS can be fairly faulted for its unexplained failure to predict, and attempt to mitigate, the fully foreseeable future floods.  For one thing, the evidence plainly indicates that the prior expedited removal practices have known and significant glitches when they have been applied to undocumented non-citizens who have just arrived in this country.  (*See* Pls.' Mem. at 18–23.)  Did DHS consider the order-of-magnitude difference that applying this policy would have if such problems occur with respect to immigrants who are in the United States, lawfully, and who have been here for a

considerable period of time, and would face a substantially increased risk that they might be erroneously identified and flagged for rapid removal as a result of the expanded expedited removal practice?  (*Cf. id.* at 18–19.)[30]  At the very least, it would seem that *some* consideration of *how many* people might be erroneously swept up in the expanded expedited-removal dragnet, and/or *how often* such identification errors have occurred with respect to the agency's expedited-removal practices in the past, would be in order if the agency endeavors to undertake a rational consideration of whether to ramp up the practice.  Yet, at least at this preliminary stage, no one has pointed to any data or information about such cautionary tales in the administrative record at issue here.

There is also the matter of the real-world consequences of implementing a policy that permits immigration officers to eject individuals immediately (even undocumented non-citizens) if such folks have been living and working inside the United States for lengthy periods of time.  (*See* Amicus Br. at 26–27 ("People who have lived in this country for one or two years (or more) have begun to build lives here.").)  DHS has not persuasively argued that the burden of having to (a) avoid immigration officials entirely—which Plaintiffs show is likely difficult or impossible for many non-citizens who would be subject to expedited removal (*see, e.g.*, Pls.' Suppl. Br. at 6 (explaining that "[immigration] enforcement actions occur across contexts—they include surveillance and arrests at courthouses, buses, and trains, as well as raids on workplaces and homes" (citation omitted)))—or (b) carry around documents establishing one's

---

[30] This is not to suggest that the potential injury to such people is a sufficient basis for them to assert Article III standing, as Plaintiffs suggest.  (*See* Pls.' Suppl. Br. at 6.)  Rather, it goes to show that such individuals exist, and to the extent that they might be harmed, DHS was likely obliged to take potential injury to such persons into account.

continuous presence or lawful status at all times in perpetuity, is irrelevant to a rational assessment of a policy that would likely generate this outcome.  And if that factor matters, then DHS was required to take it into account.  *See State Farm*, 463 U.S. at 43. However, in this respect, too, the Court has yet to find any record evidence that DHS actually considered such burdens as part of its decision making process before it adopted the New Designation (and perhaps for good reason, because, as far as this Court can tell at this early stage in the case, such matters were not factored in at all).

Nor does it appear that DHS employed its expertise to engage in the kinds of careful line-drawing that Congress likely intended when it authorized the agency to designate classes of individuals as subject to the expedited removal process.  Congress routinely sets maximum parameters within which agents of the government may exercise discretion.  *See, e.g.*, *United States v. Booker*, 543 U.S. 220, 233 (2005) (reinforcing, in the context of criminal sentencing, a federal judge's authority "to exercise broad discretion in imposing a sentence within a statutory range").  But it typically does so with the expectation that those agents will exercise that discretion in a reasoned manner, *i.e.*, by doing the work necessary to make rational, non-arbitrary decisions about the policies that will be implemented pursuant to that authority.  *Cf., e.g.*, 28 U.S.C. § 991 (establishing and outlining purpose of the United States Sentencing Commission, which is to "establish sentencing policies and practices for the Federal criminal justice system[,]" including, among other things, "provid[ing] certainty and fairness in meeting the purposes of sentencing").  That intent is evident with respect to the INA, because Congress plainly established the outer contours of acceptable implementation of the expedited removal process, *see* 8 U.S.C.

§ 1225(b)(1)(A)(iii)(II), and then asked the Attorney General to exercise his discretion to designate the categories of persons who will be subjected to expedited removal within those contours, *see id.* § 1225(b)(1)(A)(iii)(I).

Consistent with legislative authorization in other areas, this grant of discretionary authority should not be taken to mean Congress must have intended for the agency to have full power to exercise its discretion in an *irrational* way. (*But see* Defs.' Opp'n at 67–68.)  In fact, it is much more likely that Congress wanted the Attorney General (now, DHS) to make expedited removal designations under section 1225(b)(1)(A)(iii) in a manner that reflects the agency's expertise, which, of course, is likely the reason why Congress thought it best to tap the agency at all.  That is, in 1996, when Congress undertook to create the expedited removal process by statute, it could have easily dictated precisely who would be subject to expedited removal at that time, in the first instance, rather than enlisting the Attorney General's help.  But, instead, Congress intentionally delegated the designation authority to the expert agency that it likely believed was best equipped to make rational decisions about who should be exposed to the significant and consequential risks it was creating.

In this Court's view, this means that DHS is not at all exempt from the reasonable rulemaking requirement.  (*See* Defs.' Opp'n at 67–68 (arguing that the agency had every right to just adopt, wholesale, the statutory limit in its rules).)  To the contrary, it is likely that DHS only *has* such authority *precisely because* Congress and the Attorney General believed that an administrative agency with DHS's portfolio could be counted on to ask the right questions, to look at all the facts, and to evaluate, fully, the best course of action with respect to expedited removal process.

Thus, in this Court's considered judgment, in order to have fulfilled that duty with respect to the designation decision that is at issue here, at a minimum, DHS needed to consider such questions as "how long is too long" for an undocumented non-citizen, who has been living in this country for an extended period of time, to carry the burden of having to provide immediate proof of his identity and alienage, without access to counsel or other procedures.  Also important is an inquiry into whether imposing such a burden on individuals living anywhere in the nation's approximately 3.5 million square miles is really needed.[31]  Another way of getting at these same relevant concerns would be for the agency to seek, with respect to the category of settled, undocumented non-citizens who might have substantial ties to the United States at the time they are encountered, to consider which public interests weigh more heavily in the balance between rapid removal and providing procedural rights.[32]

None of the statements that the Acting DHS Secretary makes in the July 23rd Notice indicates that the agency took into account *any* of these matters.  And based on what the Notice says and the administrative record, Plaintiffs are likely to be able to demonstrate that the agency's *only* concern was the potential impact of this policy change on its own resources and the efficiency of the immigration removal system. This Court is of the opinion that, even assuming that DHS fairly and accurately assessed *those* impacts and has stated a rational connection between the agency's goals and the policy it has adopted (which is not crystal clear), the agency's apparent failure

---

[31] *See* The World Factbook, Central Intelligence Agency, https://www.cia.gov/library/publications/the-world-factbook/geos/us.html.

