## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAKE THE ROAD NEW YORK, et al.,

*Plaintiffs*,

v.

CHAD F. WOLF, Acting Secretary of the
Department of Homeland Security, et al.,

*Defendants*.

)
)
)
)
)
)
)    No. 2019-cv-02369-KBJ
)
)
)
)
)
)

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Trina Realmuto*
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA 02446
(617) 819-4447

Kristin Macleod-Ball*
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
(857) 305-3600

Karolina J. Walters (D.C. Bar No. 1049113)
American Immigration Council
1331 G Street, NW, Suite 200
Washington, D.C. 20005
(202) 507-7520

Jonathan K. Youngwood*
Susannah S. Geltman*
Joshua Polster*
Simpson Thacher & Bartlett LLP
425 Lexington Avenue

Celso Perez (D.C. Bar No. 1034959)
Anand Balakrishnan*
Michael Tan*
Omar C. Jadwat*
Lee Gelernt*
David Chen**
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Stephen B. Kang*
Spencer E. Amdur*
Julie Veroff**
American Civil Liberties Union
Foundation, Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

New York, NY 10017
(212) 455-2000

Adrienne V. Baxley (D.C. Bar No. 1044750)
Simpson Thacher & Bartlett LLP
900 G Street, N.W.
Washington, D.C. 20001
(202) 636-5822

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union
Foundation of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

*Attorneys for Plaintiffs*

*\*Admitted pro hac vice*
*\*\*Filing pursuant to LCvR 83.2(c)*

TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTS ................................................................................................................ 2

A. The Expedited Removal Process ........................................................ 2

B. Prior Administrations Expanded the Scope of Expedited Removal to Apply Only to Limited Groups of Noncitizens Who Entered Without Inspection. ........................................................ 5

C. Two Decades of Experience Revealed Widespread Flaws in the Expedited Removal Process. ................................................................................................................ 6

D. The Trump Administration Dramatically Expanded Expedited Removal Without Addressing the Flaws of the Existing System ................................................ 12

E. Improper Service as Acting Secretary of Homeland Security by Defendants McAleenan and Wolf. ................................................................................................................ 14

F. Procedural History ........................................................................... 15

LEGAL STANDARD ....................................................................................... 16

ARGUMENT .................................................................................................... 16

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ................ 17

A. Plaintiffs Have Standing to Raise, and This Court Has Jurisdiction Over, All the Claims Presented. ................................................................................................................ 17

B. Defendant McAleenan Lacked Authority to Issue the July 2019 Rule. ........................... 21

1. Defendant McAleenan Was Not Authorized to Serve as Acting DHS Secretary ......... 21

2. Defendant Wolf Did Not Validly Ratify the July 2019 Rule ....................................... 24

C. The Rule and Implementation Documents Violate the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1), Which Must Be Read to Require Fundamentally Fair Proceedings. .. 28

1. If Not Interpreted to Require Fair Procedures, the Expedited Removal Statute Would Raise Grave Constitutional Concerns. ............................................................ 29

a. The private interests at stake are of the utmost importance. ..................................... 30

b. The risk of error is high. ......................................................................................... 30

i. Errors in determining whether the noncitizen is subject to expedited removal. ...... 30

ii.Errors in determining whether the noncitizen is qualified for relief from removal. ................................................................................................ 33

iii.There are insufficient checks to ensure compliance with the limited procedures the government currently affords. ............................................................ 34

c.The probable value of additional safeguards is also high. ........................................ 37

d.The government's interests do not outweigh the need for minimal procedural safeguards. ............................................................................................................. 38

2.The Expedited Removal Statute Must Be Read to Require Fair Procedures. ............... 40

D. The Rule and Implementation Documents are Arbitrary and Capricious. ...................... 42

E. The July 2019 Rule and Implementation Documents Violate the APA and INA, Which Confer the Right to Counsel in Expedited Removal Proceedings. ..................................... 43

1.The APA Affords Noncitizens in Expedited Removal Proceedings the Right to Counsel of Their Own Choosing. ....................................................................................... 43

2.The INA Entitles Noncitizens to Counsel of Their Own Choosing in Immigration Judge Reviews of Credible Fear Denials. ...................................................... 45

F. Expedited Removal Cannot Be Applied to Individuals in the Interior Solely Because They Lack Valid Immigration Documents. ........................................................ 46

II. THE REMAINING FACTORS TIP DECIDEDLY IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION. ............................................................................... 50

CONCLUSION............................................................................................................. 53

# TABLE OF AUTHORITIES

## Cases

*Am. Immigration Lawyers Ass'n ("AILA") v. Reno*,
   18 F. Supp. 2d 38 (D.D.C. 1998) ...................................................................... 19, 20

*Am. Immigration Lawyers Ass'n ("AILA") v. Reno*,
   199 F.3d 1352 (D.C. Cir. 2000) ...................................................................... 19, 20

*Am. Wild Horse Pres. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) ................................................................................ 43

*Ardestani v. INS*,
   502 U.S. 129 (1991) .................................................................................................. 45

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019) ............................................................................................. 19

*Bondarenko v. Holder*,
   733 F.3d 899 (9th Cir. 2013) .................................................................................. 41

*Bridges v. Wixon*,
   326 U.S. 135 (1945) .................................................................................................. 30

*Bullock v. BLM*,
   No. 20-cv-00062-BMM, 2020 WL 5746836 (D. Mont. Sept. 25, 2020)................................. 24

*Casa de Maryland v. Wolf*,
   No. No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ............ 21, 22, 23, 24

*Castaneda-Delgado v. INS*,
   525 F.2d 1295 (7th Cir. 1975) ................................................................................ 45

*Chandler v. United States Parole Comm'n*,
   60 F. Supp. 3d 205 (D.D.C. 2014) ......................................................................... 37

*Cheung v. INS*,
   418 F.2d 460 (D.C. Cir. 1969) ................................................................................ 38

*Clark v. Martinez*,
   543 U.S. 371 (2005).................................................................................................. 29

*Dep't of Revenue of Oregon v. ACF Indus., Inc.*,
   510 U.S. 332 (1994).................................................................................................. 50

*DHS v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020).............................................................................................. 24

*DHS v. Thuraissigiam*,
   140 S. Ct. 1959 (2020) .................................................................................... 39, 40

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
   140 S. Ct. 1649 (2020) .......................................................................................... 23

*Freytag v. Comm'r*,
   501 U.S. 868 (1991) ............................................................................................... 27

*Genuine Parts Co. v. EPA*,
   890 F.3d 304 (D.C. Cir. 2018) .............................................................................. 42

*Gonzalez v. Freeman*,
   334 F.2d 570 (D.C. Cir. 1964) .............................................................................. 41

*Gray Panthers v. Schweiker*,
   652 F.2d 146 (D.C. Cir. 1980) .............................................................................. 37

*Great Lakes Screw Corp. v. NLRB*,
   409 F.2d 375 (7th Cir. 1969) ................................................................................ 43

*Greene v. McElroy*,
   360 U.S. 474 (1959) ......................................................................................... 37, 40

*Henderson v. Shinseki*,
   562 U.S. 428 (2011) ............................................................................................... 20

*Hicks v. Comm. of Soc. Sec.*,
   909 F.3d 786 (6th Cir. 2018) ................................................................................ 37

*Holland v. Florida*,
   560 U.S. 631 (2010) ............................................................................................... 20

*ILRC v. Wolf*,
   2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ........................................... 21, 23, 24

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ............................................................................................... 30

*Judulang v. Holder*,
   565 U.S. 42 (2011) ................................................................................................. 42

*L.M.-M. v. Cuccinelli*,
   442 F. Supp. 3d 1 (D.D.C. 2020) ............................................................ 23, 24, 26, 27

*Landon v. Plasencia*,
   459 U.S. 21 (1982) ................................................................................................. 30

*Lane v. U.S. Dep't of Agric.*,
   120 F.3d 106 (8th Cir. 1997) ........................................................................ 44

*Leslie v. Att'y Gen.*,
   611 F.3d 171 (3d Cir. 2010)......................................................................... 45

*Lyttle v. United States*,
   867 F. Supp. 2d 1256 (M.D. Ga. 2012) ......................................................... 7

*Make the Road New York v. McAleenan*,
   405 F. Supp. 3d 1 (D.D.C. 2019) ....................................... 16, 17, 51, 53

*Make the Road New York v. Wolf* ,
   962 F.3d 612 (D.C. Cir. 2020)........................................ 16, 17, 19, 42

*Marcello v. Bonds*,
   349 U.S. 302 (1955)..................................................................................... 45

*Marincas v. Lewis*,
   92 F.3d 195 (3d Cir. 1996).......................................................................... 41

*Marques v. Lynch*,
   834 F.3d 549 (5th Cir. 2016) ............................................................... 48, 49

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)...................................................................... 29, 37, 39

*Matter of Lujan-Quintana*,
   25 I. & N. Dec. 53 (BIA 2009) ..................................................................... 7

*Matter of Tomas*,
   19 I. & N. Dec. 464 (BIA 1987) .................................................................. 41

*Matter of Y-N-P-*,
   26 I. & N. Dec. 10 (BIA 2012) .................................................................... 49

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)....................................................................................... 42

*Ng Fung Ho v. White*,
   259 U.S. 276 (1922)..................................................................................... 30

*Nken v. Holder*,
   556 U.S. 418 (2009)..................................................................................... 38

*NWIRP v. USCIS*,
   No. 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020) ..................... passim

*Ortiz-Bouchet v. U.S. Att'y General,*
  714 F.3d 1353 (11th Cir. 2013) ........................................................ 48

*Pace v. DiGuglielmo,*
  544 U.S. 408 (2005) ........................................................................ 20

*Professional Reactor Operator Soc. v. U.S. Nuclear Regulatory Comm'n,*
  939 F.2d 1047 (D.C. Cir. 1991) ................................................... 43, 44

*Propert v. District of Columbia,*
  948 F.2d 1327 (D.C. Cir. 1991) ...................................................... 38

*R.I.L-R v. Johnson,*
  80 F. Supp. 3d 164 (D.D.C. 2015) .................................................. 39

*Roelofs v. Sec'y of Air Force,*
  628 F.2d 594 (D.C. Cir. 1980) ....................................................... 43

*Rumsfeld v. Forum for Academic & Inst. Rights, Inc.,*
  547 U.S. 47 (2006) ......................................................................... 18

*Santana Gonzalez v. Att'y Gen.,*
  506 F.3d 274 (3d Cir. 2007) ........................................................... 48

*SEC v. Higashi,*
  359 F.2d 550 (9th Cir. 1966) .......................................................... 43

*Sierra Club v. U.S. Army Corps of Engineers,*
  990 F. Supp. 2d 9 (D.D.C. 2013) .................................................... 16

*Simms v. D.C.,*
  872 F. Supp. 2d 90 (D.D.C. 2012) .................................................. 37

*Torres v. Barr,*
  __ F.3d __, 2020 WL 5668478 (9th Cir. 2020) .................... 47, 48, 49, 50

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001) ......................................................................... 49

*Tun v. Gonzales,*
  485 F.3d 1014 (8th Cir. 2007) ........................................................ 41

*United States v. Huazo-Garcia,*
  No. 2:18-cr-00056-SMJ, 2018 WL 2306890 (E.D. Wash. May 21, 2018) ............................ 34

*United States v. James Daniel Good Real Prop.,*
  510 U.S. 43 (1993) ......................................................................... 37

*United States v. Kwai Fun Wong*,
  575 U.S. 402 (2015) ........................................................................................ 20

*United States v. Mejia-Avila*,
  No. 2:14-CR-0177-WFN-1, 2016 WL 1423845 (E.D. Wash. Apr. 5, 2016) ......................... 36

*United States v. Ochoa-Oregel*,
  904 F.3d 682 (9th Cir. 2018) ............................................................................. 33

*United States v. Ramirez-Diaz*,
  359 F. Supp. 3d 994 (D. Or. 2019) ...................................................................... 34

*United States v. Raya-Vaca*,
  771 F.3d 1195 (9th Cir. 2014) ............................................................................ 34

*United States v. Sanchez-Figuero*,
  No. 3:19-cr-00025-MMD-WGC (D. Nev. July 25, 2019) ................................................ 35

*Weiss v. United States*,
  510 U.S. 163 (1994) ........................................................................................ 27

*Wilkinson v. Legal Servs. Corp.*,
  27 F. Supp. 2d 32 (D.D.C. 1998) ......................................................................... 23

*Wong Yang Sung v. McGrath*,
  339 U.S. 33 (1950) .......................................................................................... 40

*Yamataya v. Fisher*,
  189 U.S. 86 (1903) ................................................................................ 29, 40, 41

**Statutes**

5 U.S.C. § 3345 ............................................................................................... 25

5 U.S.C. § 3345(1)(B) ....................................................................................... 25

5 U.S.C. § 3345(a) ..................................................................................... 27, 28

5 U.S.C. § 3345(a)(2) ................................................................................. 27, 28

5 U.S.C. § 3345(a)(3) ................................................................................. 27, 28

5 U.S.C. § 3345(c) ........................................................................................... 27

5 U.S.C. § 3347 ............................................................................................... 25

5 U.S.C. § 3347(a)(1) ....................................................................................... 27

5 U.S.C. § 3347(a)(1)(A) ................................................................................... 26

5 U.S.C. § 3348(d)(1) .................................................................................. 24, 25, 26

5 U.S.C. § 3348(d)(2) .................................................................................. 25

5 U.S.C. § 3349(a) ...................................................................................... 25

5 U.S.C. § 555(a) ........................................................................................ 44

5 U.S.C. § 555(b) ........................................................................................ 43

5 U.S.C. § 559 ............................................................................................ 44

5 U.S.C. § 706(2)(A) ................................................................................... 24, 42

6 U.S.C. § 113(g) ....................................................................................... 27

6 U.S.C. § 113(g)(1) ................................................................................... 26, 27

6 U.S.C. § 113(g)(2) ................................................................................... passim

6 U.S.C. § 113(g)(3) ................................................................................... 25

6 U.S.C. § 557 ............................................................................................ 5

8 U.S.C. § 1101(a)(6) ................................................................................. 48

8 U.S.C. § 1105a ........................................................................................ 2

8 U.S.C. § 1181(a) ..................................................................................... 48

8 U.S.C. § 1182(a)(4)(A) ............................................................................ 47

8 U.S.C. § 1182(a)(5)(A)(i)(I) ...................................................................... 47

8 U.S.C. § 1182(a)(6)(A) ............................................................................ 49, 50

8 U.S.C. § 1182(a)(6)(A)(i) ......................................................................... 50

8 U.S.C. § 1182(a)(6)(A)(ii) ........................................................................ 50

8 U.S.C. § 1182(a)(6)(C) ............................................................................ 2, 11, 34, 46

8 U.S.C. § 1182(a)(6)(C)(ii)(II) .................................................................... 47

8 U.S.C. § 1182(a)(7) ................................................................................. 2, 46, 47, 48, 49, 50