[32] And, of course, one way to figure this out would be to put the proposed rule in the Federal Register and seek public comment.

to evaluate the impact of the policy on the individuals who would be subject to the New Designation, and their communities, means that it has ignored a significant aspect of the problem that its proposed policy creates—*i.e.*, the fact that the greatly expanded category of individuals who would be newly subject to expedited removal might have ties to the community that individuals arriving at ports-of-entry, or those who are found within 100 miles of a border and who have not been in the United States for at least two weeks, generally do not.[33]

In reviewing the evidence and considering the arguments that the parties in this lawsuit have made regarding the allegedly arbitrary and capricious nature of DHS's New Designation, this Court has struggled to provide a concrete way to convey its conclusions about what the evidence is likely to show and what the law indisputably requires with respect to DHS's decision making process with regard to the policy it has adopted.  The Court has come to realize a helpful fact that is easily inferred from the panoply of statements that 17 states, and the District of Columbia, make in their joint amicus brief (*see* Amicus Br. at 26–32), as well as the press accounts they cite.  As summarized above, amici persuasively point to the significant harms that are likely to occur if the New Designation that DHS has adopted is enforced around the country, and the inference of fact that they amply support is this: the expedited removal of an individual who may have been living and working in the United States for a significant period of time has the potential to cause trauma.  And not just to the individuals themselves; indeed, the anticipated radius of injury also encompasses those persons'

---

[33] The distinction between these two categories of persons explains why the D.C. Circuit's alleged endorsement of DHS's prior expedited removal practices (*see* Defs.' Opp'n at 68) is sufficient to warrant the conclusion that the Circuit would overrule all objections to the July 23rd Notice.

households, neighborhoods, communities, workplaces, cities, counties, and States.  (*See id.*)  When DHS evaluates whether or not such inflicted pain is really worth it (as it must), it can certainly assess all of the *benefits* it can identify with respect to the humanity voids that an expanded expedited removal policy creates, including the agency's own resources, *see* 84 Fed. Reg. at 35,411; the effect on the agency's ability to protect our national security, *see id.*; and anything else the facts support.  But any reasonable decisionmaker would *also* want to know about the *problems*, and would undoubtedly do its best to temper, or, at the very least, acknowledge, those effects.

This means that, in the instant context, before DHS decides to authorize the swift ejection of someone who lives in the interior of the country and has been here for up to two years, it would likely have to do some research regarding such matters as how long a person must be here, on average, to be likely to have the kinds of substantial ties to the community that would make her expedited removal more, or less, consequential for all involved.  DHS is certainly an expert with respect to that kind of information, and if it had bothered to consider impact issues prior to issuing the July 23rd Notice, who knows what that agency, with all its expertise about the effect of U.S. immigration law on the communities in question, would have found?  Perhaps two months is not long enough to really lay down roots, but 18 months of being here, and then being yanked away, would be problematic in myriad ways.  Again, those are the kinds of judgment calls that Congress plainly asked the agency to determine, and DHS had an opportunity to bring its knowledge, and its judgment, to bear on that important question before it decided that imposing expedited removal on persons who have been in the United States for up to two years was going to be the call.  Most importantly for present purposes, the

APA and the cases that interpret it make clear that DHS's apparent failure to undertake *any* kind of assessment of *any* of the downside risks of the proposed New Designation was a gross abdication of the agency's statutorily designated responsibilities in this regard. *See Nat'l Lifeline Ass'n*, 921 F.3d at 1113–14; *Am. Wild Horse Pres. Campaign*, 873 F.3d at 930–31.

Notably, this Court is not saying anything at all about whether the policy choice that the July 23rd Notice reflects—*i.e.*, up to two years of continuous residency; to be employed in every state in the Union—is proper as a substantive matter. Plaintiffs have tried (quite vigorously, in fact) to compel the Court to reach *that* conclusion in the context of its emergency motion, but this Court is ever mindful of DHS's, and Congress's, considerable expertise in these areas, as well as the established legal principle that (up to constitutional limits) the Court cannot "substitut[e] its judgment for that of the agency." *Van Hollen, Jr.*, 811 F.3d at 495 (internal quotation marks and citation omitted).

Furthermore, and most important, based on the record presented here, the Court need not come anywhere close to making a due-process pronouncement and *still* conclude that DHS likely engaged in arbitrary and capricious decision making with respect to the rule at issue in this case. This is because clear and binding precedent holds that it is the very definition of arbitrariness in rulemaking if an agency refuses to acknowledge (or fails to obtain) the facts and figures that matter prior to exercising its discretion to promulgate a rule. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019); *State Farm*, 463 U.S. at 43. Indeed, in this Court's view, an administrative agency that just plows ahead and announces a new rule, without taking

the reasonably foreseeable potential negative impacts of the policy determination into account (as DHS appears to have to done) might as well have picked its policy out of a hat.  (*See* AM Hr'g Tr. at 61:13–17; *see also id.* at 67:24–68:1 (defense counsel expressing relief, in response to the Court's line of arbitrary decision making questions, and in jest, that "thankfully, . . . there's no suggestion that [the Acting Secretary] did use darts or a Ouija board").)

### B.    If Plaintiffs' Members Are Subjected To DHS's Expanded Expedited Removal Policy During The Pendency Of This Lawsuit, They Will Suffer Irreparable Harm

Moving on to the second prong of the preliminary injunction analysis—at nearly 100 pages into this discussion—the Court is relieved to find that the irreparable-harm inquiry need not detain it for long.  Plaintiffs' contention that their members are likely to suffer irreparable harm without immediate judicial intervention is credible and supported by the evidence, and the case for this conclusion was almost already made, just on the basis of the Court's prior evaluation of Plaintiffs' members' likely injury for standing purposes.  (*See supra* Part V.A.1.b.)  With respect to the merits of the motion for a preliminary injunction, the law defines "[a]n 'irreparable harm' [a]s an imminent injury that is both great and likely, and for which legal remedies are inadequate[,]" *Jackson v. Dist. of Columbia*, 692 F. Supp. 2d 5, 7 (D.D.C. 2010) (citing *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)), and this Court has already concluded that Plaintiffs have established a substantial likelihood that at least some of their members face an injury that is imminent enough to provide the Plaintiff-organizations with the legal right to file an action in federal court alleging that DHS has violated the APA.  Therefore, the Court's assessment of whether the Plaintiff-organizations have shown that their members are likely to face irreparable harm absent a preliminary

injunction, which is a required showing for entitlement to such emergency relief, will focus, first, on whether the harm alleged is sufficiently *severe* to compel the conclusion that interim injunctive relief is warranted, and then, on whether the harms Plaintiffs allege could be otherwise remedied.