8 U.S.C. § 1182(a)(7)(a)(i) .......................................................................... 48

8 U.S.C. § 1182(a)(7)(A)(i) ......................................................................... 47

8 U.S.C. § 1182(a)(7)(a)(i)(I) ................................................................. 48

8 U.S.C. § 1182(a)(7)(A)(i)(I) .................................................................. 48

8 U.S.C. § 1182(a)(7)(a)(i)(II) ................................................................. 48

8 U.S.C. § 1182(h) ...................................................................................... 49

8 U.S.C. § 1225(a)(1) .................................................................................. 49

8 U.S.C. § 1225(a)(1)(A)(i) ....................................................................... 46

8 U.S.C. § 1225(a)(4) ............................................................... 3, 11, 33, 34

8 U.S.C. § 1225(b)(1) ....................................................................... 2, 45, 49

8 U.S.C. § 1225(b)(1)(A)(i) ........................................................ 2, 3, 31, 32

8 U.S.C. § 1225(b)(1)(A)(ii) ............................................................... 2, 3, 4

8 U.S.C. § 1225(b)(1)(A)(iii) ..................................................................... 42

8 U.S.C. § 1225(b)(1)(A)(iii) ..................................................................... 32

8 U.S.C. § 1225(b)(1)(A)(iii)(I) ........................................................... 5, 26

8 U.S.C. § 1225(b)(1)(A)(iii)(II) ......................................................... 5, 31

8 U.S.C. § 1225(b)(1)(B) ...................................................................... 3, 4

8 U.S.C. § 1225(b)(1)(B)(iii)(II) ................................................................ 4

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ....................................................... 4, 45

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ............................................................ 38

8 U.S.C. § 1225(b)(1)(B)(v) ........................................................................ 4

8 U.S.C. § 1225(b)(1)(C) ..................................................................... 2, 33

8 U.S.C. § 1228(b)(3) ................................................................................. 37

8 U.S.C. § 1229a ......................................................................................... 44

8 U.S.C. §1229a(a)(3) ................................................................................ 44

8 U.S.C. § 1229a(b) ................................................................................... 44

8 U.S.C. § 1229a(b)(4)(B) ......................................................................... 41

8 U.S.C. § 1229a(c) ................................................................................................ 44

8 U.S.C. § 1232(a)(5)(D) ......................................................................................... 7

8 U.S.C. § 1232(a)(2)(B) ......................................................................................... 7

8 U.S.C. § 1252 ....................................................................................... 2, 18, 19

8 U.S.C. § 1252(a)(2) ............................................................................................. 3

8 U.S.C. § 1252(a)(2)(D) ....................................................................................... 19

8 U.S.C. § 1252(b)(5) ............................................................................................ 19

8 U.S.C. § 1252(b)(7)(B) ....................................................................................... 19

8 U.S.C. § 1252(e) ................................................................................................. 3

8 U.S.C. § 1252(e)(1) ............................................................................................ 18

8 U.S.C. § 1252(e)(3) ................................................................................ 18, 19, 20, 21

8 U.S.C. § 1252(e)(3)(A) ....................................................................................... 18

8 U.S.C. § 1252(f)(2) ............................................................................................ 19

8 U.S.C. § 1252(g) ................................................................................................ 19

8 U.S.C. § 1361 .................................................................................................... 48

8 U.S.C. § 1362 .................................................................................................... 45

22 U.S.C.§ 6474 .................................................................................................... 6

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) ............................................. 5

Cyber Security and Infrastructre Security Agency Act of 2018
    Pub. L. No. 115-278 § 2(a) (Nov. 16, 2018) ......................................................... 22

**Rules**

67 Fed. Reg. 68,924 (Nov. 13, 2002) ......................................................................... 5

69 Fed. Reg. 48,877 (Aug. 11, 2004) ......................................................................... 6

81 Fed. Reg. 90,667 (Dec. 9, 2016) .......................................................................... 22

82 Fed. Reg. 8,793 (Jan. 30, 2017) .......................................................................... 12

84 Fed. Reg. at 35,409 (Jul. 23, 2019) ................................................................. 13

84 Fed. Reg. at 35,414(Jul. 23, 2019) ................................................... 31, 32, 33

85 Fed. Reg. 65,653(Oct. 16, 2020) ................................................................. 15, 25

Federal Rules of Civil Procedure Rule 2 ................................................................. 18

Frederal Rules of Civil Procedure Rule 3 ................................................................. 18

**Constitutional Provisions**

U.S. Const. art. II § 2, cl. 2 ................................................................. 23, 24

**Regulations**

8 C.F.R. § 208.30 ................................................................................................. 4

8 C.F.R. § 208.30(d)(4) ......................................................................................... 4

8 C.F.R. § 208.30(g)(1) ......................................................................................... 4

8 C.F.R. § 208.30(g)(2) ....................................................................................... 45

8 C.F.R. § 235.3(4)(ii) ........................................................................................... 4

8 C.F.R. § 235.3(b)(1)(i) ................................................................................. 31, 32

8 C.F.R. § 235.3(b)(1)(ii) ................................................................................ 31, 32

8 C.F.R. § 235.3(b)(2)(i) ......................................................................... 3, 32, 36

8 C.F.R. § 235.3(b)(2)(ii) ............................................................................... 3, 31

8 C.F.R. § 235.3(b)(4) ........................................................................................... 4

8 C.F.R. § 235.3(b)(5) ................................................................................. 2, 31, 32

8 C.F.R. § 242.16(a) ............................................................................................. 2

8 C.F.R. § 253.3(b)(1)(ii) ..................................................................................... 5

8 C.F.R § 253.3(b)(7) ........................................................................................... 3

**Other Authorities**

Black's Law Dictionary (11th ed. 2019).......................................................................... 18

H.R. Rep. No. 104-828, § 301(c) (Sept. 24, 1996) ........................................................ 50

H.R. Rep. No. 105-408, pt. 3 (1998)............................................................................... 6

## INTRODUCTION

Plaintiffs Make the Road New York ("Make the Road") and La Unión del Pueblo Entero ("LUPE") seek a second preliminary injunction to halt the implementation of the Department of Homeland Security's ("DHS") unprecedented decision to strip hundreds of thousands of noncitizens of their basic right to a fair hearing before they can be deported from their lives and families in the United States.  The expansion of expedited removal reverses a fundamental, longstanding principle: that individuals with substantial ties to the United States generally cannot be removed without an opportunity for a full hearing before an Immigration Judge ("IJ").  Under the new policy, an immigrant who has been continually residing in the United States for up to two years, instead of receiving an adversarial hearing with the right to retain counsel and an opportunity to prepare and present evidence, can now be ordered removed by a line-level immigration officer, and deported within a matter of days.

The expansion of expedited removal to the interior of the United States will exacerbate the deep flaws that already exist in the process.  Previously, expedited removal was limited to those who had been in the country for up to 14 days and were apprehended near the border, or those who had arrived by sea.  Even in that far more limited application, expedited removal has been rife with errors, resulting in the wrongful deportation of U.S. citizens, legal permanent residents ("LPRs"), and bona fide asylum seekers, often to countries where they face persecution, torture, or death.

This Court has already recognized the severe and irreparable harm that will ensue from implementation of the new Rule, which will subject Plaintiffs' members to the threat of abrupt removal through a fundamentally and unconstitutionally flawed system. Preliminarily enjoining it again is appropriate, based on the five claims presented in this motion.

# FACTS

## A. The Expedited Removal Process.

Before 1996, all noncitizens were entitled to a full hearing in immigration court before they could be deported or excluded, whether they sought admission at the border or had already entered the country. They were provided an opportunity to investigate and prepare their case, to retain and rely on the assistance of counsel, and to present and confront evidence before an IJ. They also were entitled to two layers of review: an administrative appeal and subsequent federal court review. *See* 8 U.S.C. § 1105a (1995); 8 U.S.C. § 1252 (1995); 8 C.F.R. § 242.16(a) (1995).

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which retained full removal hearings as the standard procedure, while also creating a highly truncated process called "expedited removal." 8 U.S.C. § 1225(b)(1). In IIRIRA, Congress authorized the use of expedited removal for noncitizens seeking admission at ports of entry, and provided for possible future expansion of the procedure to the interior by administrative action, within certain limits.

Expedited removal is a one- or two-stage process: the first is inspection by an immigration officer; the second, where applicable, is a credible fear interview ("CFI") by an asylum officer. For an individual who applies for admission at a port of entry, the immigration officer must first determine if the individual is a noncitizen who is inadmissible either because they have engaged in fraud or lack valid entry documents. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (ii) (citing 8 U.S.C. §§ 1182(a)(6)(C), (a)(7)). If the individual claims to be a U.S. citizen, lawful permanent resident, or refugee, or to have been granted asylum, then the individual is entitled to limited additional review. *See* 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5). Otherwise, if the officer concludes that the individual is inadmissible under either ground, the officer "shall" order the individual

removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). At any time during the process, the officer may allow the person to withdraw his or her application for admission and leave the country. 8 U.S.C. § 1225(a)(4).

During the inspection stage, the individual is detained and denied the ability to contact or rely on the assistance of counsel. "Because the person is detained, he or she generally has no way to gather evidence." Declaration of Kara Hartzler ("Hartzler Decl.") ¶ 13.[1] The inspection stage generally begins and concludes in a matter of hours. *See* Declaration of Timothy Warden-Hertz ("Warden-Hertz Decl.") ¶ 8 ("People who do not have legal representation can be shuffled through the process very quickly and may be deported without ever talking to an attorney."); Hartzler Decl. ¶ 13. The immigration officer's decision is subject only to a paper review by a supervisor. 8 C.F.R. § 235.3(b)(2)(i). There is no administrative appeal, *see id.* § 235.3(b)(2)(ii), (7), and the government's position is that the statute severely limits federal court review, *see* 8 U.S.C. §§ 1252(a)(2), (e).

For many individuals, the inspection stage is the beginning and the end of the process. Those seeking asylum and related forms of protection may have access to a second stage—which is also flawed and does not remotely approach what is available in regular immigration proceedings. To access this "credible fear" stage, an individual must indicate an intention to apply for asylum or express fear of return to their country of origin. The immigration officer must then refer the individual for a credible fear interview with an asylum officer. *See* 8 U.S.C.

---

[1] *See also* Declaration of Linda Corchado ("Corchado Decl.") ¶ 8 ("[M]y client told me that while he was held at a port of entry . . . . [a]lthough he presented the CBP agents with a G-28, a form which showed he had an attorney, the agents refused to allow him to speak to me, telling him he had no attorney there. My client was issued an expedited removal order and deported to Guatemala . . . ."); Declaration of Dorien Ediger-Seto ("Ediger-Seto Decl.") ¶¶ 17-18 ("[O]nce [my clients] are in CBP custody it is functionally impossible to communicate with them . . . . I have had multiple clients who report that they are not permitted to call me from CBP custody.").

§ 1225(b)(1)(A)(ii), (B); 8 C.F.R. §§ 208.30, 235.3(b)(4).  At that interview, the applicant must show "a significant possibility" that he or she is eligible for asylum.  8 U.S.C. § 1225(b)(1)(B)(v).

If the asylum officer determines that the individual has a credible fear, the individual is placed into regular removal proceedings.  Those who do not pass the interview may request a paper review of the decision by an IJ, but do not receive a full hearing or further administrative appellate review.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(II)-(III); *see also* 8 C.F.R. § 208.30(g)(1).

As at the inspection stage, Defendants detain noncitizens during the credible fear stage.  8 C.F.R. § 235.3(4)(ii).  Regulations provide that noncitizens may consult with "a person or persons of [their] choosing" to prepare for their credible fear interview and the person(s) may—at the discretion of the asylum officer—be permitted to attend the interview and present a statement.  8 C.F.R. § 208.30(d)(4).  However, applicants are not guaranteed the right to have counsel participate in either the interview or any IJ review thereof.  *See* Hartzler Decl. ¶ 16 ("[T]he government takes the position that people in expedited removal have no right to counsel, even at their own expense."); Declaration of Eduardo Beckett ("Beckett Decl.") ¶ 8 ("IJs begin the [negative credible fear review] hearing by telling me that they do not have to allow me to speak on behalf of my client and that they can tell me to leave their courtroom."); Declaration of Kelly White ("White Decl.") ¶ 23 (addressing lack of safeguards for noncitizens with mental disabilities).[2]  Defendants' position is that there is no judicial review of a credible fear denial.

---

[2] *See also* Declaration of Max Brooks ("Brooks Decl.") ¶ 8 (describing IJs refusing to permit attorney appearance or expressing reluctance or anger at attorney seeking to speak in negative CFI review, noting that one IJ who "yelled at me at the outset of a negative credible review hearing to let me know that he would not allow me to say anything"); Ediger-Seto Decl. ¶ 16 (describing IJ review of CFIs as "inconsistent," such that "a respondent's ability to present their claim for relief fully is often dependent on which judge they are randomly assigned"); Declaration of Laura St. John ("St. John Decl.") ¶¶ 27-28 (noting that, even where an attorney's appearance is on file, "the asylum office routinely refuses to pre-schedule a time for the [CFI] to allow for counsel's participation," including one case of a client who suffered from epileptic seizures and memory loss who was transferred to a new detention center away from counsel, interviewed without counsel, and then denied the opportunity to re-interview with an attorney present); *id.* ¶ 28 (describing review of CFI in which IJ told attorney that she could not "present any new evidence or testimony" or "make any argument on her client's behalf").

**B. Prior Administrations Expanded the Scope of Expedited Removal to Apply Only to Limited Groups of Noncitizens Who Entered Without Inspection.**

Congress authorized the Attorney General to expand the application of expedited removal beyond its initial scope. At maximum, the congressional authorization encompasses certain noncitizens who were not lawfully admitted or paroled into the country and not continuously physically present two years or more. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II).[3] But Congress specified that the Attorney General must affirmatively designate the scope of any expansion of expedited removal before he can subject new groups of noncitizens to these truncated procedures. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(I).

For 20 years, the government chose not to expand expedited removal to its statutory limits, and at least one prior administration rejected such an extreme expansion because of concerns it would be illegal. *See* Boggs Decl., Ex. P, Alan Gomez, *Trump's Quick Deportation Plan May Be Illegal, Past Immigration Chiefs Say*, USA Today (Feb. 26, 2017). Instead, the government made only two more modest expansions. In 2002, it applied expedited removal to persons inside the country, but limited that expansion to a narrow group of individuals who arrived by *sea* and were not continuously present for two years. *See* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924, 68,925-26 (Nov. 13, 2002).

In 2004, the government expanded the use of expedited removal to people who were apprehended within 100 air miles of a land border and unable to demonstrate that they had been

---

[3] The Attorney General delegated the designation power to the Commissioner of the Immigration and Naturalization Service ("INS"). *See* 8 C.F.R. § 253.3(b)(1)(ii). Under the Homeland Security Act of 2002, the INS ceased to exist and its functions were transferred to DHS. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002). As a result, the Secretary of Homeland Security now holds the designation power. *See* 6 U.S.C. § 557.

physically present in the United States for at least 14 days.  *See* Notice Designating Aliens for

Expedited Removal, 69 Fed. Reg. 48,877, 48,880-81 (Aug. 11, 2004).

### C. Two Decades of Experience Revealed Widespread Flaws in the Expedited Removal Process.

The past two decades have demonstrated the expedited removal process to be profoundly

flawed.  A 2005 study commissioned by Congress documented numerous "serious problems" in

the process "which put some asylum seekers at risk of improper return."  Boggs Decl., Ex. J, U.S.

Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I:*

*Findings & Recommendations* 4-5, 10 (2005) ("2005 USCIRF Study").[4]  A 2016 follow-up study

"revealed continuing and new concerns about officers' interviewing practices and the reliability of

the records they create, including . . . certain CBP officers' outright skepticism, if not hostility,

toward asylum claims; and inadequate quality assurance procedures."  Boggs Decl., Ex. K, U.S.

Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in*

*Expedited Removal* 2 (2016) ("2016 USCIRF Study").