To this end, the Court begins by acknowledging that Plaintiffs maintain that their organizations include members who would be legally subject to the expanded expedited removal procedures, "because they entered without inspection[] and have been continuously present in the United States for less than two years." (Pls.' Mem. at 53.) Plaintiffs also proffer that they have members who are *not* subject to expedited removal under DHS's New Designation, because they have been continuously present here for longer than two years, for example, but could be irreparably be harmed by being mistakenly swept up in the agency's wide-scale expansion of the fast-track procedures. (*See id.*) Plaintiffs further assert that many of their members who have authorization to be in the United States fear being subjected to expedited removal "because they do not have or know what documents they could use to show their legal status or their continuous presence, and do not know when and how they would be able to access this crucial information if they encounter[ed] an immigration officer at work, on the street, or [at] a courthouse." (*Id.*) Finally, Plaintiffs argue that, in any event, they are being irreparably "'depriv[ed] of a procedural protection to which [they are] entitled' under the APA," because the agency has not considered the comments that Plaintiffs would have submitted as part of the required notice and comment process. (*Id.* at 54 (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)).)

Plaintiffs have presented several declarations to support these contentions, the most helpful of which is the Declaration of Kara Hartzler, a criminal defense lawyer who has worked as a public defender in San Diego, California, for seven years.  (*See* Decl. of Kara Hartzler, ECF No. 13-14, ¶ 1.)  Hartzler has seen her share of expedited removal situations; she generally avers to the "rushed nature of the [expedited removal] proceedings" (*id.* ¶ 11), and helpfully explains that "[t]he [removal] order is usually issued within a few days, if not hours" (*id.* ¶ 13).  Other declarants also attest that significant errors also occur, at times, with respect to these types of proceedings. Joanna Delfunt, a Georgia-based lawyer with her own law firm (*see* Decl. of Joanna Delfunt, ECF No. 13-11, ¶ 1), testifies that an expedited removal order was once issued against a non-citizen who had been present in the United States for three years on a visa (*see id.* ¶ 8); Leah Jones, an associate at a law firm in California (*see* Decl. of Leah A. Jones, ECF No. 13-17, ¶ 1), recounts that an expedited removal order was issued against an undocumented non-citizen who had arrived in the United States to escape "horrific domestic violence" within 24 hours of her arrival at a port of entry, even though the potential asylee explicitly told the immigration officer that she was afraid to return to her home country (*id.* ¶¶ 11, 14); and Jose Rodriguez, another California attorney (*see* Decl. of Jose Jesus Rodriguez, ECF No. 13-13, ¶ 1), avers that DHS sometimes issues expedited removal orders against non-citizens who are not provided with translators, and who are never asked about whether they have a fear of persecution should they be returned to their home country (*see id.* ¶¶ 7–9).

Plaintiffs have thus provided sufficient evidence that at least one of each organization's members has a substantially increased risk of facing substantial harm

absent an order that enjoins DHS from enforcing the July 23rd Notice while the parties litigate this matter on the merits, whether the member is legitimately subject to expedited removal or not.  This is so for several reasons.

First, any member who is a citizen of the United States, a lawful permanent resident, a refugee, an asylee, or a holder of a valid visa—all of whom have a legal right to remain in the United States—would undeniably experience severe and irremediable harm if they were improperly removed from this country.  And by presenting sworn declarations such as the ones that the Court has described, Plaintiffs have established that such mistakes do happen, which supports an inference that expanding expedited removal in the manner prescribed by the July 23rd Notice would subject a not-insignificant number of such individuals to speedy and erroneous deportation, given the scale of the expansion of expedited removal from its previous scope.  *See, e.g.*, 84 Fed. Reg. at 35,411 (indicating DHS's intention to subject "hundreds of thousands" of non-citizens to rapid removal).

Second, Plaintiffs' evidence is also sufficient to establish that those non-citizen members who meet the New Designation criteria, but would otherwise be subject to deportation only via traditional removal procedures, face irreparable harm as well, due to the delta between what the law requires with respect to the traditional process and the process that might be afforded to them if they are encountered by immigration officers now.  For example, existing DHS regulations governing expedited removal requires the detention of its subjects, *see* 8 C.F.R. § 235.3(b)(2)(iii), where traditional proceedings do not, *see id.* § 236.1(b) (authorizing, but not requiring, arrest and detention pursuant to a warrant); *see also Ramirez v. USCIS*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018) (finding

that plaintiffs faced irreparable harm from detention that "surely cannot be remediated after the fact").  Additionally, and significantly, even an undocumented non-citizen who has no defense to the charge that he is in this country illegally gets a few more hours to spend with his family and friends and to wind up his personal affairs under the traditional removal procedures, whereas the hallmark of the expedited removal process is that the person is ordered removed to their home country quickly, "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i).

Ask anyone who is facing the potentially abrupt termination of a close, personal relationship with another person whether more time with that person makes a difference.  Likewise, if that bond is already broken, ask whether, if instead of extra time, she could bank a dime for each missed second that she would have spent in that person's presence—would the cash be sufficient to compensate her fully for the loss?  This Court has no doubt that there is no adequate legal remedy to make those who are forced to leave, or those who are left behind, completely whole in the wake of a forcible ejection without warning, which is, in fact, the policy that DHS says it will execute on a widespread basis, unless this Court grants Plaintiffs' plea for interim emergency relief.  (*See, e.g.*, Amicus Br. at 29 (documenting traumatic experiences of children whose parents are suddenly and forcibly removed).)[34]

---

[34] There is no doubt that Plaintiffs have primarily staked their claims on the alleged imminent injuries of their members.  (*See* Pls.' Suppl. Br. at 5 (asserting associational standing).)  Thus, the Court is hard-pressed to conclude that harm to the organizations themselves from not being afforded the opportunity to participate in notice and comment rulemaking with respect to the July 23rd Notice counts as the type of irreparable harm that warrants judicial intervention at this stage of the case.  Moreover, as the Court notes at the conclusion of this Opinion, it is not at all clear that the loss of the chance to provide comment is irreparable, since, if Plaintiffs win on their procedural claims, the July 23rd Notice will be vacated, and the parties will have another chance to participate in a rulemaking that conforms to the mandates of the APA, should DHS seek again to designate a new class of undocumented non-citizens as subject to expedited removal.  (*See infra*, Part V.D.)