Each stage of expedited removal is rife with errors.  At the inspection stage, inspecting

officers routinely make factual errors resulting in erroneous expedited removal orders.  Even with

the prior 14-day continuous presence requirement, inspecting officers have wrongly determined

that the continuous-presence threshold was not met.  *See, e.g.*, Boggs Decl., Ex. M, ACLU,

*American Exile: Rapid Deportations that Bypass the Courtroom* 63 (2014) ("American Exile")

(describing erroneous expedited removal of Mexican citizen who had lived in the United States

for 14 years); Declaration of Hannah Cartwright ("Cartwright Decl.") ¶¶ 3-8 (describing expedited

removal order against individual who had not left the United States for 10 years); Declaration of

---

[4] *See* 22 U.S.C. § 6474 (authorizing study); s*ee also* H.R. Rep. No. 105-480, pt. 3, at 17 (1998) (recognizing that immigration officers "may not always be following INS procedures designed to ensure that potential asylum claimants are properly referred" for interviews).

Joanna Delfunt ("Delfunt Decl.") ¶ 8 (describing expedited removal order against individual who previously had not left the United States for three years).[5]  Errors are made even in identifying unaccompanied minors, who by statute cannot be placed in expedited removal.  8 U.S.C. §§ 1232(a)(2)(B), (5)(D); Declaration of Leah A. Jones ("Jones Decl.") ¶¶ 11-14 (describing expedited removal of 16-year-old survivor of abuse with fear of return to Mexico); Hartzler Decl. ¶ 12 ("[O]fficers are often unable or unwilling to identify people who are juveniles or suffer from serious mental health issues.").[6]

Errors are also made in determining alienage.  *See Lyttle v. United States*, 867 F. Supp. 2d 1256, 1272-73 (M.D. Ga. 2012) (U.S. citizen erroneously issued expedited removal order); Boggs Decl., Ex. U, *De La Paz v. Johnson*, No. 1:14-CV-016 (S.D. Tex. habeas petition filed Jan. 24, 2014) (U.S. citizen erroneously subjected to expedited removal); *Matter of Lujan-Quintana*, 25 I. & N. Dec. 53, 55 (BIA 2009) (expedited removal order wrongfully issued against U.S. citizen); Declaration of Shalyn Fluharty ("Fluharty Decl.") ¶ 10 (attesting that attorneys and paralegals at the South Texas Family Residential Center have identified at least 20 U.S. citizen children erroneously placed in expedited removal); Boggs Decl., Ex. Q, Ian James, *Wrongly Deported, American Citizen Sues INS for $8 Million*, L.A. Times (Sept. 3, 2000) (recounting expedited removal of U.S. citizen).

Immigration officers also fail to record material statements made by noncitizens who express a fear of persecution or torture or otherwise deprive them of the opportunity to seek

---

[5] *See also* St. John Decl. ¶ 26 (describing expedited removal of individual stopped at a CBP checkpoint who had lived in the United States for two years with pending asylum and T-visa applications); Declaration of Carly L. Salazar ("Salazar Decl.") ¶ 8 (describing expedited removal of an individual who had lived in the United States for four years after a traffic stop).

[6] *See also* Salazar Decl. ¶¶ 4-7 (describing multiple unaccompanied children held in adult detention and subject to expedited removal proceedings, including a child who was coerced into stating he was an adult after threat of imprisonment, who was detained for 39 days (with 14 days in isolation), and who suffered wrist and ankle injuries from restraints).

protection. *See* Hartzler Decl. ¶ 14 ("It is not uncommon for a sworn statement or a video to show that a person stated that they were afraid to return to their country, yet that person never receives a credible fear interview[.]"); Beckett Decl. ¶ 5 ("My clients regularly report that, although they expressed that they were afraid to go back to their country of origin, [CBP] did not refer them for a credible fear interview."); Declaration of Gracie Willis ("Willis Decl.") ¶ 9 (same); Declaration of Edna Yang ("Yang Decl.") ¶¶ 4-6 (same); Declaration of Laura Lunn ("Lunn Decl.") ¶¶ 5-6 (same);[7] Fluharty Decl. ¶ 7 (describing encountering families in detention "[e]very day" who expressed fear but were not referred, resulting in attorneys at the South Texas Family Residential Center sending 10 to 50 requests for CFIs each week); Jones Decl. ¶¶ 11, 13 (describing failure to record client's expressed fear of return); *see also* 2005 USCIRF Study at 53-55 (finding that in 15% of observed cases, the inspections officer failed to refer an individual who expressed a fear of return for a CFI).[8]

In other cases, CBP officers actively interfere with noncitizens' efforts to express fear of return. *See* Fluharty Decl. ¶ 5 (describing families who reported that officers lied about the availability of asylum and how to apply for it; "verbally intimidated them by calling them liars and dogs[;] and physically intimidated them by kicking them, pulling their hair, and pinching them");

---

[7] *See also* St. John Decl. ¶¶ 6-8 (same, including young man and his minor brother who were refused CFIs, as well as a young woman who expressed fear but received no CFI after CBP agents told her that there was no way to stop her deportation); Supplemental Declaration of Edna Yang ("Supp. Yang Decl.") ¶ 3 (describing individuals recently told, without explanation, that asylum protections were no longer available to them); Ediger-Seto Decl. ¶¶ 7-11 (describing CBP's practice of not referring individuals who express fear for CFIs); Declaration of Nicole Ramos ("Ramos Decl.") (same, including one case requiring more than 15 phone calls to have client denied CFI removed from deportation flight); Corchado Decl. ¶¶ 6-7 (describing individuals deported without CFIs, despite both individuals and their counsel informing CBP officers of the fear).

[8] *See also* Boggs Decl., Ex. N, Human Rights Watch, *You Don't Have Rights Here* 6 (2014) (finding that fewer than half of individuals interviewed who claimed a fear of return were referred for credible fear hearings); *id.*, Ex. F, Letter from Nat'l Immigrant Justice Ctr. et al. to DHS Office of Civil Rights & Civil Liberties & Office of the Inspector Gen., at 12-22 (Nov. 13, 2014) (explaining that "[w]hen applicants express fears, CBP officials fail to capture those statements in the required documentation or include mistaken information," and providing numerous stories of asylum seekers affected by CBP's failures during the inspections stage).

Lunn Decl. ¶ 13 (describing clients told that "they were worthless, [that] they should give up, or [that] they have no chance of staying in the United States"); Yang Decl. ¶ 6 (describing client told "asylum does not exist [] anymore in the US" and others told that they could not apply for asylum); Declaration of Jessica Shulruff Schneider ("Schneider Decl.") ¶ 7 (describing CBP officers' frequent modification of questions to discourage individuals from expressing fear).[9]

Even when immigration officers do take statements from noncitizens, the statements are replete with errors, and "often inaccurate and nearly always unverifiable." 2005 USCIRF Study at 53, 55, 74; *see also* 2016 USCIRF Study at 21; Borderland Report at 13 (reporting "that CBP affidavits are often inconsistent with asylum-seekers' own accounts"); Willis Decl. ¶¶ 5-6 ("It was common for CBP officers to record what appeared to be boilerplate language stating that individuals did not have a fear of return to their country of origin or that they were coming to the United States to work."); Beckett Decl. ¶¶ 5-6 (same); Warden-Hertz Decl. ¶ 6 (same and noting that when asked about the paperwork, clients report having come to the United States due to fear of persecution); Yang Decl. ¶ 7 (same); Lunn Decl. ¶¶ 8-9 ("I have been told by at least 50 clients with . . . boilerplate language in their paperwork that they never made those statements to CBP . . . . On numerous occasions, the paperwork for a pre-verbal child said that the child had stated that he or she came to the United States to work."); Schneider Decl. ¶ 8 ("The information on the

---

[9] *See also* St. John Dec. ¶¶7-8, 14, 24 (describing "CBP tell[ing] clients information that is blatantly untrue to force the expedited removal process to move forward"); Ramos Decl. ¶ 8 (describing cases in which individuals were coerced into recanting asylum claims, including based on threats of separating mothers from their children and of incarceration); *id.* ¶ 11 (describing trans woman who was isolated and told by CBP officers that no one had invited her to the United States and she was free to leave by giving up her case until she dropped her credible fear claim); Declaration of Stacy Tolchin ("Tolchin Decl.") ¶ 6 ("[E]xpedited removal orders are frequently the result of coercion involving the detention of applicants for admission for hours on end, as well as aggressive questioning by officers . . . ."); Ediger-Seto Decl. ¶¶ 7-8 (same, including case in which CBP agents refused to refer for CFI "because, in the agent's words, only 'lesbians and people whose governments want to kill them can get asylum'"); *id.* ¶ 14 (describing "clients who were afraid to assert fear to the CBP agents . . . because they were mistreated in the course of their arrest"); Corchado Decl. ¶ 10 ("CBP agents have told many of my clients who are in expedited removal proceedings that they know many asylum claims are fraudulent and that my clients are not welcome in *their* country."); Supp. Yang Decl. ¶ 3 (describing clients receiving misinformation about the availability of asylum).

[expedited removal paperwork] is inaccurate at best and often seems fraudulently filled out."); White Decl. ¶¶ 11-12 (attesting to inaccuracies in paperwork); Hartzler Decl. ¶ 11 ("[O]fficers often include boilerplate information in the sworn statement that does not apply to a particular individual."); Jones Decl. ¶ 13 ("[T]he agent wrote a statement for [client] claiming that she was not afraid to return to Mexico, which was not true."); Cartwright Decl. ¶ 7 (describing agent who "recorded . . . that [client] had entered the U.S. five days earlier" even though the individual had not left the United States for ten years). [10]

Furthermore, providers report systemic interpretation failures.  *See* Willis Decl. ¶¶ 7-8 (describing representing "numerous Mayan language speakers with fear-based claims who had little to no understanding of what was happening in their case" due to CBP interviewing them in Spanish); Warden-Hertz Decl. ¶ 5 (describing a group of about 150 Haitian men who, after being detained for a month, had yet to have any immigration official communicate with them in Creole); Declaration of Jose Jesus Rodriguez ("Rodriguez Decl.") ¶¶ 7-8 (describing an indigenous language-speaker inspected by a CBP officer speaking broken Spanish who was never referred for CFI); Fluharty Decl. ¶ 9 (explaining that "an overwhelmingly large percentage" of the separated families at the South Texas Family Residential Center "had been in immigration custody

---

[10] *See also* St. John Decl. ¶ 10 ("[The] pattern of CBP agents claiming in official documents that individuals only stated they came to the United States 'to work' instead of properly documenting individuals' fear claim . . . is so pervasive that in 2017 our office developed a standard evidence packet that individuals could submit to try [refute these claims]."); *id.* ¶¶ 9-12 (describing multiple instances of incorrect paperwork); Ediger-Seto Decl. ¶¶ 12-13 ("[M]y client's expedited removal paperwork stated that she intended to stay in the United States for two years and live and work in a particular city . . . . she was never asked about her fear of return, was never asked what her intentions in the United States were, and that she had never even heard of the city that the CBP officer listed on her paperwork as her destination. She . . . spent a week in CBP custody and repeatedly told the officers that she could not go back to her country due to her fear of return. They informed her that she had already signed her deportation paperwork so there was no way she could fight her case. She was removed, and was only able to present her full claim for protection after she experienced further harm in Guatemala [and] returned to the United States"); Ramos Decl. ¶¶ 6-7 (describing falsified paperwork that stated clients had no fear of return, even though the same clients, one of whom had visible scars from past persecution, had previously provided detailed statements regarding fear to their attorney); Supplemental Declaration of Timothy Warden-Hertz ("Supp. Warden-Hertz Decl.") ¶ 3 (describing paperwork including false information, including that client did not fear return to El Salvador, incorrect date client entered the United States, and false claim that he came to the United States for work for five years).

for between one and three months without having a credible fear interview because neither CBP nor ICE officers questioned them in a language they understood"); Yang Decl. ¶ 9 (reporting that many people "received inadequate interpretation services"); Schneider Decl. ¶ 10 (same); Lunn Decl. ¶ 7 (same); Hartzler Decl. ¶¶ 7-8 (same); White Decl. ¶ 14 (same); 2016 USCIRF Study at 28 (same); *see also* Boggs Decl., Ex. I, DHS Advisory Comm. on Family Residential Ctrs., *Report of the DHS Advisory Committee on Family Residential Centers* 96-100 (2016) (discussing inadequate or nonexistent interpretation services at CFIs and IJ reviews of negative fear determinations).[11]

Finally, immigration officers fail to advise noncitizens that they may request to withdraw their applications for admission, which allows certain noncitizens to leave the United States voluntarily and avoid penalties that include permanent inadmissibility to the country. *See* 8 U.S.C. § 1182(a)(6)(C); 8 U.S.C. § 1225(a)(4); *see also, e.g.*, Hartzler Decl. ¶¶ 18-19 (explaining that "officers advise almost no one" of their right to request to withdraw their application for admission and identifying lack of guidance regarding decisions to grant withdrawal); White Decl. ¶ 6 (same); Jones Decl. ¶ 12 (stating that agent failed to provide client with opportunity to withdraw

---

[11] *See also* St. John Decl. ¶¶ 15-16 (noting that in the cases of "hundreds" of Central American clients speaking indigenous languages, "more often than not, our clients report that none of the communication between them and CBP officers was in their best language and they are asked to sign and initial documents written only in English"); *id.* ¶ 17 (noting that attorneys regularly hear from clients that "CBP agents who speak very limited or poor Spanish still conduct full interviews in Spanish without an interpreter"); Supp. Yang Decl. ¶ 4 (describing regular interpretation problems, including "individuals who speak Portuguese and were pressured and/or forced to proceed with an interview using a Spanish interpreter, Lingala speakers after often forced to proceed with an interview in French, and individuals who speak indigenous languages, for example someone who speaks Garifuna, who were forced to proceed with a Spanish interpreter"); Supp. Warden-Hertz Decl. ¶ 4 (describing client who originally was provided with interpreter of dialect she did not speak and then faced additional translation problems with subsequent interpreter); Corchado Decl. ¶¶ 5-6 (describing interpretation problems especially for individuals who speak Portuguese and Mam dialects); Brooks Decl. ¶ 7 (describing clients prevented from providing information in CFIs due to problems with interpreters, including interpreters who cut them off mid-sentence, did not permit them time to respond to questions, spoke incorrect dialects, had accents that were not understandable, and engaged in extensive side conversations in English with asylum officers); Declaration of Eric Fish ("Fish Decl.") ¶ 4 (describing testimony of CBP agent in federal court who admitted he regularly conducted expedited removal proceedings in Spanish without the assistance of an interpreter despite having only had two months of Spanish language instruction); *id.* (noting federal court found due process violation in client's prior expedited removal because client did not understand the proceedings, which took place in English).

application for admission); Tolchin Decl. ¶ 7 ("[I]n the cases I have seen, officers do not provide applicants for admission with [an opportunity to withdraw an application for admission].").

The systemic flaws extend beyond the inspection stage to the credible fear process. Noncitizens are often subject to truncated and unfair interviews. *See* Boggs Decl., Ex. E, *Interior Immigration Enforcement Legislation: Hearing Before the H. Judiciary Subcomm. on Immigration & Border Sec.* 5 (Feb. 11, 2015) (statement of Eleanor Acer, Human Rights First) ("[I]nterviews are sometimes rushed, essential information is not identified due to lack of follow up questions, and/or other mistakes are made that block genuine asylum seekers from even applying for asylum . . . ."); Boggs Decl., Ex. D, Letter from Am. Immigration Lawyers Ass'n et al. to Leon Rodríguez, Dir., U.S. Citizenship & Immigration Servs., & Sarah Saldaña, Dir., U.S. Immigration & Customs Enforcement 2 (Dec. 24, 2015) ("USCIS' negative fear determinations are often flawed, with numerous substantive problems evident in the transcripts of initial fear interviews."); *see also, e.g.*, Warden-Hertz Decl. ¶ 9 (describing improper denial of credible fear and IJ review corrected only due to attorney intervention).[12]

### D. The Trump Administration Dramatically Expanded Expedited Removal Without Addressing the Flaws of the Existing System.