Third, and finally, it appears that the mere threat of being singled out and subjected to the prospect of expedited removal and other similarly harsh DHS initiatives may *already* be doing irreparable damage to settled immigrant communities.  Amici maintain, for example, that "health care providers are finding that immigrant families are increasingly skipping health care appointments and abstaining from scheduling routine prevention or primary care appointments for their children."  (Amicus Br. at 32);[35] *see also* Cal Matters, *Immigrants Afraid of Trump's 'Public Charge' Rule Are Dropping Food Stamps, Medical* (Sept. 22, 2019).[36]  Thus, as the amicus brief makes clear, with respect to these kinds of potentially irreparable secondary effects, no speculation is required.

Defendants counterarguments are cast, once again, in the broadest terms, and are again based on general statements of law that are inapposite to the particular question presented.  Defendants do not engage at all with the actual record facts about the nature of its rule and its impact; instead, DHS says, essentially, that *no* effects have occurred yet as a result of the July 23rd Notice, because the agency has not yet opted to enforce the policy.  (*See* Defs.' Opp'n at 73 ("[T]hese vague speculations premised on subjective, amorphous fears that some unidentified member *could* be subject to the immigration laws of this country *if* the Executive decides to enforce the statute as to them at some *unknown* time in the *future* fails to show irreparable harm." (emphasis in original)).)  In light of the evidence that Plaintiffs have presented, all this Court can

---

[35] Citing The Children's P'ship, *Healthy Mind, Healthy Future: Promoting the Mental Health and Wellbeing of Children in Immigrant Families in California*, at 25 (Sept. 22, 2018), https://tinyurl.com/ChildrensPship-Healthy.

[36] Located at https://calmatters.org/economy/2019/09/immigrants-afraid-trump-public-charge-rule-food-stamps-medical-benefits/.

say, in response to the agency's contention, is something that the Court suspects the agency already knows:  Plaintiffs' members' fear is real—*right now*, *today*—and not at some hypothetical, unascertainable time in the future.  (*See, e.g.*, Amicus Br. at 32.) Moreover, based on the statements that DHS itself has made, perhaps in an effort to whip up that apprehension, Plaintiffs' members' fear of harm is not only realistic, its broad effects cannot be remedied by the Court's potential invalidation of the July 23rd Notice six months hence.  With children missing meals, and medicine not taken, it actually borders on preposterous for DHS to say that all Plaintiffs' members need to do is wait until this case is over, and even if their loved-one has been shipped to Guatemala, they can launch a legal action, and receive the requested injunctive remedy, at that time.  (*See* AM Hr'g Tr. at 42:6–9, 43:23–44:3; PM Hr'g Tr. at 115:15–19.)

This Court rejects that contention, and it further finds that Plaintiffs' evidence, including amici's brief, establishes ample grounds for an interim injunction to prevent, temporarily, the enforcement of DHS's legally dubious expanded expedited-removal policy.  The Court reaches this conclusion on the basis of the record evidence that (1) some of Plaintiffs' members who are lawful residents of the United States would face a substantially increased risk of being erroneously removed; (2) some of Plaintiffs' members who are undocumented non-citizens and therefore subject to the New Designation could actually be removed through the expedited removal process, instead of traditional deportation procedures; and (3) many people, including Plaintiffs' members, are being traumatized right now by the paralyzing fear of the agency's persistent threat to invoke its potentially invalid rule and thereby foregoing necessary activities of daily life.  Consequently, this Court finds, that in the absence of a

preliminary injunction that enjoins the agency's enforcement of the July 23rd Notice

during the pendency of this case, Plaintiffs' members will suffer irreparable harm.

### C.   Both The Balance Of The Equities And The Public's Interest Weigh In Favor Of The Issuance Of A Preliminary Injunction

Now that the Court has concluded that the most significant factors of the

preliminary injunction test—likelihood of success on the merits and irreparable harm—

weigh in favor of granting the relief Plaintiffs seek, it turns to the last two factors,

which require it to "balance the competing claims of injury[,]" and thereby "consider

the effect on each party of the granting or withholding of the requested relief." *Winter*,

555 U.S. at 24 (internal quotation marks and citation omitted).  The Court must also

consider whether granting a preliminary injunction is in the public's interest.  *See id.* at

20.  For the reasons that follow, the Court finds that each of these factors weighs in

Plaintiffs' favor as well.

As to the balance of the harms, the Court finds that the equities weigh in

Plaintiffs' favor, primarily due to the potentially significant harm to Plaintiffs'

members if the agency opts to enforce its rule while this litigation is pending.  The

Court has already described, at some length, how the July 23rd Notice might impact,

and, indeed, is impacting, immigrant communities (even though the agency itself

appears not to have taken these negative consequences into account before it adopted

this rule).  (*See supra* Part V.B; *see also supra* Part V.A.3.c.)  The Court also gleans

(primarily from the States' amicus brief) that the basket of harms that are likely to

occur if the Court refrains from preliminarily enjoining the agency's conduct, includes

potential damage to U.S. citizens, both inside and outside of communities that are

heavily populated by immigrants.  (*See, e.g.*, Amicus Br. at 26–28 (explaining that

settled, undocumented non-citizens "contribute to our economy and civic life in countless ways").)

On the other hand, it is not entirely clear what harm DHS will experience if the Court enjoins its rule on an interim basis, except, perhaps, the sunk costs of any training expenditures that the agency has already made.  (*See* AM Hr'g Tr. at 35:10–14.)  Setting its sights *much* higher, DHS says that "[a]n injunction would inflict profound harm on the government, and specifically, the allocation of 'limited government resources' to deal with [the] 'increasing number of aliens . . . apprehended within the United States.'"  (Defs.' Opp'n at 72 (ellipsis in original) (quoting 84 Fed. Reg. at 35,411).)  However, in light of the agency's previously discussed lack of urgency with respect to enforcement of the New Designation (*see supra*, Part V.3.b), the connection between enforcing this rule and preventing an onslaught of unauthorized entrants at the southern border seems tenuous, at best.