On January 25, 2017, President Trump signed an Executive Order directing DHS to expand expedited removal to the maximum scope authorized by statute. *See* Boggs Decl., Ex. B, Exec. Order No. 13767, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8,793, 8,796 (Jan. 30, 2017). Less than a month later, on February 20, 2017, then-DHS Secretary

---

[12] *See also* Brooks Decl. ¶ 7 (describing asylum officers who refused to permit individuals to provide complete responses to questions or asked confusing or misleading questions, including interview in which individual was only permitted to describe "first, worst, and last" examples of persecution, interview conducted in the format of a "hostile cross-examination," interviews at which individuals were not permitted to describe relevant harm that family members had suffered, and an interview in which a teenaged girl was unable to relate full nature of persecution she suffered, because she felt unable to discuss the details of rape threat at the interview in front of her mother, and to male asylum officer).

John Kelly announced that he would issue a rule expanding expedited removal.  Boggs Decl., Ex. V, Memorandum from John Kelly, *Implementing the President's Border Security and Immigration Enforcement Improvements Policies* (Feb. 20, 2017).  However, DHS took no action for more than two years.

On July 23, 2019, then-Acting DHS Secretary Kevin McAleenan published a rule in the Federal Register implementing President Trump's directive ("Rule" or "July 2019 Rule").  The Rule allows immigration officers to apply expedited removal to noncitizens arrested *anywhere* in the country who cannot show that they have been lawfully and continuously present in the United States for at least two years.  *See* 84 Fed. Reg. at 35,409.  The Rule also sets out "[i]mplementation [c]onsiderations," stating that "[t]he expedited removal procedures required under existing law and regulations are applicable to the [noncitizens] designated by this Notice" and that "DHS plans to issue further guidance on to immigration officers to guide the exercise of discretion in referring aliens for expedited removal."  *See id.* at 35,412.

On July 24, 2019, then-Acting Director of Immigration and Customs Enforcement ("ICE") Matthew Albence issued a Memorandum titled "Implementation of July 2019 Designation of Aliens Subject to Expedited Removal."  Boggs Decl., Ex. W, ICE, *Implementation of July 2019 Designation of Aliens Subject to Expedited Removal* (July 24, 2019) ("July 24 Implementation Memorandum").  The July 24 Implementation Memorandum provides that the noncitizen "bears the affirmative burden to show to the satisfaction of the encountering immigration officer that he or she has been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility by providing evidence establishing the place, date, and manner of entry into the United States and continuity of presence since that time."  *Id.* at 3.  It further provides that an individual who claims to "have access to such

evidence" but "is unable to personally provide such evidence at the time of the encounter" shall be provided a "brief but reasonable opportunity to obtain it or communicate with a third party to obtain such evidence." *Id*. at 3. The Memorandum also provides that "ICE immigration officers will not begin processing expedited removal cases under this designation until on or about September 1, 2019." *Id*. at 4.

On information and belief, in or around October 2020, Defendants and their agents issued further writings implementing the July 2019 Rule. News reports indicate that Tony H. Pham, Senior Official Performing the Duties of the ICE Director, issued an additional implementation memorandum and Defendants issued written guidance providing that the implementation of the Rule will occur only after training, which is to be completed by October 16, 2020.[13] These documents—the implementation memo and direction to apply the Rule after training, by October 16, 2020— are referred to herein as the "October 2020 Implementation Documents."

### E. Improper Service as Acting Secretary of Homeland Security by Defendants McAleenan and Wolf.

Over the last two years, DHS has engaged in an unprecedented series of maneuvers to fill its senior offices with acting officials instead of Senate-confirmed appointees, including the acting secretaries who purported to issue and ratify the July 2019 Rule. These appointments are described more fully below. *See infra* Argument I.B.

In brief, Defendant McAleenan assumed the Acting Secretary role on April 10, after the resignation of Secretary of Homeland Security Kirstjen Nielsen. Boggs Decl., Ex. AD, U.S. Gov't Accountability Off., No. B-331650, *Decision: Matter of Department of Homeland Security— Legality of Service of Acting Secretary of Homeland Security* 4 (Aug. 14, 2020). However, DHS's

---

[13] *See* Boggs Decl., Ex. Z, Hamed Aleaziz, *ICE is Planning to Fast-Track Deportations Across the Country*, Buzzfeed News (Oct. 7, 2020) (noting creation and dissemination of memorandum regarding implementation of expedited removal pursuant to the July 2019 Rule).

succession orders at the time assigned the role to a different official, and thereby precluded McAleenan from serving as Acting Secretary.  *Id*. at 4-9.  He nonetheless issued the challenged Rule on July 23, 2019.

McAleenan purported to change DHS's order of succession on November 8, 2019, to designate Chad Wolf as the next Acting Secretary.  *Id*. at 9-10.  But because McAleenan was never validly appointed, his change to the order of succession had no effect, and Wolf's service was therefore also invalid.

In response to court decisions enjoining Wolf's actions on these grounds, DHS tried to retroactively validate his and McAleenan's actions.  On September 10, 2020, Peter Gaynor, the Federal Emergency Management Agency ("FEMA") Administrator claimed to assume the role of Acting Secretary pursuant to the order of succession in place when Secretary Nielsen resigned in April 2019.  Boggs Decl., Ex. Y, Peter T. Gaynor, Order Designating the Order of Succession for the Secretary of Homeland Security (Sep. 17, 2020).  The Administrator then immediately amended the order of succession to re-install Wolf as Acting Secretary, *id*., who issued a memorandum on October 7, 2020 purporting to ratify his and McAleenan's actions, including the July 2019 Rule.  Boggs Decl., Ex. AF, DHS, Ratification of Department Actions, 85 Fed. Reg. 65,653, 65,654 (Oct. 16, 2020.

### F. Procedural History

Plaintiffs filed this lawsuit challenging the Rule on August 6, 2019 and moved for a preliminary injunction on August 9.  ECF Nos. 1, 13.  On September 20, 2019, Plaintiffs filed an amended complaint challenging Defendants' newly-disclosed Implementation Memorandum. ECF 37.

The Court issued a preliminary injunction on September 27, 2019, holding that the

decision to expand expedited removal was likely illegal for failure to comply with the APA's notice-and-comment and reasoned decision-making requirements. *Make the Road New York v. McAleenan* ("*Make the Road I*"), 405 F. Supp. 3d 1, 11 (D.D.C. 2019).

The Court of Appeals disagreed, holding that a "judgment whether to expand expedited removal" made pursuant to the designation provision is "not subject to review under the APA's standards for agency decision-making, [n]or . . . the APA's notice-and-comment rulemaking requirements." *Make the Road New York v. Wolf* ("*Make the Road II*"), 962 F.3d 612, 618 (D.C. Cir. 2020). The Court specifically noted it did *not* address any "pending constitutional and INA claims." *Id.* at 621. Moreover, neither this Court nor the Court of Appeals has addressed the manner in which Defendants have *implemented* the expedited removal system other than the Secretary's exercise of his designation authority.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 9, 24 (D.D.C. 2013) (internal citation and quotations omitted).

## ARGUMENT

Plaintiffs' Motion presents five challenges to both the July 2019 Rule and the subsequent writings implementing the Rule on July 24, 2019 and in October 2020 ("Implementation Documents").

*First*, Defendant McAleenan lacked authority to issue the July 2019 Rule in the first place because he was not validly serving as the Acting Secretary of DHS.  Nor did Defendant Wolf validly ratify the Rule.  Second Amended Complaint ("SAC"), ECF No. 37-1, Count 7.

*Second*, the Rule and Implementation Documents violate the expedited removal statute by subjecting hundreds of thousands of noncitizens to summary removal without implementing statutorily-required procedures to ensure fair proceedings.  SAC, Count 3.

*Third,* the Rule and Implementation Documents are arbitrary and capricious under the APA because the procedures they implement are inadequate to prevent erroneous removals.  SAC, Count 5.

*Fourth*, the Rule and Implementation Documents violate provisions of the APA and INA that confer the right to counsel of one's own choosing in expedited removal proceedings.  SAC, Count 4.

*Fifth*, the Rule and Implementation Documents violate the INA, by applying expedited removal to individuals who are present in the United States.  Such individuals are not subject to either ground of inadmissibility set forth in the expedited removal statute.  SAC, Count 8.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A. Plaintiffs Have Standing to Raise, and This Court Has Jurisdiction Over, All the Claims Presented.

1.     As the Court found, Plaintiffs demonstrate associational standing to challenge the July 2019 Rule and Implementation Documents.  *Make the Road I*, 405 F. Supp. 3d at 32–34; *Make the Road II*, 962 F.3d at 627-28.[14]

---

[14] Plaintiffs Make the Road and LUPE currently have members who are subject to the July 2019 Rule.  *See* Declaration of Paige Austin ("Austin Decl.") ¶ 7; Second Declaration of Paige Austin ("Second Austin Decl.") ¶¶ 2–6; Declaration of Make the Road-John Doe ¶ 2; August 2, 2019 Declaration of Juanita Valdez-Cox ("8/2/19 Valdez Decl.") ¶¶ 11-14; October 15, 2020 Declaration of Juanita Valdez-Cox ("10/15/20 Valdez Decl.") ¶¶ 3-4; Declaration of LUPE-Jane Doe.  While Plaintiff WeCount! has not identified members currently subject to the expanded scope of expedited

2.     Defendants have stated that 8 U.S.C. § 1252(e)(3) precludes Plaintiffs from raising the two additional claims (Claims 7 and 8) in the Second Amended Complaint because they were not pleaded within 60 days of the date the July 2019 Rule was published.  Defendants are incorrect.

The Court has jurisdiction over these claims because the addition of new *claims* does not violate the statutory bar on bringing new *actions* after 60 days.  8 U.S.C. § 1252(e)(3)(A) provides that "judicial review of determinations under section 1225(b) . . . is available in an *action* instituted" in this Court.  *Id.* (emphasis added).    Subsection (B) provides: "Any *action* instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is . . . implemented."  *Id.* (emphasis added).  An *action* refers to a *lawsuit*—not to specific claims within that lawsuit.  *See* Fed. R. Civ. P. 2 ("There is one form of action—the civil action."); Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."); *see also* Black's Law Dictionary (11th ed. 2019) (defining "action" as "[a] civil or criminal judicial proceeding.").    Thus, the "action instituted under this paragraph"—*i.e.*, the systemic challenges to the "validity of the system," 8 U.S.C. § 1252(e)(3) (title of paragraph)—was "filed" when the original complaint was filed on August 6, 2019, within 60 days of the publication of the July 2019 Rule.

Section 1252(e)(3) does not say that "[a]ny action *or claim* instituted under this paragraph" must be filed within 60 days.  And the INA's judicial review provision, 8 U.S.C. § 1252, demonstrates that when Congress wishes to refer to a *claim* in addition to an action, it knows how to do so.  For example, in § 1252(e)(1), Congress specified limitations on relief "[w]ithout regard

---

removal as of this filing, they have previously identified such members.  *See* Aug. 5, 2019 Declaration of Jonathan Fried ¶ 11; Declaration of Oscar Londoño ¶ 3.  Regardless, this Court can find standing on the basis of Plaintiffs Make the Road and LUPE, without relying on Plaintiff WeCount!.  *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 52 n. 2, (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

to the nature of the *action or claim*.") (emphasis added); *see also id.* § 1252(f)(2) (limitation on judicial review that applies regardless of the "nature of the action or claim"); *id.* § 1252(g) (barring review of "any cause or claim"). *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) ("our normal presumption [is] that, when Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout"). Likewise, other provisions of § 1252 repeatedly refer to a particular claim as opposed to the action in which that claim is asserted. *See, e.g.*, 8 U.S.C. § 1252(a)(2)(D) (allowing judicial review of "certain . . . claims"); *id.* §§ 1252(b)(5), (b)(7)(B) (addressing nationality "claims"). Plaintiffs' reading of § 1252(e)(3) as requiring the filing of a lawsuit within the designated time frame, but not necessarily every particular legal claim that may be advanced in that lawsuit, is further reinforced by the strong presumption in favor of judicial review of agency action. *See Make the Road II*, 962 F.3d at 623.

   *Am. Immigration Lawyers Ass'n ("AILA") v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000), does not control this issue. In *AILA*, the district court dismissed new *plaintiffs* issued expedited removal orders more than 60 days after the deadline, who then sought to join the action. *AILA v. Reno*, 18 F. Supp. 2d 38, 47 (D.D.C. 1998) ("the new plaintiffs in the amended . . . complaint are time barred."). The D.C. Circuit summarily affirmed without analysis. *See AILA*, 199 F.3d at 1357. *AILA* has no bearing here, where there is a singular action, timely filed by the Plaintiffs, who have standing to raise all the claims presented.

   3.    In the alternative, should this Court conclude that § 1252(e)(3)'s 60-day filing deadline targets the date a claim is raised rather than the date Plaintiffs filed their action, the Court should find that the deadline is subject to equitable tolling and that Plaintiffs' challenge to Defendant McAleenan's appointment as Acting Secretary merits tolling. Section 1252(e)(3) lacks the requisite "clear statement" that the Supreme Court "in recent years" has held to distinguish a

"claims-processing" provision from a jurisdictional deadline. *United States v. Kwai Fun Wong*, 575 U.S. 402, 409 (2015). *See, e.g., Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) (same).[15]

The doctrine of equitable tolling is applicable to a non-jurisdictional claims-processing rule. *See Holland v. Florida*, 560 U.S. 631, 645-46 (2010) (stating that the Court has "previously made clear" that a rebuttable presumption favoring equitable tolling is read into every federal statute of limitations (citations omitted)). Plaintiffs' challenge to Defendant McAleenan's appointment meets the standard for equitable tolling. *Id.* at 649. Specifically, Plaintiffs can show "'(1) that [they have] been pursuing [their] rights diligently, and (2) that some extraordinary circumstance stood in [their] way' and prevented timely filing." *Id.* (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

An extraordinary circumstance is present here because the illegality of McAleenan's appointment became known to the public only on November 15, 2019, through a letter sent by the congressional leaders of the House Committee on Homeland Security and the House Committee on Oversight and Reform to the Government Accountability Office ("GAO"). Boggs Decl., Ex. AC, Letter from Bennie G. Thompson, Chairman, House Cmte. on Homeland Security and Carolyn B. Mahoney, Acting Chairwoman House Cmte. on Oversight and Reform to the Hon. Gene Dodaro, Comptroller Gen. of the United States, dated Nov. 15, 2019. On the same date, on consent of the parties, this Court stayed proceedings in this case pending the government's appeal of the preliminary injunction, directing the parties to meet and confer after issuance of the mandate.

---

[15] In *AILA*, the district court held that § 1252(e)(3)'s 60-day filing deadline is "jurisdictional" without identifying any clear statement by Congress to that effect. 18 F. Supp. 2d at 46-47. As noted above, on appeal the Court of Appeals simply affirmed dismissal, seeing "no reason to disturb the district court's analysis," without further comment. 199 F.3d at 1356-57. The decision and its reasoning have been superseded by the Supreme Court's subsequent decisions in *Henderson* and *Wong*.