Undaunted, DHS also maintains that "an injunction would inflict serious harm on the government because it would 'take[] off the table one of the few congressionally authorized measures available' to remove the thousands of aliens arriving in this country illegally and absconding into the interior on a daily basis."  (Defs.' Opp'n at 72 (quoting *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019)).)  That might well be so.  But, of course, that is what injunctions against the government actors do, in every case, whenever they are issued.  And, in this Court's view, an injunction harms the government in the way that DHS argues only if the tool that it is stopped from using is *needed* at the time the government seeks to use it.  Thus despite DHS's potentially accurate characterizations of the "crisis" at the southern border and the

agency's overall need to act, what is missing from the government's showing here is a clear link between the rule it has adopted and a problem, at the border or elsewhere, that the government's enforcement of the rule will plainly solve, supported by evidence that the problem is happening now, such that the government can argue, credibly, that it *has* to act during the pendency of this litigation.  Instead, Defendants' counsel makes generalized representations about an overarching need to address a complex issue that is primarily occurring in a geographical area that is *not* the subject of the rule, and, again, the agency's own conduct in delaying the implementation and enforcement of its New Designation casts doubt on the agency's claims about its intention to enforce the new policy as a means of addressing the problem it has identified.

That's not all.  Defendants' stated concerns about the impact of a preliminary injunction from this Court on the government's ability "to remove the thousands of aliens arriving in this country illegally and absconding into the interior on a daily basis" (*id.*), also appears not to be grounded in the evidence that the agency actually considered when it decided to issue the July 23rd Notice, or the proof that has been offered to justify that action in this case.  Defense counsel provides no record citations that support a contention of this nature in relation to the policy under review, and thus, this Court cannot confidently conclude that an injunction against this particular agency action would *so* impede the government's efforts at the border that it qualifies as a weighty and significant harm to the government, as Defendants' brief maintains.  To the contrary, with respect to any injunction that this Court issues while this case is pending, it seems most likely that DHS would just continue to experience the same delay in the execution of its New Designation policy that has been going on for a while.  And,

certainly, if DHS wins this case, it can proceed apace with whatever plan it has

developed to enforce the expanded expedited removal process.  What the agency has not

done, as yet, is cogently explain to this Court why an interim injunction should not

issue because the government will be significantly harmed if it does not execute the

challenged policy *now*.

By contrast, primarily based, again, on the substantial harm that the Court has

already found would occur to Plaintiffs' members and others if DHS is permitted to

execute the July 23rd Notice *today*, the Court concludes that the public-interest factor

also weighs in Plaintiffs' favor.  As discussed above, the public has a significant

interest in avoiding the erroneous application of a policy that can result in swift and

largely unreviewable deportation, without almost any procedural safeguards, to

members of the public that have established strong ties to their communities.  In this

Court's view, Defendants have not shown that *that* public interest is outweighed by the

public's legitimate interest in "the efficient administration of the immigration laws at

the border" (*id.* at 72 (quoting *Innovation Law Lab*, 924 F.3d at 510; *United States v.

Cortez*, 449 U.S. 411, 421 n.4 (1981)), at least under the circumstances presented in this

case, and at this time.

Significantly, Plaintiffs also assert that "the public interest is served when

administrative agencies comply with their legal obligations."  (Pls.' Mem. at 54.)  If the

length and force of the instant Opinion has not been sufficient to express the Court's

conclusions in this regard, it will underscore them now, by expressly confirming that

the Court agrees.  Particularly when the agency rule that is under consideration

implicates non-trivial concerns about having one's family members, friends, and

neighbors potentially apprehended and swiftly deported—without the chance to check in, or to establish that they do, in fact, belong here—this Court cannot emphasize enough that the public's interest in procedural safeguards against unconstrained administrative agency action is especially strong.  *See Batterton*, 648 F.2d at 703–04.

### D.    Defendants' Argument That Any Injunction Can Only Restrict Agency Action As To *These* Plaintiffs Cannot Be Countenanced

At long last, we have arrived at the most peculiar argument that DHS has made in the rather long series of unpersuasive missives it has launched in opposition to Plaintiffs' motion for a preliminary injunction: its final assertion that, somehow, this Court can—and, indeed, *must*—limit any injunctive relief that it issues to the agency's application of the facially defective rule to *these* plaintiffs, and *these* plaintiffs alone. (*See* Defs.' Opp'n at 75.)  The strangeness of this position derives, first and foremost, from DHS's suggestion that the law requires this result, followed closely by the agency's assumption that such tailoring is even possible in the context of a typical case that involves a facial challenge to a rule that has been promulgated by a federal administrative agency.  Even more troubling is the fact that DHS appears to be making this argument on principle, and seemingly as part of a broader attempt to seek a departure from standard practices in the realm of administrative law.  *See, e.g.*, *East Bay Sanctuary Covenant v. Barr*, No. 19-cv-4073, 2019 WL 4265078, at *5 (N.D. Cal. Sept. 9, 2019) (addressing Department of Justice's argument that an invalid agency policy could not be enjoined without geographic limitation, because to do so would be to issuing an impermissible "nationwide injunction").  Ordinarily, in the wake of an unfavorable judgment from a federal court regarding procedural claims brought under the APA, agency actors willingly refrain from imposing *on anyone* the rule that a

federal court has found to be unlawful (at least during the pendency of the litigation, up to and including a prompt appeal). But, in this case, as elsewhere, DHS appears to be engaged in a concerted effort to establish a precedent for judicial acquiescence to an agency's continued application of rules that courts have invalidated.

In this Court's view, federal courts countenance that effort at their peril. There is neither space nor time, at this point in this Opinion, for the Court to provide a full exposition of the range of actual and theoretical problems that DHS's limited-injunction arguments create. It suffices to explain, relatively briefly, that the government's limited-injunction remedy is problematic, when applied in the context of a challenge to agency rulemaking that a plaintiff has brought on procedural grounds under the APA, in at least the three ways that this Court sketches out below. In sum, and sternly put, the argument that an administrative agency should be permitted to side-step the required result of a fair-fought fight about well-established statutory constraints on agency action is a terrible proposal that is patently inconsistent with the dictates of the law. Additionally, it reeks of bad faith, demonstrates contempt for the authority that the Constitution's Framers have vested in the judicial branch, and, ultimately, deprives successful plaintiffs of the full measure of the remedy to which they are entitled.