ECF Order (Nov. 15, 2019). Plaintiffs have moved in a reasonably diligent manner in raising this claim. For these reasons, the 60-day filing deadline should be tolled.

4.    The Court has jurisdiction over Claim 8 for an additional reason. Claim 8 challenges the authority to place into expedited removal individuals who have entered the United States but who lack documents at the time of their arrest. Claim 8 may be brought against the October 2020 Implementation Documents, which constitute a "written policy directive, written policy guideline, or written procedure issued . . . to implement" the expedited removal system. 8 U.S.C. § 1252(e)(3). The October 2020 Implementation Documents therefore provide a new 60-day period in which to file.

## B. Defendant McAleenan Lacked Authority to Issue the July 2019 Rule.

### 1. Defendant McAleenan Was Not Authorized to Serve as Acting DHS Secretary.

Defendant McAleenan lacked authority to issue the July 2019 Rule, because he was not validly serving as the Acting Secretary of DHS. Congress has authorized DHS to establish its "order of succession" for when the offices of Secretary and the two highest deputies are vacant. 6 U.S.C. § 113(g)(2). But when Secretary Nielsen resigned, DHS's succession orders assigned the role of Acting Secretary to a *different* official, which meant McAleenan could not assume the role or exercise any of its functions. Two courts, along with the GAO, have recently come to the same conclusion. *See ILRC v. Wolf*, 2020 WL 5798269, *7-9 (N.D. Cal. Sept. 29, 2020); *Casa de Maryland v. Wolf*, 2020 WL 5500165, *20-23 (D. Md. Sept. 11, 2020); Boggs Decl., Ex. AD, U.S. Gov't Accountability Off., No. B-331650, *Decision: Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security* (Aug. 14, 2020).

The invalidity of McAleenan's tenure is clear from the text of DHS's succession orders, which are contained in a rule called "DHS Delegation No. 00106." *See* Boggs Decl., Ex. X at 3-

5, DHS Orders of Succession and Delegations of Authorities for Named Positions, DHS Delegation No. 00106, Rev. No. 08.5 (Apr. 10, 2019).  At the time McAleenan purported to assume office, on April 10, 2019, this rule established two separate lines of succession: one "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," *id.* § II.A (the resignation line), and another "in the event [of] a disaster or catastrophic emergency," *id.* § II.B (the emergency line).  In case of resignation, succession was "governed by Executive Order 13753," which on April 10 assigned the Acting Secretary role to Christopher Krebs.[16]  *Id.* § II.A; *see also* Boggs Decl., Ex. AD at 8 n.11.  In case of emergency, succession was governed by "Annex A," which would have assigned the role to McAleenan.[17]  Boggs Decl., Ex. X at 3, § II.B.  On April 10, Secretary Nielsen *resigned*, which triggered the resignation line of succession in § II.A.  Under that provision, only Krebs, not McAleenan, could assume the role of Acting Secretary.

This outcome was consistent with a document Secretary Nielsen signed the day before her resignation, on April 9, 2019, which amended "Annex A of DHS [Delegation 106]."  Boggs Decl., Ex. X at 69-70.  As explained, Annex A provided only the order of succession "during a disaster or catastrophic emergency."  Boggs Decl., Ex. X at 3, § II.B.  Secretary Nielsen's April 9 order did not change Annex A's title or its function in DHS Delegation 106.  It simply changed the order of officials within Annex A.  It therefore had no impact on succession in the event of the Secretary's resignation.  *See Casa de Maryland*, 2020 WL 5500165, at *22 (concluding that "the

---

[16] Executive Order 13753 begins the order of succession with (1) the Deputy Secretary, followed by (2) the Under Secretary for Management, (3) the Administrator of FEMA, and (4) the Director of the Cybersecurity and Infrastructure Security Agency ("CISA").  Boggs Decl., Ex. AB, Exec. Order No. 13753, 81 Fed. Reg. 90,667 (Dec. 9, 2016).  On April 10, 2019, the first three positions were vacant, and Krebs was the CISA Director.  Prior to 2018, his position had been called the Under Secretary for National Protection and Programs.  *See* Pub. L. No. 115-278 § 2(a) (Nov. 16, 2018) (renaming the position).

[17] Annex A begins its order of succession with (1) the Deputy Secretary, (2) the Under Secretary for Management, and (3) the Commissioner of Customs and Border Patrol.  McAleenan held the latter position on April 10, 2019.  Boggs Decl., Ex. AD at 4.

plain language [of the Order] . . . controls [and] speaks for itself"); *ILRC*, 2020 WL 5798269, at *8 (agreeing that Delegation 106 "meant what it said" and that DHS had "no basis to ignore its plain language").

Indeed, McAleenan himself confirmed as much when, months later, he revised DHS's succession rules to say that Annex A would henceforth govern vacancies that occur when the Secretary resigns. Boggs Decl., Ex. X at 36-38, DHS Orders of Succession and Delegations of Authorities for Named Positions, DHS Delegation No. 00106, Rev. No. 08.6, § II.A (Nov. 14, 2019) (stating that "[i]n case of the Secretary's . . . resignation," succession would now be "governed by Annex A"); *see also id.* at 71. This change underscored that Annex A did not previously govern vacancies caused by resignation—Executive Order 13753 did, and it precluded McAleenan from serving as Acting Secretary.

DHS cannot disregard its own written rules. "The requirement that agencies are bound by their own rules reflects the broader principle . . . that government officials are bound by the rule of law." *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 48 (D.D.C. 1998). Holding DHS to its vacancy rules is particularly important here, where DHS's many circuitous attempts to install acting officials threaten the "accountab[ility]" that comes from Senate confirmation. *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020); U.S. Const. art. II § 2 cl. 2. Courts have therefore not hesitated to invalidate DHS's acting appointment maneuvers that violate applicable rules. *See, e.g.*, *NWIRP v. USCIS*, No. 19-3283 (RDM), 2020 WL 5995206, at *11 (D.D.C. Oct. 8, 2020); *ILRC*, 2020 WL 5798269, at *7; *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 9 (D.D.C. 2020). As courts have explained, "particularly when so much is at stake . . . the Government should turn square corners in dealing with the people." *Casa de*

*Maryland*, 2020 WL 5500165, at *22 (quoting *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020)).

Because McAleenan had no authority to serve as Acting Secretary, he had no authority to issue the July 2019 Rule. As every other court to address the issue has ruled and DHS has acknowledged in other cases, a rule issued by an illegally acting official is "not in accordance with law" and must be "set aside." 5 U.S.C. § 706(2)(A); *see, e.g.*, *Casa de Maryland*, 2020 WL 5500165, at *21 (agreeing with DHS's concession and enjoining rule); *ILRC*, 2020 WL 5798269, at *19 (enjoining rule); *NWIRP*, 2020 WL 5995206, at *24 (same). In addition, the Federal Vacancies Reform Act ("FVRA") provides that actions taken by an improperly acting official "shall have no force or effect." 5 U.S.C. § 3348(d)(1); *see L.M.-M.*, 442 F. Supp. 3d at 34 (invalidating DHS policy).[18]

### 2. Defendant Wolf Did Not Validly Ratify the July 2019 Rule.

As noted above, the appointments in this case follow a pattern by DHS of elaborate and dubious efforts to install acting officials. The latest such attempt came only weeks ago, when a DHS official attempted to appoint Chad Wolf as Acting Secretary, who then attempted to ratify the July 2019 Rule. As two courts have held, this maneuver failed to validly ratify anything. *See NWIRP*, 2020 WL 5995206, at *17-24; *ILRC*, 2020 WL 5798269, at *9.

On September 10, 2020, after relying exclusively on acting secretaries for more than 500 days, the President nominated Chad Wolf to be DHS Secretary. Boggs Decl., Ex. AE, White House, Two Nominations Sent to the Senate, Sept. 10, 2020. Wolf's nomination made him

---

[18] By acting without statutory authority, McAleenan necessarily also violated the Appointments Clause, which requires all "Officers of the United States" to be confirmed by the Senate unless Congress provides an exception. U.S. Const. art. II § 2, cl. 2. As explained, McAleenan did not act pursuant to any such exception. *See Bullock v. BLM*, 20-cv-00062-BMM, 2020 WL 5746836, *10-11 (D. Mont. Sept. 25, 2020) (explaining that an acting official who serves without statutory authority "would violate both the FVRA and the Appointments Clause of the U.S. Constitution").

ineligible to serve as Acting Secretary under the FVRA.  5 U.S.C. § 3345(1)(B).  Under Executive

Order 13753 and therefore § II(A) of DHS Delegation 106, the next person in line was Peter

Gaynor, the FEMA Administrator.  But Gaynor was never sworn in as Acting DHS Secretary;

DHS never provided notice of his appointment under 5 U.S.C. § 3349(a) or 6 U.S.C. § 113(g)(3);

and he did not purport to take any actions as Acting Secretary except one.  Hours after Wolf was

nominated, Gaynor issued a memorandum claiming to appoint Wolf as Acting Secretary, effective

immediately, using the Secretary's power to designate the "further order of succession."  6 U.S.C.

§ 113(g)(2).  Boggs Decl., Ex. Y, Peter T. Gaynor, Order Designating the Order of Succession for

the Secretary of Homeland Security (Sep. 17, 2020)  Weeks later, Wolf issued a memorandum to

ratify the July 2019 Rule and other policies issued by McAleenan.  Boggs Decl., Ex. AF, DHS,

Ratification of Department Actions, 85 Fed. Reg. 65,653, 65,654 (Oct. 16, 2020).

Wolf's ratification was invalid for at least three reasons.  First, the July 2019 Rule cannot

be ratified even by a validly serving official.  *See* 5 U.S.C. § 3348(d)(2) (certain invalid actions

"may not be ratified").  Second, an acting official like Gaynor cannot change the order of

succession for the head of an agency.  *See NWIRP*, 2020 WL 5995206, at *17-24.  Third, even if

Gaynor could change the order of succession, he could not transfer the role of Acting Secretary

without resigning as FEMA Administrator and thus creating a new vacancy for Acting Secretary.

1. The July 2019 Rule is categorically ineligible for ratification, as the FVRA makes clear.

Actions taken by an illegally acting official "have no force or effect" and "may not be ratified."

*Id*. § 3348(d)(1)-(2).  This rule applies regardless of the mode of appointment:  Ratification is

barred when the official "is not acting under section 3345," which provides the default modes of

appointment, "*or 3347*," which provides for appointment under agency-specific statutes like the

Homeland Security Act ("HSA").  *Id.* § 3348(d)(1) (emphasis added).  The no-ratification rule

thus "applies to McAleenan and Wolf."  *NWIRP*, 2020 WL 5995206, at *15.

The rule bars ratification of any invalid action that is a "function or duty of [the] vacant

office."  5 U.S.C. § 3348(d)(1).  There is no doubt that designating the scope of expedited removal

qualifies as a "function or duty" of the DHS Secretary, because the Secretary has the "sole"

authority to make such a designation.  8 U.S.C. § 1225(b)(1)(A)(iii)(I).  As Judge Moss recently

explained, an official's "functions or duties . . . must include the duties *specifically* assigned by

statute to that office."  *L.M.-M.*, 442 F. Supp. 3d at 32 (emphasis in original).  The July 2019 Rule

thus fell within the Secretary's "functions or duties" and cannot be ratified.

2.  Even if the July 2019 Rule could be ratified by a properly-appointed Acting Secretary,

Wolf was not validly appointed by Gaynor.  To designate Wolf as the next Acting Secretary,

Gaynor had to change the DHS order of succession pursuant to 6 U.S.C. § 113(g)(2).  *See* Boggs

Decl., Ex. Y.  But under that statute, an *acting* official does not have authority to change the order

of succession—only a confirmed Secretary can.  *See NWIRP,* 2020 WL 5995206, at *17-24

(holding that Gaynor lacked authority to change the succession).

The text of the FVRA and HSA makes this clear.  The FVRA provides that "the head of an

Executive department" can only designate an acting official when a statute "expressly" gives them

that power.  5 U.S.C. § 3347(a)(1)(A).  But the HSA does not "expressly" give acting officials

authority to alter the order of succession.  Only "the Secretary"—which the HSA distinguishes

from an "Acting Secretary"—has authority to designate an "order of succession."  6 U.S.C. §

113(g)(1), (2).  Thus, while an acting official can typically perform the duties of the vacant office,

Congress here chose language that denies acting secretaries the authority to name their own

successors.

That decision accords with the purposes of the FVRA and the constitutional norms it safeguards.  "Congress enacted the FVRA, in large part, to reclaim its Appointment Clause power."  *NWIRP*, 2020 WL 5995206, at *19 (quoting *L.M.-M.*, 442 F. Supp. 3d at 29) (cleaned up).  In line with the "Framers' conclusion that widely distributed appointment power subverts democratic government," *Freytag v. Comm'r*, 501 U.S. 868, 885 (1991), the FVRA tightly regulates which officials can appoint acting officials.  *See, e.g.*, 5 U.S.C. § 3347(a)(1) (requiring an "express[]" statement of such authority); *id.* § 3345(a)(2)-(3), (c) (default rule giving authority to "the President (and only the President)").  It would "undermine the structure and purpose of the FVRA" if the appointment power could suddenly be distributed to any one of the thousands of DHS officials who might be named Acting Secretary under 6 U.S.C. § 113(g)(2).  *NWIRP*, 2020 WL 5995206, at *19, 22.  Such an expansion would also raise grave constitutional concerns, because it would extend appointment power far beyond the "few potential recipients of the appointment power specified in the Appointments Clause."  *Id.* at *22 (quoting *Weiss v. United States*, 510 U.S. 163, 196 (1994) (Scalia, J., concurring)).  Thus, Gaynor, as an acting official, had no authority to change the succession and appoint Wolf.  Wolf therefore did not have authority to serve as Acting Secretary and ratify the Rule.

3.  Finally, even if Gaynor could change the order of succession, he could not pass off his role as Acting Secretary without resigning as FEMA Administrator and thus creating a new vacancy in the Acting Secretary role.  The HSA does not provide authority to directly install a new Acting Secretary; it simply authorizes the Secretary to create an "order of succession," 6 U.S.C. § 113(g)(2), which only kicks in once there is a *vacancy*—i.e., once the current Secretary or Acting Secretary leaves office.  This is clear in all the relevant statutes and DHS rules.  *See, e.g., id.* §§ 113(g), (g)(1) (rules for "vacancies" caused by a Secretary's "absence" or "disability"); 5 U.S.C.

§§ 3345(a), (a)(2)-(3) (providing for acting officials to fill a "vacant office" when the previous official "dies, resigns, or is otherwise unable to" serve); Boggs Decl., Ex. X at 3, DHS Delegation No. 00106, Rev. 08.5, §§ I, II.A (DHS succession orders apply "[i]n case of the Secretary's death, resignation, or inability to" serve). Gaynor never resigned as FEMA Administrator or otherwise became unable to serve as Acting Secretary. He therefore never created a new vacancy that would allow a new official to assume the role.

Allowing Gaynor to simply reassign the Acting Secretary role without a new vacancy would upend the HSA regime. The Secretary would lose all control over the "further order of succession," 6 U.S.C. § 113(g)(2), because her chosen successor could immediately reassign the role to anyone else. Each new Acting Secretary could pass off the role whenever they wanted, even if they did not resign and remained able to serve as Acting Secretary. The role could change hands constantly, precluding any continuity in DHS leadership or congressional oversight. That is not the system Congress or DHS has put in place. Because Gaynor never vacated the office of Acting Secretary, he had no authority to transfer the office to Wolf, who in turn had no authority to ratify the July 2019 Rule.