\* \* \*

*First of all*, it cannot be disputed that both Congress and the D.C. Circuit have spoken directly to the "sharply limited" injunctive remedy that DHS pushes in this context (Defs.' Opp'n at 75), and a good faith reading of the pronouncements of these binding legal authorities establishes, indisputably, that DHS's limited-injunction argument is foreclosed. Section 706 of Title 5 of the United States Code tells the

federal courts in no uncertain terms exactly what they must to do if they find that that an agency's "action, findings, [or] conclusions" are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"; that is, "*hold unlawful and set aside*" the facially defective agency action.  5 U.S.C. § 706(2)(emphasis added).  DHS's suggestion here that the court must *also* sharply limit the scope of its injunction, by holding that the agency's unlawful rule is to be deemed invalid *only with respect to the plaintiff who appears in the case at bar*, is nowhere in the statute.  And many years ago, a prescient panel of the D.C. Circuit addressed this very issue and explained why that is so: the panel clearly stated, pursuant to "[t]raditional administrative law principles[,]" that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).

Nearly a decade later, in *National Mining Association v. United States Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998), the D.C. Circuit went further, to point out that its view of the traditional scope of the remedy when a court determines that an agency rule is facially invalid under the APA—*i.e.*, that the court must invalidate the agency's rule—was shared by "all nine Justices" of the Supreme Court as well, and was best expressed by Justice Blackmun, writing in dissent in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990):

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual.  Under these circumstances a single

> plaintiff, so long as he is injured by the rule, may obtain
> "programmatic" relief that affects the rights of parties not before the
> court.

*Nat'l Min. Ass'n*, 145 F.3d at 1409 (quoting *Lujan*, 497 U.S. at 913 (Blackmun, J.,

dissenting)).

Notably, both Justice Blackmun and the D.C. Circuit also addressed, and put to

rest, the suggestion that the remedy called for by the APA necessarily constitutes a

disfavored "nationwide" injunction.  Justice Blackmun ably explained the difference

when he emphasized that, if an agency's rule is deemed *facially* invalid, then the

appropriate remedy under the APA is for the court to prohibit the rule's applicability in

any and all circumstances, a ruling that unavoidably redounds to the benefit of parties

"not before the court." *Id.* (citation omitted).  "On the other hand," if a court concludes

that "a generally lawful policy is applied in an illegal manner on a particular occasion,

one who is injured is not thereby entitled to challenge other applications of the rule."

*Id.*  The D.C. Circuit similarly flatly rejected the defendant agency's reliance on a case

that had cast doubt on the propriety of nationwide injunctions (*Baeder v. Heckler*, 768

F.2d 547 (3d Cir. 1985)) to support the agency's contention that "a court in some

circumstances may not order a nationwide injunction even after holding a regulation

invalid." *Nat'l Min. Ass'n*, 145 F.3d at 1409.  In response, the *National Mining*

*Association* panel explained that *Baeder* "did not involve a *facial* challenge to the

validity of a regulation; the Third Circuit [had] held simply that a sweeping injunction

would not be a proper remedy 'in the context of [an individual plaintiff's] claim for

disability benefits.'" *Id.* (second alteration in original) (emphasis added) (quoting

*Baeder*, 768 F.2d at 553).

In light of the unambiguous remedial requirements set forth in the APA, as unequivocally discussed by the D.C. Circuit in the *National Mining Association* case, it is hard for the Court to understand why DHS still insists that any injunction this Court enters "would need to be strictly limited to individual aliens who are members of the organizations currently in expedited removal and actually identified by plaintiffs in this suit." (Defs.' Opp'n at 75; *see also* PM Hr'g Tr. at 131:17–132:19.) To the contrary, the mandate that a federal court must invalidate an agency rule if it discovers fatal procedural defects that make the rule invalid on its face is spelled out plainly in section 706 of the APA. *See O.A.*, 2019 WL 3536334, at *2. Additionally, the bizarreness of Defendants' unexplained suggestion that the required remedy for a procedurally invalid agency rule turns on whether the plaintiffs have "invoke[d] associational standing" (Defs.' Opp'n at 75; *see also* PM Hr'g Tr. at 132:4–7) cannot be overstated. Likewise, Defendants' attempts to support its limited-injunction argument by constructing a convoluted narrative in which section 1252(e)(3) of the INA somehow overrides traditional understandings of what is supposed to happen when a federal court invalidates an agency rule as violative of procedural mandates of the APA miss the mark.[37]

---

[37] In this regard, DHS argues that the INA's section 1252(e)(1) limits any available remedies to those provided for in section 1252(e)(3), which DHS interprets to authorize only a "'determination[]' on the *merits* of 'whether [section 1225(b)], or any regulation issued to implement such section, is constitutional' or . . . 'is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.'" (Defs.' Opp'n at 76 (alterations in original) (ellipsis added) (quoting 8 U.S.C. § 1252(e)(3)(A)(i), (ii)).) Thus, DHS asserts that section 1252(e)(3) authorizes only *declarative* relief, and not injunctive relief. According to DHS, only section 1252(f) provides for interim *injunctive* relief, and that provision prohibits the Court from "restrain[ing] the operation of the provisions of part IV of this subchapter," which includes section 1225(b)(1).  8 U.S.C. § 1252(f)(1); (*see also* Defs.' Opp'n at 76). Of course, the interim relief that Plaintiffs are requesting has nothing whatsoever to do with restraining the operation *of the statute*. And, in any event, DHS's house of cards depends, almost entirely, on an interpretation of "determinations" in section 1252(e)(3) that seems implausible.

Importantly, the scope-of-remedy principle that is laid out in the APA and is echoed in the clear pronouncements of both the Supreme Court and the D.C. Circuit also reflects a common-sense understanding of what it means for a court to determine, at the conclusion of a case, that a formerly binding legal act of one of the parties is null and void.  Take a contract, for example.  Imagine if, instead of promulgating a rule, DHS had drafted a contract that it intended to bind all of its affiliates throughout the entire country, but, as it turns out (after a bout of litigation), a court rules that there are defects in the drafting of the agreement that render the contract invalid from the start (*i.e.*, void *ab initio*).  It would be manifestly unreasonable for the agency to argue that, nevertheless, the contract should still be considered legally valid in some circumstances, and that the court can only deem it *in*valid with respect to the particular plaintiff who brought the defect to the court's attention.  With that peculiar argument, the agency would, in effect, be seeking the court's blessing of its continued application of the contract's invalid clauses in all of the other circumstances in which the agency chose to apply it, despite the court's pronouncements about the invalidity of the agreement (which, presumably, the agency might still opt to appeal, or not).