### C. The Rule and Implementation Documents Violate the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1), Which Must Be Read to Require Fundamentally Fair Proceedings.

Neither the Rule nor the Implementation Documents provide adequate procedures to ensure that noncitizens apprehended inside the country, far from the border, and who have resided here for significant periods of time, will receive fair removal determinations. There is ample evidence of the flaws in the existing expedited removal system, which the broad scope of the new Rule and dearth of procedural protections will only aggravate. Consequently, the Rule and Implementation Documents raise serious constitutional problems. *See* Part I.C.1, *infra*.

However, the Court need not resolve the constitutional questions at this stage and should instead invalidate the Rule and its implementation for violating the expedited removal statute itself. For over a century, courts have applied the canon of constitutional avoidance to interpret immigration statutes to provide safeguards to noncitizens facing deportation. *See Yamataya v. Fisher*, 189 U.S. 86, 101 (1903). Consistent with that approach, the expedited removal statute must be read to give noncitizens a procedurally fair opportunity to contest the allegations against them and present countervailing evidence. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (explaining that if one interpretation of statute "would raise a multitude of constitutional problems, the other [interpretation] should prevail"). The Rule and Implementation Documents' utter failure to provide fair procedures render them invalid. *See* Part I.C.2, *infra*.

At this stage, Plaintiffs do not ask the Court to declare what procedures would make the Rule fair. They ask only that the Court find that the expedited removal statute, read to avoid grave constitutional problems, requires far more procedures than the Rule and Implementation Documents provide, and enjoin them for failure to comply with the statute.

### 1. If Not Interpreted to Require Fair Procedures, the Expedited Removal Statute Would Raise Grave Constitutional Concerns.

Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), a court weighs three factors when determining what process is due in a given proceeding: the private interests at stake; the risk of erroneous deprivation and the probable value of additional procedural safeguards; and the government's countervailing interests. *Id.* at 335. The Rule and Implementation Documents target noncitizens who have substantial ties with the country anywhere within the United States. Applying the existing expedited removal process, which is deeply flawed, to these newly designated individuals raises grave constitutional concerns.

### a. The private interests at stake are of the utmost importance.

The Supreme Court has repeatedly observed that deportation imposes grave penalties and implicates a liberty interest protected by the Fifth Amendment. *See*, *e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 164 (1945) (Murphy, J., concurring) ("[D]eportation . . . may result in poverty, persecution, and even death."). Those harms are even greater for those who have built connections and families in this country. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (describing "weighty" possibility of losing "the right to rejoin [one's] immediate family, a right that ranks high among the interests of the individual"); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (deportation "may result . . . in loss of both property and life; or of all that makes life worth living"). The stakes are likewise heightened for noncitizens fleeing persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is . . . all the more replete with danger when the [noncitizen] makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country.").

### b. The risk of error is high.

At two key stages of the process—determining whether the noncitizen is properly subject to expedited removal, and determining whether the noncitizen is qualified for relief from removal—the application of expedited removal in its previous form already carries a high risk of error. That risk, when applied to the expanded group of individuals, creates a constitutionally intolerable removal system.

### i. Errors in determining whether the noncitizen is subject to expedited removal.

Issuance of an expedited removal order under the new Rule and its implementation requires a single low-level officer to make two sets of threshold findings, based only on a cursory interview and records check. The first is that the individual "has not affirmatively shown, to the satisfaction

of an immigration officer," continuous physical presence of at least two years in the United States. The second is a set of determinations under the immigration laws that the noncitizen lacks lawful status and is subject to removal for certain reasons. 8 U.S.C. § 1225(b)(1)(A)(i), (iii)(II); 8 C.F.R. § 235.3(b)(1)(i)-(ii), (b)(5); 84 Fed. Reg. at 35,414. The Rule places the burden on the noncitizen to show that he or she is not inadmissible or subject to removal, and "to show to the satisfaction of an immigration officer that [he or she] has been present in the United States continuously for" two years or more. *Id*. Upon a supervisor's paper review of those findings, the officer "shall" order the individual removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see also* 8 C.F.R. § 235.3(b)(2)(i)-(ii). This system thus permits DHS officers to wrongly presume, without evidence, that *any* individual they arrest is properly subject to expedited removal.

To start, the majority of undocumented immigrants in this country have been living here for longer than two years. *See* Boggs Decl., Ex. AA, Elaine Kamarck & Christine Stenglein, *How many undocumented immigrants are in the United States and who are they?*, Brookings Institution (Nov. 12, 2019) (stating that "two-thirds of undocumented immigrants have been in the U.S. for 10 years or longer," and in 2017 "just 20% of undocumented, adult immigrants had lived in the U.S. for 5 years or less"). Yet proving at least two years of continuous physical presence, while detained, would be challenging for a U.S. citizen or lawful permanent resident, let alone an undocumented person who may lack an identification document with a sufficiently early issue date. For example, young people who came to this country as children may not have proof of physical presence easily accessible. In addition, one Plaintiff has transgender members who recently changed their legal names, meaning that much of their proof of presence may be under a different name. *See* Austin Decl. ¶¶ 16-17; *see also* Valdez-Cox Decl. ¶ 13 (member of Plaintiff

organization fears not having proper documentation on his person at time of ICE arrest).  And even under earlier, more constrained uses of expedited removal, determinations of continuous presence were error-prone.  For example, in 2014, a Mexican citizen who had been living in the United States continuously for 14 years was wrongly subjected to expedited removal after a traffic stop.  *See* American Exile at 63; *see also* Cartwright Decl. ¶¶ 6-8; Delfunt Decl. ¶¶ 7-8 (expedited removal order against individual who had not left United States for three years).  *See also* St. John Decl. ¶ 26; Salazar Decl. ¶ 8.

There are no checks against erroneous continuous presence determinations, except for language in the July 24 Implementation Memorandum permitting the noncitizen "a brief but reasonable opportunity to obtain [evidence of continuous presence] or communicate with a third party to obtain such evidence."  Boggs Decl., Ex. W, July 24 Implementation Memorandum at 3.  This is not enough, especially when expedited removal will apply to a dramatically larger population of noncitizens.  And even if a noncitizen makes a phone call to a third party to obtain evidence of continuous presence, that noncitizen will have no opportunity or aid in presenting that documentation to an immigration officer.  Where the immigration officer decides that the documents provided are insufficient or flawed, the noncitizen has no recourse.  There is no requirement that the officer confront the individual with any contrary evidence, and no opportunity for the individual to supplement, correct, or explain.

In addition, noncitizens should not be subject to expedited removal if they can show they have immigration status or are not subject to removal.  *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii); 8 C.F.R. § 235.3(b)(1)(i)-(ii), (b)(5) (permitting expedited removal only if "the individual has not been admitted or paroled;" if individual is inadmissible under certain specified statutory grounds; and the individual is not a U.S. citizen, lawful permanent resident, or refugee/asylee); *see also* 84

Fed. Reg. at 35,414. These determinations under the immigration laws can be complex and intricate. Unlike those apprehended soon after initial entry, noncitizens who have lived in the United States for substantial periods of time may have already applied for or obtained immigration relief, which could grant them various forms of admission or parole. *See* Declaration of Ira Kurzban ¶¶ 10-23. Individuals may not fully understand their status or that their status precludes their removal. *Id.* ¶ 10. Without an advisal, time to consult with an attorney, and ability to rely on the aid of others, such individuals face the risk of unlawful deportation.

Similarly, the Implementation Documents do not provide adequate protection to those who may have forms of lawful status or U.S. citizenship. Such individuals are entitled to IJ review of such a claim before they are removed. *See* 8 U.S.C. § 1225(b)(1)(C) (addressing special procedures for asylees, LPRs, and U.S. citizens). But there is inadequate time and process to ensure that individuals can raise such claims. Indeed, unrepresented and detained individuals will have difficulty triggering that review, as claims of lawful status can be complex and difficult to articulate. *See* Facts Part C, *supra* (discussing wrongful removals of citizens); *see also United States v. Ochoa-Oregel*, 904 F.3d 682, 685-86 (9th Cir. 2018) (addressing noncitizen subjected to expedited removal, despite claim that he had LPR status).

### ii. Errors in determining whether the noncitizen is qualified for relief from removal.

Even a noncitizen who is otherwise subject to expedited removal may be eligible for various forms of immigration relief. One of the most salient ones is withdrawal of admission. *See* 8 U.S.C. § 1225(a)(4) (providing that a noncitizen seeking admission "may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission").[19]

---

[19] As explained below, noncitizens present without inspection in the United States cannot be subject to expedited removal, in part because they are not making an "application for admission," which is a term of art under the INA.

Withdrawal permits the noncitizen to leave the United States voluntarily, without receiving a removal order and other associated penalties.[20]  *See United States v. Raya-Vaca*, 771 F.3d 1195, 1206 (9th Cir. 2014).  Yet the Implementation Documents do not require that noncitizens be notified of the availability of withdrawal, meaning that most noncitizens subject to the Rule would not know that they can request that relief, much less understand why they might want to do so. *See* Hartzler Decl. ¶¶ 18-19; Jones Decl. ¶ 12; Tolchin Decl. ¶ 7; *see also, e.g.*, *United States v. Ramirez-Diaz*, 359 F. Supp. 3d 994, 999-1000 (D. Or. 2019) (ruling that noncitizen who had lived and worked in United States since young age could plausibly have been granted withdrawal); *United States v. Huazo-Garcia*, No. 2:18-cr-00056-SMJ, 2018 WL 2306890, at \*2, \*4 (E.D. Wash. May 21, 2018) (finding that noncitizen had shown he was potentially eligible for withdrawal).

Moreover, noncitizens arrested in the interior may be eligible for protection from persecution, such as asylum or withholding of removal.  The existing system does not provide for any review of the decision to refer—or not refer—an individual to an asylum officer for a credible fear interview.  Multiple reports—including those by a congressionally-authorized commission—have documented systemic flaws in this phase of the process, with numerous asylum seekers denied credible fear interviews.  *See* 2005 USCIRF Study at 6, 53-55; 2016 USCIRF Study at 2, 18-23.

### iii.    There are insufficient checks to ensure compliance with the limited procedures the government currently affords.

Without sufficient enforcement mechanisms, it is easy for immigration officers to ignore even the small set of safeguards that are provided.  Practitioners report that noncitizens routinely

---

*See* Argument I.F., *infra*.  However, to the extent the Court believes that such noncitizens are making "applications for admission" under the INA, § 1225(a)(4) gives them the opportunity to withdraw any such applications.

[20] For example, a person removed from the United States via expedited removal is permanently inadmissible to the country, absent a discretionary waiver from the government.  *See* 8 U.S.C. § 1182(a)(6)(C).

are not advised of their rights in expedited removal proceedings or are coerced into signing documents. *See* Schneider Decl. ¶¶ 5-7, 9 ("People also regularly tell us they felt coerced into signing paperwork during the expedited removal process, including paperwork in English that they could not understand."); Warden-Hertz Decl. ¶¶ 5, 7 (describing meeting with 150 men detained for at least a month, none of whom had been told they could report fear of return, and meeting with women subject to family separation who signed papers to try to be reunited with their children); *see also* Fluharty Decl. ¶¶ 6, 8; Yang Decl. ¶ 8; Hartzler Decl. ¶¶ 5-6, 10; Jones Decl. ¶ 13; Beckett Decl. ¶ 7. [21]

There are no checks to ensure that noncitizens who require an interpreter are provided one, or that the information recorded by officers accurately reflects the individual's statements. Practitioners report serious interpretation problems arising from this inadequate procedure. *See* Rodriguez Decl. ¶ 7; Hartzler Decl. ¶¶ 7-9; White Decl. ¶ 14; Willis Decl. ¶ 7-8; Warden-Hertz Decl. ¶ 5; Yang Decl. ¶ 9; Fluharty Decl. ¶ 9; Schneider Decl. ¶ 10; Lunn Decl. ¶ 7; *supra* n.11.

Immigration officers consistently fail to give noncitizens an opportunity to review and respond to the statements in the required paperwork. 2016 USCIRF Study at 21-22 (documenting that asylum seekers' statements were not read back to them, and that some were pressured to sign documents); *see also* Hartzler Decl. ¶¶ 5-10; Jones Decl. ¶¶ 13-14; Boggs Decl., Ex. T, *United States v. Sanchez-Figuero*, No. 3:19-cr-00025-MMD-WGC, slip op. at 2, 9  (D. Nev. July 25, 2019) (dismissing unlawful reentry indictment where defendant, who had not slept for 36 hours at the time of apprehension, "was not informed of the charge against him and never received a

---

[21] *See also* Brooks Decl. ¶ 6 ("I have regularly had clients who report that they were pressured into signing paperwork that they did not have time to read or did not understand"); Supp. Yang Decl. ¶ 4 (describing individuals who are made to "sign statements, which they do not understand, which are then used against them during their proceedings"); Fish Decl. ¶ 7 ("I have never once had a case in which I asked my client about a prior expedited removal interview, and had them tell me that they understood at the time it was a deportation/removal proceeding."); *id*. ¶¶ 7-9 (describing clients who regularly did not receive required procedures, were forced to sign paperwork without any explanation, were denied an opportunity to respond to the content of the paperwork).

meaningful opportunity to review the sworn statement").[22]  CBP officers have forced non-English speaking individuals to sign expedited removal forms without providing translations, despite the regulations' requirement that "[i]nterpretative assistance shall be used if necessary . . . ."  8 C.F.R. § 235.3(b)(2)(i).  *See* Hartzler Decl. ¶¶ 7-8; White Decl. ¶ 14; Schneider Decl. ¶ 9; Yang Decl. ¶ 8; *American Exile* at 35-36; Borderland Report at 13 ("Individuals are forced to sign legal documents in English without translation.").[23]

The government's forms regularly reflect factual errors that result in erroneous removal orders.  *See, e.g.*, Jones Decl. ¶¶ 11-14 (expedited removal of 16-year-old survivor of abuse with fear of return to Mexico); Cartwright Decl. ¶¶ 3-8 (entry of expedited removal order against individual who had not left the U.S. for 10 years); *United States v. Mejia-Avila*, No. 2:14-CR-0177-WFN-1, 2016 WL 1423845, at *1 (E.D. Wash. Apr. 5, 2016) (dismissing indictment where defendant was not subject to expedited removal because the record was "clear" that he had lived in the U.S. for more than two years); 2016 USCIRF Study at 2 (describing "continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create"); 2005 USCIRF Study at 74 (explaining that statements recorded by CBP officers "are often inaccurate and are almost always unverifiable"); *id.* at 55 ("Study observations indicate that paper files created by the inspector are not always reliable indicators" of whether a credible fear interview was merited.); *id.* at 53 (noting that forms were routinely inaccurate).[24]

---

[22] *Cf.* Tolchin Decl. ¶¶ 8-14 (describing client subject to expedited removal despite CBP officers' failure to follow regulations governing such orders, including requiring officers and supervisory officers to sign the order and give individual opportunity to sign the order, acknowledging that he had received and understood the order).

[23] *See also* St. John Decl. ¶ 16 (describing Mam-speaking client deported after "she was presented a document in English only and told, in Spanish, to simply 'sign here, here, and here'").