*   *   *

*Second*, although DHS actively promotes this limited-injunction proposal, it has offered little help as this Court has attempted to envision what the proposed "sharply limited" injunction would look like in this context, as a practical matter.  (Defs.' Opp'n at 75.)  The agency simply parrots the Supreme Court's general statement (made in another context) that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  (*Id.* (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018)).)  Even

setting aside the fact that a court's invalidation of a procedurally improper rule actually *does* redress the injury that an APA plaintiff presents, DHS's reliance on such generally applicable statements goes only so far, and it does not distract from the nagging reality that federal administrative agencies promulgate rules in all sorts of contexts, and such rules regulate all sorts of conduct.  Indeed, a world in which this Court would be required to order an administrative agency to isolate the effects of a procedurally invalid rule and terminate its impacts only with respect to a particular plaintiff has lots of slippery slopes.

As an example, consider the request for a preliminary injunction that this Court evaluated in the case of *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174 (D.D.C. 2015), *aff'd* 808 F.3d 905 (D.C. Cir. 2015).  The plaintiffs in that matter were "two individual-plaintiff poultry consumers and an organization[,]" and they challenged the United States Department of Agriculture's Food Safety and Inspection Service's promulgation of new inspection procedures for poultry-processing establishments.  *Id.* at 178.  Before the Department of Agriculture's new rule was adopted, regulations had "require[d] federal inspectors to be stationed at fixed points along the slaughter lines within poultry-processing establishments" and also "mandate[d] that the federal inspectors themselves control and direct the inspection process, including using sight, touch, and smell to inspect each poultry carcass that travels down the line, with the assistance of the establishments' employees."  *Id.* (citation omitted).  Plaintiffs sought a preliminary injunction to enjoin enforcement of the newly promulgated regulations, which required "far fewer federal inspectors [to] be stationed along the slaughter lines" and allowed "the employees themselves [to] conduct a preliminary screening of the

carcasses before presenting the poultry to a federal inspector for a visual-only inspection." *Id.* at 178–79 (citation omitted).

In the actual *Food & Water Watch* case, this Court denied the plaintiffs' emergency request that it enjoin the Department of Agriculture's rule change, *see id.* at 206, but as the Court struggles to contemplate DHS's proposed limited-injunction remedy in the instant case, it finds it fair to ask: what if the plaintiffs in *Food & Water Watch* had prevailed?  Would DHS seriously maintain that the Court would have to order that the Department of Agriculture somehow find a way to have poultry-processing establishments inspect only those chickens that those particular plaintiffs—one of which was an organization—would purchase (or consume?) in the manner previously required, while otherwise allowing the agency to proceed to require poultry-processors to inspect all other chicken carcasses as required by the new regulations?  And could that agency ever, realistically, comply with any such requirement?

Perhaps, to avoid being held in contempt of the Court's sharply limited injunction, the Department of Agriculture could find a way to dispatch specified poultry inspectors to specified poultry processing facilities to examine poultry that was earmarked for the plaintiffs in accordance with the prior procedures, even as the bulk of the nation's poultry processing continued apace under the invalidated new rule.  But keeping the plaintiffs' poultry segregated from the rest throughout the entire chain of production could prove tricky, to say the least.  Plus, the sheer cost of maintaining both the old and new world orders with respect to the demanding and detailed poultry-inspection process would likely be prohibitive; thus, the plaintiffs would eventually complain that the agency was cutting corners and that, despite their right to have their

chickens processed under the old rules, they were *still* at risk of having the new rule applied to the chickens delivered to their tables.  Calls for increased supervision, if not an outright ban, would likely follow, potentially resulting in the very same legal response that the plaintiffs initially asked for, and the agency decried.

This striking scenario suggests that, while it might sound good in theory to contend that any injunctive relief must be "strictly limited" to the instant plaintiffs (Defs.' Opp'n at 75), DHS has no good answer to the obvious practical problems that partial invalidation of agency rules—including and especially rules that pertain to food, air, and water—would pose.  Even the partial invalidation of the *instant* rule—*i.e.*, an injunction that would enjoin DHS from enforcing the July 23rd Notice's expansion of expedited removal procedures only with respect to "individual aliens who are members of the organizations currently in expedited removal and actually identified by plaintiffs in this suit" (*id.*)—would create nearly insurmountable practical problems, because to claim their prize of not being subjected to expedited removal by court order, the undocumented non-citizens who are members of Plaintiffs' organizations would first have to identify themselves to the government, which, of course, is the first step in a chain of events that might well lead to their deportation (*cf.* PM Hr'g Tr. at 140:15–19 (statement of defense counsel that "[y]ou have members, you have won your case. Congratulations.  Give us the names, they are not getting removed")).

It is clear beyond cavil, then, that whatever its merits as a theory, the remedy that a federal court orders for an established violation of the law must also work *in practice*.  And by this important measure, DHS's proposed "sharply limited" injunction falls far short.

* * *

*Third*, and finally, Defendants' limited-injunction argument appears to reflect a spirit of defiance of judicial authority in the aftermath of defeat that is not easily reconciled with established constitutional norms or with standard, good faith practices that seek to ensure that a successful plaintiff is made whole.

In this regard, the jurisprudence that undergirds the Court's concerns is well established. It begins with the recognition that, while federal courts have limited power in the constitutional framework (*i.e.*, they can rule only on the cases and controversies that are brought to them), since the days of Chief Justice John Marshall, it has been universally accepted that federal courts *do* have the power to determine what the law is. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Thus, in this respect, the courts have the power to govern parties' conduct going forward. The conceptual problem with Defendants' proposed limited-injunction remedy is that, when considered in the context of a federal court's review of agency action, it suggests that the court *cannot*, in fact, announce the governing legal principle or otherwise tell the agency what the law demands with respect to its behavior in the future. Rather, DHS maintains that a federal district court can identify only the law that the agency will be obliged to follow in its dealings with the *particular* plaintiff who has brought that *particular* case—a suggestion that simultaneously enlarges agency power and undercuts judicial authority, by undermining the courts' ability to rule with precedential force.

And, of course, where the authority of the judiciary is diminished, the power of the executive branch expands. At bottom, DHS's position, it appears to be that an

agency need not curb its appetite for widespread application of an invalid rule that it likes, regardless of what a federal court has said.  Moreover, any agency that persists in applying a rule that a federal court has deemed facially invalid under the APA (so long it is not applied to the successful plaintiff) is undeterred even more broadly; that is, if the agency can continue to impose preferred (yet procedurally invalid) rules on anyone who is not that plaintiff, what incentive does it have to conform its rulemaking practices to the APA's requirements going forward?