[24] *See also* Salazar Decl. ¶ 8 (individual who had lived in United States for four years deported); St. John Decl. ¶ 26 (individual who had lived in the United States for two years deported); *id.* ¶¶ 16-17 (individuals with fear claims who received inadequate interpretation deported); *id.* ¶ 7-8 (individuals given false information about availability of asylum deported); *id.* ¶ 18 (individual who was processed for expedited removal with her partner and thus was unable to fully

### c.    The probable value of additional safeguards is also high.

Straightforward safeguards would mitigate the risk of error.  "Long before *Mathews*, the Supreme Court recognized the 'immutable' principle that 'where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Hicks v. Comm. of Soc. Sec.*, 909 F.3d 786, 797–98 (6th Cir. 2018) (quoting *Greene v. McElroy*, 360 U.S. 474, 496 (1959)).  Here, the noncitizen should be given meaningful notice of, and an opportunity to rebut, the government's adverse evidence. *See Gray Panthers v. Schweiker*, 652 F.2d 146, 168 (D.C. Cir. 1980) (disapproving use of form letters that reduce claimant "to guessing what evidence can or should be submitted in response"); *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 102 (D.D.C. 2012) ("No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.") (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55 (1993)).  And noncitizens must be guaranteed sufficient time to gather and present all supporting evidence and legal arguments before any expedited removal order can be executed.[25]

A requirement that officers must advise noncitizens of their rights would also prevent erroneous expedited removals.  *See Chandler v. United States Parole Comm'n*, 60 F. Supp. 3d 205, 223–24 (D.D.C. 2014) (due process may require "effective and timely notice" of one's procedural rights at a hearing).

---

explain sexual violence-based fear claim was deported); Corchado Decl. ¶¶ 7-8 (individuals with fear claims who were not referred for CFIs deported); Ediger-Seto Decl. ¶¶ 7-11 (same).

[25] The government recognizes that other kinds of removal orders should not be immediately executed, to give the noncitizen a chance to challenge them.  *Accord* 8 U.S.C. § 1228(b)(3) (automatically staying execution of administrative removal order against noncitizens with aggravated felony convictions for 14 days unless waived by the noncitizen).

Likewise, a requirement that line officers afford noncitizens an opportunity to obtain more thorough review of an individual immigration officer's decision—more than the mere paper review by a supervisor—would enable the correction of many erroneous determinations.  *See Propert v. Dist. of Columbia*, 948 F.2d 1327, 1333-34 (D.C. Cir. 1991) (officer who made initial determination that car was "junk" could not be relied upon to hear rebuttals or countervailing evidence).  The record shows that absent thorough review and the opportunity for a noncitizen to check, contest, and correct the findings underlying an expedited order of removal, officers' decisions are prone to error.

Requiring a more realistic ability to retain and consult counsel would also help noncitizens enforce legal rights provided by statute and regulation, such as, for example, presenting facts at a credible fear interview.  *See Cheung v. INS*, 418 F.2d 460, 464 (D.C. Cir. 1969) (explaining that a "lawyer could be helpful to [a noncitizen] even if deportability seemed clear" by, *inter alia*, "seek[ing] more time for a voluntary departure").

### d. The government's interests do not outweigh the need for minimal procedural safeguards.

Providing such relatively minimal procedural safeguards is not burdensome.  Nor will every noncitizen seek to avail themselves of these protections; those with no colorable defenses or who are plainly eligible for summary removal likely will not want their proceedings prolonged when it will result in detention.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).  Moreover, the government shares Plaintiffs' interest in the effective and fair administration of the immigration laws.  *Cf. Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

To the extent the government claims an immigration "crisis" weighs in its favor, that is contradicted by the evidence. Immigration across the southwest border has been declining for almost two decades. *See* Declaration of Cecilia Menjivar ("Menjivar Decl.") at ¶ 9; Supplemental Declaration of Cecilia Menjivar ("Supp. Menjivar Decl.") at ¶ 3. Furthermore, any increase in current migration to the southern border is largely driven by asylum seekers. Menjivar Decl. ¶ 17 ("The overwhelming majority of women and children crossing the United States' southern border in recent years have been fleeing violence both inside and outside the home in northern Central America."). Aggressive enforcement efforts will not deter current migration patterns of individuals fleeing extreme violence in their home countries. *See id.* ¶ 14 ("Studies of the effect of detention policy have shown that the imposition of harsher conditions on asylum seekers has no deterrent effect on migration."); *see also id.* ¶¶ 15-21; *cf. R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 189 (D.D.C. 2015) (citing lack of empirical evidence that the government's detention policy would further purpose of deterring asylum seekers from coming to United States). Moreover, even if any border "crisis" existed, focusing on *interior* enforcement will not address that situation. As stated above, DHS officers operating along land borders *already* had the authority to place individuals who recently entered the United States into expedited removal.

***

In sum, the *Mathews* factors demonstrate that the expedited removal system's expanded application violates the Due Process Clause. A noncitizen's private interest in avoiding deportation is great; the risk of error is grave; the likelihood that even minimal additional safeguards would mitigate wrongful removals; and the government's interest cannot outweigh these concerns.[26]

---

[26] The government may argue that the Supreme Court's decision in *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020), should be read to deny any due process protection to noncitizens in expedited removal. But *Thuraissigiam* addressed

## 2.  The Expedited Removal Statute Must be Read to Require Fair Procedures.

Although the expansion of expedited removal is unconstitutional, this Court need not rule on constitutional grounds.  Instead, the Court can and should read the expedited removal statute to require procedurally fair determinations, and invalidate the Rule and Implementation Documents for failure to comply with the statute.

Courts have long construed removal statutes to require due process protections, even where the statute does not expressly provide such safeguards.  The very concept of a deportation hearing arose when the Supreme Court read an early immigration statute to require a hearing to avoid serious due process concerns.  *See Yamataya*, 189 U.S. at 100-01.  The statute in *Yamataya* provided that immigration officers should "inspect" certain noncitizens arriving by sea to determine their excludability; that those determinations "shall be final" absent administrative appeal; and that the government could, "within one year after an alien of the excluded class entered the country, . . . cause him to be taken into custody and returned to the country whence he came." *Id.* at 95-96, 99.  The Court rejected a "rigid construction" of those statutes and held that they "do not necessarily exclude opportunity to the immigrant to be heard, when such opportunity is of right."  *Id.* at 100.  "The words here used do not require an interpretation that would invest executive or administrative officers with the absolute, arbitrary power" to deport noncitizens without process.  *Id.* at 101; *see also Wong Yang Sung v. McGrath*, 339 U.S. 33, 49 (1950) ("It was under compulsion of the Constitution that this Court long ago held that an antecedent deportation statute must provide a hearing . . . .");  *Greene*, 360 U.S. at 507 ("Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the

---

a noncitizen who "succeeded in making it 25 yards into U.S. territory before he was caught," and was apprehended "as soon as [he] set foot on U.S. soil." *Id.* at 1982.  In contrast, the noncitizens subjected to the expansion of expedited removal include noncitizens apprehended anywhere in the country, and who have been living in the United States for substantial periods of time. *Thuraissigiam* says nothing about their due process rights.

President intended to afford those affected by the action the traditional safeguards of due process."); *Gonzalez v. Freeman*, 334 F.2d 570, 579 (D.C. Cir. 1964) ("[W]e cannot agree that Congress intended to authorize [the penalty of debarment] without regulations establishing standards and procedures and without notice of changes, hearings, and findings pursuant hereto.").

Consistent with *Yamataya*, courts and immigration agencies have construed other immigration statutes to provide certain unenumerated safeguards when necessary to protect due process. For example, the "fair hearing" provision that applies to regular removal proceedings, 8 U.S.C. § 1229a(b)(4)(B), and its precursors have long been read to require protections such as interpretation at the hearing, *see Matter of Tomas*, 19 I. & N. Dec. 464, 465-66 (BIA 1987), the . "timely production of" adverse evidence, *Bondarenko v. Holder*, 733 F.3d 899, 907 (9th Cir. 2013), and a neutral fact finder, *see Tun v. Gonzales*, 485 F.3d 1014, 1025 (8th Cir. 2007). And in *Marincas v. Lewis*, 92 F.3d 195, 199-200, 203-04 (3d Cir. 1996), the court read into the Refugee Act a requirement that stowaways seeking asylum were entitled to basic procedural safeguards like the right to an interpreter.

This Court should similarly interpret the expedited removal statute to require fair determinations of whether, *inter alia*, the factual criteria for expedited removal are met, that the noncitizen is inadmissible for the specified grounds, and that there is a viable opportunity to express a fear of return. *See* Argument Part 1.C.1.c, *supra* (discussing probable value of additional safeguards). Reading the expedited removal statute to guard against "absolute, arbitrary power," *Yamataya*, 189 U.S. at 101, would avoid an interpretation that would create serious constitutional problems.

The failure to provide reasonable safeguards in the Rule or Implementation Documents renders them fatally defective under the statute, as read to avoid constitutional doubt.

**D.  The Rule and Implementation Documents are Arbitrary and Capricious.**

For related reasons, the Rule and Implementation Documents are arbitrary and capricious in violation of the APA.  *See* 5 U.S.C. § 706(2)(A).  The APA requires agencies to "provide a reasoned explanation for [their] action[s]."  *Judulang v. Holder*, 565 U.S. 42, 45 (2011).  An agency may not "entirely fail[] to address an important aspect of the problem . . . ."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Genuine Parts Co. v. EPA*, 890 F.3d 304, 307 (D.C. Cir. 2018) (invalidating action where agency "entirely failed to consider an important aspect of the problem by failing to address evidence that runs counter to the agency's decision").[27]

The agency must implement expedited removal in a way that ensures its fair application.  Despite voluminous evidence of systemic due process violations in the existing expedited removal process, the Rule and Implementation Documents do not mention these issues, let alone address how the expansion of expedited removal will do anything but intensify the problems.  DHS was undoubtedly aware of these problems, given the numerous investigations and public reports on expedited removal.  *See generally* Facts Part C *supra*; *see also* Boggs Decl., Ex. G, Letter from American Immigration Council and American Civil Liberties Union to Kevin K. McAleenan, DHS Acting Secretary 1 (May 1, 2019) (letter sent to agency by Plaintiffs' counsel specifically requesting that they "address and ameliorate the well-documented problems in its existing implementation of expedited removal" rather than moving forward with an expansion of expedited removal).  The facts in these publicly-available reports are confirmed by the court decisions

---

[27] The Court of Appeals' decision does not address or foreclose Plaintiffs' arbitrary-and-capricious challenge to the procedures implementing expedited removal against the new class of noncitizens designated in the July 2019 Rule. The Court of Appeals held that a court cannot review the exercise of the designation authority under 8 U.S.C. § 1225(b)(1)(A)(iii) for reasonableness under the APA. *See Make the Road II*, 962 F.3d at 618.  Plaintiffs here do not challenge the "designation" of noncitizens for expedited removal as arbitrary and capricious, but instead challenge the procedures implementing the expedited removal system against the newly-designated class.

discussed above, as well as the testimony of numerous legal services providers who have represented noncitizens subject to expedited removal.

As discussed above, the expansion of expedited removal causes *new* logistical and due process concerns, stemming from its application to noncitizens who have been living in the United States for substantial periods of time. Yet the Rule and Implementation Documents fail to account for these concerns or provide the necessary procedural protections; thus, they are arbitrary and capricious in violation of the APA. *See* Facts Part A, *supra*; *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (agencies must "adequately analyze … the consequences" of their actions).

### E. The July 2019 Rule and Implementation Documents Violate the APA and INA, Which Confer the Right to Counsel in Expedited Removal Proceedings.

#### 1. The APA Affords Noncitizens in Expedited Removal Proceedings the Right to Counsel of Their Own Choosing.

An individual considered for expedited removal is compelled to appear before an immigration officer. The APA's counsel provision, 5 U.S.C. § 555(b), provides that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel . . . ." This provision grants any person who is compelled to appear before an agency the right to "counsel of [his] choice." *Sec. and Exch. Comm'n v. Higashi*, 359 F.2d 550, 553 (9th Cir. 1966); *see also Great Lakes Screw Corp. v. Nat'l Labor Relations Bd.*, 409 F.2d 375, 381 (7th Cir. 1969) (stating that "the statutorily provided right to be represented by counsel of one's own choice is fundamental"). Section 555(b) applies broadly to both formal hearings under the APA and other adjudicative proceedings. *See Prof'l Reactor Operator Soc. v. U.S. Nuclear Regulatory Comm'n*, 939 F.2d 1047, 1051 (D.C. Cir. 1991); *see also Roelofs v. Sec'y of Air Force*, 628 F.2d 594, 600 (D.C. Cir. 1980) ("[Section] 555 is not

limited to cases where a specific statutory prescription exists, but applies 'according to the provisions thereof.'") (quoting 5 U.S.C. § 555(a)).

The APA provides that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so *expressly*."  5 U.S.C. § 559 (emphasis added); *see also Prof'l Reactor Operator Soc.*, 939 F.2d at 1052 ("If the right to counsel at investigatory interviews is to expand or contract depending on the mission of the agency, Congress must say so 'expressly.'") (quoting 5 U.S.C. § 559).  Any exemptions from the APA's terms must be clear. *See Lane v. U.S. Dep't of Agric.*, 120 F.3d 106, 110 (8th Cir. 1997) (rejecting argument that APA did not apply to administrative proceedings before Department of Agriculture because "[t]here is no provision in the . . . statutes that it is the sole and exclusive procedure for conducting hearings").

None of the provisions in the expedited removal statute are incompatible with the APA's counsel guarantee, and certainly none can be read to displace any procedural safeguard the APA provides.  Nor does the expedited removal statute contain an express exemption—either general or specific—from the APA.  The APA therefore guarantees noncitizens in expedited removal the right to counsel of their choice.

Comparing the expedited removal statute with the statute governing regular removal proceedings under 8 U.S.C. § 1229a is instructive.  In contrast to expedited removal, Congress specified that the procedures set forth in Section 1229a "shall be the sole and exclusive procedure for determining" removability, "[u]nless otherwise specified in this chapter," 8 U.S.C. § 1229a(a)(3), and included discrete procedural requirements.  8 U.S.C. § 1229a(b)-(c) (containing various provisions on counsel rights, notice, burdens and methods of proof, and credibility determinations).  The Supreme Court relied on this "sole and exclusive" language and the enumerated procedures in Section 1229a to conclude they superseded the APA's requirements.

44

*See Marcello v. Bonds*, 349 U.S. 302, 309 (1955); *Ardestani v. INS*, 502 U.S. 129, 134 (1991) (reading *Marcello* as "rest[ing] in large part on the statute's prescription that the INA 'shall be the *sole* and *exclusive* procedure for determining the deportability of an alien under this section.'" (emphasis in original)). Section 1225(b)(1) contains no such "sole and exclusive language" or specific procedural protections. Congress knew how to displace the APA's protections in the immigration context, and chose to not to do so as to expedited removal.

### 2. The INA Entitles Noncitizens to Counsel of Their Own Choosing in Immigration Judge Reviews of Credible Fear Denials.