Thus, because our constitutional system clearly contemplates that the judiciary will have the power to check the conduct of executive branch officials who violate the law, DHS's contention that the agency should be deemed to have the unfettered ability to carry on with respect to pronounced unlawful behavior—in the wake of a ruling by a federal judge that the particular conduct at issue (*i.e.*, enforcement of a procedurally invalid rule) violates a federal statute, and before the case has run its course through the courts of appeals—is quite troubling.  What is more, DHS makes the astonishing suggestion that the Court *itself* should declare that, after a plaintiff successfully establishes that an agency rule violates the law, the federal courts must stand impotently by while the agency acts in direct defiance of that court's legal determination by continuing to apply the invalid rule with respect to any person who is not the individual who filed the legal action that is before the Court.  Given the historical legions of aggrieved plaintiffs who have rightfully turned to the federal courts for enforcement of federal statutes that constrain illegal and harmful government action, DHS's limited-remedy claim has broad implications and is, quite frankly, untenable.  At the very least, it appears that DHS's efforts to champion an agency's ability to press its

prerogatives however it wants after being told specifically, by a federal court, that the law requires cessation of that behavior, conflicts with core constitutional norms.

Meanwhile, if a limited injunction does not incentivize the agency to rework the invalid rule in accordance with the requirements of the APA (and why would it?), then the plaintiff who wins in an APA lawsuit is deprived of the full measure of his well-earned right to *enforce* the statute's mandates.  Here, DHS obscures this outcome, by insisting that "an injunction as to aliens actually in expedited removal proceedings who[m] Plaintiffs identify as dues paying members would provide them *full* interim relief."  (Defs.' Opp'n at 75 (emphasis added).)  But that argument *assumes* that the only thing that matters to a plaintiff who files a legal action under the APA is that, if he's successful, the agency cannot bind *him* with its invalid rule; but, considering the APA's procedural requirements, that assumption is unfounded.

Recall that the APA establishes the public's right *to have input* into the rulemaking process and to be bound by agency rules that are *the product of reasoned decision making* that has been informed by all of the relevant facts.  Thus, a plaintiff who has sued to enforce *those* requirements seeks more than just the knowledge that the agency's invalid rule will not be applied to him.  Indeed, *that* APA claim consists of the contention that the plaintiff was improperly prevented from having a chance to influence agency decisionmakers before they promulgated the rule, and/or that the agency has exercised its discretion without taking relevant facts and circumstances into account.  And if the agency keeps on applying its uncounseled, uninformed rule to others despite the plaintiff's success in persuading the court that the rule is procedurally invalid, then the plaintiff loses his shot of persuading the agency to craft the rule in a

different way, in light of additional information, which is *precisely* the procedural right that the APA protects.

Put another way—and, in a sense, coming full circle, back to the core purposes of the APA's procedural mandates—to remedy an agency's procedural violations of the APA entirely, it is not enough for a court to prevent the application of the facially invalid rule to a particular plaintiff, as DHS maintains, because the true gravamen of an APA claim is *not* that the agency has exercised its discretion to select a policy with which the plaintiff disagrees and to promulgate a rule that the plaintiff does not endorse.  Instead, under the APA, the plaintiff's claim is that the agency has breached the plaintiff's (and the public's) entitlement to non-arbitrary decision making and/or their right to participate in the rulemaking process when it undertook to promulgate the rule.  Consequently, to provide the relief that any APA plaintiff is entitled to receive for establishing that an agency's rule is procedurally invalid, the rule must be invalidated, so as to give interested parties (the plaintiff, the agency, and the public) a meaningful opportunity to try again.

## VI.  CONCLUSION

For the reasons explained at considerable length in the preceding discussion, this Court finds that Plaintiffs' motion for a preliminary injunction (ECF No.13) must be **GRANTED**, and therefore, Defendants will be **PRELIMINARILY ENJOINED** from enforcing the policy change that Acting DHS Secretary McAleenan implemented with the July 23rd Notice, pending the outcome of the litigation before this Court, as set forth in the accompanying Order.  Consistent with the language of the APA, the Federal Rules of Civil Procedure, and established constitutional norms, the Court's preliminary

injunction treats the expanded expedited removal rule laid out in DHS's July 23rd

Notice as void *ab initio* during the pendency of this action, based on the Court's

preliminary finding that Plaintiffs are likely to be successful on the merits of their APA

claims; that Plaintiffs' members would be irreparably harmed by the challenged agency

action in the absence of a preliminary injunction; and that both the public interest and

the balance of the harms weigh in favor of the issuance of a preliminary injunction.

Consequently, DHS is prohibited from applying the expanded expedited removal policy

to anyone to whom it would apply, while this action proceeds, until further Order of the

Court.


DATE:  September 27, 2019          *Ketanji Brown Jackson*
                                  KETANJI BROWN JACKSON
                                  United States District Judge

## APPENDIX

**8 U.S.C. § 1252(a).  Applicable Provisions**

. . .

**(2) Matters not subject to judicial review**

### (A) Review relating to section 1225(b)(1)

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—

**(i)** except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,

**(ii)** except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

**(iii)** the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or

**(iv)** except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

### (B) Denials of discretionary relief

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—

**(i)** any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or

**(ii)** any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

**APPENDIX**

**(C) Orders against criminal aliens**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.

**(D) Judicial review of certain legal claims**

Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

\*     \*     \*

**U.S.C. § 1252(e).  Judicial review of orders under section 1225(b)(1)**

**(1) Limitations on relief**

Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may—

**(A)** enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection, or

**(B)** certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection.

**(2) Habeas corpus proceedings**

Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of--

**(A)** whether the petitioner is an alien,

**APPENDIX**

**(B)** whether the petitioner was ordered removed under such section, and

**(C)** whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

**(3) Challenges on validity of the system**

**(A) In general**

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of--

**(i)** whether such section, or any regulation issued to implement such section, is constitutional; or

**(ii)** whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

**(B) Deadlines for bringing actions**

Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

**(C) Notice of appeal**

A notice of appeal of an order issued by the District Court under this paragraph may be filed not later than 30 days after the date of issuance of such order.

**(D) Expeditious consideration of cases**

It shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under

**APPENDIX**

this paragraph.

**(4) Decision**

In any case where the court determines that the petitioner--

**(A)** is an alien who was not ordered removed under section 1225(b)(1) of this title, or

**(B)** has demonstrated by a preponderance of the evidence that the alien is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 1229a of this title. Any alien who is provided a hearing under section 1229a of this title pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

**(5) Scope of inquiry**

In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

\*       \*       \*