The Rule and Implementation Documents also violate the INA's guarantee of a right to counsel in one specific part of the credible fear process—the IJ review of a negative credible fear finding. The INA provides that "[i]n any removal proceedings before an immigration judge . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose." 8 U.S.C. § 1362. IJ review of a negative credible fear finding is part of expedited removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III) (provision of the expedited removal statute allowing for review by an IJ of negative credible fear determinations); 8 C.F.R. § 208.30(g)(2); *see generally* 8 C.F.R. § 1208.30(g)(2). Therefore, the review of a negative credible fear finding is clearly a "removal proceeding before an immigration judge" under 8 U.S.C. § 1362. Consequently, barring counsel from participating in that hearing unlawfully interferes with the noncitizen's statutory right to counsel of their own choosing. *See Leslie v. Att'y Gen.*, 611 F.3d 171, 180 (3d Cir. 2010) (recognizing noncitizen's "right to counsel at removal hearings" as "manifestly a statutory right"); *Castaneda-Delgado v. INS*, 525 F.2d 1295, 1298 (7th Cir. 1975) (recognizing that noncitizens "in deportation proceedings[] ha[ve] the right granted by statute and

regulation to be represented by an attorney . . . at no expense to the Government"). This right also draws support from the APA. *See* Argument Part I.C.1 *supra*.

In violation of this statutory right, IJs can ban attorneys from the courtroom during reviews of negative credible-fear determinations. *See* Boggs Decl., Ex. C, EOIR, Interim Operating Policy and Procedure Memorandum 97-3: Procedures for Credible Fear and Claimed Status Reviews 10 (1997) ("There is no right to representation prior to or during the review, either in the statute or the regulation.") (emphasis omitted); *id.* at 10 n.10 ("[N]othing in the statute, regulations or this OPPM entitles an attorney to make an opening statement, call and question witnesses, cross examine, object to written evidence, or make a closing argument."); *see also* Beckett Decl. ¶ 8 (IJs begin negative credible fear reviews by telling attorney "they can tell [him] to leave their courtroom").

**F.  Expedited Removal Cannot Be Applied to Individuals in the Interior Solely Because They Lack Valid Immigration Documents.**

The expedited removal statute, 8 U.S.C. § 1225(a)(1)(A)(i), only applies to noncitizens who are inadmissible on one of two grounds: 8 U.S.C. § 1182(a)(6)(C), which applies to those seeking to procure immigration status via fraud or who falsely claim U.S. citizenship, and § 1182(a)(7), titled "Documentation Requirements," which applies to noncitizens who, "at the time of application for admission," lack visas or other valid travel documentation. 8 U.S.C. § 1225(a)(1)(A)(i). A noncitizen who cannot be charged under either statute cannot be subject to expedited removal.

The July 2019 Rule and Implementation Documents seek to apply expedited removal based on § 1182(a)(7) (lack of documents) to noncitizens who are present without admission anywhere in the United States, and who have been here for up to two years. But § 1182(a)(7)'s text and context show that it applies only to noncitizens who are inadmissible "at the time of" their

application for admission to the United States, meaning "the moment of applying for *entry* into the country." *Torres v. Barr*, __ F.3d __, 2020 WL 5668478, *6 (9th Cir. 2020) (emphasis added). Section 1182(a)(7) does not apply to individuals who have already entered the country and have been living in the United States for up to two years.  Such individuals cannot be placed in expedited removal based on § 1182(a)(7).

Beginning with the text of § 1182(a)(7), the statute makes inadmissible any noncitizen who, "*at the time* of [his or her] application for admission . . . is not in possession of a . . . valid entry document."  8 U.S.C. § 1182(a)(7)(A)(i) (emphasis added).  By its terms, § 1182(a)(7) applies only to a noncitizen who lacks an entry document at a specific moment: "the time of [his or her] application for admission." *See Torres*, 2020 WL 5668478, at *6.  The context of the provision makes this clear.  Several of the INA's inadmissibility provisions use the phrase "at the time of," each referring to a specific time *when* a noncitizen must meet a certain condition.  *See, e.g.*, 8 U.S.C. § 1182(a)(4)(A) (inadmissible if "at the time of" his application for a visa, admission, or adjustment of status, person "is likely . . . to become a public charge"); *id.* § 1182(a)(5)(A)(i)(I) (inadmissible if noncitizen seeks to work without certification that there were insufficient workers to fill same job "at the time of [the noncitizen]'s application for a visa and admission"); *id.* § 1182(a)(6)(C)(ii)(II) (inadmissible if noncitizen falsely claimed citizenship unless she "reasonably believed at the time of making such representation" that she was citizen).

Section 1182(a)(7) also uses the phrase "at the time of . . . application for admission" in connection with documents typically required to lawfully cross the border, "signal[ing] that the time of application for admission is the time when a noncitizen seeks permission to physically enter United States territory." *Torres*, 2020 WL 5668478, at *6.  The statute lists various types of such entry documents, including "a valid unexpired immigrant visa, reentry permit, border

47

crossing identification card, or other valid entry document," "a valid unexpired passport, or other suitable travel document," 8 U.S.C. § 1182(a)(7)(A)(i)(I),[28] or a "document of identity and nationality if such document is required under the regulations issued [] under section 1181(a)." 8 U.S.C. § 1181(a), in turn, addresses documents typically used to cross lawfully into the United States. "Because all of the documents listed in connection with the phrase 'at the time of application for admission' in § 1182(a)(7)(a)(i) subsections (I) and (II) are of the type needed to lawfully cross into the United States from another country, the most logical reading of that phrase is that it refers to the moment of applying for entry into the country." *Torres*, 2020 WL 5668478, at *6.[29]   Defendants commonly apply § 1182(a)(7) in just this way, as they have since the provision's initial enactment in 1952. *See, e.g.*, *Santana Gonzalez v. Att'y Gen.*, 506 F.3d 274, 275 (3d Cir. 2007) (charged under § 1182(a)(7) with lacking valid entry document at airport).

Thus, § 1182(a)(7) renders inadmissible only those noncitizens who lack the requisite documentation "at the time of . . . application for admission."   Based on the statute's plain language, the en banc Ninth Circuit unanimously held that "inadmissibility [under § 1182(a)(7)] must be measured at the point in time that an immigrant actually submits an application for entry into the United States." *See Torres*, 2020 WL 5668478, at *7.  Two other circuits have similarly held that § 1182(a)(7) does not apply to noncitizens seeking adjustment of status in the United States, because they are "not outside the United States seeking entry." *Ortiz-Bouchet v. U.S. Att'y General*, 714 F.3d 1353, 1355 (11th Cir. 2013) (holding that § 1182(a)(7) did not apply to individuals who were "already in the United States" applying for legal status); *Marques v. Lynch*,

---

[28] The INA defines a "border crossing identification card" as being for the "purpose of crossing over the borders between the United States and foreign contiguous territory." 8 U.S.C. § 1101(a)(6).

[29] This interpretation is consistent with how the INA elsewhere uses the term "application for admission." *See* 8 U.S.C. § 1361 (providing that noncitizen who "makes application for a visa or any other document required for entry, or *makes application for admission, or otherwise attempts to enter the United States*," bears burden of showing admissibility) (emphasis added).

834 F.3d 549, 561 (5th Cir. 2016) (§ 1182(a)(7) "only applies to applicants for admission and not

to immigrants . . . who sought post-entry adjustment of status while already in the United States").[30]

Defendants may contend that a different statute, 8 U.S.C. § 1225(a)(1), "deem[s]" all

noncitizens who enters without inspection "applicant[s] for admission" under the INA, and

therefore subject to removability under § 1182(a)(7).  But as the Ninth Circuit pointed out, "no

case has held that § 1225(b)(1) allows an immigration officer to apply § 1182(a)(7) to noncitizens

who are physically but unlawfully present in the United States," *Torres*, 2020 WL 5668478, at *9

n.13.  Section 1182(a)(7) has existed since 1952 and its text was not substantively altered in 1996.

"Congress would have made it plain if the deeming provision, enacted some four decades later,

altered the longstanding meaning of § 1182(a)(7)."  *Id.*; *see also Matter of Y-N-P-*, 26 I. & N. Dec.

10, 13 (BIA 2012) (holding that status of being "an 'applicant for admission' under [§ 1225(a)(1)]

is distinguishable from "'applying . . . for admission to the United States' within the meaning of 8

U.S.C. § 1182(h)).

Indeed, Defendant's interpretation creates several problems.  First, it makes "wholly

redundant" § 1182(a)(7)'s neighboring statute: § 1182(a)(6)(A), which renders inadmissible a

noncitizen who is physically present in the United States without having been admitted or paroled.

*Torres*, 2020 WL 5668478, at *10.  By definition, a person physically present in the United States

without admission or parole for purposes of § 1182(a)(6)(A) will lack a valid entry document for

purposes of § 1182(a)(7).  *See also TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001) (rejecting

interpretation that "would in practical effect render [statute] entirely superfluous in all but the most

unusual circumstances").  Notably, despite the fact that § 1182(a)(6)(A) is one of the most

---

[30] *Torres* did not decide whether noncitizens present in the country without admission or parole could be subject to expedited removal, but highlighted the lack of authority for such an interpretation.  *See Torres*, 2020 WL 5668478, at *9 n.13.

commonly charged grounds of removability applicable to those without documentation, Congress chose not to include this ground in the expedited removal statute.  Congress's choice is especially salient given that in 1996 it added § 1182(a)(6)(A) to the grounds of inadmissibility as a neighbor to other grounds that it *did* include in the expedited removal statute.  *See also* H.R. Rep. No. 104-828, § 301(c) (Sept. 24, 1996).

Second, Defendants' interpretation would eviscerate protections that Congress created for certain noncitizens who otherwise would be removable for unlawful presence.  For example, certain survivors of domestic violence are exempt from inadmissibility under § 1182(a)(6)(A)(i) under the Violence Against Women's Act.  8 U.S.C § 1182(a)(6)(A)(ii).  But under Defendants' reading, Congress granted such individuals a reprieve from removability, only for Defendants to subject them to removal for lacking documentation.[31]  *See Dep't of Revenue of Oregon v. ACF Indus., Inc.*, 510 U.S. 332, 340 (1994) (refusing to construe statute to "prohibit" what another provision "was designed to allow").

For these reasons, § 1182(a)(7) describes a condition of inadmissibility that can exist only "at the time of . . . application for admission" and therefore cannot apply to a person residing in the United States.  Accordingly, the Rule and Implementation Documents contravene the INA.

## II.    THE REMAINING FACTORS TIP DECIDEDLY IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION.

The new Rule and Implementation Documents make far-reaching changes that will harm Plaintiffs' members and subject hundreds of thousands of individuals in the United States to the

---

[31] Similarly, the Ninth Circuit in *Torres* addressed noncitizens present lawfully in the Commonwealth of the Northern Mariana Islands ("CNMI") until a 2008 statutory change rendered their presence unlawful under the U.S. immigration laws.  To prevent unfairness to CNMI residents already living in the territory, and economic damage via the deportation of numerous guest workers, Congress granted a two-year exemption from 8 U.S.C. § 1182(a)(6)(A) to CNMI residents "lawfully present" as of a certain date.  *See Torres*, 2020 WL 5668478, at *3.  Interpreting § 1182(a)(7) to apply to noncitizens physically present in CNMI territory would render this reprieve "a complete nullity." *Id.*

risk of erroneous removal. The Court has already recognized the immense harm that will result from implementing expedited removal to Plaintiffs' members and immigrant communities. First, any member of Plaintiffs who is a "citizen of the United States, a lawful permanent resident, a refugee, an asylee, or a holder of a valid visa—all of whom have a legal right to remain in the United States—would undeniably experience severe and irremediable harm if they were improperly removed from this country." *Make the Road I*, 405 F. Supp. 3d. at 61. Second, noncitizen members who do fall within the scope of the expansion of expedited removal face irreparable harm: mandatory detention, and the prospect of "abrupt termination of a close, personal relationship" with their families and loved ones. *Id.* at 62. Finally, the use of expedited removal in the interior causes "potentially irreparable secondary effects" to immigrant communities. *Id.* at 63.

The same harms remain present. Plaintiffs' members face the prospect of summary removal pursuant to the flawed and illegal expedited removal procedures. Plaintiff Make the Road has thousands of noncitizen members, many of whom have been subject to enforcement activities by DHS. Declaration of Paige Austin. ("Austin Decl.") ¶¶ 6-10. Make the Road has identified at least three members who could be placed in expedited removal proceedings, because they entered without inspection and have been continuously present in the United States for less than two years. *Id.* ¶¶ 11-14; Second Declaration of Paige Austin ("Second Austin Decl.) ¶¶ 2-7. Make the Road also has other members who have been living in the United States for longer than two years and who could be erroneously subject to expedited removal. Austin Decl. ¶¶ 15-18.

Similarly, Plaintiff LUPE—a membership-based organization located in South Texas— has identified at least two members who have been continuously present less than two years, and could be placed into expedited removal, October 15, 2020 Declaration of Juanita Valdez-Cox

("10/15/20 Valdez Decl.") ¶¶ 11-12, along with members who fear erroneous placement into expedited removal, August 2, 2019 Declaration of Juanita Valdez-Cox ("8/2/19 Valdez Decl.") ¶ 7.

The members of Make the Road and LUPE are routinely subject to various forms of immigration enforcement activities, including workplace raids and checkpoints in communities where immigrant members reside.  *See* Austin Decl. ¶¶ 5-10; 8/2/19 Valdez-Cox Decl. ¶¶ 6-9. Thus, even those members who have a form of legal status or have been continuously present for more than two years are scared of being subject to summary removal because they do not have or know what documents they could use to show their legal status or their continuous presence, and do not know when and how they would be able to access this crucial information if they encounter an immigration officer at work, on the street, or a courthouse.  *See* Austin Decl. ¶¶ 9, 16-17; 8/2/19 Valdez-Cox Decl. ¶¶ 8, 9, 14.

In contrast, the government cannot point to any harm that could outweigh that experienced by Plaintiffs.  There is no emergency that justifies the sweeping change in long-standing immigration law, *see supra* at 40-41, and DHS has long applied expedited removal to individuals who are apprehended at the border, or who have recently entered the country.  There is no logical reason that a delay in application of expedited removal in the interior and to individuals who have not recently entered would affect Defendants' ability to cope with any purported increase in migration at the southern border through existing expedited removal procedures.  But while the policies are in effect, countless people living in the United States with their families could be deported pursuant to a flawed procedure.

Finally, the public interest strongly favors a preliminary injunction.  The public interest is served when administrative agencies comply with their legal obligations, and "the public has a

significant interest in avoiding the erroneous application of a policy that can result in the swift and largely unreviewable deportation, without almost any procedural safeguards, of members of the public that have established strong ties to their communities." *Make the Road I*, 405 F. Supp. 3d at 64.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be granted.

Dated: October 19, 2020

Respectfully submitted,

Trina Realmuto*
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA 02446
(617) 819-4447

Kristin Macleod-Ball*
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
(857) 305-3600

Karolina J. Walters (D.C. Bar No. 1049113)
American Immigration Council
1331 G Street, NW, Suite 200
Washington, D.C. 20005
(202) 507-7520

Jonathan K. Youngwood*
Susannah S. Geltman*
Joshua Polster*
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

Adrienne V. Baxley (D.C. Bar No. 1044750)
Simpson Thacher & Bartlett LLP
900 G Street, N.W.
Washington, D.C. 20001
(202) 636-5822

/s/ Celso Perez
Celso Perez (D.C. Bar No. 1034959)
Anand Balakrishnan*
Michael Tan*
Omar C. Jadwat*
Lee Gelernt*
David Chen**
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Stephen B. Kang*
Spencer Amdur*
Julie Veroff **
American Civil Liberties Union
Foundation, Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union
Foundation of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

*Attorneys for Plaintiffs*

*Admitted pro hac vice*
***Filing pursuant to LCvR 83.2*

54